## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONDA L. DAVIS, et al.,**<br><br>**and**<br><br>**CYNTHIA DUDLEY, et al.**<br><br>              **Plaintiffs,**<br><br>      **v.**<br><br>**DISTRICT OF COLUMBIA, et al.,**<br><br>         **Defendants.** | **Civil Actions 10-1564, 10-1718  (RC)** |

## MEMORANDUM OPINION

In June 2010, the Child and Family Services Agency of the District of Columbia conducted a reduction in force.  The plaintiffs were among those who lost their jobs.  They allege that they were laid off because of their age and race.  The defendants have moved to dismiss the case or, in the alternative, for summary judgment prior to discovery.

## I.  BACKGROUND

In their complaint, the plaintiffs allege that they were employed by the District of Columbia's Child and Family Services Agency ("CFSA" or "the agency") until June 11, 2010, when a reduction in force took effect.  Am. Compl. ¶ 1.  The agency had announced the layoff the previous month, emphasizing that "[t]his action in no way reflects adversely on your performance of your . . . official duties."  *Id.* ¶ 23 (quoting Letter from Roque Gerald, Director, CFSA (May 6, 2010)).  One hundred and ten employees lost their jobs, *id.* ¶ 37, including the forty-five plaintiffs, *id.* ¶¶ 9, 23, who have brought these consolidated actions as the

representatives of the putative class of all employees who were laid off in the reduction in force, *id.* ¶ 1.

Most of the plaintiffs are African-American, as were at least ninety-three percent of the employees who lost their jobs in the reduction in force. *Id.* ¶ 26. The plaintiffs allege that there is a statistically significant difference between the racial composition of the employees who were laid off and those who were retained by the agency. *Id.* ¶¶ 49–50. Many of the plaintiffs had been employed as Social Service Assistants. *Id.* ¶ 27. Those positions, which did not require a college degree, *id.* ¶ 29, were eliminated and replaced by fewer Family Social Worker positions, which required a bachelor's degree in social work or a related field, *id.* ¶¶ 31–32. Other plaintiffs had been employed as Associate Social Workers or Program Monitors before they were laid off. *Id.* ¶¶ 54–55, 76. The complaint implies that a master's degree was required for the former position, and a bachelor's degree for the latter. *Id.* ¶¶ 71–72. It is not clear whether those requirements were pre-existing or imposed at the time of the reduction in force.

The plaintiffs allege that the requirement of a bachelor's or master's degree can have a disparate impact upon African-Americans, who hold such degrees in smaller numbers than members of other racial groups, and that the defendants knew or should have known this fact. *Id.* ¶¶ 42–44. The plaintiffs further allege that, although the two positions were responsible for essentially identical duties, *id.* ¶ 51, several plaintiffs who held bachelor's degrees and had been employed as Social Service Assistants were not retained as Family Social Workers, *id.* ¶ 52.

All but one of the plaintiffs was at least forty years old on the date of the reduction in force, *id.* ¶ 35, as were approximately three-quarters of the employees who lost their jobs, *id.* ¶ 25. (The remaining plaintiff was thirty-six, *id.* ¶ 35; more than nine-tenths of the laid-off

employees were at least thirty-seven, *id.* ¶ 25.)  The plaintiffs allege that the agency hired or promoted many younger, less-experienced employees to fill the new Family Social Worker positions, instead of the older, more-experienced plaintiffs.  *Id.* ¶ 53.

On the plaintiffs' account, the Child and Family Services Agency has offered inaccurate or conflicting explanations of the reduction in force and the imposition of educational requirements.  The plaintiffs allege that, before the reduction was announced, high-ranking agency officials incorrectly claimed that the federal government requires or encourages the imposition of minimum educational requirements on employees who assist or work alongside licensed social workers.  *Id.* ¶¶ 67–68.  They further allege that, several days before the reduction took effect, the Council of the District of Columbia restored some funding to the agency's budget, thereby lessening the need for layoffs.  *Id.* ¶ 69.  If the agency had not hired any new employees from the date that it announced the reduction in force until the end of September 2010, the plaintiffs claim, it could have afforded to retain all of the employees that it laid off.  *Id.* ¶¶ 64, 70.  Instead, it hired many employees who were younger than those it laid off; the plaintiffs allege that the "great majority" of the new hires were thirty-four or younger.  *Id.* ¶ 63.

