## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

RONDA L. DAVIS, *et al.*,

    and

CYNTHIA DUDLEY, *et. al.*,

    Plaintiffs,

        v.

DISTRICT OF COLUMBIA, *et. al.*,

    Defendants.
_____

Civil Actions Nos. 10-1564, 10-1718 (RC)

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT[1]

### INTRODUCTION

On June 11, 2010, the District of Columbia's Child and Family Services Agency ("CFSA") fired 115 employees in a purported Reduction-In-Force. (Def. Ex. I, p. 1.) The vast majority of employees fired were non-managerial frontline Social Worker Associates (SWA) and Social Service Associates (SSA), who had for years provided competent services to at-risk children and families in the District. (Def. Ex. B, *Porchia-Usher Declaration* ¶¶ 8, 15, 16.) Ninety-three percent (93%) of the fired employees were African-Americans and nearly seventy-five percent (75%) were age 40 or over. (Def. Ex. I, p. 1.)     Simultaneous to the RIF, CFSA

---

[1] This memorandum of points and authorities in opposition to Defendant's motion for summary judgment is submitted on behalf of all plaintiffs, be they represented by the Howard University School of Law Civil Rights Clinic, or by Counsel Donald Temple.

management created a new position called Family Support Worker ("FSW"). The new FSW position description was virtually identical to the SSA job responsibilities, which the Defendant eliminated in the RIF. (Def. Ex. B, *Porchia-Usher Declaration,* Attachments A&B.) Even though the terminated Plaintiffs had successfully executed their job duties, some for decades, the new FSW position required applicants to hold a Bachelor's Degree. (*Id.* Attachment B.) The overwhelming majority of the terminated employees did not have a Bachelor's Degree and, as such, were automatically excluded from competing for the very positions they'd held competitively for years.

From the time CFSA announced the RIF in 2010 and for nearly three (3) years thereafter, CFSA management claimed that the RIF was justified by District-wide budget cuts. (Def. Ex. E, Attachment A). Using the sort of bureaucratese in which firing people is translated as force reduction, CFSA executives explained that the agency had to "conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering." (Def. Ex. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*, P. 1.) But from all indication, prior, during, and after the RIF, CFSA ignored the bulk of the steps required by law to manage a RIF.[2] . Rather, from all the evidence Defendant has placed on the record, it appears that in order to cut costs the agency simply fired the most vulnerable workers holding little or no managerial power, most of whom African-American and over-40. So, plaintiffs, part of a putative class of fired employees, sued, alleging the RIF had a disparate impact on African-American and over-40 employees in violation of Title VII, 42 U.S.C. § 2000e-2 et seq. and the D.C. Human Rights Act, D.C. Code Ann. §§ 2.1401.01 et seq. (*See* Dkt. 66.)

---

[2] http://dchr.dc.gov/sites/default/files/dc/sites/dchr/publication/attachments/non-competitive_case_file_checklist.pdf

Defendant now moves for summary judgment.  While Defendant makes a number of ancillary claims, its main argument is that the RIF did not have a disparate impact on plaintiffs (African-Americans and employees over age 40) because it amounted to the implementation "of new service models within three specific offices and divisions within the agency." (Def. Mem at 4.)

The fundamental flaw in Defendant's argument is that there is not a single piece of evidence on the record that supports it.  To the contrary, in an administrative challenge to the RIF brought by plaintiff Ernest Hunter, the District of Columbia Office of Employee Appeals (OAE), an administrative adjudicate body with exclusive jurisdiction over RIF planning and implementation, held that "there is no [ ] evidence [ ] to show that the RIF was properly authorized." (Pl. Ex. 15.)  OAE even went to far as to order the RIF invalid and CFSA to "reimburse [Hunter] all back-pay and benefits lost as a result of the RIF action." *Id.*  The few planning documents CFSA produced regarding planning and implementation of the RIF, as well as Declaration submitted by agency executives in the early days of this suit, indicate the agency undertook a neutral cost-cutting move rather than a targeted realignment.  (Def. Ex. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*, P. 1.)  Defendant only began to claim a targeted elimination and realignment of positions nearly four years after the RIF when the statistical expert it retained in the case argued as such, using a Declaration from a CFSA executive signed one day before the expert report. (Def. Ex. E, Raymond Davidson Declaration ¶¶ 4-17; Def. Ex. J, January 8, 2014 Bronars Report ¶¶ 8-9.) There may well be more than one inference to be drawn from the timing of Defendant's targeted realignment claim, but on a motion for summary judgment, in which Defendant is the moving party, the only fair inference

to be drawn from it is that Defendant's expert came up with a theory for the RIF and CFSA reversed-engineered the facts to support the theory.

Below, following a summary of the facts, the procedural history, and the expert evidence, we address each of Defendant's arguments in turn.   But in the final analysis, the motion for summary judgment before the Court comes to this: the central factual question upon which Defendant rests its entire argument is whether the RIF was a targeted elimination and realignment of positions or a neutral agency-wide cost-cutting move.   This question of a legal realignment and RIF presents a highly disputed fact question, which this court, upon this record, cannot decide as a matter of law. As such, Defendant has not met and cannot meet its burden of showing that it is entitled to summary judgment.


## STATEMENT OF FACTS

### A.    CFSA is Charged with Protecting Child Victims, Children at Risk and Assisting their Families

CFSA is a cabinet-level agency within the District of Columbia government charged with four primary functions: to take and investigate reports of known or suspected child abuse and neglect up to age 18; to assist families in overcoming difficulties that endanger their children; to provide safe out-of-home care for children who need to be temporarily removed from their families; and to reestablish permanent homes, children may return home to their parents, live permanently with relatives or others through guardianship, or join a new family permanently through adoption.    ("About CFSA," http://cfsa.dc.gov/page/about-cfsa, last visited: November 19, 2015.)

### B.  The Office of Agency Programs Performs the Primary Functions of CFSA

Prior to the subject RIF, the Agency's organizational chart reflects that CFSA was organized into approximately twelve (12) offices or divisions: Office of the Director, Fiscal Operations, General Counsel, Agency Programs, Community Services, Office for Planning Policy and Program Support, Clinical Practice, Chief Administrative Office, Revenue Operations, Office of Chief of Staff, Public Information, and Accountability. (Pl. Ex. 1.)

The Agency Programs' Office performed much of the Agency's frontline or direct services functions.   At the time of the RIF, headed by Deputy Director Debra Porchia-Usher, the Agency Programs office consisted of five (5) sections: Child Protective Services, In-home and Reunification I, In-home and Reunification II, Out of Home and Permanency, and Office of Youth Empowerment. (Pl. Ex. 1.) Child Protective Services (CPS) in turn was divided into three (3) separate sections: CPS Division I, CPS Division II and CPS Division III.   Notably, each CPS Division included a Social Work Manager (SWM), a number of Supervisory Social Workers (SSW), a number of Social Workers or Social Work Assistants (SWA), and a number of Social Service Assistants (SSA). (*Id.*)

### C. On April 28, 2010, CFSA's Director Cited Budget Cuts as the Basis for an Agency-Wide Reduction in Force of 123 Positions

In a memorandum dated April 29, 2010, to City Administrator Neil Albert, CFSA Director Roque Gerald ("Gerald") requested "approval to conduct a Reduction-in-Force (RIF) to abolish one hundred and twenty-three (123) positions within the Child and Family Services Agency."   (Def. Ex. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*, P. 1.) As justification for the RIF, Director Gerald stated: "The Child and Family Services Agency must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering.  The deficit resulting from the realignment will precipitate a reduction in force." (*Id.*).

5

Nothing in Gerald's April 29, 2010 memorandum indicated that the RIF targeted particular positions or was conducted as a result of individual decisions.  To the contrary, the memorandum provided an "agency-wide" list of positions to be eliminated or consolidated purportedly due to FY'11 budget cuts, which supposedly affected virtually every office in the agency. (*Id.* at 2.)  Specifically, Director Gerald sought to abolish twenty-one (21) positions in the Office of the Deputy Director for Community Programs; Nine (9) positions in the Office of the Deputy Director for Clinical Practice, two (2) positions in the Office of the Deputy Director for Revenue Operations, twelve (12) positions in the Office of the Deputy Director for Planning, Policy, and Program Support, seventy (70) positions in the Office of the Deputy Director for Agency Programs, one (1) position in the Office of General Counsel, one (1) position in the Fiscal Operations Administration, and two (2) positions in the Office of the Chief of Staff in CFSA.  (*Id.* at 4-8.)

By letter dated May 6, 2010, Director Gerald informed 115 CFSA employees that they were being separated from the Agency. (Pl. Ex. 2.)  This particular letter did not provide any reason for the RIF but merely informed affected employees that they "would be separated from District government service effective 06/11/10" and that "[t]his action is in accordance with Chapter 24 of the District's Personnel Regulations and in no way reflects adversely on your performance of your official duties."  (*Id.)*

### D. The 115 Employees Eliminated in the RIF were disproportionally non-managerial, African-American and Over Forty Years of Age.

