UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————— ) | |
| RONDA L. DAVIS, *et al.*, ) | |
| ) | |
| and ) | |
| ) | |
| CYNTHIA DUDLEY, *et. al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Actions Nos. 10-1564, 10-1718 |
| ) | (RC) |
| ) | |
| v. ) | |
| ) | |
| DISTRICT OF COLUMBIA, *et. al.*, ) | |
| ) | |
| Defendants. ) | |
| ———————————— ) | |

**PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS**

Plaintiffs do not dispute items 1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 60, 61, 62, and 63 of Defendant's Statement of Undisputed Material Facts.

Plaintiffs do not dispute items 44, 45, 46, 47, and 48 only insofar as these items describe Plaintiffs Ajakaiye's and Morris' EEOC charge filings and Right-to-Sue Letters. Plaintiffs, however, do not concede that only Plaintiffs Ajakaiye and Morris filed EEOC Charges. The record contains legitimate questions of material fact whether Plaintiffs' prior counsel, David Rose, filed EEOC charges on behalf of additional plaintiffs in the case.

Plaintiffs do not dispute items 49, 50, 51, 52, 53, 54, 55, and 56 only insofar as these items describe bankruptcy filings by Plaintiffs Ajakaiye and Alston. Plaintiffs, however, do not

concede that plaintiffs failed to meet any disclosure obligations to this Court or the bankruptcy courts.

As for the remaining items, Plaintiffs submit below that they raise the following legitimate questions of material facts:

*Defendant's Statement # 2*

> *CFSA operates the following six offices: (i) Agency Programs; (ii) Community Services; (iii) Policy and Planning; (iv) Clinical Practice; (v) Agency Management; and (vi) Financial Operations. Id. at 2 (Pl. 00090).*

Plaintiff's Disputed Statement

> Prior to the subject RIF, the Agency's organizational chart reflects that CFSA was organized into approximately twelve (12) offices or divisions: Office of the Director, Fiscal Operations, General Counsel, Agency Programs, Community Services, Office for Planning Policy and Program Support, Clinical Practice, Chief Administrative Office, Revenue Operations, Office of Chief of Staff, Public Information, and Accountability. (Pl. Ex. 1.)

*Defendant's Statement # 5*

> *The Agency Financial Operations Division provides comprehensive financial management services to CFSA to maintain the financial integrity of the District of Columbia. Exhibit A at 7 (Pl. 000095). Although employees within this Division contribute to the agency's overall headcount, they report to the Office of the Chief Financial Officer, rather than the Director of CFSA. Declaration of Dexter Starkes, attached as Exhibit C, ¶ 7.*

Plaintiff's Disputed Statement

> Prior to the subject RIF, according to the Declaration of Stan Spaght, CFSA's Human Resources Manager for Compensation/Benefits, the agency consisted of a total workforce of 832, including employees from the office of Financial Operations Divisions. (Pl. Ex. 10.)    Subsequently, Defendant submitted a separate Declaration from Dexter Starkes, CFSA Director of Human Resource.  According to the Starkes Declaration, 30 employees in CDFSA office of Fiscal Operations Administration (FOA) should not have been included in the head count of the Agency because at the time of the RIF they reported to

the Office of the Chief Financial Officer and, as such were "not technically CFSA employees." (Def. Ex. C. ¶ 7.)

*Defendant's Statement #15*

CFSA did not utilize a single uniform criteria, test or requirement for determining which employees would be separated from the Agency in the RIF. Rather, the determination as to which agency positions would be included in the RIF was the result of multiple individual decisions made by the Director working in close consultation with the Chief of Staff, the Deputy Directors in charge of CFSA's various divisions, and other senior level managers in the Agency's executive team. Declaration of Raymond Davidson, attached as Exhibit E, ¶ 4.

Plaintiff's Disputed Statement

In a memorandum dated April 29, 2010, to City Administrator Neil Albert, CFSA Director Roque Gerald ("Gerald") requested "approval to conduct a Reduction-in-Force (RIF) to abolish one hundred and twenty-three (123) positions within the Child and Family Services Agency." (Def. Exh. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*, P. 1). As justification for the RIF, Director Gerald stated: "The Child and Family Services Agency must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering. The deficit resulting from the realignment will precipitate a reduction in force." (*Id*.).

