PLAINTIFFS' EXHIBIT 11

1

1       THE DISTRICT OF COLUMBIA

2    BOARD OF ETHICS AND GOVERNMENT ACCOUNTABILITY

3

4       IN THE UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF COLUMBIA

6    - - - - - - - - - - - -X

7    RONDA L. DAVIS, et al.,      )

8            Plaintiffs,          )

9       Vs.                       )    C.A. No. 10-1564 (RC)

10   DISTRICT OF COLUMBIA          )

11   CHILD AND FAMILY             )

12   SERVICES AGENCY, et al.,      )

13           Defendants.           )

14   - - - - - - - - - - - -X

15   CYNTHIA DUDLEY, et al.,       )

16           Plaintiffs,           )

17      Vs.                        )    C.A. No. 10-1718 (RC)

18   DISTRICT OF COLUMBIA,         )

19           Defendant.            )

20   - - - - - - - - - - - -X

21                           Washington, D.C.

22                           January 23, 2014

2

1    Deposition of:

2              DARIUS R. MORRIS,

3    a Plaintiff herein, called for examination by

4    counsel for the Defendants in the above-entitled

5    matter, pursuant to Notice, taken at the Office of

6    Attorney General for the District of Columbia,

7    One Judiciary Square, 441 Fourth Street, N.W.,

8    Sixth Floor, Room 6N065, Washington, D.C., 20001,

9    scheduled to begin at 9:00 a.m., before Anne E.

10   Castellow, CVR-M and Notary Public in and for the

11   District of Columbia.

12

13

14

15

16

17

18

19

20

21

22

3

1    APPEARANCES:

2

3     ON BEHALF OF THE PLAINTIFF:

4          DAVID ROSE, ESQUIRE

5          Rose Legal Advocates, P.C.

6          4611 Norwood Drive

7          Chevy Chase, MD 20815

8          (202) 331-8556

9          (202) 769-5806 (FAX)

10         daver@roselawyers.com

11

12    ON BEHALF OF THE DEFENDANTS:

13         CHAD A. NASO, ESQUIRE

14         Office of the Attorney General

15         for the District of Columbia

16         441 Fourth Street, N.W.

17         Sixth Floor South

18         Washington, D.C. 20001

19         (202) 724-7854

20         (202) 741-8951 (FAX)

21         chad.naso@dc.gov

22

4

```
 1     APPEARANCES CONT.:

 2

 3     ALSO PRESENT:

 4          EDUARDO RIVERO, INTERN

 5

 6               -o0o-

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

5

1                        C O N T E N T S

2      WITNESS                            EXAMINATION

3      DARIUS R. MORRIS

4          BY MR. NASO . . . . . . . .        5

5

6                        E X H I B I T S

7      MORRIS EXHIBIT:                     PAGE MARKED

8      No. 1  Charge of Discrimination         45

9

10                                             .

11

12

13

14

15

16

17

18

19

20

21

22

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                1/23/2014

6

1                     P R O C E E D I N G S

2                                    (9:40 a.m.)

3      Whereupon,

4                     DARIUS R. MORRIS,

5      was called for examination, having first been duly

6      sworn by the court reporter, was examined testified

7      as follows:

8              COURT REPORTER:  Thank you.  Would you

9      please state and spell your name for the record,

10     please.

11             WITNESS:  My name is Darius R. Morris --

12     D-A-R-I-U-S, last name Morris -- M-O-R-R-I-S.

13             COURT REPORTER:  Thank you.  Witness

14     sworn.

15         EXAMINATION BY COUNSEL FOR THE DEFENDANTS

16             BY MR. NASO:

17         Q.  Good morning, Mr. Morris.  We met briefly

18     a moment ago.  I'll introduce myself for the

19     record.  My name's Chad Naso.  I am an attorney.  I

20     represent the District of Columbia in connection

21     with a lawsuit that you have brought against the

22     District.  We're here today to take your deposition

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

7

1       in connection with that lawsuit.

2               Have you ever been deposed before?

3       A.  No.

4       Q.  Okay.  So a fairly simple process, I'll

5       just walk through it.  Basically, we're here today

6       to give me an opportunity to ask you some questions

7       to give me a better understanding of your claims

8       and your experience working at Child and Family

9       Services Agency.

10              We have a court reporter here who's going

11      to be transcribing, writing down what we say so

12      that we have a transcript to look back on in the

13      future.  Because we're going to be writing down

14      what we say, there's a couple things we should keep

15      in mind.

16              One, I'm going to need for you to respond

17      to my questions verbally.  A shake of the head or a

18      body gesture doesn't come off very well on paper,

19      so I'll need yes-no answers.

20              Second, also because we're trying to have

21      a clean transcript, we should make an effort not to

22      talk over one another, so please let me finish a

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Florida
f2b3e48e-b39b-4030-a9d2-8f8ea868df05

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

8

1       question before you answer it.

2               Three, if you do not understand a

3       question, please just ask me to clarify it.  I'll

4       be happy to do it.

5               And four, if at any time you need a break,

6       take a bathroom break or need a drink -- I see you

7       brought in a bottle -- I'm happy to accommodate

8       you.  I would just ask that if a question's pending

9       that you please answer it before we take a break.

10      Does that sound okay?

11          A.  Okay.  Sounds great.

12          Q.  Okay.  You swore an oath a moment ago to

13      testify truthfully today; is that correct?

14          A.  Correct.

15          Q.  Okay.  Is there any reason why that you

16      would be unable to testify truthfully today?

17          A.  No.

18          Q.  Okay.  How do you feel today generally?

19          A.  I have a tooth ache.

20          Q.  Okay.

21          A.  Other than that, I feel pretty good.

22          Q.  Okay.  Are you on -- currently on any

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                1/23/2014

9

1       medication?

2          A.   No.

3          Q.   Okay.  Did you do anything to prepare

4       yourself for today's deposition?

5          A.   No.

6          Q.   Did you talk to anyone about your

7       appearance here today?

8          A.   No.

9          Q.   Did you review any documents to refresh

10      your memory?

11         A.   No.

12         Q.   Okay.  What is your current address?

13         A.   1010 Karen Boulevard, Capitol Heights,

14      Maryland 20743.

15         Q.   Okay.  And what is your date of birth?

16         A.   03/12/65.

17         Q.   Okay.  So if I'm correct, that makes you

18      48 as we sit here today?

19         A.   Yes.

20         Q.   Okay.  For the record, Mr. Morris, what is

21      your race?

22         A.   I guess I would be considered African

10

1      American.

2          Q.   Okay.  Are you currently employed?

3          A.   Yes.

4          Q.   Where are you employed?

5          A.   I'm employed with the District of Columbia

6      Department of Human Services.

7          Q.   What is your position with DHS?

8          A.   I am a SSR, community support

9      representative.  I -- no, I'm sorry.  SSR is a

10     social service representative.

11         Q.   A social service representative.

12         A.   I think that's what it's called.

13         Q.   How long have you been employed in that

14     position?

15         A.   A few months.  I think since the end of --

16     maybe the beginning of November, I'm thinking.

17         Q.   November 2013?

18         A.   Yes.

19         Q.   All right.  Can you briefly describe your

20     duties as a social service representative?

21         A.   Well, I work with the Child Services

22     Division.

11

1        Q.  Uh-huh.

2        A.  I'm an eligibility worker.  I interview

3    consumers for their eligibility for child care

4    missions, child care vouchers as it's also known.

5    It's a process of interviewing, collecting

6    documentation, reviewing that documentation to

7    ensure that it meets the standards to qualify for a

8    voucher.

9        Q.  Okay.  What is your salary in that

10   position?

11       A.  Approximately 50,000 or so, 50,700 and

12   something.

13       Q.  Okay.  Prior to working as an SSR with the

14   Department of Human Services, where were you

15   employed before that?

16       A.  I was employed for a company called

17   Fihankra Place.  It's a core service agency.

18       Q.  Could you spell that?

19       A.  F-I-H-A-N-K-R-A.  Yes, everyone says that.

20           COURT REPORTER:  Spell that again, please?

21           WITNESS:  F-I-N-K-H-I-A, R-I-A, something

22   like that.

12

