PLAINTIFFS' EXHIBIT 12

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                    7/29/2014

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


---------------------x
RONDA L. DAVIS, et al )
                      )
and                   )
                      )
CYNTHIA DUDLEY, et al )
                      )
      Plaintiffs,     )Civil Action No 10-1564(RC)
                      )
         v.           )Civil Action No 10-1718(RC)
                      )
DISTRICT OF COLUMBIA, )
                      )
      Defendant.      )
---------------------x


Deposition of  STEPHEN G. BRONARS, PhD

Washington D C

Tuesday, July 29, 2014

10:29 a.m.


Job No.: 138C

Pages:  1 - 228

Reported by:  Donna Marie Lewis, RPR, CSR

## Page 2

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3
 4    --------------------x
      RONDA L. DAVIS, et al )
 5                         )
      and                  )
 6                         )
      CYNTHIA DUDLEY, et al )
 7                         )
          Plaintiffs,  )Civil Action No 10-1564(RC)
 8                     )
          v.      )Civil Action No 10-1718(RC)
 9                     )
      DISTRICT OF COLUMBIA, )
10                     )
          Defendant.  )
11    --------------------x
12
13
14        Deposition of STEPHEN G. BRONARS, held
15    at the Office of the Attorney General, 441 Fourth
16    Street, NW, 6th Floor South, Washington, D C
17    20001, pursuant to Notice, before Donna Marie
18    Lewis, Registered Professional Reporter and Notary
19    Public of and for the District of Columbia.
20
21
22
```

## Page 3

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS:
 3        ROSE ADVOCATE FOR CIVIL RIGHTS
          BY:  DAVID L. ROSE, ESQUIRE
 4        4611 Norwood Drive
          Chevy Chase, MD 20815
 5        Telephone: (202) 769-5860
          Email: daver@rnselawyers.com
 6
 7        TEMPLE LAW FIRM
          BY:  DONALD TEMPLE
 8        1101 15th Street, NW
          Suite 910
 9        Washington, DC 20005
          Telephone: (202) 628-1101
10        Email: dtemplelaw@gmail.com
11
12   ON BEHALF OF DEFENDANT:
13        OFFICE OF THE ATTORNEY GENERAL
          BY:  DOUGLASS ROSENBLOOM, ESQUIRE
14        441 Fourth Street, NW
          6th Floor South
15        Washington, D C 20001
          Telephone: (202) 724-7854
16        Email: Rosenbloom@dc.gov
17
18
19
20
21
22
```

## Page 4

```
 1              I N D E X
 2   WITNESS:
 3        STEPHEN G. BRONARS, Ph.D.
 4   EXAMINATION BY:                    PAGES
 5        By Mr. Rose           5, 218
 6        By Mr. Temple              156
 7
 8              E X H I B I T S
 9   EXHIBIT:        DESCRIPTION        PAGE
10   No. 1    Dr. Monroe's Second Report      92
11
12
13
14
15
16
17
18
19
20
21
22
```

## Page 5

```
 1             P-R-O-C-E-E-D-I-N-G-S
 2        Whereupon,
 3           STEPHEN G. BRONARS
 4        after having been first duly sworn by
 5        the Notary Public was examined and
 6        testified as follows:
 7        EXAMINATION ON BEHALF OF PLAINTIFFS
 8        MR. ROSE: Dr. Bronars, is that the
 9   correct pronunciation of your name?
10        THE WITNESS: The correct pronunciation
11   is Bronars.
12   BY MR. ROSE:
13        Q   Bronars. Okay. The emphasis on the
14   first part. Bronars. Thank you. Would you tell
15   me a little of your education, please? I know it
16   is summarized in the document that you
17   presented -- as an economist?
18        A   Yes. I have a bachelor's degree in
19   economics from the University of Illinois in
20   Urbana-Champaign, Illinois. And I have a master's
21   degree and Ph.D. in economics from the University
22   of Chicago.
```

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                              7/29/2014

---

**6**

1    Q   Okay. And tell us a little about your
2    professional career?
3        A   Okay.
4        Q   Just summarize and when we get closer to
5    this time we may ask a few questions -- I may ask
6    a few questions.
7        A   Sure. When I left graduate school I was
8    an academic, a professor. And I've held positions
9    at various universities over the years including,
10   in chronological order, Texas A&M University;
11   University of California, Santa Barbara; the
12   University of Texas at Austin, where I held
13   permanent positions. I've held other kinds of
14   positions; visiting faculty positions, adjunct
15   faculty positions at Yale University, the Wharton
16   School at the University of Pennsylvania, and most
17   recently Georgetown University. About eight years
18   ago I began doing consulting work more
19   extensively. And four years ago I moved to
20   Washington, D C and at that point it became my
21   primary full time job to be a consultant.
22       Q   So tell me what kind of consulting work

---

**7**

1    you did and who your clients were, if that's -- if
2    that's possible -- in the first four years before
3    you moved to the Washington area?
4        A   In the -- before I moved to the
5    Washington area I still worked for the same firm,
6    Welch Consulting. But I still had a faculty
7    position in Texas. And so that -- my geography
8    changed, but the work -- I just did more of it
9    over time. Our clients are typically companies.
10   And much of the consulting work is litigation
11   related. It falls into several categories.
12   Lawsuits that come out of the FLSA. What are
13   known as wage and hour lawsuits that come out of
14   potential FLSA violations, how people are paid,
15   whether they are paid properly.
16       Q   Fair Labor Standards Act.
17       A   Exactly. Whether they are paid
18   correctly. And then there is EEO related,
19   discrimination related work. And more recently
20   I've done work on background checks. Sometimes
21   class action cases. Sometimes single plaintiff
22   cases. Sometimes self audits for companies.

---

**8**

1    Other times more directly related to the
2    litigation. Sometimes I work on the plaintiff's
3    side, sometimes on the defense. So a wide range
4    of clients from financial services to staffing
5    companies, to retailers, to manufactures across
6    the board.
7        Q   So tell me about the four cases in D C.
8    The ones that are in the last four years that I
9    think you identified in your as part of your --
10       A   Where I've testified?
11       Q   Yeah. I think.
12       A   Yeah, I think I disclosed cases where I
13   testified.
14       Q   Just go in -- the oldest one first if
15   you can?
16       A   I'm trying to remember them. I will
17   give it a shot and then if I need to take a look
18   at the --
19       Q   -- You are allowed to look at your CV
20   any time you want to. I don't have it handy.
21       A   Okay. The ones that I testified in most
22   recently was FLSA wage and hour case. And I think

---

**9**

1    I did that before my initial report here. So I
2    will tell you about that one. It was -- I was a
3    testifying expert. It was a case where it
4    involved assistant managers at Foot Locker stores
5    and whether or not they were being paid properly
6    for their overtime work. I've had -- I've
7    testified --
8        Q   -- Well, I'm sorry. In that case how
9    would one decide whether it's proper or not?
10       A   Well, the way in which Foot Locker
11   approached this was a method known as the
12   fluctuating workweek. So assistant managers would
13   get paid the same whether they worked 40 hours a
14   week or fewer hours. And then if they worked more
15   than 40 hours in a week they would get half time
16   premium for the hours worked in excess of 40. And
17   that method is allowed as long as there are enough
18   instances, kind of, worker by worker -- in this
19   case assistant manager by assistant manager --
20   where they were benefiting from the fact that they
21   might have only worked for 35 hours and still
22   gotten paid for 40 on the one hand. And then if

---

3  (Pages 6 to 9)

**10**

1 they worked 45 they wouldn't get the time and a
2 half premium but just the half time premium for
3 those five hours in excess of that. Part of that
4 was just showing that for all of the assistant
5 managers in this case. It was not a class action,
6 it was a collection of plaintiffs.
7    Q   Sure.
8    A   That they -- almost all of them had time
9 that they would work above 40 and below 40. And
10 it was not so skewed as to be unfair to them.
11 Then there was a lot of investigation of
12 individual complaints that the named plaintiffs
13 had about: I wasn't paid for overtime.
14     So I had the payroll records and we
15 could try to, where their claims were verifiable
16 or refutable, go back to the record and look at
17 whether there was merit to those claims. And then
18 the final part of it was just an allegation that
19 the managers were incentivized to try to shave
20 time. And so we looked for whether or not -- I
21 looked for whether or not there seemed to be
22 evidence of that. Whether the incentives really

**11**

1 would have incentivized the store managers to
2 essentially cheat their assistant managers out of
3 overtime pay.
4    Q   Okay.
5    A   That's what that report was about and
6 what that testimony was about.
7    Q   What was the name of the employer in
8 that case?
9    A   Foot Locker.
10    Q   Foot Locker. And you were retained by
11 Foot Locker?
12    A   I was retained by the attorneys who were
13 representing Foot Locker.
14    Q   Okay. All right. How about --
15 what's -- what other case?
16    A   What other cases?
17    Q   Yeah.
18    A   In the last few years where I testified?
19    Q   Well, let's say testified. I will say
20 testify or -- either at a deposition --
21    A   -- Yes.
22    Q   Or at trial or both. I mean typically

**12**

1 it would be if you did go to trial it typically
2 would be both. But --
3    A   There was -- prior to that there was a
4 single plaintiff case where a gentleman who was an
5 independent contractor as a realtor was
6 unfortunately killed in a motor vehicle accident.
7 And I don't know the details about that. It was
8 not part of what I was retained for. But it was
9 Loudoun County sheriff's may -- I think it might
10 have been -- involved a police chase that he was
11 in -- not involved in but there was a accident
12 that resulted from that.
13    Q   So that was an amount of damages?
14    A   It was an amount of damages based on his
15 projected earnings going forward. So there was a
16 plaintiff's expert report and I worked for the
17 defense and estimated his projected earnings over
18 the rest of his lifetime.
19    Q   Okay. All right.
20    A   Then another case in the last few years
21 where I testified before an administrative law
22 judge was the case involving a prevailing wage

**13**

1 determination for workers in the state of Montana.
2    Q   Oh?
3    A   Where the rules are specified that if
4 you are going to bring in workers under, let's
5 say, the H2A program in this case foreign workers,
6 the -- there is a requirement that they get paid
7 at least the average wage from a USDA survey of
8 farm workers. But states have the opportunity to
9 substitute their own survey of wages of relevant
10 workers if they think that that would be more
11 accurate than the USDA farm labor survey. And the
12 state of Montana had their own survey and I was
13 testifying about the lack of reliability and
14 accuracy of that survey relative to what could
15 have been used, which was the USDA survey.
16    Q   Okay. That's three, I think?
17    A   Yes. A fourth one was in Pensacola,
18 Florida. And it was another prevailing wage case
19 involving companies, one of them was Bayou Land
20 Services. This was the -- under the H2B program
21 if you are going to bring in foreign temporary
22 workers and non agricultural jobs there are wages

STEPHEN BRONARS, Ph. D.
**Davis v. DISTRICT OF COLUMBIA**                    7/29/2014

14

1   that you're required to pay the foreign workers.
2   And there was a dispute over whether the old
3   Department of Labor or new Department of Labor
4   rules for the wage would be applicable. And this
5   was a hearing for a temporary injunction or maybe
6   a temporary restraining order. I'm not sure of
7   the difference.
8       Q   They're functionally the same thing.
9       A   Okay. What -- I testified as to the
10  damages that would have been suffered by the
11  plaintiffs in this case, who were these companies,
12  who had already signed contracts to provide these
13  lawn care services under their understanding that
14  they could bring in workers under wage one. And
15  then the rules changed and it had to go to wage
16  two, which was higher. So I did -- my testimony
17  was just about the economic irreparable damages
18  they would suffer if the new wage was allowed to
19  proceed.
20      And I think the bulk of the case was
21  really an administrative procedure act about
22  whether the Department of Labor had the authority

15

1   to do this. But that's not really what I was
2   involved in.
3       Q   Sure.
4       A   I was just saying, well, this is what it
5   would mean for the businesses if this were to
6   happen. I think those are the four most recent
7   times that I testified.
8       Q   Okay. Let's go to back to the less
9   recent times. And if you would, do you have
10  any -- any of those involve allegations of race or
11  age discrimination, address those first?
12      A   Times that I have testified either in
13  court or in a deposition?
14      Q   Yes.
15      A   I think the one that would be most
16  relevant, it was a while ago, was a case involving
17  Donnelley, R.R. Donnelley, the company. I was
18  retained by the attorney representing them. They
19  closed a plant and there were allegations that --
20  of age discrimination in that plant closing.
21      Q   And what was your assignment in that
22  case?

16

1       A   My assignment in that case was to make
2   an assessment of whether or not there appeared to
3   be some statistical evidence of discrimination,
4   age discrimination. And a key issue in that case
5   was the fact that there was the opportunity to try
6   to relocate within the company to plants in other
7   areas. This plant was shutdown in Chicago. So a
8   key part of the analysis was who applied for those
9   positions in other locations and how successful
10  were they in getting those positions -- more so
11  than the plant closing itself.
12      Q   So -- I'm sorry. So you are saying
13  whether they were assigned to work for the same
14  employer?
15      A   Yeah. Donnelley had -- they're in the
16  business of printing.
17      Q   Sure.
18      A   And so, basically the Chicago plant
19  shutdown. They used to print the Sears catalog
20  and they stopped doing that. So they said: Hey,
21  we've got locations in Kentucky and Iowa and other
22  places. You can put in your application for these

17

1   openings that we have at other locations.
2       So some people didn't get terminated.
3   They ended up getting another job in the company
4   through this hiring center that they put in place
5   in Chicago to process these applications.
6       Q   And were the standards the same for all,
7   do you know?
8       A   I really don't.
9       Q   It wasn't part of it?
10      A   I really don't remember the precise
11  details. But the key -- a key issue that I
12  remember in that case was the interest and
13  utilization of those -- it was kind of like a
14  hiring center, a center where they would be able
15  to be placed elsewhere in the company.
16      Q   And whether they acted in a
17  discriminatory way based on age? Is that the --
18  whether the allegation was that the company was
19  discriminating?
20      A   The allegation was the company was
21  discriminating in not just choosing to shutdown
22  that plant but in the re-employment of the

5 (Pages 14 to 17)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                                    7/29/2014

---

**18**

1  workers.

2      Q   So you were retained by the employer.

3  And what was your conclusion in your test or your

4  report?

5      A   If I recall my conclusion was that the

6  reason why older workers did not end up getting

7  relocated at the same rate as the younger workers

8  is because they were applying for fewer positions,

9  less interested in relocating, apparently.

10  Because it was an open process as far as I

11  understood. And so that -- that accounted for the

12  differential placement rates.

13      Q   Okay. Have you ever testified in a case

14  involving alleged discrimination on the basis of

15  race or age? And putting aside, I understand

16  there was an allegation in the Donnelley case. Or

17  something -- any case other than Donnelley?

18      A   Not that I can recall testifying, no.

19      Q   Okay. How about writing? Is there

20  anything you recall about writing a report? Did

21  you write a report about anything in such a case

22  of race or in age -- and/or age case?

---

**19**

1      A   The way things work at my firm is that I

2  have been on teams that worked on this. I did not

3  sign a report, but I contributed to the analyses

4  in reports.

5      Q   Uh huh.

6      A   I work as a consultant on cases that

7  involve race and gender discrimination in addition

8  to age. But that would not lead to a signed

9  report or testimony.

10      Q   Well, in the consulting were employers

11  asking you to devise a program that would ensure

12  or at least guard against discrimination on

13  grounds of race?

14      A   I wouldn't necessarily say designed a

15  program as much as do more of a self audit. Say,

16  how does this look. What might a plaintiff's

17  expert --

18      Q   Yeah. Okay.

19      A   -- conclusion be. What conclusion might

20  they reach based on various statistical models.

21      Q   So did you look at statistical models

22  that look at the harm that was done to employees

---

**20**

1  by race or age, the results of either what

2  happened in the past or what was designed for the

3  future?

4      A   Yeah. I think there are two basic kinds

5  of models that we would look at. One would be pay

6  models.

7      Q   Sure.

8      A   The other one would be more selections,

9  whether it is for hiring, promotions or

10  termination.

11      Q   Sure.

12      A   Both of those kinds of models, yes.

13      Q   Yes. So what kind of advice did you

14  give people with respect to employers about

15  dangers in lawsuits? What kind of advice did you

16  give them about how to avoid liability or reduce

17  the extent of the liability?

18          MR. ROSENBLOOM: Excuse me. I'm not

19  sure I'm objecting, Mr. Rose. But for point of

20  clarification are you asking with respect to

21  consulting projects or only with respect to

22  testifying?

---

**21**

1          MR. ROSE: No. Consulting. Thank you.

2          MR. ROSENBLOOM: So to that extent,

3  Mr. Rose, I think I need to object, with all due

4  respect. I'm not sure -- I think that I need to

5  object and instruct the witness that he may answer

6  if he feels comfortable. But if there -- if he

7  has any type of confidential agreement with his

8  consulting clients that prevent him from answering

9  that I would advise him that he is within his

10  rights to decline to answer. I will leave that to

11  the witness. And I apologize for the

12  interruption.

13  BY MR. ROSE:

14      Q   That's fine. Why don't you restrict it

15  the way counsel restricted it.

16      A   I think I can answer fairly generically,

17  which would be if your decisions are being based

18  on certain factors, make sure that these factors

19  that you are using in reaching these decisions are

20  recorded accurately in your HR databases so that

21  you could point to those as legitimate business

22  factors that influenced your decisions rather than

---

6 (Pages 18 to 21)

**22**

1  not being able to produce that kind of information
2  saying that this was the policy, this is how the
3  decisions were made. As -- when you don't have
4  those, that ability to control for those factors,
5  it makes it harder to defend yourself.
6      Q   Sure. So you are saying that you
7  advised them to keep good records as to who was
8  promoted or discharged or hired by race or age so
9  that you would have a basis for showing why there
10 was a legitimate business reason to do what they
11 did?
12     MR. ROSENBLOOM: Object to the form.
13 BY MR. ROSE:
14     Q   Answer it if you can.
15     A   I think that is generally accurate.
16 Some of the factors that enter into decisions are
17 easier to record and quantify --
18     Q   -- Sure.
19     A   -- and store. And others are more of a
20 challenge. But it would be whenever possible if
21 you can maintain a record of why decisions were
22 made that will tie back to legitimate business

**24**

1  gender. So some of the work that we do is to say
2  what -- why did this person who looked pretty good
3  on paper not get promoted. Or why are the hiring
4  rates different in different areas. And not
5  presume that I know the answer but say, you must
6  know more about these people than I do.
7      Q   Sure.
8      A   This looks like there is something else
9  going on here. Could also be with pay. Why are
10 these two people that look like they should get
11 paid roughly the same thing compensated so
12 differently.
13     Q   Sure.
14     A   If that's going to go forward let's do a
15 better job of trying to track what it is that you
16 are making pay decisions based on rather than just
17 say, well, it's due to something else.
18     Q   Is it true that you knew in this case
19 that this agency, that is the defendant District
20 of Columbia, had not consulted an expert or indeed
21 made no records at all as to why they discharged
22 115 people and why they selected those 115 people?

**23**

1  factors, that's going to be a plus in helping me
2  do my job and helping them do their job.
3      Q   Sure. So you -- you would try to advise
4  them to be sure that if your practices in the
5  past -- excuse me -- practices in the past have
6  had a somewhat adverse impact because of race or
7  age that they ought to focus on the reasons and
8  perhaps they ought to modify their selection
9  procedures to be sure that tendency would not
10 continue?
11     MR. ROSENBLOOM: Objection to the form.
12     THE WITNESS: I wouldn't be able to
13 really reach a conclusion of adverse impact
14 without having that necessary information about
15 how -- what helped to guide decisions.
16 BY MR. ROSE:
17     Q   Okay.
18     A   And so the way it would typically go is
19 here is what you've told me helped guide your
20 decision. That can explain some of the decisions
21 and there are some that are left unexplained.
22 Some of that may be correlated with race or

**25**

1      MR. ROSENBLOOM: Objection to the form
2  of the question.
3      MR. ROSE: You want to read it back to
4  me, please? To see if I agree with it.
5      MR. ROSENBLOOM: That's fine. I'm of
6  course just speaking my objections for the record.
7      MR. ROSE: Go ahead.
8      MR. ROSENBLOOM: If the witness
9  understands.
10 BY MR. ROSE:
11     Q   If you think you understand please try
12 and answer.
13     A   I did not know what had happened prior
14 to those decisions in terms of whether or not any
15 expert consultant was retained or anything like
16 that. It was -- I didn't know yes or no whether
17 that had been done.
18     Q   Did you know whether there was any
19 record made by the defendant of the reasons for
20 selecting the 115 people they selected for
21 discharge?
22     A   My knowledge of the reasons tie to the

7 (Pages 22 to 25)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                                    7/29/2014

26

1   documents that I cited in my first report, most
2   notably the Davis declaration that talks generally
3   about how the decisions were made.
4        Q   Well -- but, he didn't talk about why
5   they selected, why they fired or discharged --
6   excuse me -- all of 57 of the so called SSA
7   employees. I think they are Social Security
8   assistant positions. We'd say -- the federal
9   government would say grade. I think the D C
10  government uses that terminology. Grade 8. It is
11  D8, I think -- if we are in the record keeping
12  system. Why did they fire all of those people?
13       MR. ROSENBLOOM: I will make a formal
14  objection.
15       THE WITNESS: I think they give some
16  explanation in terms of the decisions to -- there
17  were two positions that I think involved 70
18  people.
19  BY MR. ROSE:
20       Q   Yes. You are quite right. I'm sorry.
21  It is 57 --
22       A   -- And then 13.

27

1        Q   Yeah. Let's do the 57 one first.
2   That's the biggest one.
3        A   The only thing I know about that
4   decision was what was explained in that
5   declaration.
6        Q   So that declaration was made three and a
7   half years or so after the fact. Is that right?
8        MR. ROSENBLOOM: Form, object.
9   BY MR. ROSE:
10       Q   It was made in January of -- you got
11  involved in either late December or January of
12  this year?
13       A   I think I point out in my rebuttal
14  report that I first saw an unsigned version of
15  that declaration in December, at some point in
16  December.
17       Q   Do you recall when in December? Before
18  or after Christmas?
19       A   It was before Christmas. It was before
20  Christmas. It was, you know, mid December.
21       Q   Sure. Okay. So it was -- so the
22  decision to fire them had been made by May 6,

28

1   2010. Is that correct?
2        A   I don't remember the exact date, but
3   that sounds.
4        Q   And then it was -- that was they were
5   told to pack up their stuff and get out but they'd
6   get paid for another month --
7        MR. ROSENBLOOM: Object to the form.
8        MR. ROSE: Excuse me. Let me finish.
9        MR. ROSENBLOOM: Certainly.
10       THE WITNESS: They would get paid for a
11  while but they were to go home and not perform
12  their duties anymore.
13       MR. ROSENBLOOM: Object to the form of
14  the question.
15  BY MR. ROSE:
16       Q   You don't know one way or the other
17  whether that's the case?
18       A   I'm not sure what you are asking. About
19  the date or the severance?
20       Q   Yeah. The severance was functionally
21  done on May 6 because they stopped performing the
22  duties on May 6. But it did not become formally

29

1   discharged, I think because of a provision in the
2   collective bargaining agreement or whatever, until
3   June 11, 2010.
4        MR. ROSE: I will repeat the form
5   objection. And also instruct the witness to not
6   speculate because you are asking questions about
7   the facts of what happened and Dr. Bronars has
8   been retained for the statistical analysis.
9   BY MR. ROSE:
10       Q   Neither one of us wants you to speculate
11  about anything. You can off on the record, but
12  not on.
13       A   I know nothing about the details of what
14  happened in May or June of 2010 with respect to
15  those issues that you raised.
16       Q   And a company that -- if they had
17  consulted you earlier, or somebody who had some of
18  your skills, you would have suggested that they
19  have a reason for firing those 57 people or the
20  115 -- which ever way you want to go.
21       MR. ROSENBLOOM: And I will repeat the
22  objections based on form and for calling for

8  (Pages 26 to 29)

30

1  speculation.
2  BY MR. ROSE:
3      Q   Answer if you can.
4      A   Obviously my role would have been
5  different.
6      Q   Sure.
7      A   If I was hired back then.  And I just
8  would say -- I already kind of answered the
9  question with sort of general advice that I would
10  give.  But obviously you tailor that to the
11  specific situations.  So -- but -- so I think I
12  kind of answered the general kind of advice I can
13  give.
14      Q   All right.  Well, if I understand your
15  report -- please correct me if I'm wrong.  There
16  were -- so let's talk about the two groups that
17  were fired or that were discharged.  Excuse me.
18  The 57 -- and I think you know that none of those
19  57 was white and that 56 of the 57 are black.  Do
20  you know that?
21      A   Yes.
22      Q   Okay.  And do you think that the 57

31

1  people who got fired were harmed by that discharge
2  by the agency?
3      MR. ROSENBLOOM:  Object to the extent
4  that it calls for speculation.  Feel free to
5  answer as best you can.
6      THE WITNESS:  I didn't say that --
7      MR. TEMPLE:  Excuse me.  I want to put
8  an objection and a note here.  I think this
9  witness should be asking -- answering any
10  questions based on personal information and
11  personal knowledge.  And to the extent that any
12  questions are posed just instructionally, that he
13  should know that with respect to answering based
14  on personal knowledge, only.  But I think that any
15  objection to the witness -- you can answer if you
16  can or if you know -- is an appropriate objection.
17  I have no problem with the objection.  But I don't
18  think we should be talking to the witness as if he
19  can.  And he should know if he is answering any
20  questions, it's based on his personal knowledge --
21  or not.  So I just want to note that for the
22  record.

