PLAINTIFFS' EXHIBIT 13

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RONDA L. DAVIS, et al. and
CYNTHIA DUDLEY, et al.,

              Plaintiffs,

vs.             C.A. 10-1564, 10-1718

DISTRICT OF COLUMBIA

              Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:  PAIGE MUNRO, PH.D.

CATUOGNO COURT REPORTING

155 South Main Street

Providence, Rhode Island

July 3, 2014        10:38 a.m.

Darlene M. Coppola

Registered Merit Reporter

Certified Realtime Reporter

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

**Page 2**

1  APPEARANCES:
2  Representing the Plaintiffs Cynthia Dudley, et al.:
3  (via telephone)
4     ROSE LEGAL ADVOCATES, P.C.
5     1407 Highland Drive
6     Silver Spring, MD 20910
7     BY: DAVID ROSE, ESQUIRE
8     T 202.769.5860
9     E-mail: daver@roselawyers.com
10
11  Representing the Plaintiffs Ronda Davis, et al.:
12  (via telephone)
13     DONALD C. TEMPLE, P.C.
14     1101 15th Street, NW
15     Suite 910
16     Washington, DC 20005
17     BY: DONALD M. TEMPLE, ESQUIRE
18     T 202.628.1101
19     F 202.628.1149
20     E-mail: dtemplelaw@gmail.com
21
22  (Continued on next page)

**Page 3**

1  APPEARANCES: (Continued)
2  Representing the Defendant:
3     OFFICE OF THE ATTORNEY GENERAL
4     FOR THE DISTRICT OF COLUMBIA
5     One Judiciary Square
6     441 4th Street, NW
7     Suite 600 South
8     Washington, DC 20001
9     BY: DOUGLAS S. ROSENBLOOM, ESQUIRE
10    T 202.724.1342
11    F 202.730.0623
12    E-mail: gale.rivers@dc.gov
13
14  Also present via telephone:
15    Robin Massengale, Esquire
16    Dylan Young, Intern
17
18
19
20
21
22

**Page 4**

1              INDEX
2           EXAMINATION
3  Witness Name                        Page
4  PAIGE MUNRO, PH.D.
5    Cross By Mr. Rosenbloom ............................ 11
6    Direct By Mr. Rose .................................. 293
7    Direct By Mr. Temple ............................... 300
8
9           EXHIBITS
10  Exhibit   Description          Identification
11  No. 1    Notice of Deposition              6
12  No. 2    E-mail Dated July 2, 2014         6
13  No. 3    Curriculum Vitae                  6
14  No. 4    Amended Complaint                 6
15  No. 5    Disclosures                       6
16  No. 6    Statistical Analysis of           6
         Reduction in Force at the
17       DC Child Family Services
         Agency
18
         No. 7    Response to Report and        7
19         Defendant Data
20  No. 8    Request for Production of         7
         Documents
21
         No. 9    Interrogatories               7
22

**Page 5**

1              INDEX
2           EXHIBITS
3  Exhibit   Description          Identification
4  No. 10   Answers to Interrogatories        7
5  No. 11   Reduction in Force, Race          7
         and Age Differentiation
6       Analysis
7  No. 12   E-mail Dated July 1, 2014         8
8  No. 13   E-mail Dated July 2, 2014         8
9  No. 14   Declaration of Stan Spaght        9
10  No. 15   Declaration of Dexter            9
11       Starkes
12
13  No. 16   Declaration of Raymond           9
14       Davidson
15  No. 17   Invoice                          87
16  No. 18   Binder of Documents             127
17  No. 19   Cover Page of Dissertation      128
18  No. 20   Handwritten Notes               200
19
20
21
22

**6**

1  (Exhibit No. 1, Notice of
2  Deposition, marked for
3  identification.)
4
5  (Exhibit No. 2, E-mail Dated
6  July 2, 2014, marked for
7  identification.)
8
9  (Exhibit No. 3, Curriculum Vitae,
10 marked for identification.)
11
12 (Exhibit No. 4, Amended Complaint,
13 marked for identification.)
14
15 (Exhibit No. 5, Disclosures, marked
16 for identification.)
17
18 (Exhibit No. 6, Statistical
19 Analysis of Reduction in Force at
20 the DC Child Family Services
21 Agency, marked for
22 identification.)

**7**

1
2  (Exhibit No. 7, Response to Report
3  and Defendant Data, marked for
4  identification.)
5
6  (Exhibit No. 8, Request for
7  Production of Documents, marked for
8  identification.)
9
10 (Exhibit No. 9, Interrogatories,
11 marked for identification.)
12
13 (Exhibit No. 10, Answers to
14 Interrogatories, marked for
15 identification.)
16
17 (Exhibit No. 11, reduction in
18 Force, Race and Age Differentiation
19 Analysis, marked for
20 identification.)
21
22 (Exhibit No. 12, E-mail Dated

**8**

1  July 1, 2014, marked for
2  identification.)
3
4  (Exhibit No. 13, E-mail Dated
5  July 2, 2014, marked for
6  identification.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**9**

1  (Exhibit No. 14, Declaration of
2  Stan Spaght, marked for
3  identification.)
4
5  (Exhibit No. 15, Declaration of
6  Dexter Starkes, marked for
7  identification.)
8
9  (Exhibit No. 16, Declaration of
10 Raymond Davidson, marked for
11 identification.)
12
13     MR. ROSENBLOOM: We're on the
14 record. We're beginning here in the deposition
15 of Dr. Paige Munro in Civil Action No. 2010-1564
16 in front of Judge Contreras, District Court,
17 District of Columbia Federal Court.
18     This deposition is being taken in Davis,
19 et al., versus District of Columbia and the
20 related case that it's been consolidated with,
21 Dudley versus District of Columbia, Civil Action
22 2010-1718.

3 (Pages 6 to 9)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

**10**

1  We're here in Rhode Island. We're
2  starting at just about 10:38 in the morning.
3  This is Doug Rosenbloom, Office of the
4  Attorney General for the District of Columbia,
5  defense counsel, and there's also counsel for
6  plaintiffs who's previously been identified as
7  being present on the record and that's David
8  Rose and Counsel Donald Temple, who will not be
9  defending here but he's present. Counsel David
10  Rose is defending as Dr. Munro's expert witness.
11  Also from the Office of the Attorney
12  General, Robin Massengale and Dylan Young from
13  my office may be dialing in.
14  We have here today as the witness
15  Dr. Paige Munro.
16  Thank you for being here, Dr. Munro.
17  THE WITNESS: You're welcome.
18  MR. ROSENBLOOM: Let's swear
19  Dr. Munro in.
20
21  PAIGE MUNRO, PH.D.,
22  a witness called for examination by

**11**

1  counsel for the Defendant, being first duly
2  sworn by the Notary Public, was examined and
3  testified as follows:
4
5  CROSS-EXAMINATION
6  BY MR. ROSENBLOOM:
7  Q. Thank you for being here, Dr. Munro.
8  We're here in a lawsuit where you're serving as
9  plaintiffs' expert. I will be taking your
10  deposition on behalf of the defendant, the
11  District of Columbia.
12  We have an unusual setup today with the
13  attorney that will be defending the deposition,
14  David Rose, on the telephone.
15  Have you ever had your deposition taken
16  before?
17  A. No.
18  Q. So basically, I'll be asking you
19  questions. Please just try to wait for me to
20  finish my question so we don't speak over each
21  other.
22  A. Okay.

**12**

1  Q. Then you'll give an answer and I will do
2  my best to not interrupt you, unless it seems
3  that you're going in a different direction, then
4  I'll politely redirect you.
5  The court reporter, obviously, can take
6  down only verbal answers. So if you shake your
7  head or nod your head, I'll try to remind you to
8  give a verbal answer.
9  You have brought various pieces of paper
10  with you today that we chatted about briefly
11  before we started.
12  Because of the general rule that any
13  documents that the witness is looking at need to
14  be produced to the defendant -- to the deposing
15  party, at this point I think the easiest thing
16  is for you to put those documents away, and then
17  if there comes a point where you tell me you
18  need to refer to it, then we can -- you can let
19  me know that and we can make it an exhibit.
20  Do you have any questions about that?
21  A. No, I don't. But actually, I do.
22  Actually, this coupled with an annotated

**13**

1  version of the report would probably suffice.
2  You can have a copy of this. I have one
3  for you right here.
4  Q. So when we turn to your report, I will
5  have -- we have already made a copy of your
6  report as an exhibit.
7  A. I would like to refer to this, which is
8  a piece of paper that I've just made some notes
9  on and I would like to continue making notes on
10  it.
11  But then also, if I need to, because I
12  have page numbers in here, I also have
13  Dr. Bronars' report, a table in here, I need to
14  refer to.
15  You can have a copy of that if you would
16  like to.
17  (Witness indicating)
18  Q. We're good on that front. If you need
19  to refer to -- I'll give you a copy of those
20  when you need to.
21  We already have your report and
22  Dr. Bronars' report, which will be an exhibit.

4 (Pages 10 to 13)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

14

1          MR. TEMPLE:  Let me make sure what
2    you're --
3          MR. ROSENBLOOM:  Hang on one
4    second, Don.  I'll just clarify real quick.
5          What we have --
6          MR. TEMPLE:  Let me ask my
7    question, please.
8          MR. ROSENBLOOM:  Go ahead.
9          MR. TEMPLE:  You're telling the
10   witness that despite she has documents that she
11   is readily making available to you that you want
12   her to put those documents away instead of being
13   able to rely on them if she needs them during
14   the process of responding to your questions?
15         MR. ROSENBLOOM:  Negative.
16   That's not what I've said, Don.
17         What I asked Paige, and we had this
18   dialogue before you guys were dialing in, is
19   that she has documents, and I asked her, do you
20   want to be able to refer to them during the
21   deposition.  And she replied, I don't think I'll
22   need to.

15

1          I explained that if she does, then I
2    need to get a copy of them.
3          She said, okay, she would be fine
4    putting them aside.
5          If there's a point at which she wants to
6    refer to them, she knows that she can and we'll
7    make them an exhibit at that time.
8          There's one piece of paper that
9    Dr. Munro has that is a piece of loose-leaf
10   paper with her handwritten notes.
11         Dr. Munro has indicated that she would
12   like to be able to rely upon that and continue
13   to make notes upon it, and she's even making
14   notes upon it right now.
15         I've told her I have no objection to it.
16   And I'll get a copy of that when we conclude and
17   we'll make that an exhibit.
18         Other than that, Dr. Munro stated that
19   she wanted to be able to look at annotated
20   versions of the plaintiffs' report as well as
21   defendant's report.  I told her that that won't
22   be a problem.

16

1          We have copies of that that have already
2    been made exhibits.
3          With that in mind, I'm going to ask
4    Dr. Munro to put aside her copies of
5    those -- that's fine, you have that there, and
6    then the paper.
7    BY MR. ROSENBLOOM:
8          Q.  So Dr. Munro, based on the -- based on
9    representations from Attorney David Rose, do you
10   understand that Mr. Rose is the attorney who
11   will be defending this deposition today?
12         A.  Yes, I do.
13         Q.  You understand there may be points where
14   Mr. Rose may object to the form of a question?
15         A.  Yes, I do.
16         Q.  And do you understand that even if he
17   objects to the form of the question, after he
18   makes that objection, you would go ahead and
19   answer the question?
20         A.  I do.
21         Q.  And you would only not answer a question
22   in the instance where he advised you based on

17

1    privilege or something like that to not answer
2    the question, and then he and I might have a
3    discussion about it?
4          A.  Sure.
5          Q.  Very good.
6          So you've said that today is your first
7    time taking a deposition --
8          A.  Uh-huh.
9          Q.  -- when the court reporter swore you
10   in?
11         MR. ROSE:  For taking a
12   deposition?
13         I believe Counsel said it's the first
14   time for taking a deposition.  I think the
15   defendant is doing that in this case, in any
16   event.
17   BY MR. ROSENBLOOM:
18         Q.  So this is your first time being
19   deposed, right?
20         A.  Yes, sir.
21         Q.  Thank you.
22         The oath that you just took to tell the

olenderreporting.com  Olender Reporting                 WORLDWIDE
Washington                      Baltimore, MD                Florida

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

18

1  truth, the whole truth, nothing but the truth,
2  do you have any questions about that oath?
3      A.  No, I do not.
4      Q.  Do you understand that your testimony
5  today is being offered for all purposes under
6  the Federal Rules of Civil Procedure in this
7  lawsuit?
8      A.  Yes, sir.
9      Q.  Do you have any questions about the fact
10  that your testimony today is being offered under
11  penalty of perjury?
12      A.  No, I do not.
13      Q.  Thank you.
14         Do you have any questions for Attorney
15  David Rose before we move forward with this
16  deposition?
17      A.  I do not.
18      Q.  Thank you.
19         Based on your health condition or any
20  medicines or recreational drugs, is there any
21  reason whatsoever that you wouldn't be able to
22  distinguish between the truth and not the truth

19

1  today?
2      A.  No.
3      Q.  Any other impairments or issues that
4  would impair your ability to testify truthfully
5  today?
6      A.  No.
7      Q.  Any memory problems at all?
8      A.  No.
9      Q.  Very good.  Thank you.
10         Dr. Munro, would you please state and
11  spell out your full name.
12      A.  My full legal name is -- not including
13  my degrees or including my degrees?
14      Q.  Just your name.
15      A.  My name is Paige, P-a-i-g-e.  My middle
16  name is Alexandra, A-l-e-x-a-n-d-r-a.  And my
17  last name is Munro, M-u-n-r-o.  It's spelled
18  differently, M-u-n-r-o, no "E."
19      Q.  Has that been your full name your whole
20  life?
21      A.  It certainly has been.  I have not
22  changed my name after being married.

20

1      Q.  And you say you've never gone by any
2  other names?
3      A.  No.
4      Q.  Could you please provide your address,
5  your residential address for the record?
6      A.  40 -- it's long, Lawton Foster Road
7  South.  So that's L-a-w-t-o-n, Foster,
8  F-o-s-t-e-r, Lawton Foster Road South.  That's
9  in Hopkinton; Hopkinton, Rhode Island, 02833.
10      Q.  Is that also your business address?
11      A.  Yes.  Well, officially, yes, that's
12  where I work from.
13         We have a -- it depends which business
14  you're talking about, but we have offices in
15  Connecticut for the selection business but that
16  has been reformed in Rhode Island.
17         It's complicated.
18         So my selection business -- in short, I
19  do most -- I do work out of my home for the most
20  part, if I'm not traveling to a client.
21         Most of my work is not related to expert
22  witness stuff, actually, all except for this.

21

1      Q.  So for any business addresses that you
2  do use, would you please provide those
3  addresses?
4      A.  Sure, if I can remember them all.
5  Perform Consulting I think is PO Box 16,
6  Hopkinton, Rhode Island, 02833.
7         My new Rhode Island version of High
8  Activity Sales, another company I co-own and
9  that we sell employee -- pre-employment
10  selection tests and do validation and also
11  consult on retention and turnover, essentially
12  ensuring compliance with EEOC and no adverse
13  impact and so forth, that company, the current
14  address as we just reformed in Rhode Island is
15  PO Box 73, Hopkinton, Rhode Island, 02833.
16         I would have to look up, which I can,
17  the -- but we just reformed out of the
18  Connecticut company, because one of our partners
19  went internal with AIG as an SVP.
20         Would you like me to look up the
21  address?
22      Q.  It's something you can look up during a

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

---

**22**

1  break.
2      A.  Just remind me.
3      Q.  Well, go ahead and look it up now.
4      A.  I mean, I have it in my contacts.
5          I do this expert witness stuff, I guess
6  I filter through Perform Consulting. That's
7  just a general consulting company.
8          But under that company, it's -- that's
9  more where I do stuff like work for corporations
10 like Guardian, consulting on, again, the same
11 things.
12     Q.  So what would be the address for that?
13         Is that already provided?
14     A.  That's already -- that's provided, the
15 PO Box 16.
16     Q.  Great.
17         So there's one other business address
18 that you use?
19     A.  Yes.
20     Q.  What --
21     A.  That company has now been merged into
22 the new one, but if you need it, that's fine.

---

**23**

1          It's the former version of High Activity
2  Sales. The address was 5 River Road, Suite 141
3  is the mailing address, Wilton, W-i-l-t-o-n,
4  Connecticut, 06897.
5      Q.  Thank you very much, Dr. Munro.
6      A.  Sure.
7      Q.  Are there any other business addresses
8  that you currently use?
9      A.  I have to think about that.
10         No, I think that's it.
11     Q.  Dr. Munro, what is your date of birth?
12     A.  5/22/75.
13     Q.  Where were you born?
14     A.  British Columbia, Canada.
15     Q.  Are you a U.S. citizen?
16     A.  I am. I was naturalized when I
17 was -- well, I came to America when I was three
18 or four and I was naturalized seven years later.
19         So I'm actually not a naturalized
20 citizen; I'm a real citizen.
21     Q.  And besides the United States and
22 Canada, do you have citizenship in any other

---

**24**

1  countries?
2      A.  No, I do not.
3      Q.  You consider yourself a resident of the
4  state of Rhode Island?
5      A.  Yes, I do.
6      Q.  Have you ever lived in the District of
7  Columbia?
8      A.  I have never lived in the District of
9  Columbia.
10     Q.  Have you ever worked in DC?
11     A.  I have worked near DC, but not in DC.
12     Q.  How long have you been living in Rhode
13 Island, working backwards from your current
14 residence?
15     A.  About four years.
16     Q.  And before that?
17     A.  Four and a half maybe.
18     Q.  Before that?
19     A.  Before that Maryland. Prior to that,
20 Georgia. I move around a lot for career.
21         Do you want me to keep going?
22     Q.  Yes.

---

**25**

1      A.  Prior to that, Texas. Prior to that,
2  New York, New Jersey, both states, but basically
3  ten minutes apart, just across the river.
4          Prior to that, LA and San Diego for
5  graduate school and some work while I did
6  graduate school.
7          Prior to that, Oregon for college.
8          Prior to that, University of Hawaii for
9  my first year of college because I was on a golf
10 scholarship that I ended up giving up to focus
11 on academics.
12         Prior to that, Oregon where I went to
13 high school.
14         Prior to that, British Columbia.
15     Q.  Thank you.
16     A.  I think I got them all.
17     Q.  Do you have any relatives, familial
18 either through blood or marriage, who reside in
19 the District of Columbia?
20     A.  No.
21     Q.  How about who work for the District of
22 Columbia?

---

7 (Pages 22 to 25)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

---

**26**

1    A.  No.
2    Q.  Do you have any relatives or close
3    friends who are in any way connected to this
4    lawsuit?
5        Throughout the deposition, when I say
6    "this lawsuit," I'm referring to the
7    consolidated cases of Davis, et al., versus
8    District of Columbia and Dudley versus the
9    District of Columbia and Hunter versus the
10   District of Columbia?
11       A.  I would seriously doubt it.  I know of
12   nobody in this case.
13       Q.  Very good.  Very good.
14       With your residential, about -- working
15   backwards, about when did you get to Rhode
16   Island?
17       A.  About four and a half years ago.
18       Q.  So that -- so we're talking in years,
19   2010 maybe?
20       A.  That sounds about right.
21       Q.  And so then -- you came from Maryland
22   and about when did you get to Maryland?

---

**27**

1        A.  I was there for a little less than a
2    year, because I got pregnant with my husband and
3    we decided to move to Rhode Island, so I left my
4    job.
5        Q.  So would that be around 2009 maybe?
6        A.  Something like that, yeah.
7        Q.  And how about Georgia?  When would you
8    say you got to Georgia?
9        A.  That was about for two years prior to
10   that, about two years.
11       MR. ROSENBLOOM:  There are beeps
12   coming in on the phone and that's going to
13   happen.  As long as Mr. Rose is here to defend
14   the deposition, that's fine.
15       THE WITNESS:  That often means
16   sometimes that somebody drops off.
17   BY MR. ROSENBLOOM:
18       Q.  About when did you get to Texas?
19       A.  Well, I was in Georgia for two years, so
20   go back two years from that.
21       Q.  So maybe Georgia around 2007 and Texas
22   around 2005?

---

**28**

1        A.  No, I think we're off now somehow.  I
2    don't know how.
3        But the time -- I think I moved to Texas
4    around 2006 or 2007.
5        And then prior to that, I was in New
6    York, New Jersey for like seven years, I moved
7    to -- this is where I start knowing it.
8        I moved to New York City -- I can be
9    specific here -- May 2000 because I was in the
10   third year of my Ph.D.
11       Q.  Very good.
12       A.  And then prior to that was in southern
13   California between the two areas for about -- my
14   master's and my Ph.D., so four years, because I
15   moved during my third year of my Ph.D. to New
16   York.
17       Prior to that, I was in Oregon for three
18   years, maybe two and a half years, since I
19   finished college early.
20       Prior to that, Hawaii for a year.
21       Prior to that, Oregon for 18 years.
22       I'm sorry, 18 years minus the time in

---

**29**

1    Canada.
2        That covers it.
3        Q.  That's very good.
4        As another prefatory note, I forgot to
5    mention, today if there comes a point where you
6    need to take a break to use the restroom, you
7    also mentioned you have a parking meter you
8    might need to refill --
9        A.  Yes.
10       Q.  -- so that's fine.
11       I'll just ask that we don't take a break
12   if there's an open question, but otherwise --
13       A.  Of course.
14       Q.  -- if you need to take a break or if I
15   do or the court reporter does, we'll break at
16   that time.
17       A.  Sure.
18       Q.  All right.  I'm going to ask you to take
19   a look at --
20       A.  Can I ask a question?
21       Q.  Sure.
22       A.  As you ask me questions, can I be

---

8  (Pages 26 to 29)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

30

1   writing notes? Because you don't want me to
2   interrupt you.
3       Q.  No, that's fine, if it would help
4   you --
5       A.  Are you going to take that from me then?
6       Q.  So let's try to not speak over each
7   other.
8       A.  Sorry.
9       Q.  If you want to be able to write down
10  notes to yourself during the deposition, you
11  have -- that is absolutely fine with me.
12      Yes, as matter of course under the
13  Federal Rules of Civil Procedure, any notes that
14  you make or rely upon during the deposition
15  would then be something that we would make a
16  photocopy of and then we would make that part of
17  the record.
18      A.  Sure.
19      Q.  So let's -- I'm going to ask you to take
20  a look please at what's been marked as Exhibit 1
21  for today's deposition.
22      It says -- at the top, it has the style

---

31

1   of the Davis case, Davis and Dudley, and it
2   says, "Defendant's Revised Notice of Deposition
3   Duces Tecum."
4       A.  Uh-huh.
5       Q.  Do you recognize this document?
6       A.  I do.
7       Q.  Very good.
8       And have you received a copy of this
9   document?
10      A.  I have.
11      Q.  When did you receive a copy of this
12  document?
13      A.  Yesterday.
14      Q.  Very good.  Thank you.
15      Did you receive -- now you can hand that
16  back to me. I'll try to do housekeeping here so
17  you end up with a stack of exhibits, and then
18  when I need you to refer to an exhibit, I'll
19  hand it back to you.
20      A.  Do you have extra copies of those things
21  I haven't seen that I need to underline or
22  something?

---

32

1       Q.  I would provide you copies of things
2   that you need as we go.
3       A.  Great.
4       Q.  I'm going to ask you to take a look,
5   please, at Exhibit No. 2, which is an e-mail
6   chain.
7       Take a brief look at that.
8       A.  (Witness reviews document.)
9       Okay.
10      Q.  Have you had a moment to review it?
11      A.  Yes.
12      Q.  And you recognize the e-mails in there?
13      A.  Yes.  I just want to make sure I read
14  through all of them.
15      Q.  Sure.
16      A.  (Witness reviews document.)
17      Yes.
18      Q.  Very good.
19      Looking at that e-mail, that contains an
20  e-mail chain between yourself and myself and the
21  lawyers in this case, including Mr. Rose.
22      The e-mail that's on there, do you

---

33

1   recognize that as your e-mail address?
2       A.  Yes, sir.
3       Q.  Thank you.
4       And that's -- I'll spell it out,
5   d-r-p-a-i-g-e-m-u-n-r-o, drpalgemunro@gmail.com?
6       A.  Yes, sir.
7       Q.  Thank you.
8       Let's take a look at Exhibit 3, which is
9   a copy of your CV which we received through
10  Mr. Rose.
11      Take a moment to review that, please.
12      A.  Can I compare it to the one I brought
13  you to make sure it's -- even though the one I
14  brought you really is not the most updated?
15      Q.  Sure.
16      A.  Actually, no, you have the most updated
17  one.
18      Q.  Great.
19      A.  There's one thing not on here, because
20  it just happened, the engagement with Guardian.
21      Q.  The engagement with Guardian, let's talk
22  about that --

---

9 (Pages 30 to 33)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

**34**

1    A.  Sure.
2    Q.  -- real quickly.
3    A.  Sure.
4    Q.  I have another copy of it in front of
5  me, and we're talking about Exhibit 1.
6    A.  Uh-huh.
7    Q.  Where on your CV should the engagement
8  with Guardian go?
9        Is it a place of employment?
10    A.  No, it's another consulting job.
11       So I own High Activity Sales and operate
12  that.  That's one business.
13       And then I also provide consulting
14  through Perform Consulting to a variety of
15  companies and that's where I'm running this
16  from, this expert witness stuff through, because
17  I don't do this usually.
18       But basically, from the internal side
19  where I'm protecting companies against lawsuits,
20  that's -- I consult for the company.
21       So meaning Guardian is putting together
22  a master services agreement.  I took over a

---

**35**

1  project for the --
2    Q.  Hang on.  I want to interrupt you for a
3  quick second.
4        Tell me the full name for this company
5  Guardian?
6    A.  It's Guardian Financial, Guardian Life
7  Insurance, whatever; it's the company.
8    Q.  And you particularly work for Guardian
9  Financial --
10    A.  I am -- I took over a consulting project
11  for a person named Dr. John Stout, because he
12  went internal.  We were working on the project
13  together.  It's been going on for four years.
14       We were essentially their go-to external
15  consultants for everything, statistics,
16  selection, retention, adverse impact, avoiding
17  that, protecting the company, making sure the
18  right hires come in, the right people are
19  retained.
20       Long story short, he went internal as an
21  AIG SVP.  So he had to turn the project over to
22  me because of conflict of interest.

---

**36**

1        Now, we're doing -- the master services
2  agreement is currently under his name.  It's
3  being done under my name, but I have taken over
4  that project, so I am now basically his go-to.
5    Q.  Thank you.
6        Where is that company based out of?
7    A.  In New York.
8        You've heard of Guardian Life Insurance,
9  right?
10    Q.  How long have you been working for
11  them?
12    A.  Well, I've been subbed -- I
13  subcontracted through JD Stout Consulting, which
14  has now been dissolved because he's internal to
15  AIG.
16       But about four years, it was a -- do you
17  want to know the nature of the project?
18    Q.  No, no, no.  It doesn't relate to this
19  litigation.
20    A.  Oh, it does actually because I'm hired
21  as a statistical expert.
22    Q.  You are hired as a statistical expert

---

**37**

1  for them?
2    A.  Yes.
3    Q.  So we will come back to that as we go
4  through your CV --
5    A.  Sure.
6    Q.  -- thoroughly, but let's just -- so
7  that's Guardian Financial --
8    A.  Can I refer to that --
9    Q.  Hang on a second.
10       We're going to try to not talk over each
11  other.  I know it's tough.
12    A.  Okay.
13    Q.  So for about four and a half years,
14  you've been working and you've been doing
15  contract work for them --
16    A.  About three and a half.
17    Q.  About three and a half?
18    A.  Yeah, three and a half to four.  My son
19  was about nine months when I started.
20    Q.  And so I know you know that that is not
21  on Exhibit 3.
22       Do you have another version of your CV

---

10 (Pages 34 to 37)

38

1  that that is on?

2      A. No, it is. It's "Top U.S. Financial

3  Services Company."

4      Q. So it's the first one there?

5      A. Yeah, it's not -- it's not typical in my

6  field to name your clients, except for when you

7  are like on a public record.

8      Q. Besides Guardian Financial, which you do

9  have listed on here, you just haven't spelled

10  out the word "Guardian," but it's the first

11  issue on the first page, "Top U.S. Financial

12  Services Company."

13      And besides that, is there anything else

14  that is not up to date about --

15      A. No.

16      Q. -- your CV?

17      A. No.

18      Q. Exhibit 3 is an up-to-date version of

19  your CV?

20      A. Yes.

21      Q. Fantastic. I can take that back from

22  you.

39

1      A. Sure.

2      Q. I'm going to hand you briefly a copy of

3  Exhibit 4, which is Plaintiffs' Third Amended

4  Complaint.

5      Take a brief look at that and tell me if

6  you're familiar with this document.

7      A. I don't know if I -- if I did, it was

8  years ago. I don't know if I've ever seen this.

9      Can I read it, though?

10      Q. I'll get -- I don't have any questions

11  for you about it right now. So I'll give you an

12  opportunity to look at it if I ask you any

13  questions.

14      But for right now, I just want to get

15  through the exhibits.

16      A. Because I may want to refer to any

17  document that I haven't seen based on some of

18  the questions you might ask me.

19      Q. Certainly. Any document that I ask you

20  about today, I'll have a copy for you to refer

21  to while I'm asking you about it.

22      A. Okay.

40

1      Q. Let's move on to Exhibit 5. I'm going

2  to ask you if you recognize Exhibit 5, which is

3  the Rule 26(a)(1) disclosures received, signed

4  by Attorney Joshua Rose and dated April 18th,

5  2013.

6      So I'm going to hand it to you.

7      Dr. Munro, simply look at it and then

8  tell me if you've seen it before. That's all

9  I'm wondering.

10      A. (Witness reviews document.)

11      No. I don't know why I would have.

12      Q. Thank you. You can hand that back to

13  me.

14      Let's move on to Exhibit 6, which I

15  believe you have seen, but just to confirm, take

16  a look at this.

17      This is the report of Dr. Stephen

18  Bronars, expert for defense in this case.

19      A. Yes, I have certainly seen this.

20      Q. Thank you, Dr. Munro.

21      Exhibit 7 I will note is your most

22  recent -- your most recent report, the report of

41

1  Dr. Munro filed by Mr. Rose on May 13th, 2014.

2      If you would just please confirm that

3  that is your most recent report.

4      A. (Witness reviews document.)

5      I would have to look through the entire

6  thing, but the only thing that would have

7  changed is typos and stuff.

