**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| RONDA L. DAVIS, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 10-1564 (RC) |
| | : | | |
| v. | : | Re Document No.: | 144, 146 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
DENYING AS MOOT PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I. INTRODUCTION

Plaintiffs in this case are former employees of the District of Columbia Child and Family

Services Agency who were terminated in a broad layoff of agency staff.  In this putative class

action lawsuit, Plaintiffs allege that their termination was the result of a discriminatory

downsizing of the agency's workforce.  Specifically, Plaintiffs allege that the firings, referred to

as a reduction in force, were the result of discrimination based on both race and age.  Plaintiffs

also allege that the agency's imposition of a bachelor's degree requirement for the newly created

Family Social Worker position was discriminatory as to both race and age.

After extended litigation, including the Court's resolution of initial dispositive motions

and fact and expert discovery by the parties, the Court now considers two pending motions.

First, Plaintiffs have renewed their motion for class certification.  *See* Pls.' Mot. Class Certification

("Mot Class Certification"), ECF No. 144.  Second, the District of Columbia has moved for

summary judgment.  *See* Def.'s Mot. Summ. J. ("Mot. Summ. J."), ECF No. 146.  For the

reasons set forth below, the Court will grant the District of Columbia's motion for summary

judgment.  Because the Court grants summary judgment for the District on all remaining claims,

the Court does not need to reach Plaintiffs' motion for class certification.  Thus, the Court denies

that motion as moot.

## II.  BACKGROUND

The Court will begin with a description of the facts giving rise to the parties' dispute and

then turn to the procedural history of this case.

### A.  Factual Background

#### 1.  The Child and Family Services Agency

The District of Columbia Child and Family Services Agency ("CFSA") is entrusted with

protecting the safety, permanence, and well-being of abused and neglected children and with

providing services to struggling families.  *See* Def.'s Statement Undisputed Material Facts

("Def.'s Material Facts") ¶ 1, ECF No. 146-2.  Although the parties dispute the exact

organizational structure of CFSA during the relevant time period, *compare id.* ¶¶ 2, 5 *with* Pls.'

Statement Disputed Material Facts ("Pls.' Disputed Facts") at 2–3, ECF No. 148-1, it is

undisputed that many of CFSA's "frontline functions" are led by the Office of Agency Programs,

including investigating reports of child abuse and neglect, temporarily removing children from

dangerous situations, and providing direct case management.  *See* Def.'s Material Facts ¶ 3; Pls.'

Disputed Facts at 1.  District of Columbia law and the consent decree entered in the class action

*LaShawn v Bowser* mandate the provision of many of these services.  *See* Def.'s Material Facts

¶ 4; Pls.' Disputed Facts at 1; *see also LaShawn v. Bowser*, No. 89-1754 (D.D.C. Feb. 27, 2007),

ECF No. 864 (order approving Amended Implementation Plan).

CFSA experienced significant budgetary pressure in fiscal years 2010 and 2011.  In FY

2010 (October 1, 2009 to September 30, 2010), CFSA's budget decreased by $25.3 million from

the prior year.  *See* Def.'s Material Facts ¶ 7.  The FY 2010 budget reduced the number of full-time employees from 940 to 892.  *See id.* ¶ 8.  In FY 2011, CFSA's budget was reduced by $12.1 million and the number of approved full-time employees was reduced further from 892 to 840.  *See id.* ¶ 10.  The agency was required to make the required budget and employee cuts before October 1, 2010, the beginning of FY 2011.  *See id.* ¶ 11.  CFSA implemented a reduction in force ("RIF") to meet the necessary reduction in personnel costs.  *See id.* ¶ 12.  The RIF, which had an effective termination date of June 11, 2010, eliminated a total of 123 *positions*.  *See id.* ¶¶ 12–13.  All told, 115 *employees* were separated from CFSA as a result of the RIF.  *See id.* ¶ 14.

### 2.  The Reduction in Force

The parties view the RIF in drastically different light.  Plaintiffs posit that the RIF was a simple across-the-board cut with discriminatory intentions and effects.  Plaintiffs point to a memorandum dated April 29, 2010 from CFSA Director Roque Gerald to City Administrator Neil Albert that asked for "approval to conduct a Reduction-in-Force . . . to abolish one hundred and twenty-three . . . positions within the Child and Family Services Agency."  Pls.' Mem. P. & A. Opp'n Def.'s Mot. Summ. J. ("Opp'n Summ. J.") at 5, ECF No. 148 (quoting Mot. Summ. J., Ex. F at 1, ECF No. 146-3).  The memorandum explained that CFSA "must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering," and that "[t]he deficit resulting from the realignment will precipitate a reduction in force."  *Id.*  Plaintiffs note that the memorandum provided an "agency-wide" list of positions, which purportedly affected virtually every office of CFSA.  *See* Opp'n Summ. J. at 6.

CFSA's Director sent a letter dated May 6, 2010 that informed the 115 CFSA employees who would be terminated by the RIF.  *See* Opp'n Summ. J., Ex. 2 at 1, ECF No. 148-2.  The letter did not provide a reason for the RIF, but stated that employees would "be separated from

District government service effective 6/11/10" and that the RIF was conducted in "accordance with Chapter 24 of the District's Personnel Regulations and in no way reflects adversely on your performance of your official duties." *Id.*

In contrast, the District contends that the RIF was the result of a series of separate decisions. The District claims that "CFSA did not utilize a single uniform criteria, test or requirement for determining which employees" would be included in the RIF. Def.'s Mem. P. & A. Supp. Def.'s Mot. Summ. J. ("Mem. Supp. Summ. J.") at 4, ECF No. 146. Instead, relying on the declaration of Raymond Davidson, CFSA's Chief Administrative Officer at the time of the RIF, the District contends that the decisions to eliminate certain positions were the result of multiple individual choices by the Director, working in consultation with numerous managers and senior leaders in the agency. *See* Def.'s Material Facts ¶ 15; *see also generally* Mot. Summ. J., Ex. E ("Davidson Decl."), ECF No. 146-3. *But see* Pls.' Disputed Facts at 3. Mr. Davidson's declaration also focused on CFSA's attempts to create new service models for providing services in the District. *See* Davidson Decl. ¶¶ 6–7, 10–12, 14.

### 3.  The Newly Created Family Support Worker Position

The parties also apply their competing narratives to discrete components of the RIF, particularly the elimination of the Social Service Assistant ("SSA") and Social Worker Associate ("SWA") positions and the creation of a new Family Support Worker ("FSW") position.

According to Mr. Davidson, CFSA determined that it should adopt a model where Social Workers "are 'teamed' with a set of skilled partners in order to more effectively serve the needs of the Agency's children and family clients.'" Davidson Decl. ¶ 6; *see also* Def.'s Material Facts ¶ 18. To advance that model, CFSA eliminated the SSA and SWA positions through the RIF in favor of a newly created FSW position. *See* Davidson Decl. ¶ 7; *see also* Def.'s Material Facts

¶ 19.  The elimination of the SSA and SSW positions accounted for the majority of the 115

employees terminated in the RIF.[1]  Def.'s Material Facts ¶ 20; Pls.' Disputed Facts at 6.

CFSA posted openings for the new FSW positions at the same time it informed

employees of the RIF.  *See* Opp'n Summ. J., Ex. 3 at 7, ECF No. 148-2. The FSW position

required a bachelor's degree in a social service field.  Def.'s Material Facts ¶ 32; *see also* Pls.'

Disputed Facts at 8 (acknowledging the degree requirement).  Debra Porchia-Usher, CFSA

Deputy Director for Agency Programs, stated that FSWs would be "able to perform casework

activities that support investigative social workers to obtain the information necessary to

complete investigations of abuse and neglect, including interviewing family members, children,

and caretakers[;] assessing the safety of a home and the well-being of children[;] conducting

home visits; documenting information into the case record; coordinating with other team

members for meetings; and coordinating needed services for families and children."  *See* Mot.

Summ. J., Ex. B ("Porchia-Usher Decl.") ¶ 12, ECF No. 146-3.

Plaintiffs contend that the SSA and FSW positions involved the same responsibilities,

and that the only difference between the positions was the FSW's degree requirement.  Opp'n

Summ. J. at 8–11.  Plaintiffs present CFSA's job descriptions of the relevant positions, and

---

[1] The parties disagree as to whether a total of 70 or 73 employees were terminated when the SSA and SWA positions were eliminated.  *Compare* Def.'s Material Facts ¶ 20 *with* Pls.' Disputed Facts at 6.  The District relies on the declaration of Mr. Richardson, who states that the "elimination of the SSA and SWA positions accounted for 70 of the 115 employees separated in the RIF."  Davidson Decl. ¶ 9; *see also* Mem. Supp. Summ. J. at 4.  Plaintiffs rely on the declaration of Debra Porchia-Usher, CFSA Deputy Director for Agency Programs, who states that 57 SSA "positions" and 16 SWA "positions" were eliminated in the RIF.  *See* Porchia-Usher Decl. ¶¶ 14–15.  The District suggests that Ms. Porchia-Usher was referring to the number of positions eliminated, including vacant positions, instead of the number of employees.  *See* Def.'s Reply Pls.' Statement of Disputed Material Facts at 6.  The parties' experts address statistical questions in great detail.  *See infra* Part II.A.5.

suggest that the descriptions are largely identical. *See* Opp'n Summ. J. at 8–10; Porchia-Usher

Decl., Exs. A–B.  For, instance, the SSA responsibilities included:

- "[P]roviding direct support to social work staff and the social work function." Porchia-Usher Decl., Ex. A.

- "Conduct[ing] non-clinical home visits accompanying a Social Worker or a Social Service Assistant, as needed, for reasons of safety . . . ." *Id.*

- "Provid[ing] transportation assistance for clients . . . ." *Id.*

- "Support[ing] social workers and supervisory social workers in implementing service plans by supervising/facilitating visits, making referrals or scheduling service with providers . . . ." *Id.*

- "Participat[ing] in case and supervisory conferences as needed; bring[ing] problem issues to the attention of the worker and/or supervisor for discussion in these conferences." *Id.*

- "Assist[ing] the social worker in completing specified paper searches to locate hard-to-find families by searching and clarifying data, checking files, and contacting other agencies." *Id.*

The FWS job posting included a number of similar responsibilities, including:

- "Perform[ing] casework, group work, and community organization work under the supervision of a Licensed Independent Social Worker . . . ." Porchia-Usher Decl., Ex. B.

- "Accompan[ying] a Social Worker as needed, for reasons of safety or participat[ing] in home visits and/or investigations to determine the needs of clients . . . ." *Id.*

- "Provid[ing] transportation assistance for clients . . . ." *Id.*

- "Support[ing] social workers and supervisory social workers in implementing service plans by supervising/facilitating visits . . . ." *Id.*

- "With guidance, develop[ing] plans for and provid[ing] appropriate assistance and services on a continuing basis to children and family members." *Id.*

- "Assist[ing] the social worker in completing specified paper and record searches to locate hard-to-find families by engaging diligent search services or by searching and clarifying existing data, checking files and contacting other agencies as necessary." *Id.*

Plaintiffs also present evidence that SSAs were already completing some of the additional responsibilities—specifically casework and assessments during home visits—that were included in the FSW job description.  Plaintiff Darius Morris, for instance, testified during a deposition that SSAs routinely made home visits and assessments, but that CFSA did not enter those visits and assessments into its database system.  *See* Opp'n Summ. J., Ex. 11 at 21–26, ECF No. 148-3. In her response to an interrogatory, Plaintiff Stephanie Alston stated that, despite her lack of a bachelor's degree, the Georgia Avenue Family Support Collaborative, a CFSA contractor, hired her as a Family Support Worker.  *See* Opp'n Summ. J., Ex. 14 at 2, 4, ECF No. 148-6.[2] Plaintiffs contend that CFSA's decision to contract the FSW function to an outside vendor, who in turn hired Ms. Alston, shows that a bachelor's degree was not required to perform the duties of a FSW.  *See* Opp'n Summ. J. at 10–11.