One plaintiff challenged the reduction in force through the agency's Office of Employee Appeals, arguing that there was no reason for the layoffs.  *Id.* ¶¶ 73–74.  In rejecting her challenge, the agency director offered two explanations.  First, he said, "I . . . made a management decision to effect an agency-wide realignment, which resulted in the Reduction-In-Force of some positions."  *Id.* ¶ 74.  And "[a]dditionally the . . . Agency, like most District of

Columbia Government Agencies, had its agency's . . . budget cut, which added additional pressures to reduce staff . . . ."  *Id.* (ellipses in complaint).

After the reduction in force took effect, the plaintiffs allegedly notified the Mayor and the Attorney General of the District of Columbia of their claims that the District discriminated against them on the basis of age and race in conducting the layoffs.  *Id.* ¶ 77.  At least two plaintiffs filed charges with the Equal Employment Opportunity Commission, alleging race discrimination, and received right to sue letters.  *Id.* ¶¶ 78–80.  The plaintiffs now bring suit against the District of Columbia and its Mayor, alleging age discrimination in violation of the Human Rights Act of the District of Columbia, D.C. Code § 2-1401.01 *et seq.*, and race discrimination in violation of both that Act and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  The defendants have moved to dismiss the suit or, in the alternative, for summary judgment without discovery.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Such motions allege that a plaintiff has not properly stated a claim; they do not test a plaintiff's ultimate likelihood of success on the merits.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint is only required to set forth a short and plain statement of the claim, in order to give the defendant fair notice of the claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

4

A court considering this type of motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It may also consider "any documents either attached to or incorporated in the complaint." *St. Francis Xavier*, 117 F.3d at 624. The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242.

It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002), or to plead law or match facts to every element of a legal theory, *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal citations omitted). Nonetheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

### B.  Motion for Summary Judgment

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact.  *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials").  In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine dispute that is suitable for trial.  *Celotex*, 477 U.S. at 324.

On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III.  ANALYSIS

### A.  The Proper Defendant

The plaintiffs have brought this suit against both the District of Columbia and its Mayor in his official capacity.  A suit against one "amounts to the same thing" as a suit against the other.  *Evangelou v. District of Columbia*, 2012 WL 5383034, at *6 (D.D.C. Nov. 5, 2012); *see also Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals in their official capacity as 'redundant and an inefficient use of judicial resources.'" (quoting *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997))); *Cooke-Seals*, 973 F. Supp. at 187 ("A suit against an individual in her official capacity is one method of bringing suit against the employer and is distinct from an individual capacity suit. Where the suit has been filed against the employer (here the District of Columbia) and one or more employees [in their official capacities], however, the claims against the employees merge with the claim against the employer.").  The court will therefore dismiss the claims against the Mayor in his official capacity "as identical to and therefore duplicative of the claims against the District itself."  *Evangelou*, 2012 WL 5383034, at *6 n.4.

The District construes the amended complaint to name the Child and Family Services Agency as a separate defendant, and moves to dismiss all claims against the agency on the grounds that it is *non sui juris*.  The amended complaint has abandoned all claims against the CFSA and in any event the agency is, as the District argues, not susceptible to suit. *Hunter v.*

*D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 157 (D.D.C. 2010).  The District of

Columbia is the only proper defendant in this case.

### B.  The Sufficiency of the Allegations

The plaintiffs allege age discrimination in violation of the D.C. Human Rights Act; they

also allege race discrimination in violation of both the Human Rights Act[1] and Title VII of the

Civil Rights Act of 1964.  Although the amended complaint could be read to suggest otherwise,

and indeed they have sometimes read it that way, *see* Pls.' Opp. [Dkt. # 26] at 4, the plaintiffs

have made clear that "there is no separate claim under [42 U.S.C.] § 1981 in the . . . Amended

Complaint," Pls.' Resp. to Def.'s Supp. Mem. [Dkt. # 48], 2.  To the extent that there ever was

such a claim, it has therefore been abandoned.