Of the 115 employees who received RIF notices, 16 held SWA positions, 57 held SSA positions, 105 held non-managerial positions of Grade 12[3] or lower that were covered by the

---

[3] All General Schedule (GS) government employees in the United States earn more than the base rate pay through locality adjustments.  In 2010, a GS-9 pay scale ranged between $51,630-

collective bargaining agreement.   Of the fifty-seven SSA's, fifty-six (98%) were African-American, (Pl. Ex. 3 ¶13), and fifty-five (96%) were forty-years-old or older. (*Id.* ¶26.)   In addition, of the thirteen SWA's, eleven were African-American and two identified as "other than black."   (*Id.* ¶16.)

    The class of Plaintiffs terminated from their SSA positions worked in CPS Divisions I, II, and III, including but not limited to Plaintiff Zacchaeus Ajakaiye in Division I, (Pl. Ex. 15); Plaintiffs Howard Morgan and Shirley Mimms in Division II, (*Id.*); and Plaintiffs Kimberly Brown and Mable Boler in Division III (*Id.*.) Aside from the three CPS divisions, other Plaintiffs terminated from their SSA positions worked in the In-home and Permanency Administration I's three respective divisions, A1, A2, and B1. (*Id.*.) Within Division A1, those employees fired from their SSA and SWA positions included SSA Plaintiff Myrtle Smith and SWA Plaintiff Lara Smart. (*Id.*) In-home and Permanency Administration I's other divisions, A2 and B1, were similarly structured as A1, and also included employees terminated from their SSA positions, such as Plaintiff Omari Francis, who had worked in Division B1. (*Id.*)   The In home and Permanency Administration II, divided in branches C1, C2, D1, and D2, included Plaintiffs terminated from their SSA positions as part of CFSA's RIF. (*Id.*) For example, Plaintiff Carla Johnson had worked as an SSA under Division C1 (*Id.*); Plaintiff Nicky Odaka had worked as an SSA under Division D1 (*Id.*); and Plaintiffs Stephanie Alston and Darryl Stanfield had worked as SSAs under Division D2 (*Id.*)[4]

---

$67,114, while a GS-12 pay scale ranged between $74,872-$97,333.  *See* 2010 General Schedule (GS) Locality Pay Tables, United States Office of Personnel Management, *available at* http://archive.opm.gov/oca/10tables/pdf/DCB.pdf.

[4] The 45 remaining positions eliminated in the RIF included the following: Social Work Program Manager (1); Staff Assistant (2); Supervisory Administrative Review Specialist (1); Supervisory Clinical Support Specialist (1); Supervisory Health Care Specialist (1); Supervisory Program Monitor (2); Supervisory Resource Development Specialist (1); Administrative Review

**E. CFSA Eliminated The SSA Positions and Replaced them with a Position Description that Consisted of the Very Same Job Responsibilities except that the position Had a New Title and a Superfluous Higher Educational Background Requirement**

On the very same day that CFSA sent the RIF Letter to 116 terminated employees, it posted an external job listing for a new GS-9 Family Support Worker ("FSW").  (Pl. Ex. 3.) The previous and new positions involved identical responsibilities except that the new FSW position required a person hired outside of the agency to have a bachelor's degree in social service.  To ensure the non-hiring of certain terminated employees, it also required  any re-hired employee discharged through the RIF  have a bachelor's degree in any field.  (Pl. Ex. 3 ¶18.)

As noted above, the Agency Programs Office performed the primary frontline work of the Agency.  The four (4) divisions within that office -- Child Protective Services, In-home and Reunification I, In-home and Reunification II, Out of Home and Permanency, and Office of Youth Empowerment – followed a similar organizational structure. Generally, each of these divisions was headed by a Social Work Manager (SWM) who oversaw a number of Supervisory Social Workers (SSW).  Those SSWs supervised a number of Social Workers or Social Work Assistants (SWA). Those SWAs were supported by a number of Social Service Assistants (SSA). (Def. Ex. B, *Porchia-Usher Declaration*, ¶8.)

CFSA  Social Worker Associate (SWA) position was described as follows:

- "Performs casework, group work and community organization work under the supervision of a Supervisory Social Worker."

- Provides a wide range of complex support social services for complicated cases."

---

Specialist (4); Care Assessment Specialist (1); Clerical Assistant (7); Clinical Specialist (2); Contract Compliance Officer (1); Health Services Program Liaison (1); Human Resources Specialist (Benefits)(1); Mentor Project Specialist (1); Office Automation Assistant (3); Paralegal Specialist (1); Program Monitor (8); Residential Specialist (1); Resource Development Specialist (4); and Secretary (1). (Def. Ex. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*.)

- "Interviews children, families, neighbors and professional groups to obtain or provide information."

- "Participates in supervisory conferences, individually and with social workers, for the purpose of case planning, sharing information resources and developing specialized resources for clients."

(Def. Ex. B, *Porchia-Usher Declaration*).

CFSA described the SSA position as follows:

- "[P]roviding direct support to social work staff and the social work function."

  "Conducts non-clinical home visits accompanying a Social Worker or a Social Service Assistant, as needed, for reasons of safety . . . ."

- "Provides transportation assistance for clients . . . ."

  "Supports social workers and supervisory social workers by supervising/ facilitating visits, making referrals or scheduling service with providers . . . ."

-

  "Participates in case and supervisory conferences as needed; brings problem issues to the attention of the worker and/or supervisor for discussion in these conferences."

- "Assists the social worker in completing specified paper searches to locate hard-to-find families by searching and clarifying data, checking files, and contacting other agencies."

(*Id.*)

CFSA described the  newly-created FSW position, as follows:

- "Performs casework, group work, and community organization work under the supervision of a Licensed Independent Social Worker . . . ."

- "Accompanies a Social Worker as needed, for reasons of safety or participates in home visits and/or investigations to determine the needs of clients . . . ."

- "Provides transportation assistance for clients . . . ."

- "Support social workers and supervisory social workers in implementing service plans by supervising/facilitating visit . . . ."

- "With guidance, develops plans for and provides appropriate assistance and services on a continuing basis to children and family members."

- Assists the social worker in completing specified paper and record searches to locate hard- to-find families by engaging diligent search services or by searching and clarifying existing data, checking files and contacting other agencies as necessary."

(*Id*.)

In short, the new FSW positions functioned in a similar supportive capacity as the eliminated SSA position.  Specifically, SSA responsibilities included: accompanying the SWA to home visits; documenting information in the case record; supervising visits with children; entering case record information into the FACES computer program; interviewing children and families and making recommendations; and conducting searches for hard-to-find families. (*Id*.)  The external job listing CFSA posted for the FSW position noted that the FSW would, inter alia, "perform[] casework group work and community organization work," "enter[] observational information into FACES as appropriate," and "assist[] Social Workers" in various tasks.  (*Id.*)

While CFSA has repeatedly claimed that the difference between the SSA and FSW is that FSWs are able to perform casework activities and make assessments during home visitations, the record contains a number of facts disputing that claim.  To begin with, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work.  Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that SSAs routinely made home visits and assessments.  However, CFSA did not formally count and enter these visits and assessments in the FACES database. (Pl. Ex. 11 at 21-6.)  As further proof that that the Agency could have created a new position and effectively maintained the same work force, following the RIF at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a

CFSA contractor that provides services for emancipated youths in the District. (Pl. Ex. 14.)  In other words, CFSA contracted FSW functions to an outside vendor, which itself hired Alston to do the very work that Alston had been doing all along prior to the RIF but that now CFSA claimed she needed a Bachelor's Degree to perform. Lastly, CFSA's own supervisors have conceded the similarities between the SSA and FSW positions, specifically stating that the job positions are substantially the same.  In an e-mail dated May 26, 2010 between Jenna BeeBe to CFSA Program Administrator Jesse Winston and Theresa Cunningham Ms. Beebe stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion SSA's were prior to the RIF" based on the roles and responsibilities of the FSW position as defined by CFSA management. (Pl. Ex. 6.)

### F. CFSA failed to rehire the majority of terminated SSA and SWA for the new FSW Position

The external job listing for the FSW position noted that there were 35 vacancies, that there was no closing date, and that the "First Screening Date" would be May 17, 2010. (Pl. Ex. 4.)  On or near June 9, 2010, some 18 of the 115 employees who had received RIF notices accepted offers of employment in the newly created FSW positions.  Defendant filled an additional 20 slots under the FSW job title prior to the October 2010 start of FY 2011.  Director Gerald sent a follow-up email on June 7, 2010, explaining that "[t]he first of our new Family Support Workers (FSWs) came on board today," and that all 17 of the new hires "are former CFSA employees we're rehiring after the reduction in force last month."  (Pl. Ex. 5.)  Director Gerald also stated that:

> Since we want to hire 35 FSWs in all, we're about half way there. The plan is to have the majority on board within the next 30 days. Human Resources is prepared to make offers to an additional group shortly. *All those candidates are from outside CFSA.*

*Id.* (emphasis added).

Zacchaeus Ajakaiye was the only plaintiff among the re-hired employees selected for the FSW position.

## PROCEDURAL HISTORY

On July 16, 2010,[5] Plaintiff Zacchaeus Ajakaiye ("Ajakaiye") filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") and received a Right-to-Sue Letter on February 18, 2011. (Def. Exhs. M, O.)  On or about September 8, 2010, Plaintiff Darrius Morris ("Morris") filed a charge with the EEOC captioned "Class Action Charge" and stating:

> I was injured by D.C. Child & Family Services by its conduct in May and June by being selected for discharge and being discharged from its employment.  I was further injured by the Agency's decision not to rehire me for the FSW position…..*All the 60 or so Social Service Assistants are African-American (black) as the Agency knew…CFSA harmed me and the other former SSAs without business need and without any job related reason.*

(Emphasis added). (Def. Ex. P.)  Mr. Morris received a Right-to-Sue Letter on March 14, 2011. (Def. Ex. N.)