Nothing in Gerald's April 29, 2010 memorandum indicated that the RIF targeted particular positions or was conducted as a result of individual decisions. To the contrary, the memorandum provided an "agency-wide" list of positions to be eliminated or consolidated purportedly due to FY'11 budget cuts, which supposedly affected virtually every office in the agency. (*Id.* at 2). Specifically, Director Gerald sought to abolish twenty-one (21) positions in the Office of the Deputy Director for Community Programs; Nine (9) positions in the Office of the Deputy Director for Clinical Practice, two (2) positions in the Office of the Deputy Director for Revenue Operations, twelve (12) positions in the Office of the Deputy Director for Planning, Policy, and Program Support, seventy (70) positions in the Office of the Deputy Director for Agency Programs, one (1) position in the Office of General Counsel, one (1) position in the Fiscal Operations Administration, and two (2) positions in the Office of the Chief of Staff in CFSA. (*Id.* at 4-8).

*Defendant's Statement #16*

Employees holding positions within the Financial Operations Administration were not included in the RIF, because they reported to the OCFO. Exhibit C, ¶ 7.

Plaintiff's Disputed Statement

> CFSA's organizational chart shows the Financial Operations Administration under the CFSA's Office of the Director.  The April 29, 2010 memorandum from Director Gerald included one employee from the Office of Fiscal Operations Administration as being part of the RIF.  CFSA also submitted a Declaration of Stan Spaght, CFSA's Human Resources Manager for Compensation/Benefits at the time of the RIF, counting the number of CFSA employees as 832, including the 30 employees in the Financial Operations Administration. (Pl. Exh. 10).    Subsequently, Defendant submitted a Declaration from Dexter Starkes, CFSA Director of Human Resource.  According to the Starkes Declaration, the 30 employees in CDFSA office of Fiscal Operations Administration (FOA) should not have been included in the head count of the Agency because at the time of the RIF they reported to the Office of the Chief Financial Officer and, as such were "not technically CFSA employees." (Def. Exh. C. ¶ 7).

*Defendant's Statement #17*

> *CFSA achieved many of the required personnel cuts by realigning functions and implementing new service models within three specific divisions within the Agency: Agency Programs, the Office of Clinical Practice, and the Office of Community Services. Exhibit E, ¶¶ 5-13.*

Plaintiff's Disputed Statement

> The personnel cuts were not driven by a targeted realignment of the Agency.  To begin with, CFSA did not conduct an authorized realignment.  In an administrative challenge to the RIF brought by plaintiff Ernest Hunter, the District of Columbia Office of Employee Appeals (OEA), an administrative adjudicate body with jurisdiction over RIF planning and implementation, held that "there is no [ ] evidence [ ] to show that the RIF was properly authorized." (Pl. Exh. 15).  OEA even went to far as to order the RIF invalid and CFSA to "reimburse [Hunter] all back-pay and benefits lost as a result of the RIF action." Id.  The few planning documents CFSA produced regarding planning and implementation of the RIF, as well as Declaration submitted by agency executives in the early days of this suit, indicate the agency undertook a neutral cost-cutting move rather than a targeted realignment.  (Def. Exh. E, Attachment A, Memorandum from Roque Gerald to Neil Albert, P. 1).

*Defendant's Statement #18*

> *Within Agency Programs, CFSA determined that it was necessary to implement a model in which Social Workers are "teamed" with a set of skilled partners to more effectively serve the needs of the Agency's children and family clients. Id. at ¶ 6.*

Plaintiff's Disputed Statement

The question whether a "teamed" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute.   The fact that CFSA calls it a new "team model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to the same work. While CFSA has repeatedly claimed that the difference between the SSA and FSW is that FSWs are able to perform casework activities and make assessments during home visitations, the record contains a number of facts disputing that claim.  To begin with, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work. Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that SSAs routinely made home visits and assessments.  However, CFSA did not formally count and enter these visits and assessments in the FACES database. (Pl. Exh. 11 at 21-6.)  As further proof that that the Agency could have created a new position and effectively maintained the same work force, following the RIF at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a CFSA contractor that provides services for emancipated youths in the District. (Pl. Ex. 14.) In other words, CFSA contracted FSW functions to an outside vendor, which itself hired Alston to do the very work that Alston had been doing all along prior to the RIF but that now CFSA claimed she needed a Bachelor's Degree to perform. Lastly, CFSA's own supervisors have conceded the similarities between the SSA and FSW positions, specifically stating that the job positions are substantially the same.   In an e-mail dated May 26, 2010 between Jenna BeeBe to CFSA Program Administrator Jesse Winston and Theresa Cunningham Ms. Beebe stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion SSA's were prior to the RIF" based on the roles and responsibilities of the FSW position as defined by CFSA management. (Pl. Ex. 6.)