```
 1            BY MR. NASO:
 2       Q.   Okay.  And what was your position there?
 3       A.   The position was a clinical manager.
 4       Q.   Okay.  And what were the duties of the
 5   clinical manager?
 6       A.   I supervised and managed a team of
 7   community support workers, a team of
 8   approximately -- it varied in numbers --
 9   approximately eight, nine community support
10   workers.  We provide mental health services from
11   District residents.
12       Q.   Uh-huh.
13       A.   I'm responsible for reviewing treatment
14   plans.  Overall, we were trying to meet the goals
15   identified on those treatment plans to improve the
16   overall well-being of the clients or consumers that
17   were serve through mental health services, therapy,
18   psychiatric services, and community support
19   services.
20       Q.   Okay.
21       A.   That's kind of in general.
22       Q.   That was a private organization?
```

13

1        A.   Yes, it's a private organization.

2        Q.   **Okay.  And how long did you work for that**

3    **organization?**

4        A.   I worked for that organization

5    approximately I would want to say maybe two and

6    half years or so.  I don't know the actual numbers

7    right now, but that's approximately two and a half

8    years or so.

9        Q.   **All right.  Did you stop working there in**

10   **or about November of 2013?**

11       A.   Maybe before that.  Maybe September or

12   something that soon.

13       Q.   **Okay.**

14       A.   Or October.

15       Q.   **So, I guess, when did you start working**

16   **there?**

17       A.   I'm sorry?

18       Q.   **When did you begin working at**

19   **Fihankra Place?**

20       A.   I started working there -- and you have to

21   excuse me.  My memory's not that great.

22       Q.   **Of course.**

**DARIUS R. MORRIS**
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

14

1        A.   I started working there, let's see.   I was

2    RIFfed from SCFA in, was it 2010?

3        Q.   Uh-huh.

4        A.   So I probably started working there a year

5    later.

6        Q.   Okay.

7        A.   Probably 2011.

8        Q.   Would you say approximately June or --

9        A.   Maybe January 2011, maybe.

10       Q.   January of 2011.

11       A.   I'm thinking, yeah.

12       Q.   Okay.  And between the time that you were

13   RIFfed, which I believe was around June of 2011 --

14   or, excuse me, 2010, --

15       A.   Uh-huh.

16       Q.   -- and when you started at Fihankra.

17       A.   Fihankra.

18       Q.   Fihankra Place --

19       A.   Yeah.

20       Q.   -- in or about January of 2011, were you

21   employed during that stretch of time?

22       A.   Yes.

Olender Reporting, Inc.              (888) 445-3376              WORLDWIDE
Washington, D.C.                     Baltimore, MD                  Florida
                                                        f2b3e48e-b39b-4030-a9d2-8f8ea868df05

15

1      Q.   Okay.  Were you collecting unemployment

2   during that time?

3      A.   No.

4      Q.   Okay.  And were you receiving severance

5   payments from CFSA during that time?

6      A.   Yes.

7      Q.   Okay.  How much were you receiving?

8      A.   The actual amount I do not know, but it

9   was equivalent to I think my salary at the time.

10     Q.   Okay.  They paid you out for your -- the

11  remaining salary up until the end of the fiscal

12  year?

13     A.   The remaining salary -- well, I don't know

14  if it was up to the fiscal year, --

15     Q.   Okay.

16     A.   -- but we were given a severance based on

17  the years of service.

18     Q.   Uh-huh.

19     A.   So my severance was determined on the

20  length of my severance was determined based on the

21  length of service that I worked at the Agency.

22     Q.   And it looks like there was a period

16

1    between the time when you left the Fihankra Place -

2    -

3         A.   Uh-huh.

4         Q.   -- and when you began with DHS.  Were you

5    unemployed during that time?

6         A.   Yes.  I was unemployed for a short period

7    of time, yes.

8         Q.   Okay.  Could you please describe your

9    educational background?

10        A.   Well, I, of course, have a high school

11   diploma, graduated from high school.

12        Q.   Uh-huh.

13        A.   I have a degree in business

14   administration, concentration in management.  I

15   also have approximately 51 credit hours towards my

16   MSW.  I attended Howard University.  And that would

17   pretty much be the extent of it.

18        Q.   Okay.  So you have a degree in business

19   administration.  Is that a Bachelor's of Science

20   degree?

21        A.   That would be a Bachelor's of Science

22   degree, correct.

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                               1/23/2014

17

1      Q.   Okay.   And that's from Howard University?

2      A.   No.

3      Q.   Oh.

4      A.   That was from Elizabeth City State

5   University in North Carolina.   And as I mentioned I

6   have 51 credit hours towards my MSW at

7   Howard University.

8      Q.   Oh, okay.

9      A.   And that's a Master's of Social Work

10  degree.

11     Q.   And when did you obtain your BS in

12  business administration?

13     A.   That would be a long time ago.

14     Q.   Prior to 2010?

15     A.   Yes, prior to 2010.

16         MR. ROSE:   Quite a while ago.

17         WITNESS:   Quite a while ago, '80

18  something.

19         BY MR. NASO:

20     Q.   Okay.   So, as I mentioned, so it's correct

21  that you have brought a lawsuit against the

22  District of Columbia; --

18

1       A.   Okay.

2       Q.   -- is that correct?

3       A.   Correct.

4       Q.   Okay.  Can you briefly tell me what is

5   your lawsuit about?  Why are you bringing a

6   lawsuit?

7       A.   Well, my beliefs and my feeling is that we

8   were -- I was -- we, myself included, were unfairly

9   or let go from the District of Columbia for no

10   justifiable reasons.  I can't --

11             In addition to that, I was not allowed

12   to -- I was not rehired for the position --

13       Q.   Uh-huh.

14       A.   -- of the family support worker position,

15   despite the fact that I have over 15 years of

16   institutional knowledge about the position.  As

17   well as the degree, the educational degree, in

18   addition to the credit hours towards my master's in

19   social work and giving a, what I would consider

20   would be, a good history of employment with the

21   Agency.

22             In addition to the fact that after being

19

```
1    let go from the Agency, we were further, in my

2    opinion, discriminated against through its failure

3    to properly incorporate or bring us back into the

4    Agency as per its reemployment programs, both the

5    District's reemployment program as well as the

6    Agency's reemployment program.

7         Q.   Okay.   When you say "we," who are you

8    referring to?