32

1  BY MR. ROSE:
2      Q   Well, thank you.  I think -- let's
3  assume that everything I'm asking you about when I
4  say, did you know, is -- includes your personal
5  knowledge.
6      MR. ROSENBLOOM:  And real quickly, if I
7  may, because I think that had to do with my
8  objection.  I just want to know -- I think if I'm
9  following what Mr. Temple said.  I do agree
10  100 percent.  And when I object and caution
11  Dr. Bronars to not speculate I'm making an
12  objection to the extent it calls for speculation.
13  But, yes, obviously if Dr. Bronars does have
14  personal knowledge about that question whatever,
15  the factual issue is and Dr. Bronars has factual
16  knowledge of it, of course I would expect
17  Dr. Bronars to answer that.  And I don't mean for
18  my objections to discourage him from doing that.
19  That is all.  Thank you, Mr. Temple.
20      MR. ROSE:  Could you go back and read
21  the question as best you can?  I just want to see
22  how bad it was.

33

1      (Whereupon, the court reporter read the
2      requested portion)
3      THE WITNESS:  In order to answer that as
4  an expert that would be something that you would
5  want to study, the extent of the harm from a
6  discharge.  And that's the damages part as opposed
7  to the liability part.  I was not retained to do
8  that.  So I -- it would be speculation as to the
9  harm that they would have suffered.  I think it's
10  quite possible that it would be different for
11  different individuals.
12  BY MR. ROSE:
13      Q   Sure.
14      A   So I didn't study it.  I don't know.
15      Q   Let me modify the question.  I believe
16  one of your reports says that 18 people were
17  rehired.  Of the people who were discharged, it
18  says 18 were rehired.  So let's assume they were
19  not harmed.  And I'm now asking you whether you
20  believe a person who is discharged after five or
21  15 or 25 years of service was harmed by the
22  discharge?  Do you have an answer to that

34

1  question? What was your answer to the question?
2  Excuse me.
3       MR. ROSENBLOOM: Sure. So I'll repeat
4  the objections on the basis of form of the
5  question as well as calling for speculation. And
6  for this going beyond the scope of the report and
7  the expert testimony. However, Dr. Bronars, if
8  you have an answer based on personal knowledge and
9  you understand the question, by all means provide
10 an answer.
11      THE WITNESS: My personal knowledge is
12 that is a -- that's -- it's a different question.
13 That -- it's a valid question. And as an expert I
14 would have to study it before I could say whether
15 or not I believe that people were harmed and about
16 how much they were harmed.
17 BY MR. ROSE:
18      Q  Well, I understand the amount.
19      A  Right.
20      Q  I'm not asking you. But if somebody --
21 you think if somebody has been working for another
22 company, for many years some of them, less time

35

1  for a few. That, and have built up -- they've
2  been grade eights. Of the 13, some of them were
3  grade ten -- that being fired, discharged wouldn't
4  harm them financially among other things?
5       MR. ROSENBLOOM: I will repeat the
6  objection. And also note, I believe Dr. Bronars
7  already has been asked and answered the best he
8  can. But if you feel that you have more to add,
9  or that, you know, changes your answer,
10 Dr. Bronars, by all mean go ahead. But no need to
11 speculate.
12      THE WITNESS: I mean there are studies
13 that could be done, you know, in the event of the
14 liability was found to say: Okay, what are the
15 damages.
16      But generally in my -- and I have done
17 studies like that in other cases. But it's kind
18 of putting the cart before the horse. But I don't
19 --
20 BY MR. ROSE:
21      Q  -- Okay. Let me tell I don't think the
22 judge thought so in this case because he has

36

1  divided the case into liability and damages. And
2  liability is based on -- well, basically whether
3  they were harmed by the discharge.
4       MR. ROSENBLOOM: There is not a pending
5  question.
6  BY MR. ROSE:
7       Q  So my question is would it surprise you
8  to learn that they were harmed by the discharge?
9       MR. ROSENBLOOM: So I would respectfully
10 object to the premise of the question. And I
11 think this has been asked and answered. And I
12 think it's -- the witness has answered this a
13 couple of times. It's really the same question.
14 I'm sorry, Mr. Rose.
15 BY MR. ROSE:
16      Q  You state in part four with respect to
17 Dr. Bronars 12th declaration that her entrances in
18 2012 were based on a statistical assumption that
19 in the absence of race or bias every employee
20 would have been -- at the CFSA, would have been
21 equally likely to be terminated in the rift. How
22 do you know that that is an assumption? Isn't it

37

1  a fact?
2       MR. ROSENBLOOM: Objection.
3  BY MR. ROSE:
4       Q  Either the person got another job right
5  away at the same rate of pay or he did not or she
6  did not.
7       MR. ROSENBLOOM: Objection to the form
8  of the question. Dr. Bronars, if you understand
9  the question or if you need clarification, respond
10 as you best see fit.
11      MR. TEMPLE: I listen intensively and
12 you are doing the same thing. If you want to make
13 an objection, that's fine. After the objection if
14 it's a speaking objection and he should know that
15 he can answer the question based on his personal
16 knowledge not whether he is speculating or if he
17 can't. I think that's cueing the witness. And I
18 think that the witness should be allowed to
19 answer. And if he doesn't know he can say he
20 doesn't know. If he doesn't understand he can say
21 he doesn't understand. I don't think his counsel
22 has to ask him if he doesn't understand the

                              10  (Pages 34 to 37)

38

1  question. I think that is inappropriate.
2          MR. ROSE: I tend to agree.
3          MR. ROSENBLOOM: I respectfully
4  disagree. But by all means. I don't think there
5  is anything wrong with me making my objection and
6  saying to, you know, our expert go ahead and
7  answer, which is really what you are saying.
8          MR. TEMPLE: I don't think the question
9  was -- I don't think he said go ahead and answer.
10  And I think making an objection, as you know we've
11  practiced together. I welcome an objection.
12  Anything after that is speaking. Answer if you
13  can. Do you understand the question. Don't
14  speculate. Those types of things are
15  inappropriate. They're speaking objections. They
16  are also inappropriate under the rules. So if you
17  want to say: Hey, I object. That's fine. But
18  this gentleman understands the question. If he
19  doesn't he can tell Mr. Rose: I don't understand
20  the question. And that should be part of the
21  instruction so that this witness is clear.
22          MR. ROSENBLOOM: Very well.

39

1          MR. ROSE: All right. So, Dr. Bronars,
2  can you?
3          MR. ROSENBLOOM: I'm not agreeing or
4  disagreeing. I'm just saying, very well. Let's
5  move on.
6          THE WITNESS: Just to be on the safe
7  side could you read back that question? It's been
8  a little while since it was posed.
9          MR. ROSE: I understand.
10          (Whereupon, the court reporter read back
11          the requested portion)
12          MR. ROSENBLOOM: I repeat the objection
13  on the basis of form.
14  BY MR. ROSE:
15      Q  Let me just clarify it. It may be a
16  fact that's ascertainable by people other than
17  you, or not. But -- so you don't know whether
18  this particular person was harmed. I
19  understand -- or all -- all of them were. But why
20  would they be equally likely to be terminated if
21  the -- if there was a large disparity in the
22  percentages between blacks and for examples,

40

1  whites in the employees?
2          MR. ROSENBLOOM: Form. Objection.
3          THE WITNESS: Well, let me try to answer
4  the first question. And then you are going to
5  have to read back that one because I'm not sure
6  what that question was. I think I understand the
7  first question. And that is can I tell the
8  difference between an assumption that a
9  statistician is making in reaching your
10  conclusions about statistical significance and the
11  facts. And I have read Dr. Monroe's original
12  report and her supplemental report. And to the
13  best of my knowledge, my understanding is that
14  when she says she is doing an agency wide analysis
15  it is generating statistical inferences based on
16  the assumption that everyone should have an equal
17  chance and does have an equal chance of being
18  selected. And that assumption I believe is
19  inconsistent with the facts. Because it's
20  incredible, almost impossible that 57 out of 57
21  people in that one job would have been selected
22  according to this, everyone's an equal chance,

41

1  approach. So obviously a different --
2  BY MR. ROSE:
3      Q  Wait a minute. Equal chance approach?
4  Is that an approach or is that a matter of law?
5          MR. ROSENBLOOM: Objection. Form. And
6  I'm sorry, Dr. Bronars was still trying to answer
7  your question.
8  BY MR. ROSE:
9      Q  Well, have you finished? I'm sorry.
10      A  It's -- her approach to saying what she
11  would have expected had the process been neutral.
12      Q  Neutral in terms of race and age?
13      A  Correct. The way these tests are done
14  are to say what happened versus what would have
15  been expected under my assumptions. And that's
16  what I'm saying, is her assumption was that
17  whatever job you were in, whatever division you
18  were in you should have been represented in this
19  rift roughly in proportion to your representation
20  in the agency.
21      Q  And what is wrong with that assumption
22  from your point of view?

42

1       A   What is wrong with that assumption from
2   my point of view?
3       Q   Yeah.
4       A   That that is inconsistent with the way
5   in which businesses are going to operate in terms
6   of the business necessities of getting your
7   objectives completed as an agency and other
8   financial considerations. That you are not going
9   to just randomly select who gets the termination.
10  There is going to be some reason behind it --
11      Q   -- Well, it is not random.
12      MR. ROSENBLOOM: I'm sorry, Mr. Rose. I
13  know it sounded like he was wrapping up his
14  sentence.
15  BY MR. ROSE:
16      Q   Right. Have you finished? I'm sorry.
17  Did you finish the answer to the question?
18      A   This is the question when you said:
19  What was wrong with that assumption?
20      Q   Yes.
21      A   Okay. Yes.
22

43

1       Q   So if you had -- isn't that what --
2   isn't that what her assignment was and indeed your
3   assignment?
4       MR. ROSENBLOOM: Objection.
5       MR. ROSE: Excuse me, please. I haven't
6   even finished yet.
7       MR. ROSENBLOOM: I thought you were.
8   BY MR. ROSE:
9       Q   Tell me what is wrong with the
10  assumption that employers who did not want to
11  treat people differently because of their race and
12  age or race or age, if they -- why would the
13  agency fire 57 people all of whom had done their
14  work properly and then hired a group of other
15  people who were younger if they wanted to be
16  random? They fired -- your understanding is that
17  the agent -- the defendant, the District, fired
18  115 people of whom 70 were in these two jobs. And
19  the only difference -- the only reason they gave
20  was they didn't have a bachelor's degree for 57
21  and a master's degree for the -- for those 13
22  grade ten positions. They were all fired even

44

1   though they had done good work. Why would you
2   fire a worker who has done good work unless either
3   you intended to discriminate or whether in fact
4   you did discriminate or either way. It doesn't
5   matter what the purpose was. Do you have the
6   question?
7       MR. ROSENBLOOM: Objection. I will
8   object on a few grounds. Form, compound,
9   mischaracterizing facts, presuming facts not in
10  evidence.
11  BY MR. ROSE:
12      Q   Well, they may not be before this expert
13  but they are in evidence. Please go forward.
14      A   I believe the question is why would you
15  terminate people who were doing a good job.
16      Q   Yes.
17      A   And --
18      Q   -- And hire new people to do the same
19  work?
20      A   Hire new people to do the same work.
21      Q   Yes.
22      MR. ROSENBLOOM: And I will also in

45

1   addition to the form object, this is again beyond
2   the grounds of the witness's report and testimony.
3       THE WITNESS: Reorganization, different
4   models for achieving the goals for the agency,
5   redundancies, financial concerns. I mean there
6   are a bunch of reasons why companies reorganize.
7   BY MR. ROSE:
8       Q   Right.
9       A   And there is a tremendous amount of
10  turnover every day in companies in terms of
11  shifting their direction and their focus. And
12  some people get hired and other people lose their
13  jobs. So that would be my general response as to
14  lots of other possible explanations other than
15  race or age.
16      Q   I know. But in this case the
17  contentions of the defendant and the testimony of
18  the defendant -- the plaintiffs -- I represent the
19  plaintiffs -- have all stated one way or the other
20  that they were wrongfully discharged. There were
21  47 of them. And that they and -- there is no --
22  the District has made no argument to the contrary.

12  (Pages 42 to 45)

46

1    Are you aware that that's true?
2          MR. ROSENBLOOM: Mischaracterization.
3    Objection to form. Again, way beyond Dr. Bronars
4    statistical designation as a rebuttal expert.
5    BY MR. ROSE:
6      Q   Answer as best you can.
7      A   My knowledge in this case is very
8    focused on Dr. Monroe's report, the documents that
9    1 site. I'm unaware of these other things that
10   you've asked about. So I just -- I don't know.
11     Q   Are you aware of any expert reports that
12   have not, in cases involving race or age or gender
13   issue -- well, any kind of case in which the
14   expert was -- the statistical analysis was not
15   based on the assumption that -- I'm sorry. Let's
16   go to this. I think you've already testified that
17   you are not aware of any reasons for the rift, the
18   firing of the 115 people. The only reason given
19   was that they wanted a rift and a realignment.
20         MR. ROSENBLOOM: Objection. Form.
21   Mischaracterizing prior testimony.
22

47

1    BY MR. ROSE:
2      Q   Okay. Do you have any knowledge? I
3    mean do you have any knowledge of how other
4    experts have done reports in cases involving race
5    discrimination or age discrimination?
6      A   Yes, I have knowledge of how reports are
7    done.
8      Q   All right. About what assumptions are
9    made?
10         MR. ROSENBLOOM: Objection to form.
11   BY MR. ROSE:
12     Q   Isn't the normal thing -- under Title
13   VII and the Human Rights Act, isn't the normal
14   thing to do is to ask whether these statistics are
15   consistent with -- with the work force evenly or
16   whether or they are disproportionally harm blacks
17   and older people. Isn't that the usual question
18   to ask for the court and for the expert?
19         MR. ROSENBLOOM: Object to the form.
20         THE WITNESS: To the extent that
21   statistical evidence is going to enter into this,
22   I think you are looking at the significance of the

48

1    evidence. You are looking at the other legitimate
2    factors that would be taken into account in
3    addition to race and age. It is my understanding
4    that in Dr. Monroe's report she doesn't control
5    for any other possible factors and only reports,
6    when she reports the statistical significance, a
7    comparison that the only factor that could explain
8    differences in termination rates is race on the
9    one hand and age on the other. There is nothing
10   else she takes into account. And so I don't think
11   that that is my understanding of the norm for how
12   you would do this.
13   BY MR. ROSE:
14     Q   Is it the norm for an employer not to
15   state, to record reasons for discharges from
16   employment until three years or more after the
17   fact?
18         MR. ROSENBLOOM: Objection form.
19         THE WITNESS: I've got less evidence on
20   when employers -- I would be speculating as to
21   when information is recorded and how often
22   employers are in this.

49

1    BY MR. ROSE:
2      Q   Well, you said --
3      A   And even whether or not -- I mean, just
4    because the declaration that I was relying on was
5    signed a few years later doesn't mean that there's
6    not other information --
7      Q   -- Okay.
8      A   -- recording this. So I really -- I
9    can't really answer that in knowing in this case
10   or in general --
11     Q   -- Do you know whether it is the law in
12   the United States that employers with over, I
13   think, 15 employees -- I'm asking him a question?
14         MR. ROSENBLOOM: I know. But Mr. Rose,
15   again, Dr. Bronars was still answering the prior
16   question.
17         MR. ROSE: Oh. I'm sorry.
18         MR. ROSENBLOOM: I apologize.
19         MR. ROSE: Did I interrupt?
20         MR. ROSENBLOOM: He was just wrapping
21   up, I think. But he wasn't quite finished.
22         MR. ROSE: Did you wrap up?

13  (Pages 46 to 49)

50

1    THE WITNESS: At this point I can't
2  remember what I would have said at the end of
3  that.
4    MR. ROSENBLOOM: Before you move on,
5  Mr. Rose, if you would indulge me. I objected on
6  the basis of form to the prior question. I would
7  also add that it was, again, beyond the scope for
8  Dr. Bronars, the statistician. Please continue.
9  You were asking something about the law.
10 BY MR. ROSE:
11   Q  Yes. Are you aware that Title VII and
12 indeed the Civil Service Act requires employers to
13 make records and report them to EEOC every year?
14 Were you aware of that?
15   A  I'm aware of that.
16   MR. ROSENBLOOM: Excuse me. I'm not
17 making a formal object. But repeating the other
18 ground, beyond the scope.
19   THE WITNESS: I'm aware of EEO1 reports.
20 BY MR. ROSE:
21   Q  And EEO4 and 5, I believe?
22   A  Yeah.

51

1    Q  And that there is a requirement of law
2  that they, the employer, do that?
3    MR. ROSENBLOOM: Repeat the objection.
4    MR. ROSE: All right.
5    MR. ROSENBLOOM: And say it calls for a
6  legal conclusion.
7    THE WITNESS: I'm aware of these
8  reports. I don't know the legal requirements.
9  BY MR. ROSE:
10   Q  All right. So assume that I'm correct,
11 then, that there is a legal requirement. Do you
12 think that — would you think the absence of a
13 contemporaneous report is evidence or may give
14 rise to an inference that the employer had
15 something that it didn't want to make public or
16 advise its employees about?
17   MR. ROSENBLOOM: I'll repeat the
18 objection. Beyond the scope for the expert
19 designation. And although we've been sort of
20 letting these questions go, Mr. Rose, with all due
21 respect we would be within our rights to cabin
22 this deposition and the questions. And I would be

52

1  within my rights to instruct the witness to not
2  answer. I won't do that yet, but let's try to get
3  back to what the expert designation is all about.
4  BY MR. ROSE:
5    Q  I think this is about the expert's
6  report, whatever his designation.
7    A  Frankly, I don't know what I would
8  conclude from your hypothetical about record
9  keeping. I mean, it's a pretty broad question.
10 BY MR. ROSE:
11   Q  Why do you say it's hypothetical, sir?
12 It's not hypothetical. He said, you say, and
13 Dr. Monroe said there is no — the defendant has
14 not told you anything about records that were
15 contemporaneous, has he?
16   MR. ROSENBLOOM: Mr. Rose, forgive me.
17 Again —
18   MR. ROSE: I'll reframe the question.
19   MR. ROSENBLOOM: Not about reframing.
20 For the fourth or fifth time —
21   MR. ROSE: — I don't care. You can say
22 object. If you want to say, do not answer, we

53

1  will get the judge or magistrate judge to decide
2  it. I would prefer that he — I will try and
3  modify my questions as I can. But I think he is
4  an expert, he ought to tell me what he knows.
5    MR. ROSENBLOOM: Mr. Rose, what I was
6  trying to speak to is not the question you
7  subsequently asked. It is the fact that, again,
8  for the fourth or fifth time Dr. Bronars was in
9  the process of answering a question when you
10 interrupted him and started asking a new one. And
11 I would just ask you, again, for the record to
12 please try to allow —
13   MR. ROSE: — I'll try to do that.
14   MR. ROSENBLOOM: Thank you. Thank you,
15 Mr. Rose. If you would kindly repeat the last
16 question that would help me. Or we could ask the
17 court reporter to read it back.
18   (Whereupon, the court reporter read the
19   requested portion.)
20   MR. ROSENBLOOM: Right. So I don't know
21 if you want to reframe the question. If you want
22 that to be the question I will just note my

14  (Pages 50 to 53)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                7/29/2014

54

1    objections now.
2    BY MR. ROSE:
3        Q   Sorry. If you -- please accept my
4    statement that the two laws have a requirement for
5    recording and reporting it. I think it is twice a
6    year, but I'm not sure. So if in fact the agency
7    didn't state its reasons for three years, that
8    suggests that the agency isn't following the law
9    very carefully. Is that a reasonable inference?
10       MR. ROSENBLOOM: I will repeat my
11   objections. Form. Calling for speculation.
12   Beyond the scope of the expert's testimony and the
13   designation.
14       THE WITNESS: I have -- that sounds to
15   me like a legal question as --
16   BY MR. ROSE:
17       Q  -- It is.
18       A   Yes.
19       Q   I said it was.
20       A   Right.
21       Q   You said you didn't know that there was
22   such a requirement. I am advising you to take my

55

1    statement as correct. And that I'm saying it
2    in -- is it reasonable for a court then to infer
3    that there is something that the agency did not
4    want to make public or to advise its former
5    employees about? Is that a reasonable assumption?
6        MR. ROSENBLOOM: I'll repeat all of the
7    objections.
8        MR. ROSE: Thank you.
9        MR. ROSENBLOOM: Mr. Rose, please.
10   Dr. Bronars got about three and a half to four
11   words out.
12       MR. ROSE: Counsel, that's out of line.
13   He's gotten a lot of words out.
14       MR. ROSENBLOOM: The transcript speaks
15   for itself.
16       MR. ROSE: Exactly.
17       MR. ROSENBLOOM: With all due respect,
18   let's try to resolve this without court
19   intervention. But we need to allow -- just as it
20   wouldn't be appropriate for the witness to start
21   answering a question before you finished asking
22   it. Please, again, for the fifth or sixth time,

56

1    let Dr. Bronars complete answering before you
2    interrupt with the next question. Thank you.
3        THE WITNESS: I would not necessarily
4    conclude that. It seems to me like we are outside
5    my area of expertise here. And you are asking me
6    to say if it is sloppy record keeping or
7    inadequate record keeping isn't that -- doesn't
8    that mean something much more than that. And I
9    have no idea.
10   BY MR. ROSE:
11       Q   Okay.
12       A   I really don't.
13       Q   All right. That's fine. Would you
14   agree that employers should -- I'm sorry. Are
15   you -- you're talking about a model. You say in
16   the second -- your rebuttal report you said the
17   statistical significance of the adverse impact of
18   the rift are based on an unreasonable statistical
19   assumption and Mr. Davidson's declaration.
20       So are you -- what is the unreasonable
21   statistical assumption in your mind?
22       MR. ROSENBLOOM: Which paragraph were

57

1    you reading from?
2        MR. ROSE: Paragraph eight in the
3    supplemental report.
4        MR. ROSENBLOOM: Thank you.
5        THE WITNESS: Just to repeat myself a
6    little bit. Any time someone is going to do a
7    statistical study like this they are going to
8    compare what actually happened to what would have
9    happened in the absence of race or age bias.
10   BY MR. ROSE:
11       Q   Yes.
12       A   And my problem with Dr. Monroe's
13   assumption is that she takes -- doesn't take into
14   account any other factors and therefore her model
15   says that in the absence of any kind of
16   discrimination the distribution of terminations
17   across positions and across departments is going
18   to be exactly proportional, because that is the
19   statistical model she used as a bench mark against
20   which she is comparing what actually happened.
21   And that is overly simplistic in this case and
22   unrealistic and even -- I think as I say in this

15  (Pages 54 to 57)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                              7/29/2014