8      Q. That's fine.

9      I'll represent to you that it has the

10  court's PACER filing stamp at the top. This is

11  Document No. 93 from the docket of the case --

12      A. Okay.

13      Q. -- of your report.

14      A. Okay.

15      Q. Now, I'm going to ask you about Exhibit

16  No. 8.

17      Tell me if you recognize this, if you've

18  seen it before.

19      MR. ROSENBLOOM: And counsel, I

20  have handed Dr. Munro a copy of -- Exhibit 8 is

21  Defendant's Second Request for Production of

22  Documents, which my office propounded on

42

```
1        June 16th, this month -- last month, 2014.
2            A.  I don't know why I would have seen it.
3    It's a legal document.
4    BY MR. ROSENBLOOM:
5        Q.  Thank you.
6            So you have not seen that before?
7        A.  No.
8        Q.  Thank you very much, Dr. Munro.
9            Same question for Exhibit 9.  Exhibit 9
10   is a copy of our third set of interrogatories
11   propounded at the same time as the previous
12   exhibit.
13       A.  (Witness reviews document.)
14           As I said --
15       Q.  Have you seen that before?
16       A.  -- as I said, why would I have seen
17   this?
18       Q.  That's fine.
19           You have not?
20           MR. ROSE:  Is that in -- is that
21   exhibit in June or --
22           MR. ROSENBLOOM:  Correct, June
```

43

```
1    16th we propounded that.
2            MR. ROSE:  Thank you.
3            MR. ROSENBLOOM:  Sure.
4            THE WITNESS:  I haven't -- why
5    would I see that?  I don't know why I would have
6    seen those.
7            I don't recall seeing them.
8            Should I have seen them?
9    BY MR. ROSENBLOOM:
10       Q.  Don't worry about that.  That's fine.
11           Exhibit 10, I'm going to ask you if
12   you've seen this document before.  It's just the
13   same -- it's a simple yes-or-no question.
14           Exhibit 10 is plaintiffs' response to
15   defendant's first set of interrogatories.
16   Response to Interrogatories it's titled.  And
17   that is signed by Joshua Rose but it is not
18   dated.
19       A.  That would have been a -- I have no
20   idea.  No.
21       Q.  Dr. Munro, you have not seen this?
22       A.  I have not.
```

44

```
1        Q.  Thank you.
2            Dr. Munro, do you recognize Exhibit 11?
3        A.  Yes.  I wrote it.
4        Q.  Exhibit 11 is your first expert report
5    tendered in this matter --
6        A.  Yes.
7        Q.  -- titled "Reduction in Force and Age
8    Differential Analysis," correct?
9        A.  Yes, Race and Age Differential Analysis.
10       Q.  Race and age?
11       A.  Yes.
12       Q.  Thank you.
13       A.  I thought there was a word missing
14   there.
15       Q.  I have one more question.
16       A.  Sure.
17       Q.  Could you tell me with respect to
18   Exhibit 11, I don't see on here a signature from
19   you or a date on it.
20           Would you confirm that you don't see
21   that in Exhibit 11?
22       A.  I signed an affidavit at the same
```

45

```
1    time.
2        Q.  But it's -- it's not on here?
3        A.  No.
4        Q.  Correct?
5        A.  No.  I submitted them together, though.
6        Q.  Thank you very much.
7        A.  I didn't -- I didn't know the
8    procedures.
9        Q.  So that was Exhibit 11.
10           Exhibit 12 is just another e-mail chain
11   between my office and plaintiffs' counsel and
12   you.
13           Let me hand you Exhibit 12 and tell me
14   if you recognize it.
15       A.  Sure.
16           (Witness reviews document.)
17           Yes, I was looking for confirmation.
18       Q.  Thank you very much.
19           And the e-mail address on there for
20   drpaigemunro@gmail.com is --
21       A.  Yes.
22       Q.  -- your e-mail?
```

12  (Pages 42 to 45)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                              7/3/2014

46

1    A. Yes.
2    Q. Thank you.
3    And also Exhibit 13 is an e-mail
4    chain -- excuse me.
5    It's just one e-mail from me to
6    plaintiffs' counsel and I copied you on it.
7    If you would just tell me if you
8    recognize this and if you've seen it before.
9    A. (Witness reviews document.)
10   Uh-huh.
11   Q. You have?
12   A. Yes, I have.
13   Q. Thank you very much.
14   And that's your e-mail address on there,
15   drpaigemunro@gmail?
16   A. Yes.
17   Q. We're almost done with the exhibits.
18   Exhibit 14, tell me if you've seen this
19   before.
20   This is on the docket, Document 25-3.
21   It's the declaration of Stan Spaght.
22   A. I've seen it. I don't have to look at

47

1    it. I already know.
2    Q. Fantastic. Thank you.
3    A. Yeah.
4    Q. And Exhibit 15 is the declaration --
5    A. I have not seen that one and I would
6    like to read it.
7    Q. -- of Dexter -- I don't need you to read
8    it now, but take a quick look at it and confirm
9    that you have seen it before.
10   A. I have never seen this, no.
11   Q. Thank you very much.
12   A. I would like to read it, though.
13   Q. I will hand it back to you if there's a
14   point where I have a question for you.
15   A. (Witness reviews document.)
16   Oh, yeah, this is...
17   Q. Thank you.
18   And the final exhibit, Exhibit No. 16,
19   is the declaration of Raymond Davidson?
20   A. Where is the Porchia Smith declaration?
21   Q. I don't want to be rude, Dr. Munro, but
22   I ask the questions --

48

1    A. I apologize.
2    Q. -- and you answer the best you can.
3    A. Yes, I have seen this.
4    Q. You have seen that?
5    A. Yes, I have. I refer to it in my second
6    report.
7    MR. ROSENBLOOM: Thank you so
8    much.
9    Counsel, those are all the 16 reports.
10   I don't know if you were keeping track, but do
11   you need me to -- the 16 exhibits.
12   Do you need me to go over which one is
13   which exhibit for your records?
14   MR. ROSE: I think we're -- I
15   don't think it's essential.
16   MR. ROSENBLOOM: Don, are you
17   good?
18   MR. TEMPLE: I'm good. I'm
19   following.
20   MR. ROSENBLOOM: Thank you.
21   MR. TEMPLE: Thank you for asking.
22   BY MR. ROSENBLOOM:

49

1    Q. All right. Let's turn back to your CV,
2    Dr. Munro, which is -- I'm going to hand this
3    back to you so you can look at it. This is
4    Exhibit No. 3.
5    I've handed Dr. Munro a copy of Exhibit
6    3, which is her CV.
7    We talked briefly about Guardian, which
8    your -- which you said is on the first page and
9    that's what you referred to as "Top U.S.
10   Financial Services Company," correct?
11   A. Uh-huh.
12   Q. Your work here in this case for
13   plaintiffs you're performing pursuant to Perform
14   Consulting, that company?
15   A. Uh-huh. Yes.
16   Q. Thank you.
17   And Perform Consulting, according to
18   your CV, is a company that you have been working
19   for since November of 2004?
20   A. Yeah, I use it for -- 2004. Yeah, it
21   used to be in New Jersey and then I reformed in
22   Rhode Island, and I've done it on and off since

13 (Pages 46 to 49)

50

1    2004.
2         But 2004, yeah, that's when I left
3    MetLife.
4         Q.  That's when you --
5         A.  Left MetLife.
6         Q.  -- left MetLife?
7         A.  Yes.
8         Q.  Thank you.
9         Have you performed any work in this
10   lawsuit under any other company besides Perform
11   Consulting?
12        A.  No.
13        Q.  And Perform Consulting is currently
14   incorporated in Rhode Island?
15        A.  Yes.
16        Q.  Is that -- is the full name Perform
17   Consulting, LLC?  Perform Consulting, Inc.?
18        A.  I want to say Perform Consulting, LLC.
19        Q.  And besides you, are there any other
20   owners or shareholders?
21        A.  No.  I don't -- I think when I was in
22   New York, New Jersey, you needed to have two

51

1    people, so my mom had like a .0-whatever share.
2         The accountant set it up, but I think
3    it's sole now.
4         Q.  Do you have any partners in Perform
5    Consulting?
6         A.  No.
7         Q.  Do you have any employees besides
8    yourself?
9         A.  No.
10        Q.  Do you have any independent contractors?
11        A.  Yes.
12        Q.  How many independent contractors?
13        A.  It depends on the project and the time.
14        Q.  But no other full-time employees?
15        A.  No.
16        My full-time job is the selection
17   business.  And this business has been, like I
18   said, it's been full time for a lot of the years
19   and then part time some of the years.
20        Q.  I follow you.
21        A.  It's all work that basically I have to
22   do for the most part where I can sub some stuff,

52

1    but it's mostly my work.
2         Q.  But when you say "the selection
3    business," in that case, when you say "selection
4    business," you're referring to High Activity
5    Sales, LLC?
6         A.  Yeah, it's -- I may refer to all of my
7    work or some of this work as selection business,
8    but actually what I mean is everything I owe
9    from recruiting, selection, retention, turnover,
10   from the standpoint of best practices of tool
11   developments, like interview guide developments,
12   job analysis, comparing jobs, doing validation
13   studies, ensuring there's no adverse impact,
14   doing statistical data mining.
15        It's -- I work for large companies,
16   essentially protecting them against lawsuits in
17   selection, the management of them and retention
18   and turnover.
19        Q.  So you have listed here -- thank you for
20   that.
21        A.  Uh-huh.
22        Q.  So for High Activity Sales, LLC, you

53

1    have listed that as CT, which I presume you're
2    saying is a Connecticut-based company?
3         A.  Yes.  It's now Rhode Island, though.
4         Q.  So it's now in Rhode Island?
5         A.  Yes.
6         Q.  When did you transfer that from being
7    Connecticut to Rhode Island?
8         A.  Just a couple of weeks ago when the
9    owner or when my prior partner went internal at
10   AIG.
11        Q.  And have you reincorporated in the state
12   of Rhode Island?
13        A.  Yes, I have.
14        Q.  You have?
15        A.  Yes.
16        Q.  And do you have a partner --
17        A.  Yes.
18        Q.  -- you do have a partner for High
19   Activity Sales?
20        A.  Yes.  It was the person we were
21   subcontracting to prior.  I made her a partner
22   when John went internal to AIG.

14  (Pages 50 to 53)

54

1    Q. Have you done any work in this lawsuit
2 under High Activity Sales?
3    A. No, no, no.
4    Q. All of the work you have done has been
5 under Perform Consulting?
6    A. Yes. Perform Consulting is just an
7 umbrella for anytime I do consulting work.
8    Q. Very good. Thank you.
9       Have you ever done any other work for
10 Attorney David Rose or his son Attorney Josh
11 Rose?
12    A. Yeah, I worked on one other case.
13    Q. You worked on one other case for them?
14    A. Yes.
15    Q. What case was that?
16       THE WITNESS: Dave, am I allowed
17 the tell him?
18       MR. ROSENBLOOM: I'm -- I'm going
19 to interrupt here.
20       Well, you know what, Dave, I don't have
21 a problem with you advising her. She's asking
22 you a question. Go for it.

56

1    A. He would know.
2    Q. Do you -- that's fine.
3       Do you remember what court that case was
4 in?
5       Federal court?
6    A. I'm guessing DC Federal Court.
7    Q. Very good.
8       So you never had your deposition taken
9 in that case?
10    A. No.
11    Q. Did you submit an expert report in that
12 case?
13    A. Yes.
14    Q. You did?
15    A. Yes.
16    Q. How many expert reports did you submit
17 in that case?
18    A. One that was about this thick.
19       (Witness indicating.)
20    Q. Do you know or recall what the style of
21 the case was; the name of the case?
22    A. No.

55

1       MR. ROSE: I don't have any -- I'm
2 sorry.
3       I don't have any objection to you
4 telling him that.
5       THE WITNESS: It's a case against
6 Library of Congress.
7       MR. ROSE: Oh, okay. All right.
8 BY MR. ROSENBLOOM:
9    Q. Is that case still pending?
10    A. I have no idea. I think so. I worked
11 on that about four years ago and I don't know
12 what's gone on with it.
13    Q. Besides Mr. Rose, did you work for any
14 other attorneys on that case?
15    A. Josh Rose.
16    Q. Josh Rose?
17    A. Yes.
18    Q. So David Rose and Josh Rose you worked
19 for on that case?
20    A. Yes.
21    Q. And you're not sure if it's still
22 pending?

57

1    Q. You don't?
2    A. No. Sorry.
3       MR. ROSENBLOOM: Counsel?
4       MR. ROSE: Yes.
5       MR. ROSENBLOOM: We can -- I can
6 give that to you later at some point if you
7 wish.
8       MR. ROSE: Thank you very much.
9       THE WITNESS: It's like on the tip
10 of my tongue, but I can't get it.
11 BY MR. ROSENBLOOM:
12    Q. That's fine.
13       Since you said it involved the Library
14 of Congress, let's just refer to it as the
15 Library of Congress case.
16    A. Sure.
17    Q. Is that good?
18    A. Sure.
19    Q. In the Library of Congress case, were
20 you paid for your expert work?
21    A. Yes.
22    Q. And what type of lawsuit was that

15 (Pages 54 to 57)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

58

1       Library of Congress case?
2       A.  Class action.
3       Q.  Class action.  Was it also an
4    employment --
5       A.  Yes, it was a little different, though.
6    It wasn't a RIF.
7           It was pay disparity.  It was promotion
8    disparity, things like that.
9       Q.  Was that -- in that case, did it involve
10   allegations on the basis of age, on the basis of
11   race?
12          What were the discriminatory
13   allegations?
14      A.  I think it was just race.  It's been a
15   while.
16          Sorry.
17      Q.  That's fine.
18      A.  I didn't know I had to prepare for that.
19      Q.  You should just answer the questions the
20   best you can.  I appreciate it.
21          Besides the Library of Congress case,
22   -- well, before we move on from that, would you

59

1    please tell me how you billed in that case?
2           In other words, did you bill an hourly
3    rate, did you --
4       A.  (Witness nodding.)
5       Q.  You're nodding yes --
6       A.  Yes.
7       Q.  -- you billed an hourly rate?
8       A.  Yes, I think I did, although at one
9    point we might have done a flat fee.  I don't
10   really remember.
11          I know I started that -- I met Josh Rose
12   through an acquaintance and at one point, we
13   just were talking and he randomly asked if I did
14   statistics.
15          And I'm like, yes.
16          So it sort of was by happenstance sort
17   of working on that case.
18          And I think I was billing him hourly,
19   but there was a good chunk of work that was a
20   lot bigger project, so I might have gone flat
21   fee at some point.  I don't remember.
22      Q.  Approximately how much total were you

60

1    paid for your work on the Library of Congress
2    case?
3       A.  God...
4       Q.  The best approximate that you can
5    provide.
6       A.  It was a lot of hours and a lot of time.
7           I want to say like somewhere around 20-,
8    25,000.  Over about six months to a year,
9    though.
10      Q.  Thank you.
11      A.  So that's the best as I can recall.
12   Sorry.
13      Q.  No, that's fine.  Thank you.
14          As of today, do you have any outstanding
15   bills or do you expect to be paid any more for
16   your work on the Library of Congress case?
17      A.  No.  I haven't done anything on that in
18   a good year or more; two years.
19      Q.  Besides the Library of Congress case and
20   this case, are you currently serving or
21   consulting as an expert in any other lawsuits?
22      A.  No.  I originally thought I wanted to do

61

1    that stuff, but I got too busy with my regular
2    stuff.
3       Q.  I understand.  Thank you.
4           And in this current lawsuit -- well,
5    we'll come back to that.
6           Let's turn back to your resume for a
7    brief moment, okay?
8       A.  Sure.
9       Q.  So you have a very, very thorough CV.  I
10   appreciate that.
11          Real quickly, just to note, the PO box
12   at the top of your CV is the PO box that you
13   provided earlier, correct?
14      A.  For Perform Consulting, yeah.
15      Q.  Very good.
16          I see you still have an Atlanta area
17   cell phone number.
18      A.  Yeah.  I got rid of my New York one.
19   I'm mad I did.
20      Q.  Under "Education," would you please take
21   a quick look there and confirm that all of your
22   education-related credentials on your CV are

16  (Pages 58 to 61)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

---

62

1    accurate.
2        A.  No, I didn't update it with my JD.
3        Q.  So could you please tell us about your
4    law school experience, where are you attending
5    and when do you expect to graduate?
6        A.  I graduated.  I graduated on May -- it
7    just says 5/14, so May 2014.  I think it was the
8    16th or the 21st or something.
9        Q.  May 2014?
10       A.  Yes.
11       Q.  Congratulations.  You're a recent
12   graduate.
13       A.  Thank you.
14       Q.  Where did you attend law school?
15       A.  I went to Roger Williams Law School.
16       Q.  Very good.
17       A.  Would you like my rank and GPA?
18       Q.  No, that's quite all right.
19       A.  Can I put it on the record anyway?
20       Q.  That's okay.  You can go ahead and set
21   your transcript aside.
22           Dr. Munro referred to a printout of her

---

63

1    transcript.  I don't think we need that.
2           So you graduated just this year from
3    Roger Williams Law School?
4        A.  (Witness nodding.)
5        Q.  Obviously, you did quite well.
6        A.  (Witness nodding.)
7        Q.  Are you studying for the bar right now?
8        A.  I am, sort of, when I have time with all
9    the other work I have.
10       Q.  As long as you find a little time.
11       A.  I graduated summa, so I'm pretty
12   confident that I can get by.  So...
13       Q.  Are you scheduled to take the bar exam
14   this July?
15       A.  Both Massachusetts and Rhode Island,
16   yes.
17       Q.  Very good.
18           And both of them -- both exams this
19   July?
20       A.  Yes.
21       Q.  Very good.
22           Currently, are you -- I know you said

---

64

1    you're not consulting as an expert in any
2    litigation.
3        A.  No.
4        Q.  Are you currently working as a paralegal
5    or a law clerk or with any law firm doing legal
6    work --
7        A.  No.
8        Q.  -- or any kind of work?
9        A.  No.
10       Q.  Is there any legal work that you have
11   done, either through law school or at any point,
12   that is not on your current CV?
13       A.  Yeah.  I have a different law resume,
14   but the only difference is that I worked as an
15   internship as a legal clerk for the Motley Rice
16   law firm.
17       Q.  Where is that law firm based?
18       A.  About two blocks down the road.
19       Q.  So here in Providence, Rhode Island?
20       A.  Yeah.
21       Q.  Very good.
22           But you don't work for them currently?

---

65

1        A.  No, no.  It was just a summer clerkship
2    that the school encourages you to do that stuff.
3        Q.  Sure.
4           So you had a summer clerkship at a Rhode
5    Island firm?
6           Any other legal work?
7        A.  Basically --
8
9           (Disruption in telephone.)
10
11          MR. ROSENBLOOM:  Let's go off the
12   record for a quick second.
13
14          (Off-the-record discussion.)
15
16   BY MR. ROSENBLOOM:
17       Q.  Dr. Munro, besides the Providence, Rhode
18   Island firm where you did a clerkship, any other
19   legal work that you've done that's not on this
20   version of your CV?
21       A.  Nothing paid, no, and nothing that would
22   be really substantive.

---

17 (Pages 62 to 65)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

66

1     It was more I volunteered to do like one
2  day a week at a couple different law firms doing
3  research, and just like I said, to have
4  something on my resume.
5     Q.  Very good.
6        Did any of that work involve employment
7  discrimination litigation?
8     A.  No.
9     Q.  Have you ever done any legal work for
10  Attorney David Rose or Attorney Josh Rose?
11    A.  Legal work?  No.
12    Q.  And let me see if I have any other
13  questions for now about your CV.
14    A.  Sure.
15    Q.  Let's turn back to the front page on
16  your -- I'm sorry, let's stick with education.
17  Excuse me.
18    A.  Okay.
19    Q.  So you have numerous education
20  attainments here?
21    A.  Uh-huh.
22    Q.  Your undergraduate, your master's and

67

1  then your master's and Ph.D.
2     A.  Uh-huh.
3     Q.  For any portion of your post-secondary
4  education --
5     A.  Uh-huh.
6     Q.  -- have you ever faced any type of
7  honors violation or honors code charges?
8     A.  No.
9     Q.  Have you ever been accused of
10  plagiarism --
11    A.  No.
12    Q.  -- or anything like that?
13    A.  No no.
14    Q.  As you sit here today, with respect to
15  your work as a scholar, are you currently facing
16  any allegations --
17    A.  No.
18    Q.  -- of plagiarism?
19    A.  No.
20    Q.  Have you ever been accused of that?
21    A.  No.
22    Q.  That's a good thing.

68

1     A.  Yes.  I would hope so.
2     Q.  I think so.
3        In terms of your educational
4  institutions, besides maybe doing --
5  participating in alumni groups or receiving
6  alumni e-mails, do you have any ongoing
7  connections with any of these institutions of
8  higher learning?
9     A.  No.
10    Q.  Do you currently serve or have you
11  served as an adjunct professor or professor with
12  any school?
13    A.  A long time ago for University of
14  Phoenix.
15    Q.  And in what discipline did you serve?
16    A.  It says here, business and psychology.
17  I vaguely remember it.
18    Q.  And what do you consider --
19    A.  Oh, and then the naturopathic school.  I
20  was helping them with statistics.
21    Q.  Excellent.
22        Do you consider yourself to be an

69

1  industrial organizational psychologist?
2     A.  Yes, sir.  I consider myself more on the
3  industrial side, which is more the individual
4  and the statistics side.
5        But yes, my full title would be that.
6     Q.  Would you also consider yourself a
7  statistician?
8     A.  Oh, yeah, and a psychometrician.
9  Psychometrician, statistician, those are the two
10  that are specialized for what I do.
11    Q.  Very good.
12        You and I are fast talkers, so we have
13  to try to slow it down.
14    A.  All right.
15    Q.  Turning back to the first page of your
16  resume, besides the work that you're currently
17  doing for the top three companies, and we've
18  talked about the top three companies, that is
19  High Activity Sales and Perform Consulting.
20    A.  Uh-huh.
21    Q.  And then Top U.S. Financial Services
22  Company, which is Guardian Financial?

18  (Pages 66 to 69)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

70

1    A.  Yes, sir.
2    Q.  Are any of the other -- do you have any
3  other employers, any other current employers
4  right now?
5    A.  No, sir.
6       Wait, let me think about that to make
7  sure that's accurate.
8       I'm thinking through the consulting
9  work.
10       And stuff that's -- no, no, no, no, no,
11  nothing.
12    Q.  So under the title on the first page,
13  "Examples of Midterm Consulting Projects," and
14  then following about two-thirds of the way down,
15  it says "Examples of Short-term Consulting
16  Projects," do I understand your testimony is
17  that only that first example, Top U.S. Financial
18  Services Company, is currently ongoing and
19  everything else is completed work in the past?
20    A.  Yes, sir.
21    Q.  Thank you very much.
22       Is the work that you currently do in

71

1  High Activity Sales and Perform Consulting is
2  any of that work done for any law firm --
3    A.  No.
4    Q.  -- besides this case?
5    A.  No.  They're done internally for large
6  corporations to protect against lawsuits.
7    Q.  And tell me a little bit -- I want to
8  ask you about that work --
9    A.  Sure.
10    Q.  -- broadly.
11    A.  Sure.
12    Q.  So you noted that part of your work is
13  for corporations to help insulate from lawsuits,
14  correct?
15    A.  Yes.
16    Q.  Can you tell me about what that work
17  entails?
18    A.  So for -- let's go from the more -- like
19  more directly related to the lawsuit to the less
20  directly related.
21    Q.  Sure.
22    A.  So the most directly related example

72

1  would be at MetLife after a lawsuit --
2    Q.  I'm going to politely ask you to just
3  slow down a bit.
4    A.  Sorry, sorry.
5    Q.  That's okay.
6    A.  At MetLife there was a lawsuit.  There
7  was consent decree.  And I had to implement fair
8  selection and promotion tools.
9       So I was participating in the consent
10  decree.
11    Q.  And that was on behalf of MetLife?
12    A.  Yeah, as an internal employee, yes.
13    Q.  You were an internal employee?
14    A.  Yes, yes.
15    Q.  Thank you.
16    A.  Then less directly, for example,
17  Verizon, quite related to this situation, there
18  was a large RIF, and part of my work was to
19  analyze that ahead of time and ensure that there
20  was going to be fairness in it and also that
21  there was job relatedness, meaning you're truly
22  getting rid of positions that were overlapping

73

1  and not necessary and there was going to be no
2  adverse impact by the RIF.
3    Q.  Very good.
4       For a clear transcript, we're referring
5  to a RIF here, a reduction in force?
6    A.  Reduction in force.
7       Sorry, sorry.
8    Q.  No, that's fine.
9    A.  Then --
10    Q.  Can you tell me the approximate times
11  and dates -- not exact dates, but years that you
12  were working for Verizon on that RIF?
13    A.  I have it on my resume.
14       I shortened this, so it's not on here
15  anymore.
16       But basically -- actually, it might be a
17  part of one of these.
18       Essentially, when we -- not "we," I'm
19  not there anymore.  But there was a merger
20  between GTE and Bell Atlantic, and I was there
21  during that time.
22       So I'm going to say that was towards the

19 (Pages 70 to 73)

74

1  end of it.

2      Q.  And as you're looking at the CV, which

3  portion of your CV are you referring to for the

4  Verizon work on the RIF?

5      A.  That was just a small part of my job. I

6  did a lot of stuff related to --

7      Q.  It looks like you are on Page 3?

8      A.  Yeah, I'm on the -- yeah, Page 3, the

9  top of Page 3.

10     Q.  So the top of Page 3, "Verizon Corporate

11  Headquarters."

12         So this is work that you performed

13  between June 1999 and September 2001?

14     A.  Yes, while I was prepping for and

15  defending my dissertation.

16     Q.  Very good.

17         Besides the work that you did with

18  Verizon in that time frame --

19     A.  Uh-huh.

20     Q.  -- when else have you worked with a

21  company as a consultant or an employee on a

22  reduction in force?

75

1      A.  Let's see here.

2         Not large-scale RIFs, but

3  individual -- not individual, but assessments of

4  termination trends is very important.

5         I do -- I've done that in every job.

6         Mining data to ensure from a business

7  standpoint that you're not losing your top

8  performers but also that you are not

9  disproportionately losing minorities or

10  protected classes.

11        So that's pretty much a portion of what

12  I -- like I try to explained, I don't know if we

13  were on the record yet, as a psychologist, all

14  of my internal jobs and a good number of my

15  consulting is everything ensuring top hires,

16  like the best-qualified people, so recruiting

17  and selection; ensuring that the management

18  and -- and that there's fairness in that

19  process.

20        Ensuring there is no adverse impact;

21  there's job-relatedness, meeting validity

22  coefficients with every test or instrument used

76

1  you use; your hiring decisions are based on

2  quality job analyses and job descriptions.

3         Everything grows out of your job

4  description and your performance management

5  should track with that. It's all to avoid

6  unfairness and also to ensure everything is

7  merit based.

8         And then in terminations, tracking

9  termination trends from a fairness standpoint,

10  also losing-a-top-performer standpoint, which

11  goes to if there's a culture issue or if there's

12  problems going on in the company that it's

13  creating mass exodus, either voluntary or

14  involuntary turnover.

15         And then also analyzing retention trends

16  to see, like I said, if you're retaining your

17  top people.

18         So it's pretty much the whole life cycle

19  of the employee from a statistical standpoint.

20         And then also on the selection side,

21  there's the additional skill of the

22  psychometrician. And I'm a content developer,

77

1  meaning I'm an expert at creating -- expert at

2  job analysis, expert at creating job

3  descriptions, expert at doing transportability

4  studies, which basically compares job

5  descriptions.

6         Expert at validation, expert at content

7  development from everything from personality,

8  cognitive abilities, something called biodata,

9  assessment centers, interview guides, role

10  plays; and then doing validation on all such

11  tools, doing the psychometrics on that, which is

12  essentially a step before the validation.

13  You're ensuring that each of the items is

14  effective and I wouldn't even try to describe to

15  you psychometrics, unless you want to know more.

16         I'm happy to talk about it.

17     Q.  No, this is very helpful.

18     A.  Psychometrics, if you want to know, it's

19  a step above statistics.

20         Statistics is analyzing the data that

21  you already have.

22         Psychometrics is when you create an

78

1  instrument. It's the process you go through to
2  ensure that your test is going to have validity,
3  going to have reliability and also ensure it's
4  not going to have an adverse impact, although
5  you do that again at the validation phase.
6       So psychometrics can be everything from
7  item analysis, where you -- let's take a
8  personality test, say a cognitive abilities
9  test, because those tend to have adverse
10 impacts.
11      So cognitive abilities test --
12      Q. Let's do this, I'll ask you to slow
13 down.
14      It sounds like you're sort of about to
15 give a hypothetical here.
16      A. No, no, no, no.
17      Q. Okay. Go ahead.
18      A. I'm going to describe psychometrics.
19      Q. Okay, go ahead.
20      A. So you have a test that's cognitive
21 abilities test and there's multiple items on it,
22 and you administer it to a pilot group, and you

79

1  then look item by item to see the floor and the
2  ceiling to ensure that your items are not too
3  difficult or too easy.
4       You also correlate each individual item
5  to a criterion to make sure they have validity.
6       You also look at the adverse impacts, so
7  the racial make-up of those who pass and fail
8  each item, just to ensure that there's fairness.
9       And you pick your best items and then
10 you create an instrument, and then you validate
11 it and you run your adverse impacts.
12      So that's psychometrics in cognitive
13 abilities.
14      In personality, there's an additional
15 in-between step, because you have your items,
16 but you have to do what's called keying.
17      So basically, personality tends to be a
18 curb on your relationship, meaning it's not like
19 cognitive abilities where the more the better.
20      If you are an accountant, you might need
21 low sociability. If you are a waitress, you
22 might need high sociability. If you are an

80

1  attorney doing depositions, you might need a
2  higher side of middle, but you're probably
3  somewhere in the middle. You don't -- if you're
4  too social, you're not going to be effective in
5  your job.
6       So keying is another piece of
7  psychometrics, so that plus statistics is what I
8  do.
9       Q. Thank you very much, Dr. Munro. That's
10 helpful.
11      A. Sure.
12         MR. ROSENBLOOM: Mr. Temple, are
13 you trying to speak on the record?
14         MR. TEMPLE: I was actually
15 bragging on this witness. It's off the record.
16 BY MR. ROSENBLOOM:
17      Q. Let's keep going. Thank you very much
18 for that overview.
19      A. Sure.
20      Q. You can hand me or set that copy of your
21 CV to the side.
22         I don't have any more questions about it

81

1  right now, but maybe later.
2       Do you need to take a break?
3       A. No, no, it's -- I'm going to need about
4  ten minutes to plug the meter and check some
5  e-mails, but not for another probably 20
6  minutes.
7       Q. I would like to turn and ask you about
8  this matter a little bit.
9       A. Sure.
10      Q. You mentioned earlier that you met
11 Joshua Rose through an acquaintance.
12      A. Sure.
13      Q. Can you give me a better explanation of
14 that in terms of time, when and how that
15 happened?
16      A. It was when I was in Maryland. I don't
17 remember how it happened really, actually.
18         I knew somebody --
19      Q. About what year?
20      A. Oh, I was in Maryland. Whenever that
21 was.
22      Q. And so we're talking about maybe around

21 (Pages 78 to 81)

82

1    2005 to --
2        A.  No, no --
3        Q.  -- to 2009?
4        A.  -- that's, I think, later.
5            '09-ish sounds about right.
6        Q.  When you met Josh Rose, you met him
7    before you met his father, Attorney David
8    Rose?
9        A.  Yeah, probably a good year before.
10       Q.  Besides the Library of Congress lawsuit
11   and this lawsuit, have you done any other work
12   for or with Joshua Rose?
13       A.  No.
14       Q.  And did you meet him was it -- strike
15   that.
16           Is your -- when did you first become
17   engaged in this lawsuit, the Davis lawsuit?
18       A.  I'm going to go with two years ago,
19   because it was after I completed the Library of
20   Congress and a really, really thick report, and
21   it started with just that -- I can't say his
22   name, Spaght.