Finally, Plaintiffs present an email sent by CFSA employee Jenna Beebe on May 26, 2010.  *See* Opp'n Summ. J., Ex. 6 at 1, ECF No. 148-2.  Ms. Beebe states that "one of the other supervisory interviewers mentioned to me that they felt that the FSW would be used in the exact fashion SSA's were prior to RIF."  *Id.*  Ms. Beebe went on to say that, in her understanding, "FSW's will have much higher requirements and acquired skills."  *Id.*  In response, Ms. Porchia-Usher stated that CFSA would need "to be conscious that all FSW know the expectations" and that "performance evaluations [clearly] outline the current position expectations."  *Id.*

### 4.  Hiring for the FSW Position

A job posting for the newly created FSW position stated that the position would be open as of May 5, 2010 and that CFSA planned to fill 35 vacancies.  *See* Opp'n Summ. J., Ex. 4 at 1,

---

[2] Because this document is not separately paginated, the Court cites the page numbers created automatically by the Court's Electronic Case Filing system.

ECF No. 148-2.  On June 7, 2010, CFSA Director Gerald sent an email stating that "[t]he first of our new Family Support Workers (FSWs) came on board today" and that each of the 17 new FSWs "are former CFSA employees we're re-hiring after the reduction in force last month." Opp'n Summ. J., Ex. 5 at 1, ECF No. 148-2.  Director Gerald also stated that "Human Resources is prepared to make offers to an additional group shortly. All those candidates are from outside CFSA." *Id.*

According to the District's data, 44 employees who were separated through the RIF applied for an FSW position.[3]  *See* Def.'s Material Facts ¶ 36.  Of the 44 applicants, 30 held a bachelor's degree and therefore satisfied the minimal education requirements of the position.  *Id.* ¶ 37. Two declined to be interviewed and two others took other positions in the agency.  *Id.* ¶ 38. Following an interview of all qualified applicants, CFSA hired 18 employees who had been terminated in the RIF.  *Id.* ¶ 41.  The District contends that all 18 re-hires were African-American and 7 were age 40 or older.  *Id.* ¶¶ 42–43.  Plaintiff Mr. Ajakaiye was one of the 18 initial FSW hires, and is the only plaintiff in this case who was hired for that position.  Opp'n Summ. J. at 12.

### 5.  Expert Reports

During the process of discovery, the parties retained experts to provide statistical analyses of the RIF and related decisions by CFSA.  Plaintiffs hired Dr. Paige Munro, who has a Ph.D. in industrial organizational psychology.  *See* Mot. Summ. J., Ex. H ("Munro Decl.") ¶ 1, ECF No. 146-3.  The District hired Dr. Stephen Bronars, who has a Ph.D. in economics.  *See*

---

[3] Plaintiffs object to elements of the legality and propriety of the District's FSW hiring, but—with one exception—they generally accept the timeline and statistics presented here.  *See* Pls.' Disputed Facts at 10–12.  The exception is that Plaintiffs contend that the record does not show that one of the purported re-hires was African-American or 40 or older.  *Id.* at 11–12. Plaintiffs' objection appears to be at least partly mistaken.  *See infra* Part IV.B.4.

Mot. Summ. J., Ex. J ¶ 2.  Both of the experts produced two reports using statistical analyses to examine the purported impact of CFSA's employment practices.

### a.  Dr. Munro's July 2012 Report

Dr. Munro submitted her initial report for the Plaintiffs on July 28, 2012.  *See* Munro Decl. at 4; *see also* Mot. Summ. J., Ex. I, ECF No. 146-3 (Dr. Munro's report).  Dr. Munro based her report on data provided by the District in the declaration of Stan Spaght, the Human Resources Manager for Compensation/Benefits at CFSA.  *Id. ¶* 2; *see also* Mot. Summ. J., Ex. I at 1. Mr. Spaght stated that, before the RIF, CFSA had a total workforce of 832.  *See* Opp'n Summ. J., Ex. 10 ("Spaght Decl.") *¶* 5, ECF No. 148-2.  According to Mr. Spaght, prior to the RIF, 82.8% of employees were African-American and 62.7% were age 40 and over.  *Id.*  Finally, Mr. Spaght's declaration stated that, of the 115 workers terminated in the RIF, 93% were African-American, and 74.8% were workers 40 and over.  *Id.*

Relying on that data, Dr. Munro calculated that, of the 832 workers at CFSA before the RIF, approximately 689 were African-American and 143 were other races.  *See* Mot. Summ. J., Ex. I at 1.  Similarly, approximately 522 employees were 40 and over and 310 were younger than 40.  *Id.*  Dr. Munro also calculated that 107 employees terminated in the RIF were African-American (8 were other races), and 86 were 40 and over (29 were younger than 40).  *Id.* Dr. Munro then conducted a statistical analysis to determine whether the rate of termination for African-Americans and employees 40 and over differed in a statistically significant way from the termination rates for non-African-American employees and employees under 40.  *Id.*  Dr. Munro's analysis concluded that the RIF termination rate for African-Americans was 15.5%, while the same rate for non-African-Americans was 5.6%.  *Id.* at 3–4.  A parallel analysis concluded that

the RIF termination rate for employees 40 and over was 16.5%, while the same rate for those under 40 was 9.4%.  *Id.* at 4–5.

Dr. Munro's analysis relies on the 4/5ths rule, which she refers to as a "rule of thumb to evaluate adverse impact in a hiring or termination scenario."  *Id.* at 3.  Simply put, "if 100% of a majority group pass a test then the minority group should not pass at a rate lower than 80% or the test result is said to be adversely impacting the minority group."  *Id.*  Dr. Munro concluded that the RIF violated the 4/5ths rule on the basis of both race and age.  *Id.* 4–5.  Dr. Munro also concluded that both results are strongly statistically significant.  *Id.*  Finally, Dr. Munro found that re-hiring 18 African-American to the FSW position "does not change the net results notably."  *Id.* at 4.

### b.  Dr. Bronars's January 2014 Report

The District's expert, Dr. Bronars, produced his initial report on January 8, 2014.  *See* Mot. Summ. J., Ex. J.  Dr. Bronars begins his analysis with a different total number of CFSA employees at the time of the RIF.  Dexter Starkes, CFSA Director of Human Resources, stated in his declaration that 30 employees in the office of the Fiscal Operations Administration "contribute to the agency's overall headcount, [but] they report to the Office of the Chief Financial Officer and are not technically CFSA employees.  As a result, these positions were not subject to inclusion in the RIF."  Mot. Summ. J., Ex. C ¶ 7 ("Starkes Decl."), ECF No. 146-3.  Therefore, Dr. Bronars began his analysis with 802 employees at the time of the RIF, instead of 832.  *See* Mot. Summ. J., Ex. J.

Dr. Bronars took a very different statistical approach than Dr. Munro.  Dr. Bronars explained that Dr. Munro's approach "is based on the assumption that all CFSA employees faced the same risk of termination during the RIF."  *Id.* ¶ 11.  Instead, Dr. Bronars stated that his

"analysis allows the risk of termination to vary between divisions within the CFSA and among certain jobs within the CFSA." *Id.* ¶ 12.  Dr. Bronars based his assumption of disparate risk on the declaration of Raymond Davidson, CFSA's Chief Administrative Officer at the time of the RIF.  *Id.*; *see also* Davidson Decl.  Therefore, instead of one analysis of all CFSA employees, Dr. Bronars "assume[d] that there are 7 different sets of layoff decisions made by CFSA during the RIF" corresponding to 7 different positions or divisions affected by the downsizing.  *See* Mot. Summ. J., Ex. J. ¶ 21.

Dr. Bronars also used a different standard for statistical significance.  Relying on Supreme Court precedent, he would "conclude that there is statistical evidence of discrimination . . . if the difference between the actual outcomes of the termination process and the outcomes that would have been expected from a random neutral process is so large that it would have occurred 5% of the time." *Id.*  ¶ 18.  This difference corresponds to two standard deviations.  *Id.* ¶ 19.

Dr. Bronars's analysis concluded that, "while 107 African American employees were laid off during the RIF, had employees within each of the seven position and division groups been selected in a race-neutral manner, 105.21 African American employees would have been terminated." *Id.* ¶ 22.  Similarly, "while 81 employees age 40 and above were laid off during the RIF, had employees within each of the seven position and division groups been selected in an age-neutral manner, 79.09 employees . . . would have been terminated." *Id.* ¶ 23.  Dr. Bronars found that neither difference was statistically significant.  *Id.* ¶¶ 22–23.

Finally, Dr. Bronars turned to the hiring for the FSW position.  Dr. Bronars contends that Dr. Munro "effectively assumes that all 115 individuals who were initially terminated during the RIF were equally qualified and equally interested in an FSW position." *Id.* ¶ 24.  Based on

information provided by the Attorney General's Office, Dr. Bronars states that 44 former

employees applied for the FSW position, 2 withdrew or declined to be interviewed, and 14 were

determined not to be qualified for the position.  *Id.* ¶ 25.  Ultimately, 18 of the 28 qualified and

interested former CFSA employees were re-hired as FSWs.  *Id.*  Because all 18 re-hires were

African American, Dr. Bronars concludes "[t]here is, of course, no possibility of racial disparity

in the re-hiring process."  *Id.*

Turning to the age of applicants, Dr. Bronars states that "11 of the former CFSA

employees re-hired into the FSW position were under age 40 and 7 were age 40 and above."  *Id.*

¶ 26.  Dr. Bronars notes that half of the interested and qualified applicants for the FSW positon

were age 40 and above.  *Id.*  Thus, in an "age-neutral process one would expect that half of the

18 re-hired former CFSA employees would be under age 40 and half would be age 40 and

above."  *Id.*  Dr. Bronars concludes that "[t]he difference between 7 [actual] and 9 [expected] re-

hired employees is equivalent to a difference of 1.58 standard deviations and is therefore

statistically insignificant."  *Id.*

### c. Dr. Munro's May 2014 Report

Dr. Munro submitted a rebuttal to Dr. Bronars's report on dated May 7, 2014.  *See* Mot.

Summ. J., Ex. K, ECF No. 146-4.  To start, Dr. Munro raises issues with the updated data

provided by the District and relied upon by Dr. Bronars.  Dr. Munro concludes that 30

employees are not accounted for in the updated data and that racial identification is not provided

in 84 cases.  *Id.* at 2.  Nevertheless, Dr. Munro replicated her original calculations using the new

data, and found what she describes as "more significant results."  *Id.* at 2–4.  While Dr. Munro's

initial analysis concluded that the RIF's "African American termination rate was 277% the rate

for non-African Americans," her updated analysis concluded that "the termination rate of

African Americans was 444% the rate *of Caucasians*, which is much, much more notable." *Id.* at 3 (emphasis added). Similarly, Dr. Munro's initial analysis found that employees 40 and over were terminated "at 176% the rate of those under 40," but after considering the new data, she found that employees 40 and over were terminated "at 179% the rate of those under 40." *Id.* at 4. Dr. Munro concludes that the termination rates for both African-Americans and employees 40 and over violated the 4/5ths rule and that both results are statistically significant. *Id.* at 3–4.