### i.  The Unnamed Plaintiffs

The District first argues that some of the plaintiffs have failed to state a claim for age or

race discrimination because they have not alleged their age or their race.  Indeed, the amended

complaint does not even allege the names of certain plaintiffs.  The amended complaint names

thirteen plaintiffs, each of whom is African-American and the youngest of whom was forty years

old when the reduction in force took effect.  Am. Compl. ¶¶ 10–18, 20.  It also alludes to the

existence of thirty-two other plaintiffs, who were joined before the amended complaint was filed,

*see* Minute Order of December 16, 2010, but neither names them nor specifies their precise age

or their race.  The names of these additional plaintiffs appear in an attachment to their motion for

---

[1]  In their amended complaint, the plaintiffs cite a superseded version of the Human
Rights Act, but that technical failing is not grounds for dismissal.  As the plaintiffs suggest, Pls.'
Opp at 4 n.1, the court construes the references to scattered provisions of D.C Code as a failed
attempt to cite that Act.

joinder, Mot. for Joinder [Dkt. # 9], Ex. 2, which suggests that they challenge "the same kind of age and/or race discriminatory conduct" as the plaintiffs who first brought suit, *id.*, Ex. 1 at 1. Even if these documents are incorporated into the amended complaint by reference, *see* Am. Compl. ¶¶ 21, 40, they do not make clear which of the thirty-two plaintiffs—not all of whom are African-American, *see* Pls.' Opp. at 1—are alleging race discrimination. The amended complaint does suggest that they all allege age discrimination, that all but one plaintiff was at least forty years old when he was laid off, and that the remaining plaintiff was thirty-six. Am. Compl. ¶¶ 35, 65. Because the amended complaint does not specify which of the later-joined plaintiffs allege that they were discriminated against on the basis of their race, those plaintiffs have failed to state a claim on which relief can be granted. All claims of race discrimination brought by plaintiffs not named in the amended complaint will therefore be dismissed. Because this failure could easily be remedied by amending the complaint once more, the dismissal will be without prejudice and with leave to amend granted.

### ii. Race Discrimination

#### a. Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The statute therefore bars "both intentional discrimination and artificial, arbitrary, or unnecessary barriers to equal opportunity." *Segar v. Smith*, 738 F.2d 1249, 1258 (D.C. Cir. 1984). A Title VII plaintiff can prove that he was fired or was not hired "because of" his race either by proving his employer's discriminatory intent, or by showing that the decision resulted from a process that was "fair in form, but discriminatory in operation," *Griggs v. Duke*

*Power Co.*, 401 U.S. 424, 431 (1971).  That is, he can prove discrimination by disparate

treatment or by disparate impact.  *See* 42 U.S.C. § 2000e-2(k) (codifying disparate impact

theory).  As the D.C. Circuit has explained,

> Disparate treatment occurs when '[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.' 'Proof of discriminatory motive is critical' for such claims.  Disparate impact claims, on the other hand, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' 'Proof of discriminatory motive . . . is not required under a disparate-impact theory.'

*Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting *Int'l Brotherhood of*

*Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (citations omitted)).

Even in disparate treatment cases, however, a plaintiff need not present direct evidence of

discriminatory intent.  Instead, the evidence of intent can be circumstantial—and indeed, that

circumstantial evidence can be "entirely statistical in nature."  *Palmer v. Schultz*, 815 F.2d 84, 90

(D.C. Cir. 1987) (citing *Segar*, 738 F.2d at 1278–79).  Although this is equally true in single-

plaintiff cases, *see Davis v. Califano*, 613 F.2d 957, 962–63 (D.C. Cir. 1980), purely statistical

proof of discriminatory intent is a more common feature of disparate treatment cases premised

on "allegations of a 'pattern or practice' of discrimination affecting an entire class of

individuals."[2]  "Pattern or practice" plaintiffs can make a prima facie showing of intentional

---

[2] *Palmer*, 815 F.2d at 90.  Although "[t]he phrase 'pattern or practice' appears only once in Title VII—in a section that authorizes the government to pursue injunctive relief against an employer 'engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by' the statute," *Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135, 147 (2d Cir. 2012) (quoting 42 U.S.C. § 2000e-6), it is commonly used "to refer not to an element of a § 2000e-6 claim, but to the method of proof that the Supreme Court endorsed in [*International Brotherhood of*] *Teamsters* [*v. United States*, 431 U.S. 324 (1977)] for the adjudication of such claims," *Chin*, 685 F.3d at 148, which has been widely applied to private class actions, *see, e.g.*, *Palmer*, 815 F.2d at 90; *Segar*, 738 F.2d at 1265–68.