On August 30, 2010, Plaintiffs' prior counsel, David Rose ("Rose"), requested in writing that the EEOC amend Plaintiff Ajakaiye's July 16, 2010 charge "as a Class Action Charge." (Pl. Ex. 7.)  In the same letter, Rose also notified the EEOC that Mr. Ajakaiye's amended class action charge should be joined with that of nineteen other charges that had been filed with the EEOC on August 20, 2011.  Mr. Rose wrote: "We sent your office a letter dated August 20, 2010, with at least 19 other charges by Social Service Assistants, Grade 8, al of whom are African Americans." (*Id.*)  On September 17, 2010, Mr. Rose submitted a letter to the EEOC,

---

[5] Mr. Ajakaiye later amended his EEOC charge on August 6, 2010. (Def. Ex. O.)

stating: "Enclosed are the three most recent Charges of Discrimination in this case from former

CDFA SSAs Shirley Mims, Darius Morris, and Edward Randolph.  Please process these as you

did the earlier batch sent at the end of August." (Pl. Ex. 8.) On October 1, 2010, prior counsel

again wrote to the EEOC as follows:

> This Firm represents nine former employees of the Child and Family Services
> Agency including Zacchaeus T. Ajakaiye, 9505 Carol Street, Upper Marlboro,
> MD. His charge was originally filed in late July. He signed the charge on July 16,
> 2010. We believe that his charge was docketed as No. 570-20010-1573,  and was
> amended by an Amended Charge which was described as a Class Action charge,
> which we sent to your office by letter of August 20, 2010.
>
> In addition, please issue right to sue letters to eight other clients:
>
> Stephanie R. Alston, 5307 Chillim Pl., NE, Washington, D.C.  20011-2620;
> Kimberly D. Brown, 8830 Hardesty Dr., Clinton, MD 20735;
> Ronda L. Davis, 305 Round Table Dr.,   Ft. Washington MD, 20744;
> Stephany M. Kagha, 3046 Childress Ter., Clinton, MD 20866;
> Donna Yvette Lee, 1847 L. St., NE, Washington, DC 20002-3023;
> Ceciel W. Moore, 12519 Gladys Retreat Cir., Bowie, MD 20702;
> Darius Morris, 2020 Karin Blvd., Capitol Heights, Md. 20743; and
> Janice S. Washington, 13307 Harrogate Way, Upper Marlboro, MD 20772
>
> Please send the letters to us at this address, or directly to the above-listed clients,
> with a copy to this Firm. If you or your staff have any problems with this request,
> I would be happy to provide as much information as I can by telephone or e-mail.

(Pl. Ex. 9.)[6]

On September 16, 2010, Plaintiffs in *Davis, et al. v. District of Columbia, et al.,* Case

No. 10-1718, filed their putative class action Complaint in this Court alleging violations of 42

U.S.C. § 1981, the District of Columbia Human Rights Act ("DCHRA"), and 29 C.F.R.

---

[6] As part of the process of resolving then-unresolved Motions for Sanctions, undersigned counsel
requested the EEOC provide copies of charges of discrimination it received from named
plaintiffs and accompanying right-to-sue letters.  Counsel also informed the EEOC of prior
counsel's August 30, 2010 Letter, indicating that charges for at least nineteen additional
plaintiffs had ben submitted to the EEOC on August 20, 2010. EEOC staff confirmed charges
and right-to-sue letters for Plaintiffs Ajakaiye and Morris, but informed undersigned counsel
that, in the absence of Charge Numbers for the additional nineteen plaintiffs, EEOC offices lack
the capacity to conduct a thorough search of its records based solely on plaintiffs' names.

1602.32.  (*See* Dkt. 1.)  Plaintiffs in *Dudley, et al. v. District of Columbia*, Case No. 10-1718, filed their Complaint on October 8, 2010.  Both cases alleged that defendant, CFSA, discriminated against plaintiffs—on the basis of age and race—in conducting a Reduction in Force ("RIF") and then imposing a new higher education degree requirement for a new position created as part of the RIF.  In response to a motion from the *Dudley* Plaintiffs, the two cases were consolidated.[7]  Plaintiffs' filed a Second Amended Complaint on or about March 22, 2013, incorporating class allegations, (*See* Dkt. 58), and a Third Amended Complaint on May 31, 2013.  (*See* Dkt. 66.)

Plaintiffs filed an initial Motion for Class Certification on January 14, 2011. (*See* Dkt. 12.)  Because in the interim Plaintiffs had filed an amended complaint, the Court denied the Motion without prejudice as moot.  Plaintiffs' filed a renewed Motion for Class Certification on February 14, 2014. (*See* Dkt. 81.)  The Court denied that renewed motion without prejudice as premature.  (*See* Minute Order of Feb. 21, 2014.) Following discovery, and pursuant to the parties' Sept. 8, 2015 Status Conference, on November 9, 2015, Plaintiffs filed a renewed Motion for Class Certification now pending before the Court.

In their complaints, plaintiffs originally based their claims for relief on four separate theories: two grounded on disparate treatment and two grounded in disparate impact.  With respect to the disparate treatment theories, plaintiffs argued first that defendant conducted the RIF in a manner that intentionally discriminated against plaintiffs on the basis of race and age, and second that defendant imposed a new higher education degree requirement for the FSW position in a manner that intentionally discriminated against plaintiffs on account of race and age.  With respect to the disparate impact theories, plaintiffs argued first that defendant

---

[7] The Dudley case was administratively closed on March 24, 2014.

conducted the RIF in a manner that had a disparate impact upon plaintiffs on account of race and age, and second that defendant imposed a new higher education degree requirement for the FSW position in a manner that had a disparate impact upon plaintiffs on account of race and age.  On February 27, 2013, in response to defendant's motion to dismiss the complaint, or in the alternative, for summary judgment, the Court dismissed plaintiffs' disparate treatment theory regarding the manner of the RIF, and upheld the disparate treatment theory regarding the FSW degree requirement, as well as the two disparate impact theories regarding the RIF and the degree requirement. Specifically, in its Memorandum and Order, the Court noted, "The disparate impact claims based on both the reduction in force and the educational requirements for Family Social Workers will go forward under the Human Rights Act, as they did under Title VII, as will the disparate treatment claim based on those degree requirements."

## EXPERT REPORTS AND ANALYSES

In the course of discovery, Plaintiffs retained Doctor Paige Munro as an expert. Dr. Munro holds a Ph.D. in Industrial and Organizational Psychology and has extensive expertise and experience in complex data mining and statistical analysis. (Def. Ex. H.)  Defendant in turn retained Doctor Stephen Bronars.  Dr. Bronars holds a Ph.D. in economics and, as of the date of his reports, was an adjunct professor at Georgetown University in Washington, D.C.  (Def. Ex. J.)

Each expert produced two reports: Dr. Munro drafted an initial report dated July 8, 2012 (Def. Ex. I); Dr. Bronars drafted a report in response dated January 8, 2014[8] (Def. Ex. J); Dr.

---

[8] Dr. Bronars dated his signed report January 8, 2013.  This is a typographical error.  The actual date of the report is January 8, 2014.  Dr. Bronars appears to admit as much in a later report dated July 28, 2014.  While Dr. Bronars' admission is ambiguously worded, this much is clear: in his report, Dr. Bronars cites to and relies upon a declaration by Raymond Davidson, who was CFSA's Chief Administrative Officer at the time of the RIF.  The Davidson Declaration is signed

Munroe produced a rebuttal to the January 2014 Bronars response dated May 7, 2014 (Def. Ex. K); Dr. Bronars drafted a response to the Munro May 2014 rebuttal dated July 28, 2014.  (Def. Ex. L.)  Needless to say the experts reached different conclusions on the question of whether the RIF and FSW Bachelor's Degree requirement had a disparate impact on African-Americans and employees over 40.  However, key to their conflicting analyses is the disputed factual question whether the RIF was agency-wide or targeted specifically to certain isolated departments.

A.       The July 2012 Munro Initial Report

Dr. Munro based her initial July 2012 report on data provided by Defendant in the Declaration of Stan Spaght, CFSA's Human Resources Manager for Compensation/Benefits. According to the Spaght Declaration, prior to the RIF CFSA had a total workforce of 832. (Pl. Ex. 10.) The RIF terminated 115 employees, leaving 717 CFSA workers. According to that same Declaration, prior to the RIF African-Americans comprised 82.8% of the total workforce, while individuals age 40 and older comprised 62.7%. Lastly, the Declaration stated that of the 115 workers terminated in the RIF, 93% were African-American, and 74.8% were workers 40 or over. (*Id.*).