*Defendant's Statement #19*

*In support of this new model, CFSA decided to eliminate entirely the positions of Social Service Assistant (SSA)—a social work support position—and Social Worker Associate (SWA)—a bachelor-level social work position—in favor of a single new support position, titled Family Support Worker. Id. ¶¶ 7-8.*

Plaintiff's Disputed Statement

This item is merely a rephrasing of Defendant's legal argument rather than a statement of facts, much less an undisputed one.  CFSA did eliminate the SSA and SWA positions and did come up with a new FSW label but, as noted above, there is no evidence that it represented a new model.

*Defendant's Statement # 20*

*The agency-wide elimination of the SSA and SWA positions accounted for 70 of the 115 employees separated in the RIF. Id. at ¶ 9.*

Plaintiff's Disputed Statement

The Declaration of Deputy Director Debra Porchia-Usher stated that of the 115 employees who received RIF notices, 16 held SWA positions, 57 held SSA positions for a total of 73. (Def. Ex. B, *Porchia-Usher Declaration*, ¶¶14, 15)

*Defendant's Statement # 21*

*Within the Office of Clinical Practice (OCP), CFSA implemented a new model that would allow Social Workers to be paired with skilled Nurse Care managers to ensure quality medical care for the children, youth and families served by CFSA. Id. at ¶ 10.*

Plaintiffs' Disputed Statement

As with Defendant's statement regarding the SSAs, the question whether a "teamed" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute.  The fact that CFSA calls it a new "team model" or a "new model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to he same work.

*Defendant's Statement #22*

*To support the establishment of the Nurse Care Management model, CFSA eliminated or reclassified 8 full time positions (including one SSA) to create vacancies to staff and implement the new model. These positions included Clinical Support Specialists, Health Services Program Liaison, Supervisory Health Care Specialist, Supervisory Clinical Support Specialist, Residential Specialist, and Office Automation Assistant. Id. at ¶ 11.*

Plaintiffs' Disputed Statement

As with Defendant's statement regarding the SSAs, the question whether a "teamed" or "new" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute.

*Defendant's Statement # 24*

> *Within the Office of Community Services (OCS), CFSA implemented a new model to manage and oversee the performance of certain agency contractors. As a result, CFSA eliminated or reclassified 19 positions within the OCS's Congregate Care and Home Study Contract Monitoring Division. Id. at ¶ 12.*

Plaintiffs' Disputed Statement

> As with Defendant's statement regarding the SSAs, the question whether a "teamed" model or a "new" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute.  The fact that CFSA calls it a new "team model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to he same work.

*Defendant's Statement #27*

> *In addition to implementing these new services models, CFSA achieved the mandated personnel cuts by reviewing its programs and determining which positions could be eliminated with the least negative impact on the Agency's ability to perform its statutory and court-ordered functions. Id. at ¶ 14.*

Plaintiffs' Disputed Statement

> As noted above with respect to items # 17, 18, 19, and 24, Plaintiffs that Defendant achieved or intended to achieve "new service models" with the RIF.

*Defendant's Statement #28*

> *CFSA eliminated one of two Administrative Review teams that had been maintained under the Office of Planning, Policy and Program Support (OPPPS) based on a determination by the Deputy Director for OPPPS that the elimination of these positions would not detrimentally affect the division's functions. Id., ¶ 15.*

Plaintiffs' Disputed Statement

> While Defendant makes the statement that CFSA believed that the elimination of any position did not detrimentally affect any particular division's functions, the question whether the elimination did in fact have a detrimental effect is a disputed question of fact insofar as Defendant has placed no evidence on the record to show one way or another the effect of the elimination of any position.