9         A.   "We" being many of those who qualified for

10   the reemployment program and that were RIFfed on

11   that particular day.

12        Q.   Okay.   How would one qualify for the

13   reemployment program?

14        A.   Well, I would imagine that's automatic if

15   you're RIFfed from the Agency, then based on their

16   reemployment or the program itself, you should --

17   my belief is that you should be considered for

18   positions within that Agency as well as the

19   District.

20        Q.   Okay, all right.   When did you begin

21   working at CFSA?

22        A.   I believe it was in '94.
```

20

1        Q.  And to correct that, while working at the

2   CFSA, you worked as a social service assistant?

3        A.  Yes.

4        Q.  Okay.  Were you hired as a social service

5   assistant in '94?

6        A.  Yes.

7        Q.  Okay.  And it's correct that you worked

8   continuously in that position up until the time

9   that you were RIFfed in 2010?

10       A.  Correct.

11       Q.  Was there a particular division or unit of

12  the Agency in which you worked?

13       A.  Well, the name of the division I worked in

14  changed periodically.

15       Q.  Okay.

16       A.  So at the time they let me go, to be quite

17  honest with you, I can't quite remember what the

18  name of the division was at that time.

19       Q.  Okay.

20       A.  But it changed quite a bit.

21       Q.  If I told you it was In-Home Permanency

22  Division, would that sound right?

21

1      A.   That would sound -- I would agree with

2  that.

3      Q.   **Okay.**

4      A.   That could very well be it.

5      Q.   **Tell me, what were your duties as an SSA?**

6      A.   My duties as an SSA?

7      Q.   **Yeah.**

8      A.   Wow.  It varied, it ranged.  My duties as

9  an SSA would include supporting the social workers

10  as well as the supervisor in providing services for

11  children of families at risk.

12      Q.   **Okay.**

13      A.   And that varied.  It ranged anywhere from

14  home visits to medical appointments to crisis

15  situations to record management to inputting

16  information into what's called FACES system.  There

17  were quite a few duties involved with that.

18      Q.   **Okay.**

19      A.   Some of which were probably dangerous in

20  nature as well.

21      Q.   **What do you mean by that?**

22      A.   Oftentimes we were asked to go into

22

1    dangerous situations, which includes going into

2    neighborhoods that were not good neighborhoods.

3    Neighborhoods that often maybe provided threats or

4    harm, if I'm saying in correctly.

5            We were exposed to children with

6    illnesses, disease.  And I say disease because if a

7    child -- and maybe the word disease is too strong

8    of a word.  But children who are exposed to various

9    illnesses --

10       Q.  Uh-huh.

11       A.  -- that could transmitted onto or that we

12   ourselves could catch.

13           We were put into hostile situations

14   oftentimes.  I've been in many hostile situations.

15       Q.  And were those -- when you went into those

16   neighborhoods and were put in those situations,

17   were those, I guess, because of home visits?  Were

18   you conducting home visits at the time?

19       A.  Home visits, placements, --

20       Q.  Okay.

21       A.  -- removing children from homes.  Our

22   duties -- in that situation, to answer your

23

1    question, yes.

2         Q.   Okay.   You said your duties were I guess

3    generally supporting the social worker?

4         A.   Our duties as a social service assistant?

5         Q.   Uh-huh.

6         A.   Our responsibility was to support the

7    social worker as well as the supervisor in

8    facilitating or in facilitating them in meeting the

9    orders of the court as it relates to stabilizing

10   that family or supporting that family or supporting

11   a child.

12        Q.   Could you tell me a little bit about the -

13   - I guess the what's the word -- the distinction or

14   the demarcation of duties between the social worker

15   and the social service assistant?   Were there some

16   things that the social worker had to do and an SSA,

17   you know, could not do?   Were there certain duties

18   that overlapped that either one could do?

19        A.   Well, the social worker had the primary

20   responsibility for that case, which involved court

21   reports and probably a variety of other things that

22   I'm just not aware of.

24

1          It was my job to assist them in carrying

2     our whatever orders the court deemed necessary to

3     assist that family.

4          Q.  Okay.

5          A.  So the actual distinction, I could not

6     tell you; however, there were -- I mean, the

7     social worker could also do home visits or do

8     placements, but that would be something that

9     generally I would do as an SSA or as a -- yeah, as

10    an SSA.

11         Q.  Okay.

12         A.  Social service assistant.

13         Q.  We heard a little bit about clinical

14    assessments versus nonclinical assessments.

15         A.  Uh-huh.

16         Q.  Could you tell me a little about that?  My

17    understanding is that clinical assessments are

18    something a social worker had to do and the

19    social service assistant didn't really touch on

20    that.

21         A.  Clinical assessments?

22         Q.  Uh-huh.

25

1        A.   When you say assessments, what do you mean

2   when you say assessment?

3        Q.   Well, coming from someone coming from a

4   non-social work background, --

5        A.   Okay.

6        Q.   -- I'm not entirely sure, but my

7   understanding is that in the course of a home visit

8   there are certain assessments that you

9   social workers would do of the family that the

10  social service assistants didn't really get

11  involved with.  Do you have any understanding of

12  that or --

13       A.   Well, an assessment to me would be an

14  actual evaluation of --

15       Q.   Uh-huh.

16       A.   -- an evaluation of some sort.

17            A home visit may or may not be considered

18  an evaluation, but then that's not necessarily

19  something that has to be done by someone with a

20  clinical license.  It does not mean that.

21       Q.   Uh-huh.

22       A.   The Agency, to my understanding, in order

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

26

1    for certain visits to count in their FACES system,

2    they would have to be done by a clinical

3    social worker supposedly in order for it to count

4    in their FACES system.

5        Q.   I see.

6        A.   However, that does not mean that I

7    couldn't go out to a home and do a visit, --

8        Q.   Uh-huh.

9        A.   -- you know, to potentially assess the

10   situation.

11            For example, if we get a report that

12   there's something going on in the home and we want

13   to go in and check on the situation to see what's

14   going on to try to get some idea of what's going

15   on.  So that in itself would be an assessment, an

16   assessment situation.

17       Q.   Sure.  But to your understanding there

18   were certain visits that in order to make it count

19   in the FACES system, there were a certain number of

20   visits that the social worker actually had to do?

21       A.   To my understanding, yes.  In order for it

22   to count per, I guess, the FACES system or per the

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                                    1/23/2014

27

```
1    LaShawn Order or whatever standards they had set or

2    have set, then I think the social worker, the

3    social worker alone, --

4         Q.  Right.

5         A.  -- the person with their license, would

6    have to do certain visits.

7         Q.  Okay.  I guess let's talk a little bit

8    about the RIF, which, for the benefit of the

9    court reporter, that's reduction in force, if we

10   haven't said that already.  When did you first hear

11   about the RIF?