58

1    paragraph, I think it kind of contradicts other
2    arguments that she is making. And so that's the
3    assumption that we are talking about. What bench
4    mark are you comparing against? And her bench
5    mark is purely random with everyone is equally
6    likely to be selected for the rift. That is the
7    answer.
8        Q   So if -- so your assumption is that if
9    we had -- if an agency had 800 people and they
10   wanted to fire 100 people and they fired 115 black
11   employees, what analysis would you make or how
12   would you approach that?
13       MR. ROSENBLOOM: Objection to form.
14       THE WITNESS: You know, it's, you know,
15   Dr. Monroe's report. But what I think I was
16   expecting was let's try to take into account
17   legitimate factors and then after conditioning on
18   that over and above that did race or age play a
19   factor. Because no one believes that -- I don't
20   think -- that the process would play out in the
21   way in the in which her bench mark model that she
22   is comparing the outcomes to in order for her to

59

1    say the significance here is, you know, less than
2    .01 for a probability value. And this many -- you
3    know -- this is a really significant deviation
4    from what I would have expected. Well, I don't
5    think anyone would expect that you would just
6    randomly decide where to make the cuts.
7    BY MR. ROSE:
8        Q   You can't randomly -- and employer can't
9    or shouldn't at least randomly decide to make
10   where the cuts are. The employer has to decide if
11   they going to fire 115 people out of 200 or
12   whatever. They have to have a reason for firing
13   them. And my question to you is do you know of
14   any reason why 57 -- let me ask you if you know
15   the following facts are true. That is that 57 SSA
16   people were fired and something like 38 FSW people
17   at a higher rate of pay were hired to do
18   substantially the same work. Are you aware that
19   those facts are so?
20       MR. ROSENBLOOM: Objection. Form.
21   Mischaracterizing facts.
22       THE WITNESS: I don't recall those

60

1    facts. I know that some people were let go and
2    other people were hired as part of the
3    reorganization. But those particular facts I'm
4    not aware of.
5    BY MR. ROSE:
6        Q   Did you read the third amended
7    complaint?
8        A   Yes, I did. It has been a while but,
9    yes.
10       MR. ROSENBLOOM: Can we take a brief
11   break?
12       MR. ROSE: Sure.
13       (The proceedings recessed from 11:44
14   a.m. to 11:58 a.m.)
15   BY MR. ROSE:
16       Q   Dr. Bronars, if you would take a look at
17   this document. It is document 631 filed
18   5/14/2013. And see if you've read this document.
19   If you've read it and -- because as I say, my
20   memory is that you had received it.
21       A   I remember seeing this, reviewing it.
22   But -- yeah, it has been a while since I looked at

61

1    it.
2        Q   All right. Do you remember that each of
3    the plaintiffs had been advised: Despite your
4    years of faithful service you have rendered to the
5    citizens of the District of Columbia we must
6    advise you -- and there is a paren -- of a
7    reduction of force. This letter serves as
8    official notice of at least 30 calendar days that
9    you will be separated from District government
10   service effective 6/11/10.
11       Do you remember reading that?
12       A   I don't remember reading it. But I see
13   that now.
14       Q   Okay. So, let's talk about the 57
15   employees who were in the Grade 8 position. Let's
16   see if I can find it. And do you remember that?
17   Do you remember paragraph 89? Let me hand it to
18   you.
19       A   Yes, I see paragraph 89.
20       Q   So you know that that -- you know that
21   the defendant had the age of the employees who
22   would lose their positions as a result of the RIF

16  (Pages 58 to 61)

62

1   and realignments. And that it is an obligation
2   for such an employer to determine the disparate
3   impact before discharging the employees?
4        MR. ROSENBLOOM: Objection. Form.
5   Calling for a legal conclusion.
6        MR. ROSE: What?
7        MR. ROSENBLOOM: And calling for a legal
8   conclusion.
9   BY MR. ROSE:
10       Q   Well, I'm asking him what his knowledge
11  of the law is and -- as it is set forth here, at
12  least.
13       A   I'm not clear. It's not clear to me. I
14  don't understand exactly what their legal
15  obligation is pre-RIF.
16       Q   Well, would it make sense for the law to
17  provide before you take a course of action you
18  study to see if you're likely to be held liable
19  for violating the law?
20       MR. ROSENBLOOM: I will repeat the
21  objections. And also I repeat that this is beyond
22  the statistical designation of Dr. Bronars.

63

1   BY MR. ROSE:
2        Q   Well, if he was only statistical, sir,
3   he wouldn't be an expert here. He's offering his
4   opinions about things. And we're trying to get an
5   answer to some questions to see what he basically,
6   obviously he didn't base his conclusions on
7   anything in this. But I'm focusing on these
8   particular portions. Please go forward. Please
9   answer.
10       A   Could you repeat the first part of that
11  question? It was -- maybe the whole question?
12       (Whereupon, the court reporter read the
13       requested portion)
14       THE WITNESS: Okay. I think I answered
15  that question when I said -- don't I have an
16  answer to that question?
17       (Whereupon, the court reporter read the
18       requested portion)
19       MR. ROSE: And the you is -- obviously
20  refers to the District of Columbia.
21       MR. ROSENBLOOM: I will repeat the prior
22  objections.

64

1        THE WITNESS: So the way I understand
2   your question is would it make sense for the law
3   to have this as a provision. And -- wow. There
4   are a lot of laws that don't make that much sense.
5   And so this might make sense. I would have to,
6   you know --
7   BY MR. ROSE:
8        Q   -- Well, if you were --
9        A   -- see exactly what the provision was.
10       Q   If you were an employer who wanted to
11  follow the law wouldn't you either ask your
12  general counsel's office or whoever your lawyer
13  was, what do I do to keep records. I'm thinking
14  of discharging people. Would that be a reasonable
15  thing for an employer to do?
16       MR. ROSENBLOOM: I will repeat the prior
17  objection about scope, form and add speculation.
18       THE WITNESS: So the way I understand
19  the question is would that be a reasonable thing
20  for an employer to do? And --
21  BY MR. ROSE:
22       Q   -- In light of --

65

1        A   -- the way you've described it I believe
2   that would be a reasonable thing to do.
3        Q   And are you aware that the employer here
4   did not conduct such an analysis?
5        MR. ROSENBLOOM: Objection.
6   BY MR. ROSE:
7        Q   You can answer the question, yes or no.
8        MR. ROSENBLOOM: Form. Calling for
9   speculation. Misrepresenting facts not on the
10  record.
11       THE WITNESS: I think this is a question
12  I had before. I'm unaware of the possibility or
13  actuality of any kind of study, analysis, you
14  know, all of this kind of stuff that you are
15  asking about that happened.
16  BY MR. ROSE:
17       Q   Before the RIF?
18       A   Before RIF. I -- I don't know one way
19  or the other what was done. I'm unaware of the
20  circumstances.
21       Q   So you didn't take into account the fact
22  that -- well, do you disagree with the fact that

17 (Pages 62 to 65)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                    7/29/2014

---

66

1    the selection procedure that the District used was
2    not supported by any validity study?
3            MR. ROSENBLOOM: Just to clarify
4    Mr. Rose. You are reading from what paragraph?
5            MR. ROSE: Eighty-seven.
6            MR. ROSENBLOOM: Okay. From the third
7    amended complaint?
8            MR. ROSE: Yes.
9            MR. ROSENBLOOM: Okay. Thank you. So I
10   will repeat the objections, scope.
11           MR. ROSE: You're really talking about
12   speculation.
13           MR. ROSENBLOOM: Yes.
14           MR. ROSE: Okay.
15           MR. ROSENBLOOM: It calls for
16   speculation and for the witness to speculate as to
17   whether he agrees or disagrees with the
18   allegations in your fact. We don't have to argue
19   the objections. But if you want an explanation I
20   can provide it. That is beyond the scope. And I
21   object to the form of the question. And I object
22   to your representation about allegations of the

---

67

1    complaint being facts on the record.
2            MR. ROSE: Do you think those facts were
3    denied?
4            MR. ROSENBLOOM: Are you ask me or
5    Dr. Bronars?
6            MR. ROSE: I'm asking you the question.
7    You're saying it's beyond the scope. Do you think
8    they were denied?
9            MR. ROSENBLOOM: I'll decline. I'll
10   decline to respond because I'm not the deponent.
11   I will certainly represent that the District has
12   not admitted to that factual allegation.
13           THE WITNESS: I --
14   BY MR. ROSE:
15       Q   It -- oh. Go ahead.
16       A   My understanding, this is more like a
17   fact question. I'm not a fact witness. It is not
18   like a -- I am a statistical consultant. I was
19   not a D C employee. So my answer to these
20   questions would be, I don't know. And I really
21   don't know. I am not trying to be difficult. I
22   just don't know.

---

68

1            Q   You don't know whether it would have
2    been possible to make the -- to accomplish a
3    reduction in force without having a disparate
4    impact?
5            MR. ROSENBLOOM: Repeat the objection.
6            THE WITNESS: Could you repeat the
7    question, please?
8            (Whereupon, the court reporter read the
9            requested portion)
10           THE WITNESS: I think it's possible to
11   make a reduction in force without having a
12   disparate impact, yes.
13   BY MR. ROSE:
14       Q   And you don't know of any reason why the
15   District had not looked into the possibility of
16   disparate impact against blacks or older people
17   before making the RIF?
18           MR. ROSENBLOOM: Objection to the
19   factual basis of the question and to the form.
20   BY MR. ROSE:
21       Q   Do want to read it, please?
22       A   Yeah. Thank you. If you could read

---

69

1    that question again?
2            (Whereupon, the court reporter read the
3            requested portion)
4            THE WITNESS: The way I understand that
5    question, it presumes that I know that they
6    didn't. And I really don't. I said I don't know
7    one way or the other what they did. And I don't
8    know the reasons that entered into that decision,
9    whether to do that or not. So I'd have to say
10   I -- I'd say no to both parts. The second part I
11   don't know what they did or didn't do and I don't
12   know the reasons why they chose to do or not do
13   things. Because --
14   BY MR. ROSE:
15       Q   Well, you didn't --
16       A   That was beyond --
17       Q   In your initial interviews with the
18   lawyers did you ask? Or whoever hired you, did
19   you ask what the facts were? What the case was
20   about?
21       A   Yes.
22       Q   What was the case about? Disparate

---

18 (Pages 66 to 69)

70

1   impact, was it not?
2       A   Yes.
3       Q   And did you ask whether they had
4   conducted any study to -- before the RIF. Did you
5   not ask them that question?
6           MR. ROSENBLOOM:  Objection.  Form.
7           THE WITNESS:  I did not ask them that
8   question.
9   BY MR. ROSE:
10      Q   You didn't think of that question?
11          MR. ROSENBLOOM:  Objection.  Form.
12          THE WITNESS:  I didn't think it was
13  important to the analysis that I was going to do.
14  BY MR. ROSE:
15      Q   How do you know what -- did you know at
16  that time that you were not going to use -- what
17  do they call it -- a null possibility that is
18  eliminating other reasons?  Did you know at that
19  time that you were going to do a different type of
20  analysis?
21          MR. ROSENBLOOM:  Objection on the basis
22  of form and confusion.

71

1   BY MR. ROSE:
2       Q   All right.  If he is confused he can
3   tell me that.
4       A   I'm a little bit confused by the
5   question, but I will just --
6       Q   -- try to do your best and let me see if
7   I can't ...
8       A   Okay.  I believe that when I had the
9   initial discussion of this case I had a copy of
10  the original Paige Monroe, Dr. Paige Monroe's
11  report or declaration.  And my role was to use
12  that as a starting line to say what about the
13  statistical analysis that she has presented.  And
14  then we talked about -- well, what data and facts
15  that I would need to do an assessment.  And I did
16  not get into a discussion of any kind of pre-RIF
17  analysis.
18      Q   Well, when did you -- you did read this
19  amended complaint before you completed your study?
20      A   Yeah.  I don't remember when I read
21  that.  I'd have to go back and look at when I
22  received it.

72

1           MR. ROSE:  Counsel, do you have any
2   information as to when he received it, if you can
3   recall?
4           MR. ROSENBLOOM:  No.  I'm not able to
5   answer beyond what the -- to supplement the
6   witnesses answer.
7   BY MR. ROSE:
8       Q   So what legitimate business purpose did
9   you think the RIF was designed?  Did you have any
10  views as to what the objective of the District was
11  other than to continue to litigate this case?
12          MR. ROSENBLOOM:  Objections on the
13  grounds of form.
14          MR. ROSE:  I will rephrase it.  I will
15  rephrase it.
16          MR. ROSENBLOOM:  Thank you.
17  BY MR. ROSE:
18      Q   So do you remember whether you had the
19  amended complaint before mister -- did you ever
20  talk to Mr. Davidson?
21      A   I did not talk to Mr. Davidson.
22      Q   Okay.  Did you know that the defendant

73

1   knew the age of employees who would lose their
2   positions as a result of the RIF?
3           MR. ROSENBLOOM:  Objection to form and
4   to presuming facts on the record.  And you are
5   reading again from the complaint?
6           MR. ROSE:  Yes.
7           MR. ROSENBLOOM:  Which paragraph, sir?
8           MR. ROSE:  This one is 89.
9           MR. ROSENBLOOM:  Thank you.  I will
10  repeat those objections.
11  BY MR. ROSE:
12      Q   Did you know the District kept a record
13  of the date of birth of the age of the employees
14  when you did your report?
15          MR. ROSENBLOOM:  I'll repeat the same
16  objection as to factual basis and as to form.
17          THE WITNESS:  I assume that they would
18  know that.  In my experience it is a common piece
19  of information that would be in the HR system and
20  it was in the spreadsheet that I had received that
21  described the employees in the agency.
22      Q   All 832?

19 (Pages 70 to 73)

74

1    A   I received --
2    Q   Was it 802?
3    A   Yes, 802. I received a spreadsheet with
4    802.
5    Q   Okay. And you knew that -- you also
6    knew that the District had kept records of race --
7    of the impact of employment decisions, did you?
8         MR. ROSENBLOOM: Form objection.
9         THE WITNESS: Well, I knew that -- that
10   they --
11   BY MR. ROSE:
12   Q   -- Race and age?
13   A   Race and age were in the data.
14   Q   Common. Right. Did you know that there
15   were -- and actually 832 people in the agency
16   rather than 802 at the time you did the report?
17   A   I knew that whenever you get an account
18   of a number of employees in an agency or a firm it
19   can vary from one snapshot to another, one time to
20   another.
21   Q   Sure.
22   A   So it was my understanding that at the

75

1    time the RIF decisions were made there were 802.
2    Although I'm basing that on the information that I
3    received from the District. I have no other
4    knowledge other than they have said, here is the
5    list of who was there.
6    Q   Did you know that the District had
7    created a new position called family support
8    worker -- I believe, FSW -- to perform the duties
9    that had been performed by the SSA employees,
10   substantially the same ones, same duties?
11        MR. ROSENBLOOM: Object to the form and
12   the representation of the facts. And we remain
13   here and well beyond the scope of the rebuttal of
14   Dr. Bronars to Dr. Monroe.
15        THE WITNESS: I'm not 100 percent sure
16   we have these job titles right. I was thinking the
17   FSW position was something different than the way
18   you have phrased it.
19   BY MR. ROSE:
20   Q   You knew it was a nine position, salary
21   grade nine. It was more than the SSA. It was
22   higher than the SSA?

76

1    A   I'm just -- the only thing I'm
2    questioning here is what the specific title was
3    for SSA and FSW. And I would have to go back and
4    look at the --
5    Q   -- Well, you can look at this.
6         MR. ROSENBLOOM: Mr. Rose, on the last
7    two questions and answers you have interrupted
8    before Dr. Bronars completed the sentence.
9         MR. ROSE: I'm sorry.
10        THE WITNESS: It seems to me this is
11   a -- they are factual kinds of questions here.
12   And I was aware that there was a position where
13   people were going to do some of the
14   responsibilities under a different model than the
15   SSA. But I don't remember the names of the
16   specific job titles.
17   BY MR. ROSE:
18   Q   All right.
19   A   Yes.
20   Q   Well, let's assume for purposes of this
21   question that the SSA job was an eight and
22   therefore it had a salary slightly less than the

77

1    grade nine. People that had -- that means not --
2    that doesn't mean that the highly experienced
3    eight people were not getting as much as the --
4    some of the new GS9 people or GS9. But did you --
5    do you know why a reduction of force should lead
6    to the hiring of more expensive employees to do
7    the work that had been done by less expensive
8    employees?
9         MR. ROSENBLOOM: Object to the form, to
10   the factual representations, to the form of the
11   basis to the extent that it calls for speculation
12   and to being beyond the scope of Dr. Bronars'
13   designation as a rebuttal witness to Dr. Monroe.
14        THE WITNESS: My understanding of the
15   reorganization was not that it was simply, let's
16   take Grade 8 people and their job duties will be
17   exactly the same except replaced by grade nine.
18   It was --
19   BY MR. ROSE:
20   Q   -- I didn't say exactly the same.
21   A   For something like that to make sense,
22   obviously, there is going to have to be some other

20 (Pages 74 to 77)

78

1  responsibilities and work that is going to be done
2  if the goal of the RIF is to fit inside of the
3  financial constraints. So there's -- it's more --
4  it's going to be a more complicated story in terms
5  of their ability to do different things than just
6  the people in the previous position. But again,
7  this is just, you know, my understanding of the
8  reorganization and realignment of the agency. And
9  I'm basically here repeating the facts as I
10 understand them based on Mr. Davidson's
11 declaration of the reorganization of the CFSA.
12     Q   You knew that 57 of the 115 employees
13 that received the RIF had held the SSA job. You
14 understood that?
15     A   I understood that.
16     Q   And did you understand that the
17 defendant or the District had not conducted a
18 validity study to support the elimination of the
19 SSA position selection procedure?
20     MR. ROSENBLOOM: Object to the factual
21 representation as the basis of the question.
22     THE WITNESS: Again, I'm not really --

79

1  BY MR. ROSE:
2     Q   -- You didn't focus on that?
3     MR. ROSENBLOOM: Dr. Bronars, excuse me.
4  Mr. Rose, let Dr. Bronars answer.
5     THE WITNESS: I am not aware. I think
6  you are asking again about a validity study or
7  pre-RIF study. As I said before I'm not aware of
8  one way or the other of this. I understand this
9  is in the allegations, but...
10 BY MR. ROSE:
11     Q   Yeah. But you've just --
12     A   I've read that, but I don't know whether
13 that's --
14     Q   -- You don't know whether they're true?
15     A   Correct.
16     Q   Assuming that it is true that there was
17 no -- you were never told about any validity study
18 that had been done prior to the RIF to see what
19 the situation -- did you ask? Did you ever ask if
20 there had been a study conducted before the RIF?
21     MR. ROSENBLOOM: Objection. Form.
22     THE WITNESS: No, I did not ask.

80

1  BY MR. ROSE:
2     Q   Why not? Isn't that essential to your
3  task? Isn't the task -- wasn't the task to
4  determine whether or not there was an adverse
5  impact on the basis of race or age?
6     MR. ROSENBLOOM: Form, compound.
7     THE WITNESS: My task was to look at
8  Dr. Monroe's report. And reply to that, rebut
9  that.
10 BY MR. ROSE:
11     Q   And possibly to testify?
12     A   And possibly to testify.
13     Q   At depositions such as this?
14     A   Yeah. Right. So. My -- I was not
15 asked to go back and independently look at these
16 issues of what might or might not have happened.
17     Q   So had you decided -- you know -- do you
18 know when you decided to use a different kind of
19 analysis than Dr. Monroe? Did you -- had you read
20 this amended complaint?
21     MR. ROSENBLOOM: Objection to form. The
22 question is whether he read the amended complaint?

81

1     MR. ROSE: He already testified that he
2  did.
3     MR. ROSENBLOOM: Yes.
4  BY MR. ROSE:
5     Q   I asked if he recalls whether he had
6  read it in December or early?
7     A   I don't recall when I read it. It
8  probably was before December.
9     Q   Okay.
10    A   And -- so. And then later I received
11 some other information like the actual data and
12 the Davidson declaration. I had this I think
13 before, probably when I had Dr. Monroe's report.
14 But I had -- if I had my emails and all of that I
15 could tell you exact dates on that. But sitting
16 right here, I don't recall that. My best
17 recollection is that this is something I received
18 earlier.
19    MR. ROSE: Okay. Well, why don't you --
20 let's just go off of the record, I guess is the
21 best way to proceed.
22    MR. ROSENBLOOM: I prefer, if it is okay

21 (Pages 78 to 81)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                    7/29/2014

82

1  with you, to stay on the record if we are talking
2  about the testimony in the deposition. If we are
3  going to talk about whether the Redskins are going
4  to have a decent season this year we can stay off
5  the record.
6      MR. ROSE: We don't have court reporters
7  around for that.
8      MR. ROSENBLOOM: That's right. So if we
9  are talking about follow up or questions about
10  Dr. Bronars' answer, let's stay on the record.
11  BY MR. ROSE:
12     Q  My proposal -- I'm proposing that you
13  check your records. And we will assume that you
14  did did this -- get this document in December. If
15  in fact it was December then you don't have to do
16  anything. But if you find that it was really, you
17  know, late December or the last week of December
18  or first week of January, then call counsel and
19  tell him and give us the correct date.
20     A  Okay.
21     MR. ROSE: Sound all right?
22     MR. ROSENBLOOM: Yeah. I don't have --

83

1  I don't have any problem following up on that.
2  But without -- those communications should come
3  between yourself and myself. There is nothing
4  insufficient about Dr. Bronars' prior response.
5  He gave his -- his best recollection was of
6  sometime in December, probably before Christmas.
7  And if you are of the position that we need to
8  supplement any discovery or anything to you, let
9  us know that in writing. But if Dr. Bronars
10  checks his record and would forward that on to me,
11  I certainly have no problem forwarding that on to
12  you.
13  BY MR. ROSE:
14     Q  Well, all right. Could you tell me how
15  your approach to -- well, your analysis and that
16  of doctor -- I'm sorry. Let me ask you one. Were
17  you aware that an employee of the agency named
18  Spaght. Stan Spaght, it's S-P-A-G-T, had done a
19  report in December, a two page report. Did you
20  ever get a copy of that?
21     MR. ROSENBLOOM: Objection. Form. Are
22  you asking if he is aware of the report or if he

84

1  got a copy?
2  BY MR. ROSE:
3      Q  Well, let's separate it.
4      A  Well, I'm aware of the report. I don't
5  remember whether I got a copy of it. I would have
6  to go back and check.
7      Q  And would you presume that the report of
8  Mr. Spaght had the correct numbers, would you
9  assume that they were consistent with the records
10  of the agency -- of the defendant?
11     MR. ROSENBLOOM: Objection. Form.
12     THE WITNESS: I have no reason to expect
13  that he would have deliberately not used the
14  accurate numbers.
15  BY MR. ROSE:
16     Q  Okay.
17     A  So I presume he would try to use the
18  accurate numbers.
19     MR. ROSE: I'm looking at a copy of your
20  report. Do you have them? I don't know if I have
21  an extra copy.
22     MR. ROSENBLOOM: Sure. Dr. Bronars has

85

1  a copy of his -- the recent rebuttal report that
2  was provided yesterday?
3      MR. ROSE: No. This was the original,
4  is what I was looking at.
5      MR. ROSENBLOOM: Okay. We don't have an
6  extra copy of that with us. If you would like to
7  share your copy?
8      MR. ROSE: All right.
9  BY MR. ROSE:
10     Q  Would you kindly look at that? Both of
11  you? Why don't you go first. Dr. Bronars
12  background, page two of the original report.
13  Paragraph 7.
14     A  Okay. Yes.
15     MR. ROSE: And have you?
16     MR. ROSENBLOOM: Yes.
17  BY MR. ROSE:
18     Q  Do you know what the qualifications for
19  the family -- what qualification the defendant
20  imposed for rehiring family support workers,
21  hiring or rehiring? Do you know what these --
22  what the requirement was?