83

1        Q.  Is it Spaght, S-p-a-g-h-t?
2        A.  Yes.  It started with all I had was the
3    Spaght declaration or affidavit, whatever it is.
4    And I did the analysis --
5        Q.  I'm going to interrupt you for a quick
6    second.
7        A.  Sure.
8        Q.  So approximately two years ago --
9        A.  Yeah, give or take a half year, because
10   it was roughly during my first year or end of my
11   first year at law school.
12       Q.  That's fine.  That's fine.
13       A.  Maybe -- yeah, that sounds about right,
14   maybe my second year.  I don't remember.
15       Q.  So Dr. Munro, probably sometime in the
16   2012 range --
17       A.  That sounds about right, give or take.
18       Q.  -- who --
19       A.  Yeah.
20       Q.  -- who reached out to you?
21           Was it Josh Rose?  David Rose?
22       A.  I don't remember, actually.  It could

84

1    have could have been either.
2            I was dealing more with Josh Rose for a
3    long time.
4        Q.  And besides Joshua Rose and David Rose,
5    have you dealt with any other lawyers in this
6    case?
7        A.  I don't remember Uri, he worked for them
8    for a while.  I don't remember if he was on this
9    case or the Library of Congress, but that was
10   very brief.  I might have communicated with him
11   a couple of times.
12       Q.  The Library of Congress case was already
13   going on when the Rose law firm asked to you
14   work on Davis; is that correct?
15       A.  I had completed my report, yes.
16       Q.  You had completed the Library of
17   Congress report?
18       A.  Yes.
19       Q.  Very good.
20           And can you please tell me how your
21   billing and payment has worked on this matter in
22   Davis with the Rose law firm?

85

1        A.  How my billing and payment -- hourly.
2        Q.  So you've been --
3        A.  Because it's a smaller project, so we're
4    doing hourly.
5        Q.  And this hourly rate is $200 an hour; is
6    that correct?
7        A.  Uh-huh.
8        Q.  That's a yes?
9        A.  Sorry.  Yes, yes.
10       Q.  And how much have you been paid so
11   far?
12       A.  This one hasn't been very much.  I
13   think -- so the report for Dr. Bronars, which
14   was obviously --
15       Q.  I'll interrupt you again, I'm sorry, for
16   a quick second.  This is fine.
17           Dr. Munro is referring to some piece of
18   paper --
19       A.  You can have it.
20       Q.  -- and we'll make it an exhibit.  That's
21   fine.
22       A.  Yes.

22 (Pages 82 to 85)

86

1    Q. It looks like a bill of some kind.
2    A. Yeah.
3    Q. Go ahead.
4    A. You asked me in the subpoena to bring
5    proof of my hourly rate.
6    Q. Correct.
7    A. So I brought this, which was my bill for
8    the Dr. Bronars rebuttal report.
9         This, which you see is 32 pages long and
10   includes incredible amounts of tables, was only
11   about two and a half hours. So you can --
12   Q. You're referring to your rebuttal
13   report?
14   A. Yeah, my --
15   Q. Hang on. Before we get too detailed, I
16   want to go question by question.
17        Hand me, if you would, please -- so this
18   copy -- may I write on here, please?
19   A. Yes, it's yours.
20        MR. ROSENBLOOM: So this is
21   Exhibit 17. It's a one-page invoice from
22   Dr. Munro for $4,100, and that's Exhibit 17.

87

1
2         (Exhibit No. 17, Invoice, marked
3         for identification.)
4
5    BY MR. ROSENBLOOM:
6    Q. So that invoice is for $4,100.
7         Besides that invoice on the Davis case,
8    have you invoiced any other amounts?
9    A. Yes. I'm trying to estimate it from
10   this, because I didn't know I had to know that
11   amount.
12   Q. That's fine.
13   A. But if this 32-page report took me two
14   and a half hours, I don't think I billed many
15   more than about ten other hours, maybe fifteen
16   for the original report.
17        Was it a declaration or an affidavit
18   that I did?
19   Q. Well, you provided a report.
20        So do I understand you're saying that
21   ballpark, 30 to 40 hours is what you've invested
22   in in this case so far?

88

1    A. Ballpark, 30 to 35, so probably a total
2    of -- what is that -- $6,000, $7,000.
3    Q. Very good.
4         And have you been paid in full for that
5    so far?
6    A. No, I'm still owed money.
7    Q. So you're still owed that full $4,100?
8    A. No, I'm owed part of this. I haven't --
9    I got to -- I have to have my spreadsheet to
10   tell you.
11   Q. So you're owed currently some amount
12   less than $4,100?
13   A. Yes.
14   Q. Very good.
15        How long has that amount been
16   outstanding?
17   A. I guess since February '07. I may not
18   have sent the --
19   Q. Excuse me. Not February, you're
20   referring to the date --
21   A. February 7th.
22   Q. -- February 7th, 2014?

89

1    A. Yeah. And to be honest --
2    Q. Hang on one second. I'll go question by
3    question.
4    A. Sure, sure.
5         I'd like to clarify something, if I can.
6    Q. Go ahead, Dr. Munro.
7    A. Given this was -- I was not always good
8    at billing right away. So I may not -- I
9    probably dated this for the date of service.
10        I may or may not have sent it until
11   later. I don't know.
12   Q. That's fine.
13   A. Just juggling law school, this, the
14   business, you know...
15   Q. Certainly, certainly. I understand.
16   Thank you.
17        You can -- do you need to refer to that
18   any longer?
19   A. No.
20   Q. So I'll add this as Exhibit 17.
21        So Dr. Munro, under the payments here,
22   it says, "Invoice 12, paid in full."

23 (Pages 86 to 89)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

90

1      A.  Uh-huh.
2      Q.  Does that indicate that for this case,
3  you have done a total of 12 invoices?
4      A.  No, that's -- that includes the Library
5  of Congress case, too.
6      Q.  So does that mean for the Library of
7  Congress case and the Davis case, you have
8  invoiced the Rose law firm a total of 12
9  times?
10     A.  Probably, yeah, yes.
11     Q.  And since this invoice of February 7th,
12 2014, have there been any subsequent invoices?
13     A.  Actually, that would be 13 invoices,
14 because the top --
15     Q.  This is No. 13 right here?
16     A.  Yeah, yeah.  And I invoiced them since
17 then -- I think I invoiced upon payment.  I
18 might have -- I probably invoiced upon payment
19 and I might have billed for rereviewing my
20 report before we submitted it to you guys.
21     Q.  Very good.  Thank you.
22     A.  It was small, though, if I did.

---

92

1  Dr. Munro that after we conclude today, I would
2  ask that you please create a separate invoice --
3      THE WITNESS:  Sure.
4      MR. ROSENBLOOM:  -- and that
5  invoice should include both your time here
6  today -- feel free to write this down if you
7  want -- your time here today for this deposition
8  and your time for preparing for the deposition
9  and grabbing those documents.
10     And the Office of the Attorney General
11 already has you registered in its system --
12     THE WITNESS:  Good.
13     MR. ROSENBLOOM:  -- and so we
14 will be able to process that payment for you
15 within a reasonable time once we get your
16 invoice.
17     THE WITNESS:  Quick clarification.
18 Do you actually pay me for the
19 preparation time, not just gathering the
20 documents?
21     MR. ROSENBLOOM:  We can pay you
22 for a total of up to three hours of preparation

---

91

1      Q.  So that's Exhibit 17.
2      Thank you, Dr. Munro.
3      A.  Sure.
4      MR. ROSENBLOOM:  So this isn't a
5  question, but let me put a quick representation
6  on the record since we're talking about billing.
7      We, under the rules, are responsible and
8  we already have committed to paying for your
9  time to be here today.
10     And then Mr. Rose, so you know,
11 Dr. Munro also indicated that she spent some
12 time preparing for today's deposition, and I
13 indicated -- Dr. Munro said that she spent about
14 two hours preparing for that --
15     THE WITNESS:  Finding information
16 for you.
17     MR. ROSENBLOOM:  -- finding
18 documents pursuant to this.
19     So I have also indicated that we have
20 the ability to pay her for up to three hours of
21 that time.
22     So I'll just put on the record, please,

---

93

1  time.
2      THE WITNESS:  Well, then it was
3  definitely three.
4      MR. ROSENBLOOM:  So then
5  that -- so include three hours of preparation
6  time.
7      THE WITNESS:  I didn't know you
8  paid me for that part of it, too.  I thought it
9  was just finding the documents pursuant to the
10 subpoena.
11     MR. ROSENBLOOM:  Very good.
12 Thank you.
13     THE WITNESS:  Fine.
14     MR. ROSENBLOOM:  You can finish
15 making notes on that.
16     THE WITNESS:  No, we're good.
17     MR. ROSENBLOOM:  Mr. Rose, do you
18 have any questions about that as far as our
19 process for getting --
20     MR. ROSENBLOOM:  No, that's
21 fine.
22     MR. ROSENBLOOM:  Very good.

---

24  (Pages 90 to 93)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

94

1  Thank you.
2  BY MR. ROSENBLOOM:
3  Q. Dr. Munro, from — you have about ten
4  minutes before you need to take a break?
5  A. Yeah, I need to hit the meter. They're
6  quick down here.
7  Q. Tell me a little bit more about
8  when — tell me about when you first met or when
9  you first got involved in this case.
10  You said that Josh Rose was your main
11  contact, correct?
12  A. Yes.
13  Q. Was it —
14  A. I think. I think. My — by then, I
15  might have switched to Dave talking to me more
16  or both of them.
17  I'm not really sure. Definitely Library
18  of Congress I worked a lot more with Josh on,
19  Q. And in the course of your working on
20  this case, besides the current e-mail address of
21  drpaigemunro@gmail, are there any other Gmail
22  addresses that you used while working on this

---

95

1  matter?
2  A. Probably. I have another one that's
3  horrible. It's ppllccopy@gmail.com.
4  And I think sometimes I use that one
5  interchangeably.
6  I don't think I would have used anything
7  else.
8  Q. So it's fair to say you have two Gmail
9  addresses that you have used for this case?
10  A. I don't know if for this case, but with
11  them.
12  Q. If you did send any other e-mail
13  correspondence about this case, would it be
14  possibly from any other e-mail address besides
15  the two that you've discussed?
16  A. I don't think so, because their e-mail
17  wouldn't pop up.
18  So I would only be using an e-mail where
19  it popped up.
20  Q. Very good.
21  And is it — have you e-mailed — well,
22  we'll get back to that.

---

96

1  With respect to text messages, have you
2  exchanged text messages with plaintiffs' counsel
3  on this case?
4  A. No.
5  Q. Have you e-mailed or spoken in any way
6  with any of the plaintiffs individually in this
7  case?
8  A. No.
9  Q. Have you ever met any of the plaintiffs
10  in this case?
11  A. No.
12  Q. And besides Mr. Rose and Josh Rose and
13  Dave Rose, have you ever met any of the other
14  attorneys affiliated with this case,
15  specifically Donald Temple or David Branch?
16  A. No.
17  Q. And at the Office of the Attorney
18  General for DC, which is my office, do you know
19  anybody besides me in my office?
20  A. The Office of the Attorney General for
21  DC?
22  I went on a trip there for school,

---

97

1  but — and my professor, I think, used to work
2  there.
3  Q. You took a field trip to our office?
4  A. We had a field trip to the Supreme Court
5  and —
6  Q. Well, to go to the Supreme Court sounds
7  better.
8  A. — we went to the Federal AG's Office.
9  Sorry. That's different, so no,
10  definitely not.
11  Q. And you mentioned —
12  A. Just a field trip that —
13  Q. Just to confirm, earlier you said you
14  don't have any familial or marital connections
15  with the Office of the Attorney General or any
16  other DC folks?
17  A. No.
18  Q. Do you own any property in the District
19  of Columbia?
20  A. No.
21  Q. Is it fair to say that — would
22  you — is it fair to say that you don't have any

---

25 (Pages 94 to 97)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

**98**

1   financial stake in this case?
2       A.  No.
3       Q.  Do you have — for your work, besides
4   sending invoices like the one you've shown me,
5   do you have any type of engagement agreement?
6       A.  No.
7       Q.  You do not?
8       A.  No.
9       Q.  So how did you memorialize, if at all,
10  your engagement and your work in this case with
11  the Rose law firm?
12      A.  Verbally.
13      Q.  Would there be any e-mails discussing
14  this?
15      A.  Probably.  I don't know.
16          So when this one came up, it was
17  probably like, hey, Paige, we got another case,
18  this is what happened, I got this Spaght -- say
19  it again --
20      Q.  The Spaght declaration.
21      A.  -- the Spaght declaration --
22      Q.  I'm going to interrupt you for a minute.

---

**99**

1           You're referring to Josh Rose talking to
2   you saying, hey, Paige, I need your help?
3       A.  One or the two.  I don't remember.
4       Q.  Is it fair to say you spoke
5   telephonically with both David Rose and Josh
6   Rose?
7       A.  Yes, definitely.  That's the main way we
8   communicate.
9       Q.  By telephone?
10      A.  Yes.
11      Q.  And by telephone, is that generally to
12  your 770 area code —
13      A.  Yes.
14      Q.  — cell phone?
15      A.  Yes.
16      Q.  Besides David and Josh Rose —
17          MR. ROSENBLOOM:  And by the way,
18  gentlemen, Mr. Rose, I don't mean to be
19  disrespectful by using your first name.  I'm
20  just doing that for clarification purposes.
21          MR. ROSE:  That's fine.  For the
22  Roses, it's very good ID.

---

**100**

1           BY MR. ROSENBLOOM:
2       Q.  For your communications with Dave Rose
3   and Josh Rose, besides those two gentlemen, are
4   there any other lawyers from that law firm or
5   any other paralegals or employees of that law
6   firm with whom you have spoken telephonically or
7   corresponded about this case?
8       A.  About the case?  Probably Mark Rose, who
9   works for Dave Rose.  And I don't remember if it
10  was this case.
11          But it was Uri.  I don't remember his
12  last name, but he was --
13          MR. ROSE:  His name is Urzal
14  (phonetic).
15          MR. ROSENBLOOM:  That's fine.
16          Go ahead, Mr. Rose.  Do you want to
17  spell that out for us?
18          MR. ROSE:  I'm sorry, no.  Now I
19  have to -- he was a lawyer here, but he left us
20  two or three years ago.
21          THE WITNESS:  So it wouldn't have
22  been this case probably.

---

**101**

1           MR. ROSE:  Yes.
2           MR. ROSENBLOOM:  Thank you very
3   much.
4           BY MR. ROSENBLOOM:
5       Q.  So besides that gentleman —
6           MR. ROSE:  2012.  I'm sorry, go
7   ahead.
8           BY MR. ROSENBLOOM:
9       Q.  So besides that former employee of the
10  Rose law firm and besides Attorneys Josh Rose
11  and David Rose and David Rose's son and
12  paralegal Mark Rose, are there any other Rose
13  law firm employees with whom you've spoken or
14  corresponded about this matter?
15      A.  Possibly Josh's son when he interned
16  there for a short period of time, but I don't
17  think it was about this matter.
18      Q.  So what is Josh's son's name?
19          Do you recall?
20      A.  Dave?  I don't know.
21          MR. ROSE:  It's Herschel.
22          THE WITNESS:  Herschel, Herschel,

---

26  (Pages 98 to 101)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                        7/3/2014

102

1   Herschel, Herschel, yeah, yeah. I'm trying to
2   give you everything so there's no --
3           MR. ROSENBLOOM: I appreciate it.
4           THE WITNESS: Yeah, I don't
5   remember if it was about this matter. It was a
6   very short period of time, maybe once I talked
7   to him.
8   BY MR. ROSENBLOOM:
9       Q.  I asked you a moment ago if you
10  exchanged e-mails about this case with any of
11  the Rose law firm and you said probably; is that
12  right?
13      A.  Oh, I've definitely exchanged e-mails
14  and sending invoices and sending reports, but
15  the main communication tends to be by phone.
16      Q.  Very good.
17          Before we got on the record, when you
18  and I were just meeting each other at the
19  beginning of the deposition this morning, you
20  mentioned that you had tried to get together as
21  much as you could for this deposition, which I
22  really appreciate.

103

1           You've also -- I will put on the record
2   that Dr. Munro has brought with her bound, hard
3   copies of her very, very thick dissertation and
4   another hard copy bound work in which she was
5   cited.
6           I see no reason to make this part of the
7   record except to just kill trees, so we won't do
8   that.
9           But Dr. Munro, is it fair to say that
10  you were not able to bring any copies of any of
11  these e-mails with you today?
12      A.  No.
13      Q.  Do you think it would be possible for
14  you to retrieve these e-mails, either from
15  somewhere within your e-mail records or --
16      A.  It would be highly time consuming
17  because I would have to search for them and -- I
18  mean, certainly, I could retrieve them,
19  absolutely, but it would be not very interesting
20  and it would also be -- you know how Gmail does
21  that drop-down thing. It's so difficult to
22  search for anything.

104

1   So I would have to basically go one by
2   one, find stuff relevant to this matter. You
3   know what I mean? Not stuff talking about, you
4   know, billing or timing -- I guess it's
5   relevant, but I don't know.
6       Q.  But yes, it's possible?
7       A.  Yes, not very interesting though.
8       Q.  Would you have any reason to think that
9   any of your e-mails about this case would not be
10  retrievable that way?
11          In other words, what I'm asking --
12      A.  No.
13      Q.  -- is you don't have any concern that
14  they've been deleted or not saved or something
15  like that?
16      A.  I can't really say.
17          Can they go back four years?
18          I don't use the PPLC as much anymore,
19  but I don't know why they would be deleted.
20          I think they stay there forever, don't
21  they?
22      Q.  So you haven't actively deleted them?

105

1       A.  No.
2       Q.  Has Mr. Rose, either David Rose or Josh
3   Rose, instructed you to provide copies -- to
4   grab those e-mails and either print them out or
5   forward them to him or to me?
6       A.  No.
7       Q.  Had he asked you to do so, to produce
8   them in response to my deposition notice, would
9   you have done so?
10      A.  Probably not, given the time.
11      Q.  Had you been given sufficient time,
12  would you have done so?
13      A.  Had I been given a couple of months and
14  paid for my time, certainly.
15      Q.  Thank you. Fair enough.
16      A.  Certainly.
17      Q.  If a court orders you to produce
18  those --
19      A.  Will the court pay me?
20      Q.  I can't speak for the court, but let me
21  just say on the record that I'll just request
22  kindly that you continue to do what you've done,

27 (Pages 102 to 105)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

**106**

1  which is to do the best you can to make sure
2  that they are not automatically deleted?
3      A.  No, no, no, no, I get it. It's
4  spoliation. I get it.
5      Q.  Thank you.
6      A.  I know the rules.
7      Q.  With respect to these e-mails about this
8  case, besides the Rose law firm employees we've
9  discussed, are there any other people that you
10  have included on those e-mails, such as anybody
11  that's been working for you --
12     A.  Uh-huh.
13     Q.  -- or anybody else that the Rose law
14  firm has asked you to copy on them?
15     A.  I regularly copy myself so I have a
16  record, so I can find things sometimes more
17  easily, because that's that search thing I told
18  you about.
19         I have copied Mark Rose regularly. And
20  then other than that, I've never -- that I can
21  recall, I've never copied anybody else, until I
22  started copying you guys.

---

**107**

1      Q.  Thank you. I appreciate that.
2      A.  Sure.
3      Q.  And besides e-mail communication and
4  telephone communication, have you communicated
5  about this case via any other form, such as via
6  fax machine or have you been exchanging hard
7  copy documents by snail mail or by UPS?
8      A.  I snail mailed on this matter, I think
9  just this report, because it was lot to print
10  and his color printer, I think, was out.
11     Q.  You mentioned that your engagement was
12  memorialized verbally.
13         Was that with Josh Rose or David Rose or
14  both?
15     A.  I don't know. I'm sorry.
16     Q.  Is that the same in the Library of
17  Congress case, that you didn't have a written
18  engagement?
19     A.  No, I...
20     Q.  The same thing?
21     A.  No, no, no; no written agreement.
22     Q.  Was that by mutual -- did you ever

---

**108**

1  request that you have a written engagement --
2      A.  No.
3      Q.  -- for your expert services?
4      A.  No. I was novice to this stuff. I
5  just -- I do this as a practitioner and they
6  said, hey -- it was actually very informal, even
7  for the Library of Congress.
8          Josh said -- I'll slow down.
9          Josh said, hey, do you do statistics?
10         I said, sure, I can look at some data.
11         And he sent me the stuff, then
12 they -- we talked about an hourly rate and how
13 much work it would be. And it was all verbal.
14         Then I just did the work and then
15 whenever I got portions of it done, I would
16 invoice.
17     Q.  Excellent.
18         Besides the agreement that you would be
19 paid on an hourly rate, has there been any other
20 agreement regarding possible compensation for
21 you, such as a contingency fee?
22     A.  No.

---

**109**

1      Q.  Nothing like that?
2      A.  No.
3      Q.  Very good. Thank you.
4          Why don't we -- I got a five-minute sign
5  from Dr. Munro and we will not be able to
6  reimburse her for a parking ticket.
7          It's 11:54. Should we take a 15-minute
8  break?
9      A.  Probably.
10         MR. ROSENBLOOM:  Let's all come
11 back at 10 minutes after 12.
12
13         (Recess taken from 11:55 a.m.
14         to 12:13 p.m.)
15
16 BY MR. ROSENBLOOM:
17     Q.  We're back on the record.
18         Dr. Munro, it's just about quarter after
19 twelve.
20         You're still under oath. We'll
21 continue.
22         So in this matter, you were working for

---

28  (Pages 106 to 109)

110

1    the Rose law firm already on the Library of
2    Congress case and they asked you to come on and
3    help them with this; is that correct?
4        A. Yes, sir.
5        Q. And we've talked about with whom you've
6    communicated with in the e-mails with the Rose
7    law firm and if needed, we'll somehow be able to
8    get from you the e-mails that you still have,
9    right?
10       A. Yes, sir, assuming somebody pays me for
11   my time.
12       Q. Very good. Thank you.
13           Hard copies, any documents about this
14   case that you might have in hard copy that are
15   unique that haven't otherwise been sent around?
16       A. No. It's the report, the declaration,
17   the old report, and there's some dataset that's
18   not in hard copy, but the same one you have.
19       Q. Very good.
20           So from your -- from your vantage point,
21   what would you like to see happen in this
22   lawsuit?

112

1    regard to declarations and affidavits, it
2    appears that there wasn't a whole lot of thought
3    behind the RIF ahead of time.
4        From what I understand, the allegations
5    were that there was a large number of
6    African-Americans and people over 40 who claimed
7    they were discriminated against. And from what
8    I understand, they hired plaintiffs' attorneys
9    and I was originally brought on to just look at
10   the Spaght -- is that right?
11       Q. Right.
12       A. -- the Spaght declaration and the
13   percentages that were there and see if there was
14   something that looked statistically relevant.
15       So that's my understanding of what the
16   lawsuit's about.
17       Q. Thank you.
18       You previously responded that with
19   respect to Exhibit 4, which is the copy of the
20   third amended complaint --
21       A. Yes.
22       Q. -- you previously responded that you

111

1        A. From my vantage point, what would I like
2    to see?
3        Q. Yes.
4        A. It's a tough question to answer.
5            MR. ROSE: Well, I don't think
6    that -- I do object as it being way outside the
7    scope.
8            MR. ROSENBLOOM: I'll rephrase.
9    I'll rephrase, Mr. Rose.
10           MR. ROSE: Thank you.
11           MR. ROSENBLOOM: Sure.
12   BY MR. ROSENBLOOM:
13       Q. Do you have a personal interest in what
14   comes out of this lawsuit?
15       A. No, not at all.
16       Q. Thank you.
17           From your understanding, what is this
18   lawsuit about?
19       A. From my understanding, the lawsuit is
20   about a reduction in force that occurred in
21   2010.
22           And from what I have been provided with

113

1    had not seen this before.
2        A. If it was a long time ago, I may have,
3    but I do not think so.
4        Q. Very good.
5            This -- do you have any recollection of
6    doing any work to help draft this third amended
7    complaint?
8        A. I did not draft that, no.
9        Q. Do you know what the plaintiffs are
10   asking for in this case?
11       A. Relief-wise?
12       Q. Relief-wise.
13       A. I don't know if it's injunctive or
14   damages. I would assume one or both.
15       Q. In preparation for today's -- can you
16   provide as short as possible of a narrative
17   response setting forth what you've done to
18   prepare for today's deposition?
19       A. Going from engagement to now or just the
20   past --
21       Q. From when you learned you were going to
22   be deposed.

29 (Pages 110 to 113)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                              7/3/2014

**Page 114**

1    A. Well, I learned I was going to be
2    deposed about a year ago.
3    Q. Well, you said that you saw the exhibit
4    which is the deposition notice, which is Exhibit
5    1?
6    A. Yes, I saw that yesterday.
7    Q. And that's the revised deposition
8    notice?
9    A. Right.
10   Q. I'll represent to you that we had
11   previously sent out a deposition notice that had
12   all of the same information except for the
13   specific office space or street address here.
14   A. Okay.
15   Q. Did you get that deposition notice?
16   A. From you, yes.
17   Q. You did get that from me?
18   A. Yes, and that was only dated a few days
19   earlier though.
20   Q. That was dated a few days earlier.
21   Did you -- so you received that from me
22   in the e-mails that I sent or that my office

**Page 115**

1    sent yesterday?
2    A. Did I -- yes.
3    Q. Thank you very much.
4    So you did not receive that on the day
5    that I sent it from Mr. Rose?
6    A. No. Where I thought we were at was you
7    and I had communicated you had copied me on
8    something asking me about dates. I had
9    responded and Mark forwarded my response to you.
10   I thought we were set on July 3rd. But
11   then I hadn't heard -- I think I sent an e-mail
12   to you asking about I need space and location.
13   And then a couple of weeks went by and
14   there was some confusion. I didn't know if it
15   was still on. My calendar gets booked up.
16   And so then I e-mailed saying I need
17   confirmation, so yeah.
18   Q. Sounds good. Very good.
19   So in terms of what you've done to
20   prepare for this deposition specifically --
21   A. Yes.
22   Q. -- can you please state what you've done

**Page 116**

1    for this?
2    I'll note you've certainly brought some
3    documents and you've searched for some
4    documents --
5    A. Yes.
6    Q. -- including your dissertation.
7    A. Yes.
8    Q. What else have you done in preparation
9    for today's --
10   A. Do you want me to talk about the
11   documents I brought you per the subpoena?
12   Q. Yes, this would be a great time to talk
13   about what you brought pursuant to the subpoena.
14   A. I basically brought a copy of -- well,
15   two copies apparently of Dr. Bronars' -- my
16   response to Dr. Bronars' report.
17   In here, which I'm not allowed to look
18   at, is just copies of all the affidavits that I
19   read, which is Porchia -- or declarations,
20   whatever -- Spaght, Porchia, Davidson, and
21   Bronars' report.
22   I brought my resume. I brought a copy

**Page 117**

1    of my declaration. And I thought I brought a
2    copy of my old report, but I apparently didn't,
3    but I see you have one, so we're good.
4    And I brought my dissertations. And I
5    brought my resume already or dissertation. And
6    I brought my transcript because you asked for
7    proof of my education, which I don't have any
8    other transcripts, but this one says "doctor" on
9    my law school transcript, so I'm assuming it's
10   sufficient to show that it's verified.
11   Q. Thank you very much.
12   A. So I grabbed the documents, searched for
13   that, printed stuff out.
14   I also spent time preparing by printing
15   out all of the affidavits again, Dr. Bronars'
16   report again, my initial report, my initial
17   declaration, and my rebuttal report regarding
18   Dr. Bronars.
19   And then I spent several hours last
20   night rereading it, making notes, which I'm not
21   allowed to look at, but I mostly memorized.
22   Sorry. And making notes and tabbing them so

30 (Pages 114 to 117)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

---

118

1  nicely and I can't even open it.
2      Q.  Let's come back to that in a minute.
3      So besides the notes, anything else?
4      A.  No, I didn't refer to anything else.
5      I basically went through this, looked at
6  the report and made notes and, yeah, that's it.
7      Q.  Very good.
8      When we take a lunch break in a few
9  minutes, I'll see if either Darlene or someone
10 else in the office can get us access to a copy
11 machine and we'll see about making a copy of
12 that.
13     A.  Well, you don't need a copy of this. I
14 can speak to it.
15     You can have a copy of this.
16     Unless there's specific numbers --
17     Q.  Dr. Munro, I'm sorry to interrupt. I
18 don't have an open question to you right now.
19     A.  I apologize. I apologize.
20     Q.  Since it's work that you've done in
21 preparation for today's deposition, we'll go
22 ahead and we'll get a copy of it and make a

---

119

1  record for the report.
2      Just for the record, when Dr. Munro said
3  "this," she was also referring to that one sheet
4  of loose-leaf paper that includes your notes,
5  which we said earlier, by all means, if you want
6  to make notes during the deposition, that's
7  fine.
8      Do you have a question?
9      A.  I do have a question.
10     Q.  Sure.
11     A.  If I'm not referring to this, though,
12 because a lot of this is my thought process that
13 might be at trial unique to what you are hearing
14 today if you don't ask the correct questions --
15 no offense, I'm sure you'll ask all the correct
16 questions.
17     But if I'm not referring to this, even
18 though I used it to prepare, if I'm not
19 referring to it, then some of this or -- can we
20 not photocopy this?
21     Q.  So if Mr. Rose wants to make an
22 objection, he could, but we would -- I'll defer

---

120

1  to him on that.
2      But, obviously, the position of our
3  office is that in this case, you're a witness
4  and you're not an attorney and, therefore,
5  there's no attorney work product objection for
6  your work.
7      And the rule in our and our office's
8  supposition is that any work done or thoughts or
9  writings by any witness who has been disclosed
10 as possible to testify that has to do with this
11 case is, indeed, discoverable.
12     And so I will -- since we're about to
13 break, and I will at this time, since we are
14 learning that there is this other document that
15 exists, and without casting any aspersions on
16 Dr. Munro, I will note that this document
17 certainly would have been covered by our
18 discovery request, had it had not previously
19 been produced to us.
20     And to Dr. Munro's credit, she has
21 brought it here today and she has explained what
22 it is.