Dr. Munro also identified several purported methodological and statistical issues with Dr. Bronars's previous report. *Id.* at 5–7 (summarizing concerns). First, Dr. Munro questions Dr. Bronars's assumption that different positions faced unequal risks of termination in the RIF. *Id.* at 5, 8–11. Dr. Munro contends that Dr. Bronars bases this assumption on the relatively recent declaration of Mr. Davidson, but that, "at the time of [her] analysis, the *most* practical assumption to make was that aside from the SSAs (that were 100% terminated), every other position and employee . . . was at equal risk for termination."[4] *Id.* at 5; *see also id.* at 8–12.

Second, Dr. Munro raises two statistical issues with Dr. Bronars's analysis. *Id.* at 6, 12–16. For one, sample size is an important factor in finding a statistically significant result, and by breaking the larger sample size (all employees) into smaller subgroups (specific positions or divisions), Dr. Bronars made it less likely that any statistically significant result would be found. *Id.* at 14. For another, the subgroups analyzed by Dr. Bronars were very homogenous—at least one subgroup was entirely African-American, for example—and Dr. Munro contends that homogenous subsamples can make an effort to predict differentials between expected and

---

[4] Dr. Munro, like Plaintiffs, refers to the fact that Mr. Davidson signed his declaration one day before Dr. Bronars signed his report. *See* Mot. Summ. J., Ex. K at 5–6; *see also* Opp'n Summ. J. at 3–4. Dr. Bronars explains that his "statistical analysis was informed by an unsigned copy of Mr. Davidson's declaration that [he] received . . . several weeks before [his] report was due." Mot. Summ. J., Ex. L ¶ 14.

observed outcomes "completely meaningless." *Id.* Third, Dr. Munro suggests that Dr. Bronars's "conclusions are not dispositive of adverse impact." *Id.* at 16. According to Dr. Munro, the homogeneity of Dr. Bronars's subsamples raises another possibility—"that the 'targeted' positions and divisions were disproportionately occupied by African Americans and those over 40." *Id.* Finally, Dr. Munro concludes her report with a lengthy analysis of the financial and agency efficiency implications of the RIF. *Id.* at 22–31.

### d.  Dr. Bronars's July 2014 Report

Dr. Bronars also submitted a second report, which he signed on July 28, 2014. *See* Mot. Summ. J., Ex. L at 6, ECF No. 146-6. In short, Dr. Bronars states that his "conclusions are the same as they were in [his] January 2014 report." *Id.* ¶ 8. Dr. Bronars does, however, respond to the critiques raised by Dr. Munro.

The core of Dr. Bronars's argument is that Dr. Munro's model improperly assumes that "a non-discriminatory RIF implies that all agency employees have the same chance of termination." *Id.* ¶ 10. Dr. Bronars points to both Mr. Davidson's declaration and Dr. Munro's own analysis of RIF best practices to argue that a well-constructed and non-discriminatory RIF will not target employees in a completely random manner. *Id.* ¶¶ 10–12. Instead, "[b]est practices and concerns for program efficiency could lead to the elimination of entire positions or disproportionate terminations" in redundant divisions, but these "valid non-discriminatory RIF decisions are nearly impossible to reconcile with Dr. Munro's statistical model." *Id.* ¶ 12.

Dr. Bronars acknowledges that "a small sample size reduces the statistical power of a test and will tend to make the statistical inferences inconclusive," but he argues that low statistical power due to small sample sizes is not a reason to "assume that a non-discriminatory RIF would subject all employees to the same chance of termination." *Id.* ¶ 7. Dr. Bronars also contends that

"while [his] analysis allowed for different termination decisions in each of seven different employee categories . . . [his] statistical calculation for adverse impact was aggregated across all of these categories." *Id.* ¶ 17.  Finally, Dr. Bronars again criticizes Dr. Munro's reliance on the 4/5ths rule and suggests that Dr. Munro "offered no statistical tests for her conjecture that the 'targeting' of certain positions and divisions/offices was motivated by discrimination rather than business necessity." *Id.* ¶¶ 20–21.

### B. Procedural History

#### 1. The Equal Employment Opportunity Commission

Following the RIF, Darius Morris filed his claim with the Equal Employment Opportunity Commission ("EEOC") on September 8, 2010, alleging discrimination on the basis of race, color, national origin, age, and retaliation.  *See* Def.'s Material Facts ¶ 47.  Mr. Morris referred to his charge as a "Class Action Charge" in the caption, and stated, "[a]ll the 60 or so Social Service Assistants are African-American (black) as the Agency knew . . . . CFSA harmed me and the other former SSAs without business need and without any job related reason."  Mot. Summ. J., Ex. P, ECF No. 164-4.  Mr. Morris received a right to sue letter from the EEOC on March 14, 2011.  *See* Def.'s Material Facts ¶ 48.

Zaccheus Ajakaiye filed a charge of discrimination with the EEOC alleging discrimination based on national origin on July 16, 2010.  *See id.* ¶ 44.  Mr. Ajakaiye filed an amended charge on August 6, 2010 alleging discrimination on the basis of race, color, and national origin.  *See id.* ¶ 45.  He received a right to sue letter from the EEOC on February 18, 2011.  *See id.* ¶ 46.

Plaintiffs acknowledge that no other purported class members are in possession of right to sue letters from the EEOC.  *See* Pls.' Disputed Facts at 1; Opp'n Summ. J. at 30 & n.2

(acknowledging that Plaintiffs cannot present other right to sue letters, but stating that "Plaintiffs do not concede that Ajakaiye and Morris are the only terminated CFSA employees to file claims with the EEOC"). But Plaintiffs present evidence that additional EEOC charges were filed. Specifically, Plaintiffs' prior counsel, David Rose, requested the amendment to Mr. Ajakaiye's charge in a letter to the EEOC. *See* Opp'n Summ. J., Ex. 7. In the same letter, Mr. Rose referred to a "letter dated August 20, 2010, with at least 19 other charges by Social Service Assistants." *Id.* Two months later, Mr. Rose submitted another letter to the EEOC referring to "the three . . . most recently signed Charges of Discrimination in this case, from former CFSA SSAs." Opp'n Summ. J., Ex. 8. In October 2010, Mr. Rose sent another letter stating that he represented nine former employees of CFSA, including Mr. Ajakaiye, and requested right to sue letters for the other eight. *See* Opp'n Summ. J., Ex. 9. Plaintiffs state that they contacted the EEOC regarding these communications and other possible right to sue letters, but that the EEOC informed Plaintiffs' current "counsel that, in the absence of Charge Numbers for the additional nineteen plaintiffs, EEOC offices lack the capacity to conduct a thorough search of its records based solely on plaintiffs' names." Opp'n Summ. J. at 13 n.6.

### 2. Proceedings before this Court

Plaintiffs in *Davis v. District of Columbia*, No. 10-1564, filed their Complaint in this Court on September 16, 2010. *See* Compl., ECF No. 1. This case was consolidated with *Dudley v. District of Columbia*, No. 10-1718, and following the Court's resolution of dispositive briefing, Plaintiffs filed a Second Amended Complaint on March 22, 2013. *See* 2d Am. Compl., ECF No. 58. Finally, Plaintiffs filed a Third Amended Complaint on May 31, 2013, which remains operative in this case. *See* 3d Am. Compl., ECF No. 66.

The Third Amended Complaint was filed on behalf of 47 named Plaintiffs and "other members of the group who received the RIF notices . . . and were discharged from employment by defendant." *Id.* ¶ 8.  The Third Amended Complaint contains two claims for relief: (1) "Age Discriminatory Practices" in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11, and (2) "Race Discrimination" in violation of the DCHRA and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.  Id.* at 14, 16.  Plaintiffs alleged that both the RIF and the bachelor's degree requirement of the newly created FSW position had a discriminatory impact on African-Americans and older employees.  *Id.* ¶¶ 84–86, 98–100.

As previously mentioned, this Court resolved initial dispositive motions in 2013.  *See Davis v. District of Columbia*, 949 F. Supp. 2d 1 (D.D.C. 2013), ECF No. 55.  Upon consideration of the District's motion to dismiss, or in the alternative, for summary judgment, the Court dismissed Plaintiffs' disparate treatment theory based on the RIF, but allowed a related disparate impact theory to go forward.  *Id.* at 11.  The Court also permitted Plaintiffs to go forward with both disparate impact and disparate treatment theories related to the FSW's degree requirement. *Id.*  Specifically, the Court explained that the "disparate impact claims based on both the reduction in force and the educational requirements for Family Social Workers will go forward under the Human Rights Act, as they did under Title VII, as will the disparate treatment claim based on those degree requirements."  *Id.* at 12.  Now pending before the Court is the District's post-discovery motion for summary judgment.  *See* Mot. Summ. J., ECF No. 146.

During the pendency of this litigation, the Court granted the District's motion for sanctions, finding that Plaintiffs "have missed or ignored discovery deadlines, not provided appropriate documentation or answers to discovery requests, and generally failed to comply with the Federal Rules of Civil Procedure."  *See Davis v. D.C. Child & Family Servs. Agency*, 304

F.R.D. 51, 60 (D.D.C. 2014), ECF No. 97.  The Court also issued an order dismissing without prejudice Michelle Millard-Simms, based on her voluntary withdrawal, and four other Plaintiffs for failure to prosecute their claims.  *See* Order, ECF No. 139

Plaintiffs have repeatedly sought class certification during this case.  On January 14, 2011, Plaintiffs moved for class certification for the first time.  *See* Pls.' Mot. Class Certification, ECF No. 12.  The Court denied that motion without prejudice as moot because Plaintiffs had amended their Complaint.  *See* Min. Order (Sept. 23, 2011).  Plaintiffs renewed their motion for class certification on February 14, 2014.  *See* Mem. Supp. Pls.' Mot. Class Certification, ECF No. 81.  The Court again denied Plaintiffs' motion without prejudice and explained that the pre-discovery motion was premature.  *See* Min. Order (Feb. 21, 2014).  Following discovery, the Court ordered Plaintiffs to file an additional motion for class certification on or before November 9, 2015.  *See* Min. Entry (Sept. 8, 2015).  That motion is now pending before the Court.  *See* Mot. Class Certification.

## III.  LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine

need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying

portions of the record that demonstrate the absence of any genuine issue of material fact. *See*

Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to

specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324. "[T]he non-movant 'may not rest upon mere allegations or

denials . . .' but must [instead] present 'affirmative evidence.'" *See Laningham v. U.S. Navy*,

813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57).

In considering a motion for summary judgment, a court must "eschew making credibility

determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir.

2007). All underlying facts and inferences must be analyzed in the light most favorable to the

non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered

without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*,

164 F.3d 671, 675 (D.C. Cir. 1999).

## B.  Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–701

(1979). To justify a departure from that rule, "a class representative must be part of the class and

'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor*

*Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists*

*Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).  Rule 23 of the Federal Rules of Civil

Procedure, which governs class certification, permits certification only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately represent the interests of the class.

Fed. R. Civ. P. 23(a).

In addition, the party seeking certification must demonstrate that one of the relevant

provisions of Rule 23(b) has been satisfied.  *See* Fed. R. Civ. P. 23(b).  Here, Plaintiffs have

requested hybrid class certification that would certify two subclasses—one defined by age and

the other by race—first under Rule 23(b)(2) for the purposes of determining the District's

liability and then under Rule 23(b)(3) for the purpose of determining an appropriate remedy for

each member of the class.  *See* Pls.' Mem. P. & A. Supp. Mot. Class Certification at 14–15, ECF

No. 144.  In the alternative, Plaintiffs request that the Court certify the two subclasses under Rule

23(b)(3) for all purposes.  *Id.* at 22.  Rule 23(b)(2) requires a showing that "the party opposing

the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires a showing that "the questions of law or

fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Plaintiffs bear the burden of establishing that there is a "reasonable basis for crediting

[their] assertion[s]" as to each Rule 23 requirement.  *Wagner v. Taylor*, 836 F.2d 578, 587 n.57

(D.C. Cir. 1987); *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n.9 (D.C. Cir. 1984)

("[I]t is the party seeking class certification that bears the burden of establishing the class action requirements.").