discrimination by "providing evidence—often in statistical form—of a disparity in the position

of members of the plaintiff class and comparably qualified" members of another class.  *Segar*,

738 F.2d at 1267 (emphasis deleted).  Disparate impact plaintiffs can similarly use statistical

evidence to prove that "observed, nonrandom disparities" in hiring, firing, or other significant

employment decisions "were caused by a 'facially neutral' selection criterion that disadvantaged

[the plaintiff class] more than [another class]."  *Palmer*, 815 F.2d at 114; *see also Aliotta*, 614

F.3d at 565 ("To establish a prima facie disparate impact claim . . . a plaintiff . . . need only offer

statistical evidence of a kind and degree sufficient to show the employment decision

disproportionately impacts" members of the plaintiff's class.).

 Doctrinally speaking, then, the central distinction between a disparate impact case and a

"pattern or practice" disparate treatment case is that only the latter requires proof of

discriminatory intent.  *See Anderson*, 180 F.3d at 338; *Palmer*, 815 F.2d at 115 n.23 ("[A]

disparate treatment claim must prove both a disparity and discriminatory intent—even if proof of

intent is circumstantial and the disparity itself raises an inference of intent.").  But if intent can

be inferred from observed statistical disparities, the more practical distinction is that disparate

impact plaintiffs identify particular employment practices that are allegedly responsible for those

disparities, while "pattern or practice" plaintiffs do not.  *See Palmer*, 815 F.2d at 115 ("Because

appellants have specifically identified the [employment practice], and not the [employer's

discriminatory] intent, as causing the disparity . . . we will treat their claim concerning this

disparity as relying solely on the disparate impact theory.").[3]  Instead, the theory of a "pattern or

---

 [3]  The D.C. Circuit has also suggested that the theories may not be "mutually
inconsistent," that "it may . . . be possible to claim that both discriminatory intent and a facially
neutral, although disadvantageous, selection criterion simultaneously caused a particular

practice" case is that the observed disparities were caused by intentional discrimination.  But an *employer* can respond to that allegation by pointing to a facially neutral employment practice that arguably accounts for the disparities.  When an employer makes that argument, it becomes hard to distinguish a pattern-or-practice case from one based on a theory of disparate impact.  *See Palmer*, 815 F.2d at 114 n.21 ("As this court has previously recognized, a disparate treatment claim can turn into a disparate impact claim if a defendant rebuts an allegation of discriminatory intent by claiming that a facially neutral selection criterion caused a disparity in selections.");  *Segar*, 738 F.2d at 1270 (explaining that "when an employer defends a disparate treatment challenge by claiming that a specific employment practice causes the observed disparity, and this defense sufficiently rebuts the plaintiffs' initial case of disparate treatment" then "[t]he only difference between this situation and the traditional disparate impact case is that in the latter the plaintiff articulates the employment practice causing the adverse impact and forces the employer to defend it, while in the former the employer articulates the employment practice and must then go on to defend it").  In either case, the employer can prevail by showing the business necessity of a facially neutral employment practice that caused the observed disparity.  *Segar*, 738 F.2d at 1270.

The plaintiffs argue that they have adequately alleged race discrimination both by disparate impact and through a "pattern or practice" of intentional discrimination.  Their argument jumbles the theories somewhat.  For example, the plaintiffs say that the reduction in force had an illegally disparate impact because it was not actually the product of budgetary

---

disparity, each contributing to the end result."  *Palmer*, 815 F.2d at 114 n.21.  But the court found that it "need not decide any of these complex questions about partial causality" where an identifiable employment practice accounted for all of the observed statistical disparity.  *Id.*

pressure and so must have been motivated by animus towards African-Americans.  This confuses

disparate impact, which does not require any proof of animus, and intentional discrimination,

which does.  But the District does not make any substantive argument against the adequacy of

the disparate impact allegations, which seem to focus on the criteria for the reduction in force

and the educational requirements for the new Family Social Worker positions.  Instead, the

District argues that both the reduction and the increased requirements were business necessities.

That is an affirmative defense on which the District bears the burden of proof, *see Segar*, 738

F.2d at 1298, and therefore inappropriate on a motion to dismiss unless "the facts that give rise

to the defense are clear from the face of the complaint."  *Smith-Haynie v. District of Columbia*,

155 F.3d 575, 578 (D.C. Cir. 1998).  The plaintiffs' complaint does not allege facts establishing

the business necessity of the challenged employment practices, and so the court will not dismiss

their disparate impact claims.