Using these percentages, Dr. Munro made the following calculations: of the 832 workers prior to the RIF, 82.8% African-Americans equated to (rounding to the nearest full number) 689 employees, and 143 were races "other" than African-American (Def. Ex. I); 62.7% workers who were 40 or over prior to the RIF equated to 522 (rounding to the nearest full number), and 310 workers were under 40 (*Id.*); of the 115 RIF-terminated employees, 93% equated to 107 African-Americans, with 8 of all "other" races terminated during this same RIF (*Id.*); 74.8%

---

and dated January 7, 2014, only one day prior to Dr. Bronars, report.  It does not seem possible that Dr. Bronars would have produced a report based on a Declaration that had not yet been drafted at the time of the report.

equated to 86 workers who were 40 or over and terminated during the RIF, with 29 terminated workers who were under 40. (*Id*.)

Dr. Munro then coded the above numbers into a database to represent variables. The variables were entered into a computer program called Statistical Package for the Social Sciences (SPSS)[9] to determine whether the termination rate of African-Americans and over-40 employees differed in a statistically significant way from the termination rates of non-African-Americans and uner-40 employees. (*Id*.) The analysis showed that the termination rate for African-Americans was 15.5% of that total group, whereas the termination rate for non-African-Americans was only 5.6%. With respect to the over-40 group, the analysis showed that its termination rate was 16.5%, whereas that of the under-40 group was only 9.4%. (*Id*.)

According to EEOC Regulations Four-Fifths Rule, for purposes of Title VII disparate impact analysis, a statistically significant disparity is one in which the minority termination rate is greater than 125% of the majority termination rate.[10] Therefore, the analysis showed that African-Americans had been terminated in the RIF at a rate 277% greater than that of non-African-Americans, and that over-40 employees had been terminated at a rate 176% of the termination rate of under-40 employees. In other words, the RIF had violated the 4/5ths rule for both African-Americans and over-40 employees. (*Id*.)

**B.    The January 2014 Bronars Response**

In his January 2014 response, Dr. Bronars did not actually disagree with Dr. Munro's math. Rather, Dr. Bronars first maintained that the total number of employees at CFSA was 802 and not 832. (Def. Ex. J.) The discrepancy was explained by a Declaration from Dexter Starkes,

---

[9] SPSS is a widely-used software for statistical analysis in social science. *See* George Argyrous, Statistics for Research: With a Guide to SPSS (2011)

[10] Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11998 (Mar. 2, 1979).

CFSA Director of Human Resource.  According to the Starkes Declaration, 30 employees in CDFSA office of Fiscal Operations Administration (FOA) should not have been included in the head count of the Agency because at the time of the RIF they reported to the Office of the Chief Financial Officer and, as such were "not technically CFSA employees." (Def. Ex. C. ¶ 7.)

But more significantly, unlike Dr. Munro, who had based her analysis on the fact that the RIF was agency-wide, Dr. Bronars began with the radically different factual assumption that not all employees in all positions and all divisions faced the same risk of a layoff due to the RIF. (Def. Ex. J)  In plain language, Dr. Bronars looked at each division within CFSA independently and determined that employees in divisions and in positions that had suffered greater losses in the RIF must have been at a greater risk of being terminated than those working in divisions with fewer or no loss.

In support of his variable risk hypothesis, Dr. Bronars relied on a Declaration by Raymond Davidson, CFSA's Chief Administrative Officer at the time of the RIF.  The Davidson Declaration was dated January 7, 2014, the day before Dr. Bronars signed his report on January 8, 2014 and stated for the first time, nearly four years after the RIF, that "CFSA did not utilize a single uniform criteria, test or requirement for determining which employees would be separated from the Agency in the RIF.  Rather, the determination as to which positions would be included in the RIF was the result of multiple decisions made by the Director…" (Def. Ex E ¶ 4.)

Using the Davidson Declaration, Dr. Bronars then "assume[d] that there are 7  different sets of layoff decisions made by CFSA during the RIF" corresponding to the 7 positions/divisions that suffered layoffs. (Def. Ex. J, ¶21.) Based upon that assumption, Dr. Bronars performed a two-standard deviation analysis, according to which there is statistical evidence of discrimination only if the difference between the actual outcomes of the termination

process and the outcomes that would have been expected from a random neutral process is so large that it would have occurred 5% of the time, or less, given a neutral process. (Def. Ex. J, ¶19.)  The results of Dr. Bronars' analysis claimed that while 107 African American employees were laid off during the RIF, had employees of each of the seven position and division groups been selected in a race-neutral manner, 105.21 African American employees would have been terminated during the RIF. This difference is equivalent to a difference of 1.09 standard deviations and therefore statistically insignificant. (Def. Ex. J, ¶22.)  Similarly, in determining whether employees age 40 and over were more likely to be laid off than employees under age 40, the results of Dr. Bronars' analysis concludes that a difference of 81 employees terminated versus 79 is 0.93 which is statistically insignificant.  (Def. Ex. J, ¶23.)

With regard to rehiring for the FSW positions, Bronars asserted that Dr. Munro erroneously assumes that all 115 individuals who were initially terminated during the RIF were equally qualified and equally interested in an FSW positions. Bronars also states that there is no possibility of racial disparity in rehiring for the FSW position because 18 of the former CFSA employees that were rehired were African Americans. In the rehiring process 11 of the former CFSA employees re-hired into the FSW position were under age 40 and 7 were age 40 and above. The difference between 7 and 9 re-hired employees is equivalent to a difference of 1.58 standard deviations and is therefore statistically insignificant.

### C.    The May 2014 Munro Rebuttal

In her May 2014 rebuttal report, Dr. Munro re-ran her analysis using the new employee numbers provided in Dr. Bronars' Report.  With respect to race, she concluded "the defense-provided database showed that when African-Americans are compared to only whites, the termination rate of African Americans was 444% the rate of Caucasians, which is much, much

more notable." (Def. Ex. K. at 3.) With respect to age, she concluded, "based on the defense's database, those 40 and over were terminated at 179% the rate of those under 40." (*Id.* at 4.)

Dr. Munro also identified two flaws in Dr. Bronars Report. The first flaw is that Dr. Bronars made the factual assumption that certain divisions and positions were targeted in the RIF – a crucial assumption backed by nothing more than the declaration of Mr. Davidson, signed the day before the Bronars report, and backed by no other evidence in the record. (*Id.* at 6.)

But more significantly, Dr. Munro identified two crucial methodological problems in Dr. Bronars' January 2014 report.  First, every statistical analysis must begin with a sample population; the larger the population the more interpretable the analysis and the more reliable the conclusion; the smaller the sample, the less interpretable the analysis and the less reliable the conclusion.  In fact, too small a sample leads to meaningless conclusions.  By slicing and dicing his analysis in terms of 7 different positions/divisions, Dr, Bronars all but guaranteed that his samples would be so small as to be meaningless.  For example, Dr. Munroe pointed out that the Bronars sample for the SWA position was as small as 13. (*Id.* at 12.)

Second, by reducing his sample sizes, Dr. Bronars created categories that were homogeneous.  That is to say, by insisting that the terminated SSAs could only be compared to the SSA sample population, rather than the entire agency population, Dr. Bronars ended up with homogenous categories in which both the sample and the targeted population were nearly 100% African-American.  The problem, as Dr. Munro pointed out is that " no statistical analysis can be used to determine group differences when he group is 100% homogenous." (*Id.* at 15.)

Lastly, even taking the Bronars at face value that only specific positions were at risk during the RIF, Dr. Munro pointed out that "the targeted positions and divisions were disproportionally occupied by African Americans and those over 40.  Such finding not only ass

additional support to my original conclusion that he RIF had an adverse impact, but also further

rebuts r. Bronars' chosen analysis methods and findings."  (Def. Ex. K at 16.)  Specifically, Dr

Munro showed that the allegedly targeted positions were over-represented in terms of African-

Americans and those over 40 as follows: Whereas the Agency-wide average for African-

Americans was 80% and those over 40 was 62%, for the SSA position it was 98.2% African-

American and 75.4% over 40; for the SWA position, it was 84.6%, and 46.2% respectively; for

the Clinical and Health Services Administration, it was 100% and 69.2%; for the Administrative

Review Division, it was 71.4% and 93.3 %; for the Congregate Care and Home Contract

Management Division, it was 90% and 80%; and for the Clerical Assistant Position, it was 100%

and 72.5%.

### D.      Defendant's Rebuttal Report

In his rebuttal to Dr. Munro's rebuttal, Dr. Bronars did not offer any new analysis.

Instead, he reiterated his basic assumption that the RIF was not an agency wide cost-cutting

decision but a targeted realignment and consolidation of positions. (Def. Ex. L.)


### LEGAL STANDARDS

Summary judgment is not appropriate under Rule 56 of the Federal Rules of Civil

Procedure unless the pleadings and the evidence demonstrate that "there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Holcomb v. Powell*,

433 F.3d 889, 895 (D.C. Cir. 2006 "An issue is 'genuine' if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Id.* (citing *Anderson*, 477 U.S.

248). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing

law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Id*. (citing *Anderson*, 477 U.S. at 248). To be sure, the non-moving party must offer more than the "mere existence of a scintilla of evidence" in support of its position in order to avoid summary judgment. *Anderson*, 477 U.S. at 252. However, when there does exist in the record "evidence on which the jury could reasonably find for the [non-moving party]," *Celotex* 477 U.S. at 252, the moving party does not get the benefit of the doubt. Thus, in ruling on summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor; the Court must also not make credibility determinations or weigh the evidence. *Holcomb*, 433 F.3d at 895 (citing *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150 (2000).