*Defendant's Statement #32*

> *As part of implementing the new service model in Agency Programs, CFSA created a new position of Family Support Worker (FSW), which required a bachelor's degree in a social service field. Exhibit B, ¶ 12.*

Plaintiff's Disputed Statement

> CFSA may have required a Bachelor's Degree for the FSW position but Plaintiffs dispute that the requirement should have been imposed.  As explained above, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work.  Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that SSAs routinely made home visits and assessments. However, CFSA did not formally count and enter these visits and assessments in the FACES database. (Pl. Exh. 11 at 21-6.)  As further proof that that the Agency could have created a new position and effectively maintained the same work force, following the RIF Plaintiff at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a CFSA contractor that provides services for emancipated youths in the District. (Pl. Ex. 14.)  In other words, CFSA contracted FSW functions to an outside vendor, which itself hired Alston to do the very work that Alston had been doing all along prior to the RIF but that now CFSA claimed she needed a Bachelor's Degree to perform. Lastly, CFSA's own supervisors have conceded the similarities between the SSA and FSW positions, specifically stating that the job positions are substantially the same.  In an e-mail dated May 26, 2010 between Jenna BeeBe to CFSA Program Administrator Jesse Winston and Theresa Cunningham Ms. Beebe stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion SSA's were prior to the RIF" based on the roles and responsibilities of the FSW position as defined by CFSA management. (Pl. Ex. 6.)

*Defendant's Statement #33*

> *FSWs perform casework activities that support investigative social workers to obtain the information necessary to complete investigations of abuse and neglect, including interviewing family members, children, and caretakers, assessing the safety of a home and the well-being of children, conducting home visits, documenting information into the case record, coordinating with other team members for meetings, and coordinating needed services for families and children. Id.*

Plaintiff's Disputed Statement

> Plaintiffs agree that the above item reflects, in part, the job description for the FSW position.  As stated with respect to item 32, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, in particularly as it compares with that of SSAs and SWAs.

*Defendant's Statement #34*

> *In December 2010, the court adopted an Implementation and Exit Plan that permitted FSWs to conduct certain visitations that count toward the Agency's exit standard. See LaShawn v. Fenty, No. 89-cv-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b.*

Plaintiff's Disputed Statement

The Implementation and Exit Plan, ordered by the United States District Court for the District of Columbia merely states that Family Support Workers are expected to conduct a second monthly visit at the home, school or elsewhere [Section 4.b], children in child in out-of home care (foster family homes, group homes, congregate care, independent living programs, etc.) [Section 5.b], and finally, visits to each child during the first four weeks of a new placement or a placement change [Section 6.b]. The Court's declarations cited by the Defendant's fail to assert the reason for CFSA determination that the SSAs employed by CFSA prior to the Reduction in Force were not able to perform these duties.

Moreover, the Defendants have also failed to adequately articulate the rationale behind their assumption that a Bachelor Degree is necessary to perform this function, particularly since a large majority of the work done by FSWs significantly overlaps with the job responsibilities of the SSAs. The SSA job description contained in the appendix of Ms. Usher's declaration, shows that the Social Service assistant major duties were to (1) conduct unaccompanied home visits, for reasons of safety, or to assist in locating the assessment site, (2) provide transportation for clients, (3) support social workers in implementing service plans by supervising/facilitating visits, making referrals, or scheduling service with providers, (4) supervises visits with children, and their family members, (5) documenting information into the case record. (Def. Ex.Exhibit B.) Despite Defendants position that SSAs were not qualified to conduct home visits, the job description shows that in performing the duties required by CFSA, SSAs already had significant contact with children and their families due to multiple visits at home and elsewhere, and were given a substantial amount of responsibility in conducting home visits, determining the safety, and well-being of the children and even making the appropriate referrals if necessary, as well as documenting the case for CFSA's records. There is no reason for CFSA to conclude that a Bachelor's degree was required to perform a function that SSAs seem to already be knowledgeable and skilled enough to perform. Furthermore, the responsibilities of FSWs listed by the Court do not conflict with the job responsibilities of SSA's listed in the appendix of Ms. Usher's declaration. *LaShawn v. Fenty*, No. 89 cv-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b. Accordingly, there is no evidence to support the Defendant's position that the Social Services Assistants could not perform the job responsibilities of an Family Support Worker adequately and consistent with the mission of CFSA.

*Defendant's Statement #35*

> Prior to the creation of the FSW position, only Social Workers were permitted to conduct such visits. *See LaShawn v. Fenty, No. 89-cv-01754 (TFH), ECF No. 864, Amended Implementation Plan (Feb. 2007) §§ 4-6.*

Plaintiffs' Disputed Statement

> See Plaintiffs' disputed statement re Defendant's Statement #34

*Defendant's Statement #37*

> Thirty of the separated CFSA employees who applied for an FSW position held a bachelor's degree, and thus satisfied the minimal educational qualifications for the position. Id. at ¶ 20

Plaintiffs' Disputed Statement

> Plaintiffs do not dispute that Attachment A to the Davidson affidavit shows that thirty former CFSA employees who applied for the FSW had a Bachelor's degree. As noted above, however, Plaintiffs dispute Defendant's description of "minimal educational qualifications" insofar as it implies that the Bachelor's degree is in fact necessary for a position that was functionally indistinguishable from the SSA position.