12        A.  Hear about the RIF or the Agency letting

13   go employees?  Because we said "the RIF."

14        Q.  Uh-huh.

15        A.  To my understanding, people were being let

16   go, I guess.  There wasn't just one situation where

17   someone was let go, so.

18        Q.  Oh, okay.

19             MR. ROSE:  Well, I think there are a whole

20   group.

21             WITNESS:  Right.

22             MR. ROSE:  The RIF is referring to one
```

28

1    particular group.

2              MR. NASO:  Yeah, I can rephrase or

3    clarify.

4              WITNESS:  Okay.

5              BY MR. NASO:

6        Q.  So my understanding is that on or about

7    May 6th of 2010, --

8        A.  Okay.

9        Q.  -- the Agency announced that it was going

10   to be terminating, I guess, a large number of

11   employees.

12       A.  Okay.

13       Q.  I guess it was announced on May 6th, is my

14   understanding.  I'm just wondering when the first -

15   - if you had heard any rumblings of this large

16   scale layoffs come down the pipe or if May 6th was

17   the first time you had heard about it?

18       A.  Well, there had been rumors --

19       Q.  Uh-huh.

20       A.  -- floating about that there was going to

21   be a RIF.  There were rumors.

22       Q.  And what was in -- I mean, what do you

29

1    remember about that, those rumors?  Was there a

2    reason as to why this was going to happen?

3         A.   Well, my assumption would have been that

4    given the economic climate the time that it was for

5    fiscal reasons.

6         Q.   Uh-huh, okay.  And do you recall -- well,

7    I guess, how were you actually informed that you

8    were being let go?

9         A.   How was I informed?

10        Q.   Yeah.

11        A.   Well, I was informed by being told to --

12   well, how was I actually informed?  I was

13   summonsed to a room, conference room, whereby we

14   were -- all those who were there that day that was

15   being let go with their, I guess, supervisors as

16   well -- were summonsed to a conference room, and we

17   were all told that we were going to -- that that

18   was our last day of work.

19        Q.   Okay.  Do you have an understanding of how

20   many people were let go in the RIF?

21        A.   You said as far as how many, no.  I do not

22   have an actual understanding of how many people

30

1    were let go.

2         Q.  Do you know whether the RIF was confined

3    to the social service assistant position or whether

4    it was broader, included other positions?

5         A.  There were others that were let go that

6    were not social service assistants.  Yes, there

7    were others.

8         Q.  Do you have any understanding as to how

9    the Agency decided who to fire in the RIF?

10        A.  No.  Actually, I don't know if -- how the

11   social service assistant was let go 'cause I don't

12   know if it was a RIF or a realignment or we were

13   RIFfed.

14        Q.  Okay.  Did you ever try to appeal your

15   termination in the RIF through the District's

16   Office of Employee Appeals?

17        A.  The District's Office of Employee Appeals,

18   no.

19        Q.  Okay.  Were you aware that you could

20   appeal it through the Office of Employee Appeals?

21        A.  Well, what I chose to do is seek advice

22   from my union leadership --

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

31

1       Q.   Okay.

2       A.   -- and allow them to handle the process,

3    being it was something I had never experienced

4    before and they were very -- should have been very

5    familiar with the process and so.

6       Q.   So you went to the union leadership and --

7

8       A.   Yes.

9       Q.   -- allowed them to, I guess, address any -

10   - raise any concerns concerning the RIF that you

11   have.

12      A.   Being that that is, to my understanding,

13   their role and responsibility, I allowed them to go

14   ahead and handle that situation.

15      Q.   You mentioned the family support worker

16   position?

17      A.   Family support worker position, yes.

18      Q.   It my understanding that position was

19   created around the time of the RIF at CFSA.  How

20   did you first come to learn about this position?

21      A.   Well, the family support worker position

22   was -- how did I first come to learn about the

32

1    family support worker position?

2            We were told that there will be a new

3    position created after we were, I guess, let go

4    from the Agency, and that we, for those who

5    qualified, we would be allowed to apply for the

6    position.

7        Q.  Okay.  And what did they talk about in

8    terms of qualifications?

9        A.  Qualifications?

10       Q.  Uh-huh.

11       A.  That you needed to have a bachelor's

12   degree, and that was pretty much it.

13       Q.  And at the time you met that

14   qualification, correct?

15       A.  Yes.

16       Q.  Okay.  And did you apply for the family

17   support worker position?  Well, you said you did.

18       A.  Yes, I applied for the position.

19       Q.  Okay.  Did you receive an interview for

20   the position?

21       A.  Actually, I was interviewed by the

22   Lionel Hamin and Betty Mitchell, I believe.  During

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                                    1/23/2014

33

1     that interview, Mr. Hamin frequently dozed off,

2     fell asleep.  Mr. Hamin is no longer here.  He has

3     since passed away.

4          Q.   Oh.

5          A.   My assumption could be that he was dozing

6     off because of whatever medication he could have

7     very well been on at the time.  I do not know that,

8     but he did frequently doze off.

9          Q.   Uh-huh.

10         A.   Ms. Mitchell is no longer employed with

11    the Agency.  It's my understanding that she was

12    fired from the Agency.

13              I was very surprised to be interviewed by

14    both parties being that none of which had any

15    experience or had any knowledge of my actual

16    performance with the Agency.  And I was very

17    surprised of that.

18         Q.   Okay.  Can you tell me a little bit

19    about -- I mean, other than what you've just

20    described -- about the interview process, what sort

21    of questions were they asking you?

22         A.   Some of the questions they asked, it

34

1    appeared to me as if they had no real understanding

2    of the role and responsibility that I performed as

3    an SSA, which surprised me.

4        Q.   Okay.   I guess --

5             MR. ROSE:   I'm sorry.   Could you either

6    restate the question or ask the reporter to?

7             MR. NASO:   I think it was, I was asking

8    him to describe the interview.

9             MR. ROSE:   Okay.

10             MR. NASO:   I believe that was the last

11   question.

12             MR. ROSE:   Do you want him to describe it?

13             MR. NASO:   I think he described it to my

14   satisfaction.

15             MR. ROSE:   Okay, that's fine.

16             BY MR. NASO:

17        Q.   After you left the interview, did you have

18   a feeling that it went well or that it went not so

19   well?

20        A.   Well, after leaving the interview, I felt

21   that -- I guess I felt that it went well, although

22   I did have some slight concerns.

35

1      Q.   Uh-huh.

2      A.   Obviously, if the person who's

3    interviewing me is dozing off, going to sleep, and

4    the other person is asking me questions that --

5    which appeared as if she had no real understanding

6    of the actual role and responsibilities that SSAs

7    carry on a day-to-day basis.

8      **Q.   I guess what are your understandings as to**

9    **the duties of a family support worker in contrast**

10   **to the social service assistant position?**

11     A.   Well, it's been told to me by people who

12   currently work at the Agency, and it's been

13   whispered to me by people who even are working in

14   the position of the family support worker position,

15   that they are doing nothing different from the

16   position of the SSAs.  And, in fact, they're

17   probably doing less.

18     Q.   Uh-huh.

19     A.   Upon us being let go, Debra Porchia-Usher,

20   I believe she issued a statement saying that the

21   family support worker position would be responsible

22   for case -- did she say case management?  I'm

36

1      sorry, I'm drawing a blank --

2          Q.  Sure.

3          A.  -- in terms of the term that she used.

4              However, to my understanding, the FSWs are

5      not doing anything different.  They're not.  And,

6      in fact, they're probably doing less.

7          Q.  **And your understanding is based on what**

8      **you've been told by people who are still at the**

9      **Agency?**

10         A.  I've been told by people who are still at

11     the Agency, and I'm pretty sure it could be

12     documented if someone were to look into it.

13         Q.  **Sure.  Could you tell me who told you**

14     **that?**

15         A.  At this point I would probably rather not

16     mention any names because I doubt if they would

17     want to have their names mentioned at this point.

18             MR. ROSE:  I think we have a privacy

19     agreement, so that if you wish you could answer the

20     question, but it would be something that both sides

21     have agreed --

22             MR. NASO:  Is confidential?

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                                      1/23/2014

37

1          MR. ROSE:  -- is confidential.

2          WITNESS:  Well, I will say that

3    Mr. Ed Randolph, who is not working at the Agency,

4    however, he is a former employee of the District of

5    Columbia.  He also was an SSA.  He now works for an

6    organization that provides services for the

7    District.  He works as a family support worker.

8       Q.   **Does he work for that collaborative?**

9       A.   He works for one of the collaboratives.

10      Q.   **Okay.**

11      A.   So he works side by side with CFSA in many

12   cases, so he's able to bear witness to pretty much

13   what the FSWs do.  His concern, obviously, is he

14   doesn't want to have to -- he doesn't want the

15   Agency or the collaboratives to penalize him in any

16   kind of way for bringing that information to light.

17      Q.   **Okay, fair enough.**

18          MR. ROSE:  So that's the question and

19   answer that we've agreed has been confidential, so

20   from now on, unless there's another situation of

21   the same kind, it's going to be public.  But your

22   answer's going to be available.

38

1             WITNESS:  Okay.

2             MR. NASO:  Thank you.

3             BY MR. NASO:

4        Q.  Okay.  So back to the hiring process for

5    the family support worker.  Do you have any idea as

6    to what the Agency or what sorts of factors the

7    Agency was considering or looking for in candidates

8    for family support worker positions?

9        A.  No, and it's puzzling.  I was told that in

10   order to qualify for the position you need to have

11   a degree.

12       Q.  Uh-huh.

13       A.  Again, I have of 15 years of institutional

14   knowledge of the Agency.  There were people who

15   were hired for the position who had less experience

16   than myself.

17       Q.  Uh-huh.

18       A.  I have 15 credit hours towards a master's

19   in social work on top of the degree.  There were

20   people who, to my understanding, had less education

21   and were hired for the position, --

22       Q.  Uh-huh.

39

1       A.   -- but also those people were younger than

2    myself.

3         Q.   Okay.

4       A.   And when I asked my administrator at the

5    time, Jesse Winston, I contacted him and asked

6    him -- I tried to get some understanding of what

7    was going on.  He stated to me -- and whether he

8    will want to admit to it or not.

9              He said that it would be to my advantage

10   to challenge or to question why I wasn't brought

11   back.  And the way he explained it to me is that

12   they purposely chose not to bring me back.

13        Q.   Okay.

14       A.   Now, this is what he stated.

15        Q.   And "they" meaning the Agency in general

16   or --

17       A.   I guess it would be the administration.

18   There were times when I worked for the Agency where

19   I was told that I could not work overtime, and that

20   any overtime that I was asked to do by a

21   social worker or someone that I had to pass that

22   overtime onto someone else.

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

40