22 (Pages 82 to 85)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                          7/29/2014

86

```
 1        A  I don't recall.
 2        Q  If I told you it was an educational,
 3    that it required a diploma, a bachelor's degree or
 4    diploma, does that sound right?
 5        A  I seem to recall something like that.
 6    But I would want to double check that I think
 7    that's right.
 8        Q  And do you know what the -- and you know
 9    that that had not been required by the SSA
10    positions?
11        A  Again, I seem to recall that, yes.
12        Q  Okay.  You say -- do you recall you said
13    in this second sentence:  I understand that 44
14    individuals who were terminated in the reduction
15    in force subsequently applied for a position as a
16    family support worker.
17        And the reference is to Davidson's
18    declaration and Exhibit A, which I believe is
19    attached.  I'm sure it's attached.  Do you know
20    whether educational attainments are good
21    indicators of job performance?
22        MR. ROSENBLOOM:  Objection to form and
```

87

```
 1    beyond the scope of Dr. Bronars -- of the expert
 2    designation and rebuttal designation in this case.
 3        THE WITNESS:  I'm not aware one way or
 4    the other for this particular job.
 5    BY MR. ROSE:
 6        Q  For any particular job are you aware
 7    of -- do you have any -- you have not studied
 8    industrial organizational psychology, I assume?
 9        A  I know that -- you're talking about a
10    college degree?  Is that it?
11        Q  Yeah.
12        A  Is a college degree correlated with
13    better job performance?
14        Q  Yes.
15        MR. ROSENBLOOM:  I'll repeat my prior
16    objections about form and scope.
17        THE WITNESS:  There are lots of
18    different jobs out there.  For some of them it's a
19    good indicator, others it's a less good indicator.
20    It depends upon what other factors you are taking
21    into account.
22
```

88

```
 1    BY MR. ROSE:
 2        Q  Let's put aside the medical positions
 3    which are frequently -- where a certain grade is
 4    required for a nurse or doctor and that sort of
 5    thing.  Let's not talk about medical jobs.  Okay.
 6    Even, you know, assistants to those people.  But
 7    for -- in the work force at large in the
 8    United States do you know whether such
 9    requirements are widely used, had been widely used
10    in the last 25 or 30 years?
11        MR. ROSENBLOOM:  Form and scope.  I will
12    repeat those prior objections.
13        THE WITNESS:  Again, there are a lot of
14    different jobs out there for some job function.
15    For some -- you know, I know that when we hire
16    people to be our analysts we are looking for
17    people with college degrees.  And it's pretty
18    common I think to have degree requirements for
19    certain jobs.
20    BY MR. ROSE:
21        Q  You want to let your employer know we
22    talked?  Why do you think -- what kind of jobs
```

89

```
 1    does your employer hire for assistant to an
 2    economist or . . .
 3        MR. ROSENBLOOM:  I'm sorry.  Mr. Rose,
 4    we are so far beyond the scope here.
 5        MR. ROSE:  You may think so, counsel,
 6    but I think we will let the court decide that.
 7        MR. ROSENBLOOM:  So I -- I mean, I'll
 8    repeat my prior objections.  And as to -- as to
 9    this one specifically, form and beyond the scope.
10    But I do -- depending on how much longer this
11    goes, whether we need to reach out to the court to
12    cabin the scope of this may become something we
13    initiate sooner rather than later, with all due
14    respect, Mr. Rose.
15        MR. ROSE:  Let's put respect away from
16    here.
17        MR. ROSENBLOOM:  Is there a pending
18    question to the witness?
19    BY MR. ROSE:
20        Q  I asked him if he remembered saying that
21    I understand that 44 of the individuals were
22    terminated in the reduction subsequently applied
```

23 (Pages 86 to 89)

90

1   for family support workers. And I don't know
2   whether he answered that question or not.
3       A   I remember.
4       Q   All right.
5       A   Looking at that and writing that.
6       Q   All right. And do you know why some of
7   those people were not qualified for the FSW
8   position. Did you or do you now know?
9       MR. ROSENBLOOM: I will repeat the
10  objections. It is beyond the scope.
11      THE WITNESS: I know that 18 of them
12  were rehired. And I don't recall any information
13  on why the other 26 were not.
14  BY MR. ROSE:
15      Q   And I think I advised you that it was
16  lack of a bachelor's diploma and accept that -- do
17  you know if that is true?
18      A   I don't know if that is true.
19      Q   Okay. Let's assume that that's true.
20  Is there -- if the people who had bachelor's
21  degrees could be rehired -- could be rehired --
22  and those that didn't have a bachelor's degrees,

91

1   do you have an opinion as to whether that might
2   have a discriminatory impact on the grounds of
3   race and/or age?
4       MR. ROSENBLOOM: Object to the form to
5   the factual basis and again to scope under Rule 26
6   of designation.
7       THE WITNESS: My understanding, that
8   would have been a different report that Dr. Monroe
9   would have written. It would have been about
10  policy that she would have done a statistical
11  assessment of the possible disparate impact of
12  that specific policy. And that is just beyond the
13  scope of what I was hired to do, given that she
14  did not present the test of that assertion or
15  conjecture, whatever you want to call it.
16  BY MR. ROSE:
17      Q   So you see here a reference to
18  Mr. Spaght's data?
19      A   Yes. Yes, I remember that.
20      MR. ROSENBLOOM: Just for the record,
21  when you say here what are you pointing to,
22  Mr. Rose?

92

1   BY MR. ROSE:
2       Q   Page 22, apparent facts. This is
3   Dr. Bronars --
4       A   No. I think that is Dr. Monroe's.
5       Q   Dr. Monroe's second report.
6       MR. ROSENBLOOM: So that is page 22 of
7   Dr. Monroe's -- the second. Correct?
8       MR. ROSE: Exactly.
9       MR. ROSENBLOOM: Would you mind just
10  identifying that by the pacer stamp number stamp
11  at the time? Is that the one that was filed?
12      MR. ROSE: I am not positive. I'm sure
13  the two are significantly the same. I don't have
14  a --
15      MR. ROSENBLOOM: Since that was not the
16  one that was filed maybe we should make that, just
17  mark it as an exhibit.
18      MR. ROSE: Fine. Make this Exhibit
19  Number 1, for this. It may be the only one.
20  Thank you.
21      (Whereupon, Exhibit No. 1 was marked for
22      identification.)

93

1   BY MR. ROSE:
2       Q   Would you read apparent facts on page 22
3   of Exhibit 1 and share it with counsel. And also
4   if you can, let's do the first paragraph here
5   under occurring facts and we may talk about that.
6       A   I don't have to read it out loud, right?
7   Just read it?
8       Q   No. We will save a few cents by not
9   reading it out loud.
10      MR. ROSENBLOOM: Page 22 of Exhibit 1.
11      MR. ROSE: Yeah.
12      MR. ROSENBLOOM: Okay.
13      THE WITNESS: Okay. I read the first
14  paragraph.
15  BY MR. ROSE:
16      Q   Yes. Have you read it?
17      A   Yes.
18      Q   Okay. So she said the document says,
19  post hoc, that means, after the fact, if you are a
20  good Greek or Latin student or you know English.
21  Anyhow, at post hoc, means after the fact, based
22  on the declaration of Spaght dated December 17,

24   (Pages 90 to 93)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                                    7/29/2014

94

1   only conducted an adverse impact after the fact
2   and seemingly in response to the plaintiff's
3   filing this case.
4          You didn't take that -- did you take
5   that fact into account in doing your report?
6      A   I did not take into account his
7   analysis.
8      Q   Okay. And was there a reason for that?
9   Was there a good reason? Well, let me ask if
10  there was any reason for that?
11     A   In these kinds of situations it depends
12  on what you are going to control for in your model
13  in terms of what are the reasons other than race
14  or age that might have contributed to the
15  termination decision. And so I would have to have
16  seen exactly what he did in order for me to really
17  understand what it meant. Because just stating
18  that -- this result --
19     Q   -- that's a two page. Do you remember
20  that's a two page?
21         MR. ROSENBLOOM: Mr. Rose, can
22  Dr. Bronars please complete the answer?

95

1   BY MR. ROSE:
2      Q   Have you completed the answer?
3      A   I'm saying that I don't recall what's in
4   that two-page report. But if it doesn't contain
5   enough detail about the procedures and the
6   techniques that were done it's not -- I'm not
7   going to use it to impact my analysis when I have
8   more and better information available to me.
9      Q   What makes you think you have better
10  information? You had -- he had 832 people in it
11  and you only had 802?
12         MR. ROSENBLOOM: Objection. Form.
13  Factual basis.
14         THE WITNESS: I had the individual
15  person-by-person information in a spreadsheet.
16  And all I had from his declaration would have been
17  that two page report. Not the data that he used
18  or the programs that he used or the analysis that
19  he used.
20  BY MR. ROSE:
21     Q   Didn't he just analyze the numbers and
22  the numbers were statistically significant? Is

96

1   that right?
2          MR. ROSENBLOOM: Objection. Form and to
3   the factual basis.
4   BY MR. ROSE:
5      Q   Let me parse that. I'm sorry. Let me
6   change the question.
7          You remember he gave percentages of 832
8   and the 115 and by race -- not by race, yeah. He
9   did it basically African American and others. He
10  was comparing African Americans with all others.
11  Does that sound right?
12     A   That seems about right. I want to go
13  back and look at it before I would agree. It is a
14  factual question as to what he did and it
15  sounds -- it sounds like what I remember.
16     Q   Okay. So why didn't you address his
17  evidence, which was consistent with Dr. Monroe's
18  as far as numbers were concerned?
19         MR. ROSENBLOOM: Objection. Form and --
20  object to the representation of facts and forms
21  and basis of the question.
22         THE WITNESS: When you do an analysis

97

1   and you are saying something is statistically
2   significantly different than something else. The
3   facts are about the 115. It's what you are
4   comparing it to to say if it is statistically
5   different --
6   BY MR. ROSE:
7      Q   -- Isn't it?
8          MR. ROSENBLOOM: Mr. Rose, please let
9   Dr. Bronars finish the answer.
10  BY MR. ROSE:
11     Q   Have you completed?
12     A   No. So the difference in the approach
13  is that the bench mark against which these
14  statistical significance comparisons are being
15  made is a -- is a selection procedure that doesn't
16  take into account what office you are in, what
17  division you are in, what your job function is,
18  whether there is any reorganization or
19  redundancies or anything. It doesn't look at any
20  other factors that could heighten or lower your
21  chance of being selected in the RIF. And it
22  explains it completely only by your race on the

25 (Pages 94 to 97)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                     7/29/2014

---

**98**

1  one hand for that analysis and your age on the
2  other. And that is why I didn't take into account
3  Mr. Spaght's analysis. I think I know what he
4  did. I don't have the actual numbers that he
5  used. And that's my understanding of what he did.
6  And so that's a bench mark against which I don't
7  think it makes a whole lot of sense to calculate
8  statistical significance.
9       MR. ROSENBLOOM: Quick question. We
10  should stay on the record but this is for you, I
11  think as well for Mr. Temple. Just as we cross
12  the line of the two hour threshold of the time --
13  and we've addressed the issue of the payment. I
14  think the court's position beyond two hours we
15  would just submit a supplemental bill for the time
16  in excess of that. I just wanted to, on the
17  record, ask you and Mr. Temple, if he chimes in,
18  is it that all of your -- we should send that to
19  both of you and you are sort of jointly handling
20  that? Or should I send that to just you,
21  Mr. Rose? If you can address that. Just because
22  we have sort of a unique circumstance that there

---

**99**

1  is not a deposition notice here, notice by just
2  the Dudley plaintiffs or just the Davis
3  plaintiffs. So if you could just clarify that for
4  the record.
5       MR. ROSE: Donald, are you there?
6       MR. ROSENBLOOM: The phone line is still
7  on. We can go off of the record while I try to
8  get him.
9       THE WITNESS: I would like to go off of
10  the record to use the restroom.
11       MR. ROSENBLOOM: Well, how about that?
12  Should we take a quick break and we'll resolve
13  this and try to get Donald?
14       MR. ROSE: Sure. Do you want to come
15  back at five after, or ten after?
16       MR. ROSENBLOOM: Yeah. Let's come back
17  in ten minutes. Thanks a lot.
18       (The proceedings recessed from 12:54
19       p.m. to 1:05 p.m)
20       MR. ROSENBLOOM: Back on the record.
21  Thank you.
22       MR. ROSE: Let me say one thing more on

---

**100**

1  the schedule because it pertains to schedule.
2  Donald Temple said he had some questions. I hope
3  I'm covering some of the ones I think he wants to
4  cover. If not I think we are going to have to
5  wait. We will see where we are. But it's -- it's
6  five after. Let's find out whether he is here in
7  25 minutes.
8       MR. ROSENBLOOM: Sure.
9       MR. ROSE: We can break then if we need
10  to.
11       MR. ROSENBLOOM: I have left him a voice
12  mail and sent him an email letting him know that
13  he can dial me on my cell phone. And then also,
14  since we are back on the record what you noted
15  that to the extent that there is a supplemental
16  bill for Dr. Bronars' time, we will send that to
17  you, Mr. Rose.
18       MR. ROSE: Uh huh.
19       MR. ROSENBLOOM: Thank you.
20  BY MR. ROSE:
21       Q   Would you read on page 22 and 23, the
22  one or two, three sentences. And I'm going to ask

---

**101**

1  you if you have any reason to think there is an
2  error? Page 22 and the top of 23.
3       A   Okay.
4       Q   Do you have any reason to think that the
5  data that Dr. Monroe refers to concerning
6  Mr. Spaght's data is incorrect? Do you have any
7  reason to think it is wrong in any way?
8       MR. ROSENBLOOM: Objection. Asked and
9  answered with respect to the Spaght declaration.
10       THE WITNESS: I don't have any knowledge
11  that those numbers are wrong, no.
12  BY MR. ROSE:
13       Q   No? Are you -- and you do agree with
14  her last sentence which is, the termination rates
15  for these groups are notably higher than the
16  representation in the organization pre-RIF? These
17  referring to the --
18       A   I agree that those numbers are higher.
19       Q   Okay.
20       A   I don't know what notably exactly means.
21       Q   So do you disagree with Dr. Monroe's
22  statement that if the -- and she doesn't say if --

---

26 (Pages 98 to 101)

102

1    if the D C government had, "conducted a pre-RIF
2    adverse impact analysis the organization should
3    have been on notice that their decisions would
4    cause adverse impact." Do you have any reason to
5    disagree with that statement?
6         MR. ROSENBLOOM: Objection because it
7    calls for speculation.
8         THE WITNESS: I think that if there are
9    justified business reasons for making these
10   decisions then there is no conclusion of adverse
11   impact.
12   BY MR. ROSE:
13       Q   Well, what business reasons do you think
14   would be a defense?
15        MR. ROSENBLOOM: I'm sorry. I'll repeat
16   that the business questions are really beyond the
17   Rule 26 designation.
18        MR. ROSE: Redundancies --
19        THE COURT REPORTER: Excuse me. I
20   didn't hear you.
21        MR. ROSENBLOOM: Redundancies.
22        MR. ROSE: I'm sorry. What did you

103

1    mean? Well, let me reread it.
2         MR. ROSENBLOOM: I think you were just
3    disagreeing with my point.
4    BY MR. ROSE:
5         Q   I'm quoting this. And she doesn't --
6    Dr. Monroe says organization, meaning either the
7    D C government or the people in the CFSA. Anyway,
8    the -- I'm assuming that it's -- they are the
9    same. But that the District "should have known
10   the termination decisions could raise an issue of
11   adverse impact." And I don't know if you disagree
12   with that or agree?
13        MR. ROSENBLOOM: And repeat objections
14   based on form and speculation. There is
15   speculation within the comment.
16        THE WITNESS: I think that if the issues
17   could have raised -- is that what you said it
18   could have raised the issue of adverse impact?
19   BY MR. ROSE:
20       Q   No. Whether they had conducted an issue
21   it would -- the agency or the District would have
22   been on notice of -- that it would cause an

104

1    adverse impact?
2         A   I disagree with that, because --
3         Q   Why?
4         A   If they're valid business reasons, we
5    are talking about redundancies, reorganization.
6    So people in these positions can do more things,
7    more efficiently than the people that were in the
8    position previously. Then even if the
9    terminations were in the percentage that you are
10   talking about, that wouldn't be adverse impact.
11   Because the defendant is saying that there is a
12   business reasons for the decision. So I don't
13   think --
14       Q   -- So is the defendant?
15        MR. ROSENBLOOM: Mr. Rose, let
16   him finish.
17        MR. ROSE: Go ahead.
18        THE WITNESS: I don't think that's -- I
19   don't agree with that statement because it doesn't
20   necessarily mean there is adverse impact.
21   BY MR. ROSE:
22       Q   I don't think she said necessarily. But

105

1    in any event, what do you understand that it's
2    the -- under the law that it's the employer's
3    obligation to avoid adverse impact unless the
4    organization can prove that the job relatedness
5    and discriminatory -- I'm sorry -- business
6    necessity?
7         MR. ROSENBLOOM: Objection. Form.
8    Calling for a legal conclusion.
9         THE WITNESS: I'm not exactly sure what
10   the question is? My understanding -- can you
11   repeat the question, please? I think that would
12   help me.
13        (Whereupon, the court reporter read the
14        requested portion.)
15        THE WITNESS: I can try to answer this
16   as a non lawyer -- my understanding.
17   BY MR. ROSE:
18       Q   Yes.
19       A   Okay.
20       Q   That is what I'm asking for.
21       A   If you can find a less discriminatory
22   way that still meets your business necessities,

27 (Pages 102 to 105)

**106**

1  you are obligated to do that. But if there's
2  business reasons for making these decisions then
3  even if the statistics are often the way we are
4  talking about here, it is not an adverse impact.
5  It's my understanding.
6      Q   Well, it is adverse impact but it is
7  justified by business necessity and job
8  relatedness?
9      MR. ROSENBLOOM: Repeat the objection.
10  Is there a question?
11  BY MR. ROSE:
12      Q   My question is do you have any reason to
13  disagree with that sentence?
14      A   I don't think so. Part of it may be the
15  legal interpretation.
16      Q   Well, of course. So I -- please state
17  for me the differences between the way that
18  Dr. Monroe and Mr. Spaght did their analysis and
19  your analysis?
20      MR. ROSENBLOOM: I will object on form.
21  And other that that is --
22      MR. ROSE: -- I'm asking about his own

**107**

1  report.
2      MR. ROSENBLOOM: Right. That question
3  goes to the -- basically the entire report answers
4  that question. Maybe you can clarify or ...
5  BY MR. ROSE:
6      Q   Well, let's try and see if we can
7  clarify it.
8      A   First of all I can't really comment as
9  much about what Mr. Spaght did.
10      Q   You said --
11      A   I think I know what he did. But I'd
12  be -- some speculation there as to what he did. I
13  wasn't hired to go into depth in terms of what he
14  did. My approach differs in some fundamental ways
15  in the sense that I calculate difference between
16  actual and expected terminations for African
17  Americans and for age protected workers within
18  several different subgroups, cumulating the
19  difference and coming up with an overall statistic
20  for the difference between actual and expected
21  terminations, taking into account that some
22  positions were more at risk of being terminated

**108**

1  than others. I also -- and Dr. Monroe did not do
2  this. I also at least paid attention to the fact
3  that 18 of the 18 people who were re-employed were
4  African American from those SSA positions. Those
5  are two of the main differences in our approaches.
6      Q   Well, as to the 18, if they were RIF but
7  then reapplied and therefore didn't lose anything
8  then they haven't suffered any harm. Is that
9  correct?
10      MR. ROSENBLOOM: Object to the
11  characterization. Form.
12      THE WITNESS: I wasn't asked to figure
13  out what the harm might be. But clearly it is a
14  different situation if you got your job back than
15  if you didn't.
16  BY MR. ROSE:
17      Q   Sure. Right.
18      A   Right.
19      Q   All right. So for the -- other than the
20  18, so if you subtract 18 from 115 I guess you
21  come up with 97. Is that correct?
22      A   That's correct.

**109**

1      Q   So are you aware that none of the 97
2  other people had been rehired into the grade nine
3  position?
4      A   I had assumed that, but I wasn't
5  100 percent sure of that.
6      Q   Okay.
7      MR. ROSENBLOOM: I would object to the
8  factual basis of that last question.
9  BY MR. ROSE:
10      Q   So describe for me the difference
11  between what Dr. Monroe didn't factor into
12  anticipated -- what is the word you used to
13  distinguish? Was it anticipated?
14      A   Expected.
15      Q   Expected. Why is that relevant? Why is
16  it relevant whether the 57 -- the 57 people at SSA
17  jobs, why is that relevant to who expected --
18  first of all when you say who expected, do you
19  mean the deciding official expected or do you mean
20  something else?
21      A   I mean the statistician.
22      Q   What difference does it make what the

28 (Pages 106 to 109)

110

1    statistician thinks about the facts?
2         A   Well, in order for anyone, whether it is
3    Dr. Monroe or myself to say the likelihood of
4    seeing this outcome is less than one and 100 or
5    one in a thousand.
6         Q   It's one in a thousand, I think.
7         A   Right. Whatever the number is. One in
8    20 -- whatever the number is. You have to say
9    based on what alternative mechanism or process for
10   making decisions on who is going to be terminated.
11   And my approach is that I'm going to use that same
12   logic within each of these categories and say,
13   once you're in that category --
14        Q   -- But?
15            MR. ROSENBLOOM: I'm sorry.
16            THE WITNESS: Once you are in the
17   category, again, everybody's in this -- in the
18   congregate care division, in the clinical
19   department where there was reorganization.
20   Everyone has an equal chance within those
21   divisions. And then I summed up the total which
22   gives you a different statistical approach than

111

1    her approach which is even if you are in child
2    protective services or even if you are the head of
3    the whole CFSA everybody is equally at risk.
4    Those are the two differences in the approaches.
5    BY MR. ROSE:
6         Q   Okay. Table three to your report?
7         A   Yes.
8         Q   Reports that there were 57 people
9    included in the RIF and that 100 percent of them
10   were fired. Does that -- is that correct? Is
11   that what you said in your report?
12            MR. ROSENBLOOM: Can we take a quick
13   look at that? What you are referring to?
14            MR. ROSE: I'm sorry. Certainly.
15            MR. ROSENBLOOM: This is the
16   supplemental report that we just -- this is the
17   original report from Dr. Bronars?
18            THE WITNESS: Yes. 57 out of 57.
19   BY MR. ROSE:
20        Q   Okay. You'd expect 57. So it's lawful.
21   But there is no discriminatory impact if 57 are
22   fired and most of the rest of them are not

112

1    rehired?
2         MR. ROSENBLOOM: Objection. Form and
3    characterization of prior testimony.
4         THE WITNESS: I am making -- I am doing
5    a statistical analysis.
6    BY MR. ROSE:
7         Q   Right.
8         A   So I'm saying that --
9         Q   -- What other? Okay.
10        A   That in my statistical analysis that I
11   am calculating the differences in the expected
12   number of terminations to protected group members,
13   an actual, given this kind of reorganization.
14            MR. ROSE: You want to read that back to
15   me? I don't think he answered the question.
16            (Whereupon, the court reporter read the
17            requested portion)
18   BY MR. ROSE:
19        Q   Do you want to try again or should I try
20   again?
21        A   Could you repeat his question?
22            (Whereupon, the court reporter read the

113

1            requested portion.).
2            THE WITNESS: I'm saying that that
3    position was eliminated, yes.
4    BY MR. ROSE:
5         Q   Yeah. And so under your view, because
6    it was anticipated that the -- that position would
7    be abolished that there is no adverse impact? Is
8    that your conclusion?
9            MR. ROSENBLOOM: Objection. Form.
10   Mischaracterization.
11            THE WITNESS: My -- my conclusion is
12   that Dr. Monroe's conclusion of the chance of this
13   happening less than one in 1,000 times is not a
14   reasonable calculation given the way in which
15   these decisions are going to be made.
16   BY MR. ROSE:
17        Q   Well, these decisions by whom? By this
18   agency or by other people?
19        A   By the CFSA.
20        Q   The CFSA wasn't the deciding official.
21   There was no deciding official as far as we know.
22   Were you aware of that fact?