---

121

1  Mr. Rose, I will note at this point that
2  I will be asking for Dr. Munro to tender that
3  over to us so that we can make a photocopy here.
4      Do you have any objection to that,
5  Mr. Rose?
6          MR. ROSE:  No, not to making the
7  photocopy and --
8          THE WITNESS:  It has my notes.
9  Does that matter?
10     It's like extra stuff I wrote when I
11 thought of it, like extra ways to discredit the
12 report.
13         MR. ROSENBLOOM:  Mr. Rose?
14         THE WITNESS:  That I would have
15 testified to that are not in the report.
16         MR. ROSE:  I -- it's hard for me
17 to have any sense of what's there, but if you
18 could get a copy made and if you can e-mail it
19 to me, that would be good.
20     I don't know.
21         MR. ROSENBLOOM:  So, obviously,
22 we won't be able to do that today.

---

31 (Pages 118 to 121)

122

1    So what I would ask then, Mr. Rose, is
2  that Dr. Munro provide us with that copy so that
3  we can have it copied, have it labeled as an
4  exhibit, and then should you choose to make any
5  objection, it will be an exhibit to the
6  deposition and you can choose to make any
7  objection at any future time.
8    Is that appropriate?
9    MR. ROSE:  The only -- I think
10  that works, but I think -- I don't know if she
11  has any privacy concerns and I'm not sure we do
12  either.
13    But let's just not publish that, at
14  least until it's figured out, our position.
15    MR. ROSENBLOOM:  Well, I will
16  ask -- I will ask Dr. Munro now.  I mean,
17  Dr. Munro, I think, has spoken candidly to the
18  report.
19  BY MR. ROSENBLOOM:
20    Q.  Dr. Munro, besides your candid remarks
21  on these pages about the case, do these pages
22  contain anything else that would be private and

123

1  confidential to you personally, involving your
2  personal life unrelated to this case?
3    A.  I have to flip through it to make
4  sure.
5    Q.  So let's do that now.  Let's stay on the
6  record, and let me give Dr. Munro -- go ahead,
7  Dr. Munro.
8    And Dr. Munro is opening a three-ring
9  binder that has pages in it and tabs and --
10    A.  These are supplementary things I was
11  going to bring in case you wanted to ask
12  questions about stuff, but okay.
13    (Witness reviews document.)
14    Q.  You feel free to flip through quietly so
15  that the reporter doesn't need to -- so we'll
16  just take a moment now.
17    Dr. Munro, if you see anything in there
18  that is not related to this case, that is
19  somehow private to you that you don't want to
20  disclose, bring that to my attention.
21    Otherwise, we'll ask to make a copy of
22  the entire three-ring binder and all of the

124

1  documents inside of it.
2    A.  I note like my typo, because I did find
3  a typo.  I think I found two typos in here.
4    So that's not personal, right?
5    Q.  I don't think so.  I think that pertains
6  to this case.
7    A.  Yeah.
8    Q.  I'm talking about if you have anything
9  in there, such as you wrote down your credit
10  card number --
11    A.  You never know.
12    Q.  -- or notes about something in your
13  personal life.
14    If it's comments about the report, then
15  that would not be private.
16    A.  (Witness reviews document.)
17    MR. ROSE:  I am thinking of a
18  different thing, if she made some derogatory
19  note about Dr. Bronars that would not be the
20  sort of thing that people would want to have
21  preserved, and I think that she --
22    THE WITNESS:  Derogatory in terms

125

1  of I say --
2    MR. ROSENBLOOM:  Hang on one
3  second, Dr. Munro.  There's not an open question
4  to you.
5    THE WITNESS:  I apologize.
6    MR. ROSENBLOOM:  Mr. Rose, are
7  you making an objection?  And if so, on what
8  ground rules?
9    MR. ROSE:  Well, I'm trying to ask
10  for privacy, nonpublication essentially until
11  after she and I have a better chance to look at
12  it.
13    MR. ROSENBLOOM:  And I would
14  respectfully take issue with that.
15    We have -- I don't know of any grounds
16  that you're articulating.  Privacy pertains to
17  personal privacy.  But Dr. Munro's comments
18  about this case, about our expert are certainly
19  within the bounds of discovery.
20    THE WITNESS:  The most derogatory
21  thing I've seen is "bad design" and things like
22  that.

32  (Pages 122 to 125)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

126

1      MR. ROSE: Well, okay.
2      THE WITNESS: I'm just --
3      MR. ROSE: If that's -- well, I'll
4  withdraw the objection.
5      MR. ROSENBLOOM: Thank you.
6      (Witness reviews document.)
7      MR. ROSENBLOOM: Well, let me
8  propose this: Dr. Munro is taking some time and
9  she's certainly entitled to go through what is a
10  very thorough binder.
11      THE WITNESS: Do we want to keep
12  going and deal with this during lunch?
13      MR. ROSENBLOOM: Let's go ahead,
14  it's 12:27 now, and let's get back on the record
15  as close as possible to 1:00 p.m., 1:05.
16      I'm told there's a place real quick
17  where I can grab something. And Dr. Munro has
18  brought food with her.
19      If there are any pages that Dr. Munro or
20  any portions that need to be redacted, we can
21  address that.
22      So let's adjourn and please be back

127

1  available, say by 1:05 p.m. to go back on the
2  record.
3      And I will make every effort to be back
4  here and ready to go by then, as will
5  Dr. Munro?
6      Anything else before then?
7      MR. ROSE: Just as a technical
8  matter, I guess we sign out and then we go
9  through the same procedure?
10      MR. ROSENBLOOM: Sure, why don't
11  you do that and plan to dial back at 1:00 and
12  we'll be back by 1:05.
13      Very good?
14      MR. ROSE: Very good.
15
16      (Off the record at 12:28 p.m.)
17
18      (Exhibit No. 18, Binder of
19      Documents, marked for
20      identification.)
21
22      (Back on the record at 1:13 p.m.)

128

1
2      MR. ROSENBLOOM: We're back on
3  the record.
4      We have Dr. Munro back and our reporter
5  is here. It's almost quarter after 1:00.
6      We'll wait about another minute or two
7  for Mr. Temple to dial in as a courtesy, though
8  technically, we can continue since Mr. Rose is
9  here.
10      Correct, Mr. Rose?
11      MR. ROSE: Yes, I think so.
12      MR. ROSENBLOOM: Let's give Don
13  another minute.
14
15      (Pause In Proceedings)
16
17      (Exhibit No. 19, Cover Page of
18      Dissertation, marked for
19      identification.)
20
21      (Resuming at 1:19 p.m.)
22

129

1  BY MR. ROSENBLOOM:
2      Q. Dr. Munro, we're going back on the
3  record.
4      You understand you're still under oath
5  like you were before?
6      A. I understand.
7      Q. I just want to confirm or clarify one
8  question that I asked you previously.
9      I am going to hand you again what's been
10  marked as Exhibit No. 16, the affidavit of
11  Raymond Davidson.
12      Can you remind me whether you said you
13  saw that --
14      A. Yes.
15      Q. -- or if you haven't --
16      A. Yes. I referenced it in my report, in
17  my rebuttal report, so yes.
18      Q. So I can take that back from you.
19      A. I went through it in detail in my
20  rebuttal report.
21      Q. Besides serving as a witness in the
22  cases that we've talked about, have you ever

33 (Pages 126 to 129)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                7/3/2014

---

130

1    been a party to a lawsuit?
2        A.  No, sir.
3        Q.  Have you ever been a party to any legal
4    proceeding?
5        A.  A party?
6        Q.  Yes.  For example, a divorce, a
7    bankruptcy?
8        A.  Oh, divorce and a bankruptcy, yes,
9    because of my divorce.
10       Q.  In either of -- so you've been a
11   party -- you've been a party of one bankruptcy
12   and one divorce?
13       A.  Yes, not the current husband, obviously.
14       Q.  I hope not.
15       A.  You never know.
16       Q.  In either your bankruptcy case or your
17   divorce case, did you provide any testimony
18   either in court or at a deposition?
19       A.  No to deposition to both.
20           In court, my ex-husband and I were both
21   not represented.  It was very amicable, so I did
22   talk to the judge.  I'm assuming that's on a

---

131

1    record somewhere.
2        The bankruptcy, I just filed papers
3    through an attorney and I think when it was
4    discharged, they called me and I talked to them
5    on the phone and then they discharged it.
6        Q.  So you have never been a plaintiff in
7    any type of lawsuit, outside of that bankruptcy
8    and the divorce?
9        A.  I just want to make sure that I'm
10   accurate about everything.
11           I don't think so.  No.
12       Q.  So never say, for example, a personal
13   injury case from a car accident?
14       A.  Oh, no, no, no.
15           I'm thinking about my husband.  Sorry.
16       Q.  But just for you.
17       A.  No.
18       Q.  For the record, what is your husband's
19   name?
20       A.  Scott Velotto.
21       Q.  Can you spell that, please.
22       A.  V-e-l-o-t-t-o.

---

132

1        Q.  And what is his date of birth?
2        A.  6/16/69.
3        Q.  Have you discussed this case with
4    Mr. Velotto?
5        A.  Have I discussed the case?
6        Q.  Yes.
7        A.  No.  I mean, he knows I'm working on it,
8    but he doesn't understand statistics, so...
9            MR. ROSENBLOOM:   We'll go off the
10   record for a second.
11
12           (Off-the-record discussion)
13
14   BY MR. ROSENBLOOM:
15       Q.  Besides your work that is described on
16   your CV, do you have any other sources of
17   income?
18       A.  Do I have any other sources of income?
19   Me personally?
20       Q.  Yes, ma'am.  Not your husband, but you
21   personally, such as alimony from the first
22   marriage.

---

133

1        A.  No.
2        Q.  No?
3        A.  No.
4        Q.  Are you like a partner in any type of
5    investment company or anything like that?
6        A.  I'm a partner in the business.  It's on
7    my resume.
8            I'm just thinking.
9            Investment company, no.
10           Other income, no.
11           I manage my dad's finances because he
12   has Alzheimer's and lives on my property, but
13   that's not my money.
14           Other income?  Other income; I've
15   borrowed money from my mom for construction.
16           Does that count?
17       Q.  No other income?
18       A.  No income, no, not -- unless 1099
19   through these businesses.
20       Q.  So you don't have --
21       A.  I'm just trying to make sure.
22           I worked for Motley Rice last summer.

---

34  (Pages 130 to 133)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

**134**

1  I can't think of anything else, no.

2  Q.  You testified earlier that you've never

3  resided in the District of Columbia, correct?

4  A.  I had a PO box, but I never resided

5  there, no.

6  Q.  You did have a PO box --

7  A.  When I first moved there, yeah.

8  Q.  -- when you moved to the DC area?

9  A.  Maryland.

10  Q.  But you were residing in Maryland?

11  A.  Yes.

12  Q.  If you were residing in Maryland, why

13  did you have a PO box in DC?

14  A.  I don't remember.  I think it was the

15  closest one to my work, because my work was

16  right on the border.

17  So I needed a PO box for my mail because

18  I was living in corporate housing.

19  Q.  Do you remember what neighborhood that

20  was?

21  A.  No.  North.

22  Q.  Well, is it possible that was someplace

**135**

1  off of Connecticut Avenue Northwest?

2  A.  Probably.  I don't know.  It sounds

3  familiar.

4  Q.  Besides that PO box, have you had any

5  other residential addresses within the District

6  of Columbia?

7  A.  No, I physically never lived in the

8  District.

9  I did look for condos in there, but I

10  ended up buying in Maryland.

11  Q.  You spoke broadly earlier and gave a

12  good overview about your work, both in terms of

13  statistics and psychometrics.

14  It appears from what you've said that a

15  lot of your work is around protecting and

16  preventing HR decisions that are illegal and

17  unfair; is that fair to say?

18  A.  That's half right.  It's protecting

19  against, I wouldn't say illegal but unfairness,

20  which also does cross over into illegal when it

21  meets a certain threshold.

22  But the other half of it is ensuring

**136**

1  essentially the business necessity piece of it,

2  ensuring tools, decisions, retention stuff.

3  Like all of that goes towards ensuring you have

4  top performers, you're selecting them in, you're

5  retaining top performers.

6  So it's also a merit-based skill I have

7  in addition to -- the thing I do in addition to

8  just the ensuring that they don't get sued.

9  It's twofold.

10  Q.  Would you agree that -- strike that.

11  Are you familiar with the legal

12  standards for statistical deviations in

13  employment discrimination lawsuits?

14  A.  Am I familiar with the -- say it again.

15  Q.  With the legal standards for statistical

16  deviations in employment discrimination.

17  MR. ROSE:  I think the term is

18  "statistical significance."

19  MR. ROSENBLOOM:  Are you

20  objecting, Mr. Rose?

21  MR. ROSE:  Yes, sir.

22  BY MR. ROSENBLOOM:

**137**

1  Q.  Did you understand my question?

2  A.  Both are technically correct.

3  So yes, I'm familiar with that.

4  Deviations is one way of looking at it.

5  From my understanding and my experience as 15

6  years as a practitioner as well as my training

7  in law, there is not a set standard for, in

8  general, what meets the statistical

9  significance.

10  However, the standard tEEOC says for

11  hiring and generally in turnover cases, any time

12  there's an adverse decision is the four-fifths

13  rule, 80 percent rule --

14  Q.  Slow down.

15  A.  Four-fifths rule, 80 percent rule, grew

16  out of Griggs.  It's codified in tEEOC uniform

17  guidelines.  And that is what practitioners use

18  to evaluate if there is -- that's one thing they

19  use, the four-fifths rule, to see if the

20  percent of minorities deviates enough for the

21  court -- from the percent of majority, whether

22  you're talking hiring or termination.

olenderreporting.com  Olender Reporting                  WORLDWIDE
Washington              Baltimore, MD                      Florida

138

1    But you always use some statistic,
2    chi-squared, ANOVA. 1 generally use both.
3    Sometimes correlations are appropriate.
4        So you always use one or more statistics
5    along with the four-fifths rule.
6        So the statistical piece is you want a
7    probability of P less -- P less than .05, or
8    P less than .01 is even better, and depending
9    upon sample size.
10       And that is the same, essentially
11   equates to a t-test that's significant at the
12   99th or the 95th percentile.
13   Q.  Thank you very much.
14   A.  Sure.
15   Q.  I'm going to ask you to please take a
16   look at what has been marked as Exhibit 6, which
17   is the report in this case submitted by defense
18   expert, Stephen Bronars.
19   A.  Uh-huh.
20   Q.  If you could please turn to Page 4 of
21   that.
22   A.  Sure.

139

1        Since you're copying this, can I open my
2    notes?
3    Q.  Sure.
4        So the witness is opening that binder we
5    discussed earlier, which has been marked as
6    Exhibit 17.
7    A.  I didn't make any notes on that page, so
8    it's fine.  Yes.
9    Q.  Just to have a clean transcript, just
10   try to not speak until I have a question open.
11   It's a little harder with folks on the phone
12   too.
13   A.  Uh-huh.
14   Q.  Do you -- since you've grabbed that and
15   you've opened it to a page, what I'd like you to
16   do, Dr. Munro, is just explain based on what tab
17   is in there what page that notebook is open to
18   that you're referring to -- that you may refer
19   to.
20   A.  It's Dr. Bronars' report, Page 4.
21   Q.  Thank you very much.
22       So you have your own copy of Dr.

140

1    Bronars' report there?
2    A.  Yes, sir.
3    Q.  So on Page 4 of Exhibit 6, I direct your
4    attention to Paragraph 18, it begins on the
5    bottom of Page 4.
6    A.  Uh-huh.
7    Q.  Please review that paragraph.
8    A.  (Witness reviews document.)
9        Okay.
10   Q.  Please also review Paragraph 19.
11   A.  (Witness reviews document.)
12       Yeah, 1 know these cases.
13       Wait, let me finish reading, though.
14   Q.  Sure.
15   A.  (Witness reviews document.)
16       Okay.
17   Q.  You've had an opportunity to read
18   Paragraphs 18 and 19?
19   A.  I have.
20   Q.  And with respect to Paragraph 18, do you
21   have an opinion as to whether you agree or
22   disagree with what Dr. Bronars has written in

141

1    that paragraph?
2    A.  Yes, I disagree.
3    Q.  You disagree with that?
4    A.  Yes.
5    Q.  We'll come back to that.
6        Paragraph 19, do you have an opinion as
7    to whether you agree or disagree with what
8    Dr. Bronars wrote in Paragraph 19?
9    A.  Well, I have to clarify.
10       I agree this is what the court said in a
11   footnote, and I agree this is what was used in
12   one case, which was a Grand Jury selection case
13   and one case which was a systemic disparate
14   treatment case.
15       I do not agree with the use of the two
16   standard deviation rule in a disparate impact
17   case, as this is.
18       Also, I do not agree with it based on
19   numerous objections I have to the methodology,
20   the assumptions, all of which I would love to go
21   into.
22   Q.  That's fine.  But for right now,

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

142

1    Paragraph 18 on its face, that does not deal
2    with methodology or assumptions, correct?
3        A.  The problem is --
4        Q.  Hang on.  I'm just asking a yes-or-no
5    question.
6        A.  Does it --
7        Q.  Are there any --
8            MR. TEMPLE:  The witness is
9    answering the question.
10           MR. ROSENBLOOM:  Mr. Temple,
11   you're not defending.  I'm sorry.
12           MR. TEMPLE:  Excuse me, Counsel.
13   That does not preclude my right to make an
14   objection.
15           MR. ROSENBLOOM:  Actually, I
16   think that it does.
17           MR. TEMPLE:  What's your authority
18   for that?
19           MR. ROSENBLOOM:  My authority is
20   that I specifically asked numerous times who
21   will be defending this --
22           MR. TEMPLE:  I'm not defending

143

1    these depositions, for the record, I want to be
2    clear.
3            That does not mean that I don't have a
4    right to make an objection as a party.
5            MR. ROSENBLOOM:  So go ahead,
6    make your observation briefly, please.
7            MR. TEMPLE:  My objection is the
8    fact that you cut the witness off.  She's
9    answering the question and you're telling her
10   that it's a yes or no.
11           I'm objecting to the fact that it is a
12   yes-or-no question.
13           MR. ROSENBLOOM:  Duly noted.
14   Thank you Mr. Temple.
15   BY MR. ROSENBLOOM:
16       Q.  Does Paragraph 18, within Paragraph 18
17   itself, refer to methodology?
18       A.  Let me try to answer you as specifically
19   as I can.
20       Q.  Thank you.
21       A.  He says that that standard for
22   statistical significance that I use is the one

144

1    established in the U.S. Supreme Court in the
2    case of Castenda V. Partida and Hazelwood, of
3    course, a case we all know.
4            "I concluded that there is statistical
5    evidence of discrimination only if there is a
6    difference between the actual outcomes of the
7    termination process and the outcomes that would
8    have been expected from a random neutral process
9    so large that it would have occurred 5 percent
10   of the time or less, given a neutral process."
11           That is a methodology question because
12   he's saying that this is the statistic that is
13   used and it is only applicable if there's a
14   large sample size, which he does not have in any
15   of his analyses.
16       Q.  Without getting to the analyses, as far
17   as this specific paragraph, let me try to be
18   more specific.
19       A.  Sure.
20       Q.  Are you saying that you disagree with
21   what this paragraph says because the
22   paragraph -- are you saying that you disagree

145

1    with what this paragraph says or are you saying
2    that you disagree with the report generally?
3            That's what I'm trying to understand.
4        A.  You know, that's a great question.
5            I disagree with several things.
6            I disagree that this is the standard
7    that's endorsed for a case such as this, meaning
8    the CFSA case.
9            I disagree that this is an appropriate
10   test to use in a case when you have a small
11   sample size as specifically noted in the
12   footnote in the Supreme Court case that it says
13   that it requires a large sample size, which I
14   cited in my report.
15           And I disagree that that means his
16   conclusion is correct, that if he finds a
17   deviation occurred 5 percent or less, then that
18   actually means something.
19       Q.  So --
20       A.  It's also not the right-test, so...
21       Q.  Okay.  So that --
22       A.  For a number of reasons.

37 (Pages 142 to 145)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

146

1   Q.   You referred to a Supreme Court case in
2   the footnote.
3       Which case are you referring to.
4       A.   I'm referring right now to Page 14 of my
5   rebuttal report and there's a footnote 21.  It's
6   Castenda versus Partida.  And it says --
7   Footnote 17 states, "As a general rule for such
8   large samples, if the difference between the
9   expected value and the observed number is
10  greater than two or three standard deviations,
11  then the hypothesis that the jury had drawn was
12  random would be suspect to a social
13  scientist."
14      It goes on, and I explain in my report
15  that they emphasize, it is absolutely critical
16  to have a large sample size when using the two
17  standard deviation test.
18      They say the same thing in Hazelwood.
19      Further, as I emphasized before,
20  Castenda is a -- would be probably a systemic
21  disparate treatment case because it is a Grand
22  Jury selection case.  And Hazelwood is

147

1   definitely a disparate treatment case.  And I
2   would -- it is -- this is a disparate impact
3   case because of the fact that you have a neutral
4   process that resulted in the termination of
5   groups who are protected.
6       And the proper test, according to tEEOC,
7   and according to many -- the Supreme Court has
8   actually never decided -- I found the appellate
9   court case that stated -- it's in my report --
10  that stated that the Supreme Court has never
11  actually advocated for one test or another.
12      So he's actually misleading here because
13  he says that this has essentially been endorsed
14  by the Supreme Court.
15      This has been noted in a footnote in the
16  Supreme Court as a possible test in a disparate
17  case -- I'm sorry -- a systemic disparate
18  treatment case.
19      If you have a large number sample size,
20  that can be used, but nowhere is it the only
21  standard.  And in fact, the EEOC advocates for
22  statistical analysis with a four-fifths rule.

148

1   So that's why I disagree with 18 and 19
2   strongly.
3       Q.   Thank you very much.
4       Besides the -- for the points that you
5   just made right now in your response, do you
6   rely upon any authorities, whether treatises
7   pertaining to statistics or legal authorities
8   such as court decisions, that are not
9   specifically cited in either of your two
10  reports?
11      A.   Uniform guidelines, tEEOC uniform
12  guidelines, which I basically have memorized,
13  but I did not cite to them.
14      Oh, I mentioned them.  I mentioned
15  tEEOC -- codified in tEEOC.  I don't know if
16  it's technically codified or if it's a
17  regulation, if that's the correct term.
18      So I mentioned tEEOC guidelines.  I
19  don't know if I specifically call it the uniform
20  guidelines, but that's what's used.
21      And I cited to the two Supreme Court
22  cases he did.

149

1       Q.   You mean the same two Supreme Court
2   cases that Dr. Bronars cited?
3       A.   Yes, I did.
4       And I also cited to, it looks like a law
5   review article.  I'm on page --
6       Q.   Excuse me, Dr. Munro.  I don't need you
7   to tell me everything you did cite in your
8   report.
9       A.   Anything that I didn't cite to you --
10      Q.   Well, I do want to move this along.
11      A.   Sure.
12      Q.   So my question is -- and you've given an
13  answer that part of the answer might be tEEOC
14  guidelines?
15      A.   Yeah.
16      Q.   For the long reply that you just
17  provided about why you disagree with Paragraph
18  18 and 19 --
19      A.   Yeah.
20      Q.   -- besides tEEOC uniform guidelines, do
21  you rely upon any other pieces of information or
22  authorities not disclosed in either of your

38  (Pages 146 to 149)

150

1   reports?
2       A.  Is common knowledge considered an
3   authority in the field of IO psychology?
4       Q.  So are you saying that you're referring
5   to what you perceive to be common knowledge?
6       A.  Yeah, in IO psychology.
7           MR. ROSENBLOOM:  Mr. Rose, can
8   you speak up, sir?
9           MR. ROSE:  I believe she's saying
10  that it's IO psychology, it's common knowledge.
11          THE WITNESS:  It's common
12  knowledge to use the four-fifths rule and
13  chi-squared, ANOVA, MANOVA, different acronyms,
14  some form of statistics, as many as possible.
15          It's common to use -- it's common
16  knowledge, any IO psychologist who works as a
17  practitioner versus an economist who's mainly an
18  academician, now appears to be an expert witness
19  professionally --
20      Q.  I'm sorry.  I want to interrupt you
21  again because we're going off here.
22      A.  Sorry.

151

1       Q.  When you say "common knowledge," are
2   you --
3       A.  Common knowledge for anybody --
4       Q.  Excuse me, excuse me.
5           You're referring to the four-fifths
6   rule?
7       A.  Common knowledge -- yes, four-fifths
8   rule, coupled with statistics.
9       Q.  Very good.  Thank you.
10      A.  Coupled with statistics.
11          Yes, common knowledge in the field of IO
12  psychology and even HR generalists, people who
13  do this type of stuff without an IO psychology
14  degree, it's common knowledge that that's how
15  you test adverse impacts.
16      Q.  Any other specific treatises, articles
17  or case law upon which you're referring that are
18  not identified in either of your reports?
19      A.  TEEOC regulations.
20      Q.  Thank you.
21          Anything else?
22      A.  Not that I can think of, but there may

152

1   be.  I'll think -- if I think of something, I'll
2   tell you.
3       Q.  If you had been relying -- okay.  Strike
4   that.
5           It's possible that there are other
6   things that you were relying upon?
7       A.  I have an incredibly good memory, so
8   it's possible I read something and I know I read
9   lower court cases that were in disparate impact
10  that used the four-fifths rule, supported it,
11  and it emphasized that tEEOC guidelines are the
12  thing to do.
13          But I would say -- I would say that what
14  I relied on to write this report, the only thing
15  missing would be the regulations for tEEOC
16  guidelines.
17      Q.  Did Mr. Rose -- either Mr. David Rose or
18  Josh Rose advise you to include in your report
19  all materials upon which you're relying in
20  making your expert conclusions?
21      A.  I thought I did.
22          So I didn't cite to the --

153

1       Q.  Excuse me, I'm sorry.
2           I'm asking did either of them tell to
3   you?
4       A.  I mean, yeah, that's what you're
5   supposed to do, right?
6       Q.  I understand that's what you're supposed
7   to do.
8           My question for you is, were you
9   directed by either David Rose or Joshua Rose to
10  include in your report all authorities upon
11  which you were relying?
12          MR. ROSE:  I object to the
13  vagueness of the term "authorities," because
14  some are legal authorities --
15          MR. ROSENBLOOM:  Excuse me,
16  Mr. Rose.  Mr. Rose, I won't permit a speaking
17  objection.
18          You've made an objection to the form as
19  vague, which is sufficient.
20          Is it okay if the witness proceeds to
21  answer now?
22          MR. ROSE:  Yes, she can answer,

39 (Pages 150 to 153)

154

1   yes.
2           MR. ROSENBLOOM: Thank you.
3           MR. TEMPLE: I don't think -- one
4   second. I don't think -- I don't think you even
5   let him finish his objection before you said it.
6   He was speaking. The man was speaking
7   and you cut him off in the middle of his
8   sentence.
9           MR. ROSENBLOOM: All right.
10          MR. TEMPLE: The least you can do
11  is let him at least make his objection.
12          I agree if you want to make an objection
13  that's speaking, but let the man make his
14  objection.
15          MR. ROSENBLOOM: Mr. Rose,
16  besides objecting to the form of the question,
17  is there another basis upon which you are
18  objecting to the question?
19          MR. ROSE: Yes. I say when
20  something is vague, you can be relying to two
21  different bodies of knowledge. If you're asking
22  her for court citations, I think that's highly

155

1   objectionable.
2           Though she's not here as an expert in
3   the law, maybe next year she will be, but she's
4   here as an expert in IO psychology.
5           MR. ROSENBLOOM: So
6   besides -- I'm not hearing from you grounds. I
7   heard grounds of form.
8           MR. ROSE: It's a question which
9   is unnecessarily ambiguous.
10          Either focus on IO psychologists'
11  reports or the law.
12          If it's the law, it's not hers to bring
13  the law of various cases to the attention of the
14  court. That's supposed to be our job.
15          MR. ROSENBLOOM: One point is
16  that the report that you submitted on behalf of
17  Dr. Munro does include legal authority.
18          Second --
19          MR. ROSE: The same ones that were
20  used --
21          MR. ROSENBLOOM: Excuse me.
22          MR. ROSE: -- by Dr. Bronars and

156

1   only those --
2           MR. ROSENBLOOM: Excuse me. This
3   type of protracted argument and the speaking
4   objection you are making is precisely the type
5   of inappropriate and time-consuming objection
6   that I will not permit or stand for.
7           If this continues.
8           MR. ROSE: Okay.
9           MR. ROSENBLOOM: If this
10  continues, I will suspend.
11          MR. ROSENBLOOM: -- if you want
12  to, that's fine.
13  BY MR. ROSENBLOOM:
14      Q. Please go ahead. And do you recall my
15  question, Dr. Munro?
16      A. Yes, I do.
17          You were asking if I was told to include
18  all authorities that I relied upon in making my
19  report.
20      Q. Yes.
21      A. I'm positive I was told that at some
22  point. I'm positive I was reminded of that at

157

1   some point.
2           I can't specifically tell you who told
3   me or when they told me, but that's one of those
4   things that I just know I'm supposed to do
5   because somebody probably told me.
6       Q. Thank you, Dr. Munro. I appreciate
7   that.
8       A. Sure, sure.
9       Q. Dr. Munro, you've submitted two reports
10  in this case, both of which we've made exhibits
11  here.
12          For your two reports, besides you, who
13  if anyone else helped compose them?
14      A. Nobody.
15      Q. Nobody helped compose them?
16      A. No.
17      Q. Did anyone help edit them?
18      A. On this one yet.
19          (Witness indicating.)
20      Q. This one, you're pointing to is the --
21      A. The Dr. Bronars report, yes.
22      Q. Is that -- the Dr. Bronars --

40 (Pages 154 to 157)

158

1     A. My -- my rebuttal.
2     Q. Your rebuttal?
3     A. My rebuttal, yes.
4     Q. So you're referring to what is marked as
5     Exhibit 7?
6     A. Yes.
7     Q. Thank you very much.
8         So for Exhibit 7, you did receive
9     assistance in what?
10        A. Proofing. I tend to make -- I wrote it
11    very quickly, and I didn't have a chance to
12    proofread it for typos. I read it for content
13    to make sure it represented what I was saying.
14        So I had some proofing help.
15        Q. Thank you.
16        From whom did you receive that
17    proofreading help?
18        A. It was actually Mark Rose, but he did
19    track changes and I then approved or disapproved
20    of them.
21        Q. Thank you.
22        How did he send you that? Was that as

159

1     an e-mail --
2     A. E-mail.
3     Q. Let me just complete the question.
4         Mark Rose, paralegal to the Rose law
5     firm, and Mr. Rose's son, David Rose's son, who
6     has also been copied on our correspondence --
7     A. Uh-huh.
8     Q. -- e-mailed back and forth with you
9     drafts or versions in track changes?
10    A. Yes, sir.
11    Q. Thank you.
12        I will represent to you, Dr. Munro, that
13    to this point, defense counsel has not received
14    from plaintiffs, and you don't have with
15    you -- you have not brought with you here today
16    and we haven't received from Mr. Rose any of
17    these e-mails or any versions and track changes.
18    A. No.
19    Q. Has any lawyer in this case asked you to
20    save those track change versions?
21    A. I know to. I know, so I -- I'm positive
22    I have a version of it saved.