## IV.  ANALYSIS

The District raises a wide range of arguments in support of its motion for summary judgment.  The District first raises a number of issues that are specific to particular Plaintiffs. Next, the District argues that the Plaintiffs' discrimination claims generally fail as a matter of law.  The Court will address the arguments in turn, first considering the narrow Plaintiff-specific issues and then turning to the broader discrimination questions.  After addressing the preliminary issues, the Court finds that the District is entitled to summary judgment on all of Plaintiffs' remaining claims.  Because the Court grants the District's motion for summary judgment as to all remaining claims, there is no need to consider Plaintiffs' motion for class certification.  Thus, the Court denies that motion as moot.

### A.  Issues Specific to Particular Plaintiffs

#### 1.  Judicial Estoppel and Prior Bankruptcy Proceedings

The doctrine of judicial estoppel prevents a party from relying on one argument in an initial proceeding, and then subsequently prevailing in another proceeding by relying on a contradictory position.  The District argues that Mr. Ajakaiye and Ms. Alston are barred from bringing their claims in this case because they failed to disclose their claims in separate bankruptcy proceedings.  *See* Mem. Supp. Summ. J. at 12.  Plaintiffs respond that judicial estoppel is not appropriate where the omission was the result of an innocent mistake or inadvertent conduct.  *See* Opp'n Summ. J. at 24.  For the following reasons, the Court finds that judicial estoppel bars Mr. Ajakaiye's and Ms. Alston's claims.

The doctrine of judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  The purpose of judicial estoppel is "to protect the integrity of the judicial process" and "to prevent improper use of judicial machinery," and the doctrine may be invoked at the court's discretion.  *Rogler v. Gallin*, 402 F. App'x 530, 530 (D.C. Cir. 2010) (per curiam) (quoting *New Hampshire*, 532 U.S. at 750).  The D.C. Circuit has identified three questions a court should consider when exercising that discretion:

> (1) Is a party's later position clearly inconsistent with its earlier position?  (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled?  (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

*Moses*, 606 F.3d at 798.

The *Moses* court considered these questions in the context of a plaintiff who failed to disclose a pending suit in a bankruptcy proceeding.  *Id.* at 798–99.  After considering the application of each of the three questions, the D.C. Circuit joined other circuits in approving the application of judicial estoppel "to bar a debtor from pursuing a cause of action in district court where that debtor deliberately fails to disclose the pending suit in a bankruptcy case."  *Id.* at 798.  In sum, judicial estoppel in the bankruptcy context "protects the integrity of the bankruptcy system and is meant to prevent parties from hiding causes of actions during bankruptcy proceedings," obtaining the discharge of debts, and only then asserting the cause of action.  *Robinson v. District of Columbia*, 10 F. Supp. 3d 181, 185 (D.D.C. 2014) (internal citations omitted).

In this case, it is undisputed that Mr. Ajakaiye and Ms. Alston both filed for bankruptcy and that neither listed claims against the District in their bankruptcy petition. *See* Def.'s Material Facts ¶¶ 49–56; Pls.' Disputed Material Facts at 1 (agreeing to the factual descriptions of the bankruptcy proceedings, but disputing legal conclusions). Mr. Ajakaiye filed his bankruptcy petition on July 2, 2010, and the bankruptcy court discharged his debts on October 14, 2010 and issued a final decree closing the case on October 22, 2010. *See* Def.'s Material Facts ¶¶ 49, 51–52. Ms. Alston filed her bankruptcy petition on May 21, 2013, and the bankruptcy court discharged her debts on August 22, 2013 and issued a final decree closing the case on September 20, 2013. *See* Def.'s Material Facts ¶¶ 53, 55–56.[5] Both Plaintiffs were named in the initial Complaint, which was filed on September 16, 2010. *See* Compl. at 1, ECF No. 1. It is fair to presume that a party would be aware of their claim before it was filed in Court. At the very least, a party needs time to secure counsel and then to coordinate with their attorney during the drafting and preparation of the complaint. Furthermore, Mr. Ajakaiye filed a charge of discrimination with the EEOC alleging discrimination based on national origin on July 16, 2010. *See* Def.'s Material Facts ¶ 44. He was certainly aware of his claims at that time, just two weeks after he filed his bankruptcy petition.

Based on these facts, the Court reaches the same result as *Moses*. First, Mr. Ajakaiye and Ms. Alston's bankruptcy filings and pleadings in this case are "clearly inconsistent." *Moses*, 606 F.3d at 798. Both were "required to disclose all potential claims in a bankruptcy petition," but failed to do so. *Id.* at 793 (citing 11 U.S.C. §§ 521(1), 541(a)(1)). Furthermore, both bankruptcy proceedings overlapped temporally with this case, even if only briefly in Mr. Ajakaiye's case,

---

[5] The Court notes that the District's Statement of Material Facts appears to mistakenly assert that the bankruptcy court discharged Ms. Alston's debts on October 18, 2013. *See* Def.'s Material Facts ¶ 55; Mot. Summ. J., Ex. U, ECF No. 146-4.

and a debtor is under a duty "to amend his petition if circumstances change during the course of the bankruptcy." *Id.*  Despite these requirements, neither Mr. Ajakaiye nor Ms. Alston disclosed their discrimination claims in their bankruptcy proceedings.  Second, the relevant Bankruptcy Courts discharged the debts of Mr. Ajakaiye and Ms. Alston, and this Court permitted the current discrimination case to proceed at the same time.  As in *Moses*, this convergence "leaves little doubt that [Mr. Ajakaiye and Ms. Alston] succeeded in hiding the inconsistency from the courts and 'creat[es] the perception that either the first or the second court was misled.'" *Id.* at 799 (quoting *New Hampshire*, 532 U.S. at 750)).  Third, Mr. Ajakaiye and Ms. Alston gained an unfair advantage over their creditors because they would not be required to turn over any damages to their creditors if they were to succeed in this suit.  The non-disclosure also affected the District because, if the relevant Trustees were aware of this case, they "might have settled this case early or decided not to pursue it." *Id.*  Therefore, the basic requirements for the application of judicial estoppel, as articulated in *Moses*, are applicable here.

Plaintiffs make an additional argument against the application of judicial estoppel. Plaintiffs assert that judicial estoppel does not bar Mr. Ajakaiye and Ms. Alston's claims because they did not have knowledge of their claims or any motive to conceal those claims in their bankruptcy proceedings.  *See* Opp'n Summ. J. at 23–24.  The Supreme Court has instructed that "it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." *New Hampshire*, 532 U.S. at 753 (quotation marks omitted). In *Moses*, the D.C. Circuit accepted this basic principle, but found that the plaintiff "cannot avoid judicial estoppel" on this basis because he "failed to disclose the existence of this case in two separate bankruptcy proceedings, yet in both of those proceedings he listed pending lawsuits

that, unlike the instant case, reduced the overall value of his assets through wage garnishment."

*Moses*, 606 F.3d at 800.

The D.C. Circuit recently revisited the question of when inadvertence or mistake can excuse a debtor's failure to disclose a claim. *See Marshall v. Honeywell Tech. Sys. Inc.*, 828 F.3d 923, 932 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 830 (2017). In a divided opinion, the court summarized the views of other circuits:

> Many courts of appeals have adopted the Fifth Circuit's statement that a "debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment." *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999) (italics in original); *see Barger*, 348 F.3d at 1295–96; *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002); *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1157 (10th Cir. 2007). Others have found that evaluating subjective motivations is difficult and the court can therefore presume that a debtor has acted intentionally, unless there is evidence otherwise. The Third Circuit, for example, has held that if a debtor knowingly omits valuable assets from her bankruptcy schedules, the court may infer that the omission was not an innocent mistake. *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *see also Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1287–88 (11th Cir. 2002). The Ninth Circuit, disagreeing, holds that district courts must give weight to "the plaintiff's subjective intent when filling out and signing the bankruptcy schedules." *Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 277 (9th Cir. 2013).

*Id.* The court concluded, however, that it had "no need to take sides in this debate, if indeed there are discrete sides at all." *Id.*

Some policy considerations weigh against the overzealous application of judicial estoppel in this context. As Judge Griffith explained, "[h]onest mistakes and oversights are not unheard of" in the bankruptcy context. *Id.* at 934 (Griffith, J., dissenting) (alteration in original) (quoting *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 548 (7th Cir. 2014)). Furthermore, when a court "appl[ies] judicial estoppel based on bankruptcy omissions, the costs primarily fall not on the plaintiff, but on her creditors, who might otherwise recover assets from successful lawsuits." *Id.* at 934–35.

Ultimately, the Court finds that judicial estoppel bars Mr. Ajakaiye and Ms. Alston from bringing their claims here because they have put forward no evidence that inadvertence or mistake caused their prior omissions.  Under the well-known rule, summary judgment is appropriate only if there is "no genuine issue as to any material fact." *Celotex Corp.*, 477 U.S. at 322.  The Court must resolve "any doubts" as to the existence of a genuine issue for trial in the non-moving party's favor.  *McSurely v. McClellan*, 697 F.2d 309, 321 (D.C. Cir. 1982).  But the non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial."  *Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009).

In *Marshall*, the court refused to find inadvertence or mistake even after the plaintiff filed an affidavit stating that she "had no knowledge that I was required to list my discrimination administrative proceedings on my bankruptcy petition schedules or on any financial statements." *Marshall*, 828 F.3d at 930–31.  The plaintiff also presented evidence that she orally disclosed one of her discrimination claims to the trustee at her creditors' meeting in 2005.  *Id.* at 930. Plaintiffs in this case have presented no evidence, by affidavit or otherwise, to support their assertion that Mr. Ajakaiye and Ms. Alston failed to disclose their claims because of inadvertence or mistake.  Even in the more permissive circuits, courts have refused to find inadvertence or mistake where a plaintiff "presented no evidence, by affidavit or otherwise, explaining her initial failure to include the action on her bankruptcy schedules."  *Dzakula v. McHugh*, 746 F.3d 399, 401 (9th Cir. 2014).  For these reasons, the Court finds that judicial estoppel bars the claims of Mr. Ajakaiye and Ms. Alston.  The Court will therefore grant summary judgment in favor of the District on this issue.

2.  Standing of Plaintiffs with a Bachelor's Degree

The District argues that Mr. Morris and Mr. Ajakaiye do not have standing to challenge

the college degree requirement for the newly created FSW position because both men had a

college degree at the time of the RIF.  *See* Mem. Supp. Summ. J. at 15.  Plaintiffs respond that

each Plaintiff, "regardless of their educational backgrounds and regardless of whether they were

subsequently hired for the FSW position, suffered injury from the moment that they were

separated from the agency."  *See* Opp'n Summ. J. at 34.  For the reasons explained below, the

Court finds that Plaintiffs with a college degree lack standing to challenge the degree

requirement for the FSW position.

The party seeking to assert federal jurisdiction bears the burden of establishing standing.