      The District does, however, argue that the plaintiffs have not adequately alleged

intentional race discrimination.  The plaintiffs respond first that they have made a

straightforward disparate treatment allegation: that racial discrimination and not budgetary

pressure was the real reason that the District conducted layoffs in the first place.  They allege

that several days before the reduction took effect, the Council of the District of Columbia

restored some funding to the budget of the Child and Family Services Agency, thereby lessening

the need for layoffs.  Am. Compl. ¶ 69.  They further allege that if the agency had not hired any

new employees from the date that it announced the reduction in force until the end of September

2010, it could have afforded to retain all of the employees that it laid off.  *Id.* ¶¶ 64, 70.  None of

this amounts to "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  All the plaintiffs have said is that the District faced real budgetary pressures on the date of the reduction in force, but those pressures had lessened somewhat and could have been completely eliminated through a temporary hiring freeze.  To choose a reduction in force over a hiring freeze in response to budgetary pressures does not suggest racial animus.  Nor does the District's alleged failure to cite budgetary pressures in various communications.  *See, e.g.*, Am. Compl. ¶ 60.

The plaintiffs next argue that the District's discriminatory intent can be inferred from its knowing use of employment practices with a disparate racial impact.  They label this a "pattern or practice" claim.  But, as explained above, when plaintiffs ascribe statistical disparities to identifiable and facially neutral employment practices, they state a *disparate impact* claim; it is only when plaintiffs argue that observed disparities were instead caused by intentional discrimination that they articulate a "pattern or practice" claim.  The plaintiffs here point to two facially neutral practices: the reduction in force, *id.* ¶¶ 49–50, and the requirement that Family Social Workers hold bachelor's degrees, *id.* ¶¶ 31–32, 42–44.  At this stage of their argument, the plaintiffs aren't really asserting that racial disparities in hiring and firing were caused by intentional discrimination *rather than* those facially neutral policies, as the usual "pattern or practice" case would have it.  Instead, the plaintiffs now argue that the disparate racial impact of the facially neutral policies was so obviously foreseeable that it must have been intended.  That is, they claim that it is possible to deduce intentional discrimination from evidence of disparate impact.

The plaintiffs' argument would have been pointless when Title VII was first adopted, because nothing turned on whether plaintiffs proved discrimination by disparate impact or

instead established a "pattern or practice" of intentional discrimination—or both.  The same

equitable remedies were available under either theory.  *Taylor v. D.C. Water & Sewer Auth.*, 205

F.R.D. 43, 46–47 (D.D.C. 2002) ("Prior to the passage of the 1991 [amendments to Title VII],

injunctive and declaratory relief were . . . available to litigants who successfully prosecuted

either disparate treatment or disparate impact Title VII claims."); *see also Watson*, 487 U.S. at

987 ("The distinguishing features of the factual issues that typically dominate in disparate impact

cases do not imply that the ultimate legal issue is different than in cases where disparate

treatment analysis is used.").  Once a disparate impact case had been established, it would have

been a waste of time to argue about whether or not a reasonable person should have foreseen that

impact, whether a facially neutral policy could be taken as evidence of discriminatory intent.

When Congress amended Title VII, however, it provided that compensatory (and, in some cases,

punitive) damages would be available to plaintiffs who proved intentional discrimination, but not

to those who proved discrimination by disparate impact.  *See* 42 U.S.C. § 1981a(a)(1), (b).  So it

now matters whether plaintiffs who have proven discrimination by disparate impact have also

proven disparate treatment.  And it may therefore be possible to argue—as the plaintiffs here

have argued—that a particular facially neutral employment practice is so widely known to cause

a disparate impact as to suggest that the employer who used it must have intended that disparate

effect.  The question, then, is whether the plaintiffs have plausibly made such an allegation.

The plaintiffs allege that the District knew or should have known that requiring Family

Social Workers to hold bachelor's degrees would have a disparate impact upon African-

Americans.  Their allegations regarding the reduction in force are somewhat harder to unpack,

since the plaintiffs do not discuss the criteria on which the reduction in force was based, nor

make allegations about its structure.  The court cannot tell what foreseeably discriminatory policy the District allegedly adopted, and a conclusory allegation that the reduction in force was (or contained) such a policy does not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  By contrast, the allegation that the degree requirement had a foreseeably disparate impact unjustified by business necessity is specific enough to permit the court to infer liability on the facts pled.