Under both Title VII of the United States Civil Rights Act of 1964 ("Title VII") and the District of Columbia Human Rights Act ("DCHRA"), employers may not discriminate with regard to the terms and conditions of employment based on an employee's protected traits, e.g. race or national origin. 42 U.S.C. § 2000e-2(a); D.C Code § 2-1042.11(a)(1). The "effects clause" of the District of Columbia Human Rights Act ("DCHRA") prohibits "any practice which has the effect or consequence of violating any of the provisions of this chapter." D.C. Code § 2-1402.68. The D.C. Court of Appeals has ruled that:

> [U]nder the 'Effects Clause' of the DCHRA, D.C. Code Sec. 2-1420.69, 'despite the absence of any intent to discriminate, practices are unlawful if they bear disproportionately practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason.'

*Estenos v. PAHO/WHO Fed. Credit Union,* 952 A.2d 878, 887 (D.C. 2008) (citing

*Gay Rights Coalition v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987)).

When analyzing cases under DCHRA, the District of Columbia customarily looks to federal anti-discrimination jurisprudence—specifically cases interpreting Title VII—for guidance. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n.17 (D.C. 1993). Under both DCHRA and Title VII, when no direct evidence of discrimination exists, a burden-shifting framework is utilized to evaluate the plaintiff's claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973) (referring to this principle as the *McDonell Douglass* burden shifting framework). First, the plaintiff must establish a prima facie case by a preponderance of the evidence. *Id*. at 792. Then, the burden of production shifts to the employer to rebut this by providing articulating some legitimate, nondiscriminatory reason for the employee's rejection. *Id.*. The employee may prevail only if he or she can show that the employer's response is merely a pretext for behavior that was actually motivated by discrimination. *Id*.

## ARGUMENT

### I

### JUDICIAL ESTOPPEL DOES NOT BAR PLAINTIFFS AJAKAIJE'S AND ALTSON'S CLAIMS BECAUSE DEFENDANT HAS PRESENTED NO EVIDENCE THAT THE TWO PLAINTIFFS' INADVERTENT AND INNOCENT FAILURE TO DISCLOSE THE PRESENT ACTION IN BANKRUPTCY PROCEEDINGS THEY BEGAN PRIOR TO EVEN EEOC FILINGS SHOWS ANY KNOWLEDGE OF THE YET-TO-BE-FILED TITLE VII CLAIM, OR THAT PLAINTIFFS HAD ANY MOTIVE FOR CONCEALMENT

Plaintiffs Ajakaiye and Alston respectively filed bankruptcy claims on July 2, 2010 and May 21, 2010. The very first complaint in the present action was not filed until September 16, 2010, a full four (4) months after Alston's bankruptcy filing and over two (2) months after Ajakaiye's filing. At the time Mr. Akakaiye filed for bankruptcy, he had not yet filed a charge with the EEOC. Yet, Defendant now insists that both of these plaintiffs' claims should be

barred by judicial estoppel because they supposedly "became aware of the facts underlying this lawsuit on May 6, 2010" when they received their termination notices. Def's Mem. at 8.  In other words, Defendant's argument essentially comes to this: the moment that plaintiffs received their RIF notices they somehow knew they were under an obligation to disclose in any future bankruptcy proceedings the possibility that there might be future litigation around the RIF; if such litigation did occur, they might join as plaintiffs; and that the fact that they did not have the foresight to speculate about a future Title VII litigation was an attempt to mislead this or the bankruptcy court.  Nothing in the doctrine of judicial estoppel in general or in this Circuit's precedent in particular supports Defendant's argument.

Judicial estoppel is "inappropriate in cases where omissions [by plaintiff] are the result of mere mistakes or inadvertent conduct." *Robinson v. District of Columbia*, 10 F. Supp. 3d 181, 185 (D.D.C. 2014) (internal quotations and citations omitted).  "[T]he failure to comply with the Bankruptcy Code's disclosure duty is 'inadvertent' only when a party either lacks knowledge of the undisclosed claim or has no motive for their concealment." *Id.* at 187.  Even obvious and general benefits of a debtor's non-disclosure in a bankruptcy proceeding do not necessarily produce an irrebuttable presumption that there was motive behind the non-disclosure. *Id.* at 189. Rather, to find improper motive, courts must weigh the assumption that non-disclosure produced an advantage to a plaintiff against the specific facts of the case. *Id.*  As a result, courts have refused to apply judicial estoppel where, among other things, "[t]here is no evidence that the nondisclosure played any role in the confirmation of the [reorganization] plan or that disclosure of the potential claims would have led to a different result." *See Ryan Operations v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 364-65 (3d Cir. 1996).  At bottom, "judicial estoppel is an extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in

a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts." *Id.* at 365.

The three cases upon which Defendant principally relies – *Robinson v. District of Columbia, Moses v. Howard Univ. Hosp.,* 606 F.3d 789 (D.C. Cir. 2010) and *Marshall v. Honeywell Tech. Sys. Inc.*, 73 F. Supp. 3d 5, 11 (D.D.C. 2014) – make it perfectly clear that in the context of bankruptcy proceedings the point of judicial estoppel is to prevent parties from intentionally gaming the system by selectively hiding from the bankruptcy court claims that might increase the value of their assets.

In *Moses*, an employee brought an action against Howard University Hospital claiming retaliation in violation of Title VII and DCHRA.  606 F.3d at 799.  Plaintiff twice filed for bankruptcy in the United States District Court of Maryland but in both instances failed to disclose the existence of his lawsuit against the hospital.  *Id.* at 791.  The Court rejected the plaintiff's argument opposing judicial estoppel because, while plaintiff had failed to disclose the existence of his discrimination claim in both bankruptcy proceedings, he selectively included other pending lawsuits that reduced the overall value of his assets through wage garnishment.  *Id.* at 800.  Similarly, the plaintiff in *Marshall* failed to disclose a discrimination action in which she was the plaintiff and, as such, would have benefited from a favorable judgment, but selectively disclosed three other claims against her that lessened the value of her assets. 73 F. Supp. 3d at 11.  Finally, in *Robinson*, plaintiff and his wife filed for bankruptcy after filing two separate EEOC charges alleging race discrimination under Title VII.  10 F. Supp. 3d at 183.  The Court inferred deliberate manipulation because plaintiff had $900,000 in debts discharged through

Chapter 7 and failed to disclose that he was seeking a $750,000 judgment in the discrimination claim. *Id.* at 189.

In short, *Moses*, *Marshall* and *Robinson* involved either plaintiffs selectively disclosing claims that lessened the value of their assets while hiding claims that would have increased the value, or plaintiffs knowingly failing to disclose a claim that had been commenced prior to initiation of bankruptcy proceedings.

Such is not the case here.  To begin with, neither plaintiff initiated the discrimination claim prior to bankruptcy.  Moreover, neither plaintiff manipulated the value of his assets in bankruptcy by disclosing potentially negative claims that would result in a diminution in asset value while shielding potentially positive claims that would result in an increase in asset value. In other words, unlike *Moses* and *Marshall*, there is no evidence that plaintiffs' conduct was anything other than an innocent mistake.  What's more, Defendant presents no evidence that the nondisclosure played any role in the confirmation of the bankruptcy reorganization plan or that disclosure of the potential claims would have led to a different result. Instead, Defendant seems to suggest without ever explicitly saying so that the bankruptcy filing alone should suffice for the Court to draw an inference of bad motive on the part of plaintiffs.  As the moving party on a motion for summary judgment, Defendant is owed no such favorable inference.  To the contrary, all reasonable inferences from the record point to the fact that the plaintiffs had neither intent nor motive to conceal or mislead.

In the absence of any evidence of bad motive on the part of plaintiffs or any miscarriage of justice, Defendant essentially asks this Court to do that which no other court in this or any other Circuit has ever done: invent a *per se* rule, according to which any non-disclosure, no matter now inadvertent, no matter how insignificant, is *per se* cause for judicial estoppel.

Nothing in the factual evidence on the record or in the authorities Defendant cites justifies such a novel rule.

## II

**PLAINTIFFS HAVE ALL VICARIOUSLY EXHAUSTED ADMINISTRATIVE REMEDIES BECAUSE THE PRINCIPAL NOTICE FUNCTION OF THE EEOC FILING REQUIREMENT WAS AMPLY SATISFIED BY THE AJAKAIYE AND MORRIS EEOC CHARGES, AND BECAUSE THEIR CLAIMS ARE SO SIMILAR THAT NO PURPOSE WOULD HAVE BEEN SERVED BY FILING MULTIPLE AND SEPARATE EEOC CHARGES.**

Ordinarily, Title VII plaintiffs must first exhaust administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action. However, this Circuit has held that the requirement of exhaustion for each plaintiff is unnecessary when the "claims are so similar that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges." *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981). The "single-filing exception," also known as "vicarious exhaustion," allows a non-filing party to join the lawsuit of a filing party if she possesses claims against the same defendant "so similar to those asserted by the original plaintiff that no purpose would be served by requiring them to file independent charges." *Brooks*, 606 F.3d at 807; *see also Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 63 (D.D.C. 2011). In determining the requisite similarity of claims, "courts have examined the original EEOC filings of the party with the perfected EEOC charge to evaluate whether it provided sufficient notice of all charged by the plaintiffs who claim to be similarly situated[.]" *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 182-83 (D.D.C. 2012) (quoting *Cook v. Boorstin*, 763 F.2d 1462, 1466, 246 U.S. App. D.C. 201 (D.C. Cir. 1985)).