*Defendant's Statement #39*

> Each of the separated CFSA employees who met the minimal qualifications for an FSW position was interviewed and scored based on six weighted factors: worker experience (25%), flexibility/adaptation (10%), communication (10%), conflict resolution (10%), critical thinking (20%), and their most recent performance rating (25%). Id. at ¶ 21.

Plaintiffs' Disputed Statement

> The formula utilized by CFSA in determining the score of the separated CFSA employees is in direct violation of the District of Columbia's Reduction in Force protocol. Section 24 of the Protocol describes the Agency Reemployment Priority Program. Each agency, including CFSA, has the authority to establish and maintain a Reemployment Priority List. The employee's name remains on the Reemployment list and placed into (a) Group I- (2) years and (b) Group II – (1) year. The employee's name shall be entered into the appropriate list as: (a) grade level at time of separation and (b) any lower grade acceptable to the employee. An employee's name may also be deleted from the Reemployment Priority List. Restrictions of appointments are also assessed due

to reemployment priority list with respect to new appointments, transfer, or reemployment of person not on appropriate priority list. The order of priority is also considered based upon the relative standing in competitive level and group tenure. The order of priority is also considered based upon the relative standing in competitive level and group tenure. A competitive level consists of all positions in a competitive area that is in the same pay system, grade, class and series and are sufficiently alike in qualification requirements, duties, responsibilities, and working conditions. Id. The incumbent in any one position should be able to successfully perform the duties and responsibilities of any of the other positions, without any loss of productivity beyond normal expectations.

There is no evidence in the record to show that CFSA followed this protocol and placed the employees separated from the agency in the Reduction in Force in a Reemployment Priority Program. The formula used above to determine the reemployment of the qualified SSAs does not account for any priority given to the separated employees despite the fact that CFSA labeled them as qualified and they already possessed a wealth of knowledge and experience of the mission of CFSA and of the job duties of an FSW as it is strikingly similar to their previous job as an SSA. Pointedly, there is nothing in the record to show that such a program existed. Defendants have never articulated a reason for their failure to implement an Agency Reemployment Priority Program, which would have had a significant impact on those employees that had performed their duties as an SSA well, meeting CFSA's standards, and were also qualified for the position as an FSW.

_Defendant's Statement #42_

*All of these individuals were African-American. See id. at Ex. 2.*

Plaintiff's Disputed Statement

Defendant's assertion that CFSA hired 18 African American individuals who were separated in the RIF as an FSW is in dispute. Shikita Beander is not listed in the record and there is no evidence that she is in fact African-American.

_Defendant's Statement #43_

*Seven of these 18 individuals were age 40 or above. See id. at Exs. 1 & 2.*

Plaintiff's Disputed Statement

Defendant's assertion that CFSA hired 7 individuals over 40 that were separated in the RIF as an FSW is in dispute. Shikita Beander is not listed in the record and there is no evidence that she is in fact over 40.

*Defendant's Statement # 57*

    *Plaintiffs' expert concluded that African-Americans and employees age 40 and above were separated in the RIF at a rate higher than would be statistically attributed to chance when compared to the pre-RIF composition of the agency workforce as a whole. Declaration of Dr. Paige Munro, attached as Exhibit H, ¶¶ 2-6.*

Plaintiffs' Disputed Statement

    According to EEOC Regulations Four-Fifths Rule, for purposes of Title VII disparate impact analysis, a statistically significant disparity is one in which the minority termination rate is greater than 125% of the majority termination rate.[1] Dr. Munro's analysis showed that African-Americans had been terminated in the RIF at a rate either 277% or 444% greater than that of non-African-Americans, and that over-40 employees had been terminated at a rate either 176% or 179% of the termination rate of under-40 employees.  In other words, the RIF had violated the 4/5ths rule for both African-Americans and over-40 employees. (Def. Ex. K)