```
 1        Q.  Okay.

 2        A.  Which, to me, did not make any sense.

 3        Q.  Do you believe that the fact that you were

 4   not hired -- strike that.

 5             Yeah, I guess, do you believe that CFSA's

 6   decision not to hire you for a family support

 7   worker position was discriminatory?

 8        A.  Yes.

 9        Q.  Okay.  On what -- discriminated based on

10   what?

11        A.  Based on I think a number of reasons.

12   Some of which probably makes no sense.  But to

13   begin with, based on I believe age.

14        Q.  Okay.  Because you were older or younger?

15        A.  Because they chose not to rehire me when,

16   in fact, they hired some people who were much

17   younger than me with less experience and probably

18   with less education.

19        Q.  Uh-huh.

20        A.  I think it was -- I mean, of course, I

21   don't know for sure.  It's my guesstimation.  I

22   think it had to do with fiscal reasons.
```

41

1              I believe that some of the younger people

2     that they hired who had only been at the Agency I'm

3     assuming maybe three or four years, they were being

4     making less than what I was making, considering

5     that I had been there for over 15 years.

6              So to elevate me to a higher grade would,

7     of course, mean you're going to spend more money on

8     me than you are going to spend on a younger person

9     that you just brought into the Agency.

10             I think some of it had to do with the fact

11    that at the time, because I'm single and I don't

12    have any children, I choose to work, if I'm able to

13    work.  I don't have a problem in working overtime,

14    working nights and weekends.

15        Q.   Uh-huh.

16        A.   I think they looked at that as being

17    something that they did not want to pay for, so

18    they chose to cut my overtime for whatever reason.

19             There were a number of occasions I was

20    called into both of my supervisors' office or my

21    administrator or program manager's office, and I

22    was told that, "Darius, you cannot work overtime"

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

42

1    or "We have to give this to someone else" who gets

2    paid at a higher rate.

3              So, yes, I think there was one occasion

4    when I brought this situation up to

5    Mr. Roque Gerald, I mentioned to Mr. Gerald that I

6    thought it was unfair that I was being told that I

7    couldn't work overtime, and that I did not want to

8    bring this up to the union as an issue.

9              Mr. Gerald stated to me that, "Well, you

10   may have won the battle, but you won't win the

11   war."

12       Q.   **Mr. Gerald told you that?**

13       A.   Yes, he said that directly.  So as far as

14   their reasons for not bringing me back, I don't

15   know.

16       Q.   **Uh-huh.  Okay, so you think that -- but**

17   **you believe that it was discriminatory based on**

18   **your age?**

19       A.   Age, --

20       Q.   **Uh-huh.**

21       A.   -- I don't know.  Who knows how they

22   think.  It could be personal.

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                 1/23/2014

43

1       Q.   Do you believe that it was discriminatory

2   based on your race?

3       A.   I think that probably in some way, yes.

4       Q.   Okay.   And why would you believe -- why do

5   you believe that?

6       A.   I think Mr. Gerald wanted to change the --

7   this is my opinion.   I think he wanted to -- he had

8   an idea of what image he wanted to have the Agency

9   to appear.   I don't know how that sounds.   And I

10  think, in fact, he wanted to get rid of possibly

11  some people because of our race.   I don't know.

12      Q.   Do you think that would have been -- is

13  that intentional -- would have been an intentional

14  decision on the part of Mr. Gerald?

15      A.   Well, when Mr. Gerald stated to me that

16  "You might have won the battle, but you will not

17  win the war," that said to me -- I'm very puzzled

18  by that, and I can't understand why he would say

19  something like that to me, which kind of gave me

20  the impression -- well, after I got let go and not

21  brought back.

22      Q.   Just so I understand, that statement that

44

1    Mr. Gerald made, "You might win the battle, but you

2    won't win the war," that was made in reference to a

3    complaint you had about not being able to work

4    overtime?

5         A.  Well, yes.  It came to a complaint that --

6    and at that point it really wasn't a complaint.  I

7    was really just pointing out to him that, "Hey,

8    here's something that's going on."

9         Q.  Uh-huh.

10        A.  "And I just kind of want to bring it to

11   your attention 'cause I don't want it to become a

12   situation," in hopes that he would look at the

13   unfairness of it.

14            And without skipping a beat he said to me,

15   "You may win the battle" -- in other words, you can

16   go to the union if you want to -- "You may win the

17   battle, but you're not going to win the war," which

18   kind of said what war?

19        Q.  Uh-huh.  All right, this might be a

20   related question, but do you believe that the fact

21   that you were -- do you believe that you were fired

22   because of either your race or age?

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

45

1              MR. ROSE:  He's answered both.

2              BY MR. NASO:

3         Q.  Yeah, I just want to clarify that.  My

4    previous question was specifically that the fact

5    that you were not rehired for a family -- or not

6    hired as the family service position.  I understand

7    that you believe that that was discriminatory.

8              The fact that you were included in the RIF

9    in the first place, you believe you were included

10   in the RIF because of either your age or your race?

11        A.  Yes.

12        Q.  Okay.  For the same reasons we discussed?

13        A.  I think for some of the same reasons we

14   discussed, yes.

15        Q.  Okay.

16        A.  Those things do factor in.

17        Q.  Okay.  Do you believe that anyone else who

18   was included in that RIF was also discriminated

19   against because of either race or age?

20        A.  Yes.

21        Q.  And who that be?

22        A.  Well, several individuals.  Ed Randolph,

46

1    for one; Carla Johnson, and there were several

2    other individuals.

3         Q.  Okay.

4              MR. NASO:  Let me mark this as Exhibit 1.

5              (Whereupon, Morris Deposition Exhibit

6    No. 1 was marked for identification.)

7              BY MR. NASO:

8         Q.  Mr. Morris, I'm going to show you what has

9    been marked as --

10             MR. ROSE:  Let me just look at it, please.

11             BY MR. NASO:

12        Q.  -- Exhibit No. 1 --

13             MR. NASO:  Oh, sorry.  Let me give you

14   that.

15             MR. ROSE:  Oh, I know what this is.

16             MR. NASO:  This is a document that's been

17   produced in discovery in this case.  It bears

18   Bates stamp No. Davis 2927.  It bears the caption

19   Charge of Discrimination.

20             BY MR. NASO:

21        Q.  Do you recognize this document?

22        A.  Yes.

47

1        Q.  Can you tell me what it is?

2        A.  Well, it says charge of discrimination

3    form from the D.C. Office of Rights of EEOC.

4    That's my understanding of it.

5        Q.  Did you prepare this document?

6        A.  Yes.

7        Q.  Okay.  I believe on the -- if you turn to

8    the second page there's a signature next to the

9    charging parties.  Is that your signature there?

10       A.  Yes.

11       Q.  Okay.  So this is, I guess, a charge of

12   discrimination, which is what the caption bears.

13   Can you tell me what -- why you filed this

14   document?

15       A.  Well, because I feel like the Agency

16   discriminated against me in letting me go for