29  (Pages 110 to 113)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                                    7/29/2014

114

1    MR. ROSENBLOOM: Object to the factual
2  representation.
3    THE WITNESS: My recollection is that
4  the explanation was that this was a sequence of
5  individual decisions and what Mr. Davidson said in
6  his declaration about how the decisions were made.
7  BY MR. ROSE:
8    Q   Well, but in fact they were all fired.
9  All 115 people were fired on the same day.  Right?
10   A   That doesn't mean that there weren't --
11  yeah.  I understand that.  But it doesn't mean
12  that there weren't a sequence of decisions leading
13  up to that.
14   Q   Well, let's say --
15   MR. ROSENBLOOM: Let him finish the
16  answer.
17  BY MR. ROSE:
18   Q   Let's say that only the 57 people were
19  discharged from their employment on this date as a
20  reduction in force.
21   MR. ROSENBLOOM: Excuse me.  This may be
22  Mr. Temple.

115

1    (Pause)
2    MR. ROSENBLOOM: That was attorney
3  Donald Temple calling on my phone.
4    MR. TEMPLE: Thank you.
5    MR. ROSENBLOOM: All right.  Sure thing.
6  We are on the record.  Please continue.  Is there
7  a question?
8    MR. TEMPLE: Did you guys -- you guys
9  went to lunch?
10   MR. ROSENBLOOM: No.  We took a short
11  break.  I don't know when we lost you.
12   MR. TEMPLE: Okay.  I don't know when --
13  I was trying to call -- it's okay.  Did you hear
14  me?
15   MR. ROSE: Yeah.
16   MR. TEMPLE: Okay.
17   MR. ROSE: Hang on a second.  We're
18  waiting for the last question and answer, as far
19  as I can see.
20   (Whereupon, the court reporter read the
21   requested portion.)
22   MR. ROSE: Okay.

116

1    MR. ROSENBLOOM: So there is no question
2  that has been asked.  Go ahead.
3  BY MR. ROSE:
4    Q   I'll start again.  Let's assume for the
5  moment that there's instead of having 115 people
6  fired, they fired 57 of whom 56 were black and
7  zero were Caucasian or white.  Let's make that
8  assumption.  Are you saying that there would be no
9  adverse impact in the selection of that group of
10  people for discharge?
11   A   I am saying that if that decision was
12  reached by eliminating positions that had 57
13  people in it, a statistical analysis that told me
14  that that is an unusual outcome to have 56 in one
15  numbers that you are talking about, relative to a
16  selection process that gave everyone a equal
17  chance of being selected for the termination.  I
18  would say that is not surprising that that is
19  different than you would expect because the
20  decision was, we are going to have to eliminate
21  some positions.  This is the one that we selected.
22  That is how the decision was made.  It wasn't made

117

1  according to the statistical model posited by
2  Dr. Monroe.
3    Q   Is that model posited by Dr. Monroe
4  frequently followed by courts and other experts?
5    MR. ROSENBLOOM: Objection.  Form.
6    THE WITNESS: It is the -- depends on
7  what else you are controlling for.  It is the same
8  model that I used within each of these groups.
9  BY MR. ROSE:
10   Q   Well -- but they were fair.  They fired
11  all 57 of the people.  That's equal, isn't it?
12   MR. ROSENBLOOM: You are referring to
13  your hypothetical?
14   MR. ROSE: Yes.
15   THE WITNESS: I'm saying if you
16  wanted -- in my opinion, if you want to
17  demonstrate that that was not an unbiased
18  decision, you are going to have to use -- that you
19  say there was some bias involved in that decision,
20  the reference against which you are going to
21  compare it is perhaps other positions being
22  eliminated or other requirements, not a model in

30 (Pages 114 to 117)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                          7/29/2014

---

**118**

1  which everyone has an equal chance of being
2  terminated because --
3  BY MR. ROSE:
4      Q   Even if they --
5          MR. ROSENBLOOM:  Mr. Rose, Dr. Bronars
6  was still speaking.
7          MR. ROSE:  He spoke.  I thought you were
8  finished.
9          THE WITNESS:  No.  I will finish.
10  Because using Dr. Monroe's model, the odds of
11  selecting 57 people who all do the same job,
12  according to her baseline statistical model, is
13  astronomically low.  That's the -- the odds of
14  that happening is --
15  BY MR. ROSE:
16      Q   Less than 1 in 1,000?
17      A   It is less than 1 in 3.6 times 10 to
18  the -- it is astronomically low odds that if I was
19  just going to make a reduction in force by
20  selecting people to get terminated that I would
21  get 57 up out of -- 57 out of one position.
22      Q   No, it is 57 positions which were filled

---

**119**

1  by and they did abolish that position.
2      A   Right.
3      Q   But they abolished 57 of them and nobody
4  else would have been harmed.  How is that fair to
5  them as compared to other people or why is it not
6  adverse impact as compared to --
7      A   I --
8          MR. ROSENBLOOM:  Object --
9          MR. ROSE:  Let me finish.
10          THE WITNESS:  Okay.
11  BY MR. ROSE:
12      Q   Why is it not adverse impact under the
13  way that is used by the courts?
14          MR. ROSENBLOOM:  I will object to the
15  form and speculation.  Also to clarify the record,
16  Dr. Bronars previously testified, and the court
17  reporter needed clarification, and I don't know if
18  it made back in, that when he said the odds were
19  astronomically low, he then said it was -- well, I
20  don't want to repeat your words, Dr. Bronars.  Can
21  you say what you said before but didn't make it
22  on, 3.6 to --

---

**120**

1          THE WITNESS:  One out of every 3.6 times
2  10 to the 54th time would you end up by random
3  chance --
4  BY MR. ROSE:
5      Q   Sure.
6      A   -- with 57 with that position being
7  eliminated.
8      Q   So what I'm saying is your conclusion,
9  that is a very low, and so that would be adverse
10  impact as you understand it; is that right?
11          MR. ROSENBLOOM:  Objection, form.
12          THE WITNESS:  No.  I'm saying that that
13  is coming out of Dr. Monroe's benchmark model,
14  that everyone is in -- has the same baseline
15  chance.  That is how she comes up with her less
16  than one in a thousand chance that there would be
17  the representation of African Americans in the
18  RIF.
19          That same model would say it is also
20  extremely unlikely that you would eliminate the
21  SSA position, according to the way in which you
22  think -- you say a race and age neutral RIF

---

**121**

1  process would work.
2          And I'm saying that she has got the
3  wrong approach, because decisions were not made to
4  say I'm going to ignore what position you are in.
5  What position you were in was of critical
6  importance.  Her model did not --
7      Q   Well --
8          MR. ROSENBLOOM:  Excuse me.  Mr. Rose,
9  please let --
10          THE WITNESS:  I'm just saying her model
11  did not account for the differences in the risks
12  of being terminated based on the position that you
13  are in.
14  BY MR. ROSE:
15      Q   Let's assume for the moment that the
16  mayor of DC said and wrote down, I want to fire 57
17  people and I want to fire them on May 6th, and
18  they will be fully terminated on June 11th, signed
19  it.  Is there any risk -- there is no risk to the
20  entity, in this case the boss, decided that we
21  should -- they should fire them.  So 57 people got
22  fired.  All of them African American except for

---

31 (Pages 118 to 121)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                                7/29/2014

122

1  one, and that person is not an employee.
2      Is that not adverse impact?
3      MR. ROSENBLOOM: Objection. Asked and
4  answered and form of the question.
5      MR. ROSE: I'm asking it in a slightly
6  different --
7      THE WITNESS: Her saying risk is again a
8  term of art for this kind of statistical
9  analysis --
10 BY MR. ROSE:
11     Q  There is no risk, yeah?
12     A  Well, I'm saying it is a statistical
13 term, so you can't tell me -- I'm not telling you
14 what the legal terms are. I'm telling you
15 statistically when I say are you at risk of being
16 selected, it means something to me as a
17 statistician.
18     But putting that aside, there is a
19 difference in the way one would approach the model
20 if the mayor said we are going to get rid of 57
21 people, I'm not sure where they are going to be
22 working for DC, but we are going to get rid of

123

1  them. And would it be odd to pick 56 out of 57
2  who are African American versus we have to
3  eliminate a position, okay.
4      Q  We are going to --
5      A  Please. And we are going to select a
6  position to eliminate based on cost factors,
7  redundancy factors, reorganization factors. And
8  the appropriate statistical analysis for those two
9  different ways of reaching that decision is what
10 I'm saying, there are two different approaches.
11     And the first one where I said they
12 could be in any of the divisions and offices
13 within this division, we have to have 57 people
14 terminated is much -- it is not just much more, it
15 is entirely consistent with the benchmark model
16 against which Dr. Monroe was making all of her
17 statistical inferences.
18     And I as an expert am responding to the
19 statistical inferences that she is making, not
20 anything other than statistical tests and
21 inferences.
22     Q  Do you think the word "risk" is

124

1  different in the law or in statistics than its
2  normal reading as risk of harm? Do you think it
3  is different from that in statistics than from
4  other things?
5      A  Yes.
6      Q  Because? What is your reason?
7      A  Because when someone is in a statistical
8  monitoring you are at risk of being selected for
9  this, I'm not really weighing in anything on what
10 the harm of being selected would be. It comes out
11 of models that were, what I'm going the call
12 selection models, where the outcome is certain
13 people are going to end up in one group and others
14 in another group. So I think it can be bias --
15     Q  That is only if you don't -- suppose
16 there is purposeful discrimination? Suppose the
17 mayor just what I said, I want the fire them even
18 though I'm black, I want to fire them because
19 there too much black in this damn organization,
20 namely, not the whole government but in CFSA,
21 which is an agency of the District of Columbia. I
22 want to get rid of them. So fire them. And then

125

1  they would say, is there any risk? There is no
2  risk at all/it is 100 percent. It is the entire
3  group that is going to get harmed.
4      MR. ROSENBLOOM: Forgive me, Mr. Rose, I
5  know I sound like a broken record, but again on
6  the last question and answer you launched into
7  your next question while Dr. Bronars was still
8  trying to complete his answer.
9      MR. ROSE: Please continue. I'm sorry.
10     MR. ROSENBLOOM: I have to ask you,
11 please, to try to let him finish.
12     MR. ROSE: I will even ask you at some
13 point or I will ask him, better, I guess.
14     MR. ROSENBLOOM: Thank you.
15     THE WITNESS: I didn't want you to think
16 that when I say that you were at risk of being
17 selected that in any way that was presuming
18 something about the harm or outcome that would
19 have come from being selected, because I'm talking
20 about it from a statistical sense, what are the
21 chances that you are going to be included in this
22 group that is being -- this group -- in this

32  (Pages 122 to 125)

126

1   hypothetical of 57. And prior to knowing how that
2   decision is going to be made, some people might
3   say I could be one of the 57 or not. If it is
4   part of your hypothetical the mayor says it going
5   to be in CFSA and not in some other agency --
6   BY MR. ROSE:
7       Q   Yes.
8       A   Then I wouldn't be at risk of being
9   terminated if I was outside the CFSA.
10      Q   Right.
11      A   But I would be at risk if I was in.
12      Q   And nobody was terminated outside of
13  CFSA, did you know that?
14          MR. ROSENBLOOM: Object to the factual
15  basis and to the form.
16          THE WITNESS: I have no knowledge of
17  what happened outside of CFSA.
18  BY MR. ROSE:
19      Q   Because this case is only about what
20  happened within CFSA, is that --
21      A   Correct. I was using that as an
22  example. If the mayor had said within CFSA we are

127

1   going to get rid of 57 positions, but Child
2   Protective Services is off the table, we are going
3   to make sure that no one in that unit because we
4   need the people there, then you would use a
5   different model to try to see what the expected
6   from a statistician's point of view versus the
7   actual would be.
8       Q   You are saying, in other words, that you
9   don't need to be a statistician to know that if
10  you fire 56 blacks and one other minority that
11  there is discrimination in favor of white
12  employees?
13          MR. ROSENBLOOM: Objection, form,
14  mischaracterizing prior testimony.
15          MR. ROSE: I'm asking a question.
16          THE WITNESS: I'm saying if you want to
17  present statistical evidence that is, just
18  that alone, there was 56 out of 57, right, and you
19  are going to say I am going to attach a level of
20  statistical significance to it, it matters what
21  the baseline or benchmark against which you are
22  making this comparison.

128

1   BY MR. ROSE:
2       Q   Well, what benchmark do you think we are
3   making in this? We are making a benchmark of
4   those who were harmed and those who were not
5   harmed. Let's assume that is the case, if we are
6   making a distinction between those who are harmed
7   and those who are not harmed and all of these
8   people were harmed and the rest of the agency was
9   not harmed, then there would be adverse impact
10  against blacks, is that not correct?
11          MR. ROSENBLOOM: Object to the form and
12  the factual basis.
13          MR. ROSE: Okay.
14          THE WITNESS: Your conclusion about the
15  statistical significance -- about a test that is
16  run, all I'm saying that Dr. Monroe, when she
17  presents a P value, she has performed a
18  statistical test that compares what she sees to
19  what she says would have happened in the absence
20  of bias decision, maybe. So if it was unbiased,
21  it would have turned out this way.
22          And what I'm saying is that that matters

129

1   in terms of what her baseline or benchmark is.
2           And so, if you want to weight the
3   statistical evidence you have to understand what
4   the assumptions are that go into the statistical
5   calculations.
6   BY MR. ROSE:
7       Q   Okay. I'm going to show you page 28.
8           Did you know that there was one person
9   in the CFSA who earned $170,000 a year, and that
10  he was -- this is the director -- was not RIFed
11  would that surprise you?
12          MR. ROSENBLOOM: I will make the scope
13  objection again.
14          THE WITNESS: I would not be surprised
15  by those facts.
16  BY MR. ROSE:
17      Q   And if you had a business reason for the
18  RIF, would you hire people who are paid more than
19  the people to do -- I'm sorry.
20          Do you agree that the percent of blacks
21  fired in grades 8 and below -- that 59 percent of
22  them that if you compare things by grade, that the

33  (Pages 126 to 129)

130

1    lowest people, the paid employees, were fired --
2    discharged at a higher rate than the more
3    expensive employees?
4           MR. ROSENBLOOM: Object to the form.
5    What page are you reading from?
6           MR. ROSE: This is 27.
7           MR. ROSENBLOOM: Page 27 of
8    Dr. Monroe's --
9           MR. ROSE: Yes.
10          THE WITNESS: Supplemental.
11          MR. ROSENBLOOM: -- supplemental report
12   marked as --
13          MR. ROSE: It is called "Response."
14   BY MR. ROSE:
15      Q   Does that sound like a reasonable thing
16   to do in a downsizing?
17          MR. ROSENBLOOM: Objection, form.
18   Calling for speculation.
19          MR. ROSE: He is an expert in economics,
20   doesn't -- thinks that hiring -- firing of less
21   expensive people and hiring more expensive people,
22   new people to take their place is economically the

131

1    sound thing to do.
2           MR. ROSENBLOOM: I object to the
3    argumentative misstatement of the facts.
4           MR. ROSE: Don't think the facts are
5    misstated, and I want his opinion. Thank you.
6           THE WITNESS: I saw those tables in
7    Dr. Monroe's report. I did not make those
8    calculations myself. I believe them to be
9    accurate, but I would like to stipulate that I
10   would like to do it myself before I would swear to
11   those particular figures.
12          And what matters is in these business
13   decisions is what people can -- what tasks and
14   jobs they can perform relative to what you are
15   paying them. So because someone is in a lower
16   grade doesn't mean that they are more of a bargain
17   to the agency if they are -- the task that they
18   can do are more limited. So I don't think that in
19   and of itself is damning evidence.
20   BY MR. ROSE:
21      Q   Right. But to hire people to do the
22   same -- assuming for purposes of this that we are

132

1    talking about the SSA position and the new SFW
2    position. If you are hiring experienced people
3    who have done -- you are firing them, you are
4    firing 57 all black but one, all 57 minority as
5    compared to whites, only 4 percent of whom were
6    discharged, does that comparison indicate adverse
7    impact? I mean does that seem like a -- a
8    businessman would make to make money?
9           MR. ROSENBLOOM: Mr. Rose, I'm sorry. I
10   keep sounding like a --
11          MR. ROSE: Yeah. You can press the
12   little button.
13          MR. ROSENBLOOM: I know. I wish I had
14   that.
15          MR. ROSE: You can just do that and --
16          MR. ROSENBLOOM: Right, right. No.
17   This question and a lot of today's deposition is
18   way beyond the statistical designation.
19          MR. ROSE: I think you are taking a very
20   narrow view of statistics.
21          MR. ROSENBLOOM: I also object on the
22   basis of the form of the question.

133

1           THE WITNESS: I would have to have a lot
2    more information than I relied on in my report and
3    that I think Dr. Monroe relied upon in order to
4    even come close to asking that question in terms
5    of do the rehires of people who are going to, in a
6    different position, how do they compare to the
7    people who were terminated.
8           I don't have any information on, other
9    than the 18 that were rehired from out of the
10   RIFed employees, so anything about does this seem
11   like a decision that would make good business
12   sense would depend on looking at those people that
13   were hired. And I don't think that --
14   BY MR. ROSE:
15      Q   And what --
16      A   Dr. Monroe didn't do that and I didn't
17   do that either.
18      Q   Well, let me look.
19          At the last -- on page 30 Dr. Monroe
20   says: It is notable that the 38 SFWs only 18 were
21   internal hires. While the declaration of Davidson
22   attempts to justify that some SSAs did not have a

34  (Pages 130 to 133)

134

1   bachelor's degree, he stated that the 30 RIFed
2   applicants for the SFW were qualified for
3   bachelor's degree but were -- but a large
4   proportion were disqualified from the position due
5   to the interview criteria alone. And thus,
6   applicants not involved in the CFR RIF were hired
7   instead. Unfortunately this justification -- I'm
8   sorry. She just castigates that the justification
9   so I will drop that.
10      So you did have the information, did you
11  not, that -- you certainly had it by the time of
12  your second report that the 30 RIFed people were
13  qualified? Do you have the -- where is the second
14  report?
15      MR. ROSENBLOOM: Are you referring to
16  this (indicating)?
17      MR. ROSE: Yes.
18      MR. ROSENBLOOM: This is Dr. Bronars'
19  first report.
20      MR. ROSE: I'm sorry. We have your
21  second report. Here it is. I'm sorry.
22      THE WITNESS: I --

135

1       MR. ROSENBLOOM: I'm not sure if there
2   is an open question yet or if --
3       THE WITNESS: Not that I'm aware of.
4       MR. ROSENBLOOM: I think Mr. Rose is
5   still trying to figure out if there is a question.
6   I know there was a reading from -- we will just
7   wait and Mr. Rose can reask it.
8       MR. ROSE: I'm sorry, what is the last
9   thing you have?
10      MR. ROSENBLOOM: In the interest of
11  time, I know you read a portion of Dr. Monroe's
12  report.
13      MR. ROSE: Yes.
14      MR. ROSENBLOOM: At first it sounded
15  like there was going to be a question, and then
16  you superceded with a quotation with another
17  question about were you aware about 30 of 30. And
18  then you started to look at -- you asked about the
19  second -- Dr. Bronars' second report and you have
20  been looking at Dr. Bronars' second report.
21      MR. ROSE: Yeah, called rebuttal report.
22      MR. ROSENBLOOM: Of course, it would be

136

1   helpful for Ms. Lewis to read back where you left
2   off. Of course you can --
3       MR. ROSE: Would you do that, please?
4       (The reporter read back the record as
5       requested.)
6   BY MR. ROSE:
7       Q   In your original report, did you say
8   anything about the 30 RIFed applicants for the FSW
9   position were qualified with a bachelor's degree
10  but that a large proportion were disqualified from
11  the position due to the interview criteria alone
12  so that people outside of the CFSA RIF were hired
13  instead? Did you -- did you recognize that people
14  with a bachelor's degree had applied for that
15  position and not -- including many of the
16  plaintiffs?
17      MR. ROSENBLOOM: You are reading from
18  what page?
19      MR. ROSE: This is page 30.
20      MR. ROSENBLOOM: Of?
21      MR. ROSE: Of Dr. Monroe's report. She
22  didn't say anything about the qualifications being

137

1   a bachelor's degree, but that is what she says
2   talking about because they had -- they had been
3   screened out by an interview, which as far as I
4   know the -- interview process which as far as I
5   know the agency has never argued for as an
6   internal policy.
7       MR. ROSENBLOOM: Would you please show
8   the witness and me what you are reading from so --
9       MR. ROSE: Sure. Sure. The last
10  paragraph on page 30, please, sir. And will you
11  share that with counsel? I have got another
12  version.
13      MR. ROSENBLOOM: Okay. Thank you. What
14  is your question again, Mr. Rose? Is your
15  question whether Dr. Bronars agrees with the last
16  paragraph or is it something else?
17      MR. ROSE: Yes, I think so. And I said
18  the last paragraph on page 30; is that correct.
19      MR. ROSENBLOOM: Yes, sir. Yes, sir.
20      THE WITNESS: My understanding is
21  that --
22      MR. ROSE: She said --

35  (Pages 134 to 137)

138

1 THE WITNESS: -- 44 of the people who
2 were RIFed applied to get position, and 18 were
3 hired and all 18 were African American.
4 BY MR. ROSE:
5 Q Right.
6 A And there were some other facts here
7 that I --
8 Q But --
9 A As I sit here, I can't -- I think they
10 are correct in terms of the 30 of those 44 did
11 have a bachelor's degree.
12 Q Yes.
13 A I believe that to be true. But that is
14 just my recollection. But I do recall clearly
15 that there were 44 and all 18 who are hired back
16 were African American.
17 Q But they were also younger, is that what
18 you understand?
19 A I believe 11 of the 18 were under the
20 age of 40 and seven were 40 and above. It is in
21 my original report. I think that was the
22 breakdown.