160

1         I have the pre-version, the track
2     changes version and this is the final version.
3         Q. Thank you very much.
4     A. Sure.
5     Q. So there's a total of, if we count
6     Exhibit 7 as the final version --
7     A. Uh-huh.
8     Q. -- and from what you said, there are a
9     total of three versions?
10    A. The version I sent him clean. He did
11    track changes. And then I accepted some and
12    it's basically all just typo stuff and sentences
13    that he thought weren't clear. And so then I
14    went through it.
15        And the only reason I had him edit is
16    because I was short on time.
17    Q. To confirm you were not instructed by
18    the Rose law firm to bring either the e-mails or
19    the track change versions to today's deposition,
20    correct?
21    A. It may have been and I didn't think of
22    it. It might have been I read it in your

161

1     subpoena for prior versions.
2         It didn't even dawn on me that I should
3     bring that. So it's really my fault because I
4     should have saw that in the subpoena and
5     remembered that there was a track changes
6     version, because everything else was just my
7     versions.
8         So I can get that to you literally the
9     second I get home.
10    Q. Sure. I appreciate that, Dr. Munro.
11    A. Sure.
12    Q. But just to have a clear transcript, is
13    the answer to my question, no, that you were not
14    instructed to bring them today?
15    A. I don't know. I don't know. I may have
16    been. I don't know. I've been incredibly busy
17    and my memory's lately -- this has just been a
18    lot.
19    Q. So you may have been instructed?
20    A. I very well may have. I'm sorry.
21    Q. That's okay.
22        If you received that instruction in your

olenderreporting.com Olender Reporting          WORLDWIDE
Washington                Baltimore, MD          Florida

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                7/3/2014

---

162

1    e-mail, you would still have a copy of that
2    e-mail?
3    BY MR. ROSENBLOOM:
4        A.  I wouldn't have had it in an e-mail.
5        Q.  It would have been verbal?
6        A.  Yeah.
7        Q.  Do you recall -- okay.
8            Well, with respect to Exhibit 7, which
9    is your most recent report, the file date on the
10   stamp at the top is May 13th.
11           And then you confirm your signature date
12   on the last page is May 7th.
13           Could you confirm that, please,
14   Dr. Munro?
15       A.  Yeah, I said that he sent me --
16       Q.  I just need a yes or no --
17       A.  Oh, yeah, that's my signature.
18       Q.  -- if you could confirm --
19       A.  Yes.
20       Q.  You confirm that says May 7th for the
21   date --
22       A.  Yeah.

---

163

1        Q.  -- the date that you signed it on the
2    last page?
3        A.  Yeah.
4        Q.  And it's filed May 13th?
5        A.  Yeah.
6        Q.  Do you recall when you were exchanging
7    e-mails with and revising this report with the
8    Rose law firm?
9        A.  I would assume -- see, the thing is this
10   might have been -- this being the signature
11   page, might have been sent later because I
12   e-mailed this.
13           I probably sent it the same time,
14   though.  I probably scanned it.
15       Q.  Dr. Munro --
16       A.  I'm guessing within a month -- within
17   two weeks of that time frame.  I could easily
18   find that e-mail, like I said, without an issue.
19       Q.  So sometime probably earlier in May or
20   in late April?
21       A.  That's probably very fair.
22       Q.  Very good.  Thank you very much.

---

164

1        A.  It was literally two e-mails back and
2    forth, Dave needs this soon.
3            I said, I don't have time to do it, you
4    know, I don't have time to do this, to edit it.
5            And he said, you know, I can do track
6    changes.  I am a proofer.  I proofread stuff.
7            And I said, that would be very helpful.
8    I said make sure you track changes.
9            And then I read through it in very great
10   detail for about four hours and made sure I
11   approved of everything and it was all typo
12   changes.
13       Q.  Excellent.  Thank you.
14       A.  And I have those correspondences.
15           Do you need me to make a list of stuff I
16   have to get you?
17       Q.  It's okay.  Hang on to Exhibit 6.
18           And if you would, please turn to Page 5
19   that has at the top, "Summary of Concerns with
20   Dr. Bronars' Expert Report."
21       A.  Uh-huh.  I'm there.
22       Q.  Starting on Page 5, in the second

---

165

1    paragraph, the last sentence reads:
2        "Dr. Bronars' assumptions and
3    category-based adverse impact analysis are but
4    one way to slice the data, and his report
5    misleadingly concludes it is the only way."
6            I accurately read that, correct?
7        A.  You certainly did.
8        Q.  Is it fair to say on -- I'm going to try
9    to paraphrase here in the interest of time, but
10   I'm not trying to misrepresent-testimony.
11           Is it fair to say that what you're
12   referring to here is that Dr. Bronars' report
13   focuses on the importance of looking at specific
14   subgroups of CFSA employees and looking at the
15   data subgroup by subgroup; whereas, your
16   original report focused on the total number of
17   laid-off employees versus the total
18   agency -- the total agency roster?
19           Is that -- is that a fair paraphrasing
20   of what that distinction is looking at?
21       A.  Partially.
22       Q.  Partially.  Okay.  Please explain.

---

42 (Pages 162 to 165)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                                 7/3/2014

166

1    A.  So he implies, and this is just -- don't
2    forget, this is the intro to the whole report,
3    which goes into great detail about what this
4    means, and there's about seven different
5    subsections to problems I saw.
6        But the point of this is, but one way to
7    slice the data refers to both the use of a
8    t-test and the use of the category-based adverse
9    impact analysis.
10       Where I say he misleadingly concludes,
11   it's the only way, that is a reference to
12   Paragraphs 18 and 19 that you just had me read
13   and that I just disagreed with.
14       So that before you even get to the
15   problems analytically and the problems with the
16   factual assumptions he used to base his
17   statistical analysis on.  It's both the use of
18   the t-test and the category-based analysis.
19       And then I go in detail later into why
20   both of those are problematic for several
21   different reasons.
22       Q.  Let's talk about the category-based

167

1    analysis.
2    A.  Sure.
3    Q.  Do you disagree with Dr. Bronars -- it
4    appears that you do from your supplemental
5    report -- where he states that looking at CFSA
6    employee subgroups is appropriate; whereas,
7    looking at the agency overall is inappropriate
8    because looking at the agency overall fails to
9    account for the fact that not all groups were
10   equally susceptible to the RIF?
11   A.  There's a lot of questions in there, so
12   I'm going to try to --
13   Q.  Do you need me to break it down more?
14   A.  Please.  Break it down one step at a
15   time, because there's a lot of stuff there and a
16   lot of answers to each of those.
17   Q.  Do you acknowledge that the RIF -- that
18   the agency CFSA agency, had numerous different
19   subgroups of employees?
20   A.  I acknowledge that they had numerous
21   subgroups of employees and departments that were
22   subject to the RIF, yes.

168

1    Q.  Do you acknowledge that your initial
2    report -- which just to be clear, we have marked
3    Dr. Munro's initial report as Exhibit 11.
4        Do you acknowledge that Exhibit 11 and
5    the conclusions that you reach in Exhibit 11,
6    your initial report, is based on looking at the
7    total -- the RIF -- is based on looking at the
8    agency in its totality with -- strike that --
9    let me rephrase that.
10       Do you acknowledge that Exhibit 11, your
11   initial report, does not account for the fact
12   that different subgroups of employees were
13   subject to the RIF differently?
14   A.  Yes, I acknowledge that.
15       And can I explain?
16   Q.  I want to get back to that, but I'll
17   give you time to explain.
18   A.  Well, it's kind of important to clarify
19   with a yes.
20   Q.  So you said yes and you want to clarify
21   right now?
22   A.  I would.

169

1    Q.  Go ahead.
2    A.  Because yes, because at the time all I
3    was given was the Spaght declaration, which had
4    percentages.  I didn't have the dataset yet.
5        Had I had the dataset I would have
6    looked the way he did at the job level analysis
7    also, job and the category-based analysis.
8        But I would have discarded that as a
9    theory to go about statistically because it had
10   sample size problems, problems where you had 100
11   percent African-Americans in the group,
12   therefore, you can't run a meaning t-test on it
13   and groups that were 100 percent RIF.  Again,
14   you cannot run a t-test on it.
15       Most, if not all, had very small sample
16   sizes and you cannot rely on a t-test like that.
17       So basically -- or any statistic for
18   that matter.
19       And so I would have rejected that both
20   methodologically, but I also would have rejected
21   that from just an assumption standpoint.
22       When you go into statistics, when you do

43 (Pages 166 to 169)

170

1    statistics, you have a dataset. You're told
2    there's a RIF. I looked at every -- the Porchia
3    declaration is not in your stuff. I don't know
4    why, but it's in my report.
5         I looked at the Porchia, the Davidson
6    and the Spaght information. And the -- and I
7    compared them in detail in here.
8         I found it -- in a nice way, I found it
9    inappropriate to base an entire statistical
10   analysis on a category-based analysis that is
11   based on a justification that was signed
12   apparently a date -- in the declaration, a day
13   before his report and that was never before
14   explained in that level of detail or even
15   tracking the same way before. And I found that
16   to be inappropriate to base a category-based
17   analysis on.
18        Put that aside, then there's all the
19   methodological problems.
20        Q. Let me interrupt you. You said a lot
21   and I'm going to let you explain fully, but I
22   want to follow up.

171

1         A. Sure.
2         Q. With respect to the concerns that you've
3    just raised, that Dr. Bronars' -- strike that.
4         With respect to your point that you
5    opine that the datasets were not sufficient
6    or --
7         A. No, there was discrepancies between the
8    Spaght -- what Spaght said in 2010 in his
9    declaration and what he cited to be the sample
10   sizes, and what I found to be the sample sizes
11   in the data the defense provided me.
12        Q. Thank you.
13        A. They were quite discrepant.
14        Q. You just paraphrased that better than I
15   had.
16        Is it fair to say that that problem that
17   you just articulated, the problem in your view,
18   you did, in fact, articulate in your
19   supplemental report?
20        A. Yes.
21        Q. Very good.
22        A. That was one of the first issues I took

172

1    with his analysis; one of many.
2         Q. And is it fair to say that the full
3    import of what you just said today verbally
4    about that is contained within your rebuttal
5    report?
6         A. About the dirty data? Concerns about
7    the data?
8         Q. Exactly.
9         I mean, I will represent to you that it
10   is correct that you do speak about --
11        A. Yes.
12        Q. -- what you call dirty data in your
13   supplemental report?
14        A. I speak about that. It may not be the
15   fullest version of what I could say about it
16   because the first thing you're supposed to do as
17   a statistician is match up to make sure your
18   data is accurate. And when you see data that
19   has different numbers than the original
20   declaration, that should be a major flag.
21        You also have a totally different numb
22   of people coded with race. That should be

1    initial flag, and you should at least explain
2    that in your report somewhere.
3         Q. So just now for the sort of
4    administrative housekeeping level --
5         A. Sure.
6         Q. -- your -- you acknowledge that in your
7    supplemental report, you contain this dirty data
8    argument that you're making, correct?
9         A. Let me verify.
10        I'm sure I read it last night. I'm sure
11   I did, but let me verify that before I put
12   something on the record.
13        (Witness reviews document.)
14        I think it starts...
15        I talk about it on Page 2.
16        Q. As you just noted, in your original
17   report which is Exhibit 11, you had -- as you
18   say yourself, you referred to the Spaght
19   declaration?
20        You referred to the Spaght declaration?
21        A. Yes.
22        Q. And then in Exhibit 7, which is your

44 (Pages 170 to 173)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                              7/3/2014

174

1    supplemental report, you then criticized the
2    timing of the provision of additional
3    information and questioned the data; is that
4    correct?
5        A.  Yes, and ran analysis on the database he
6    provided me.
7        Q.  Very good.  Thank you.
8        A.  I didn't just leave my original report.
9    I actually reran all the analyses.
10       Q.  Thank you.
11           Is it also fair to say that your most
12   up-to-date and current opinion is contained in
13   Exhibit 7, your supplemental report?
14           Is that fair to say?
15           Or are you today offering any newer or
16   different opinions than is contained in your
17   most recent report?
18       A.  Not different, I could just probably say
19   a whole lot more if I had more time and space.
20       Q.  You acknowledge that the point that you
21   made earlier in your response about the Spaght
22   declaration being all you had at the time that

175

1    you wrote the first — the first exhibit is
2    something that you addressed in your second
3    report, correct?
4        A.  I don't know if I addressed that.  I
5    mentioned that it's all I had at the time and I
6    used that, but I also then reran the analysis on
7    Page 2 with the actual data —
8        Q.  On Page 2 —
9        A.  Of my rebuttal report.
10       Q.  Very good.  And you've answered that.
11   Thank you.
12           Let me ask —
13       A.  Can I clarify one thing?  I wasn't quite
14   done.
15       Q.  If you absolutely feel you need to —
16       A.  I do.
17       Q.  — but I want to be time —
18       A.  I understand.
19       Q.  — cautious.
20       A.  I understand.
21       Q.  Dr. Munro, I don't — there's not a
22   question that I have for you about — right now

176

1    about even the conclusions you're reaching.  I'm
2    just trying to make clear the timeline of what
3    happened —
4        A.  Oh, okay.
5        Q.  — and that's all.
6           We'll get deeper into it.
7        A.  Okay.  I can't wait.
8        Q.  Very good.
9           If you would please turn to your
10   supplemental report.  That is Exhibit 7.
11       A.  Which page?
12       Q.  Would you please look toward Page 8 on
13   your supplemental report, and there's text on
14   Page 8 using language, "I am not to judge if
15   Mr. Davidson's declaration..."
16       A.  Where are you reading from?
17       Q.  There's —
18       A.  Oh, I see it.
19       Q.  You found it?
20       A.  Yes.
21       Q.  Where — let's see.
22       A.  I see it.  It's the second paragraph,

177

1    second sentence.
2        Q.  Thank you.
3           Page 8 of your supplemental report, in
4    that paragraph, the second paragraph, where you
5    read, "I am not to judge if Mr. Davidson's
6    declaration is inaccurate," and then you have a
7    parenthetical, "but late representation," and
8    then the sentence concludes.
9           I want to ask you a couple of questions
10   about that sentence.
11       A.  Let me finish the sentence.
12       Q.  Take a minute to read it to yourself if
13   you need to.
14       A.  (Witness reviews document.)
15           Okay.
16       Q.  What do you mean by your parenthetical,
17   "but late"?
18           I'll represent it appears that — what
19   it appears, and you can speak to this, is that
20   you're stating that the representation from
21   Mr. Davidson and — strike that.
22           Let's clarify the record.

178

1       Before I ask you about that sentence,
2   when you refer to Mr. Davidson's report, you are
3   referring to what has been marked as Exhibit 16,
4   the affidavit of Mr. Davidson, correct?
5       A.  Yes.
6       Q.  Thank you.
7           What do you mean by your parenthetical,
8   "but late"?
9       A.  I'm sorry.  I didn't want to forget part
10  of my point.
11          So as a practitioner, they should have
12  figured all this stuff out ahead of time and it
13  should have been in the explanation in 2010.
14          Then you look at the other declarations.
15  They don't explain why they're choosing those
16  positions.
17          Like the Spaght declaration, all it says
18  is these people were RIF'd.  It gives no
19  explanation.
20          If you were an internal person working
21  there as an IO psychologist, you would have
22  strongly recommended they run analyses ahead of

179

1   time and ensure that what they were doing made
2   sense from a business perspective and they met
3   their goals that they claim to have and didn't
4   cause any sort of adverse impact.
5           And if they had ran any sort of basic
6   analysis, they would have seen the impact.
7           I mean, you look at the grade level.
8   You look at the jobs chosen.  You look at
9   the -- everything, the overall.
10          And so when I say "but late," I'm saying
11  I get this declaration that's signed a day
12  before Dr. Bronars' report, because I'm assuming
13  he meant 2014, as you -- he signed it 2013, but
14  it was --
15      Q.  I think your point is correct, and you
16  note that in your report.
17      A.  I did.  I put "sic," "2013 sic."
18          So when I see them signed two days
19  apart -- if I'm a practitioner -- I'm not
20  thinking as a lawyer.  I'm thinking as an IO
21  psychologist.  I'm saying this doesn't make
22  sense.

180

1       Q.  Just for brevity purposes to clarify, so
2   what you mean by your parenthetical "but late,"
3   is your receipt of the affidavit for
4   Mr. Davidson coming in 2014 several years after
5   the RIF is conducted, correct?
6       A.  And that being the first time it was
7   ever explained in any detail why
8   these -- what -- what happened.
9       Q.  Do you acknowledge that in the -- strike
10  that.
11          The -- your testimony to that point that
12  they should have looked at this earlier and
13  seen -- and made projections earlier, you're not
14  suggesting, are you, that the fact that
15  Mr. Davidson's affidavit was not made until 2014
16  for this litigation means that the RIF is
17  evidence that the RIF was conducted without
18  regard to impact on the work force, are you?
19      A.  I can't speak to what his motivation is
20  or what was in his head.
21          I can just say, one would have expected
22  that if that was their reasoning, to see that in

181

1   the Spaght declaration in 2010.
2       Q.  And is it possible that -- strike that.
3           This lawsuit was filed in 2010, correct?
4       A.  I don't know.
5       Q.  I'll represent to you that it was.
6           You acknowledge that in the course
7   of -- strike that.
8           I've previously asked you if in this
9   case you've been working as an attorney or an
10  expert, and you replied the latter, that you've
11  been working as an expert, but you have not been
12  working with the Rose law firm as an attorney,
13  correct?
14      A.  No, I have not done any legal work for
15  them; no.
16      Q.  So that means in terms of the day-to-day
17  exchange of papers and filings in this case on
18  the court's website and exchanges, discovery
19  requests, you haven't been part of that?
20      A.  Uh-huh.
21      Q.  Correct?
22      A.  No.

46 (Pages 178 to 181)

182

1    Q. Have you been part of helping the
2    plaintiffs' law firm come up with a discovery
3    request that they propounded upon us?
4    A. No.
5    Q. Is it your --
6    A. I said I wanted data at one point and
7    they said it wasn't available or that the
8    defense wasn't -- I don't know. But I
9    eventually got it from Dr. Bronars' report.
10   So...
11   Q. Okay. So that --
12   A. I think we got some before that, too,
13   but it was very dirty, so I didn't go into it.
14       And then we got Dr. Bronars' report, so
15   I used his data.
16   Q. You don't -- as you sit here today,
17   despite your criticism of the timing of the
18   affidavit of Raymond Davidson, you don't have
19   any information or evidence that defendant
20   District of Columbia withheld any request for
21   information, do you?
22   A. No. What I'm referring to --

183

1    Q. Just yes or no. We didn't withhold
2    anything, correct?
3    A. No. How would I know that? How would I
4    know that information?
5    Q. Just to move it along with yes-or-no
6    answers.
7    A. Sorry. No.
8    Q. Has Mr. Rose, either David Rose or Josh
9    Rose, represented to you that we have withheld
10   any information?
11   A. No.
12   Q. In the course of your putting together
13   the supplemental report, you looked at, relied
14   upon and sought to rebut Dr. Bronars' report
15   that we submitted, correct?
16   A. Yes, because I was moderately appalled
17   at the way he did the statistics.
18   Q. Were you moderately appalled by the
19   statistics?
20   A. Yes.
21   Q. Now, would you --
22   A. And the assumptions and a lot -- just,

184

1    yeah.
2    Q. Is it fair to say that -- you've
3    expressed today that you're appalled by the --
4    A. Just the --
5    Q. Let me finish the question.
6    A. Okay.
7    Q. Do you have any problems with the
8    statistics or the methodology in Dr. Bronars'
9    report that are not included in your
10   supplemental report?
11       Yes or no?
12   A. How am I supposed to answer that?
13   It's a 34-page report. I can't read
14   through it all right now and double-check my
15   notes that I made. I --
16   Q. So Dr. Munro, is it possible --
17   A. -- pretty well covered it.
18   Q. So that --
19   A. But there might be additional things.
20   Sorry.
21   Q. So you're saying there might be
22   additional things?

185

1    A. If I looked at it again, I might find
2    more.
3    Q. So are you saying that if you were
4    called to trial -- called to testify at trial in
5    this case, you might testify to opinions that
6    are not included in your supplemental report?
7        Is that what you're saying?
8    A. Well, actually, what I'm saying is now
9    that you photocopy --
10   Q. Just yes or no.
11       You can explain it, Dr. Munro, but yes
12   or no --
13   A. So that --
14   Q. Excuse me --
15   A. The answer's no then.
16   Q. The answer's no?
17   A. Because -- may I explain?
18   Q. Go ahead and explain.
19   A. The answer is no because I actually then
20   did -- last night, I made notations on his table
21   about why none of those analyses were
22   appropriate and the reasons.

186

1   Additionally, on the old report I had
2   written, I ran the t-tests overall and they were
3   not matching his.
4   And even though I don't use t-tests and
5   you're not supposed to use t-tests in this area
6   because they're going to be the same chi-squared
7   and they're not -- the two standard deviation
8   rule is not the rule.
9   T-tests are perfectly fine. It's
10  just --
11  Q.  I'm going to interrupt you again.
12  I'm not looking to talk about the
13  substance of what you're saying. This is an
14  administrative question.
15  That question again, and I'm going to
16  try to ask you to explain.
17  Do you, as you sit here today, have
18  opinions about this case that you would offer at
19  trial that are not contained within Exhibit 7,
20  your supplemental report?
21  A.  With the notes in here that you're
22  photocopying, the answer is no.

187

1   Q.  Thank you.
2   So you're saying yes, there are things
3   within -- that are not within what has been
4   submitted as Exhibit 7, but what you're pointing
5   to which contains your handwritten notes and has
6   been marked as Exhibit 17, that does contain
7   additional notes and opinions not contained
8   within Exhibit 7; is that correct?
9   A.  Yeah, because I made notes in the
10  margins, so yes.
11  Q.  So those notes in the margins -- now, I
12  would ask you to share, as succinctly as
13  possible, what additional opinions have you
14  reached that are contained in Exhibit 17 that
15  are not in your supplemental report filed with
16  the court on May 13th?
17  A.  It's not really additional opinions
18  other than the fact that the t-test is
19  significant when you look at the overall group.
20  It's just that I reread this and just
21  was -- saw, for example, like I would want
22  further justification on -- like I would want to

188

1   see the interview guide that they used.
2   Q.  And just slow down a little bit. I'm
3   listening.
4   A.  Like some stuff I -- I cover on a high
5   level in here. And keep in mind, this is a
6   32-page report, single-spaced.
7   Q.  Dr. Munro, you said -- I want to go
8   piece by piece about each of the new things.
9   A.  Sure.
10  Q.  You said you would want to see the
11  interview guide they used?
12  A.  Yes. They didn't explicitly say that in
13  here.
14  I noticed when reading this again that
15  they used -- they used interview guides. And I
16  made a note in the margin saying, like to see
17  this.
18  And then they used a 70 percent cutoff
19  score which I said, like to see the validity of
20  that. So I would like to see the validation
21  study as a best practice that shows that that
22  cutoff score and that those items are valid at

189

1   predicting the best performer and also do not
2   have any adverse impact, because that's what
3   they used to rehire people in.
4   So that's an example of some of the
5   additional things that dawned on me.
6   They're mentioned in here in passing,
7   like that they used interviews and that the jobs
8   are the same. Like I compared the job
9   descriptions. And I said the jobs are basically
10  the same, except for the interviewing of
11  families.
12  I could go into more detail with that
13  stuff if I could see a job analysis, if they
14  have one.
15  The job descriptions look the same to
16  me.
17  So there was just additional stuff I
18  would like to see that I bet you would not pass
19  best practices, just because it generally --
20  Q.  Dr. Munro, the things that you would
21  like to see that you think might not pass best
22  practices are what the interview guides were,

48  (Pages 186 to 189)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                7/3/2014

190

1       what the job descriptions were?
2           A. Right.
3           Q. Is there anything else to just add to
4       that list?
5           A. Well, specifically, I would like to see
6       the interview guides to see if they are
7       structured behaviorally based -- behaviorally
8       anchored rating scales.
9               I would also like to see if they're
10      structured.
11              I would also like to see the technical
12      report, what's called a technical report that
13      you do for any sort of instrument you use for
14      selection. And that should include an analysis
15      of the interview guides, showing not only
16      qualitative linking to the job description in
17      detail, but also in best practices. You would
18      also have validity coefficients. You would have
19      an adverse impact number.
20              That's not always available. Sometimes
21      just a mapping between the job description and
22      the interview guide is, but making sure the

191

1       interview guide is proper form.
2           Q. Thank you.
3           A. Honestly, there's no -- we'll be here
4       for three days if I rack my brain and think
5       through every new thought I had on this.
6               It's pretty much in the margins,
7       though.
8           Q. Is it fair to say, though, that you were
9       retained and you have been proffered as the
10      statistical expert regarding the numbers of
11      African-American employees and employees over
12      the age of 40 subject to the RIF versus the
13      population of agency overall, and you were not
14      retained to offer opinions going to the -- to
15      your perception of the quality of the interview
16      guides, the technical reports and the
17      interview -- and the job descriptions; would
18      that be correct?
19          A. No, that's actually incorrect.
20          Q. So is it your testimony --
21          A. Again, my understanding --
22          Q. Just let me follow up.

192

1           A. Sorry.
2           Q. So is it your testimony?
3               MR. TEMPLE: Counsel, I have
4       listened for the last 30 to 45 minutes and you
5       consistently interrupt the witness in the middle
6       of her question -- answers.
7               You will ask the question. She will
8       answer. Then you will ask her another question,
9       deviating -- which deviates her from another
10      question, the underlying question that you
11      posed.
12              I would only ask, respectfully, that you
13      let her answer her question.
14              If she goes too long, you're cutting her
15      off habitually here.
16              MR. ROSENBLOOM: I object to the
17      colloquy and dispute the point, Counsel.
18      BY MR. ROSENBLOOM:
19          Q. Dr. Munro, with respect to the -- what
20      we were talking about.
21              So are you saying my -- you said "no" to
22      my last question.

193

1               So your testimony in this matter beyond
2       statistics does -- from your standpoint, does in
3       fact go to and include the quality of the
4       interview guides and job descriptions and
5       whether rating scales were structured and
6       behaviorally based?
7           A. In my opinion, it's all one. It's all
8       wrapped together and it's all under my expertise
9       and it's actually all in the report.
10              If you notice my notes, I -- when you
11      get to Page 22, I head it with a -- a
12      handwritten note, "Subject Matter: Expertise =
13      IO Psychology."
14              This is when it switched from a stat
15      expert to a subject matter expert. This is
16      where I go into detail about comparing the job
17      descriptions and I go into detail about the
18      process for the rehire and wanting to see the
19      interview guides and the reports. Because
20      generally when you do this internally as a
21      practitioner -- keep in mind I'm not a
22      professional expert witness -- when you do this

49 (Pages 190 to 193)

194

1  as a practitioner, they all go together. Your
2  whole process is the process.
3       You have to make sure it's all fair and
4  good and selecting the best person and not
5  discriminatory.
6       Q. Did you ever tell Mr. Rose that he
7  should request from us in discovery these items
8  that you're claiming that you wish you could
9  see?
10      A. Honestly, it just dawned on me when I
11 was reading it last night.
12      Q. Thank you.
13      So this was not something that was
14 occurring to you when you wrote your report back
15 in April or May?
16      A. When I wrote the report, I would have to
17 reread how I referenced them.
18      But I referenced concerns about the use
19 of college education when the job descriptions
20 were basically identical substantively, with the
21 exception of one job task, which is interviewing
22 families.