*See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  The requirements for standing

are that: (1) the plaintiff must have suffered an injury in fact, (2) the injury must have a causal

connection to the actions of the defendant, and (3) it must be likely that a favorable decision

could redress the injury.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  In short,

"the Constitution requires that an injury be concrete, particularized, and actual or imminent;

fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v.*

*Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

Plaintiffs argue that the loss of their jobs is sufficient to create standing because they

"suffered injury from the moment they were separated from the agency" and the District caused

that injury.  *See* Opp'n Summ. J. at 34.  Plaintiffs also attempt to tie the RIF to the degree

requirement, arguing that the District has already conceded Plaintiffs' standing to challenge the

RIF and that the "eligibil[ity] to be hired for the FSW position represented an opportunity for the

government to mitigate the injury of selecting plaintiffs for the RIF, not a separate injury." *Id.* Plaintiffs offer no support for that position.

As the District correctly notes, "standing is not dispensed in gross."  Def.'s Reply Mem. Supp. Mot. Summ. J. ("Reply Supp. Summ. J.") at 9, ECF No. 154 (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).  Instead, "a plaintiff must demonstrate standing for each claim he seeks to press." *Cuno*, 547 U.S. at 335.  Here, it is undisputed that Mr. Morris and Mr. Ajakaiye held a bachelor's degree at the time of the RIF.[6]  *See* Def.'s Material Facts ¶¶ 61–62; Pls.' Disputed Material Facts at 1 (noting that Plaintiffs do not dispute these paragraphs).  Plaintiffs argue that the bachelor's degree requirement for the FSW position is discriminatory, *see* Opp'n Summ. J. at 43–44, but that requirement simply could not have injured employees who already had a degree.  The policy is not causally connected to any injury alleged by employees with a bachelor's degree.  Although Mr. Morris and Mr. Ajakaiye have standing to challenge the RIF, they do not have standing to challenge the FSW's bachelor's degree requirement.  Thus, the Court will grant summary judgment for the District on this issue.

### 3.  Exhaustion of Administrative Remedies

The District argues that only Mr. Morris and Mr. Ajakaiye have exhausted their administrative remedies, and therefore the other Plaintiffs should not be permitted to proceed on their Title VII claims.  *See* Mem. Supp. Summ. J. at 16.  Plaintiffs acknowledge the general rule asserted by the District, but argue that the doctrine of vicarious exhaustion allows a party who did not file a charge with the EEOC to piggy back on another similar charge.  *See* Opp'n Summ. J. at 27.  The Court finds that the EEOC charges filed by Mr. Morris and Mr. Ajakaiye provided

---

[6] The District also notes that Mr. Ajakaiye was hired to the FSW position, *see* Mem. Supp. Summ. J. at 15, but the Court relies solely on Mr. Ajakaiye's bachelor's degree in its standing analysis.

sufficient notice to the District of the similar claims raised by other Plaintiffs.  Thus, the Court denies the District's motion for summary judgment on this issue.

Generally, a plaintiff must exhaust their administrative remedies by filing a charge of discrimination with the EEOC before bringing a civil suit under Title VII.  *See Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998); 42 U.S.C. § 2000e–5(f)(1).  "The purpose of the [administrative exhaustion] doctrine is to afford the agency an opportunity to resolve the matter internally and to avoid unnecessarily burdening the courts." *Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996).  Ordinarily, as proof of such exhaustion of administrative remedies, a plaintiff would receive a right to sue letter from the EEOC.  *See* 42 U.S.C. § 2000e–5(f)(1); *see also Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Only after the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action herself.").  "A court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process."  *Park*, 71 F.3d at 907.

Nevertheless, the vicarious exhaustion exception "allows non-filing parties to join the suit of another similarly situated plaintiff who did file an administrative complaint against the same defendant."  *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 804 (D.C. Cir. 2010).  Vicarious exhaustion is only available for parties whose claims are "so similar to those asserted by the original plaintiff that no purpose would be served by requiring them to file independent charges." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 63 (D.D.C. 2011) (quoting *Brooks*, 606 F.3d at 807).  In other words, the original administrative claim must "(1) put the employer-defendant on notice of all charges by the similarly situated plaintiff, and (2) provide the employer and the EEOC with an opportunity for administrative . . . resolution."  *Id.* (citing *Foster v. Gueory*, 655

F.2d 1319, 1322 (D.C. Cir. 1981)).  In *Cook v. Boorstin*, the D.C. Circuit explained that "the critical factor in determining whether an individual Title VII plaintiff must file an [administrative] charge, or whether he may escape this requirement by joining with another plaintiff who has filed such a charge, is the similarity of the two plaintiffs' complaints."  763 F.2d 1462, 1466 (D.C. Cir. 1985) (quoting *Foster*, 655 F.2d at 1322); *see also Byrd*, 807 F. Supp. 2d at 63 ("The similarity of two claims is evaluated for whether the original filing performs the principal notice function of the EEOC filing requirement . . . .").

In this case, the District concedes that Mr. Morris and Mr. Ajakaiye have exhausted their administrative remedies.[7]  *See* Mem. Supp. Summ. J. at 16; Def.'s Material Facts ¶¶ 44, 47.  The District, however, raises four objections to Plaintiffs' reliance on vicarious exhaustion.

First, the District argues that the EEOC charges filed by Mr. Morris and Mr. Ajakaiye only assert a claim of discrimination on behalf of themselves and other SSAs, not the non-SSA employees who were terminated in the RIF.  *See* Reply Supp. Summ. J. at 12.  A review of the relevant EEOC charges reveals that Mr. Morris and Mr. Ajakaiye both focused on the RIF's impact on SSAs.  *See* Mot. Summ. J., Exs. O–P, ECF No. 146-4.  Of course, both men were SSAs and the majority of employees terminated by the RIF were SSAs.  *See* Pls.' Disputed Facts at 6 (stating that 57 of the 115 employees who received the RIF letter were SSAs).  The relevant question here, is whether the EEOC charges "put the employer-defendant on notice of all charges

_____

[7] Plaintiffs also contend that there are "legitimate questions of material fact whether Plaintiffs' prior counsel . . . filed EEOC charges on behalf of additional plaintiffs in this case." *See* Pls.' Disputed Facts at 1.  Because the Court finds that Plaintiffs can rely on the EEOC charges filed by Mr. Morris and Mr. Ajakaiye, the Court does not need to consider that contention.  The Court does note, however, that failure to exhaust administrative remedies is an affirmative defense, which the defendant bears the burden of pleading and proving in a Title VII case. *See Davis v. District of Columbia*, 949 F. Supp. 2d 1, 12 (D.D.C. 2013); *see also Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  In other words, Plaintiffs do not bear the burden of *disproving* the application of the affirmative defense raised by the District.

by . . . similarly situated plaintiff[s]." *Byrd*, 807 F. Supp. 2d at 63 (citing *Foster*, 655 F.2d at 1322).  Mr. Morris's EEOC charge does just that.  *See* Mot. Summ. J., Ex. P at 1.  Mr. Morris described the letter he received from CFSA, which explained that he was being terminated "because of a reduction in force" despite the lack of any concerns about his job duties.  *Id.*  Mr. Morris alleged that there was "no financial crisis" and that he was injured by CFSA "by being selected for discharge."  *Id.*  Mr. Morris also checked boxes indicating his allegations of discrimination based on race, color, national origin, age, and retaliation and described the charge as a class action charge.  *Id.*  These allegations are common to all employees terminated in the RIF, not just SSAs.  Although Mr. Morris went on describe particular complaints about the FSW position and the degree requirement, his general complaint about the RIF was sufficient to put CFSA "on notice of all charges" by non-SSA Plaintiffs.  *See Byrd*, 807 F. Supp. 2d at 63.

Second, the District argues that the charges filed by Mr. Morris and Mr. Ajakaiye "only assert a claim based on their termination in the RIF," and "cannot exhaust a distinct claim of discrimination based on the FSW bachelor's degree requirement."  *See* Reply Supp. Summ. J. at 12.  The District is correct that a "party must exhaust . . . administrative remedies . . . for each discrete act of discrimination," *Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 155–156 (quoting *Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271 (D.D.C. 2008)).  But the District misreads the relevant EEOC charges.  In fact, both charges refer to the degree requirement, and thus exhaust a distinct claim of discrimination based on that policy.  *See, e.g.*, Mot. Summ. J., Ex. O at 1 ("[CFSA] created a new position, Family Support Workers . . . and made attainment of a Bachelor's Degree as a prerequisite to obtaining that position . . . . A greater proportion of the white employees do have a college degree . . . .").

Third, the District argues that the relevant EEOC charges are not sufficiently similar to the claims raised by other Plaintiffs "in light of the individual decisions underlying the RIF and the subsequent hiring of FSW positions." Reply Supp. Summ. J. at 13. But both EEOC charges address general grievances—that the RIF was generally discriminatory and that the FSW degree requirement was generally discriminatory. *See* Mot. Summ. J., Exs. O–P. Those general allegations of discrimination form the basis of Plaintiffs' claims before this Court. This case is distinguishable from *Byrd*, for instance, where four employees alleged sexual harassment and retaliation by two male supervisors and the court concluded that the plaintiff's complaint would require "a different factual inquiry and testimony from different witnesses." *Byrd*, 807 F. Supp. 2d at 64. Unlike cases with "differences in the factual allegations pertaining to each plaintiff's claims," *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 185 (D.D.C. 2012), courts have found vicarious exhaustion where "multiple plaintiffs' claims arose from the same allegedly discriminatory practice presented to and analyzed by the EEOC," *id.* at 183 (citing *Brooks*, 606 F.3d at 807). The relevant EEOC charges and the claims before this court arose from the same allegedly discriminatory practices, permitting vicarious exhaustion by the Plaintiffs.

Finally, the District argues that Plaintiffs have provided "no authority for the proposition that a claim may be vicariously exhausted by someone who lacks standing . . . or is judicially estopped." Reply Supp. Summ. J. at 13. The District, however, provides no authority to the contrary. The purpose of the vicarious exhaustion rule is to ensure that the employer has notice of claims and an opportunity to resolve them administratively, *Foster*, 655 F.2d at 1322–23, while avoiding unnecessary EEOC filings, *Brooks*, 606 F.3d at 807. Those principles are not tarnished when the party bringing the initial charge is subsequently barred from bringing their claim in court for another reason. Thus, the Court finds that subsequent and unrelated challenges

to a party's ability to bring their exhausted claim in court do not prevent other Plaintiffs from relying on the initial EEOC charge for the purposes of vicarious exhaustion.

For these reasons, the Court finds that Plaintiffs have shown that they vicariously exhausted their administrative remedies.  The Court will permit Plaintiffs to rely on the EEOC charges filed by Mr. Morris and Mr. Ajakaiye, which raised sufficiently similar claims and fulfilled the notice function of the EEOC filing requirement

### 4.  Purported Abandonment of Claims

The District argues that Ms. Dudley, Ms. Gray, Mr. Hailes, and Ms. Kelley have abandoned their Title VII claims through their answers to the District's discovery requests.  *See* Mem. Supp. Summ. J. at 16.  Specifically, the District asked Plaintiffs to produce their right to sue letters from the EEOC.  *See* Def.'s Material Facts ¶ 65.  In response, these Plaintiffs stated that the request was irrelevant because they were not pursuing Title VII claims.  *Id.* ¶ 66. The District asserts that this response constituted abandonment of any Title VII claims.  *See* Mem. Supp. Summ. J. at 16.