The court will therefore preserve the plaintiffs' Title VII claims of disparate racial treatment in hiring Family Social Workers, but dismiss the disparate treatment claims based on the reduction in force.

### b.  The District of Columbia Human Rights Act

Like Title VII, the D.C. Human Rights Act makes it "an unlawful discriminatory practice" for an employer "[t]o fail or refuse to hire, or to discharge[ ] any individual" "wholly or partially for a discriminatory reason based upon the actual or perceived[ ] race" of that person. D.C. Code § 2-1402.11(a), (1).  And because "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice," *id.* § 2-1402.68, the Human Rights Act authorizes discrimination claims based on a theory of disparate impact.  *Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc) ("As the legislative history demonstrates, the Council imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)."); *accord Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887–88 (D.C. 2008).

16

The D.C. Court of Appeals "follow[s] cases construing Title VII in interpreting and applying the provisions of the [Human Rights Act] . . . to the extent that the acts use similar words and reflect a similar purpose." *Estenos*, 952 A.2d at 887; *see also Benefits Communication Corp. v. Klieforth*, 642 A.2d 1299, 1301 (D.C. 1994). Neither party suggests that Title VII and the Human Rights Act differ in ways that would affect the pleading standards for the race discrimination claim at issue here, so the court will dismiss only the plaintiffs' disparate treatment claims based on the reduction in force. The disparate impact claims based on both the reduction in force and the educational requirements for Family Social Workers will go forward under the Human Rights Act, as they did under Title VII, as will the disparate treatment claim based on those degree requirements.

### iii.  Exhaustion

The District also argues that the plaintiffs have not adequately alleged the exhaustion of their administrative remedies, by submission of their Title VII claims to the Equal Opportunity Employment Commission and their Human Rights Act claims to the local Office of Employee Appeals.

Although "Title VII '[c]omplainants must timely exhaust the[ir] administrative remedies before bringing their claims to court,'" *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (quoting *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (alteration in original)), "Title VII's exhaustion requirements are not jurisdictional," *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011) (citing *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010)). The failure to timely exhaust administrative remedies "is an affirmative defense, [which] the defendant bears the burden of pleading and proving" in a Title VII case.

*Bowden*, 106 F.3d at 437.  And "there is no categorical answer to the question whether failure to exhaust administrative remedies counts as failure to state a claim for Rule 12(b)(6) purposes." *Thompson v. Drug Enforcement Admin.*, 492 F.3d 428, 438 (D.C. Cir. 2007).  Instead, as mentioned above, the rule is that "an affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint" but not when they are not.  *Smith-Haynie*, 155 F.3d at 578; *accord Jones v. Bock*, 549 U.S. 199, 215 (2007) ("Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract."); *see also Thompson*, 492 F.3d at 438 (commenting that when "failure to exhaust is treated as an affirmative defense and appears nowhere on the face of the complaint, the defense will not be raised on a Rule 12(b)(6) motion").  The District suggests that the plaintiffs bear the burden of plausibly alleging exhaustion, but that is not the law.  *See Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1058 n.3 (D.C. Cir. 1988) (holding that "failure to exhaust administrative remedies is an affirmative defense, and therefore [the plaintiff] was not required to anticipate it in his complaint").  And the District does not argue that the plaintiffs' failure to exhaust is "clear from the face of the complaint."  *Smith-Haynie*, 155 F.3d at 578.  Indeed, read in the light most favorable to the plaintiffs, the amended complaint alleges that at least two plaintiffs—and perhaps others—filed timely charges of race discrimination and received right to sue letters from the EEOC.  *See* Am. Compl. ¶¶ 78–80.  The complaint does not make it clear that any plaintiff failed to exhaust his

administrative remedies before filing a Title VII claim, and so the court will not dismiss those claims.[4]