27

Vicarious exhaustion is based on a long line of class action cases, holding that each individual plaintiff in a Title VII class action suit need not individually file an EEOC complaint, but that it is sufficient if at least one member of the plaintiff class has met the filing prerequisite. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975); *Romasanta v. United Airlines, Inc.*, 537 F.2d 915, 918 (7th Cir. 1976); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333 n.1 (D.C.Cir.1973); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 985 n.11 (D.C. Cir.1973). The rationale of this line of cases is that "[i]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with EEOC." *See also Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968) ("[T]he very fact that the suit is a class action means that the plaintiffs' claims not only share common questions of law and fact, but those claims are such that representative plaintiffs will fairly and adequately protect the interests of all plaintiffs of the class.")

However, certification of a class is not a prerequisite for vicarious exhaustion; the principle has also long been extended to instances in this and other circuits where no class action has been certified, but where the court is nonetheless able to treat as a class a plaintiff who has satisfied the EEOC filing requirement and one or more plaintiffs who have not satisfied that requirement. *See, e.g.*, *Boorstin*, 763 F.2d at 1466 (allowing vicarious exhaustion where there was no possibility that only one claim could be settled administratively because both plaintiffs needed to demonstrate the same pattern of racial discrimination in promotion and advancement to prove their allegations).

For example, in *Foster*, the District Court refused to permit three plaintiffs to intervene in a racial discrimination case based, in part, on their failure to exhaust administrative remedies. 655 F.2d at 1321. On appeal, the three intervening plaintiffs conceded that they had not filed

discrimination charges with the EEOC and, therefore, had not exhausted their administrative remedies, but argued that the filing of an EEOC complaint by at least one original plaintiff was sufficient.  *Id*.  The Circuit court reversed the District court and granted the intervening plaintiffs the benefit of vicarious exhaustion, holding that the "critical factor" that determined whether a plaintiff would be required to file a separate charge was the "similarity of the two plaintiffs' complaints."  *Id*. at 1322.

Similarly, in *Allen v. Amalgamated Transit Union Local*, 788, 554 F.2d 876 (8th Cir. 1977), fifteen plaintiffs joined in a Title VII suit alleging racial discrimination. No attempt was made to certify the suit as a class action, and only two of the plaintiffs had filed EEOC charges. The Eighth Circuit held that Title VII relief could not be denied to the thirteen plaintiffs who had not pursued administrative remedies.  In reaching that result, the court noted that these plaintiffs had "alleged facts demonstrating they were similarly situated and had received the same discriminatory treatment" as had the two plaintiffs who had filed EEOC charges. *Id*. at 882. Under these circumstances, the court determined that, "it would be nonsensical to require each of the plaintiffs to individually file administrative charges with the EEOC." *Id*. at 883.[11]

Whether or not a class is certified, the key to vicarious exhaustion is that at least one filing perform the principal notice function of the EEOC filing requirement, thus rendering a multiple filings by similarly situated plaintiffs unnecessary and wasteful. *See Moore*, 424 F. Supp. 2d at 150. In short, vicarious exhaustion applies whenever one claim (1) puts the

---

[11] By contrast, in *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 182-83 (D.D.C. 2012), five plaintiffs who had not filed charges with the EEOC sought to "piggy back" on another plaintiff's perfected charge of discrimination.  *Id*. at 181. The court determined the "single-file exception" or "vicarious exhaustion" was inapplicable because the five non-filing plaintiffs made additional claims that were not asserted by the filing plaintiff.  *Id*. at 183-84.

employer-defendant on notice of all charges by the similarly situated plaintiff, and (2) provides the employer and the EEOC with an opportunity for administrative consolidation and resolution.

Such is the case here.  It is a matter of undisputed fact that at least two plaintiffs -- Zacchaeus Ajakaiye and Darius Morris – filed EEOC charges and received Right-to-Sue letters.[12] It is also a matter of undisputed fact that both the Ajakaiye and Morris charges explicitly put both defendant and the EEOC on notice that both the RIF and the new FSW degree requirements had harmed a class of similarly situated plaintiffs based on race and age.  Lastly, plaintiffs have placed evidence in the record, which demonstrates that plaintiffs' prior counsel provided numerous notices to EEOC – and by extension the Defendant – that the RIF and FSW degree requirements had an adverse impact on a class of former CFSA employees.  This combined record sufficiently establishes a basis upon which this court should determine vicarious exhaustion as a matter of law.

Even more so, plaintiffs' pending motion for class certification demonstrates that all plaintiffs in the case share the same common questions of law and facts.  They were veteran employees with largely competitive performance records. None of the plaintiffs and none of the other members of the RIF class were discharged for cause or for poor performance.  All had performed the duties of their positions in at least a satisfactory manner prior to June 2010. Moreover, CFSA's May 6, 2010 RIF notice letter, sent to each putative class member, stated  no

---

[12] Plaintiffs do not concede that Ajakaiye and Morris are the only terminated CFSA employees to file claims with the EEOC.  As noted above, prior counsel indicated in communications with the EEOC that at least 19 other charges had ben filed.  The fact that the EEOC has been unable to locate these charges is in no way conclusive proof that they were not filed. At best, prior counsel's EEOC correspondence raises a strong inference that more charges were filed.  At worst, the record shows that it is a legitimate question of material fact whether these 19 additional charges were filed. Either way, as the moving party Defendant is not entitled to summary judgment on the issue.

specific reason as to why the RIF was being conducted and the criteria which governed the execution of the RIF.   Therefore, the employees-plaintiffs terminated under the RIF will independently or jointly use the same evidence and method of proof as the other putative class members to demonstrate that the RIF was designed and implemented in a manner which evidences both race and age discrimination and, as such, "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Duke,* 131 S. Ct. 254, 2551 (2011).    Lastly, Plaintiffs and the putative class of employees discharged by Defendant suffered, not only by the loss of annual salaries, but also the loss of health care coverage, reduced pension benefits and other monetary losses.   Additionally, Defendant's actions in designing and implementing the 2010 RIF and Realignment have caused Plaintiffs significant emotional distress, loss of self-esteem, worry, and the loss of prestige.

In short, all plaintiffs suffered the same injury as a result of their common claim, the 2010 RIF and termination from CFSA due to a RIF which was not carried out in a legally sound or equitable and non-discriminatory manner.

Defendant does not cite a single case in its Memorandum for summary judgment motion to counter plaintiffs' theory of vicarious exhaustion of administrative remedies.   Rather, the two cases upon which defendant relies -- *Ahuja v. Detica Inc*., 873 F. Supp. 2d 223, 224 (D.D.C. 2012), and *Park v. Howard Univ*., 71 F.3d 904, 907 (D.C. Cir. 1995) – both involved instances in which a lone plaintiff failed to exhaust administrative remedies. Moreover, neither case raises a question of vicarious exhaustion.   In *Ahuja*, plaintiff failed to exhaust administrative remedies because she was the sole claimant in the case and neglected to file a proper EEOC claim. 873 F. Supp. 2d at 231.   Similarly, *Park* involved a lone claimant who sought to include a hostile work

environment claim in her federal court complaint even though her EEOC charge contained no

such claim. *Park*, 71 F.3d at 907.

In sum, whether or not this Court chooses to certify the class, plaintiffs as a group have

shown that they have vicariously exhausted administrative remedies because the principal notice

function of the EEOC filing requirement was more than amply satisfied by the Ajakaiye and

Morris charges, and because their claims are so similar that no purpose would have been served

by filing multiple and separate EEOC charges.

### III

### PLAINTIFFS DUDLEY, GRAY, HAILES, AND KELLEY HAVE NOT ABANDONED THEIR TITLE VII CLAIMS BECAUSE THEIR DISCOVERY RESPONSES INDICATED ONLY THAT THEY DID NOT POSSESS RIGHT-TO-SUE LETTERS

Defendant argues that Plaintiffs Dudley, Gray, Hailes, and Kelley have abandoned their

Title VII claims based upon their non-production of right to sue letters as per their response to

Defendant's Document Production request.

The four Plaintiffs have neither relinquished nor abandoned their Title VII claim as part

of the larger class, and plead as much in the Third Amended Complaint. Admitedly, although

Plaintiffs do not have right to sue letters, they nevertheless asserted and continue to assert, as

plead at paragraphs 2, 94 and in their jury demand, in their Third Amended Complaint,

discrimination claims based on Title VII.   Defendant's argument is based on disputed

interpretation of Dudley, Gray, Hailes, and Kelley's discovery responses. These four plaintiffs,

through counsel Donald Temple, have since clarified and corrected their Document Response

consistent with Rule 26e (1) (a), which provides that parties and their counsel have a duty to

supplement or correct responses to requests for documents "if the party learns that in some

material respect the disclosure or response is incomplete or incorrect, and if the additional or

corrective information has not otherwise been made known to the other parties during the discovery process or in writing."   In this case, Plaintiffs have indeed corrected their responses ((Pl. Ex. 17), and have argued that they are part of the putative class in which Title VII claims are asserted.    In any event, since other plaintiffs may well also lack right-to-sue letters, there is no prejudice to Defendant in permitting these four plaintiffs to correct their responses.