*Defendant's Statement # 58*

    *Dr. Munro's conclusion that the RIF had a disparate impact on African-Americans and employees age 40 and above is based on the erroneous assumption that all CFSA employees faced an equal risk of termination in the RIF. Exhibit J, 1 ¶¶ 11-13, 20; Report by Dr. Paige Munro in Rebuttal to Dr. Bronars Analysis, ECF No. 93, attached as Exhibit K ¶ 5 ("I chose the analysis that assumed all jobs were equally at risk because there was no reason to believe all jobs were not equally at risk when I conducted the analysis.").*

Plaintiffs' Disputed Statement

    Dr. Munro's statement is not erroneous but is rather one of the central disputed factual questions in the case. Dr. Bronars, Defendant's expert, relied on a Declaration by Raymond Davidson, CFSA's Chief Administrative Officer at the time of the RIF.  The Davidson Declaration was dated January 7, 2014, the day before Dr. Bronars signed his report on January 8, 2014 and stated for the first time, nearly four years after the RIF, that "CFSA did not utilize a single uniform criteria, test or requirement for determining which employees would be separated from the Agency in the RIF.  Rather, the determination as

---

[1] Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11998 (Mar. 2, 1979).

to which positions would be included in the RIF was the result of multiple decisions made by the Director…" (Def. Ex E ¶ 4). Dr. Bronars' conclusion is not an undisputed question of fact, nor is the belated self-serving Davidson Declaration. Defendant is free to argue that the Bronars assumption of a targeted RIF is correct and that the Munro conclusion of an agency-wide RIF is incorrect, but that argument does not make it an undisputed question of fact.

### Defendant's Statement # 59

*Dr. Munro concluded that the RIF had a disparate impact on African-Americans and employees age 40 and above based on the "four-fifths" rule, rather than the two standard deviations rule from Hazelwood Sch. Dist., v. United States, 433 U.S. 299 (1977). Report by Dr. Paige Munro, attached as Exhibit I ¶¶ 6.a., 6.b., 7.a., 7.b.; Rebuttal by Dr. Paige Munro, attached as Exhibit K at 13.*

Plaintiffs' Disputed Statement

Dr. Munro used three different statistical methods to calculate disparate impact: ANOVA, Chi-Squared, and the 4/5ths Rule. While each analysis has a different systematic computation process, all three tests consistently found that there exists a disparate impact with respect to race and age with statistical significance. Moreover, the statement that *Hazelwood* requires exclusively the two standard deviations rule – a statement the Supreme Court itself has never made – is an argument of law, not a statement of fact, much less an undisputed one.

### Defendant's Statement # 64

*Plaintiffs Dudley, Gray, Hailes, and Kelley have abandoned their Title VII claims based on their answers to the District's discovery requests.*

Plaintiffs' Disputed Statement

The referenced Plaintiffs have not abandoned nor dismissed their claims.

### Defendant's Statement # 65

*The District duly served upon Plaintiffs a First Requests for Production of Documents and asked Plaintiffs to produce their right to sue letters issued from the EEOC. Defendants Requests for Production, attached as Exhibit W, ¶ 9.*

Plaintiffs' Disputed Statement

The referenced Plaintiffs do not have Right to Sue Letters.   However, consistent with the Third Amended Complaint at paragraphs 2 and 94, they have asserted and continue to assert Title VII race discrimination claims.


*Defendant's Statement # 66*

*Plaintiffs filed a Response to Defendant's First Requests for Production Documents and Second Set of Interrogatories stating that they are not asserting Title VII actions and that the request is irrelevant to their claims. Response to Plaintiffs Requests for Production. attached as Exhibit X, ¶ 9.*

Plaintiffs' Disputed Statement

Plaintiff' Response did not concede its claims under Title VII as plead, but intended to indicate only that they had not received Right to Sue Letters. Said Response has been supplemented and clarified consistent with paragraphs 2, 94 and the jury trial demand in the Third Amended Complaint.   The aforementioned Plaintiffs Dudley, Gray, Hailes, and Kelley do not concede their Title VII claims.  (Pl. Exhibit 17).


Date: December 21, 2015

Respectfully submitted,

 /s/ Aderson B. Francois
Aderson B. Francois
Civil Rights Clinic
Howard University School of Law
2900 Van Ness Street N.W.
Washington, DC 20008
Phone: (202) 806-8065
Facsimile: (202) 896-8436
Email: afrancois@law.howard.edu

Donald M. Temple, Esq.
1101 15th Street NW, Suite 203
Washington, D.C. 20005
Phone:  (202) 628-1101
Facsimile: (202) 628-1149
Email: dtemplelaw@gmail.com