17   reasons that seem to me that they made up.

18           In addition to the fact that they did not

19   rehire me for the position when, in fact, I met the

20   standards and met the qualifications for the

21   position.  And that they hired other people with

22   less experience and things of that nature.

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

48

1    Q.   Okay.  I'll direct your attention -- well,

2    actually I'm going to point to the document.

3    A.   All right.

4    Q.   Direct your attention to this portion

5    where it says, Cause of discrimination based on,

6    and then there's a number of boxes checked.  It

7    appears from this that you're asserting that the

8    cause of discrimination has been -- was based on

9    race, color, national origin, retaliation, and age.

10          We discussed race and age a moment ago.  I

11   guess for the record, what is your national origin?

12   A.   National origin, please explain.

13   Q.   Well, it appears, and maybe I'm misreading

14   this or misunderstanding what you meant.  But it

15   appears that you checked the box that you believe

16   you're discriminated by the Agency or by the

17   District because of your national origin.  I guess

18   the country that you originate from.

19          Are you, I guess, are you American, are

20   from the United States, or you a foreign citizen?

21          MR. ROSE:  He's already testified he's an

22   American.

49

1                 WITNESS:  I am an American.

2                 BY MR. NASO:

3         Q.  Okay.

4                 MR. ROSE:  Pardon me, excuse me, again,

5     I'm sorry.  But I think the national origin

6     African American description is a -- means that

7     somebody's parents were born and they're raised

8     in --

9                 MR. NASO:  Right.

10                MR. ROSE:  -- Africa.

11                BY MR. NASO:

12        Q.  So I'll clarify then.  Is the fact that

13    the box national origin is marked, does that really

14    mean that you believe you're discriminated against

15    because of your race because you are

16    African American?

17        A.   I believe in some ways, yes, I was

18    discriminated against because of -- because I'm

19    African American in some ways, yes.

20        Q.  Okay.  And it says -- the box for

21    retaliation is also marked.

22        A.  Uh-huh.

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

50

1        Q.  Can you tell me what do you believe you

2    were retaliated for doing?

3        A.  Well, I believe that because I have been

4    employed with the Agency for over 15 years, --

5        Q.  Uh-huh.

6        A.  -- and that I've been pretty much almost

7    at the top of pay scale.  And that the Agency was

8    looking for a way to reduce its financial

9    obligations or reduce some of its financial -- some

10   of its expenses --

11       Q.  Uh-huh.

12       A.  -- that I was let go in that way as a

13   retaliation.  Or that they chose to use that as a

14   way to, I guess, --

15       Q.  Right.

16       A.  -- cut their expenses.

17       Q.  Basically you believe you were, I guess,

18   targeted because you were making too much money, or

19   if that's the way to phrase it?

20       A.  Maybe in some sort of way.

21       Q.  Yeah.

22       A.  Maybe also maybe they looked at the

51

1    potential of my age and the fact that older people

2    require more health coverage, or maybe I don't

3    know.

4         Q.  Okay.

5         A.  I don't know, I'm sorry.

6         Q.  **And just to be clear, do you have any,**

7    **other than just logically thinking it through or I**

8    **guess speculating, do you have any other basis for**

9    **believing that that is the case?**

10        A.  Well, again, with Mr. Roque's statement --

11

12        Q.  Okay.

13        A.  -- stating that "You will win the battle,

14   but you will not win the war," --

15        Q.  Right.

16        A.  -- I couldn't understand why he would even

17   say something like that.

18             And knowing that I had been brought into

19   my administrator's office on several -- on a couple

20   of occasions as well as my program manager, and the

21   issue of me working overtime was brought up.

22             And when I said to them, "Okay, so you're

52

1    not going to allow me to work overtime.  So this

2    task that needs to be completed, you're going to

3    give it to someone else to do.  And that other

4    person could easily be a social worker who makes

5    more money than me.  So in essence, you'll be

6    paying them more money than you will be paying me

7    to do the overtime."

8              That didn't seen to matter to them, which

9    is why I then went to Mr. Roque to bring it up as

10   to see if we could resolve it, and that was his

11   statement, so.

12        Q.  Okay.  Let me just direct your attention

13   to the first paragraph, second-to-last sentence,

14   where it says, "There was and is no financial

15   crisis."

16        A.  First paragraph, second-to-last sentence,

17   okay.

18        Q.  I guess, what is that statement based on

19   that "There was and is no financial crisis"?

20        A.  Well, for the fact that they would bring

21   in family support worker positions, pay them a

22   higher amount of money because you're paying them a

53

1      higher grade.

2          Q.   Uh-huh.

3          A.   How do you -- I don't understand there

4      being a financial issue if, in fact, you're paying

5      people at a higher grade to perform the same job in

6      which I was doing.  It seemed to me that there is

7      no financial crisis.

8          Q.   Okay, I see.  Did you ever receive a

9      response from the, I guess, the EEOC, the Office of

10     Human Rights to your charge?

11         A.   I believe we did.

12         Q.   You believe we did, but your attorney

13     would have received that, or is that what you

14     believe?

15             MR. ROSE:  My understanding of the

16     practice at EEOC is that if a case has been filed,

17     they will defer to the lawsuit and they won't do

18     anything one way or the other, so they just --

19             MR. NASO:  Okay.

20             MR. ROSE:  I would guess this would still

21     be on.  They were certainly -- they got a right-to-

22     sue letter.

54

1           MR. NASO:  And I guess that's what I'm

2     asking.  Mr. Morris, I'll ask.

3           BY MR. NASO:

4        Q.  **Have you -- do you know what a right-to-**

5     **sue letter is, Mr. Morris?**

6        A.  Not well enough to be able to explain in.

7        Q.  **Okay.  I'm just wondering if you have ever**

8     **seen a right-to-sue letter at least by the EEOC?**

9        A.  I believe so.

10          MR. NASO:  Okay.  I guess for the record,

11    that's something that we requested and we haven't

12    received.

13          MR. ROSE:  No, I think we might have, but

14    I think I gave it to --

15          MR. NASO:  If you could send it to me, I'd

16    appreciate it.

17          MR. ROSE:  I will try to do that.  And

18    remind me if you don't get it.

19          MR. NASO:  Will do.

20          BY MR. NASO:

21       Q.  **Mr. Morris, do you know what a class**

22    **action is?**

55

1     A.  Probably not well enough to be able to

2     explain it.

3         Q.  No, that's fine.  Can you give me a

4     speculation what you think?

5         A.  It, I guess, is when a group of

6     individuals come together and they agree to pursue

7     a legal situation as a group.

8         Q.  Exactly, great.  Do you understand that

9     this lawsuit has been brought as a class action?

10        A.  Yes.

11        Q.  Do you understand that you have been --

12    it's my understanding that you have been

13    designated as a representative of the class in this

14    lawsuit; is that your understanding?

15        A.  Yes.

16        Q.  Okay.  Can you tell me, what is the class