139

1 Q All right.
2 MR. ROSENBLOOM: And to the extent the
3 question was whether Dr. Bronars agreed with the
4 last paragraph on page 30, I would also object,
5 and to the extent that it calls for speculation
6 because the paragraph itself contains lots of
7 speculation.
8 BY MR. ROSE:
9 Q Can you answer?
10 A I thought I had answered. I agree with
11 the, like I said the 18, 44, I believe that the
12 30, that number is correct although I don't
13 remember referencing that number specifically in
14 my report. And I -- if you ask me something about
15 the age distribution, and it is in my original
16 report and I gave you what I recall the numbers
17 being. But we can just look it will up in my
18 original report. So I don't know if there was
19 another question that was on the table at this
20 point.
21 Q Let's assume that there is not.
22 I asked you, I think, why from a

140

1 business point of view terminating lower paid
2 workers in return from likely higher paid
3 workers -- Dr. Monroe says this, further -- or
4 forget that -- terminating lower -- she used
5 "terminate" instead of discharge --
6 A Which page are you reading from, sir?
7 Q Twenty-eight. And the last part of this
8 was, if not sufficiently justified by the record
9 declarations, the choice of lower paid positions
10 for mass terminations seems to infer a more
11 adverse impact.
12 And if you look at page 28 and then you
13 can see that the average age for grades 7 through
14 13 are in the 60, 48, 46, 47, 49, 47, they are
15 almost all over the age of 40. But none of those
16 people in grades 11 and -- all of the people in --
17 the average age of the people in grade 12 was
18 46 percent, and grade -- yeah, grade 13 was
19 47 percent, grade 14 was even higher, but even
20 excluding those, they were all a majority over the
21 age of 40.
22 So essentially what do you -- do you

141

1 agree that essentially what the District did was
2 to fire lower paid people and retain all of the
3 most expensive people, including Dr. Gerald, who
4 no longer works there but who had a very high
5 income? Does that make sense from an economic
6 point of view.
7 MR. ROSENBLOOM: Object to form.
8 MR. ROSE: The economy is supposed to be
9 what he knows about.
10 MR. ROSENBLOOM: We had reading from a
11 few different charts on page 28, but you also for
12 a moment, and I don't know what page it was, if it
13 was from the same document --
14 MR. ROSE: It was.
15 MR. ROSENBLOOM: You were reading from
16 another page, too, that I couldn't follow. But
17 anyway, so object on form. I will advise the
18 witness to not speculate. And I think the
19 question was whether Dr. Bronars' -- whatever the
20 question was -- just answer the best that you can
21 but don't speculate.
22 And form and beyond the scope and to the

36 (Pages 138 to 141)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                    7/29/2014

142

1  extent --
2          MR. TEMPLE: You can't tell this witness
3  don't speculate. We have had that discussion.
4          MR. ROSENBLOOM: Don, it has been a --
5  you have --
6          MR. TEMPLE: I understand. I
7  understand, trust me. But you have to follow the
8  rules because the witness is intelligent. He
9  knows not to speculate. He knows he is testifying
10  from his own person knowledge. But that is not
11  fair to the question.
12          MR. ROSENBLOOM: I respectfully
13  disagree. I have been trying to follow the rules
14  and give a lot of latitude here.
15          Go ahead, Dr. Bronars.
16          THE WITNESS: I am unaware of an
17  analysis by Dr. Monroe other than this little
18  table here, which directly compares the salaries
19  of the people who were terminated in the RIF
20  versus those who were retained. We have something
21  here by grade. But as you had said earlier, an
22  experienced, long-term grade 8 employee could

143

1  actually make more than a new grade 9 employee.
2  BY MR. ROSE:
3      Q   Well --
4      A   Let me finish. So I'm unaware of a
5  study that would show what you put out there as a
6  possibility, which is that all of the highest paid
7  employees were retained and these were lower paid.
8  That is not really exactly the same thing as we
9  have in some of these charts here. So I'm not
10  sure if that is even true.
11          Then your second part of the question
12  was, would it make sense for reductions in force
13  to be concentrated in positions lower down in the
14  organization and maintain some of the higher
15  positions. There are lots of different ways in
16  which you can do reductions in force. And so, in
17  some cases that would make sense, in some cases it
18  wouldn't. I don't think there is a blanket answer
19  to that, would never make sense or would always
20  make sense. That's the best answer I can give
21  you.
22      Q   Well, let me ask you a slightly

144

1  different question. Do you know of any adequate
2  explanation by the defendant that a bachelor's
3  degree was required for the FSW position given the
4  fact that the SSAs, many of them, did not have a
5  bachelor's degree but performed well?
6          MR. ROSENBLOOM: Object to the factual
7  basis and the form.
8          MR. ROSE: The question was asked from
9  an economic point of view.
10          THE WITNESS: I am -- I think the
11  question was, is there an adequate explanation for
12  why that was one of the new --
13  BY MR. ROSE:
14      Q   Requirements.
15      A   -- requirements?
16      Q   Yeah, it was. Do you know of any
17  justification for imposing a bachelor's degree
18  requirement for jobs that were performed by many
19  people for many years and performed well?
20          MR. ROSENBLOOM: I will repeat my prior
21  objections.
22          MR. ROSE: Okay.

145

1          THE WITNESS: There -- I can understand
2  circumstances in which there is a new models, new
3  pairings of individuals to deliver the services,
4  and that because of the new responsibilities it is
5  determined that this would be the new minimum
6  qualifications. I'm not aware of a -- of -- other
7  than that kind of explanation of what you are
8  talking about here in terms of the justification.
9  BY MR. ROSE:
10      Q   Well, do you understand that the usual
11  reason for downsizing is to reduce the payroll?
12  Or let me put it this way, the only stated reason
13  was at the time contemporanous issues? And I
14  will ask you, as I have in the past, that the
15  functional duties of both the grade 8 employees
16  and the grade 9 employees were the same,
17  substantially the same. On that assumption, why
18  would the agency, if it was trying to save money,
19  not keep the SSA people and disqualifying all of
20  them one way or the other, even those that had
21  bachelor's degrees?
22          MR. ROSENBLOOM: Objection to form,

146

1  confused basis and object to the factual
2  assertion.
3     THE WITNESS: I think there was -- if
4  you can read back this question because there was
5  some predicates to it that I'm not sure are any
6  part of the question or not. But would you just
7  read back the question? Is.
8     (The reporter read back the record as
9  requested.)
10    THE WITNESS: Okay. There are a couple
11 of things here. One is that people have the same
12 functional duties and some people are better or
13 worse at it, even if, you know, grade 8, grade 9.
14 Grade 8 is not a protected class. Not having a
15 bachelor's degree or having a bachelor's degree is
16 not a protected group.
17    So you are asking to speculate about a
18 lot of things that were not really in a
19 statistical analysis in Dr. Monroe's report, and
20 so I haven't studied these hypotheticals that you
21 are putting forward. So I can understand why you
22 would say here are people that are in a lower

147

1  grade that are high up in the pay range in this
2  grade and they are not capable of producing as
3  much as someone in a higher grade. That is a
4  perfectly reasonable, given the way you have
5  described this business justification for these
6  decisions.
7     And so, if we are just speculating and
8  talking about hypotheticals, there is no reason
9  why you wouldn't see this kind of pattern. And I
10 didn't think Dr. Monroe studied whether or not
11 that there was a significant difference in the
12 context of this kind of decision-making framework.
13 She didn't do anything like that at all. So this
14 is just all my response to your hypothetical and
15 not anything that was actually in her report.
16 BY MR. ROSE:
17    Q   Well, if I -- I ask you to focus your
18 attention to the bottom of page 12 and the top
19 of -- 29, I'm sorry, and the top of page 30.
20    MR. ROSENBLOOM: The bottom of 29 and
21 top of 30 on Dr. Monroe's rebuttal --
22

148

1  BY MR. ROSE:
2     Q   These two job descriptions concerning
3  SSA and FSW positions were not substantially
4  different, at least on paper. Why don't we break
5  it down and ask you to -- did you notice whether
6  the two -- did you look at the two positions
7  descriptions?
8     A   No, I don't think so.
9     Q   Okay. And you note that she said that
10 requirement of the bachelor's degree was the SSA
11 responsibility of interviewing families. And so
12 did you -- you didn't respond to that at all; is
13 that correct, in your reply?
14    A   No, I didn't respond to that particular
15 statement by Dr. Monroe.
16    Q   And are you aware of any national census
17 or Labor Department data that shows percentages of
18 blacks who had obtained their bachelor's degrees
19 as compared to whites?
20    MR. ROSENBLOOM: Objection, beyond the
21 Rule 26 designation of Dr. Bronars.
22    THE WITNESS: I'm aware of the national

149

1  statistics.
2  BY MR. ROSE:
3     Q   And they do show that blacks or
4  something like only 18 percent of blacks obtain a
5  bachelor's degree by the time they are something
6  to a much higher percentage of whites that are --
7  it is like 30 -- the white percentage is in the
8  30s, I believe. Does that sound right?
9     MR. ROSENBLOOM: I will repeat my prior
10 objection. I also object on the form.
11    THE WITNESS: We are getting pretty --
12 BY MR. ROSE:
13    Q   Please, please just answer the question.
14    A   Does that sound about right? I have no
15 idea. Depends on what age you would be talking
16 about. Are you talking about men or are you
17 talking about women? Are you talking about here
18 in the District --
19    Q   No. Well, for all --
20    A   I mean, there is a statistic --
21    MR. ROSENBLOOM: Hold it, Mr. Rose.
22

38  (Pages 146 to 149)

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                              7/29/2014

150

1   BY MR. ROSE:
2       Q   The statistics go for both women and men
3   and by age, and they all show a disproportionately
4   low number of bachelor's degrees held by U.S.
5   citizens between Caucasians or whites and blacks
6   or African Americans. Are you aware that there
7   are such figures and that there is a significant
8   disparity?
9           MR. ROSENBLOOM: Dr. Bronars was trying
10  to answer your question and you interrupted to
11  testify about your understanding of the data.
12          MR. ROSE: I want to make sure that he
13  understands the question. All right, please, you
14  have already objected. We note your objection.
15          THE WITNESS: So your initial question
16  was throwing out percentages and differences, and
17  now you are talking about significant differences.
18  And I'm saying that in my business we want to be
19  precise about this.
20          I agree that nationally the figures are
21  going to be different in terms of educational
22  obtainment by race. For some groups bigger and

151

1   smaller, depending on where we -- what part of the
2   country, age group, gender, and so on. So my
3   objection was that you started throwing out
4   numbers --
5   BY MR. ROSE:
6       Q   Okay.
7       A   -- and I said I was going to try to
8   qualify this. Yes, there is -- there is generally
9   speaking higher educational obtainment for whites
10  and lower for African Americans. That is a
11  generally true statement.
12      Q   Is it also true that generally people
13  over 50 or so -- above a certain age, although
14  with fixing it in one age, tend to have a less --
15  they have a lower percentage of bachelor's degrees
16  than people who are younger, citizens who are
17  younger?
18          MR. ROSENBLOOM: Objection on basis of
19  form and beyond the scope of the Rule 26
20  designation.
21          THE WITNESS: At different periods in
22  our time there have been increases in educational

152

1   obtainment.
2   BY MR. ROSE:
3       Q   Right.
4       A   And I think it is generally true that
5   currently younger people are more likely to at
6   least have attended some college.
7       Q   No, I'm talking about four years.
8       A   I know. Attending a four-year college
9   and completing a degree, that is going to depend
10  on where you are making these comparisons. There
11  has been an increase in educational obtainment. I
12  would want to be careful before I made a blanket
13  statement about some age cutoff, whether it is
14  above or below 50 or above or below 40 or being a
15  significant difference, if we are talking about
16  people, including people who have already retired
17  or only people who are active in the labor force
18  right now.
19          So you have to be careful in terms of
20  setting these things out in terms of who is in the
21  available labor market pool.
22          So I think my answer to that is maybe,

153

1   it could be.
2       Q   You are not aware of any recent -- any
3   census or Labor Department reports that indicate
4   that people between, let's say, 50 and 65 hold
5   fewer, significantly fewer bachelor -- percentage
6   obtains a bachelor's degree as compared to the
7   younger ones?
8           MR. ROSENBLOOM: I will repeat my
9   objection.
10          THE WITNESS: Are these people who are
11  working or are they -- include people who are not
12  participating in the labor force?
13  BY MR. ROSE:
14      Q   No. People who are in participating in
15  the labor force but not -- may or may not be
16  working today.
17      A   Yeah. Fifty to 65 compared to under 50,
18  is that the comparison?
19      Q   Yes.
20      A   It has been a while since I have seen a
21  statistic like that. That is a pretty specific
22  thing. I wouldn't be surprised if educational

39 (Pages 150 to 153)

154

1  obtainment was somewhat different between those
2  groups. But off the top of my head I can't tell
3  you.
4       Q   Well, some of us remember and some of
5  you learned later, but we know that after World
6  War II and the troops came home, there was a
7  policy of supporting veterans and letting them get
8  through college. And I think it is a matter of
9  public notice that even after that ran out and
10  more and more -- a higher percentage of people
11  were seeking college degrees. But there is still
12  a big disparity both on the age as well as race.
13       Does that sound right to you?
14       MR. ROSENBLOOM: I will repeat my
15  objections to the prior questions.
16       THE WITNESS: I have no question that
17  that is true in the general population.
18  BY MR. ROSE:
19       Q   Okay.
20       A   I'm saying if you are 60 years old and
21  you are still working, you are probably more
22  likely to be a college graduate than you are to be

155

1  a high school dropout. So, you know --
2       Q   That is --
3       MR. ROSENBLOOM: Please let him finish.
4       THE WITNESS: So I'm saying that if you
5  are talking about an employer that is going out
6  and going to hire people from the outside and how
7  is educational obtainment correlated with age,
8  that is not an obvious correlation that I'm going
9  to speculate about without having studied it. So
10  I think that is what you are talking about, not in
11  just the general population. You are talking
12  about the population of people who are interested
13  in finding a job.
14  BY MR. ROSE:
15       Q   Most of the figures I have seen have
16  been national and they do sometimes do, you know,
17  regional areas but -- and there is a little bit
18  higher education of people in the Washington, D.C.
19  area than in the rest of the country, which is
20  understandable because the government in many jobs
21  has used degrees as a requirement, and sometimes
22  that is perfectly legitimate.

156

1       But, you know, now I think that that is
2  incorrect, that there is a disparity based on age
3  as well as race?
4       MR. ROSENBLOOM: I will repeat my
5  objections to the prior questions and to the
6  basis.
7       THE WITNESS: Right. I'm willing to
8  agree that it is really likely that the 50 to 65
9  age group that you are talking about has less
10  likely to have a college degree than under 50,
11  yes.
12       MR. ROSE: Okay. Thank you.
13       Mr. Temple, do you have some questions?
14       MR. TEMPLE: I do. I do. Let me start
15  with the latter question, if I can.
16       EXAMINATION ON BEHALF OF PLAINTIFFS
17  BY MR. TEMPLE:
18       Q   You said that the age of 50 -- less than
19  50 --
20       MR. ROSE: No, more than 50, 50 or more.
21       MR. TEMPLE: Let me ask the witness.
22

157

1  BY MR. TEMPLE:
2       Q   Can you recall what you just said. Did
3  you say those over 50 or under 50 are less likely
4  to have the degrees?
5       A   You know, I have said that in the
6  general population people over the age of 50 are
7  less likely to have a college degree than
8  adults -- so let's say you have to be at least 25,
9  because they don't usually report educational
10  obtainment in the Department of Labor surveys
11  unless you are at least 25, since you might still
12  be in school, so 25 to 49, probably higher
13  education obtainment.
14       I know the big change is some college.
15  So if you are looking at these figures, there is a
16  difference between college degree or just attended
17  college. And then the question I said was -- so
18  that is the general population.
19       Now, if we are talking about the people
20  who are working, so you are going to lose some of
21  the older, but then Mr. Rose qualified it and said
22  50 to 65, but still there is going to be a

158

1  possibility that people in their 60s with lower
2  educational obtainment are not working, so our
3  comparison was among working adults.
4       I think the difference would be less
5  pronounced, but I would still think it is probably
6  true there are more college graduates in the 25 to
7  49 age range than 50 to 65. That is the --
8       Q  Did you look at any objective data for
9  this metropolitan area?
10      A  No. I mean this is just -- I was asked
11 to answer this question, and this really has
12 nothing to do with what I did in my report. And
13 Mr. Rose is right, that this is a highly educated
14 metro area, if you look in the aggregate. And I
15 don't know how that breaks down to the District
16 versus the suburbs, but those are facts that could
17 be ascertained if we all pull up the Department of
18 Labor data.
19      Q  Your answer is no?
20         MR. ROSENBLOOM: Excuse me. I'm going
21 to renew my objection. This is beyond the scope
22 of the Rule 26 designation.

160

1       Q  You have never opined, given an expert
2  opinion on reduction in force cases, number one;
3  is that correct?
4       A  No. I worked on -- we talked about
5  this, I think, early on. I worked on a case where
6  I testified in court. It was R.R. Donnelley. It
7  was a reduction in force.
8       Q  It was the age discrimination case you
9  talked about?
10      A  It was an age -- yeah, an age reduction
11 in force. They closed a plant.
12      Q  What jurisdiction was that?
13      A  It was in Chicago. And I don't know
14 what the jurisdiction was, but I was in.
15      Q  Do you know what year it was?
16      A  Oh, it has been a while now. That
17 was -- it was probably in 2000 --
18      Q  Okay.
19      A  -- to 2002, something like that.
20      Q  And did you look at the District of
21 Columbia reduction in force laws at all?
22      A  No.

159

1      (Pause)
2         MR. ROSENBLOOM: Do you want to reask
3  your prior question?
4  BY MR. TEMPLE:
5       Q  Did you look at any of the demographic
6  information for the D.C. metropolitan area, number
7  one?
8       A  No.
9         MR. ROSENBLOOM: And I objected before,
10 beyond the scope of the Rule 26 designation for
11 that question.
12        MR. TEMPLE: You don't have to object
13 again. That is three times.
14        MR. ROSE: Your objection is noted.
15        MR. TEMPLE: I think we have it and the
16 answer is very simple.
17 BY MR. TEMPLE:
18      Q  Now I wanted to go back, I wanted to put
19 it on rewind for a minute. Have you never opined
20 on reduction in force cases before; is that
21 correct?
22      A  I have what?

161

1       Q  Do you know what a competitive level is?
2         MR. ROSENBLOOM: Hang on a second, Don.
3  One of the things that is happening here is Dave
4  is repeating a portion of your question, and in a
5  minute we are going to be without a court
6  reporter, because she is going to leave us.
7         MR. TEMPLE: We don't need to do that I
8  don't think, do we?
9         MR. ROSE: No.
10        MR. TEMPLE: Let's try to concentrate on
11 what we need to do to get through this painless
12 process.
13 BY MR. TEMPLE:
14      Q  Okay. I was asking you, do you know
15 what a competitive level is?
16      A  I'm not sure.
17      Q  Do you know what a crosswalk is?
18      A  I think so. I'm not sure what the
19 context is here, though.
20      Q  Okay. Do you know how -- what a
21 crosswalk means in the context of a reduction in
22 force?

41  (Pages 158 to 161)

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                    7/29/2014

---

162

1       A  I don't think I have heard that term.
2       Q  Okay.  And do you -- you know what a job
3   description is; is that correct?
4       A  Yes, I do.
5       Q  Okay.  And in a context of this
6   particular RIF, to what extent you aware --
7   did you study the job descriptions before the RIF
8   and after the RIF, if at all?
9       A  I did not study the job descriptions.
10      Q  So you don't know the educational -- you
11  don't know the basis for the District's change in
12  the job description to add a college degree
13  requirement and how that corresponds with the job
14  description; is that correct?
15      MR. ROSENBLOOM: Object to the form of
16  the question.
17      THE WITNESS: I am aware of this change
18  and I -- but I don't think -- I think your
19  question was am I aware of the -- what aspect of
20  this --
21  BY MR. TEMPLE:
22      Q  Let me be more direct.  Tell me the

---

163

1   correlation between changing the job description
2   to add a college degree and the actual job
3   description as it was changed?
4       MR. ROSENBLOOM: Form objection again.
5       THE WITNESS: I don't know how -- what
6   other parts of the job description were changed or
7   how the job description was changed when there was
8   the change in the college degree requirement.  I
9   don't know that.
10  BY MR. TEMPLE:
11      Q  Can you tell me why you believe the
12  college degree was added to the job description?
13      A  The justification that I saw was given
14  in the Davidson declaration about the pairing of
15  workers to provide these services and some of the
16  tasks there.  So if I -- I would have to go back
17  and look at the justification that was given
18  there.
19      Q  Let me be clear.  You looked at what
20  Davidson stated was the justification, but you
21  didn't look at a particular job description to
22  ascertain the validity of what he was stating; is

---

164

1   that correct?
2       MR. ROSENBLOOM: Objection,
3   mischaracterizing prior testimony, and to the
4   form.
5   BY MR. TEMPLE:
6       Q  Is that correct.
7       A  I'm not sure what you mean by the
8   validity of what he was saying.  I assume that in
9   his declaration that what he was saying was
10  true --
11      Q  Okay.  So you operated --
12      MR. ROSENBLOOM: Don, hold on.  He was
13  still answering.
14      THE WITNESS: I assume --
15      MR. TEMPLE: I apologize.  I apologize.
16  I can't see you but continue.  My apologies.
17      THE WITNESS: No, no.  I was assuming
18  that if it is a sworn statement by him that it was
19  the truth.  I'm not sure if that is what you were
20  getting at.
21  BY MR. TEMPLE:
22      Q  Okay.  So that is fine.  So you operated

---

165

1   on the premise that because he gave a sworn
2   statement that it was true.  That is what we agree
3   on; is that correct?
4       A  Yes.
5       Q  Okay.  But you did not look at a single
6   job description to verify that the changes that
7   were being made, including the college degree
8   requirement, whether they were absolutely
9   necessary or justifiable; is that correct?
10      A  I did not do that analysis, no.
11      Q  So when you spoke -- when Mr. Rose asked
12  you why there was a business necessity, your basis
13  for saying that there is a business necessity for
14  the college requirement was based upon the
15  declarations rather than the actual RIF documents,
16  is that -- would that be a correct statement?
17      MR. ROSENBLOOM: Repeat the objection
18  about beyond the Rule 26 designation and to the
19  form.
20      THE WITNESS: Okay.  I got several
21  questions from Mr. Rose about this.  I think some
22  of them were, do I see a relationship between

---

42  (Pages 162 to 165)

166

1    education and performance under the job and things
2    like that. I said it depends on the job.
3         Could I -- would this indicate
4    something, and my -- I think my point is that,
5    unless I'm mistaken. Not having a college degree
6    does not entitle you to protection under the law
7    in terms of discrimination. And so, I would need
8    to see an analysis by plaintiffs showing how that
9    requirement specifically caused some adverse
10   impact.
11        And I did not see an analysis like that
12   by Dr. Monroe. And therefore, I did not, in my
13   role to rebut her statistical evidence, study that
14   either, because she didn't.
15        So that is the best answer I can give
16   you as to a summary of the answers that I gave to
17   the questions about education.
18   BY MR. TEMPLE:
19        Q   Did you read her deposition?
20        A   I did. I did.
21        Q   Okay. Did you see any reference to the
22   fact that a college degree wasn't needed for the

167

1    modified job description?
2         A   You know, it was a pretty long
3    deposition, I'm not sure if I remember exactly
4    that passage, but -- so I don't remember that in
5    particular.
6         Q   Okay. Let's operate on this premise for
7    a minute. Would it make a difference to you if
8    there was a reduction in force and there was the
9    addition of a college degree requirement and there
10   was no meaningful change in the job description,
11   and as a result, a majority of people who lost
12   their jobs were older African American employees?
13        MR. ROSENBLOOM: Don, are you done with
14   the question?
15        MR. TEMPLE: Yes, I am. I was waiting
16   for the objection, actually.
17        MR. ROSENBLOOM: I figured. I was
18   waiting for the voice inflection that put the
19   question mark at the end, and I just never heard
20   it. But honestly, I'm not exactly sure what you
21   are asking.
22

168

1    BY MR. TEMPLE:
2         Q   Are you, sir?
3         A   I think your question started with,
4    would it make a difference to you, and --
5         MR. ROSENBLOOM: Is that the question,
6    Don, would it have made a difference to him?
7         MR. TEMPLE: Right. Yes. Yes.
8    BY MR. TEMPLE:
9         Q   Analysis and assessment, you are saying
10   there is a business justification for this degree
11   requirement, am I right so far?
12        MR. ROSENBLOOM: Okay. Thank you. So
13   now, yes, I will object to the form and being
14   beyond the Rule 26 designation.
15   BY MR. TEMPLE:
16        Q   Am I right --
17        A   Yeah. What would make a difference to
18   me is if Dr. Monroe had conducted a study along
19   the lines of what you are saying, and then I would
20   be able to evaluate the significance of that
21   particular factor in causing, you know, a
22   different rate of terminations, a different rate

169

1    at which people are rehired. But I didn't see
2    that from the other side, and I work for the
3    defense, so that is --
4         Q   What do you mean when you say you work
5    for the defense, I'm sorry?
6         A   She did not make that case. She did not
7    make that statistical -- do those statistical
8    tests. And you know, my job is to look at the
9    statistical analysis that she did and comment on
10   that and improve upon that. But I wasn't asked to
11   do a study like what you are talking about right
12   here.
13        So I don't know what the answer to that
14   question would be in terms of the impact of the
15   educational requirement. I have no idea.
16        Q   Well, notwithstanding what she did, I'm
17   asking you a very basic premise. I would like for
18   you to try to answer the question. Okay.
19        Would it make a difference to you, in
20   your analysis, statistical analysis, if there was
21   no correlation -- in other words -- and I want to
22   be as clear as possible, if there was the addition

170

1  of college degree requirement and there was no
2  substantive change in the job description but as a
3  result of the college degree requirement, in a
4  reduction of force did people who lost their jobs
5  were predominantly black and predominantly elderly
6  or over the age of 50 years old, would that matter
7  at all to you?
8      MR. ROSENBLOOM: I will repeat the
9  objection based on the Rule 26 designation being
10  about statistics.
11     THE WITNESS: It would have mattered to
12  me more had Dr. Monroe conducted such --
13  BY MR. TEMPLE:
14     Q  I'm not asking about Dr. Monroe. I
15  would like for you to answer my question.
16     MR. ROSENBLOOM: Don, Dr. Bronars wasn't
17  finish answering.
18     THE WITNESS: I'm not sure what you mean
19  would it matter to me. I think it is -- it is
20  relevant, it is possible. I have not seen a
21  statistical test. So I would just be speculating
22  as to how important that one change that you are

171

1  talking about was in this process. I know that 18
2  out of 18 of the people hired back were African
3  American, so I'm not willing to speculate as to
4  how this would have an impact on the composition
5  of those positions at the CFSA. I just don't
6  know.
7      MR. ROSE: Don, let me just ask -- let
8  me just offer you the fact that the people who are
9  rehired had bachelor's degrees, and that was --
10  and they were all -- our view is they also tended
11  to be younger. But they were all people -- to my
12  knowledge, they all had bachelor's degrees.
13     Would that make a difference in your
14  testimony?
15     MR. ROSENBLOOM: Who is asking the
16  questions right now.
17     MR. TEMPLE: I'm asking the question. I
18  appreciate that.
19  BY MR. TEMPLE:
20     Q  Let me go back to your answer, though.
21  Mr. Rose pointed out that the 18 African Americans
22  that were rehired were degreed or had college

172

1  credentials. Did you know that?
2      A  I presumed so because I thought that was
3  the new requirement.
4      MR. ROSE: Sure.
5      THE WITNESS: That doesn't surprise me.
6  BY MR. TEMPLE:
7      Q  When you say you presumed, what do you
8  mean you presumed?
9      A  I'm not sure that I had the ability to
10  check that, but I assumed that if you got hired
11  back into that position, you would have to meet
12  the qualifications. And so, that is what I
13  assumed to be true, and I think that is what the
14  testimony of other people has reflected.
15     Q  Okay. I'm sorry. I'm not a
16  statistician, so I apologize. But I wanted to
17  make sure that I was communicating with you,
18  because you are giving a statistical -- you are
19  giving an opinion about a statistical analysis
20  that we have made, the plaintiffs have made; is
21  that correct?
22     A  Yes.