195

1       And I would like to see the evidence
2  linking the need for a college education to
3  interviewing a family when they basically did
4  similar tasks before that.
5       So I didn't specifically ask for that
6  evidence citing that, but I would like to see
7  that. Now it dawned on me.
8       I would like to see -- given the job
9  descriptions are the same, I would like to see
10 all the job descriptions.
11      Because they claim that one of the
12 departments, I don't remember which one, that
13 there was a duplicate of function and they
14 eliminated one of the teams.
15      I would like to see the job descriptions
16 to see if that's true.
17      I mean, there's a lot of stuff that I
18 could look at here.
19      If I was a practitioner -- if CFSA were
20 to hire me internally and I were to go in there
21 or as a consultant, I would look at their stuff,
22 and there is probably a lot of problems I would

196

1  find based on what I'm seeing here.
2       I've been doing this a long time, 15
3  years. I've seen good companies that do this
4  stuff right and I see companies that don't
5  follow best practices.
6       Q. Would you acknowledge that to the extent
7  that you have not seen these things that you
8  have said you would like to see, that to the
9  extent you have not seen them, then that means
10 that you're unable to render an opinion on them
11 with any certainty; is that correct?
12      A. I can render an opinion on the job
13 descriptions because I saw them, comparing the
14 old SSA, I believe it was, whichever was turned
15 into the FSW.
16      Q. To the extent there are things that you
17 have not seen --
18      MR. TEMPLE: You're interrupting
19 her again.
20      THE WITNESS: I cannot render an
21 opinion on anything I haven't seen. That would
22 be illogical.

197

1       MR. ROSENBLOOM: Again, I dispute
2  that. When I ask a yes-or-no question and I
3  don't immediately get a yes-or-no answer, then
4  it's not interrupting.
5       I'm also going to put Counsel on notice
6  that the next time we -- well, let's just try to
7  move this on, but I'm getting close to
8  suspending and calling the court.
9       I've been very generous with letting the
10 long narrative answers go.
11 BY MR. ROSENBLOOM:
12      Q. Dr. Munro, when you say that you've seen
13 some of the job positions, are you claiming to
14 have seen all of the job positions?
15      A. No, it's -- no.
16      Q. Thank you.
17      And with respect to the interview
18 guides, you have not seen those, correct?
19      A. I have not.
20      Q. Dr. Munro, in the course of this
21 litigation -- strike that.
22      Besides the -- are there any other

50 (Pages 194 to 197)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                      7/3/2014

198

1    pieces of information — I'm going to repeat a
2    question to you that was asked earlier but with
3    a different focus.
4          When you start — we were talking about
5    cases earlier. I asked you if there were any
6    cases or other authorities upon which you relied
7    in your report.
8          I'm going to basically ask you the same
9    question now, but instead of thinking about
10   cases or authorities, I want you to think about
11   documents or evidence that has been gathered or
12   produced in this lawsuit, whether it was things
13   that were given to you by plaintiffs' counsel or
14   things that were produced by the Office of the
15   Attorney General.
16         Are there any pieces of information or
17   evidence upon which you have relied in reaching
18   your opinions that are not articulated in your
19   reports?
20     A.  No. Everything I relied on is
21   articulated.
22         MR. ROSENBLOOM:  Thank you very

199

1    much.
2          Can we take a five-minute bathroom
3    break?
4          MR. ROSENBLOOM:  Sure.
5
6          (Recess taken from 2:19 p.m.
7          to 2:30 p.m.)
8
9    BY MR. ROSENBLOOM:
10     Q.  Dr. Munro, with respect to your 70
11   percent cutoff score that you raised earlier, is
12   there anything specific about your position on
13   that that is not contained within your
14   supplemental report?
15     A.  It's just in the margins because I just
16   thought of it last night.
17     Q.  So the answer would be, yes, it's in the
18   handwritten margins on Exhibit 17?
19     A.  Yeah. Let me just double-check that
20   that's accurate. It should be.
21         It's also in this note, by the way.
22   Yeah, right there.

200

1          (Witness indicating.)
2          "Job selection process, college degree?
3    OXM," and that means interview, and "70 percent
4    cut?"
5      Q.  And so you're referring to another piece
6    of paper which has handwritten notes?
7      A.  Yes.
8          MR. ROSENBLOOM:  Let's go ahead
9    and mark that as the next exhibit.
10
11         (Exhibit No. 20, Handwritten Notes,
12         marked for identification.)
13
14   BY MR. ROSENBLOOM:
15     Q.  Dr. Munro, what is it that you would say
16   about the 70 percent cutoff score that is not
17   contained within your report?
18     A.  I would just say that I would like to
19   see what the basis of that was.
20     Q.  And you mean the basis of deciding that
21   reaching a 70 percent level of proficiency on a
22   test was required?

201

1      A.  Interview.
2      Q.  On the interview?
3      A.  More specifically, I would like to
4    understand -- because it appears how they use
5    their selection process, you had to pass the
6    interview to be considered for the job. And if
7    that's the case, then it's a selection
8    determination.
9          And I would like to know what that 70
10   percent is based on as well as see if the
11   instrument looks like it's best practices and if
12   it actually has a validity coefficient and
13   adverse impact report to go along with it.
14     Q.  Are you aware that the discovery in this
15   case closed a while ago and has only been
16   extended by a recent order through August 4th
17   for expert discovery only?
18         Were you aware of that?
19     A.  No. Maybe I saw it in one of the
20   e-mails that you had.
21     Q.  And to -- and you acknowledge that you
22   have not been presented with sufficient

51 (Pages 198 to 201)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

---

202

1  information to form an opinion about the
2  interview or the interview cutoff score,
3  correct?
4      A.  I have not been provided sufficient
5  information to form an opinion about either
6  that, but I have been provided sufficient
7  information to call into question their process
8  for rehire.
9      Q.  And in your opinion as an expert, what
10  is the difference between formulating an opinion
11  versus calling something into question, to use
12  your words?
13      A.  Well, I have to see the material to form
14  an opinion about it.
15      But I can have an opinion that I have
16  questions about the selection process, given --
17  or for the rehire portion, given the college
18  degree doesn't make sense looking at the job
19  descriptions, and given that there was no
20  information described in the declarations
21  provided to me other than an interview was used
22  and a 70 percent cut was used and they mentioned

---

203

1  the categories of what was measured, but they
2  didn't define them nor describe how they were
3  measured.
4      Q.  There is a difference in your mind,
5  though, between having sufficient information to
6  form an expert opinion in litigation that is
7  proper under the Daubert standard --
8      A.  Right, right.
9      Q.  -- versus having information that might
10  lead you to call a process into question --
11      A.  Yes.
12      Q.  -- yet not having enough information to
13  form an expert opinion?
14      A.  I get what you're saying.
15      So let me clarify.
16      Job descriptions being virtually the
17  same or substantively the same, which calls into
18  question the college degree requirement; I have
19  formed an opinion that would pass Daubert.
20      The interview quality -- interview guide
21  quality, the cut score and validity coefficient
22  and all that stuff that goes along with that, I

---

204

1  do not have sufficient information to form an
2  opinion.
3      Does that clarify?
4      Q.  Thank you for clarifying.
5      A.  Good.
6      Q.  So you do feel that you have an opinion
7  that you're offering that the -- an opinion
8  against the bachelor degree requirement for the
9  FSW positions?
10      A.  Based on the information I was provided,
11  which is the job description for the eliminated
12  position and the job description for the new
13  position, reading them line by line and
14  comparing them, which is what you do, I saw no
15  difference other than wording, which I think I
16  refer to in the report as using more complex
17  terminology, but substantively didn't alter the
18  knowledge skills and abilities or tasks.
19      And then the one task difference was
20  interviewing the families.  And from a task,
21  knowledge, skills, ability perspective, that did
22  not differ substantively from the other tasks of

---

205

1  required of the other position in any way
2  sufficient to justify a college education.
3      Q.  Do you acknowledge that there are or at
4  least may be other factors that you don't know,
5  because you have not been subject -- you have
6  not participated in the fact discovery --
7      A.  Absolutely.
8      Q.  -- that were taken into account in
9  drafting the job descriptions to which you
10  object?
11      A.  Wait.  Reform that or ask that again.
12      Q.  Do you acknowledge that there's
13  information that you don't have or there may be
14  information that you don't have that implicated
15  the job descriptions?
16      A.  I don't see how that's relevant, because
17  it doesn't matter what drove drafting them.
18      I'm looking at the descriptions and
19  they're not substantively different.
20      Q.  Would it be relevant in your mind if the
21  agency was required --
22      A.  Yes.

---

52  (Pages 202 to 205)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                          7/3/2014

---

206

1    Q. Let me finish the question.

2    A. I know where you're going, though.

3    Q. Would it be relevant to your opinion if

4 the agency was required to draft job

5 descriptions akin to the ones that it ended up

6 drafting for the FSW ones, whether required by a

7 court order or by some other mandate?

8    A. That's not where I thought you were

9 going.

10    I thought you were going, would I find

11 it relevant if there was a regulation or law

12 that mandated interviewing families required a

13 college education.

14    That would certainly be relevant and

15 then that would rebut my concern about the

16 college education, which again, is really quite

17 an ancillary point to the probably 15 to 20

18 major points I have.

19    But is it -- do I recognize that there's

20 potentially information like a court order that

21 made them draft it?

22    I don't see why that matters, because

---

207

1 the bottom line is they eliminated one position

2 that had a job description and they created a

3 new position that they drafted a job description

4 by court order, by whatever, and the two are

5 substantively the same.

6    Q. But you acknowledge that you were not

7 part of the drafting process?

8    A. Of course not.

9    Q. And you acknowledge that during the

10 drafting process, the drafter or drafters likely

11 had -- strike that.

12    Do you acknowledge that it's possible

13 that a court has the power -- let me rephrase

14 again.

15    Do you acknowledge that a court order

16 could be impacting -- could have impacted how

17 the new job descriptions for the FSW position

18 were crafted?

19    MR. ROSE: I object.

20    MR. ROSENBLOOM: Duly noted.

21    MR. ROSE: A court order that

22 doesn't exist as far as we know?

---

208

1    MR. ROSENBLOOM: Sir, let's not

2 have a speaking objection.

3    Are you -- you've made your objection.

4 Are you letting her answer?

5    THE WITNESS: Yes, I'll answer --

6    MR. ROSE: I'm sorry. The

7 question is, is it -- I am not aware that there

8 is any court order.

9    MR. ROSENBLOOM: But Mr. Rose,

10 we'll not deposing you, sir.

11    My question is whether she acknowledges

12 that a court order could have been -- that a

13 court order could have been driving the job

14 descriptions. Whether you know about it is

15 not -- is not a form objection to the question.

16    MR. TEMPLE: That question -- I

17 object to the form of the question and the fact

18 that it also calls for speculation.

19    MR. ROSENBLOOM: Thank you.

20    THE WITNESS: Do I answer still?

21 BY MR. ROSENBLOOM:

22    Q. Go ahead.

---

209

1    A. I acknowledge there could be something

2 that drove the crafting of it in the way they

3 did.

4    But once again, I still don't see how

5 that has any relevancy on the job descriptions

6 are the same, but why does one require a college

7 education and the other not.

8    Q. And are you familiar at all -- prior to

9 reading it in Exhibit 16, the affidavit in -- of

10 Raymond Davidson, were you familiar with the

11 LaShawn litigation.

12    A. No.

13    Q. After reading Raymond Davidson's

14 exhibit -- affidavit, I'll hand you --

15    A. Can you give it to me.

16    Q. -- a copy of that.

17    The LaShawn litigation is referred to in

18 Exhibit 16, which you note in your report?

19    A. Uh-huh.

20    Q. And if you turn to Paragraph 15, on

21 Page 4, there's a reference with a case citation

22 to LaShawn V Gray.

---

53 (Pages 206 to 209)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                          7/3/2014

210

1    A. Yeah.
2    Q. So my first question, which you already
3    answered in the negative, was that you had
4    not -- you were not familiar with this before
5    you read the report, correct?
6    A. Not that I can recall.
7    Q. You were not familiar with it before you
8    read Mr. Davidson's affidavit, correct?
9    A. I do not believe so, no.
10   Q. Since reading this affidavit, have you
11   researched anything from this case?
12   A. I actually did not.
13   Q. Is it fair to say then that you don't
14   have an opinion on anything about the LaShawn
15   versus Gray case?
16   A. No, but this was what I was referencing
17   earlier when they talked about pending --
18   pursuant to that order, that's why they had
19   redundant teams that they eliminated.
20       It was one of the bases that they had
21   for some of their -- a small group of their
22   RIFs.

211

1    Q. And Dr. Munro -- that's fine. Thank
2    you.
3    A. Sure.
4    Q. So just to have a clear record, you have
5    not read anything independently about that
6    case?
7    A. No, I did not.
8    Q. Thank you very much.
9        Dr. Munro, is it -- have you read or
10   seen any internal DC government e-mails or
11   documents about the drafting of these positions?
12   A. No. But again, I'm looking --
13   Q. Dr. Munro, it was just a yes-or-no
14   question.
15   A. Okay. No, I have not.
16   Q. Thank you.
17       Dr. Munro, have you personally talked to
18   any current or former DC government employees
19   who are involved in the drafting of the job
20   descriptions?
21   A. No, I have not.
22       MR. ROSENBLOOM: In -- quick

212

1    indulgence, counsel, I just need about a second
2    here.
3
4              (Pause In Proceedings)
5
6    BY MR. ROSENBLOOM:
7    Q. Dr. Munro, in your -- both in your
8    report and in your earlier testimony, you've
9    taken issue with the reduction in force as it
10   applied to groups of employees where the entire
11   group was African-American, and you've made the
12   point that it's -- if I'm properly paraphrasing
13   you from earlier, it's impossible to do a t-set
14   analysis where it's entirely African-American.
15       Can you explain that, please?
16   A. Yeah, and that's not a proper paraphrase
17   statistically.
18       So --
19   Q. Just to be clear, you're reading right
20   now from some handwritten remarks?
21   A. On Dr. Bronars' table.
22   Q. On Dr. Bronars' table. And this is

213

1    within Exhibit 17. And there's an orange tab in
2    the top right corner.
3        Okay. Go ahead, Dr. Munro.
4    A. Okay. So the issue with running any
5    statistic when you have, just for simplicity,
6    100 percent -- whatever, African-American.
7    Okay.
8        So 100 percent African-American. So I
9    do an illustration in here, I don't remember
10   what page it's on, which is a perfect
11   illustration. But the best way for me to
12   describe this to you is by illustration.
13       So would you mind? It might take a
14   second.
15   Q. Well, my question is, you said that I
16   didn't properly paraphrase you.
17   A. Right.
18   Q. So let's just start here.
19   A. Okay.
20   Q. Can you then, please, repeat or correct
21   my paraphrase.
22       You spoke earlier about that -- I'm

54  (Pages 210 to 213)

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

214

1    attempting to paraphrase you — that it's not
2    possible to do a t-set analysis where you have
3    an entire group that's African-American that's
4    laid off.
5         Can you address that? Tell me what I've
6    said there that is not a correct paraphrase.
7    A. I understand the question now.
8         This applies whether it's 100 percent
9    African-American or just the whole group is 100
10   percent African-American.
11        If you are doing a two — you're
12   comparing two proportions. You're comparing a
13   proportion of say white to black.
14        If 100 percent of that group is black,
15   whether 50 percent are terminated or 100 percent
16   are terminated, the actual two expected ratios
17   are going to be what that distribution of that
18   group is.
19        So if you have 100 people in a job and
20   you have — if the illustration is 100 people in
21   the job. 50 people are white. 50 are black.
22   You terminate 10. You would expect five white,

215

1    five black.
2         If it deviates from that, then let's say
3    to get to the two standard deviation, you would
4    probably need, you know, I don't remember, I
5    don't know how many, but you would have to
6    deviate beyond the five and five.
7         So the problem is in this scenario when
8    you have 100 percent of one race, the note I
9    wrote was, with nobody white in the group, you
10   can run the test, just the interpretation of it
11   doesn't make sense because you're comparing
12   proportions.
13        So you have 100 percent black. What are
14   you comparing that to? 0 percent white? But
15   then it's going to be the same in the actual and
16   the expected.
17        There's — it's not interpretable. It
18   doesn't make logical sense.
19   Q. Does that problem that it's not
20   interpretable, in your opinion, make it illegal?
21   A. It's just — illegal?
22        It's just the wrong way to look at if

216

1    something illegal was done.
2    Q. Is that — strike that.
3         Thank you.
4    A. I have more issues with this table, if
5    you want to talk about it now.
6         Can I add one thing?
7    Q. Sure.
8    A. The same problem arises a little
9    slightly different when you have 100 percent of
10   the group terminated, whatever the
11   representation is of black and white because,
12   again, you don't have a comparison.
13        You don't have a — it's meaningless
14   because all of the group is terminated.
15        So basically, whatever the
16   representation in the job is, it's going to
17   be — you're going to get a 0 deviation.
18   Q. Thank you.
19   A. This is the problem and this is most of
20   these analyses apply to one of those two
21   situations.
22   Q. Dr. Munro, I'd like to ask you to turn

217

1    to Exhibit 9.
2         Do you have a copy of that?
3         It's Dr. Bronars' report.
4    A. I have it.
5    Q. Would you please turn to Paragraph 20
6    and take a moment —
7    A. I'm sorry. This is my report.
8         Paragraph 20; got it.
9    Q. Take a moment to review Paragraph 20 of
10   Exhibit 9.
11        Please also review Paragraph 21.
12   A. (Witness reviews document.)
13        Yes, sir.
14   Q. Thank you.
15        I'll ask you a couple of questions about
16   that.
17        I'll represent to you that I think
18   Paragraphs 20 and 21 get to a major heart of the
19   dispute between what Dr. Bronars has opined and
20   what you have opined.
21        Would you at least agree generally with
22   that, that Paragraphs 20 and 21 are really a big

218

1   part of what's at the heart of this dispute
2   statistically?
3       A. Yes, because Paragraph 20 --
4       Q. I don't want to be rude. I just want to
5   move this along.
6       So yes, you agree?
7       A. Yes, I agree.
8       Q. Thank you.
9       Do you feel you need to clarify your
10  "yes"?
11      A. Just to clarify, the difference between
12  them, Paragraph 20 is about throwing their names
13  in a hat.
14      My analysis assumed all jobs were
15  equivalent at risk for termination. And I have
16  two responses to that, which I won't go into.
17      And then Paragraph 21 says, his did the
18  seven different groups. And obviously, I have
19  several concerns to go with that one.
20      Q. Very good.
21      A. They're different ideas. One is the
22  assumption upon -- based upon which we chose our

219

1   analysis type.
2       The other is the specifics of the
3   analysis type he chose.
4       Q. Very good. Thank you.
5       Do you have any additional opinion in
6   opposition to Paragraphs 20 and 21 that you
7   would testify about before that jury which is
8   not included in your supplemental report,
9   Exhibit 7?
10      A. I think the supplemental report covers
11  it pretty well. It's quite detailed on these
12  two points or the -- on these two areas, which
13  have multiple sub-objections.
14      Q. Thank you.
15      A. Now, does that mean if I realize and
16  figure out something additional later is another
17  point to challenge him on that I can't testify
18  about it at trial?
19      Q. That's a legal point, so I'll decline to
20  respond.
21      I'm sorry.
22      A. I can't imagine I can think of anything

220

1   else, but you never know.
2       Q. I'll clarify on the record, certainly it
3   would be our position that any opinions given at
4   trial would need to be limited to what's been
5   put forth in the report.
6       A. Or at least begun to be discussed in the
7   report.
8       I wouldn't have to read the report,
9   right?
10      Q. It's a bit out of place to talk about
11  what would happen at trial.
12      A. I apologize.
13      Q. I'm trying to nail down what you would
14  testify to.
15      A. Okay, sorry.
16      Q. But as you sit here today, any opinion
17  that you have in opposition to Paragraphs 20 and
18  21 of Dr. Bronars' report is contained within
19  your supplemental report?
20      A. There is a good deal of amount of
21  information, yes, considering these two points.
22      Q. Thank you.

221

1       Does your opinion about the
2   appropriateness of the RIF in question take into
3   account that prior to the RIF challenged in this
4   lawsuit, there was another RIF that impacted a
5   higher proportion of Caucasian employees of
6   CFSA?
7       A. No.
8       MR. ROSE: Higher than Caucasians
9   than African-Americans?
10      MR. ROSENBLOOM: Is there an
11  objection here, Mr. Rose?
12      MR. ROSE: Yes.
13      MR. ROSENBLOOM: On what grounds?
14      MR. ROSE: I object on the grounds
15  of you have one side of something that in the
16  lawsuit, there's two sides.
17      I object to the form.
18      MR. ROSENBLOOM: Thank you.
19  BY MR. ROSENBLOOM:
20      Q. All right. You understood my question,
21  yes?
22      A. Yes, I believe you're asking me if I was

56 (Pages 218 to 221)

### 222

1  aware that there was a prior RIF where there was
2  a larger number of Caucasians terminated.
3      I'm not clear if you mean proportionally
4  or gross number, whether you mean standing alone
5  white compared to white in this RIF or white
6  compared to black in that RIF.
7      Q.  Is it fair to say though that the
8  opinions that you've reached here were made
9  without information about another RIF made
10  immediately prior to the RIF in question in this
11  lawsuit?
12      A.  Yes.  I took the data --
13      Q.  Thank you.
14      A.  -- provided by the defense.
15      Q.  Would it potentially impact your opinion
16  about the proper methodologies and the proper
17  conclusions to draw from the methodologies to
18  know that there was another RIF immediately
19  prior to the one at issue that impacted the
20  agency and Caucasian and African-American
21  employees in a different way than this RIF did?
22      A.  I would have to know the proportion of

### 223

1  Caucasians versus blacks or African-Americans in
2  that RIF and also the sample size to tell you
3  the impact.
4      Q.  Is it fair to say that in your rebuttal
5  report, Exhibit 7, one major theme that you put
6  forth is that you question the motivation behind
7  the choice to have the RIF apply to the employee
8  groups to which it applied?
9      A.  Close.
10      I question, one, when the explanation
11  was given that was not given in the original
12  declaration by Spaght; two, the fact that the
13  declarations don't track each other, meaning
14  Porchia, her declaration and Davidson's and
15  Spaght's.
16      Spaght gives no description.
17      Porchia describes, I believe, the SSA
18  RIF only explanation behind it.
19      And then Davidson in 2014 describes the
20  reasoning for all of it.
21      And thirdly, I take issue with that
22  explanation because being an internal person

### 224

1  involved in both analyzing jobs, RIFs, all my
2  background, you know, 15, 20 years, it didn't
3  make sense logically to terminate the
4  lowest-level, cheapest people when your goal is
5  to save money.
6      And I read it in great detail over and
7  over again and it also didn't make -- a lot of
8  the explanations were vague and they didn't make
9  sense and they didn't track with each other.  It
10  just raised a lot of questions.
11      Q.  Thank you very much.
12      A.  Sure.
13      Q.  With respect to my prior comment about
14  there being a prior RIF that you did not know
15  about, would it impact some of your conclusions
16  to know that the prior RIF impacted
17  higher-paying positions in the agency?
18      A.  I would have to combine all the data and
19  analyze it to have any opinion.
20      Q.  With respect to Paragraphs 20 and 21,
21  would you acknowledge that there is an
22  analytical difference between conducting the

### 225

1  statistical analysis of this RIF looking only at
2  the groups of employees impacted by this RIF,
3  which is what Dr. Bronars puts forth, versus
4  doing what you've done, which is looking at the
5  demographics of the agency overall and the RIF'd
6  employees overall?
7      A.  Let me make sure I understand the
8  question first.
9      Are you asking me to acknowledge there
10  is a different methodology at work?
11      Q.  Yes.
12      A.  Yeah --
13      Q.  There's a different sample set.  You're
14  looking at two different datasets.
15      A.  No, same dataset, just sliced
16  differently.
17      And the way he's slicing it is
18  inappropriate, given the sample sizes, the 100
19  percent, the homogeneity as I call it, and the
20  100 percent determination.
21      When you look, we're using the exact
22  same data.

226

1    Q. So do you dispute that there is -- if
2    you're looking at the number of -- the
3    percentage of African-American employees RIF'd
4    as a numerator above a denominator of the total
5    number of African-American employees, you would
6    acknowledge that there's a difference whether
7    you use as the denominator of African-American
8    employees in the specific groups that were
9    subject to the RIF versus African-American
10   employees at the agency overall; is that right?
11   A. That question actually doesn't make
12   sense, so I'm confused.
13   Q. I'll rephrase it.
14   A. Yeah.
15   Q. Do you acknowledge that it produces a
16   different statistical result to look, as
17   Dr. Bronars suggests, at the groups of employees
18   subject to the RIF versus looking at the
19   demographics of the agency overall, which is
20   what you do?
21   A. It's different and incorrect.
22       So therefore, it shouldn't have been

227

1    used.
2    Q. You acknowledge it's different?
3    A. I will acknowledge it's incorrect.
4       It is not appropriate at all and the
5    fact that he did that raises another inference
6    that the targeted jobs are more minority than
7    the nontargeted jobs. So doing that was -- it
8    produced an interesting graph, I believe, in
9    Page 17 of the rebuttal report.
10       It's difficult for me to answer that
11   question and say I acknowledge -- because I know
12   where you're going. You're saying, oh, there's
13   two different ways of doing it and --
14   Q. Hold on, hold on. Just to keep a clean
15   transcript.
16   A. Sorry.
17   Q. So my question was, do you acknowledge
18   that it's different.
19       You said you acknowledge that it's
20   incorrect?
21   A. Yes.
22   Q. But by basic meaning of the English

228

1    language and based on what you said in the
2    report, you would certainly acknowledge that
3    they are different from one another in that your
4    approach, as put forth in Exhibit 7, is
5    different from Dr. Bronars' approach as put
6    forth in Exhibit 9, correct?
7    A. Different and far superior.
8    Q. Your approach is different and far
9    superior?
10   A. Given the multiple things in this report
11   and the stuff on this table, it's far superior,
12   also from a practitioner's standpoint, which
13   Dr. Bronars' is not; from a practitioner's
14   standpoint, that is not the way you should
15   analyze this.
16   Q. Thank you.
17   A. Given that those jobs are most highly
18   targeted or the most highly minority anyway.
19       So...
20   Q. And would you acknowledge that that same
21   difference applies to the age analysis?
22   A. Yes, because he used the exact same

229

1    thing.
2    Q. Thank you.
3       Are you aware of a specific policy or
4    practice that plaintiffs have identified in this
5    case to be illegal?
6    A. I don't believe you need one.
7       Neutral practices that cause disparate
8    impact are illegal.
9    Q. So I need you to help me with a
10   yes-or-no answer.
11       Are you aware of plaintiffs having
12   identified in this lawsuit a policy or a
13   practice that they claim to be illegal?
14   A. That's a tough question, because I can
15   infer one from the jobs selected.
16   Q. And do you infer one from the jobs
17   selected?
18   A. It raises a potential inference when the
19   jobs selected for termination are of the lowest
20   grade, yet the goal was to save money and yet
21   the jobs selected for termination are also of
22   the highest minority rate compared to the

58 (Pages 226 to 229)

230

1   agency.
2       Q.  But that goes to --
3       A.  It would be conclusive, but it certainly
4   raises concern.
5           As a practitioner and a statistician, it
6   raises a big concern.
7       Q.  To the extent that one of your concerns
8   is that the agency, in your opinion, is not
9   credible by claiming to seek to save money and
10  then having a RIF for lower positions, isn't
11  that where it would certainly impact your
12  opinion to know that they also eliminated
13  higher-paying positions?
14      A.  Okay.  So --
15      Q.  I need a yes-or-no answer if that --
16      A.  I'm trying to understand the question.
17          Would it impact me to know they had a
18  prior RIF?
19          I would have to see the data.  I would
20  have to take that data and combine --
21      Q.  And you have not?
22      A.  No, I haven't been given it.  No.

231

1       Q.  Thank you.
2           With respect to what you have said here
3   today and put forth very thoroughly in Exhibit
4   7, that you have serious questions about whether
5   the agency really needed to eliminate the
6   positions that it eliminated, you acknowledge
7   that the affidavits provided by the defendant
8   also have spoken to the need to realign the
9   agency to improve its services in addition to
10  saving money, correct?
11      A.  Uh-huh, uh-huh.
12      Q.  That's a yes?
13      A.  Well, no, because that question was very
14  long and as we say in testing,
15  quadruple-barreled, meaning there's a lot of
16  parts to it.
17          So what I --
18      Q.  Do you need me to repeat the question?
19      A.  I would like you to break that into
20  parts, because you basically had a
21  quadruple-barreled question.
22          There was like four questions in there.

232

1       Q.  Let me repeat the question.
2       A.  Thank you.
3       Q.  It's correct that in your report,
4   Exhibit 7, where you seek to rebut Dr. Bronars,
5   in addition to the point that we've previously
6   discussed that laying off people at the lower
7   end of the pay scale undermines the District's
8   goal of saving money, you also in your opinion
9   stated today and in your report dispute whether
10  the actual jobs removed, eliminated promoted the
11  realigned goal of the agency, correct?
12      A.  Again, it was very long.  I think I can
13  answer at least most of it.
14      Q.  Did you understand it?
15      A.  I think.  Let -- before you repeat it
16  again, though, because it's just -- so there's a
17  couple of things there.
18          My concern about their motivation or
19  decision-making is secondary.  Consider that
20  like ancillary, ancillary evidence.
21          My biggest concern is the statistic he
22  chose based on the sample size and the

233

1   homogeneity and the 100 percent termination on a
2   job-level basis.
3           I for that reason wholeheartedly, also
4   given the lower level jobs had the higher
5   representation, I would strongly advocate for an
6   agency-wide analysis and I believe that would be
7   the best practice, in my field, any practitioner
8   internally.
9           So everything subsequent to that, all
10  the other stuff I talk about in here, like the
11  fact that the positions targeted had a higher
12  representation of minorities and the fact that
13  the declarations don't track and they -- the
14  explanations get more detailed as they go on and
15  are vague, and blah, blah, blah.  That's all
16  just like additional stuff that concerns me
17  about the process, and again, supports why an
18  agency-wide analysis should be done.
19          To me it's not sufficient information
20  for him to have based a job-level analysis,
21  because he's relying upon -- he's framing an
22  entire statistical analysis that's going to end

234

1  up saying there is or is not discrimination,
2  which is a serious question. He's basing his
3  chosen method -- which by the way, is flawed as
4  we talked about -- on the fact that the agency
5  said in one declaration that this was the case.
6         To me as a practitioner, that's not
7  appropriate, both as an IO psychologist and a
8  statistician with an IO psychology, it's not
9  appropriate.
10        Q.  You've used a few different phrases that
11 I'll try to briefly paraphrase --
12        A.  Sure.
13        Q.  -- that the practice was not appropriate
14 or the practice was inappropriate or that some
15 practices did not appear to be, quote, unquote,
16 best practices.
17        You would acknowledge that something
18 could be short of a best practice but still not
19 be illegal, correct?
20        A.  Not his analysis. His analysis --
21        Q.  I need you to answer the question that
22 I'm asking you.