In response, Plaintiffs argue that the District's position is "based on [a] disputed interpretation" of the discovery response, and state that Plaintiffs "have since clarified and corrected" their response.  *See* Opp'n Summ. J. at 32.  These Plaintiffs' updated response, which they served shortly after the District filed the pending motion for summary judgment, states that "Plaintiffs have not filed individual right to sue letters," but they have "filed Title VII claims based upon" the right to sue letters and notices filed by other Plaintiffs in this action.  Opp'n Summ. J., Ex. 17 at 1, ECF No. 148-6.  The updated response was served pursuant to Federal Rule of Civil Procedure 26, which requires a party to supplement or correct its discovery

responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

The District argues that this amendment was not timely, because it was served after the close of discovery and after the District filed its motion for summary judgment. *See* Reply Supp. Summ. J. at 13–14. The District does not, however, present any authority in support of its position that the amended responses were untimely. In fact, the District's support for the principle that a party can abandon claims through discovery responses is relatively scanty. The District cites two cases, one from the Eastern District of Missouri and another from the Court of International Trade. *See* Mem. Supp. Summ. J. at 16. In the first, the court went on to consider the purportedly abandoned claims. *See Casey-El v. Jordan*, No. 05-0148, 2007 WL 2702654, at *2–3 (E.D. Mo. Sept. 12, 2007). In the second, the court's analysis appears to rely on the fact that the plaintiff did "not deny nor address [its purported abandonment of its claims] in its response to defendant's motion for dismissal." *Chrysler Corp. v. United States*, 664 F. Supp. 527, 530–31 (Ct. Int'l Trade 1987).

But Plaintiffs support their argument on this issue with even less backing. Aside from Federal Rule of Civil Procedure 26, Plaintiffs cite no other authority. *See* Opp'n Summ. J. at 32. Nevertheless, as the moving party, the District carries the burden of showing that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The District has not provided sufficient authority to show that Plaintiffs' discovery response constitutes abandonment as a matter of law, nor has it provided any authority to show that the amended discovery response is untimely. Thus, the Court will deny the District's motion for summary judgment on the Title VII claims of Ms. Dudley, Ms. Gray, Mr. Hailes, and Ms. Kelley.

### 5.  Issue Preclusion and the Propriety of the RIF

In their opposition to the District's motion for summary judgment, Plaintiffs argue that the District should be precluded from arguing that the RIF was properly authorized.  *See* Opp'n Summ. J. at 34.  Plaintiffs correctly note that the determination of a legal or factual question in one action can be binding on subsequent actions, in certain circumstances.  *See id.*  The Supreme Court has held that this principle, known as the doctrine of issue preclusion, may also apply "where a single issue is before a court and an administrative agency."  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015).

Plaintiffs argue that Mr. Hunter, one of the Plaintiffs in this case, brought a petition to review the RIF before the District of Columbia's Office of Employee Appeals ("OEA") and OEA determined that the RIF was not properly authorized.  Opp'n Summ. J. at 36 (citing *In re Hunter v. Child and Family Services Agency*, OEA Matter No. 240-0321 (Mar. 4, 2014)).  In response, the District raised a number of arguments, including that applying issue preclusion in this case would be unfair in light of the disparate stakes of the two cases and that OEA only determined that the RIF was not authorized—not that the RIF had a discriminatory impact.  *See* Reply Supp. Summ. J. at 2–3.

This Court does not need to address these issues.  After the parties completed summary judgment briefing, the Superior Court for the District of Columbia overturned the OEA's decision.  *See* Def.'s Not. Suppl. Auth., ECF No. 155 (attaching the Superior Court's opinion).  The Superior Court found "that OEA's decision was clearly erroneous as a matter of law because the Director of CFSA had the authority to order the RIF without mayoral approval."  *D.C. Child & Family Servs. Agency v. D.C. Office of Emp. Appeals*, No. 14-1857, at *4 (D.C. Super. Ct.

April 15, 2016).  In light of the Superior Court's reversal, the OEA decision has no preclusive

effect here.

### B.  Plaintiffs' Discrimination Claims

This Court previously addressed Plaintiffs' discrimination claims.  *See Davis v. District

of Columbia*, 949 F. Supp. 2d 1 (D.D.C. 2013).  As previously stated, the Court dismissed

Plaintiffs' disparate treatment theory based on the RIF, but allowed a related disparate impact

theory to go forward.  *Id.* at 11.  The Court also permitted Plaintiffs to go forward with both

disparate impact and disparate treatment theories related to the FSW's degree requirement.  *Id.*

In brief, the Court statedthat the "disparate impact claims based on both the reduction in force

and the educational requirements for Family Social Workers will go forward under the Human

Rights Act, as they did under Title VII, as will the disparate treatment claim based on those

degree requirements."  *Id.* at 12.

Now the District has moved for summary judgment on all of Plaintiffs' remaining claims.

The Court finds that there are no genuine disputes as to any material facts and that the District is

entitled to judgment as a matter of law.  Therefore, the Court will grant summary judgment for

the District on Plaintiffs' pending race and age discrimination claims under Title VII and the

DCHRA.

### 1.  Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "to fail or refuse to

hire or to discharge any individual . . . because of such individual's race."  42 U.S.C. § 2000e-

2(a)(1).  The statute therefore bars "both intentional discrimination and artificial, arbitrary, or

unnecessary barriers to equal opportunity."  *Segar v. Smith*, 738 F.2d 1249, 1258 (D.C. Cir.

1984).  A Title VII plaintiff can prove that he was fired or was not hired "because of" his race

either by proving his employer's discriminatory intent, or by showing that the decision resulted

from a process that was "fair in form, but discriminatory in operation." *Griggs v. Duke Power

Co.*, 401 U.S. 424, 431 (1971).  In other words, a plaintiff can pursue two paths to prove

discrimination: disparate treatment or disparate impact.  *See* 42 U.S.C. § 2000e-2(k) (codifying

disparate impact theory).  The D.C. Circuit has explained that:

> Disparate treatment occurs when "[t]he employer simply treats some people less
> favorably than others because of their race, color, religion, sex, or national
> origin."  "Proof of discriminatory motive is critical" for such claims.  Disparate
> impact claims, on the other hand, "involve employment practices that are facially
> neutral in their treatment of different groups but that in fact fall more harshly on
> one group than another and cannot be justified by business necessity."  "Proof of
> discriminatory motive . . . is not required under a disparate-impact theory."

*Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting *Int'l Bhd. of Teamsters v.

United States*, 431 U.S. 324, 335 n.15 (1977) (internal citations omitted)).

Even in disparate treatment cases a plaintiff is not required to present direct evidence of

discriminatory intent.  *See Palmer v. Schultz*, 815 F.2d 84, 90 (D.C. Cir. 1987).  Instead,

evidence of intent can be circumstantial, including evidence that is "entirely statistical in nature."

*Id.* (citing *Segar*, 738 F.2d at 1278–79).  Disparate impact plaintiffs can similarly use statistical

evidence to prove that "observed, nonrandom disparities" in hiring, firing, or other significant

employment decisions "were caused by a 'facially neutral' selection criterion that disadvantaged

[the plaintiff class] more than [another class]."  *Palmer*, 815 F.2d at 114; *see also Aliotta v. Bair*,

614 F.3d 556, 565 (D.C. Cir. 2010) ("To establish a prima facie disparate impact claim . . . a

plaintiff . . . need only offer statistical evidence of a kind and degree sufficient to show the

employment decision disproportionately impacts" members of the plaintiff's class.).

Doctrinally speaking, then, the central distinction between a disparate impact case and a

"pattern or practice" disparate treatment case is that only the latter requires proof of

discriminatory intent.  *See Anderson*, 180 F.3d at 338; *see also Palmer*, 815 F.2d at 115 n.23

("[A] disparate treatment claim must prove both a disparity and discriminatory intent—even if proof of intent is circumstantial and the disparity itself raises an inference of intent.").  But if intent can be inferred from observed statistical disparities, the more practical distinction is that disparate impact plaintiffs identify particular employment practices that are allegedly responsible for those disparities, while "pattern or practice" plaintiffs do not.  *See Palmer*, 815 F.2d at 115 ("Because appellants have specifically identified the [employment practice], and not the [employer's discriminatory] intent, as causing the disparity . . . we will treat their claim concerning this disparity as relying solely on the disparate impact theory.").

### 2.  The D.C. Human Rights Act

Like Title VII, the D.C. Human Rights Act ("DCHRA") makes it "an unlawful discriminatory practice" for an employer "[t]o fail or refuse to hire, or to discharge[ ] any individual" "wholly or partially for a discriminatory reason based upon the actual or perceived[ ] race" of that person.  D.C. Code § 2-1402.11(a), (1).  Unlike Title VII—and relevant to this case—the DCHRA also prohibits discrimination based on age.  *Id.*  And because "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice," D.C. Code § 2-1402.68, the DCHRA authorizes discrimination claims based on a theory of disparate impact.  *See Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc) ("As the legislative history demonstrates, the Council imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)."); *see also Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 887–88 (D.C. 2008).

The D.C. Court of Appeals "follow[s] cases construing Title VII in interpreting and applying the provisions of the DCHRA . . . to the extent that the acts use similar words and reflect a similar purpose." *Estenos*, 952 A.2d at 887.  For the purposes of this case, neither of the parties suggests that Title VII and the Human Rights Act differ in any meaningful respect.  *See* Mem. Supp. Summ. J. at 17, 23 (analyzing Title VII and DCHRA claims in tandem); Opp'n Summ. J. at 23 ("When analyzing cases under DCHRA, the District of Columbia customarily looks to federal anti-discrimination jurisprudence—specifically cases interpreting Title VII—for guidance."); *see also Davis*, 949 F. Supp. 2d at 12.  Thus, the Court will consider Plaintiffs' Title VII race discrimination claims and DCHRA race and age discrimination claims in tandem for each of Plaintiffs' theories.

### 3.  Plaintiffs' Disparate Impact Claim Based on the RIF

The District contends that Plaintiffs cannot establish a *prima facie* case for disparate impact based on the RIF.  First, the District argues that Plaintiffs have "failed to identify a facially neutral employment practice."  Mem. Supp. Summ. J. at 19.  Second, the District argues that Plaintiffs' statistical evidence is insufficient to demonstrate the existence of a disparate impact.  *Id.* at 20.  Plaintiffs respond that the RIF itself is a facially neutral policy, and that it was not the result of subjective decision-making, as the District claims.  *See* Opp'n Summ. J. at 37–40.  Plaintiffs also argue that the statistical analysis put forward by their expert is sufficient to demonstrate a disparate impact.  *Id.* at 41.  Because the Court finds that Plaintiffs have failed to identify a specific employment practice, the Court will grant summary judgment to the District on Plaintiffs' disparate impact claims based on the RIF.

As previously stated, disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one

group than another and cannot be justified by business necessity." *Anderson*, 180 F.3d at 338

(quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15). To establish a *prima facie* disparate

impact case, "the employee is 'responsible for isolating and identifying the *specific* employment

practices that are allegedly responsible for any observed statistical disparities.'" *Smith v. City of

Jackson*, 544 U.S. 228, 241 (2005) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642,

656 (1989)). The Supreme Court has cautioned that the failure to home in on a specific practice

could "result in employers being potentially liable for the 'myriad of innocent causes that may

lead to statistical imbalances.'" *Id.* (quoting *Wards Cove*, 490 U.S. at 657).

Plaintiffs maintain that the "RIF was a neutral policy in that the reduction targeted one or

more positions agency-wide." Opp'n Summ. J. at 37. But numerous courts have reached the

opposite conclusion. As a general rule, a plaintiff "cannot attack an overall decisionmaking

process in the disparate impact context, but must instead identify the particular element or

practice within the process that causes an adverse impact." *Stout v. Potter*, 276 F.3d 1118, 1124

(9th Cir. 2002).