The District also argues that the Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.01, *et seq.*, requires its employees who are alleging discrimination under District law to seek review from the Office of Employee Appeals before filing suit.  But, as the plaintiffs point out, the CMPA does not apply to allegations of discrimination.  *See Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000) (noting that "an employee seeking relief for discrimination must pursue the remedies provided under the District of Columbia Human Rights Act *rather than the CMPA*" (emphasis added)).  Although the D.C. Human Rights Act formerly required employees of the District government to exhaust their administrative remedies before filing suit, *see, e.g.*, *Williams v. District of Columbia*, 467 A.2d 140, 142 (D.C. 1983), the law has since been amended to remove that requirement, *see* D.C. CODE § 2-1403.03.  The District has offered nothing to support its argument that a different legal framework applies to allegations of discrimination involving a reduction in force.  An employee alleging discriminatory layoffs is still "seeking relief for discrimination," *Robinson*, 748 A.2d at 41, and his claims are therefore governed by the Human Rights Act.

---

[4]  The District has attached two of the EEOC charges to its reply brief, in an apparent attempt to argue that, on the basis of those letters, the District should be granted summary judgment on its failure-to-exhaust defense.  The court will not consider that argument on this motion.  *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) (both refusing to consider arguments first raised in a reply brief).

### C. Pre-Discovery Motion for Summary Judgment

The District makes two other arguments that the court should dispose of the plaintiffs'

claims immediately.  The District argues that a union contract bars the unexhausted claims of

any union member, and that the reduction in force and educational requirements imposed in June

2010 had no disparate impact and were in any case business necessities.[5]  What these arguments

have in common is that, to consider them, the court would be forced to refer to materials outside

of the complaint and therefore to treat a portion of this motion "as one for summary judgment

under Rule 56."  FED. R. CIV. P. 12(d).

"[S]ummary judgment is premature unless all parties have 'had a full opportunity to

conduct discovery.'"  *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)); *accord Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986) (summary judgment appropriate only "after adequate time for

discovery"); *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997)

("[S]ummary judgment ordinarily 'is proper only after the plaintiff has been given adequate time

for discovery.'" (quoting *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C.

Cir. 1988))).  Rule 56(d) therefore provides for the party opposing summary judgment to

"show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to

---

[5]  A third argument—that the plaintiffs have failed to provide notice of their Human
Rights Act claims as required by D.C. Code § 12-309—was also raised for the first time in the
District's reply brief and so will not be considered on this motion.  *See supra* note 4.  Suffice it
to say that, regardless of their compliance with D.C. Code § 12-309, the plaintiffs can still pursue
claims for liquidated damages.  See *Caudle v. District of Columbia*, 2008 WL 3523153, at *2
(D.D.C. Aug. 13, 2008).  This argument therefore seems focused on the available remedies
should the plaintiffs prevail, and so need not be addressed now.  Moreover, compliance with
D.C. Code § 12-309 would have no impact on the plaintiffs' Title VII claims.  *See Brown v.
United States*, 742 F.2d 1498, 1500 (D.C. Cir. 1984).

justify its opposition." FED. R. CIV. P. 56(d).  The plaintiffs have submitted an affidavit in which they allege that, without discovery, they do not have enough data to conduct a disparate impact analysis, nor enough information to know how (if at all) the District attempted to determine whether the reduction in force and imposition of educational requirements were business necessities.  *See* Pl.'s Opp., Ex. 1.  That is enough to prevail on this motion.  *See Convertino*, 684 F.3d at 99 (noting that requests for additional time for discovery pursuant to Rule 56(d) "should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence").

Finally, the District suggests that a union contract bars any unexhausted claims of union members.  The plaintiffs argue that it does no such thing, but do not suggest that it is too soon to consider the issue.  Nonetheless, the court will put the question off until discovery has made clear which plaintiffs (if any) were union members, which plaintiffs (if any) exhausted their administrative remedies before what administrative bodies, and what the scope of any such exhaustion was.  Without that information, the court cannot grant summary judgment to the District any more than it could dismiss the plaintiffs' claims for failure to exhaust.

## IV.  CONCLUSION

For the reasons set out above, the court will dismiss all claims of intentional race discrimination, and also dismiss the claims of race discrimination by disparate impact brought by plaintiffs who are not named in the amended complaint.  The latter dismissal will be without prejudice.  The court will also dismiss all claims against the Mayor.  The remainder of the District's motion to dismiss will be denied, and the court will deny the District's motion for summary judgment and allow adequate time for discovery.

Rudolph Contreras
United States District Judge

Date: February 27, 2013