Therefore, given Plaintiffs Dudley, Gray, Hailes and Kelley's clarification and correction of their discovery responses that they did not abandon their Title VII claims, they should obtain the same benefit of vicarious exhaustion as all other similarly situated plaintiffs.

## IV

**ALL PLAINTIFFS, REGARDLESS OF THEIR EDUCATIONAL BACKGROUNDS AND REGARDLESS OF WHETHER THEY WERE SUBSEQUENTLY RE-HIRED, HAVE STANDING TO CHALLENGE THE FSW DEGREE REQUIREMENT BECAUSE THEY SUFFERED INJURY FROM THE MOMENT THEY WERE SEPARATED FROM THE AGENCY IN VIOLATION OF TITLE VII AND DCHRA**

At summary judgment, the plaintiff must "show that a reasonable juror could find he has standing." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012).  The requirements of standing are the following: 1) the plaintiff must have suffered an injury in fact, 2) there must be a causal connection between said injury and the actions of the defendant, and 3) it must be likely that the injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To satisfy the causation requirement, the injury must simply be "fairly traceable to the challenged action."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1140 (2013).

Defendant's argument is that Plaintiff Ajakaiye lacks standing to challenge the FSW degree requirement because he was hired and subsequently fired, and that Plaintiff Morris lacks standing to challenge the FSW degree requirement because he possesses a bachelor's degree. Plaintiffs' injuries are directly attributable to the actions of the government.  All plaintiffs,

regardless of their educational backgrounds and regardless of whether they were subsequently hired for the FSW position, suffered injury from the moment that they were separated from the agency in violation of Title VII and DCHRA.  Plaintiffs would not have needed to seek new employment had they never been terminated.

The D.C. Circuit recognized "in *Andrade I* that the particularized injury that permitted appellants to have standing to raise their claim was the loss of their jobs . . . ."  *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987) (holding that the fact that the government initiated plans that could have resulted in the employees' demotion or termination was not the injury, but the actual termination itself was the injury).  Further, defendants have cited no cases to support the assertion that plaintiffs must demonstrate that the Defendant's actions subsequent to the RIF also caused injury.  Defendant has already conceded that plaintiffs have standing to challenge their selection for the RIF.  That plaintiffs were possibly eligible to be hired for the FSW position represented an opportunity for the government to mitigate the injury of selecting plaintiffs for the RIF, not a separate injury.

## V

**PURSUANT TO THE DOCTRINE OF ISSUE PRECLUSION CFSA IS PRECLUDED FROM RE-LITIGATING IN THIS COURT THE ISSUE WHETHER THE RIF WAS A LEGITIMATE REALIGNMENT OF THE AGENCY BECAUSE THE D.C. OFFICE OF EMPLOYEE APPEALS, AN AGENCY WITH EXCLUSIVE ADMINISTRATIVE JURISDICTION OVER RIFS, HAS ALREADY HELD THAT THE CFSA RIF AT ISSUE WAS NEVER PROPERLY AUTHORIZED**

The Supreme Court has long recognized that "the determination of a question directly involved in one action is conclusive as to that question in a second suit." *Cromwell v, County of Sac*, 94 U.S. 351, 354 (1877). The doctrine, known as issue preclusion or collateral estoppel, bars "'successive litigation of an issue of fact or law, even if the issue recurs in the context of a

different claim." *Taylor v. Sturgell*, 553, U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-9 (2001)).  The Supreme Court has defined issue preclusion to mean "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

This Circuit has recognized that "the objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it fulfills 'the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction.'" *Yamaha Corp. of America v. United States*., 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Kremer v. Chemical Constr. Corp*., 456 U.S. 461, 467 n. 6 (1982)). Issue preclusion is not limited to those situations in which the same issue is before two *courts*. "Rather, where a single issue is before a court and an administrative agency, preclusion also often applies." *B&B Hardware, Inc. v. Hargins Industries, Inc.*, 135 S. Ct. 1293, 1303 (2015) This reflects the longstanding view that "'[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.' " *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)).

This circuit has laid out the standards for applying issue preclusion as follows:

The standards for establishing the preclusive effect of a prior holding are: First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude.

*Yamaha*, 961 F.3d at 254. (internal citations omitted)

Defendant's central argument on summary judgment is that its actions were proper because the RIF amounted to a legitimate targeted elimination and realignment of positions, rather than an improper agency-wide cost-reduction that resulted in a disparate impact on African-American employees and those over 40 years of age.  But plaintiffs cannot re-litigate the question whether the RIF was a proper realignment of positions because that question of law and fact is foreclosed by issue preclusion.   Specifically, the District of Columbia's Office of Employee Appeals (OEA) has already held that the present RIF was not conducted according to proper procedures. OEA is the District's administrative agency with exclusive administrative jurisdiction for determining whether a RIF is legitimate under D.C. law.  Ernest Hunter, one of the plaintiffs in the present action, sued CFSA, alleging that the RIF was not a legitimate realignment and reorganization of the Agency. *See In re Ernest Hunter v. Child and Family Services Agency*, OEA Matter No.  2401-0321 (March 4, 2014) (Pl. Ex. 15). OEA agreed and determined that CFSA had failed to follow its established procedures in securing approval of the RIF. Specifically, OEA stated:

> [CFSA] clearly falls under the Mayor's authority as evidenced by the D.C. Office of Human Resources website.  Moreover, [CFSA]'s request for approval from the City Administrator to conduct the RIF is evidence that it knew it was under the Mayor''s authority.  If [CFSA] was independent, as it alleges, it would not have sought approval for the RIF. As a result of the requirements of District Personnel Regulations 2405.4, 2406.1, 2406.2, and 2406.4, CFSA was required to receive approval from the Mayor prior to conducting the RIF.  Because  it cannot provide any evidence of an Administrative Order from the Mayor, there is no proof that the RIF was actually approved. … Accordingly, Employee''s Petition for Review is GRANTED. As a result, the Initial Decision and Agency's RIF action are REVERSED.

In short, the OEA decision meets the three requirements for issue preclusion: 1) the same issue Defendant seeks to raise in this Court was already litigated before OEA and was not appealed; 2) not only is OEA a forum of competent jurisdiction, but it is the exclusive D.C.

agency charged with determining whether RIFs are conducted according to DC law; and 3) there is no credible evidence that preclusion would be unfair to Defendant since Defendant was a party in the OAE litigation. (Pl. Ex. 15).

VI

### PLAINTIFFS PROVIDE SUFFICIENT STATISTICAL EVIDENCE TO RAISE A GENUINE ISSUE OF FACT IN SUPPORT OF TITLE VII AND D.C. HUMAN RIGHTS ACT DISPARATE IMPACT CLAIMS.

"To establish a prima facie case of disparate impact, the plaintiff must show that a facially neutral employment policy has a disproportionately adverse effect on a protected class of people." *Smith v. City of Jackson*, Miss., 544 U.S. 228, 249 (2005); *Ficken v. Clinton*, 841 F. Supp. 2d 85, 89 (D.D.C. 2012).   To do so, the plaintiff must first identify the specific employment practice challenged.   Next, the plaintiff must establish causation by offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused an adverse impact on a protected group because of their membership in said protected group. *Meachum v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92-3 (2008).

Here, for purposes of opposing summary judgment Plaintiffs have more than sufficiently shown that the RIF was a facially neutral employment policy, that it was not the result of subjective decision-making, and that it had a disparate impact on African-American employees and those over 40 years of age.

A. **The RIF was a facially neutral policy.**

The RIF was a neutral policy in that the reduction targeted one or more positions agency-wide.  This Court has previously identified an agency reduction in force as a neutral employment practice in determining disparate impact on a protected class. *Aliotta v. Bair*, 614 F.3d 556, 561

(D.C. Cir. 2010).    In *Aliotta*, the Federal Deposit Insurance Corporation (FDIC) informed employees from one of its departments called the Division of Resolutions and Receiverships (DRR) that staff would be reduced by as much as 53%.  DRR is responsible for managing bank failures.  When bank failures increase, DRR workload increases; when bank failures decrease, so does DRR workload. The force reduction was necessary because bank failures had declined and consequently the FDIC's budget was cut.    The plaintiff-class asserted the RIF had a discriminatory impact on plaintiffs and employees aged 50 and older.  The Court explained that "by challenging the effect of specific employment practices, plaintiffs alleging disparate impact, like those in a disparate treatment pattern or practice case, are alleging the employer's practices have had a "systemic adverse effect" on members of the class." *Id*. at 565 (quoting *Moore v. Summers*, 113 F.Supp.2d 5, 19 (D.D.C.2000)). The Court accepted the RIF as a neutral employment practice but determined that plaintiffs' expert evidence was not sufficient to show a statistically significant impact on older employees. In other words, there is no question that a RIF conducted due to budget cuts is a facially neutral employment practice that can be considered under disparate impact theory even when the RIF targets particular divisions of the agency.

Here, as in *Aliotta*, the RIF was supposedly driven by budget considerations.  The City Administrator ordered the CFSA to reduce its personnel expenses by $3.2 million.  Here, as in *Aliotta*, CFSA allegedly undertook to look over the entire agency.   The Gerald-Albert Memorandum, outlining the RIF, shows that the goal was to broadly eliminate one or more positions in at least seven (7) offices. Here, as in *Aliotta*, the offices are so diverse in function, size, qualifications for job duties, and seniority status that there is no reasonable basis to assume that the RIF was anything but neutral.