17    that you are representing?  What is the group of

18    people that you are seeking to represent here?

19        A.  Well, I'm representing all those who were

20    of older age, --

21        Q.  Okay.

22        A.  -- okay, who were let go.  In addition to

56

1       those, the SSAs who were unfairly let go, and as

2       well as anyone in the race discrimination piece.

3           Q.   Okay.   Would that be any African Americans

4       that were let to?

5           A.   Right, African Americans that were let go,

6       yes.

7           Q.   And when you say you're representing older

8       people who were let go in the RIF, what would be

9       your definition of "older"?

10          A.   I'm sorry.   My definition of older?

11          Q.   Yeah.   What constitutes an older employee?

12      I guess, who do you -- how old did you have to be

13      to have been discriminated against in this action?

14          A.   Well, it's kind of a difficult question to

15      answer to narrow down.   Well, I just really feel as

16      though, given my experience, given my education,

17      given the things that I possess, that I feel should

18      have qualified me for the position.

19               Given the fact that I was not given the

20      position, and given even the fact that my history

21      of employment has no issues, given the fact that

22      they hired someone younger than me --

1     Q.   Uh-huh.

2     A.   -- for the position, I would guess anyone

3   older than the people that they hired, I don't

4   know.

5     Q.   Okay.

6     Q.   I don't know, I'm sorry.

7          MR. ROSE:  I point out that we describe it

8   as age 40 and older in the papers that we've done

9   based on the federal age discrimination of

10  employment.

11         MR. NASO:  Okay, noted.

12         BY MR. NASO:

13    Q.   If you were to win this lawsuit, what

14  would you -- what are you asking the judge to do?

15    A.   Well, to begin with, I will be -- I would

16  ask to made whole or whatever that means.  At the

17  time that I got let go, I was at a grade 8, and I

18  consistently, when available, I would work

19  overtime, so I was able to make my ends meet.

20         I had aspirations of moving to other

21  positions.

22    Q.   Uh-huh.

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

58

1        A.  At this stage or at this point I would

2   have potentially been at either a grade 11 or

3   grade 12, if given the opportunity to move within

4   the Agency or another position.  That's what I had

5   aspired to do at that time is to move into

6   positions that would move or allow me to move up in

7   grade.

8        Q.  Uh-huh.

9        A.  Being that the Agency let me go, that

10  opportunity -- I wasn't given that opportunity.  At

11  this point in my career I really feel as though I

12  would have at least been a grade 11 or a 12.

13        Q.  And, I'm sorry, what grade are you

14  currently at DHS?

15        A.  Seven.

16        Q.  Seven, okay.

17        A.  Okay.  Also during that time when I was

18  let go, my retirement was not -- I was not able to

19  contribute to my retirement.  The market itself

20  reached an all-time low, which means that I wasn't

21  able to take advantage of the investment

22  opportunities.  Right now I think the market is

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Florida
f2b3e48e-b39b-4030-a9d2-8f8ea868df05

DARIUS R. MORRIS

Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

59

1    almost at an all-time high.

2            I would hope not to be retaliated against

3    because of this.  I would hope for some type of

4    protection against retaliation.

5            At this point I'm on the verge of losing

6    my home because of reduction of income that I

7    experienced.  There's been quite a bit of worries

8    and aggravations and pains and things of that sort

9    that have come along with this, so that's a very

10   broad question in terms of what I would be

11   receiving or asking for.

12       Q.  Okay.  I guess to clarify, would you be

13   asking to be reappointed to a position within the

14   district government a grade 11 or 12?

15       A.  Is that possible?

16       Q.  The judge can order anything she wants, I

17   guess.

18       A.  I feel as though at this point, because

19   it's been over three years, --

20       Q.  Uh-huh.

21       A.  -- I would have been able to, because

22   according to my understanding, you have to be in a

60

1    grade at least a year before you're allowed to move

2    up to a higher grade.  And I aspire to move up in

3    order to prepare for a family and do those types of

4    things, and unfortunately I wasn't afforded that

5    opportunity because I was let go.

6        Q.  Okay.  As a representative of the class in

7    this action, do you understand that -- do you have

8    an understanding as to what the responsibilities of

9    a class representative entail?

10       A.  I believe I do.

11       Q.  Okay.  What's your understanding?

12       A.  That I'm to represent the group and to

13   make myself available for any statements, I guess,

14   for court, things of that nature.  Am I missing

15   something?

16       Q.  Do you have an understanding of how long

17   it might take to resolve this matter?

18       A.  No, not really.

19       Q.  Neither do I.  Do you have -- would you be

20   willing to serve as a representative of the class

21   for the duration of this lawsuit, no matter how

22   long it takes?

61

1      A.  Sure, yes.

2      **Q.  If this went to trial, would you be**

3  **willing to testify as a witness in court?**

4      A.  Yes.

5          MR. NASO:  I don't have any further

6  questions.

7          MR. ROSE:  I don't have anything.  You

8  have almost achieved your goal.

9          MR. NASO:  Almost, exactly.

10          (Pause in deposition.)

11          COURT REPORTER:  While we're still on the

12  record, Mr. Naso, do you want the original?

13          MR. NASO:  Yes, please.

14          COURT REPORTER:  And, is the witness

15  waiving reading and signing?

16          MR. ROSE:  No.

17          COURT REPORTER:  Not waiving?

18          MR. ROSE:  He'll read and sign.

19          COURT REPORTER:  Okay.  And we'll be

20  sending it to your office, Mr. Rose?

21          MR. ROSE:  Yes.

22          COURT REPORTER:  Okay.  And are we

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Florida
f2b3e48e-b39b-4030-a9d2-8f8ea868df05

62

1    attaching the exhibit?

2              MR. NASO:  Sure.

3              COURT REPORTER:  Okay.  And do you have

4    that filled out already?

5              MR. NASO:  I don't have it filled out.

6              COURT REPORTER:  Okay.

7              MR. NASO:  I think Gale will take care of

8    that.

9              COURT REPORTER:  All right, I guess that's

10   it.  Thank you.

11             MR. NASO:  Thank you.

12             (Whereupon, at 10:42 a.m., the deposition

13   was concluded.)

14

15

16

17

18

19

20

21

22

DARIUS R. MORRIS
Davis, et al v. D.C. Child & Family Services, et al                    1/23/2014

63

1                    CERTIFICATE OF DEPONENT

2            I hereby certify that I have read the

3    foregoing pages of my deposition testimony in

4    this proceedings, and with the exception of

5    changes and/or corrections, if any, find them to

6    be a true and correct transcription thereof.

7

8

9                              _____

10                             DARIUS R. MORRIS

11

12

13                                              DATE

14           Subscribed and sworn to before me this

15    ____ Day of           , 20

16

17

18

19

20                                    NOTARY PUBLIC

21    SEAL

22    My commission expires:

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                 Baltimore, MD                  Florida
                                                  f2b3e48e-b39b-4030-a9d2-8f8ea868df05

64