173

1      Q  Okay. And in that statistical
2  assessment you can't ascertain -- you can't really
3  say, you have not looked at the job descriptions,
4  and so your information is purely based upon the
5  way the numbers are played out, is that right?
6      A  I have not taken into account the job
7  descriptions specifically, no.
8      Q  So how would you -- as a counter expert,
9  how would you ascertain the extent to which there
10  was or was not a discriminatory impact?
11     MR. ROSENBLOOM: Forgive me,
12  Dr. Bronars. I was going to make that Rule 12
13  beyond the scope objection. Go ahead.
14     THE WITNESS: Can you read back the
15  question.
16     (The reporter read back the record as
17  requested.)
18     THE WITNESS: So I think we are off here
19  in a hypothetical situation where a study was done
20  to show that but for the educational requirement,
21  things would have turned out differently, and that
22  study was not done. And then I would have to

44 (Pages 170 to 173)

174

1    address the features of that study, but that is
2    just not what was done.
3        So I don't know what the impact of that
4    particular college requirement for that one
5    position, what impact that had had on the race and
6    age composition of the positions in question at
7    the CFSA. So I don't really have the information
8    to know exactly how I would respond to that or
9    agree with that or disagree with that. But that
10   wasn't really a study that I saw, so it is all
11   hypothetical.
12   BY MR. TEMPLE:
13       Q   So let me make sure I understand you,
14   though. To the extent that there is -- you would
15   want to see a study, would you not want to see a
16   study from the defendant as to why this
17   educational requirement is being put into place?
18       MR. ROSENBLOOM: I will repeat my prior
19   objection.
20       MR. TEMPLE: Noted.
21   BY MR. TEMPLE:
22       Q   You can answer the question, please.

175

1        A   Would I want to see a study? If a study
2    had been given to me, I would look at it, but I
3    would want to do my on study based on what I
4    thought was, you know, the correct approach. So
5    if a study had been given to me, I wouldn't have
6    said I'm not going to look at it, but I'm not sure
7    how much it would have influenced what I would
8    have done.
9        Q   Why would you want to do a study? Can
10   you help me to understand that, please?
11       MR. ROSENBLOOM: Don, would you just
12   give me a standing objection to this line of
13   questioning and I will stop interrupting you on
14   that it is beyond the scope the Rule 26
15   designation?
16       MR. TEMPLE: Actually, we can have a
17   running objection. I strenuously disagree with
18   you as to your interpretation of that.
19   BY MR. TEMPLE:
20       Q   You can answer the question, sir.
21       A   Is the question, why would I would want
22   to have a study? I want to know specifically what

176

1    kind of study we are talking about here.
2        Q   What you just testified to, is that you
3    would wanted to see a study about the educational
4    requirement and the correlation to the work duties
5    and job description. And my question to you is,
6    why, why do you want to see it, the study?
7        A   I don't think I said that. I said that
8    in order for me to even go down this path, the
9    plaintiff's expert would have to make it clear
10   that the education was the policy through which
11   this discriminatory impact occurred. Then we
12   could -- if that was made clear, which it has not
13   been made clear, then all this other stuff would
14   be open for a discussion. But that is not the
15   study that she did. That is the study that I said
16   I would respond to.
17       And then you asked about some kind of
18   correlations between job performance and
19   education. That is just, you know -- maybe that
20   would be helpful, maybe it wouldn't. I'm saying I
21   wouldn't reject a study like that, but I think
22   those kind of studies are -- you know, they might

177

1    be informative and may not. I'm not going to give
2    a blanket statement that, yes, that would be
3    useful.
4        Q   Well, let me ask you. You said they
5    might be informative, might not be informative.
6    Let me ask you hypothetically.
7        If Joe Smith has the job and Joe Smith
8    is working in a job as a program analyst for 30
9    years and the job description changes, is the
10   reduction in force, the job description changes
11   and it says that Joe Smith's position now requires
12   a bachelor's degree. And Joe Smith loses the job
13   because he doesn't have a bachelor's degree, and
14   you notice that 35 other people have lost their
15   jobs, and they are all over 50 and they are all
16   black, would that inform you in any way?
17       A   In your hypothetical here where the only
18   thing that change was now I'm going to require a
19   degree and nothing else changed, you know, if that
20   is the hypothetical --
21       Q   Yes.
22       A   -- then that would be, I think, worth

STEPHEN BRONARS, Ph. D.
Davis v. DISTRICT OF COLUMBIA                    7/29/2014

---

178

1   investigating for sure.
2        Q   You said worth investigating. What
3   would you be looking for?
4        A   My understanding is that, you know, the
5   protected group, not having a college degree does
6   not protect you under the civil rights law. So
7   you would have to look how did that play out in
8   terms of other characteristics that are protected.
9        So --
10       Q   So then back to my question a few
11  questions ago. In terms of our expert analysis,
12  what do you think she would have to show to show
13  that there was discrimination, just statistically?
14  And let me rewind. You are saying that her
15  analysis is inferior, isn't that correct?
16       A   I'm saying that her analysis makes it
17  pretty clear that these reductions in force were
18  not spread out in a way across the agency that
19  would be consistent with her benchmark against
20  which she is comparing things to. So her
21  inference about how unlikely it is to see these
22  disparities that she sees are not meaningful

---

179

1   because she is comparing it to a strawman model
2   that says everybody is equally likely to be RIFed.
3        So I would have liked to have seen model
4   and control for some factors that are relevant and
5   legitimate and saying, holding those things
6   constant, is there an independent effect of race
7   or age. And that is just generally what we do in
8   this business is try to control as best we can --
9        Q   Well, isn't --
10       A   Wait a minute. Wait a minute. We try
11  to control for the legitimate factors as best we
12  can -- they are not going to be perfect -- and
13  then saying holding that constant, do race or age
14  play an independent effect. Not controlling for
15  nothing do they play a role, but -- so generically
16  that is what I would like to say.
17       Q   You lost me. You lost me. Take me
18  back.
19       For the purposes of this particular
20  analysis, in the District of Columbia when there
21  is an agency RIF, a single agency, do -- are all
22  employee affected by the RIF, are all them subject

---

180

1   to the RIF process?
2        MR. ROSENBLOOM: Objection, beyond the
3   Rule 26 designation. Don, you are talking about
4   factually how do RIFs happen?
5        MR. TEMPLE: The gentleman just
6   testified that the plaintiff's expert's analysis
7   that everyone is protected subject to a RIF is
8   incorrect. I'm trying to see what he understands
9   about District of Columbia reductions in force.
10       And the question is, at the Department
11  of Child and Family Services was everyone
12  subjected to the RIF when the RIF occurred?
13       MR. ROSE: In the agency.
14       THE WITNESS: My conclusion is that it
15  is -- a more sensible model is to recognize that
16  certain people and certain positions in certain
17  offices and divisions were at much greater risk or
18  chance of being terminated in the RIF than others.
19  And that to compare the outcomes to an artificial
20  world in which everyone, whether you were in Child
21  Protective Services or you were the head of the
22  whole division or whatever program you are in, you

---

181

1   faced the same proportionate chance of being
2   selected for the RIF is inconsistent with the
3   evidence they way I see it. And therefore, that
4   is the primary weakness of her approach in her
5   report, period.
6   BY MR. TEMPLE:
7        Q   Well, I don't want to just gloss over.
8   You have said a lot. And we need to talk about
9   that. Okay. Because I don't know that I
10  understand you and I don't know that the record is
11  clear. So I'm going to ask you some bite size
12  questions to see if we can get a clear record.
13       First of all, I'm talking about an
14  agency RIF. Do you understand that?
15       A   Yes.
16       MR. ROSE: So it is this --
17  BY MR. TEMPLE:
18       Q   And do you understand -- as my question
19  was posed, do you understand and can you tell me
20  whether all employees would be equally subject to
21  a RIF when a RIF takes place?
22       MR. ROSENBLOOM: Object to form.

---

46 (Pages 178 to 181)

---

182

1    BY MR. TEMPLE:
2        Q   You can answer the question.
3        A   Yeah. That wouldn't be true of all
4    RIFs, but -- that wouldn't be true in all
5    situations.
6        Q   The question is, I'm not talking about
7    all situations. I want to narrow this down to the
8    RIF at issue. We are not talking about RIFs
9    universally. We are talking about a District of
10   Columbia RIF at a particular agency in a
11   particular year. And that is a risk that you are
12   opining on; is that correct?
13       A   Correct.
14       Q   Okay. And the question is, for that
15   particular RIF were all employees subject to that
16   RIF?
17       A   At some level, yes.
18       Q   What does "at some level" mean?
19       A   They didn't all face an equal chance of
20   being RIFed.
21       Q   That wasn't my question. Were they
22   subject to the RIF? And let's be clear. Maybe we

---

183

1    are confused here.
2        Being RIF it means losing your job,
3    right?
4        A   Right.
5        Q   However, being in the RIF process means
6    that the agency is looking at your position to see
7    whether you are going the lose your job?
8        A   Yes.
9        Q   So were all employees at the agency in
10   the RIF process?
11       A   I believe so. I believe so, yes.
12       Q   Okay. And so all of them were not
13   subject equally to losing their jobs, you agree,
14   right?
15       A   Correct.
16       Q   And do you know the factors that would
17   determine whether or not they would would or would not
18   become subject to losing their jobs?
19       A   I think I already tried to answer this.
20   It is based on the financial concerns, the
21   reorganization concerns, the realignment of goals,
22   different kind of service models were the general

---

184

1    points that I understand were the factors taken
2    into account.
3        Q   And when they are taking into
4    consideration -- okay. But do you know whether
5    there was a realignment versus a reorganization at
6    the agency?
7        A   I think it depended on the office and
8    division whether it was more of a realignment or
9    reorganization. It is more of a semantic term. I
10   don't know.
11       Q   Do you know whether there is a
12   difference between a realignment and a
13   reorganization in the District of Columbia?
14       MR. ROSENBLOOM: Objection to form.
15       THE WITNESS: No, I'm not sure of the
16   technical difference.
17   BY MR. TEMPLE:
18       Q   Okay. And putting that aside, going
19   back to the reduction in force. Do you understand
20   that in a reduction in force, in either a
21   realignment or reorganization, that job
22   descriptions are changed?

---

185

1        MR. ROSENBLOOM: Objection to form.
2        THE WITNESS: I don't think I knew that
3    as a fact, but that doesn't surprise me.
4    BY MR. TEMPLE:
5        Q   Okay. My question is, how can you
6    really give a statistical analysis which says that
7    what the agency did was legitimate without looking
8    under the RIF statistics to ascertain the extent
9    to which there were certain people based upon such
10   special classifications as age and race who were
11   affected by changes, for example, in job
12   descriptions?
13       MR. ROSENBLOOM: Objection to form.
14       THE WITNESS: I'm not sure exactly what
15   the question was there. But I know in the first
16   part of the question. I am opining about whether
17   or not there are statistical evidence of
18   decision-making that appears bias. And that is
19   what my opinion is about. And --
20   BY MR. TEMPLE:
21       Q   Did you say bias? I'm sorry. I
22   couldn't hear you. Did you say --

---

186

1      A   Yes.
2      Q   That appear bias? Did you use that
3   word?
4      MR. ROSE:  Bias.
5      THE WITNESS:  Bias, discriminatory bias,
6   yes.
7   BY MR. TEMPLE:
8      Q   Okay. I wanted to make sure I heard
9   you. Okay.
10     A   I think the first part of your question
11  was a bit more sweeping than my conclusion, if we
12  read back the question.
13     THE WITNESS:  Would you read back the
14  first part of the question.
15     (The reporter read back the record as
16     requested.)
17     THE WITNESS:  Yeah.  And my conclusion
18  is that the statistical evidence is not there
19  based on either my analysis or Dr. Monroe's
20  analysis, which is my conclusion about the
21  statistical evidence.
22

187

1   BY MR. TEMPLE:
2      Q   Back to question as to bias.
3      A   Pardon me?
4      Q   Back to the question to the point that
5   you make of bias.  What types of statistical
6   evidence would you need to show that there was a
7   bias?
8      A   Right.  And I think the evidence that
9   you need is to compare what happened to the
10  reasonable alternatives that would be possible and
11  with an unbiased, nondiscriminatory framework.
12  And that is not what Dr. Monroe put forward. Her
13  comparison was, as I said before, to a very simple
14  style strawman model that says that the RIFs could
15  and should occur anywhere and everywhere as
16  opposed to what you would expect to see with a
17  reorganization and/or a realignment where
18  positions are eliminated, departments are
19  realigned.
20     And she didn't do that study. But it is
21  possible to do such a study, it is just not what
22  has happened in this case.

188

1      Q   I'm going to try to follow you. And you
2   said that she didn't do that. So the flaw in her
3   analysis is that she did not have narrow enough of
4   a statistical assessment?
5      A   No. I mean, I'm not saying there was
6   only one way to do it. But I'm saying that if you
7   compare outcomes to what we know would never have
8   happened, which is that they just sprinkled the
9   terminations throughout the agency, in no
10  particular way -- they didn't decide to eliminate
11  any positions, they didn't decide to focus on
12  reorganizing any departments, of course, the
13  terminations are going to look different than her
14  baseline.
15     Because her baseline says you put 802 or
16  832 or whatever you want names in a hat, and you
17  draw out a 115, and that is who gets RIF. That is
18  not what happened.  And I agree with her.  Nothing
19  close to that happened.  But that doesn't mean
20  that what happened was discriminatory.  It is just
21  not purely random.  And --
22     Q   I still don't know that you answered my

189

1   question, though.  My prior question was, what
2   would she have to -- what would you do to show
3   that there is discriminatory bias, statistically
4   speaking?
5      MR. ROSENBLOOM:  Asked and answered, but
6   go ahead, Dr. Bronars.
7      THE WITNESS:  What you have to do is you
8   have to try to control as best you can for what
9   factors you think are legitimate and/or the way in
10  which decisions are made, which is like which
11  positions are going to be affected.  There are a
12  lot of different ways to make the case.  I'm just
13  saying that this was not one of them from a
14  statistical point of view.
15     So there are lots of different ways that
16  one could approach this, and, you know, I haven't
17  thought about what, if I were in her situation,
18  exactly I would have done differently, but I would
19  have tried to bottle as best I could the kinds of
20  decisions that are actually being made in the
21  agency as a reference point, against which you
22  would compare what actually happened.

190

1      So that you were actually modeling the
2   decisions that were being made and the kind of way
3   that they were being made as opposed to a very
4   simple alternative which she put forward, which is
5   that everybody is equally likely to get terminated
6   as a benchmark against which she was comparing the
7   outcomes.
8      And I keep repeating myself, but that is
9   the best I can do.
10  BY MR. TEMPLE:
11     Q   Okay.  I understand that, but then you
12  would agree that you need to look at the process
13  and the administration of the RIF process to -- in
14  addition to the statistics to ascertain bias; is
15  that correct?
16     MR. ROSENBLOOM:  Objection, form.
17     THE WITNESS:  I believe that the best
18  kind of statistical analysis would be one that
19  takes into account the institutional features and
20  incorporates that into the model that you are
21  building.  And that way your tests and your
22  inference about the statistical significance of

191

1   outcomes being different than what would have
2   happened had they done this in a way that was
3   neutral would have more force.
4      Sometimes it is easier to do that than
5   others, but, yeah, you would want to try to take
6   into account those factors.
7   BY MR. TEMPLE:
8      Q   So then objectively, based on what you
9   know about this case, are there any particular
10  pieces of evidence or factors that are -- that you
11  have identified as the case that would assist in
12  the assessment or evaluation of bias?
13     A   You know, the organizational structure,
14  the fact that different departments with different
15  functions and different divisions and offices
16  were -- they are doing -- there are different
17  tasks to perform and different responsibilities,
18  you want to take that into account in some way.
19     So I would say, one number, you would
20  want to take into account the structure of the
21  organization and include that at least as some of
22  the factors that you are controlling for in

192

1   addition to just race and age.
2      Q   Can you explain that, please?
3      A   Well, I'm saying that people are in
4   different -- they are doing different things.  It
5   is a big agency, and the decision-making is in
6   part about individuals, but it is in part about
7   the offices and divisions and positions.
8      And so I don't think a valid statistical
9   analysis can ignore that kind of information in
10  saying that that, regardless of race or age --
11  they are a lot of people that didn't get selected
12  who were African Americans.  There were a lot of
13  people who didn't get selected who were age 40 and
14  above.  And why is that?  It is partly because of
15  the kind of job they had and the role that they
16  played in the organization.
17     So that is something that needs to be
18  modeled, in my opinion.  And I do that in a very
19  simple way, but I'm not saying that that is the
20  only way to do it.
21     Q   Would it help you to have some
22  understanding as to the correlation of these

193

1   new -- of the new college degree requirement and
2   an understanding of the job position description
3   as it was notified with the job description
4   requirement?  Does that help you?
5      MR. ROSENBLOOM:  Objection to form.
6      THE WITNESS:  I'm trying to answer this
7   education question as best I can.  The way I think
8   you are asking this question is that this is the
9   policy that led to discriminatory behavior and --
10  by requiring an education -- requiring a
11  education -- requiring a college degree.
12     And I think I have tried to answer that
13  the best I can.  That that is something that could
14  be investigated.  I don't think it was
15  investigated here.  And knowing something about
16  the job descriptions and knowing who had a college
17  degree and who didn't, and all of that kind of
18  stuff, could have been part of a statistical study
19  of that particular aspect of the decision-making
20  process.
21     I did not see that kind of a study.  And
22  therefore, I'm not prepare to really speculate as

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                    7/29/2014

194

1  to how that would have turned out. But I -- I'm
2  trying to say that, yeah, it is possible to do a
3  study like that. It is just not what was done
4  here.
5  BY MR. TEMPLE:
6      Q   That is not my question. And I'm not
7  asking you how it would have turned out. I'm not
8  asking you, was there a study, and not even a
9  study, but an analysis of the college degree
10  requirement along with the respective job
11  description as modified would help you in your
12  assessment of bias?
13      MR. ROSENBLOOM: Objection, form.
14      THE WITNESS: It would only help me in
15  my assessment of bias if I also had some other
16  information, but it could conceivably help. I'm
17  not going to say that it wouldn't help. I would
18  have to see was that assessment was. So it could
19  possibly -- it could possibly help. I think I
20  have said that already in answering this question.
21      I don't think that would prove that
22  there was bias. I think you have to go further to

195

1  do that kind of assessment.
2  BY MR. TEMPLE:
3      Q   Where would you have to go and what
4  other information would you need?
5      A   Again, you are talking about the adverse
6  impact of a policy, a specific policy that can be
7  studied. So it wasn't studied in this case. And
8  you would have to have information about the
9  people in that particular job, what their
10  qualifications were in other things, and focus on
11  the impact of the educational requirement, per se.
12  And then see what -- how -- what impact did that
13  have on the racial composition of the work force
14  and go from there or the age distribution of the
15  work force.
16      But just describing kind of how that
17  kind of study would go is not the same thing as a
18  statistician coming in and saying it has this
19  effect, it is significant to this degree, it
20  accounted for an excess number of terminations of
21  a certain amount. That wasn't done. And so, I'm
22  just trying to answer this question, but

196

1  recognizing that that wasn't done, so this is all
2  speculation.
3      MR. ROSE: How much longer are we going
4  to be?
5      MR. ROSENBLOOM: Quick question, Don.
6  We just want to know in terms of -- we never took
7  a lunch break on our side. What is your
8  suggestion about should we keep pushing through,
9  or should we take a 30-minute, grab a bite break.
10      MR. TEMPLE: I think we should break,
11  but I don't have many more questions, quite
12  frankly. I don't know if you have questions.
13      MR. ROSENBLOOM: If by "you," you mean
14  me, I don't at this point intend to do a redirect
15  of Dr. Bronars, no, sir. But Mr. Rose seems to be
16  indicating that he may have a couple of additional
17  questions, so I wonder whether it wouldn't be a
18  bad idea for us to reconvene, so that we can get
19  and quick late lunch.
20      MR. TEMPLE: That is fine. And I
21  apologize, I thought you guys had eaten lunch.
22      MR. ROSENBLOOM: No, it is quite all

197

1  right.
2      MR. TEMPLE: I'm starving. In fact, I
3  had been sitting here and getting myself thinking
4  that you guys have ate and I didn't want to lose
5  you. No problem.
6      MR. ROSENBLOOM: Let's go off the
7  record, and then we can talk about how long we
8  want to break for.
9      MR. TEMPLE: Thank you.
10      (The proceedings recessed from
11      3:20 p.m., to 4:18 p.m.)
12          *   *   *
13
14
15
16
17
18
19
20
21
22

50 (Pages 194 to 197)

198

1      AFTERNOON SESSION
2          MR. TEMPLE: I don't have a lot of
3    questions. Are you ready now?
4          MR. ROSENBLOOM: Yes, sir.
5    BY MR. TEMPLE:
6      Q   In your testimony you said that our
7    expert's testimony was, quote, unquote,
8    "oversimplistic and unrealistic." What did you
9    mean by "oversimplistic" specifically --
10         MR. ROSENBLOOM: Apologies, Don. You
11   said oversimplistic and what was the last word?
12         MR. TEMPLE: Unrealistic.
13         MR. ROSENBLOOM: Thank you.
14         THE WITNESS: Yeah. And again, this is
15   repeating myself again, the comparison to a
16   benchmark for what would statistically have been
17   the average or expected outcome in a RIF like this
18   in the absence of any kind of discrimination. And
19   the unrealistic and simplistic really comes down
20   to the assumption that we have been talking to
21   about all day here today, which is that every
22   position and every person is equally likely to be

199

1    terminated because of this RIF.
2    BY MR. TEMPLE:
3      Q   Was that not one of her premises that
4    everyone, but for bias, was equally likely to be
5    considered for the RIF and potentially RIFed?
6      A   Yeah. There is not a problem with
7    saying everyone was considered. But if the way
8    the RIF is going to go we are going to pick a
9    position to eliminate or a department to cut back,
10   then her statistical model is not right, because
11   it assumes that all of these decisions are
12   independent statistically of each other.
13         So in her model you are picking people
14   with no reference to their job function or any of
15   that other kind of organizational information.
16   And that is the, what I consider unrealistic and
17   simplistic version of her analysis.
18     Q   So what she should have done was?
19     A   Well, we have been going over what she
20   should have done. What she should have done was
21   try to model a process that is more reflective of
22   the realities of the situation in terms of, hey,

200

1    we are going to have to focus our cutbacks in
2    particular areas based on, you know, whatever
3    factors that she thought were reasonable to base
4    them on in a world where you are trying to make
5    decisions in the way that was not discriminatory.
6          So I'm not going to presume what factors
7    she should have controlled for, but I have already
8    said that the organizational unit and the fact
9    that if I'm -- for example, if I'm operating a
10   factory -- and this is just a hypothetical -- I
11   might decide to shut down the second shift or the
12   third shift as an option as opposed to saying I'm
13   just going to randomly select people regardless of
14   shift, because it might make more business sense
15   to say, hey, we are -- business doesn't require us
16   to be open for two or three shifts, and so we are
17   going to make the cutbacks in that way.
18         So that is kind of what I'm talking
19   about here, that her view of the way in which the
20   RIFs would have taken hold is a very base level
21   simplistic, the simplest approach that you could
22   take but not very realistic.