235

1         So I want you to listen very carefully.
2         A.  Okay.
3         Q.  Do you need me to repeat the question?
4         A.  Please.
5         Q.  You acknowledge there's a difference
6  between something being short of what you might
7  think is a best practice and something that is
8  illegal under anti-discrimination laws?
9         A.  I acknowledge that it could go either
10 way, meaning a best practice could not be
11 illegal or -- or not doing a best practice may
12 not reach the standard of illegality. Not doing
13 a best practice may not read the standard, or
14 whatever, the other way around.
15        But the way he analyzed it does not
16 prove there's not discrimination, period,
17 because it's not methodological proper.
18        Q.  Does your analysis prove there was
19 discrimination?
20        A.  I can never prove anything 100 percent.
21 But the statistical prohibitions in the original
22 report and the redone ones, I believe on Page 2

236

1  of this report, which actually got stronger
2  based on the data differences, would prove in a
3  statistician's mind the chi-squared and ANOVA
4  were both statistically significant at P less
5  than .05, which is the threshold.
6         I believe both were also statistically
7  significant, or at least most or one, below .01.
8  Actually, I think they're all below .01. I
9  would have to look at the data.
10        But they are very -- the threshold is
11 .5.
12        I also ran the t-test on both of them
13 and they were statistically significant;
14 one-tailed and two-tailed at all of the 95, 97.5
15 and then the 99 and 99.5, because one-tailed and
16 two-tailed are different.
17        Q.  You would like to know more about the
18 process by which this happened, right?
19        A.  Honestly, based on what I've seen, I can
20 conclude unquestionably that based on the data,
21 in my expert opinion, there was adverse impact
22 for both blacks and age.

237

1         Based on the data I saw in the database
2  and the Spaght declaration they both came out.
3  So --
4         Q.  And that's based on the data -- okay.
5  Let me rephrase it.
6         Do you have any concern that the
7  testimony you're providing today is even more
8  argumentative in plaintiffs' favor than Exhibit
9  7 in the report?
10        A.  I --
11        MR. ROSE: Object to the form?
12        THE WITNESS: I don't -- do I
13 talk?
14 BY MR. ROSENBLOOM:
15        Q.  Go ahead, go ahead.
16        A.  I'm not intending it to be.
17        My report, I believe, summarizes that in
18 my opinion, this is evidence of adverse impact.
19 Strong evidence of adverse impact, I believe I
20 used in the initial report. I don't remember
21 the wording in this report.
22        If I'm coming across strongly right now,

60  (Pages 234 to 237)

**238**

1  it's because we keep going back and forth about
2  different stuff and I'm trying to emphasize the
3  key point, because we're talking about sort of
4  ancillary points, like the lower-level jobs were
5  terminated and would it matter that there's
6  higher-level jobs terminated just before.
7        And my point is that there is evidence,
8  strong evidence of adverse impact based on the
9  analysis I originally did on the Spaght
10  declaration and the analysis I did based on
11  defense's data using the correct assumptions and
12  the correct methodology.
13        Q.  Dr. Munro, you would acknowledge,
14  though, that if the information about the prior
15  RIF that impacted — that I'm representing to
16  you impacted different groups of employees, if
17  you had that information, you would acknowledge
18  that that could possibly change your opinion,
19  don't you?
20        MR. ROSE:  That what?  What was
21  the last word?  I didn't hear.
22        MR. ROSENBLOOM:  My lasts words

**239**

1  were, does Dr. Munro acknowledge if she had the
2  information about the prior RIF that impacted
3  higher-paid employees, that that would possibly
4  impact her opinion.
5  BY MR. ROSENBLOOM:
6        Q.  Go ahead, Dr. Munro.
7        A.  It would impact my opinion if there was
8  large group that was RIF'd in that group and if
9  there was a large reverse disparity with whites
10  being terminated, much higher than blacks and
11  several other factors were in play and a large
12  sample.
13        If we're talking about a small RIF and
14  not much difference between black and white,
15  then it wouldn't impact my opinion.
16        Again, I would have to see the data to
17  know for sure to form an opinion.  I cannot form
18  an opinion currently.
19        But I can tell you that there's certain
20  parameters that would have to be met to even
21  have a chance at impacting my opinion.
22        If there was a large enough sample size,

**240**

1  big enough disparity, a reverse disparity.
2        Q.  Is it fair to say, though, that you just
3  learned from me today that there was some other
4  RIF that impacted higher-paid employees at the
5  agency?
6        A.  Yes, because Dr. Bronars didn't mention
7  it. I've never heard of it in any other
8  deposition — I mean declaration.
9        Q.  Would it impact your opinion — strike
10  that.
11        In reaching your opinions, have you
12  assumed that all of the plaintiffs in this case
13  lack a bachelor's degree?
14        A.  No, I'm not assuming that.  I don't
15  really know.
16        Q.  Based on your — you don't know?
17        A.  I have data.
18        Q.  Will you acknowledge that if a — strike
19  that.
20        So is it fair to say that actual
21  educational attainment, whether a high school
22  degree or bachelor's degree or otherwise, did

**241**

1  not impact your opinion?
2        A.  I don't understand the question.
3        Q.  Did you consider plaintiffs' educational
4  attainments in reaching your opinions?
5        A.  In one section where they talk about
6  rehire and education, I considered education.
7        Q.  And that's with respect to the FSW —
8        A.  Yes.
9        Q.  — positions, correct?
10        A.  Yes, it was.
11        Q.  And in consideration there, did you
12  presume that all plaintiffs — that — did you
13  presume that the plaintiffs who claim to have
14  been illegally denied a FSW position after
15  applying for one all lacked a bachelor's degree?
16        A.  If I recall correctly, what I read was
17  that there was a certain portion of people that
18  were or did not have a bachelor's degree, so
19  they were not even considered for rehire.
20        Then there was two people who did
21  not — who chose to not interview.
22        The rest went through an interview

PAIGE MUNRO, PH.D.
DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

242

1    process.
2         This is only about the rehire, which is
3    a tiny little piece of this.
4    Q.  Let's talk about that rehire portion
5    now.
6         I will represent to you that that rehire
7    portion is the only portion of this case for
8    which a disparate impact claim continues.
9         And I'll represent to you that for the
10   RIF, the court has already dismissed as a matter
11   of law the disparate impact claim and only the
12   disparate treatment claim continues.
13        So with that representation --
14        MR. ROSE:  I object to that.  I
15   certainly don't read the court's decisions that
16   way.
17        MR. ROSENBLOOM:  Duly noted.
18   BY MR. ROSENBLOOM:
19   Q.  With respect to the hiring and the
20   allegations around discriminatory hiring for the
21   FSW positions that we were just talking about --
22   A.  Uh-huh.

243

1    Q.  -- would it impact your opinion if
2    plaintiffs -- strike that.
3         You said that your understanding of that
4    claim involved certain people who were told that
5    they were -- certain plaintiffs were told that
6    they were not permitted to apply because they
7    did not have a bachelor's degree?
8    A.  I don't know if they were told that.  I
9    know they were not considered qualified.  It was
10   in one of the declarations.
11   Q.  Would it -- strike that.  That's fine.
12        I think I can move off of that.
13        I want to go back to the question
14   earlier where I asked you from your knowledge,
15   whether plaintiffs have identified a policy or
16   practice at issue in this litigation that is
17   discriminatory.
18        I recall you answering -- and I just
19   want to clarify for the transcript.
20        I recall you answering that you say that
21   you think that you can infer that there was a
22   practice.

244

1         I want you to try to answer the question
2    directly, please.
3    A.  Okay.
4    Q.  Do you understand if plaintiffs have
5    identified a specific policy or practice or in
6    the plural, specific policies or practices, that
7    are illegal in this case?
8         MR. ROSE:  It certainly is a legal
9    question and I object to it on that ground.
10        MR. ROSENBLOOM:  Thank you.
11        MR. ROSE:  You're asking whether
12   something is illegal.  You're asking her opinion
13   as a lawyer.  That's now how she's testifying.
14   She's testifying as an expert in industrial and
15   organizational psychology.
16        MR. ROSENBLOOM:  Thank you.
17   Thank you, Mr. Rose.  Your objection is noted.
18   BY MR. ROSENBLOOM:
19   Q.  Dr. Munro, did you understand my
20   question?
21   A.  Can you repeat it?
22   Q.  My question, which I'll repeat -- and

245

1    again, just for the record, Dr. Munro is looking
2    here at her notebook, which is Exhibit 17.
3         I don't recall if we were on the record
4    or not, Darlene, our wonderful court reporter,
5    indicated that after today, she will be able to
6    take Exhibit 17 and photocopy it and then mail
7    the original back to Dr. Munro, which Dr. Munro
8    is okay with.
9         So Dr. Munro, I'm repeating my question
10   here.
11   A.  Yes.
12   Q.  Do you understand -- let me start again.
13        Have plaintiffs identified to your
14   understanding a policy or practice that is
15   allegedly illegal in this lawsuit?
16   A.  No, but the data from defense infers
17   one.
18   Q.  Thank you very much.
19        As you infer one, are you inferring that
20   the policy or practice is the RIF itself?
21   A.  I'm inferring --
22        MR. ROSE:  What's the last three

62  (Pages 242 to 245)

246

1  words?
2          MR. ROSENBLOOM: My question was,
3  is Dr. Munro inferring that the illegal policy
4  or practice is the RIF itself.
5          A.  And my answer is, I am inferring from
6  the table on Page 17 that the illegal practice,
7  if there is one, would have been the selection
8  of positions targeted.
9          MR. ROSE: FSW positions?
10          THE WITNESS: Not just that. If
11  you look at the table on Exhibit 17, my rebuttal
12  report to Dr. Bronars, the agency average of
13  African-American representation compared to
14  those 40 and over is, in all but one case,
15  essentially there's more minorities in these
16  positions targeted.
17          So I would say that from an
18  internal policy and practice procedure, that
19  could infer a targeting of specific positions
20  for a different type of treatment.
21  BY MR. ROSENBLOOM:
22          Q.  Thank you.

247

1          So just to follow up, your testimony is
2  that those statistics could infer -- from those
3  statistics, to use your words, you could infer
4  an attempt to target African-American groups of
5  employees, correct?
6          A.  That is correct.
7          Q.  So I want to follow up to that.
8          When you say that that could be inferred
9  from your statistics, don't you acknowledge,
10  though, that that inference of an intent to
11  specifically target black employees certainly
12  could be rebutted by evidence that those groups
13  of employees were subject to the RIF for other
14  reasons, for legitimate reasons, not based on
15  race?
16          A.  Of course.
17          Q.  Thank you.
18          You don't have an opinion, though, do
19  you as to whether there is such rebuttal
20  evidence in this case because you haven't seen
21  all of the discovery, correct?
22          A.  Well, that's not -- well, what you just

248

1  said is, again, incorrect, sort of paraphrasing
2  what I'm trying to say here.
3          The rebutting of the fact -- the
4  inference raised by the table on Page 17 and the
5  table on Page 19, which I haven't had a chance
6  to talk about because it was -- I wanted to
7  follow up on this, would be rebutted if there
8  was business necessity, and I'm not putting,
9  again, my subject matter expert hat on. That's
10  my statistical matter hat.
11          There does not seem to be a sufficient
12  business necessity that made sense to justify a
13  lot of these eliminations.
14          Add to that, especially the elimination
15  of the SSA and the creation of the FSW, the job
16  descriptions being substantially equivalent, yet
17  one requiring a college education, again, shows
18  the business necessity; it's a weak rebuttal
19  against business necessity, in my opinion.
20          Q.  Dr. Munro, have you read any of the
21  briefing submitted by defendant in this case?
22          A.  No.

249

1          Q.  Have you attended any of the court
2  hearings in this case?
3          A.  No.
4          Q.  Have you attended any of the depositions
5  of defendant's witnesses taken by plaintiffs?
6          A.  No.
7          Q.  Have you reviewed any transcripts of
8  those depositions?
9          A.  (Witness nodding.)
10          Q.  No? You're shaking your head no.
11          A.  No, no, but I'm referring to the
12  declarations.
13          Q.  Hang on. You -- so it is correct that
14  you've reviewed some declarations?
15          A.  I'm assuming declarations have the force
16  of law, correct?
17          They're under oath, right?
18          Q.  So you have reviewed some
19  declarations?
20          A.  Yes, sir.
21          Q.  Do you acknowledge that it's perfectly
22  possible that in those declarations, the

63 (Pages 246 to 249)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

250

1  defendant did not undertake to make its complete
2  case?
3      A.  Possible.
4      Q.  Do you acknowledge that nothing in the
5  law required defendant to make its case, so to
6  speak, in those affidavits?
7      A.  Well, if you're talking about --
8          MR. ROSE:  Could you read that
9  back?
10          MR. ROSENBLOOM:  Sure, I will
11  repeat it again.
12      I'm asking the witness to acknowledge
13  the obvious.
14      I'm asking Dr. Munro to acknowledge that
15  there was no legal obligation for us to put our
16  entire case of these -- the RIF being driven by
17  a legitimate business necessity in those
18  affidavits.
19  BY MR. ROSENBLOOM:
20      Q.  You acknowledge that, correct?
21      A.  Well, of course, but you can still see
22  stuff in the data.

251

1      Q.  You acknowledge that -- are you familiar
2  with how documents get Bates-stamped by the
3  Federal Court system after they're filed?
4      It's called a PACER system.
5      A.  They don't train you in that in law
6  school.
7      Q.  No, they don't.  That's absolutely true.
8      So I'll represent to you that the number
9  is higher now, but if you look at Exhibit 7, as
10  of May 13th, two months ago, there was already
11  93 documents just on the docket in this case.
12      A.  Uh-huh.
13      Q.  You certainly acknowledge to not having
14  read all of those documents?
15      A.  Of course not.
16      Q.  You haven't read most of them?
17      Most of them you haven't read,
18  correct?
19      A.  No.  I assume I was provided the
20  relevant ones.
21      Q.  You assume that you were -- and to the
22  extent you were provided documents in forming

252

1  your opinion, you were provided them by
2  plaintiffs' counsel, David and Joshua Rose,
3  correct?
4      A.  Yes, sir.  And I was provided the data,
5  which by the way, is the biggest, strongest
6  point I make, the data by defense counsel.
7      Q.  So you were presented the data by
8  defense counsel, but you acknowledge that the
9  data does not include the words from or the
10  testimony from District of Columbia employees
11  about why the certain groups selected were
12  selected, right?
13      The data is just the numbers.  It
14  doesn't include any of those explanations,
15  right?
16      A.  Yeah, but explanations can't rebut.
17      Q.  Dr. Munro, I'm asking you a yes-or-no
18  question.
19      A.  So that --
20      Q.  You acknowledge that when you say --
21  you're saying, I've seen the data and the data
22  supports the inference that there was no

253

1  business necessity.
2      I'm asking you, you acknowledge as a
3  basic matter of what words and numbers mean --
4      A.  Yes.
5      Q.  -- that the numbers and the data are not
6  the words in the sentence and the paragraphs put
7  forth as an explanation for why the specific
8  groups were selected for the RIF and why the FSW
9  position was crafted as it was crafted?
10      You acknowledge that, right?
11      A.  Right, the data just supports those
12  adverse impacts.
13      Q.  Dr. Munro, you're not giving me -- you
14  almost gave me a direct yes-or-no answer, but
15  you added something.
16      A.  Because that seems to misrepresent what
17  I'm trying to say here, but okay.
18      Q.  Dr. Munro, I need you to just for one
19  minute --
20      A.  I will.
21      Q.  -- focus not on what you want to say
22  without answering the questions I'm asking.

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

254

1    A.  I will.
2    Q.  If at the conclusion of my
3  cross-examination Mr. Rose wants to conduct a
4  direct examination of you to elicit other
5  testimony, he has every right to do that, but
6  right now I get to ask my questions.
7    A.  I apologize.  I'm new to this.
8    Q.  I understand.
9       So Dr. Munro, do you acknowledge that
10  the data that you have claimed supports an
11  inference of discrimination, that data that you
12  reviewed does not include the explanatory
13  verbiage and sentences and paragraphs that have
14  been put forth by my client throughout the
15  course of this litigation?
16       Do you acknowledge that?
17    A.  Yes, all I have is the verbiage of three
18  declarations.
19    Q.  Thank you.
20       Did -- and as -- and I'm correctly
21  paraphrasing you, earlier you said something
22  like that, I have assumed that affidavits have

255

1  the force of law and I have assumed that you've
2  put forth your information in the affidavits,
3  right?
4    A.  Well, I'm assuming what I am reading
5  they swore to, so that at least what they wrote
6  was true, there could be other information,
7  sure.  But what they wrote was true.
8    Q.  Very good.  Thank you.
9       But you do acknowledge that there could
10  be other information?
11    A.  Of course.
12    Q.  And do you acknowledge that the absence
13  of other information in the affidavits that you
14  reviewed does not mean that such information
15  does not exist?
16    A.  Of course not.
17    Q.  Thank you.
18    A.  Or of course so, or whatever direction
19  that should be.
20    Q.  So of course you acknowledge that other
21  information could exist --
22    A.  Other information could exist, but that

256

1  is also, again, separate from data.
2    Q.  In the course of your interactions with
3  plaintiffs' counsel --
4    A.  Yes, sir.
5    Q.  -- did you ever say to them something
6  like, am I seeing everything that defense
7  counsel has put forward?
8       Did you ever ask them that question?
9    A.  No, because these were, what do you call
10  it, ancillary to my main point, which is the
11  statistics.
12    Q.  Very good.  Thank you.
13    A.  They're things I just saw by
14  happenstance in reading the declarations and
15  inconsistencies and vagaries that I was
16  concerned about personally as a practitioner.
17    Q.  Earlier in your testimony, when you were
18  speaking about the job descriptions for the FSW
19  and speaking about the decisions to select
20  certain groups for the RIF or not select other
21  groups, you acknowledged that that subject
22  matter crosses from the strict statistical

257

1  work --
2    A.  Way too long.  I lost you about halfway
3  through.
4    Q.  In the course of this deposition, you've
5  talked about the distinction between offering
6  testimony strictly about statistics --
7    A.  Uh-huh.
8    Q.  -- and offering testimony about the
9  substantive drafting of position descriptions
10  and the necessity of position descriptions,
11  correct?
12    A.  Yes.
13    Q.  And you have stated that in your report
14  and today in your deposition, you're offering
15  opinions about both of those, correct?
16    A.  Yes, I am.
17    Q.  Wouldn't you acknowledge that you lack
18  sufficient information to render an opinion
19  about the substantive selection of certain
20  criteria -- of certain positions and the
21  substantive drafting of positions because you
22  were not part of that process and you have not

65  (Pages 254 to 257)

258

1   received discovery about those decisions and
2   those processes and the only discovery you
3   received is the statistical data and a few
4   affidavits and you've had to make inferences
5   from that?
6        Wouldn't you agree with that?
7   A.  That's incorrect.
8   Q.  You dispute that?
9   A.  I have -- I dispute that because I have
10  the job descriptions of the SSA --
11  Q.  You have the job descriptions?
12  A.  -- and the new position created.
13       And as I tried to explain to you a few
14  times, it doesn't matter why they were created
15  or what drove it or what decision-making.
16       The bottom line is the two job
17  descriptions are substantively the same job.
18       If I was doing --
19  Q.  Are you talking about SSA to FSW?
20  A.  The job they eliminated to FSW.
21  Whatever it was.  I think it was in Porchia's
22  declaration, in one of these.  I can find it for

259

1   you --
2   Q.  That's fine.  That's fine.
3   A.  Yeah, it's in Porchia's declaration.
4        So she provides job descriptions for the
5   SSA and a job description for the new FSW
6   position or --
7   Q.  Dr. Munro, I'm not disputing --
8   A.  So I mean, I'm saying I do have enough
9   information to form a basis of that -- one thing
10  that I can absolutely form a basis on, aside
11  from the statistics, is that these job
12  descriptions are the same, and therefore, should
13  not require -- absent a regulation or a law or
14  some other great justification, should not
15  require a college education, especially when
16  college education carries with it adverse
17  impacts --
18  Q.  But you --
19  A.  -- for age and race.  It carries adverse
20  impacts, college education does.
21  Q.  But toward the end of your answer, you
22  said absent some other great justification,

260

1   right?
2   A.  Right.  And there could be one.
3   Q.  There could be one?
4   A.  I would like to see it and then evaluate
5   it.
6        MR. ROSE:  It's not written.
7        MR. ROSENBLOOM:  Mr. Rose, are
8   you making an objection again?  And if so, on
9   what grounds?
10       MR. ROSE:  I'm not.
11       MR. ROSENBLOOM:  Thank you.
12  Please don't interrupt to coach the witness.
13       MR. ROSE:  Well, I didn't
14  interrupt.  I waited for you to stop.
15       MR. ROSENBLOOM:  Thank you.
16  Thank you.
17       MR. ROSE:  Please go ahead.
18       MR. ROSENBLOOM:  Thank you,
19  Mr. Rose.
20  BY MR. ROSENBLOOM:
21  Q.  Dr. Munro, I will represent to
22  you -- strike that.

261

1        *You acknowledge that your revised
2   report as well as your testimony today have
3   challenged -- or dispute whether eliminating the
4   positions in the RIF were done for a legitimate
5   business reason, correct?
6   A.  Most specifically the --
7        MR. ROSENBLOOM:  Hang on.  I
8   think Mr. Rose -- Mr. Rose, were you making an
9   objection?
10       MR. ROSE:  Yes, I think the law as
11  now it stands is that the defendant, if there's
12  adverse impact, the defendant has the obligation
13  to show job relatedness for the position in
14  question and business necessity.
15       MR. ROSENBLOOM:  Okay, Mr. Rose,
16  but are you making an objection to my question?
17  I appreciate that that --
18       MR. ROSE:  The law -- that is the
19  law and your question assumes it's not the law.
20       MR. ROSENBLOOM:  So are you
21  suggesting that my question is misleading?
22       MR. ROSE:  Yes.

66  (Pages 258 to 261)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

262

1          MR. ROSENBLOOM:  I'm trying
2   to -- okay.  Thank you.
3   BY MR. ROSENBLOOM:
4       Q.  Dr. Munro, did you understand my
5   previous question?
6       A.  I can't remember it anymore.
7          MR. ROSENBLOOM:  Would you read
8   it back.
9
10          *(Question read.)
11
12  BY MR. ROSENBLOOM:
13      Q.  Do you understand that, Dr. Munro?
14      A.  I'm still processing.  Hold on.
15         Maybe it's because it's been such a long
16  day.
17      Q.  I can simplify it.  I'll supersede the
18  question by simplifying it.
19         Dr. Munro, as you sit here today, you
20  are disputing that this RIF was conducted for a
21  legitimate business reason, correct?
22      A.  Based on the information I have, I

263

1   have -- based on the information I have, I am
2   disputing that the SSA/FSW situation was
3   legitimate, given the college education addition
4   when there was only one substantive job task
5   change.
6          And I am disputing that the RIF was --
7   what was the word you just used -- for
8   legitimate business reasons because of the
9   statistical data and the jobs targeted and all
10  the other stuff in the report.
11      Q.  Do you acknowledge that that dispute
12  that you're making, as you've said earlier, is
13  an inference from the statistics?
14         I'm just paraphrasing what you said
15  previously.
16         You're inferring from the data that --
17      A.  You're mixing up two things, I think.
18         You're mixing up the inference from the
19  data that there's improper motive under like
20  systemic treatment.
21         I'm saying the data shows under systemic
22  treatment or disparate treatment or adverse

264

1   impact, the data shows an impact unquestionably.
2          That's not an inference.  That's what
3   the -- data shows that.
4          Then it's not an inference that these
5   two job descriptions which I'm referencing is in
6   Porchia's declaration, SSA, FSA (sic), are
7   substantively the same and, therefore, I do not
8   see a reason why a college education would be
9   required to do the one additional task of
10  interview families.
11         So those are the two things that I'm
12  saying are not inferences but I have sufficient
13  information to form a very -- I believe a very
14  strong opinion.
15      Q.  Thank you very much for that
16  clarification.
17      A.  Sure.
18      Q.  And just to be clear, during that
19  answer, Dr. Munro was referring to some pages
20  also in Exhibit 17, I think to Porchia's
21  affidavit, right?
22      A.  Yes, Porchia's affidavit on her

265

1   appendix.
2       Q.  Thank you, Dr. Munro.
3          I hear you saying that having the old
4   SSA job description and the new FSW job
5   description has been sufficient to determine
6   that the bachelor's degree requirement was not a
7   legitimate requirement; is that correct?
8       A.  I can tell you from my knowledge, skills
9   and experience, my master's in clinical
10  psychology, my master's and Ph.D. in IO
11  psychology and years doing job analysis and also
12  what's called transportability validity, where
13  what you do is map a job description to a job
14  the --
15      Q.  I'm going to interrupt you, Dr. Munro.
16      A.  -- these are identical.
17      Q.  We've gone through at the beginning of
18  your deposition your qualifications.
19      A.  I know.
20      Q.  And you're certainly very well educated.
21  You have a lot of experience.  So please go
22  ahead and just provide an answer, but I don't

266

1    need your qualifications.
2            MR. TEMPLE: I object to the
3    characterization that she's not talking about
4    her qualifications. She's not talking about her
5    qualifications.
6            She's talking about her experience
7    associated with those degrees and how it affects
8    her view of this particular -- in responding to
9    your question.
10           I think that's -- that's not fair. I
11   mean, you keep cutting her off. She's giving
12   you a learned response.
13           MR. ROSENBLOOM: Well, I do want
14   to hear your learned responses. I'm not sure
15   that I want any more of Mr. Temple's learned
16   speaking objections.
17           But learned they are, Mr. Temple, I
18   dispute what you say, however.
19      A.  As a neutral, I will split the
20   difference. And I will say that based on my
21   knowledge and experience, which you already have
22   on the record, and having done this several

267

1    times where line by line I have compared job
2    descriptions. These descriptions look so
3    similar that it doesn't make logical sense from,
4    again, my experience working in this field of HR
5    and people management, and it doesn't make sense
6    why it would apply a college education to one
7    position and not to the other, absent some
8    regulation or law or other incredibly compelling
9    reason.
10   BY MR. ROSENBLOOM:
11      Q.  Thank you very much.
12      A.  Given the adverse impact that education
13   carries for age and race.
14      Q.  Thank you.
15          Did you ever go back to Mr. Rose -- Josh
16   Rose or Dave Rose and after saying that, say to
17   them, can you tell me, do you know, is there any
18   other outside law or regulation or compelling
19   reason why CFSA did that?
20          Have you asked them that?
21      A.  It's not really my job, is it?
22      Q.  I'm not asking you if you thought it was

268

1    your job or not.
2            I'm just asking you if you did.
3       A.  No.
4       Q.  So I'm thinking that no, you did not do
5    that?
6       A.  No. My job is to compare the document
7    in front of me and also compare the statistics.
8       Q.  Did you ever say, and I understand the
9    answer is no, but just confirm that, that you
10   never went to --
11      A.  No, I did not ask them to give me all
12   the possible information because I'm very busy
13   and I --
14      Q.  Dr. Munro, did you ever -- did you ever
15   ask them --
16           MR. ROSE: Hang on a second,
17   please.
18           MR. ROSENBLOOM: Sure.
19
20           (Pause In Proceedings)
21
22           MR. TEMPLE: Can we take a

269

1    five-minute break.
2            MR. ROSENBLOOM: Sure.
3
4            (Recess taken from 3:38 p.m.
5    to 3:56 p.m.)
6
7    BY MR. ROSENBLOOM:
8       Q.  Dr. Munro, there have been a couple of
9    points during today's deposition where you've
10   started to talk about something as a portion of
11   an answer and we either haven't continued
12   through with that or turned to something else.
13           I don't need you and I'm not asking you
14   to go through all of the things that you started
15   to say or would want to say. But I do want to
16   ask you whether there is anything else that you
17   haven't already articulated that is not in
18   Exhibit 7, your supplement report, to which you
19   would testify to in this case?
20      A.  More importantly, the photocopied
21   version of Exhibit 17 and this.
22      Q.  And "this" is the paper that's marked

68  (Pages 266 to 269)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

270

1   **Exhibit 20?**
2       A.  Yes.  I think it's pretty much -- the
3   question is, is there anything I would testify
4   to that I have not covered today?
5       I can't say for sure because, for
6   example, you keep asking me about all this stuff
7   I haven't seen that would help me understand if
8   there was a justification.  I would like to see
9   all of that if it's appropriate and if I testify
10  at trial.
11      So I would certainly have stuff to talk
12  about with regard to those analyses of reviewing
13  those justifications and documentations.
14      I think with regard to what I've seen so
15  far, as far as I can see, there is no broad
16  topic area I'm missing, but there's a lot of
17  detailed points within here, "here" being
18  Exhibit 20, within Exhibit 19 and my notes that
19  are things I could elaborate on in great detail
20  which I don't want to be construed as outside of
21  the scope of what I'm testifying to today and,
22  therefore, forbidden at trial.

271

1       Does that answer your question?
2       MR. ROSENBLOOM:  I think it does.
3       Obviously, for the record,
4   we'll -- we're of the position that anything
5   beyond Exhibit 7 was not timely disclosed.
6       But notwithstanding your production of
7   that binder today.
8       Dr. Munro, I don't think I have any more
9   questions for you about Exhibit 17 and Exhibit
10  20, so I think you can set those aside.
11      THE WITNESS:  You still have my
12  resume still?
13      MR. ROSENBLOOM:  Hang on a
14  second.  I still have a few more questions.
15      I wanted to let you know you could put
16  that to the side.
17      THE WITNESS:  Sorry.  Okay.
18      MR. ROSENBLOOM:  Just a few more
19  questions.
20      THE WITNESS:  Sorry.  I
21  apologize.
22  BY MR. ROSENBLOOM:

272

1       Q.  Have you submitted either of the reports
2   in this case or any work that you've done in
3   this case for publication with any journal or
4   anything like that?
5       A.  No.
6       Q.  Have you had -- strike that.
7       Dr. Munro, I'm going to hand back to you
8   Exhibit 16, which is the declaration of
9   Mr. Davidson.
10      Please turn to Paragraphs 4 and -- 3
11  through 5.
12      A.  (Witness reviews document.)
13      Q.  I've handed Dr. Munro the clean copy of
14  Exhibit 16.
15      Dr. Munro, at certain points throughout
16  the deposition, has reopened Exhibit 17 which is
17  the binder that is her marked-up version of it.
18      A.  I have no notes here, so I'm just going
19  to go -- which -- what do you want me to read?
20      Q.  Please read Paragraphs 3 through 5 and
21  let me know when you're ready.
22      A.  (Witness reviews document.)