More specifically, the District has presented two cases that it contends stand for the

proposition that a RIF cannot constitute a specific employment practice for disparate impact

purposes if the RIF did not utilize a uniform selection criteria. *See Leichihman v. Pickwick Int'l*,

814 F.2d 1263, 1269 n.5 (8th Cir. 1987) ("The [RIF] was not implemented through some facially

neutral procedure, such as a height and weight requirement or an aptitude test, but was conducted

through a series of subjective decisions eliminating certain positions in order to cut costs . . . a

disparate impact model provides an inappropriate vehicle for analysis."); *Combs v. Grand

Victoria Casino & Resort*, No. 08-0414, 2008 WL 4452460, at *3 (S.D. Ind. Sept. 30, 2008)

(rejecting a disparate impact claim where plaintiffs failed "identify a *specific* employment

practice or policy" in a termination of several employees).  Plaintiffs attempt to distinguish these

cases, by arguing, among other things that *Leichihman* involved a more rigorous reorganization

process and that *Combs* involved plaintiffs who were terminated for disciplinary reasons.

*See* Opp'n Summ. J. at 39–40.

The core of Plaintiffs' position, however, is that the RIF was not the result of targeted,

subjective decision-making.  *Id.*  To that end, Plaintiffs argue that the RIF was "supposedly

driven by budget considerations."  *Id*. at 38.  According to Plaintiffs, the goal of the RIF "was to

broadly eliminate one or more positions in at least seven  . . . offices."  *Id.*  Because the RIF

touched on offices that "are so diverse in function, size, job qualifications . . . , and seniority

status . . . there is no reasonable basis to assume that the RIF was anything but neutral."  *Id.*  On

the surface, Plaintiffs' position is contradictory.  The undisputed facts show that the RIF made

cuts across the agency, but those cuts were not equally distributed.  The RIF left some positions

or divisions relatively unscathed, while it completely eliminated other positions.  In fact, cuts to

just two positions constituted the majority of terminations in the RIF.  *See* Def.'s Material Facts

¶ 20.  Plaintiffs have no explanation for how a truly "neutral" RIF would lead to that result.

At a deeper level, Plaintiffs' argument misses the point.  Plaintiffs must identify a

"specific test, requirement, or practice . . . that has an adverse impact."  *City of Jackson*, 544 U.S.

at 241.  Numerous courts that have considered this question have decided that simply pointing to

a RIF generally is not sufficient.  *See, e.g.*, *Leichihman,* 814 F.2d at 1269 n.5;  *Powell v. Dallas*

*Morning News L.P.*, 776 F. Supp. 2d 240, 259 (N.D. Tex. 2011), *aff'd*, 486 F. App'x 469 (5th

Cir. 2012) ("Many courts have held that a plaintiff's reliance on the undue subjectivity of the

RIF termination process is not a proper basis for a disparate impact claim."); *Zawacki v. Realogy*

*Corp.*, 628 F. Supp. 2d 274, 281 (D. Conn. 2009) ("[T]he Plaintiff alleges that the Defendant's

procedures in conducting the RIFs were nothing more than a cover for behind-the-scenes, intentional discrimination against its older employees [but,] [t]here is no allegation of a facially neutral practice or policy that fell more harshly on the protected group."); *Mustelier v. Equifax, Inc.*, No. 08-1008, 2009 WL 890468, at *6 (D.P.R. Mar. 25, 2009) ("[Plaintiffs] allege that as a part of the restructuring process, older workers were overrepresented among those employees that were fired.  However, they have not identified a facially neutral rule that is responsible for the disparity . . . ."); *Kourofsky v. Genencor Int'l, Inc.*, 459 F. Supp. 2d 206, 214–15 (W.D.N.Y. 2006) (finding that plaintiffs "simply allege, in conclusory fashion, that 'the involuntary reduction in force had a disparate impact against [older employees]'" without identifying "any facially neutral policy that produced such a result" (internal citation omitted)).

Plaintiffs cite a single case, *Aliotta v. Bair*, in support of their argument.  *See* Opp'n Summ. J. at 37–38; *see also Aliotta v. Bair*, 614 F.3d 556 (D.C. Cir. 2010).  Plaintiffs argue that the D.C. Circuit's decision in *Aliotta* leaves "no question that a RIF conducted due to budget cuts is a facially neutral employment practice."  Opp'n Summ. J. at 38.  But Plaintiffs stretch *Aliotta* farther than it can reach.  In that case, the Federal Deposit Insurance Corporation ("FDIC") informed the employees of one of its divisions that it intended to cut the staff by more than half. *Aliotta*, 614 F.3d at 559.  The plaintiffs alleged that the RIF had a discriminatory impact on employees aged 50 and older.  *Id.* at 560.  The district court granted summary judgment for the FDIC, finding that the plaintiffs "failed to identify a specific employment practice that resulted in an adverse impact," failed to establish sufficient statistical evidence of a disparate impact, and failed to rebut the FDIC's reasonable explanation for the termination other than age.  *Aliotta v. Bair*, 576 F. Supp. 2d 113, 127 (D.D.C. 2008).  The D.C. Circuit affirmed the trial court's decision.  *See* 614 F.3d at 558.

On appeal, the D.C. Circuit stated the general rule that a plaintiff "may also challenge the disparate impact of specific employment practices." *Id.* at 565.  The court did not, however, provide analysis of whether the RIF in question constituted a sufficiently specific employment practice.  Instead, the court stated that the plaintiffs had maintained their allegations that the RIF had a discriminatory impact on employees over the age of 50.  *Id.* at 565–66.  The court explained, however, that the district court had concluded that the class members' statistical evidence did not establish a disparate impact and that the FDIC had articulated a reasonable factor other than age for the terminations.  *Id.*  It went unmentioned that the district court had also relied on an additional basis—that the RIF was not a sufficiently specific employment practice.  The D.C. Circuit eventually went on to consider and reject the statistical analysis presented by the class members.  *Id.* at 569–70.

Plaintiffs' argument appears to be that the D.C. Circuit's consideration of the statistical impact of the RIF means that the RIF must be a specific employment practice for purposes of a disparate impact analysis.  That argument goes too far.  The court did not analyze whether the RIF in that case constituted a specific employment practice, and it had no need to do so because it upheld the district court's decision on other grounds.  It would be surprising if the D.C. Circuit intended *Aliotta* to leave "no question that a RIF conducted due to budget cuts is a facially neutral employment practice," Opp'n Summ. J. at 38, without discussing the Supreme Court's statement that an "employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'"  *City of Jackson*, 544 U.S. at 241 (quoting *Wards Cove*, 490 U.S. at 656).  The court certainly explored other aspects of the *City of Jackson* decision.  *See Aliotta*, 614 F.3d at 561 & n.4.

43

Plaintiffs have framed the RIF *itself* as a purportedly facially neutral policy.  *See, e.g.*, Opp'n Summ. J. at 38 ("[T]here is no question that a RIF conducted due to budget cuts is a facially neutral employment practice that can be considered under disparate impact theory even when the RIF targets particular divisions of the agency.").  Plaintiff's expert, Dr. Munro, similarly analyzed the RIF as a single employment practice.  In her initial report, Dr. Munro analyzed the *agency-wide* termination rates for African Americans and employees 40 and over.  *See* Mot. Summ. J., Ex. I. at 1–2, 6.  The statistical analysis simply looked at employment figures before and after the RIF, and then repeated the analysis with the addition of the 18 employees re-hired as FSWs.  *Id.* at 1, 4–5.  In other words, Dr. Munro analyzed the RIF as if every employee stood an equal chance of termination.  In her second report, Dr. Munro defended this approach, explaining that she "chose the analysis that assumed all jobs were equally at risk because there was no reason to believe all jobs were not equally at risk."  Mot. Summ. J., Ex. K. at 5.

At times, Plaintiffs have hinted at a different framing of this issue.  For instance, although Dr. Munro "stands by" her assumption that all positions were at equal risk in the RIF, she argues that, "if certain positions *were* more at risk (an assumption [she] would not yield to with a single, new declaration), then it appears . . .  that those positions that were 'targeted' were also positions with notably higher minority representation."  *Id.* at 20.  Notably, however, Dr. Munro provides limited statistical support for this alternative view, and Plaintiffs do not develop this theory more fully in their briefing.  Instead, Plaintiffs have framed the RIF itself as a neutral employment practice and presented statistical analysis that supports that framing.  For instance, Plaintiffs might have framed the purported neutral employment practice as the elimination of the SSA and

SSW positions in favor of the degree-requiring FSW position and presented statistical evidence related to that framing.[8]  Plaintiffs did not elect to do so.

The Supreme Court has held that "the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'"  *City of Jackson*, 544 U.S. at 241 (quoting *Wards Cove*, 490 U.S. at 656). Plaintiffs have failed to identify a specific employment practice and cannot make out a *prima facie* disparate impact case based on the RIF.[9]  Therefore, the Court will grant summary judgment to the District on Plaintiffs' disparate impact claims based on the RIF under Title VII and the DCHRA.[10]

4.  Plaintiffs' Disparate Impact Claim Based on the FSW Degree Requirement

Following initial dispositive motions, the Court allowed Plaintiffs to go forward with their claims based on the FSW bachelor's degree requirement under both a disparate impact theory and a disparate treatment pattern or practice theory.  *See Davis v. District of Columbia*, 949 F. Supp. 2d 1, 12 (D.D.C. 2013).  The District now argues that it is entitled to summary judgment on Plaintiffs' disparate impact claim because undisputed statistical evidence shows that the FSW hiring process did not have a disparate impact on African-Americans or older

---

[8] The Court takes no position on the strength of that possible argument.

[9] In its opinion resolving the District's motion to dismiss, the Court previously referred to the RIF as a facially neutral employment practice.  *See Davis v. District of Columbia*, 949 F. Supp. 2d 1, 10 (D.D.C. 2013).  The Court also noted that Plaintiffs' "allegations regarding the reduction in force are somewhat harder to unpack, since the plaintiffs do not discuss the criteria on which the reduction in force was based, nor make allegations about its structure."  *Id.* at 11. Following briefing and argument on this question, the Court finds that the RIF is not a specific employment practice for the purposes of a disparate impact analysis.

[10] Because Plaintiffs fail to identify a specific employment practice, the Court need not consider whether Plaintiffs' statistical evidence is sufficient to demonstrate a disparate impact.

applicants.  *See* Mem. Supp. Summ. J. at 23.  The Court agrees, and will therefore grant

summary judgment in favor of the District on this issue.

To establish a *prima facie* case of disparate impact, the plaintiff must show that a facially

neutral employment policy has a disproportionately adverse effect on a protected

class.  *See Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A));

*see also Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).  First, a plaintiff must identify a

specific employment practice—in this case the FSW degree requirement.  *See Smith v. City of

Jackson*, 544 U.S. 228, 241 (2005).  Next, a plaintiff must establish causation, meaning

"statistical evidence of a kind and degree sufficient to show that the practice in question has

caused the exclusion of applicants for jobs or promotions because of their membership in a

protected group."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988); *see also Ricci*,

557 U.S. at 587 (noting that a *prima facie* case of disparate impact requires "essentially, a

threshold showing of a significant statistical disparity" (quoting *Connecticut v. Teal*, 457 U.S.