**B.  The RIF was not the result of subjective decision-making.**

Citing *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1270 n. 4 (8th Cir. 1987) and *Combs v. Grand Victoria Casino & Resort*, No. 1:08-cv-00414-RLY-JMS, 2008 WL 4452460 (S.D. Ind. Set. 30, 2008), Defendant claims that a RIF cannot be challenged where it did not utilize a uniform selection criterion.  Not only are these cases from outside the circuit and, therefore, not controlling, but more importantly, neither case says what Defendant seems to want them to say.

In *Leichihman*, the employer was a corporation whose reorganization completely split its parent company into two separate entities.  In doing so, the job responsibilities of most employees changed.  In order to reduce costs the defendant developed a company task force specifically charged to "conduct[ed] a six-month study to identify areas of possible savings and came up with a number of ideas, including eliminating several jobs."  *Id*. at 1265.  The facts of *Leichihman* are significantly different in that a specific task force within the company was designed to address cost-cutting measures, target specific positions for elimination, and make recommendations to the company leadership.  This was an extremely subjective decision based on a specialized team, evaluation process, and recommendation process to target specific individuals.  The Court noted: "Pickwick was not implemented through some facially neutral procedure, such as a height and weight requirement or an aptitude test, but was conducted through a series of subjective decisions eliminating certain positions in order to cut costs. There existed no neutral policy, the impact of which could be measured."  *Id*. at 1270.  In other words, unlike CFSA, the *Leichihman* defendant did not merely cut a section of its workforce in order to save money.  Rather, the cost-cutting policy served as an impetus for the defendant to establish a

process by which a specialized task force looked at each position within the company and made subjective decisions whether they were needed or not.

*Combs v. Grand Victoria Casino & Resort* is even more distinguishable.  There, each member of the class was terminated as a result of disciplinary action.  The Court identified the following reasons for the termination of the six employees: "poor performance and rude behavior to customers", "impeding an investigation", "complaints of harassment, insubordination, and unprofessional conduct", "violation of policies, neglect of duties, and unprofessional conduct", "poor performance", and "job abandonment".  *Combs*, 2008 WL 442460 *Id*. at *2.  Additionally, the Court noted the plaintiffs "have not pointed to a specific employment practice to support their disparate impact claims." *Id*.   Lastly, the case was brought solely as an ADEA disparate impact claim.

*Combs* simply does not apply to this case.   The employees terminated in the RIF by CFSA were not subject to disciplinary action.  Plaintiffs have clearly identified the specific employment practice in this case is the RIF.  Lastly, the disparate impact claim pending before the Court is brought pursuant to Title VII.  As the Court in *Combs* noted "the scope of disparate-impact liability under the ADEA is narrower than under Title VII." *Id*. (quoting *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005)).

In short, on the present record Defendant simply cannot show that the RIF was a targeted subjective process because there are two scenarios in which a Defendant may make such a showing and Defendant has not presented evidence to support either scenario.  The first scenario (call it the *Combs* scenario) involves instances in which employers take adverse actions against employees after finding their performance wanting. This is not the case here.  Director Gerald himself in his RUF letters to employees said as much.   The second scenario (call it the

*Leichihman* scenario) involves instances in which employers eliminate jobs that have become essentially obsolete.  Again such is not the case here, CFSA's mission has not changed and the work FSWs perform is in all meaningful respect, as we've shown above, the same as used to be performed by SSAs and SWAs.

### C.  Plaintiff's Statistical Evidence is *Sufficient* to Demonstrate a Disparate Impact.

Dr. Munro's initial analysis showed that the termination rate for African-Americans during the RIF was 15.5%, whereas the termination rate for non-African-Americans was only 5.6%.  With respect to the over-40 group, the analysis showed that its termination rate was 16.5%, whereas that of the under-40 group was only 9.4%. (*Id*.)  In her rebuttal report, using the defense's modified numbers, Dr. Munro concluded that with respect to race, "the defense-provided database showed that when African-Americans are compared to only whites, the termination rate of African Americans was 444% the rate of Caucasians, which is much, much more notable." (Def. Ex. K. at 3). With respect to age, she concluded, "based on the defense's database, those 40 and over were terminated at 179% the rate of those under 40." (*Id.* at 4).

According to EEOC Regulations Four-Fifths Rule, for purposes of Title VII disparate impact analysis, a statistically significant disparity is one in which the minority termination rate is greater than 125% of the majority termination rate.[13]  Depending on whether one used a sample population of 832 or 802, Dr. Munro's analysis showed that African-Americans had been terminated in the RIF at a rate either 277% or 444% greater than that of non-African-Americans, and that over-40 employees had been terminated at a rate either 176% or 179% greater than the termination rate of under-40 employees.  In other words, the RIF had violated the 4/5ths rule for both African-Americans and over-40 employees. (*Id*.)

---

[13] Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11998 (Mar. 2, 1979).

Defendant contends that Dr. Munro's analysis is incorrect in that it used the entire agency work force as the relevant sample population. According to Defendant, the relevant sample should be neither 832, nor 802, but rather the number of terminated employees at 115. (Def. Mem. at 21). This is wrong for two reasons. First, courts have made it clear that for purposes of disparate impact analysis, too small a sample size will not yield statistically meaningful conclusions. *Schmid v. Frosch*, 680 F.2d 248, 250 (D.C. Cir. 1982); *see Hazelwood Sch. Dist. V. United States*, 433 U.S. 299, 309 n. 14 (1977); *Castaneda v. Partida*, 430 U.S. 482 n. 17 (1977).

Second, even if the Court were to accept the sample size of 115 as determinative for purposes of statistical analysis, the allegation that only the 115 employees terminated were ever at-risk, as opposed to the total of 832 or 803 employees agency-wide is a key disputed question of fact in this case. Defendant claims that the 115-sample is relevant because this was a targeted realignment of the agency. However, as we've made clear above, four facts belie that statement: 1) the realignment was never properly authorized; 2) the few planning documents for the RIF stated that it was an agency-wide budget-driven decision; 3) for three years after the RIF Defendant did not claim it was a targeted realignment; and 4) the very first claim of realignment came nearly four years after the RIF once Defendant's expert said so, using a declaration signed one day before the expert report.

In the end, Defendant's argument relies on a bit of self-serving circular logic: the 115 employees were fired because they were targeted and they were targeted because they were fired. In other words, Defendant's best evidence that the employees were subjectively targeted is the fact that they were fired.   By that logic, Title VII plaintiffs would never be able to show disparate impact no matter how clear the statistical impact because employers would

automatically use the termination itself as proof to argue that any disparate impact was the result of employees being subject subjectively targeted for termination.

## VII

**PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE THAT DEFENDANT IMPOSED A NEW BACHELOR'S DEGREE REQUIREMENT FOR THE FSW POSITION IN A MANNER THAT BOTH INTENTIONALLY DISCRIMINATED AGAINST, AND HAD A DISPARATE IMPACT UPON, PLAINTIFFS ON ACCOUNT OF RACE AND AGE.**

Even though the new FSW positions functioned in a similar supportive capacity as the eliminated SSA position, and even though CFSA management knew or should have known that the majority of SSAs did not have a Bachelor's Degree (Pl. Ex. 16), CFSA intentionally imposed the degree requirement for the FSW.

In terms of disparate impact, only 18 of the 115 employees who had received RIF notices and only one of the plaintiffs accepted offers of employment in the newly created FSW positions.  In other words, a large majority of terminated employees were not hired as FSW.

In terms of disparate treatment, while CFSA has repeatedly claimed that the difference between the SSA and FSW is that FSWs are able to perform casework activities and make assessments during home visitations, the record contains a number of facts disputing that claim. To begin with, as plaintiff Morris testified on deposition, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work. (Pl. Ex. 11 at 21-6.) As further proof that that the Agency could have created a new position and effectively maintained the same work force, following the RIF, CFSA contracted FSW functions to an outside vendor, which itself hired plaintiff Alston to do the very work that Alston had been doing all along prior to the RIF but that now CFSA claimed she needed a

43

Bachelor's Degree to perform. (Pl. Ex. 14). Lastly, CFSA's own supervisors have conceded in internal communications that "the FSW would be used in the exact fashion SSA's were prior to the RIF" based on the roles and responsibilities of the FSW position as defined by CFSA management. (Pl. Ex. 6.)

The fact that CFSA knew that the bulk of SSAs did not have higher education degrees, the fact that it knew the FSW position was essentially the same as the SSA and SWA positions, and the fact that it nonetheless imposed a Bachelor's Degree requirement for the FSW position create a strong inference on summary judgment that CFSA intentionally discriminated against plaintiffs on account of age and race.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion for summary judgment.

Date: December 21, 2015

Respectfully submitted,

/s/ Aderson B. Francois
Aderson B. Francois
Civil Rights Clinic
Howard University School of Law
2900 Van Ness Street N.W.
Washington, DC 20008
Phone: (202) 806-8065
Facsimile: (202) 896-8436
Email: afrancois@law.howard.edu

Donald M. Temple, Esq.
1101 15th Street NW, Suite 203
Washington, D.C. 20005
Phone:  (202) 628-1101
Facsimile: (202) 628-1149
Email: dtemplelaw@gmail.com