```
 1              ERRATA SHEET COMPLETED BY WITNESS

 2              I, DARIUS R. MORRIS, the undersigned

 3     deponent, have this date read the foregoing pages

 4     of my deposition and with the suggestions noted

 5     below, if any, these constitute a true and

 6     accurate  transcription of my deposition given on

 7     the 23rd day of January, 2014,, at the time and

 8     place stated therein.

 9     PAGE   LINE              SUGGESTIONS

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21

22     SIGNATURE:_____  DATE:_____
```

65

CERTIFICATE OF COURT REPORTER

I, Anne E. Castellow, CVR-M, the officer before whom the foregoing testimony was taken, do hereby certify that the testimony of said witness was taken by me by the voice writing method via digital recorder and thereafter reduced to typewriting by me or under my direction; that said testimony is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.



*Anne E. Castellow*

ANNE E. CASTELLOW, CVR-M

Notary Public in and for the

District of Columbia

My Commission Expires:

March 31, 2014

# Exhibits

# CHARGE OF DISCRIMINATION

AGENCY
Enter Charge NUMBER
FEPA

This form is affected by the Privacy act of 1974; See Privacy Act Statement before completing this form.

X EEOC 570·2010·0185

## D.C. Office of Human Rights and EEOC
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE |
|---|---|
| Darius Morris | ( 301) 736-3738 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1010 Karen Blvd. | Capitol Heights, MD 20743 | 3-12-1965 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE,   STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, | MEMBERS TELEPHONE |
|---|---|---|
| D.C. Child & Family Services Agency | 200 to 500 | 202-724-7373 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 400 6th St., S.W. | Washington, D.C. 20024 | n/a |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

DATE DISCRIMINATION TOOK PLACE
EARLIEST            LATEST
June 11, 2010

X RACE   X COLOR   SEX   RELIGION       CLASS ACTION CHARGE
X NATIONAL ORIGIN  X RETALIATION  X AGE
DISABILITY       OTHER (Specify)

THE PARTICULARS ARE    (If additional space is needed, attach extra sheet(s)

I was employed as a Social Services Assistant (grade 8) by the DC Government Child & Family Services Agency (CFSA) for over 15 years. Although the Agency, by letter of May 6, 2010 expressed its "appreciation for the faithful and dedicated service" that I "rendered the citizens of the District of Columbia, in the same letter it advised me that I would be put on leave immediately, and that I should return all keys and items promptly, and that my termination would be effective on June 11, 2010 because of a reduction in force. There was and is no financial crisis. The Agency has hired Family Services Workers (FSW) at grade 9, to perform the same duties which I and other SSAs performed well for many years.

I was injured by D.C. Child & Family Services by its conduct in May and June, by being selected for discharge and discharged from its employment. I was further injured by the Agency's decision not to rehire me for the FSW position. I earned and received a Bachelor's Degree, and in addition I earned 51 credits out of 60 required for a Master's in Social Work.

All of the 60 or so Social Services Assistants are African-American (black), as the Agency knew. I believe the Agency terminated my employment and the employment of the other SSAs because we are African-American (black). In addition, I believe that Dr. Gerald held a dislike for the SSA group because it did not fit into his perception of what the position group should embody given the groups average age, average income and the absence of a post secondary education by the majority group. CFSA harmed me and the other former SSAs without business need and without any job related reason.

CONFIDENTIAL          AVIS 002927

EXHIBIT
1
Morris
1-23-14

I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true.

SIGNATURE OF COMPLAINANT

NOTARY - (When necessary for State and Local Requirements)
SUBSCRIBED AND SWORN TO BEFORE ME THIS
___ day of _____, 201_
DATE (Day, month, and year)

Charging Party (Signature) _____

Date _9-8-2010_

CONFIDENTIAL                    DAVIS 002928