201

1      Q   I'm trying to follow you, so bear with
2    me because you are talking about -- you are saying
3    it is realistic. And you are saying that her
4    sampling was not a realistic sampling, in effect?
5      A   Not really, no. I'm saying that anytime
6    she's going to -- when I say she has made some
7    statistical inference, what I'm saying is she has
8    said this outcome that I observe is so unlikely I
9    would expect it to serve it less than one time in
10   a thousand.
11         How did she possibly arrive at that
12   calculation? She arrived at that calculation by
13   saying I know what things would look like had
14   there not been discrimination. And I'm saying
15   that her nondiscrimination benchmark is one that
16   was -- it is much more than assuming
17   nondiscrimination.
18         It is assuming that I'm not going to
19   eliminate any positions, I am not going to focus
20   on any departments. I'm going to spread this
21   thing out as evenly as I can by having everyone
22   with one, you know, Ping-Pong ball in the urn or

51 (Pages 198 to 201)

### 202

1    one name in the hat, and everybody is going to be
2    facing the same chance of losing there job. And
3    that is contradicted by the testimony and also by
4    the evidence in this case, I believe.
5        Q   You know I want to follow you, though.
6        MR. ROSE: Donald --
7    BY MR. TEMPLE:
8        Q   She said -- is it your view that a
9    premise of her analysis is that no one should lose
10   any position?
11       A   No, that is not at all what I'm saying.
12   I'm saying that when she is describing how
13   significant the allocation of terminations, how
14   significantly different it was from what she would
15   have expected as a statistician, she is putting
16   forward a benchmark that she says this is how I
17   would have expected it to go.
18       And that is not an innocuous assumption
19   that she is making, and it is the crux of my
20   rebuttal to her and the difference between my
21   approach and her approach.
22       Q   Okay. I think I understand what you are

### 203

1    saying. Okay.
2        A   Well, I mean, it is a statistical point
3    that if you are going to say that I think this is
4    something that I would see fewer than one time in
5    a thousand if the agency was behaving in a way
6    that was nondiscriminatory, you would have to ask,
7    well, how do you know that, what would it have
8    looked like if they were not discriminating. And
9    the question is, well, what are alternative ways
10   in which they could have conducted the reduction
11   of force. And only one of those ways is throw
12   everybody's name in a hat.
13       MR. ROSE: Donald --
14   BY MR. TEMPLE:
15       Q   I didn't understand that because you
16   said only one of those ways to throw everybody's
17   name in a hat is adorn know under D C law whether
18   everybody's name in a hat, but you don't know
19   under D.C. law if everybody's name should or
20   should not be in the hat?
21       A   Well, I'm saying how do --
22       MR. ROSENBLOOM: I'm sorry. I'm just

### 204

1    going to object to the form, but go ahead.
2        THE WITNESS: I'm saying that we all
3    agree that 57 positions were eliminated.
4        MR. ROSE: Well, more than that.
5        THE WITNESS: One position with 57
6    people.
7        MR. ROSE: Right.
8        THE WITNESS: So that was a decision
9    that was not made on an individual
10   person-by-person basis, right. So her statistical
11   model is comparing a decision that was made to
12   eliminate a position to what would things look
13   like if you didn't do things that way and you just
14   spread it out. And I'm saying that it is possible
15   to model in a different way.
16   BY MR. TEMPLE:
17       Q   I want to go back to your RIF, too, in
18   Chicago, whenever it was.
19       A   Yes.
20       Q   Okay. You did a statistical analysis;
21   is that correct?
22       A   Yes.

### 205

1        Q   Can you explain what you did differently
2    than what she did?
3        A   Well --
4        MR. ROSENBLOOM: Hang on a second. It
5    looks like Mr. Rose -- are you okay?
6        MR. ROSE: Okay. Sorry. Sorry.
7        THE WITNESS: Yeah. The key part of
8    that case was what we have talked a little bit
9    about here, people getting their jobs back and who
10   applied for it, and all of that.
11       But the analogy would be they decided
12   the shut an entire plant. I don't remember off of
13   the top of my head how many they had. But they
14   said this is the way we are going to do it, we are
15   going to shut one plant.
16       And so, if you are going to make the
17   case that that was a discriminatory decision, you
18   would have had to say, well, what other plant
19   could they have shut down, et cetera, et cetera.
20       So they didn't decide to -- let's say
21   you had 100 plants and they shut down one of them,
22   they didn't decide instead to reduce employment by

206

1 1 percent, 1 out of 100 at every plant. They said
2 we are going to shut down one of these. That is
3 the difference between modeling the kind of
4 decision that was being made and just throwing
5 something out there that you say is what you would
6 expect in a nondiscriminatory environment.
7        So that is how I would respond to that.
8 If you are going to pick a plant to shut down,
9 that is a decision. That is different than saying
10 we are going the pick 1 percent of the people to
11 issue pink slips to.
12 BY MR. TEMPLE:
13     Q   Is everybody RIFed in the plant?
14     A   Again, this case was from awhile ago. I
15 believe that everybody was, but people had an
16 opportunity to try to relocate to another plant.
17     Q   Did you opine that there was
18 discrimination at the plant?
19     A   Again my analysis was not about which
20 plant was selected. My analysis was about why
21 were fewer older workers being relocated, and it
22 had to do with that fewer of them were applying,

207

1 and when they did apply, they only picked maybe
2 one or two other locations. And the younger
3 employees were more willing to apply for more open
4 positions.
5        And my opinion was that the difference
6 between what I would have expected from a neutral
7 decision-maker and what happened was not
8 significant in that case.
9        My conclusions are going to be, is there
10 statistical evidence of this or not. That is what
11 my opinion is about. And I think in that case I
12 said it is close enough to what I would have
13 expected, that there is not a significant
14 difference between what I observed and what I
15 would have expected to observe under a neutral
16 decision-making rule.
17     Q   Is it possible for you to look at this
18 group of 57 people and to look at the college
19 degree requirement and the job description and to
20 opine from there whether there is any evidence of
21 a statistical analysis of any bias?
22     MR. ROSENBLOOM: I apologize. Don, I'm

208

1 going to object to form just because I missed part
2 of it, but I think the reporter got it.
3        Could repeat that question?
4        (The reporter read the record as
5        requested.)
6        MR. ROSENBLOOM: Thank you. I will
7 object to the form.
8        THE WITNESS: Is it possible. I think,
9 as I have said before, it is this 57 or another
10 57, how much of a role did the reformulation and
11 the new job description and the educational
12 requirement, how much did that play a role in
13 this. I think all those things are, in principle,
14 analyzable. So I would say, yes, it is possible
15 to do a study like that.
16 BY MR. TEMPLE:
17     Q   And the study would tell you what? How
18 would that be useful to you in ascertaining bias?
19     A   Well, I mean, I'm saying that the study
20 has -- it is either eliminating this position,
21 these 57 people or someone else. And so, you have
22 to look at the decisions in that framework. It is

209

1 not, hey, no one -- if it is not these 57, it is
2 not someone else.
3        So if the next group on the list had 57
4 out of 57 African Americans, then 56 out of 57
5 looks pretty good. And if the education
6 requirement was not really very important, then
7 your premise that it is driven by the educational
8 requirement may not be that important. So it is
9 something that would need to be studied, but I
10 didn't do that report, I didn't do that study.
11     Q   Let me just try to follow up on that.
12 I'm going to be brief.
13     A   Okay.
14     Q   If you have -- if you go back to
15 Mr. Rose's earlier question and if it showed
16 disproportionately that blacks over 50 are less
17 likely to have college degrees, would you consider
18 that effect to place you one way or the other in
19 the direction of racial and age bias?
20        MR. ROSENBLOOM: Object to the form.
21        THE WITNESS: Okay. When you in a
22 situation like this and you know who the actual

53 (Pages 206 to 209)

210

1  employees are and the actual applicants are going
2  to be for the new position, I would put less
3  weight on what the general statistics say and look
4  more at actually the individual people in these
5  positions, because it is -- just because the
6  general -- go ahead.
7      MR. TEMPLE: I'm sorry. Go ahead. I'm
8  sorry.
9      THE WITNESS: Just because the general
10  statistics show a particular correlation, it
11  doesn't mean that it is going to correlate to the
12  same kind of difference here. And that is both in
13  terms of the magnitude of this effect or the
14  significance. And so I understand the point that
15  there is a nationwide statistic that you are
16  trying to point to, but I think what is most
17  relevant is that at that very agency level who was
18  in the positions and who are the new people that
19  are brought in.
20      MR. ROSE: Mr. Temple, it is Dave. Are
21  you there?
22      MR. TEMPLE: Yes.

211

1      MR. ROSE: I would like to ask two
2  questions. I think they are getting --
3      MR. TEMPLE: Hold on one second, Dave.
4  Let me just get this last question and I'm going
5  to turn him over to you. He just said something
6  and I don't want to lose it.
7      MR. ROSE: Very good.
8  BY MR. TEMPLE:
9      Q  The last thing that you said was that
10  you would have -- first of all, you said that you
11  would place less emphasis on the statistical
12  analysis and more individual -- more of it on the
13  actual individual anecdotal evidence. Is that
14  right?
15      A  Well, I consider the individual evidence
16  at the CFSA also statistical. I'm saying that
17  would be primary what that relationship was
18  between race and education and who held onto their
19  jobs and who didn't than some nationwide or even
20  citywide set of statistics. But I consider them
21  both statistics, not --
22      Q  Well, how can you consider anecdotal

212

1  evidence, for example, the college degree
2  requirement and its implication a statistic?
3      MR. ROSENBLOOM: I apologize, Don.
4  Could you repeat that one more time?
5      MR. TEMPLE: He said he considered
6  anecdotal evidence as statistical. And I just
7  want him to explain how he considered this college
8  degree requirement statistical in nature.
9      MR. ROSENBLOOM: Okay. Thank you.
10      THE WITNESS: I think it is possible to
11  do a statistical study saying if -- what would
12  things have likely looked like had there not been
13  this educational requirement. And I have not seen
14  that study in showing that it -- there is a
15  significant difference in the composition of the
16  workforce with and without that requirement.
17      Making the legal argument is not the
18  same thing as making a statistical study and
19  pointing to it and saying this is a difference,
20  this is how big it is, this is how many people,
21  this is how significant it is, and that study was
22  not done. So I can't -- I'm trying to make it as

213

1  clear as I can that I don't consider that
2  anecdotal. I consider that a study that it is
3  possible to do. It just wasn't done.
4  BY MR. TEMPLE:
5      Q  And that study would proved post list
6  the number of whites in the affected positions
7  versus the number of blacks. And the affected
8  positions I'm talking about for purposes of a
9  statistical grouping that would show bias would be
10  the positions with the college degrees
11  requirements -- the college degree requirement; is
12  that correct?
13      A  I mean, yeah, you would be looking at
14  those positions with the college degree
15  requirements, and you would be looking at the
16  impact of that requirement on the decisions.
17      Q  Your answer is that -- is it a "yes" to
18  my question?
19      A  I think I understand your question. And
20  I think it is a yes, but it was kind of a
21  complicated question. So I didn't just give it a
22  "yes" answer.

214

1          MR. TEMPLE: Okay. Mr. Rose, I
2     apologize for cutting you off.
3          MR. ROSE: I'm just going to do --
4          MR. ROSENBLOOM: I'm sorry to interject.
5     Don, on that last question, would you mind either
6     asking it again or explaining it? Maybe I should
7     have objected, but I'm not sure if it was clear
8     and Dr. Bronars -- I know, I know. You guys were
9     laughing at the idea that I might have missed an
10    objection.
11         MR. TEMPLE: I will do just that. Okay.
12    So, Doctor, let me go back to it.
13         And, counsel, I greatly appreciate your
14    interest in clarification.
15         MR. ROSENBLOOM: Thanks, Don. I
16    appreciate it.
17    BY MR. TEMPLE:
18         Q   I wanted to just go to this point. In
19    terms of the evidence the question is that, to the
20    extent that you said the anecdotal evidence would
21    be useful to your statistical analysis, am I
22    correct that you would then want to look at the

215

1     resulting number of people in the agency in the
2     positions, the new positions -- underscore new
3     positions -- with the college degree requirements
4     on a race and age basis?
5         A   Yeah, I think I would want to see that.
6     Yes.
7         Q   Okay. Thanks. By the way, did you look
8     at that information to ascertain whether or not
9     there were any whites in the resulting racial
10    disparity?
11        A   I will repeat what I did --
12        Q   I'm asking a simple question. Did you
13    look at that information?
14        A   Okay. Only to the extent that they were
15    people who were previously included in the RIF and
16    then came back.
17        Q   Did you look at the specific information
18    that we just spoke about in the previous question,
19    the specific anecdotal statistic, i.e., the number
20    of people that filled these positions with a
21    college degree requirement and their race and age?
22        MR. ROSENBLOOM: Object to the form of

216

1     the question.
2         THE WITNESS: I think we are down to 18
3     people that came back, but I might be missing
4     something here. So, yes, I did.
5     BY MR. TEMPLE:
6         Q   I'm not just talking about the 18
7     people. I'm talking about a number of jobs were
8     created with college positions -- college degree
9     requirements subject to modified job descriptions.
10    Did you look at those positions to make any
11    assessment about the race and age implication?
12        MR. ROSENBLOOM: I will repeat the
13    objection.
14        THE WITNESS: Yeah. But I don't think
15    you are going to like my answer, because the way I
16    looked at it was that who was able to hang on to
17    their job in those positions and what was their
18    race and age, and that's how I looked at it. So I
19    did look at it, but in that context.
20    BY MR. TEMPLE:
21        Q   Did you make a note regarding your
22    examination of that evidence anywhere?

217

1         MR. ROSE: I'm sorry.
2         MR. ROSENBLOOM: Don, did you make a
3     what?
4         MR. TEMPLE: A note or a written
5     reference regarding your examination of that
6     evidence.
7         THE WITNESS: In my original report --
8     to the extent that I looked at this question,
9     okay, so I might not have looked at exactly what
10    you are talking about, but it relates to your
11    question, I looked at the people that came back
12    and what was their age, what was their race. And
13    in order to come back, you had to have a college
14    degree, and I didn't have -- I didn't look at the
15    new people that were brought in. So that part of
16    it I didn't look at.
17        And the other aspects of what you are
18    talking about I didn't look at, because I'm just
19    telling you everything that I did with respect to
20    these questions. So anything else other than what
21    I just said the answer would be no.
22        MR. TEMPLE: Thank you so much for your

218

1    time.
2        And I hope I didn't take up too much
3    time, gentlemen.
4        MR. ROSENBLOOM:  Thanks Don.
5        MR. ROSE:  I have a couple more
6    questions at least.
7        THE WITNESS:  Okay.
8    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
9    BY MR. ROSE:
10       Q   Would you look at page 28 of
11   Dr. Monroe's paper?
12       A   Sure.
13       MR. ROSENBLOOM:  This is Exhibit 1?
14       MR. ROSE:  Yep.
15   BY MR. TEMPLE:
16       Q   Isn't it true, sir, that the RIF burned
17   almost all its people, almost all of the -- let's
18   go to graph seven down below -- all right, six
19   above, average age.  Did you know that no one in a
20   grade 14 was discharged in the RIF?
21       A   I didn't remember that, but I'm not
22   surprised.

219

1        Q   Did you know that there were 143 grade
2    13 employees of whom only one was discharged, so
3    that all of the discharges were -- substantially
4    all of them were in grades 6, 7, 8, 9, 10, 11 and
5    12?  So a substantially there was only one out of
6    115 people of -- had a grade 13.  Did you know
7    that fact?
8        MR. ROSENBLOOM:  Object to the form.
9    BY MR. ROSE:
10       Q   Well, did you know that -- did you
11   understand that to be the case?
12       A   Yeah, I believe that to be the case.
13       Q   So isn't it more accurate to say that
14   Dr. Monroe looked at the grades of the people who
15   got fired in addition to the other statistical
16   information?  So there was a -- so instead of --
17   and she did an analysis of both by age and by
18   grade.  And there is absolutely no doubt that it
19   was 143 -- I'm sorry -- there was -- anyway,
20   77 percent of the 13s were fired, and so forth, if
21   you can see that graph 7.
22       So she really focused on the grades as

220

1    the additional factor beside the purest
2    statistics.  She was basically limiting the
3    statistics or concern a group of people who were
4    in -- almost all of them were in grade 9 and
5    below.  But there were a few in 11 and 12.  But
6    the RIF was substantially of those people in the
7    lowest -- none of the people in the highest got
8    discharged, and almost all of the black people got
9    discharged and there were only four whites.
10       But did you take into account that
11   she -- functionally she was doing what she said,
12   she was looking -- these two graphs addressed the
13   question of what level grade they were in, the
14   people who got fired?
15       MR. ROSENBLOOM:  Object to the form.  I
16   don't know if you are able to tighten that up,
17   because there were -- but as it is, I'll just
18   object to the form.  Go ahead.
19       THE WITNESS:  I mean, the graphs show
20   the age percentage of people who are 40 and over
21   by grade, the average age by grade.  There are
22   descriptive statistics for, I believe, the entire

221

1    agency.  And I don't think she did either a
2    grade-by-grade analysis or an analysis that
3    controlled for grades.
4        Even if she had done something like
5    that, that assumes that, again, once I'm inside a
6    grade, I'm not looking to eliminate positions or
7    consolidate departments.  So there is some
8    descriptive statistics here, but I don't see a
9    statistical test that describes what you are
10   talking about.
11   BY MR. TEMPLE:
12       Q   So did you understand that the age --
13   I'm sorry -- the education requirement was a basis
14   for not selecting people?
15       A   I believe the testimony made that clear
16   and/or --
17       Q   I'm sorry?
18       A   The testimony --
19       Q   Made --
20       A   -- made it clear that for the people
21   that had been in the SSA position to get their job
22   back.  There was an educational requirement, yes.

56 (Pages 218 to 221)

olenderreporting.com  Olender Reporting          WORLDWIDE
Washington            Baltimore, MD                Florida

STEPHEN BRONARS, Ph. D.

Davis v. DISTRICT OF COLUMBIA                7/29/2014

---

**222**

1  Q   Right. But it was not used as a reason
2  for firing those people; did you understand that?
3  Do you know that at least 30 of the clients who
4  had bachelor's degrees were fired from grade 8,
5  even though they could have -- and some of them
6  applied for it? In fact, you have reference to
7  the fact that they applied for it. But none of
8  the 98 people that we talked to made it through
9  the second part of the unvalidated selection
10  procedure.
11       MR. ROSENBLOOM: I have to object to the
12  form and to the representation of some of the
13  facts. But go ahead, Dr. Bronars.
14       THE WITNESS: I will answer to this part
15  of it. I am aware that in the SSA position, even
16  if you had a college degree, everyone in that
17  position was RIFed.
18  BY MR. ROSE:
19  Q   Yes.
20  A   And so, that I understand. That is the
21  way it happened.
22  Q   So what is the justification for firing

---

**223**

1  people -- whether it is 30 or 45, we don't know
2  exactly. Let's assume it is something like that.
3  What is the justification -- possible
4  justification of the agency for firing people who
5  met the same standard that they used to hire new
6  people, only no experience, and to do
7  substantially the same work?
8       MR. ROSENBLOOM: Object to the form,
9  calls for speculation.
10       THE WITNESS: The way I approached it
11  there is really not a difference between saying
12  let's terminate in the RIF 57 people and bring 18
13  back or just 57 minus 18, 39. So why was it was
14  done in that order sequentially, first we are
15  going to let you go and then let you apply to come
16  back, I don't know.
17  BY MR. ROSE:
18  Q   Yeah. And you don't know, either,
19  why -- why they would have been fired? Why would
20  they have been fired as they -- all they required
21  was satisfactory performance in the past and the
22  bachelor's degree why did the -- if they didn't

---

**224**

1  want to do it for some bias or some hidden factor,
2  why did they fire of these plaintiffs, several of
3  them -- anyhow, there is a whole bunch of them
4  that have degrees and there are some that even
5  have master degrees and they didn't offer those
6  people any jobs they just fired them.
7       Do you have any -- do you know of any
8  reason that supported that conduct?
9       MR. ROSENBLOOM: Same objections.
10       THE WITNESS: The reasons that I know of
11  for the reorganization are based on the
12  explanations that were given in Mr. Davidson's --
13  BY MR. ROSE:
14  Q   Declaration?
15  A   -- declaration about the new service
16  model and the peering of people. And why he
17  played out in this sequence where some people were
18  let go and then brought back as opposed to just
19  saying doing it in one step, again, I don't know
20  why that happened. And I don't have any more
21  information than that.
22  Q   Okay. So but did you understand that

---

**225**

1  the new people were not required to take the test
2  that the 30 or 45 former incumbents were required
3  to take in order to get the job if they had a
4  bachelor's degree?
5  A   I didn't do an analysis of the hiring
6  of --
7  Q   How could you?
8  A   I don't know what their characteristics
9  were.
10       MR. ROSE: Donald, are you there?
11       MR. TEMPLE: I'm listening attentively.
12       MR. ROSE: I think I'm done.
13       MR. TEMPLE: Very good. Thank you.
14       Gentlemen, I'm going to sign off. You
15  do what you have to do for the record. I want to
16  thank everyone for their patience.
17       (Whereupon, at 5:56 p.m., the above
18       proceedings was adjourned.)
19
20
21
22

---

57 (Pages 222 to 225)

226

1    ERRATA SHEET COMPLETED BY WITNESS
2        I, STEPHEN G. BRONARS, the undersigned
3    deponent, have this date read foregoing pages of
4    my deposition numbered 1 through 225, and with the
5    suggestions noted below, if any, these constitute
6    a true and accurate transcription of my deposition
7    given on the 29th day of July 2014, at the time
8    and place stated therein.
9    Page and Line number      Correction or change
     as reported:              and reason therefore:
10   _____            _____
11   _____            _____
12   _____            _____
13   _____            _____
14   _____            _____
15   _____            _____
16   _____            _____
17   _____            _____
18   _____            _____
19   _____            _____
20   _____            _____
21      SIGNATURE: _____
22         DATE: _____

227

1        CERTIFICATE OF DEPONENT
2        I, the undersigned, declare under
3    penalty of perjury that I have read the
4    foregoing pages of my deposition
5    testimony in this proceeding, and with
6    the exception of changes and/or
7    corrections, if any, find them to be a
8    true and correct transcription thereof.
9
10   _____
11       (Stephen G. Bronars, Ph.D)
12
13   Subscribed and sworn to before me
14   this ___ day of _____, _____.
15
16   _____
17       Notary Public
18
19
20   SEAL
21   My commission expires _____
22

58 (Pages 226 to 227)

1                    REPORTER'S CERTIFICATE

2              I, DONNA M. LEWIS, RPR, Certified

3    Shorthand Reporter, certify;

4              That the foregoing proceedings were

5    taken before me at the time and place therein set

6    forth, at which time the witness, Stephen G.

7    Bronars, Ph.D, was put under oath by me;

8              That the testimony of the witness, the

9    questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13             I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16             As witness, my hand and notary seal this

17   31st day of July, 2014.

18

19                         _____

                           Donna M. Lewis, RPR
20                         Notary Public

21   My Commission expires:

22   March 14, 2018