273

1       Okay.
2       Q.  You can really focus on 4 and 5.
3       A.  (Witness reviews document.)
4       Okay.
5       Q.  Thank you, Dr. Munro.
6       Directing you to Paragraph 4, it states
7   that the agency positions to be included in the
8   RIF were made as a result of multiple individual
9   decisions --
10      A.  Uh-huh.
11      Q.  -- and it lists in there the director
12  working in close consultation with people,
13  including the chief of staff and deputy
14  directors.
15      A.  Uh-huh.
16      Q.  And it also refers to other senior-level
17  managers in the agency's executive team.
18      A.  Uh-huh.
19      Q.  Would you acknowledge that for you to
20  reach a credible expert determination as to
21  whether those individuals' decisions were a
22  legitimate business necessity that you would

69  (Pages 270 to 273)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

274

1   need more information than what you have had at
2   this point in time?
3        A.  Yes.  I would like to see it.
4        Q.  Thank you.
5             Would you acknowledge that turning your
6   attention to Paragraph 5 --
7        A.  Uh-huh.
8        Q.  -- where it talks about, in the first
9   sentence, CFSA was required to implement cuts to
10  reduce the budget and reduce the number of FTE
11  employees.
12            Paragraph 5 goes on to state that, CFSA,
13  in fact, achieved many of the required personnel
14  cuts by realigning functions, by implementing
15  new service models and that these were designed
16  to increase efficiency in work force
17  utilization.
18       A.  Uh-huh.
19       Q.  Would you acknowledge here today,
20  Dr. Munro, that you lack sufficient information
21  to dispute those assertions?
22       A.  I would very much like to evaluate the

275

1   way they measure their achievement of those
2   goals.
3        Q.  Dr. Munro, I've asked you a yes-or-no
4   question.
5        A.  Okay.
6        Q.  Would you please acknowledge, yes or no,
7   isn't it true that you lack sufficient
8   information to dispute those assertions?
9        A.  Yes, of course I do.
10       Q.  Thank you.
11       A.  But if evaluated, I may have a different
12  opinion.
13       Q.  And it's fair to say that for any
14  decision or opinion that any person forms in
15  life, whether it's an expert -- as an expert
16  witness in a case or whether you're choosing
17  what product to buy from the grocery store,
18  generally speaking, it goes to say that -- it
19  goes to reason that as you get new information,
20  that new information might change your opinion;
21  right?
22       A.  Yes, absolutely.

276

1        Q.  Thank you.
2        A.  That's why I really would like to see
3   some of this stuff, just because the statistical
4   evidence is concerning.
5        Q.  I would ask you to review Paragraphs 6
6   and 7 of that affidavit.
7        A.  (Witness reviews document.)
8             Yeah, okay.
9        Q.  Would you also acknowledge that for
10  Paragraph 6 and 7, you lack sufficient
11  information to dispute the assertions in those
12  paragraphs?
13       A.  I would disagree with that one more.
14            Do you want me to explain why?
15       Q.  Please.
16       A.  This whole teamed approach thing --
17  well, I think Debra did address or the Porchia
18  declaration did address one of the
19  justifications for one of the jobs terminated,
20  but I believe they were still pretty vague, but
21  it's concerning and it's not the way an internal
22  should document their decision-making.

277

1             But 7, especially I do not lack
2   sufficient information to, if I read this
3   correctly, decided to eliminate entire position
4   in favor of creating a new position with a
5   greater skill set and scope of responsibility.
6             I disagree with that based on the job
7   descriptions provided to me by CFSA.
8        Q.  And you feel that you have sufficient
9   information to reach that --
10       A.  Yeah, job description.
11       Q.  Let me finish my question.
12       A.  Sorry.
13       Q.  You feel that you have sufficient
14  information because you have the old job
15  description and the new job description, and
16  that is sufficient information for you to reach
17  that determination?
18       A.  Because all you need for that
19  determination is to compare the job
20  descriptions.  It's the only information you
21  need.
22       Q.  You don't need to be part of or be aware

70  (Pages 274 to 277)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                          7/3/2014

278

1   of broader conversations about the goal of the
2   realignment of the agency and how the new FSA
3   position fits into the overall framework?
4       You don't need that?
5       A.  Well, if that information was relevant
6   to the position and a basis for the hiring, it
7   should have been in the job description or it's
8   a very poor job description.
9       Q.  So a job description is poor if it does
10  not contain the overall considerations based on
11  a whole agency?
12      A.  No.  A job description is poor if it
13  does not fairly represent the job knowledge,
14  skills, abilities and tasks required.
15      Based on the job descriptions that I
16  read that encompass knowledge, skills, abilities
17  and tasks, they are the same.
18      Therefore, I can form an opinion on
19  No. 7 that they look like the same job to me.
20      Q.  So is it your opinion that pursuant to
21  the Daubert standard, it meets the standard of
22  expertise for someone in your field to opine

279

1   about whether a job description is legitimate
2   without looking at the broader
3   construct -- excuse me -- without looking at the
4   broader realignment of an agency that led to the
5   new job description?
6       A.  Under Daubert, I would be able to show
7   that comparing two job descriptions to see if
8   they are substantially the same job is the exact
9   same method used in transport validity, which is
10  recognized by experts in the field who do
11  validation studies and transfer validation of a
12  task from one job to another based on a
13  comparison of job descriptions.
14      Therefore, the practice I undertook
15  would certainly suffice under the Daubert
16  standard.
17      Q.  Even though you've previously
18  acknowledged that it would be relevant to know
19  if there were some other law or regulation or
20  court order or compelling circumstance that
21  might justify the new job description, even
22  though you've acknowledged that, you still think

280

1   that this is sufficient just to compare the two?
2       A.  Your confounding job description with
3   the college education requirement.
4       Job descriptions, I have sufficient
5   information to form an opinion.
6       College education applying to one of
7   those job descriptions that's substantially
8   similar to the other job description, that's a
9   different question and that's where the
10  regulation or law could affect my feeling about
11  that.
12      But if there is no such regulation or
13  law, I feel like it's an inappropriate
14  requirement based on what I saw in the job
15  descriptions.
16      So there's kind of two questions on the
17  job descriptions.  They're the same and I don't
18  think the new one merits a college degree.  Two
19  points.
20      And though -- and I do have sufficient
21  information in front of me to form that opinion
22  that would pass Daubert for sure, in my opinion.

281

1       Sorry.
2       Q.  Would you please review, I think we've
3   gotten up to Paragraph 7, the rest of
4   Mr. Davidson's affidavit, please, and
5   advise -- I'm going to ask you if there's any
6   other paragraph that --
7       A.  That I disagree with?
8       Q.  -- if there's any other paragraph or
9   assertion here that you believe that you have
10  sufficient information to dispute.
11      And for brevity, first just let's go
12  through and flag whichever those paragraphs are
13  and then we'll hit them one by one.
14      A.  That's fine.
15      Q.  But just to clarify the record, the
16  question is, please flag for me any paragraph
17  that contains an assertion that you believe you
18  have sufficient evidence and information to
19  dispute with certainty.
20      A.  Yeah, I get it.
21      If No. 8, if the first sentence is meant
22  to say --

71 (Pages 278 to 281)

282

1    Q. Hang on. So let's just flag them.
2    A. So No. 8, potentially. Potentially, No.
3    8 if I'm understanding correctly.
4    Q. Keep going, then we'll come back one by
5    one.
6    A. I would have to check my numbers to
7    check No. 9.
8         I have to double-check. I can't answer
9    without having informed myself.
10        (Witness reviews document.)
11        Yeah, that's fine. So No. 9 is fine.
12        MR. ROSE: Are you talking about
13   the social work -- I'm sorry, the --
14        THE WITNESS: The Davidson
15   declaration.
16        MR. ROSE: The --
17        THE WITNESS: The Davidson
18   declaration, Dave.
19        MR. ROSE: Yeah.
20        THE WITNESS: Yeah.
21        MR. ROSE: All right. Thank you.
22

283

1         (Witness reviews document.)
2
3         THE WITNESS: It's tough to give an
4    all-or-nothing answer on some of these.
5         Nine is fine.
6         Ten is fine, I believe.
7         Eight is, like I said, a potential
8    issue.
9         Eleven is tough, because, again, it's
10   been a long day and I'm remembering something in
11   my report that flags something about the stuff
12   in No. 11 and it could be the congregate care
13   division or both. It's a different division.
14   BY MR. ROSENBLOOM:
15        Q. So maybe 11. Let's keep going just to
16   capture them.
17        A. Yeah, possibly 12. I would have to
18   look. It would take me quite a while to look
19   through my notes and tell you what exactly it is
20   about them that I potentially have sufficient
21   information to form an opinion on.
22        Q. I'll tell you what, let's do this in the

284

1    interest of time.
2         Dr. Munro, you acknowledge that your
3    revised report, which is Exhibit 7 today --
4         A. Yes.
5         Q. -- was based on -- you got to review
6    this Davidson affidavit?
7         A. I did. I did. I did. And I cited to
8    it a lot.
9         So do you want me to stop doing that?
10        Q. That's fine.
11        A. Do you want to talk about No. 8?
12        Q. Let's hold off on that.
13        A. Okay.
14        Q. Let's turn back to Paragraph 4.
15        A. Yes, sir.
16        Q. You've already stated that you lack
17   sufficient information to dispute Paragraph 4,
18   correct?
19        A. Of course.
20        Q. Of course you do?
21        A. Of course I do.
22        Q. Thank you.

285

1         MR. ROSENBLOOM: I think we're
2    done with Mr. Davidson's affidavit.
3         Can we go off the record for just about
4    a minute?
5         MR. ROSE: Okay.
6
7         (Recess taken from 4:16 p.m.
8         to 4:18 p.m.)
9
10   BY MR. ROSENBLOOM:
11        Q. Dr. Munro, with respect to High Activity
12   Sales --
13        A. Yes, sir.
14        Q. -- and your Perform Consulting --
15        A. Yes, sir.
16        Q. -- those two companies --
17        A. Yes, sir.
18        Q. -- are there any projects or clients in
19   the District of Columbia that you're currently
20   soliciting or working on trying to solicit at
21   this time?
22        A. Headquarter-wise, no. But both our

72 (Pages 282 to 285)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

286

1   client AIG, our -- we have other clients we are
2   soliciting and talking to, including Edward
3   Jones and others could have agencies and offices
4   in DC.
5        Q.  So plaintiffs' counsel wants me to feel
6   like the mean bad guy, but their own expert is
7   working for AIG?  Is that what I hear?
8        A.  I sell test data to AIG.  I don't work
9   for them.
10       Oh, yeah, AIG was the big bad wolf in
11  the Wall Street --
12       Q.  They got bailed out with a couple of
13  federal taxpayer dollars.
14       A.  I sell tests to them trying to make them
15  a more responsible company.
16       Q.  That's a good thing?
17       A.  See, it's a good motive.
18       Q.  At various points in today's
19  deposition --
20       A.  Yes, sir.
21       Q.  -- you've talked about best practices
22  and you've used phrases like "what they should

287

1   have done" or "what I would want to see" or
2   "what I would want to do if I were there."
3        A.  Uh-huh.
4        Q.  You certainly acknowledge, Dr. Munro,
5   that for purposes of forming an opinion in this
6   case, you have not had the benefit of the
7   information and access to information that one
8   has when they are, indeed, in-house for a
9   company or consulting for a company, right?
10       A.  Well, the data is the exact same data I
11  would have inside or outside.
12       Q.  But Dr. Munro, besides data, which here
13  you basically have data and you have a few
14  affidavits that were put together for litigation
15  purposes.
16       When you're working for a client as a
17  consultant to help -- to do the work that you
18  do, you get a whole lot more access to that
19  client as a general matter, don't you?
20       A.  The data, again, is identical.  You
21  would get this kind of dataset if I was trying
22  to look at something.

288

1        With regard to the practices they used
2   in the RIF, I would expect to see -- hopefully
3   you guys do have evidence that they did a preRIF
4   analysis and that they did a validation of their
5   interview guide and if so, great.
6        So it's like a pointless hypothetical
7   that, sure, if I was internal, I would have
8   access to a lot more information.  But I'm
9   betting money they don't have a validation study
10  on their interview guide and --
11       Q.  You're betting money?  So you're
12  speculating, right?
13       A.  Well, actually, gambling is illegal, so
14  I shouldn't say that.
15       Q.  But as a term of speech -- there's no
16  actual money on the table.  There's no cigars
17  here.  There's no scotch.
18       But as a term of speech, you're
19  speculating --
20       A.  I'm speculating strongly based on what
21  of I have seen of the processes they have used
22  that they do not have a best practices interview

289

1   guide, a technical report that goes along with
2   it justifying it, and then more importantly,
3   what was the other thing that I said before
4   that?
5        Q.  Whether the job descriptions were
6   structurally --
7        A.  No, the job descriptions are the job
8   descriptions.
9        So internally, the two things I have the
10  same access to is the data and the job
11  descriptions.
12       Q.  So internally, you might have access to
13  those things?
14       A.  Yes.
15       Q.  But you also have access to people and a
16  lot more information for context which you have
17  not had access to here, correct?
18       A.  Yes.  But you have to read between the
19  lines.
20       Q.  Besides -- I'm sorry?
21       A.  You're able to read between the lines to
22  a good degree when you do this long enough for

73  (Pages 286 to 289)

290

1    consulting. So...
2        Q. Have you ever had a consulting
3    project -- strike that.
4        You acknowledge, though, that the scope
5    of work between coming inside a company as a
6    full-time staff member doing your work or coming
7    inside a company as an outside consultant doing
8    your work is extremely different in that type of
9    work than doing a reverse -- doing the type of
10   expert testimony and opining that you have
11   rendered here in the Davis lawsuit, correct?
12       A. I would agree with you 75 percent.
13       The only 25 percent disagreement is that
14   when you do this long enough, the stuff that I
15   have seen, it's a form of correlation.
16       I've seen data that does this.
17       I've seen declarations that speak
18   nothing to the processes they used until four
19   years after the fact.
20       I've seen a processes that they use,
21   interview guides and put in job descriptions
22   that are the same but call them different, then

291

1    require a college degree.
2        Based on my 15 years of experience, I am
3    saying that it is speculation, but it's a little
4    more than speculation because when I have seen
5    this in the past, then my speculation has been
6    true.
7        When I've actually seen the evidence
8    then, meaning as a consultant, there was not
9    best practices. There was not proper procedures
10   followed.
11       Q. So if instead of looking at Exhibit 16
12   of Davidson's affidavit, that's Mr. Davidson's
13   affidavit, if instead of looking at that you
14   actually had Mr. Davidson here and the other
15   people with whom he works and could ask them
16   questions and get follow-up documents and those
17   sorts of things, isn't it very likely that you
18   would get more information?
19       A. Absolutely.
20       MR. ROSENBLOOM: Thank you. I
21   have no further questions.
22       Dr. Munro, thank you.

292

1        Is there any cross-examination?
2        MR. ROSE: Further --
3        MR. ROSENBLOOM: I mean direct
4    examination?
5        MR. ROSE: Yes.
6        MR. ROSENBLOOM: So you are going
7    to do a direct exam?
8        MR. ROSE: I'm going to ask her a
9    few questions, yes.
10       MR. ROSENBLOOM: Then we need to
11   let Dr. Munro go feed the meter and we'll stand
12   by.
13       MR. ROSENBLOOM: Okay. Is it ten
14   minutes?
15       THE WITNESS: How many questions
16   do you have, Dave?
17       MR. ROSE: Only about three or
18   four.
19       THE WITNESS: I'll just risk the
20   meter. Let's go.
21       BY MR. ROSENBLOOM: Mr. Rose, you
22   understand that -- I want to make sure that --

293

1    okay, I don't want your witness to get a parking
2    ticket and also --
3        THE WITNESS: It's fine. I'll
4    just run and it will take two seconds. I'll be
5    quick. I'll be two seconds.
6        MR. ROSENBLOOM: Let's let
7    Dr. Munro feed the meter.
8        MR. ROSE: That's fine.
9
10       (Recess taken from 4:24 p.m.
11   to 4:30 p.m.)
12
13       DIRECT EXAMINATION
14   BY MR. ROSE:
15       Q. Dr. Munro, as far as using an
16   educational attainment, is that something that
17   you recommend for clients or subcontractors that
18   you work for?
19       A. Using education as a selection criteria?
20   Is that what you're asking?
21       Q. I'm sorry. Did you answer?
22       A. I'm asking you if -- are you asking me

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                                    7/3/2014

---

294

1   if I recommend to my clients to use education as
2   one of the criteria for selection?
3       Q.  As a prerequisite for selection, which
4   it appears for the DS or GS9 position.
5       A.  I do not recommend --
6           MR. ROSENBLOOM:  Excuse me.
7       Let me interpose an objection.  That was
8   a leading question.
9       Go ahead, Dr. Munro.
10      A.  I would have answered this way without
11  the leading question, but essentially, I think
12  education is a poor indicator of performance
13  unless it is directly related to the job.
14      So basically, in my report there is a
15  table that actually shows, essentially, the
16  usefulness of education in predicting overall
17  job performance.
18      Granted, this is aggregated across a lot
19  of jobs.  This is a very notable study from
20  Hunter and Hunter that is referenced a lot.
21      But I mean, in general, you have to go
22  from the job description.  You start with the

---

296

1       And I'm going to ask you again about in
2   Maryland and Rhode Island and if you can answer
3   all of those, that would be good.
4       A.  If I understand your question correctly,
5   you're asking me if I'm aware of any regulation
6   that requires a bachelor's degree for the FSW
7   position or a position like that?
8       Q.  Yes.
9       A.  It's different from a social worker
10  position, I think.
11      Q.  But I'm going to do them separately.
12      A.  I know nothing about the regulations.
13      I'm stating that based on the job
14  description, it does not look like a job where
15  knowledge, skills and abilities would require a
16  college education.
17      Q.  And do you have any information about
18  the use of the social worker -- there were
19  social worker -- I'm sorry -- there were social
20  worker associates or something like that who
21  were GS10s, and they were fired because they
22  apparently did not have a master's degree.

---

295

1   job description, then the knowledge, skills and
2   abilities required.  If it's something that
3   requires a college education, like an accounting
4   degree, then it makes sense.
5       But based on the job description, as I
6   said multiple times during this deposition,
7   based on the job description for the new
8   position, I don't understand, absent regulation
9   or law, why a college education is required to
10  do the one additional task of interviewing
11  families.
12          MR. ROSENBLOOM:  Objection.
13  Nonresponsive.
14          THE WITNESS:  Should I try again?
15          MR. ROSE:  No, no, no.  He can ask
16  another question.
17  BY MR. ROSE:
18      Q.  Let me ask you, are you aware of any law
19  or regulation in the District of Columbia to
20  require the use of a bachelor's degree
21  or -- prior to this time, a bachelor's degree or
22  a social worker degree?

---

297

1       If that is the case, are you -- are you
2   aware of any regulation or so forth with respect
3   to a bachelor's degree instead of a master's
4   degree for --
5       A.  I have no specific information about
6   social --
7           MR. ROSENBLOOM:  I'm going to
8   object to the form, but go ahead and let's
9   -- just to be clear, Mr. Rose, I want to give
10  you an opportunity to ask the question and then,
11  Dr. Munro, let me have an opportunity to just
12  object briefly and then go forward.
13      Go ahead, Mr. Rose.  Do you want to
14  clarify the question for the record?
15          THE WITNESS:  I can actually
16  answer it based on what he said and he can tell
17  me if I didn't answer it.
18      I am not specifically knowledgeable
19  about the DC laws and regulations regarding
20  social workers.
21      Does that answer the question?
22  BY MR. ROSE:

---

75 (Pages 294 to 297)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                    7/3/2014

298

1    Q.  Yes.  Thank you.
2         Are you aware of the recordkeeping
3    requirements for the institutions, either
4    private or governmental, the employers in the
5    federal government usually are required to keep
6    a record of the reasons for any decisions.
7    A.  Do you want to just -- I'm sorry.
8         MR. ROSENBLOOM:  So --
9    BY MR. ROSE:
10   Q.  Are you aware of any such laws or
11   regulations?
12        MR. ROSENBLOOM:  Objection to the
13   testimonial form.
14        Go ahead and answer Dr. Munro.
15   A.  So I'm aware of the -- I'm not sure if
16   it's an EEOC standard.  Although, I think it
17   might be.  But maybe it's just a best practice
18   used in corporations.
19        But you're supposed to be retaining
20   records relating to employment and termination
21   decisions for a number of years, at least that's
22   what I've already seen.  I can't say

299

1    specifically whether that derives from law,
2    regulation or just plain --
3    Q.  That's fine.
4    A.  -- just plain being smart.
5         MR. ROSE:  You referred to tEEOC
6    regulations.  That's fine.
7         I don't think I have any other
8    questions.
9         MR. ROSENBLOOM:  Thank you.
10        As I've been trying to clean up, I
11   realize that throughout the deposition today, I
12   misspoke numerous times by referring to Exhibit
13   18 as Exhibit 17.
14        Exhibit 18 is the binder that Dr. Munro
15   brought and that the court reporter will take
16   and photocopy and make part of the record that
17   Dr. Munro had numerous documents in there with
18   her handwritten notes and with orange tabs on
19   them and was referring to them.
20        I apologize.  At numerous points I
21   referred to that today as Exhibit 17, but that
22   was Exhibit 18.

300

1         Exhibit 17, to clarify, was the one-page
2    invoice from Dr. Munro.
3         MR. ROSE:  Okay.
4         MR. ROSENBLOOM:  So let's just
5    have that clarified on the record.
6         MR. TEMPLE:  Does Donald Temple
7    get a chance to ask a question, by any chance?
8         MR. ROSENBLOOM:  I suppose we
9    should since he's such a nice guy.
10
11        DIRECT EXAMINATION
12   BY MR. TEMPLE:
13   Q.  I just want a clarification.
14        You actually compared the former job
15   descriptions with the revised job descriptions;
16   is that correct?
17   A.  I compared what was in a Porchia's
18   declaration, which appeared to have the -- I
19   believe the -- he would have to give me my
20   binder back so I can refer to it.
21        MR. ROSENBLOOM:  Sure.
22   A.  I have -- I believe it had a copy of the

301

1    SSA, which is the eliminated job.
2         Before I speak on the record, let me
3    actually just check.
4         (Witness reviews document.)
5         Where is my friend Porchia.
6         Here we go.
7         It is -- it is the declaration of Debra
8    Porchia-Usher, which I've been referring to as
9    Porchia the whole time.  Debra Porchia-Usher,
10   and she has an appendices, Exhibit A, attached
11   to Porchia-Usher's declaration.  She has what is
12   entitled -- it says "File 12/2010," and this
13   is -- the title of this is the CFSA social
14   services assistant.  So it's the SSA.  And it
15   gives the major job duties; Page 1, knowledge
16   required; Page 2, supervisory control, Page 2, a
17   bunch of other stuff.  Sorry.  I'm slowing down.
18        It's essentially a job description for
19   the SSA.
20        And that was compared to Exhibit B,
21   which after a couple of pages of stuff is the
22   FSW, the family support worker.  And it follows

76 (Pages 298 to 301)

302

1  a similar format, where it has major duties.
2  And these are what I compared line by line.
3  Knowledge required; I compared that line by
4  line. Supervisory control, I compared that, so
5  forth.
6        And I wrote about that in my report as
7  coming to the conclusion that the major
8  substantive difference I noticed was
9  interviewing families.
10       Q. And the point to that is that there is
11  no real relationship between the additional
12  educational requirement and the -- and the
13  changes and the modified job descriptions?
14       MR. ROSENBLOOM:  Objection.
15  Leading.
16       Go ahead, Dr. Munro.
17  BY MR. TEMPLE:
18       Q. Is that correct?
19       A. Even without leading, I would
20  have -- basically, the point of that analysis
21  was to say, A, is this job really any different
22  and what was the need to dissolve it and create

303

1  a new one; and B, why does one job require a
2  college education and the other doesn't.
3        And you know my conclusion already.
4        Q. Did you -- did you factor in, based on
5  your experience, why someone would -- why a --
6  why the government in this particular case would
7  be motivated to make these shifts for people
8  that have already been working and doing their
9  jobs for a significant numbers of years?  Why
10  they would modify the job description and
11  educational requirement that would effectively
12  result in eliminating the job positions?
13       MR. ROSENBLOOM:  Again,
14  objection. Leading. Argumentative.
15       Go ahead, Dr. Munro.
16       A. I can't speculate as to their motives.
17       I can say that there's a misnomer that a
18  college education is a good thing; it somehow
19  predicts performance in a wide variety of jobs,
20  which is not actually true.
21       There's a lot of better predictors of
22  performance.  So I can't speculate as to why

304

1  they would dissolve one job and essentially
2  create what appeared to be the -- a very, very,
3  very similar job requiring a college education
4  other than the thought that a college-educated
5  worker is a better worker, which there's not
6  really very good proof of that and there's a lot
7  of adverse impact that a college education
8  carries with it.
9  BY MR. TEMPLE:
10       Q. In addition to that, were you able to
11  glean anything from the college education
12  requirements which would point in the direction
13  of that particular educational requirement being
14  specifically related to the modified or
15  additional requirement and in the job
16  description?
17       Do you follow me?
18       MR. ROSENBLOOM:  I'll object to
19  form.
20       Dr. Munro, did you follow that?
21       THE WITNESS:  Yes, I think I did.
22  So you're saying, could I make -- from

305

1  my knowledge and experience, could I make an
2  understanding as to why a college education is
3  required to interview a family, which seemed to
4  be the main substantive difference?
5  BY MR. TEMPLE:
6        Q. Not only the college education generally
7  that is required, but is there anything in the
8  definition of the educational requirement that
9  suggests that there is some reasonable
10  relationship between the additional college
11  education requirement and the modified or the
12  increased responsibility of the job description?
13       A. Okay. I think I understand, but they
14  don't see -- see, the job descriptions I'm
15  looking at, unless I'm missing it, and
16  it's -- it might be in here somewhere.
17       Where I got the college requirement was
18  from the declarations where they said that the
19  SSA was gotten rid of, the FSA -- I'm sorry, the
20  FSW was created and required a college
21  education.
22       So beyond that, I'm not entirely sure I

77 (Pages 302 to 305)

PAIGE MUNRO, PH.D.

DAVIS v. DISTRICT OF COLUMBIA                          7/3/2014

306

1   understand your question.
2          MR. TEMPLE: Not a problem.
3   Thank you.
4          THE WITNESS: Did I answer your
5   question?
6          MR. TEMPLE: Yes.
7          MR. ROSENBLOOM: He was trying
8   ask you a friendly question.
9          Mr. Rose, Mr. Temple, do you guys have
10  any more questions?
11         MR. ROSE: No, sir.
12         MR. ROSENBLOOM: Mr. Rose, do you
13  have a direction to Dr. Munro with regard to
14  reading and signing or waiving?
15         MR. ROSENBLOOM: I think she
16  ought to read and sign. Unless you have some
17  different reason, I think she ought to read and
18  sign it.
19         MR. ROSENBLOOM: So I think that
20  we are concluded and I wish everyone a very,
21  very happy Fourth of July weekend.
22         THE STENOGRAPHER: Would you like

307

1   to order a copy of the transcript?
2          MR. ROSE: I think you ought to
3   send to it the witness and have her send it
4   back.
5          I think Mr. Temple does, too.
6          MR. TEMPLE: No, I'll hold off.
7          MR. ROSE: So send the witness a
8   copy to sign and send me a copy.
9          MR. ROSENBLOOM: We will order
10  whatever we usually order and Olender has that
11  order, but we are ordering the transcript.
12         THE STENOGRAPHER: Thank you.
13
14         (Deposition concluded at 4:43 p.m.)
15
16
17
18
19
20
21
22

308

1                  CERTIFICATION
2          I, Darlene M. Coppola, a Notary Public, do hereby
3   certify that Paige A. Munro came before me on the 3rd
4   day of July, 2014 in Providence, Rhode Island, and was
5   by me duly sworn to testify to the truth and nothing but
6   the truth as to her knowledge touching and concerning
7   the matters in controversy in this cause; that she was
8   thereupon examined upon her oath and said examination
9   reduced to writing by me; and that the statement is a
10  true record of the testimony given by the witness, to
11  the best of my knowledge and ability.
12         I further certify that I am not a relative or
13  employee of counsel/attorney for any of the parties, nor
14  a relative or employee of such parties, nor am I
15  financially interested in the outcome of the action.
16         WITNESS MY HAND THIS 15th day of July 2014.
17
18
19  DARLENE M. COPPOLA     MY COMMISSION EXPIRES:
20  NOTARY PUBLIC      11/18/16.
21  REGISTERED MERIT REPORTER
22  CERTIFIED REALTIME REPORTER

309

1   Today's Date:   July 16, 2014
2   To:    drpaigemunro@gmail.com
3   Copied to:   Douglas Rosenbloom, Esquire
4                David Rose, Esquire
5   From:   Darlene M. Coppola, RMR, CRR
6   Deposition of:   Paige Munro, Ph.D.
7   Taken:    July 3, 2014
8   Action:    Davis vs. District of Columbia
9
10         Attached is a copy of your deposition
11  transcript in the above-referenced matter.
12         Pursuant to the Rules of Civil Procedure,
13  you have thirty days to sign the deposition from
14  today's date.
15         Please review the transcript and execute
16  the attached signature page. If there are any
17  errors, please mark the page, line and error on
18  the enclosed correction sheet. You should not
19  mark the transcript itself. This addendum
20  should be forwarded to all interested parties.
21         Thank you for your cooperation in this
22  matter.

78  (Pages 306 to 309)