440, 446 (1982))).  Evidence of causation must show that the challenged practice "select[s]

applicants for hire or promotion in a . . . pattern significantly different from that of the pool of

applicants."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

In this case, the District has presented evidence that 18 employees terminated in the RIF

were re-hired to the FSW position and all were African-American.  *See* Def.'s Material Facts

¶¶ 41–42.  The District has also presented evidence that 7 of the 18 re-hired employees were

over the age of 40.  *Id.* ¶ 43.  Plaintiffs only objection to these facts is that they claim Shikita

Beander,[11] who the District lists as a re-hire, "is not listed in the record and there is no evidence

---

[11] The Court notes that the District appears to misspell Ms. Beander's name.  *See* Def.'s
Reply Pls.' Statement of Disputed Material Facts at 13.

that she is in fact African-American" or over 40.  *See* Pls.' Disputed Fact at 11–12.  In fact, Ms.

Beander's name can be found in a table indicating that she is "Black, not of Hispanic origin."

*See* Mot. Summ. J., Ex. C, Ex. 1 at 1.[12]  The same table makes clear that Ms. Beander was under

40 at the time of the RIF, but the District notes that Ms. Beander was not included in the group of

seven employees aged 40 and over who were re-hired for FSW positions.  *See* Def.'s Reply Pls.'

Statement of Disputed Material Facts at 14, ECF No. 154-1.  It is true that Ms. Beander does not

appear on the list of FSWs as of May 2011, *see* Mot. Summ. J., Ex. C, Ex. 2, but she does appear

on the list of active employees as of May 2010 and on the list of internal re-hires.[13]  *Id.* Ex. C,

Exs. 1, 3.

Plaintiffs dispute the re-hiring statistics provided by the District on the basis of Ms.

Beander's inclusion alone, *see* Pls.' Disputed Fact at 11–12, but Plaintiffs make no reference to

this dispute in their opposition to the motion for summary judgment.  Of course, when

considering a motion for summary judgement, the Court must consider whether "the movant

shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  The

District bears the initial burden of identifying portions of the record that demonstrate the absence

of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  In response, Plaintiffs, as the non-moving party, have the opportunity to

identify specific facts that reveal a genuine issue that is suitable for trial, *see* Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324, but they cannot simply rest upon mere allegations or denials

but must instead present affirmative evidence.  *See Laningham v. U.S. Navy*, 813 F.2d 1236,

---

[12] The Court notes that this exhibit is difficult to read because of the small font size and poor reproduction.

[13] Although the parties do not address this discrepancy, one possible explanation is that Ms. Beander left CFSA in the year after she was hired.

1241 (D.C. Cir. 1987).  In this case, Plaintiffs simply assert that the District's re-hiring statistics are in dispute, without providing any evidence other than a passing reference to Ms. Beander. Particularly in light of the fact that Ms. Beander *can* be found in the record, Plaintiffs fail to identify a material fact in dispute with regard to this issue.

Furthermore, even if Ms. Beander were not African-American, the statistical change would not be relevant to the Court's conclusion.  A further review of the evidence in the record reveals that, as of May 2011, all 36 FSWs were African-American.  *See* Mot. Summ. J., Ex. C, Ex. 2.  Similarly, in May 2012, all 38 FSWs were African-American.  *Id.*  These ongoing hiring records simply provide further evidence that the FSW degree requirement did not have a disparate impact on African-American applicants.

The District's expert, Dr. Bronars, evaluated only the 18 employees who were re-hired, and found "no possibility of racial disparity" in light of the fact that all 18 were African-American.  Mot. Summ. J., Ex. J. ¶ 25.  Dr. Bronars also found that the difference between the number of interested and qualified applications over the age of 40 who were terminated in the RIF was not significantly different from the number in that pool hired for the FSW position.  *Id.* ¶ 26.  Aside from their objection to the inclusion of Ms. Beander, Plaintiffs have put forth no evidence to dispute the District's statistics.

In fact, in their brief argument on this point, Plaintiffs only contend that the FSW degree requirement had a disparate impact on African-Americans and older employees because "a large majority of terminated employees were not [re-]hired as FSW."  Opp'n Summ. J. at 43.  This argument misunderstands the proper disparate impact analysis.  To show causation, Plaintiffs must show that the FSW degree requirement "select[s] applicants for hire or promotion in a . . . pattern significantly different from that of the pool of applicants."  *Albemarle Paper*, 422 U.S. at

425.  The undisputed evidence shows that all of CFSA's initial FSW hires were African-American and a statistically proportionate number were 40 and above.  Plaintiffs only dispute with this evidence, a mistaken argument assertion that one of the hires may not be African-American or 40 or older, would not significantly change the statistical analysis and is therefore not material.

Plaintiffs must make out a *prima facie* case that the FSW degree requirement has a disparate impact, which requires "essentially, a threshold showing of a significant statistical disparity."  *Ricci*, 557 U.S. at 587 (quoting *Teal*, 457 U.S. at 446).  They have failed to show *any* statistical disparity.  Thus, the Court grants summary judgment for the District on Plaintiffs' disparate impact claims based on the FSW degree requirement under Title VII and the DCHRA.

5.  Plaintiffs' Disparate Treatment Claim Based on the FSW Degree Requirement

The District argues that, because Plaintiffs have failed to establish a disparate *impact* caused by the FSW degree requirement, Plaintiffs' disparate *treatment* claim must also fail.  *See* Mem. Supp. Summ. J. at 24–25.  In response, Plaintiffs argue that the FSW was "essentially the same as the SSA and SWA positions" and that CFSA knew that "the bulk of SSAs did not have higher education degrees."  Opp'n Summ. J. at 44.  Plaintiffs suggest these facts "create a strong inference on summary judgment that CFSA intentionally discriminated against plaintiffs on account of age and race."  *Id.*  As set forth above, the Court has found that Plaintiffs have not shown a disparate impact caused by the FSW degree requirement.  Plaintiffs have not provided any other evidence, anecdotal or otherwise, to buttress their statistical evidence.  *See Palmer v. Schultz*, 815 F.2d 84, 96 (D.C. Cir. 1987) (explaining that, while a plaintiff *may* rely entirely on statistical evidence, a "Title VII pattern and practice case[] need not rely on statistical evidence

alone"). Accordingly, the Court also grants summary judgment for the District on Plaintiffs' disparate treatment claims.

In the Court's prior opinion resolving the District's motion to dismiss, the Court explained that Plaintiffs' disparate treatment claim was based on a theory that the FSW degree requirement would have a disparate *impact* that "was so obviously foreseeable that it must have been intended." *Davis v. District of Columbia*, 949 F. Supp. 2d 1, 10 (D.D.C. 2013). In other words, Plaintiffs "claim that it is possible to deduce intentional discrimination from evidence of disparate impact." *Id.* At that stage in the litigation, the Court concluded that "the allegation that the degree requirement had a foreseeably disparate impact unjustified by business necessity is specific enough to permit the court to infer liability on the facts pled." *Id.* at 11.

A disparate treatment claim alleges that the defendant intentionally based an employment decision on a protected attribute of the plaintiff. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). The claim can involve an isolated incident of discrimination against an individual, or, as in this case, allegations of a "pattern or practice" of discrimination affecting an entire purported class of individuals. *See id.* at 336. To establish a *prima facie* pattern or practice case, "[t]he plaintiffs must, by statistical evidence, individual testimony, or a combination of the two, make a showing adequate to raise the inference that employment decisions were predicated on an illegal criterion." *McKenzie v. Sawyer*, 684 F.2d 62, 71 (D.C. Cir. 1982). To succeed on a disparate treatment claim, "[p]roof of illicit motive is essential, but, especially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group." *Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C. Cir. 1984). In fact, statistical evidence alone "may suffice to establish a prima facie case if the disparities in

treatment are significant." *Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010) (citing *Wagner v. Taylor*, 836 F.2d 578, 592 (D.C. Cir. 1987); *Ledoux v. District of Columbia*, 820 F.2d 1293, 1303 (D.C. Cir. 1987)).

Plaintiffs cannot make out a *prima facie* disparate treatment claim.  As the District correctly notes, "the plaintiffs must make a *prima facie* showing that a racial disparity exists." *Moore v. Summers*, 113 F. Supp. 2d 5, 19 (D.D.C. 2000).  As the Court previously noted, the District presented evidence showing that all of CFSA's initial FSW hires were African-American and that a statistically proportionate number of the new hires were 40 or older.  *See supra* Part IV.B.4.  Plaintiffs have not presented evidence materially disputing those facts.  Thus, Plaintiffs have failed to show any statistical disparity caused by the FSW degree requirement.

Instead, Plaintiffs briefly argue that SSAs performed the functional equivalent of the FSW position and that "CFSA knew that the bulk of SSAs did not have higher education degrees."  Opp'n Summ. J. at 44.  These disputed facts are not relevant here.  The purported similarities between the responsibilities of SSAs and FSWs do nothing to show that the FSW degree requirement caused a disparity based on either race or age.  In a disparate treatment case, "illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group," *Segar*, 738 F.2d 1265–66, but the undisputed record before the Court does not show any disparity caused by the FSW degree requirement.[14]  For these reasons, the Court grants summary judgment for the District on

---

[14] Again, the Court notes that Plaintiffs analyzed the RIF in terms of its broad impact on African Americans and employees 40 and over.  *See supra* Part IV.B.3.  To the extent Dr. Munro—Plaintiffs' expert—considered the impact of re-hiring terminated employees to the FSW position, her analysis considered how those re-hires changed the agency-wide statistics.  *See* Mot. Summ. J., Ex. I at 4 ("The rehire of 18 African-Americans and 0 "other" race workers into the FSW position does not change the net results notably.");  *id.* at 5 (noting that 8 of the 18

Plaintiffs' disparate treatment claims based on the FSW degree requirement under Title VII and the DCHRA.

### C.  Class Certification

Plaintiffs' motion for class certification is currently pending before the Court.  *See* Pls.' Mot. Class Certification.  In general, district courts decide motions for class certification before turning to dispositive motions.  *See Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997).  However, Federal Rule of Civil Procedure 23 gives the district courts "great discretion in determining the appropriate timing for such a ruling."[15]  *Id.*  The D.C. Circuit has explained that "[i]t is readily apparent that a decision on class certification cannot be made in a vacuum." *Wagner v. Taylor*, 836 F.2d 578, 587 (D.C. Cir. 1987); *see also Shaw v. Marriott Int'l, Inc.*, 570 F. Supp. 2d 78, 82 (D.D.C. 2008), *aff'd in part and rev'd in part on other grounds*, 605 F.3d 1039 (D.C. Cir. 2010).  In this case, deciding the summary judgment motion first will save time and resources and the parties will not suffer any prejudice as a result.  The Court grants summary judgment for the District on all of Plaintiffs' remaining claims.  Therefore, there is no need for the Court to address class certification, and the Court will deny Plaintiffs' motion as moot.  *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1041 (D.C. Cir. 2010) (noting that the "district court granted summary judgment for Marriott, mooting the motion for class certification").

---

rehires into the FSW position were 40 or older, and concluding that "[i]ncorporating the rehire numbers to adjust the termination variable to make a net termination result makes the group difference more strongly statistically significant").  Plaintiffs did not frame the elimination of the SSA and SWA positions and their replacement with the FSW position as a single decision restructuring the relevant duties or present statistical evidence in that manner.

[15] This discretion is also reflected in the 2003 amendments to the Federal Rules, which replaced the "requirement that the court determine whether to certify a class 'as soon as practicable after commencement of an action'" with a requirement that a determination be made "at an early practicable time."  Fed. R. Civ. P. 23 advisory committee's notes to 2003 amendment.

**V.  CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 146) is

**GRANTED** and Plaintiffs' Motion for Class Certification (ECF No. 144) is **DENIED** as moot.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  March 31, 2017                                         RUDOLPH CONTRERAS
                                                              United States District Judge