## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONDA L. DAVIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 10-01564 (RC) |

## DEFENDANT'S RENEWED
## MOTION FOR SUMMARY JUDGMENT

Defendant the District of Columbia (the District) renews its motion for summary judgment. *See* Fed. R. Civ. P. 56(a); Sept. 16, 2019 Min. Order. As discussed in the accompanying memorandum of points and authorities, plaintiffs cannot establish a *prima facie* case of racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, or the District of Columbia Human Rights Act D.C. Code §§ 2-1401.01, *et seq.*, in their challenge to a reduction in force (RIF) conducted by the Child and Family Services Agency (CFSA) in 2010. Specifically, because plaintiffs are unable to demonstrate that the alleged practices undertaken by CFSA to implement the RIF had a statistically significant racial impact, the District is entitled to judgment as a matter of law. A proposed order is attached.

Dated:  November 18, 2019.        Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Michael A. Tilghman II
MICHAEL A. TILGHMAN II [988441]
MICAH BLUMING [1618961]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C.  20001
(202) 727-6247
(202) 741-8776 (fax)
michael.tilghman@dc.gov

*Counsel for Defendant District of Columbia*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONDA L. DAVIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 10-01564 (RC) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This case was remanded from the D.C. Circuit for this Court to determine whether plaintiffs have established a *prima facie* case of racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII), or the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01, *et seq.* (DCHRA).[1] Plaintiffs allege that the implementation of a reduction in force (RIF) conducted in 2010 by the District of Columbia Child and Family Services Agency (CFSA) had a disparate impact on African Americans. But plaintiffs cannot establish a *prima facie* case of discrimination, and the District of Columbia (the District) is entitled to summary judgment, for two reasons.

---

[1]     As explained below, the Circuit held that the case could proceed on remand only if plaintiffs first establish a *prima facie* case in support of their sole remaining disparate impact claim. Cir. Op. at 21-22.

First, plaintiffs have proffered no probative evidence of a statistically significant racial impact caused by either of the two separate employment practices they explicitly identify:  CFSA's decision to (1) eliminate the Social Worker Associate (SWA) and Social Service Assistant (SSA) positions; and (2) allow managers to make individualized choices about which other positions to eliminate.[2] Instead, plaintiffs' expert statistician limited her analysis to the statistical impact of the RIF as a whole. Title VII allows plaintiffs to analyze a multifactor decision-making process as a single employment practice only after plaintiffs have proven that the elements of that process are not capable of separation for analysis. Plaintiffs have not even attempted to satisfy this burden, nor can they. Therefore, the statistical analysis they offer is irrelevant to whether either of the employment practices they identify had a disparate impact on African Americans.

Second, even assuming plaintiffs could satisfy this burden and rely on their expert's statistical analysis of the RIF as a single employment practice, their expert's analysis has no probative value because it does not account for a court order barring CFSA from abolishing the position of any case-carrying social worker or their supervisors, which make up 30 percent of the agency's workforce. Moreover, CFSA lacked any discretion to decide which employees competing for retention would be

---

[2]     Although the Circuit accepted, for purposes of its analysis, plaintiffs' conclusion that the RIF consisted of only the two separate employment practices they identified, the undisputed record demonstrates at least four distinct employment practices, only one of which involved individualized decisions as to which positions to abolish. These facts are set forth below.

2

separated. Because their expert failed to incorporate these factors into her analysis, her statistical conclusions have no probative value.

## BACKGROUND

### I.    Overview of Applicable Laws

Title VII "prohibits both intentional discrimination (known as 'disparate treatment') as well as … practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."[3] *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). A disparate-impact plaintiff "establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race.'" *Id.* at 578 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). "An employer may defend against liability by demonstrating that the practice is '… consistent with business necessity,'" and the plaintiff must then "show[] that the employer refuses to adopt an available alternative employment practice that has less disparate impact." *Id.* (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)).

Under the Comprehensive Merit Personnel Act (CMPA), D.C. Code § 1-624.01 *et seq.*, the District is authorized to abolish positions, and separate excess employees, so long as the process is "conducted in a fair manner." *Dupree v. D.C. Office of Emp. Appeals*, 36 A.3d 826, 829 (D.C. 2011). An agency may start the RIF process by submitting to the appropriate personnel authority "[a]n administrative order or

---

[3]     As relevant here, the DCHRA applies the same evidentiary standards as Title VII. *See Estenos v. PAHO/WHO-FCU*, 952 A.2d 878, 886 (D.C. 2008).

equivalent identifying the competitive area, and the positions to be abolished, … and the reason therefore." 6B DCMR § 2406.2 (2010).   If the abolished positions are occupied, employees are selected for separation through a strictly regulated process of lateral competition. *See* 6B DCMR §§ 2408-2421. Employees compete for retention within their competitive level, which includes other employees with the same grade and title in a competitive area. 6B DCMR § 2410. Then, employees are separated in reverse order of retention standing, which is "determined on the basis of tenure of appointment, length of creditable service, veterans preference, residency preference, and relative work performance." 6B DCMR §§ 2408.1, 2420.3.

II. **The Child and Family Services Agency**

In 2001, the District established CFSA as a cabinet level agency to administer the District's child welfare system. *See In re D.K.*, 26 A.3d 731, 735 (D.C. 2011); Child and Family Services Agency Establishment Amendment Act of 2000, 48 D.C. Reg. 2043. At all times relevant to this case, CFSA was comprised of six divisions:  (1) Agency Programs; (2) Community Services; (3) Policy and Planning; (4) Clinical Practice; (5) Agency Management; and (6) Agency Financial Operations. *See* CFSA FY2011 Proposed Budget at E21 – E23, Ex. 1. CFSA has four primary functions:  (1) take and investigate reports of child abuse and neglect; (2) assist families; (3) provide safe out-of-home care; and (4) re-establish children in permanent homes. *See* D.C. Code § 4-1303.03.

As of the beginning of 2010, CFSA operated under the constraints of a remedial order entered in *LaShawn A. v. Bowser*, Civil Action No. 89-1754 (*LaShawn*),[4] to address alleged deficiencies in the provision of child services by the Department of Human Services—the agency previously responsible for administering the District's child welfare system. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 87-88 (D.D.C. 2010). The Modified Final Order (MFO) entered in *LaShawn* imposed significant requirements on CFSA that only licensed social workers could fulfill.[5] *See* Report to the Subcommittee on the District of Columbia, Committee on Government Reform, House of Representatives at 10 (Dec. 2000), Ex. 2.[6] To be a licensed social worker, an individual carrying cases must have at least a master's degree from a social work program accredited by the Council on Social Work Education. D.C. Code § 3-1208.02. Under the 2010 compliance plan, those who investigated abuse or neglect could be assigned no more than 12 investigations at a time; those providing in-home or in-foster-care services could be assigned no more than 15 cases at a time; those who

---

[4]     The *LaShawn* plaintiffs originally sued former Mayor Marion Barry in his official capacity. Subsequent mayors, including Mayor Muriel Bowser, have been substituted as official capacity defendants while the case remains pending.

[5]     Those requirements include, among other things, timely investigations into allegations of child abuse and neglect, a prompt preparation of a case plan for each child associated with a substantiated report of abuse or neglect, prompt placement of a child back into his home or foster care instead of languishing in voluntary or emergency care, and ensuring that children in the system have a permanency plan to allow them to be in an adoptive home within a certain period of time. *See LaShawn*, 701 F. Supp. 2d. at 104-09.

[6]     Electronically available at https://www.gao.gov/new.items/d01191.pdf (last accessed Nov. 18, 2019).

conducted home studies could be assigned no more than 30 cases at a time; and supervisors could be responsible for no more than six employees at a time. *See LaShawn* Amended Implementation Plan at 8-9, 18, 21-22, Ex. 3. In early 2010, these non-discretionary positions accounted for 30 percent of CFSA's workforce. CFSA Working Organizational Chart Dated Feb. 9, 2010, Dist. Doc. Prod. at DAVIS-003923 – DAVIS-003966, Ex. 4. (organizational chart showing, out of 892 positions, at least 222 case-carrying social workers and 50 social worker supervisors).

III.    CFSA's Post-Recession Budget Shortfalls

The 2009 financial collapse forced the District to streamline agency operations and cut spending to balance its budget. *See* Former Mayor Adrian M. Fenty June 29, 2010 Letter to the President, Ex. 5. This included spending cuts at CFSA. The District reduced CFSA's fiscal year[7] 2010 budget by $25.3 million from fiscal year 2009. *See* Loren Ganoe June 3, 2011 Decl. (Ganoe Decl.) ¶¶ 4-5, Ex. 6. For fiscal year 2011, the final budget passed by the D.C. Council included a $12.1 million reduction to CFSA's budget from fiscal year 2010 and a reduction of full-time employees from 892 for fiscal year 2010 to 840 for fiscal year 2011. Ganoe Decl. ¶¶ 6, 8, Ex. 6.

The budget shortfall required that CFSA consolidate operations through a RIF while continuing to meet its obligations under *LaShawn. See* Gerald Roque Apr. 29, 2010 Mem., Dist. Doc. Proc. at DAVIS-001020, Ex. 3; Raymond Davidson Jan. 7, 2014 Decl. (Davidson Decl.) ¶ 5, Ex. 7. Specifically, "CFSA realign[ed] core functions to

---

[7]     The District of Columbia fiscal year runs from October 1 to September 30. D.C. Code § 1-204.41(a).

ensure that services to children and families [were] not negatively impacted and to ensure that best practice caseload standards [were] maintained." Ex. 1 at E-26. As noted above, CFSA workers contributing to *LaShawn* compliance at this time—social workers and their supervisors—accounted for 30 percent of CFSA's workforce. *See* CFSA Working Organizational Chart Dated Feb. 9, 2010, Dist. Doc. Prod. at DAVIS-003923 – DAVIS-003966, Ex. 3. Those positions, as well as other supervisory positions needed for CFSA to carry out its mission, were not subject to the implementation of a RIF. Debra Porchia-Usher Nov. 18, 2019 Decl. (Porchia-Usher Decl.) ¶ 10, Ex. 8.

Instead, CFSA's leadership had to determine ways to increase efficiency and conduct a RIF that would not interfere with CFSA's mission or its legal obligations. Davidson Decl. ¶¶ 4-5, Ex. 7; Porchia-Usher Decl. ¶ 10, Ex. 8. For instance, CFSA's Agency Programs division responded by converting its workforce to the "team model," which grouped social workers with a set of skilled partners to serve client needs together. Davidson Decl. ¶ 6, Ex. 7. This transition allowed the Agency Programs division to eliminate two positions no longer needed under the new model: the SSA position, a social work support position held by 57 employees; and the SWA position, held by 13 employees. *Id.* ¶¶ 7-8.

Other CFSA divisions made similar changes. The Clinical Practice division implemented a new "Nurse Care Management" model, which allowed it to eliminate or reclassify eight full time positions. *See id.* ¶¶ 10-11. The Community Services division eliminated or reclassified 19 positions. *Id.* ¶ 12. CFSA also eliminated one of

the two administrative review teams located in the Office of Planning, Policy and Program Support. *Id.* ¶ 15. And, based on seniority and in accordance with District personnel regulations, CFSA "identified various non-direct and[] administrative service positions for elimination, including Clerical Assistants, Human Resource Support, Paralegal, Case Assessment Specialist, Payroll Specialist and Contract Compliance." *Id.* ¶¶ 16-17.

In total, CFSA eliminated 115 full-time positions, effective June 11, 2010. Davidson Decl. ¶ 3, Ex. 7; Porchia-Usher Decl. ¶¶ 15, 16, Ex. 8. The agency, however, created a new position called a Family Support Worker (FSW)—that required a bachelor's degree—to be part of the team model in the Agency Programs division, and subsequently hired 38 individuals for that position, some of whom had lost their positions during the RIF. Porchia-Usher Decl. ¶¶ 12, 14, Ex. 8; Stan Spaght Dec. 17, 2010 Decl. ¶ 6, Ex. 9.

## IV.   Plaintiffs' Lawsuit

Plaintiffs—former CFSA employees—brought this lawsuit against the District in 2010. The Third Amended Complaint[8] asserts claims under Title VII and the DCHRA, alleging:  (1) the RIF had a disparate impact on African Americans; (2) the requirement that FSWs hold a bachelor's degree had a disparate impact on African

---

[8]     Plaintiffs here are comprised of the plaintiffs in *Davis v. District of Columbia*, Civil Action No. 10-1564 and *Dudley v. District of Columbia*, Civil Action No. 10-1718. The Court consolidated the cases and plaintiffs filed their Third Amended Complaint, the operative complaint, on May 31, 2013. *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 381 (D.D.C. 2017).

Americans; (3) the FSW bachelor's degree requirement intentionally discriminated against African Americans; and (4) the RIF and FSW bachelor's degree requirement discriminated against older employees.[9] The Court ordered that the proceedings be bifurcated, with Phase I considering "the existence and statistical validity of group-based disparities caused by the [RIF] and/or the education requirements." Apr. 4, 2013 Scheduling Order [59].

Plaintiffs proffered an expert in industrial and organizational psychology, Paige Munro, Ph.D., to support their claim that the RIF had a statistically significant disparate impact on African Americans. Paige Munro, Ph.D. July 28, 2012 Decl. (Dr. Munro Decl.) ¶ 1, Ex. 10. Dr. Munro "assumed all jobs were equ[ally] at risk for termination," and created a statistical model with just two variables: race and job retention status (separated or not). *Id.* ¶¶ 5-6; Paige Munro, Ph.D. Dep. Tr. (Dr. Munro Dep.) at 218:14-15, Ex. 11. Dr. Munro compared the racial composition of the pre-RIF CFSA workforce with the racial composition of the separated employees and concluded that "the African American termination rate was 277% the rate of non-African Americans" and "444% the rate of Caucasians." Paige Munro, Ph.D. Resp. (Dr. Munro Resp.) at 3, Ex. 12. Her report, however, offered no analysis of the specific employment practices alleged by plaintiffs to have been unlawful—*i.e.*, the targeting of SSAs and SWAs for elimination and the decision to abolish other positions through new teaming models and elimination of redundancies. *See generally* Exs. 10, 12.

---

[9]     Plaintiffs also initially asserted an intentional discrimination claim based on the RIF, which this Court dismissed at the pleading stage of the case. *See Davis v. District of Columbia*, 949 F. Supp. 2d 1 (D.D.C. 2013).

Dr. Munro vigorously defended basing her statistical model on an assumption that all positions were equally at risk of abolishment. First, she explained that she "would always choose" this approach "unless there was uncontroverted evidence that certain positions were in fact the only positions at risk," and that she was "less than fully confident" that Mr. Davidson's[10] description of CFSA's decision-making process was true. Dr. Munro Resp. at 6, 12, Ex. 12. Dr. Munro's skepticism was largely based on "timing"—she found Mr. Davidson's January 2014 declaration "somewhat incredible" because it contained details not set forth in earlier-executed declarations of other CFSA officials, and because he signed his declaration only one day before the District's expert, Stephen G. Bronars, Ph.D., issued his report. *Id.* at 8-9; *see* Dr. Munro Dep. at 170:8-14 ("I found it inappropriate to base an entire statistical analysis on a … justification that was signed … a day before his report and that was never before explained in that level of detail."); 178:11-13 ("They should have figured all this stuff out ahead of time and it should have been in their explanation in 2010."), Ex. 11.

Second, Dr. Munro testified that she had assumed that all positions were equally at risk of abolishment because it made her results more statistically reliable. Dr. Munro explained that she had rejected a "category-based analysis"—which would have considered different risks of abolishment in different divisions—because it

---

[10]   Raymond Davidson served as CFSA's Chief Administrative Officer during the relevant time period. Davidson Decl. ¶ 2, Ex. 7. In that role he oversaw various divisions of CFSA, including the Human Resources Department, and was involved in CFSA's design and implementation of the RIF. *Id.* ¶¶ 2-3.

would have led to sample sizes that were "too small to be meaningful" or so homogenous that the results were "irrelevant and un-interpretable." Dr. Munro Resp. at 6, 14, 15, Ex. 12; Dr. Munro Dep. at 215:2-18, Ex. 11.

## V. The Court's Summary Judgment Order

The District moved for summary judgment, and the Court granted the District's motion on March 31, 2017. The Court held that the employees failed to satisfy their *prima facie* burden on their disparate-impact challenge to the RIF. *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 394-97 (D.D.C. 2017). In its opinion, the Court explained that, to establish that a RIF had a disparate impact, the employees "'cannot attack an overall decisionmaking process …, but must instead identify the particular element or practice within the process that causes an adverse impact.'" *Id.* at 394 (quoting *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002)). The employees, however, had "framed the RIF *itself* as a purportedly facially neutral policy," and their expert had "similarly analyzed the RIF as a single employment practice." *Id.* at 396 (emphasis in original). Because plaintiffs' failure to identify a particular employment practice was dispositive of their claim, the Court did not consider the probative value of their statistical evidence. *Id.* at 397. The Court also granted summary judgment to the District on plaintiffs' FSW degree requirement and age discrimination claims. *See id.* at 397-401.

## VI. The D.C. Circuit's Decision

The Circuit remanded this case for a determination of whether "the practices by which [CFSA] implemented the layoffs had a statistically significant racial

impact." Cir. Op. at 21.[11] The Circuit confirmed that "[i]f on remand plaintiffs clear the statistical hurdle," the parties would then "have an opportunity after appropriate discovery to address whether [CFSA's] execution of the [RIF] was justified by business necessity." Cir. Op. at 22.

The Circuit held that plaintiffs had not merely challenged the RIF as a whole but instead challenged two particular employment practices: "[CFSA]'s choices to (a) target the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units." *Id.* at 14. The Circuit held these specific processes were "susceptible of challenge under disparate impact precedents." *Id.* at 19 (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656 (1989); *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 990-91 (1988)).

The Circuit remanded for this Court to determine whether the African American plaintiffs—all plaintiffs except for Luz Lagaris and Laura Smart, *see* Third Am. Compl. ¶ 93—have established a *prima facie* case of discrimination as to these two practices. *Id.* at 21. Plaintiffs must now show "that the practices by which [CFSA] implemented the layoffs had a statistically significant racial impact." *Id.*

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no

---

[11]     The Circuit analyzed plaintiffs' Title VII and DCHRA claims together, observing that the same legal standards apply to both. *See id.* at 11. The District will do the same for purposes of this brief.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

To prevail on a motion for summary judgment, the moving party need only show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A nonmoving party, however, must establish more than a "mere existence of a scintilla of evidence" in support of his position to overcome a motion for summary judgment. *Anderson*, 477 U.S. at 252. The nonmoving party must present specific facts that would engage a reasonable jury to find in his favor. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## ARGUMENT

I.   <u>**Plaintiffs Cannot Establish that Either of the Two Employment Practices They Identify Had a Disparate Impact on African Americans.**</u>

Under Title VII, disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *see also Moore v. Summers*, 113 F. Supp. 2d 5, 19 (D.D.C. 2000). That is, "plaintiffs alleging

disparate impact ... are alleging the employer's practices have had a 'systemic adverse effect' on members of the [alleged protected] class." *Aliotta v. Bair*, 614 F.3d 556, 565 (D.C. Cir. 2010). "'[P]laintiffs bear the burden of persuasion as to the existence of a race-related disparity caused by an employment practice ...." *Moore*, 113 F. Supp. 2d at 19 (quoting *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984)). Only if the plaintiff meets this initial burden does the defendant then bear the burden of persuasion to show business necessity justified the practice. *Id.*

A plaintiff establishes a *prima facie* violation through a two-step process. 42 U.S.C. § 2000e-2(k)(1). First, the plaintiff "begin[s] by identifying the specific employment practice that is challenged." *Watson*, 487 U.S. at 994; 42 U.S.C. § 2000e-2(k)(1)(A). Second, the plaintiff "must offer statistical evidence" sufficient to show that the challenged practices caused the termination of employees "because of their membership in a protected group." *See id.* In other words, a *prima facie* case will fail unless the plaintiff can proffer "statistical evidence from which a reasonable jury could determine that the [identified practice] <u>caused</u> the statistical disparity in question." *Latson v. Sessions*, 239 F. Supp. 3d 163, 177 (D.D.C. 2017) (emphasis in the original).

A. <u>Plaintiffs Have Offered No Evidence That Either of the Two Employment Practices They Identify Had a Statistically Significant Disparate Impact on African Americans.</u>

Plaintiffs have not proffered any probative statistical evidence to establish this causal connection. "A plaintiff who fails to ... produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate

impact." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). And "courts … [are not] obliged to assume that plaintiffs' statistical evidence is reliable." *Watson*, 487 U.S. at 996. Statistical conclusions based on flawed assumptions are simply not "probative of a prima facie case of disparate impact." *Wards Cove*, 490 U.S. at 651.

In particular, the Supreme Court has rejected "bottom line" reasoning, which fails to consider the various factors that could have caused a racial imbalance. *Id.* at 657. "In order to determine whether an employment practice causes a 'disparate' impact, the court must gain some handle on the baseline racial composition that the impact is 'disparate' from; that is, what should the racial composition of the job force look like absent the offending employment practice." *Crum v. Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999). This is why the first step of the plaintiff's *prima facie* case is so important—"[f]or … statistical evidence to be reliable, it … must 'isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Tabor v. Hilti, Inc. (Tabor I)*, 703 F.3d 1206, 1223 (10th Cir. 2013) (quoting *Watson*, 487 U.S. at 994). Only by isolating the challenged employment practice can a statistician "control[] for key factors outside the challenged practice that could potentially cause or contribute to the disparity." *Id.* "The data need not include 'all measurable variables' but must be sufficient to prove discrimination by 'a preponderance of the evidence.'" *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *see also Koger v. Reno*, 98 F.3d 631, 637 (D.C. Cir. 1996) ("Courts [do] not … require acceptance of regressions from which clearly major

15

variables have been omitted ….”). “This disdain for 'bottom line' reasoning reflects the belief that holding employers liable for statistical imbalances *per se* is inconsistent with Title VII's plain language and statutory purpose.” *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276 (11th Cir. 2000).[12]

As the Circuit observed, plaintiffs have challenged two employment practices: “[CFSA's] choices to (a) target the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units.” Cir. Op. at 14. But their statistical evidence does not separately address the statistical impact of either employment practice. Instead, it rests on unreliable bottom-line reasoning. Dr. Munro started with a false assumption:  that “all jobs were equ[ally] at risk for termination.” Dr. Munro Dep. at 218:14-15, Ex. 11. This led her to consider only two variables:  race and retention status (“terminated or not”), which she “analyzed to determine if the termination rates for African Americans … differed statistically significantly from the termination rates for the non-African Americans.” Dr. Munro Decl. ¶¶ 5-6, Ex. 10.

---

[12]     For example, in *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006), Hispanic farmers challenged the administration of federally funded loans, offering statistical evidence that compared the percentage of loans approved for white farmers with those approved for Hispanic farmers. *Id.* at 634. The Court affirmed the district court's rejection of this “bottom line” analysis, explaining that the “statistical analyses were analytically flawed because they did not incorporate key relevant variables,” such as “whether fewer Hispanic farmers were U.S. citizens, whether Hispanic farmers had worse credit and whether Hispanic farmers had less experience.” *Id.* at 635.

Dr. Munro offered two defenses to her decision to analyze the RIF as a whole rather than separately consider the two employment practices identified by plaintiffs. First, she explained that she did not consider CFSA's discrete decisions—like its adoption of new service models that led to the elimination of two job categories—because she was "less than fully confident" in the truth of Mr. Davidson's declaration describing those decisions. Dr. Munro Resp. at 6, 12, Ex. 12. But these facts are undisputed, making her personal doubts irrelevant. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record."). While plaintiffs question the wisdom of the new service models, they do not dispute that the new models were adopted. And this evidence unquestionably changed the statistical landscape, rendering meaningless any analysis that assumed that all positions were equally likely to be abolished. After all, the adoption of a new service model that eliminated the SSA and SWA positions directly caused the abolishment of 70 positions—more than half of the total positions abolished in the challenged RIF. Davidson Decl. ¶¶ 4-17, Ex. 7; *see also* Pls.' Dec. 21, 2015 Statement of Disputed Material Facts [148-1] at 5-7.

Indeed, Dr. Munro conceded the falsity of her baseline assumption, stating that "the most practical assumption to make was that *aside from the [Assistants] (that were 100% terminated)*, every other position and employee in [CFSA] was at equal risk for termination." Dr. Munro Resp. at 5, Ex. 12 (emphasis added). But Dr. Munro did not incorporate the Assistants' "100%" separation risk into her statistical model.

17

This error was significant, as the abolishment of those positions accounts for half of the employees separated in the RIF. Porchia-Usher Decl. ¶¶ 14-15, Ex. 8. She also admitted that the decision to eliminate one of the duplicative review teams "appears rational and the data supports this as the justification," but she never factored these abolished positions into her analysis. Dr. Munro Resp. at 11, Ex. 12.

Second, Dr. Munro explained that she had chosen to exclude the new service models from her study because including them would have created sample sizes "too small to be meaningful or reliable statistically" or so homogenous that the results would be "irrelevant and un-interpretable." *Id.* at 12, 14, 16; Dr. Munro Dep. at 215:2-18, Ex. 11. "[G]iven the very small raw number of [non-African American] employees" in these smaller categories, "it is likely impossible that adverse impact would ever be shown because there are simply not enough of the other group to reach two standard deviations." Dr. Munro Resp. at 16, Ex. 12. It is possible, however, that Dr. Munro still could have obtained reliable results with advanced statistical modeling that allowed her to aggregate the too-small samples and use multiple regression to adjust for the different variables. *See Garcia*, 444 F.3d at 635 (noting that the Hispanic farmers could have incorporated the relevant variables with a "multiple regression" model—"a form of statistical analysis used increasingly in Title VII actions that measures the discrete influence independent variables have on a dependent variable").

And even if this was not possible—if incorporating the relevant variables would have led to inconclusive results—this cannot justify Dr. Munro's rejection of

those variables from her study. Results from a statistical model based on a false premise lacks probative value regardless of whether the results from a properly structured model also would have lacked probative value. A plaintiff offers statistical analysis to demonstrate that the challenged employment practice "causes a disparate impact on the basis of race[.]" 42 U.S.C. § 2000e-2(k)(1)(A)(i). That analysis therefore must "incorporate key relevant variables[.]" *Garcia*, 444 F.3d at 635. Dr. Munro's desire to produce a statistically significant result therefore cannot justify her adoption of a statistical model based on assumptions explicitly disproven by the undisputed evidence.

To meet their burden at this stage, plaintiffs must point to some evidence in the record tying the particular practices to a racially disparate result. *See Wards Cove*, 490 U.S. at 657 ("[A] plaintiff must demonstrate that it is the application of a *specific or particular employment practice* that has created the disparate impact under attack.") (emphasis added). To do this, they must separately analyze each employment practice and show how each had a disparate impact on their protected class. *See id.* (disparate impact plaintiff's burden requires "specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for" affected group). As the Supreme Court has explained, any other rule "would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* (quoting *Watson*, 487 U.S. at 992).

19

Plaintiffs' failure to proffer statistical evidence for each challenged employment practice is fatal to their case and entitles the District to summary judgment. *See Latson*, 239 F. Supp. 3d at 178 (concluding that because "the plaintiff has submitted purported statistical evidence that the Court cannot identify and review, much less rely upon[,] … [the] plaintiff has failed to establish a prima facie case of disparate impact, and thus her claim must fail."); *Martin v. District of Columbia*, 78 F. Supp. 3d 279, (D.D.C. 2015) (Contreras, J.) (failure "to introduce statistical evidence demonstrating causation" in support of a disparate impact claim rendered the plaintiff unable "to meet her summary judgment burden").

    B.  **Plaintiffs Have Not Met Their Burden of Demonstrating that the Two Challenged Employment Practices Are Incapable of Separation for Analysis.**

When Congress codified the "particular employment practice" requirement, it provided one exception to the general rule that each challenged practice be tied to a racially disparate result: "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e‑2(k)(1)(B)(i). The burden is thus on the plaintiffs to demonstrate that CFSA's decision to eliminate two entire job categories is incapable of being separately analyzed from CFSA's other decisions regarding which positions to abolish. *Id.*; *see also Tabor v. Hilti, Inc. (Tabor II)*, 577 F. App'x 870, 877 (10th Cir. 2014) ("[I]t was [the plaintiff's] burden to demonstrate that the [employee development process] and the [promotional] interview process are not capable of

separation for analysis."); *Davis v. Cintas Corp.*, 717 F.3d 476, 497 (6th Cir. 2013) (affirming summary judgment because plaintiff "did not explain why the well-defined, discrete elements of the [hiring system] are 'not capable of separation for analysis'"); *Grant v. Metro. Gov't of Nashville & Davidson Cty.*, 446 F. App'x 737, 740-41 (6th Cir. 2011) ("A plaintiff may challenge the process as a whole only if he *first* demonstrates that its elements are incapable of separation."); *Bennett v. Nucor Corp.*, 656 F.3d 802, 817-18 (8th Cir. 2011) (rejecting plaintiff's argument that the elements of a promotion process were incapable of separation, where the company "used a variety of measures to evaluate candidates for promotion").

Although plaintiffs carry the burden of showing the challenged practices must be analyzed together, *see* 42 U.S.C. § 2000e-2(k)(1)(B)(i), plaintiffs have not proffered evidence to show that the separation of the two challenged employment practices is not feasible, *see Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 326 (D.D.C. 2018) (finding plaintiffs "failed to meet their burden to show that [defendant employer's] selection procedures are 'not capable of separation for analysis'" where testimony from statistical experts did not establish absence of adequate data to conduct separate analyses of different employment practices).

Moreover, although the District does not bear the burden, it has demonstrated that the decisions identified by plaintiffs *are* capable of separate analysis. More than half of the separated employees held SWA and SSA positions, and those positions were abolished to make room for the new "teaming" model implemented in Agency Programs. The record already includes much of the data the employees would have

needed to separately analyze the effect of this discrete decision. *See, e.g.*, Gerald Roque April 29, 2010 Memorandum, District Doc. Proc. at DAVIS-001020-DAVIS-001028, Ex. 3 (list of positions abolished in the RIF); Dexter Starks Decl. Ex. 2, Ex. 13 (spreadsheet listing the name, position, and race of CFSA's active employees before the RIF). Dr. Munro herself indicated that the elimination of the SSA and SWA positions could be assessed in a separate statistical analysis. *See* Dr. Munro Resp. at 14, Ex. 12 (observing that "57 terminated SSAs would be an adequate analysis to conduct").

## II. <u>Alternatively, Plaintiffs' Statistical Analysis of the RIF as a Whole Is Not Probative Because It Does Not Consider the Nondiscretionary Requirements Imposed by *LaShawn* and the RIF Regulations.</u>

Even if this Court could consider Dr. Munro's analysis of the RIF as a single employment practice, it should not find this evidence probative because she failed to consider two critically important limitations in CFSA's determination of which employees to separate. To have probative value, statistical analysis must "control for the constraints placed upon the decisionmaker's discretion." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006) (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 266-67 (4th Cir. 2005)). "This is necessary '[e]specially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests.'" *Tabor I*, 703 F.3d at 1224 (quoting *Watson*, 487 U.S. at 994). In *Carpenter*, a class of female employees offered evidence that they were "highly statistically significantly less likely" than similarly situated male employees to receive overtime assignments. 456 F.3d at 1195. The Tenth Circuit found this

insufficient to satisfy their *prima facie* burden, because their statistical model had not incorporated the collective bargaining agreement's non-discretionary eligibility requirements for overtime assignments, which required that assignments first be offered to the employees who worked in that particular shop. *Id.* at 1198. This failure, the court explained, could "skew the results." *Id.* "If, for example, overtime assignments were concentrated in a handful of shops and almost no women worked in those shops," the discrepancy "could simply be a reflection of the gender distribution among those eligible for overtime." *Id.*

The RIF challenged here also was affected by nondiscretionary factors that Dr. Munro failed to incorporate into her statistical model. The *LaShawn* compliance plan required CFSA to retain enough case-carrying social workers—those who investigated abuse or neglect, provided in-home and in-foster-care services, and conducted home studies—to keep their caseloads below a specified number. Ex. 3 at 8-9, 18, 21-23. CFSA was still struggling to comply with these caseload limits when it conducted the RIF. *See LaShawn* Dkt. No. 1086 at 90-91 (June 2009 report showing that, in most categories, four to nine percent of case-carrying social workers carried more than the permissible number). It therefore could not abolish any of its case-carrying social worker positions, which, along with their supervisors, made up more than 30 percent of its workforce. Dist. Doc. Prod. at DAVIS-003923 – DAVIS-003966, Ex. 4. Dr. Munro admitted that her analysis did not consider any of the Court-ordered *LaShawn* requirements—it assumed that all positions, including case-carrying social worker positions, were equally at risk of abolishment. Dr. Munro Dep. at 209:8-211:7,

218:14-15, Ex. 11. This failure could easily have skewed her results and makes her conclusions insufficient to satisfy plaintiffs' *prima facie* burden as a matter of law. *See Carpenter*, 456 F.3d at 1198.

Another nondiscretionary factor that may have affected the separated employees' racial composition is their retention standing relative to those who were retained. An employee occupying a position designated for abolishment is not automatically separated—rather, there is a strictly regulated process of lateral competition among employees in the same grade and classification series who perform similar duties. 6B DCMR §§ 2408-2421. Competing employees are separated in reverse order of retention standing, which is determined by "tenure of appointment, length of creditable service, veterans preference, residency preference, and relative work performance." 6B DCMR § 2408.1. Thus, while CFSA chose which positions to abolish, it did not necessarily know which employees would lose their jobs. Plaintiffs' statistical analysis therefore needed to consider whether, among competing employees, there was a racial disparity between those with higher retention standing and those with lower retention standing. A higher concentration of African Americans among the less-senior employees could lead to a higher percentage of African Americans among the separated employees, without raising any inference of a disparate impact based on race. *See Carpenter*, 456 F.3d at 1198. Dr. Munro's overly simplistic statistical model did not consider this possibility. Her results therefore have no probative value and cannot satisfy plaintiffs' *prima facie* burden.

An employment practice may not always lend itself to statistical analysis, either because of the number of factors involved or the size of the affected group of employees. *See Inclusive Cmtys.*, 135 S. Ct. at 2523-24 ("It may … be difficult to establish causation" where "multiple factors … go into [the challenged] decision[]."); *Connecticut v. Teal*, 457 U.S. 440, 463 n.7 (1982) ("[T]he probative value of statistical evidence varies with sample size in disparate-impact cases."). Sometimes it is impossible to show a causal connection between a policy and disparate impact because the "law substantially limits [the defendant's] discretion[.]" *See Inclusive Cmtys.*, 135 S. Ct. at 2524. These circumstances, however, do not excuse a disparate-impact plaintiff from satisfying a *prima facie* burden. If statistically significant evidence of disparate impact cannot be obtained, summary judgment is properly entered for the defendant. *See Koger*, 98 F.3d at 639.

Having failed to "produce statistical evidence demonstrating a causal connection" between the two challenged employment practices and race, plaintiffs "cannot make out a prima facie case of disparate impact." *See Inclusive Cmtys.*, 135 S. Ct. at 2523. As a result, the District is entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should grant the District's renewed motion for summary judgment.

Dated: November 18, 2019.        Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Michael A. Tilghman II
MICHAEL A. TILGHMAN II [988441]
MICAH BLUMING [1618961]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C.  20001
(202) 727-6247
(202) 741-8776 (fax)
michael.tilghman@dc.gov

*Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RONDA L. DAVIS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 10-01564 (RC) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Defendant the District of Columbia submits the following statement of undisputed material facts in support of its renewed motion for summary judgment.

1.     As of the beginning of 2010, the District of Columbia Child and Family Services Agency (CFSA) operated under the constraints of a remedial order entered in *LaShawn A. v. Bowser*, Civil Action No. 89-1754 (*LaShawn*), to address alleged deficiencies in the provision of child services by the Department of Human Services— the agency previously responsible for administering the District's child welfare system. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 87-88 (D.D.C. 2010).

2.     The Modified Final Order (MFO) entered in *LaShawn* imposed significant requirements on CFSA that only licensed social workers could fulfill. *See*

Report to the Subcommittee on the District of Columbia, Committee on Government Reform, House of Representatives at 10 (Dec. 2000), Ex. 2.[1]

3.      Under the 2010 compliance plan, those who investigated abuse or neglect could be assigned no more than 12 investigations at a time; those providing in-home or in-foster-care services could be assigned no more than 15 cases at a time; those who conducted home studies could be assigned no more than 30 cases at a time; and supervisors could be responsible for no more than six employees at a time. *See LaShawn* Amended Implementation Plan at 8-9, 18, 21-22, Ex. 3.

4.      In early 2010, these non-discretionary positions accounted for 30 percent of CFSA's workforce. CFSA Working Organizational Chart Dated Feb. 9, 2010, Dist. Doc. Prod. at DAVIS-003923 – DAVIS-003966, Ex. 4. (organizational chart showing, out of 892 positions, at least 222 case-carrying social workers and 50 social worker supervisors).

5.      The 2009 financial collapse forced the District to streamline agency operations and cut spending to balance its budget. *See* Former Mayor Adrian M. Fenty June 29, 2010 Letter to the President, Ex. 5.

6.      The District reduced CFSA's fiscal year 2010 budget by $25.3 million from fiscal year 2009. *See* Loren Ganoe June 3, 2011 Decl. (Ganoe Decl.) ¶¶ 4-5, Ex. 6.

---

[1]      Electronically available at https://www.gao.gov/new.items/d01191.pdf (last accessed Nov. 18, 2019).

7.    For fiscal year 2011, the final budget passed by the D.C. Council included a $12.1 million reduction to CFSA's budget from fiscal year 2010 and a reduction of full-time employees from 892 for fiscal year 2010 to 840 for fiscal year 2011. Ganoe Decl. ¶¶ 6, 8, Ex. 6.

8.    CFSA's budget shortfall required that CFSA consolidate operations through a RIF while continuing to meet its obligations under *LaShawn*. *See* Gerald Roque Apr. 29, 2010 Mem., Dist. Doc. Proc. at DAVIS-001020, Ex. 3; Raymond Davidson Jan. 7, 2014 Decl. (Davidson Decl.) ¶ 5, Ex. 7.

9.    "CFSA realign[ed] core functions to ensure that services to children and families [were] not negatively impacted and to ensure that best practice caseload standards [were] maintained." Ex. 1 at E-26.

10.    Those positions subject to *LaShawn* compliance, as well as other supervisory positions needed for CFSA to carry out its mission, were not subject to the implementation of a RIF. Debra Porchia-Usher Nov. 18, 2019 Decl. (Porchia-Usher Decl.) ¶ 10, Ex. 8.

11.    CFSA's leadership had to determine ways to increase efficiency and conduct a RIF that would not interfere with CFSA's mission or its legal obligations. Davidson Decl. ¶¶ 4-5, Ex. 7; Porchia-Usher Decl. ¶ 10, Ex. 8.

12.    CFSA's Agency Programs division converted its workforce to the "team model," which grouped social workers with a set of skilled partners to serve client needs together. Davidson Decl. ¶ 6, Ex. 7.

13.     This transition allowed the Agency Programs division to eliminate two positions no longer needed under the new model:  the SSA position, a social work support position held by 57 employees; and the SWA position, held by 13 employees. *Id.* ¶¶ 7-8.

14.     The Clinical Practice division implemented a new "Nurse Care Management" model, which allowed it to eliminate or reclassify eight full time positions. *See id.* ¶¶ 10-11.

15.     The Community Services division eliminated or reclassified 19 positions. *Id.* ¶ 12.

16.     CFSA also eliminated one of the two administrative review teams located in the Office of Planning, Policy and Program Support. *Id.* ¶ 15.

17.     Based on seniority and in accordance with District personnel regulations, CFSA "identified various non-direct and[] administrative service positions for elimination, including Clerical Assistants, Human Resource Support, Paralegal, Case Assessment Specialist, Payroll Specialist and Contract Compliance." *Id.* ¶¶ 16-17.

18.     In total, CFSA eliminated 115 full-time positions, effective June 11, 2010. Davidson Decl. ¶ 3, Ex. 7; Porchia-Usher Decl. ¶¶ 15, 16, Ex. 8.

19.     CFSA created a new position called a Family Support Worker (FSW)— that required a bachelor's degree—to be part of the team model in the Agency Programs division, and subsequently hired 38 individuals for that position, some of

whom had lost their positions during the RIF. Porchia-Usher Decl. ¶¶ 12, 14, Ex. 8;
Stan Spaght Dec. 17, 2010 Decl.¶ 6, Ex. 9.

20.    In this case, plaintiffs proffered an expert in industrial and
organizational psychology, Paige Munro, Ph.D., to support their claim that the RIF
had a statistically significant disparate impact on African Americans. Paige Munro,
Ph.D. July 28, 2012 Decl. (Dr. Munro Decl.) ¶ 1, Ex. 10.

21.    Dr. Munro "assumed all jobs were equ[ally] at risk for termination," and
created a statistical model with just two variables:  race and job retention status
(separated or not). *Id.* ¶¶ 5-6; Paige Munro, Ph.D. Dep. Tr. (Dr. Munro Dep.) at
218:14-15, Ex. 11.

22.    Dr. Munro compared the racial composition of the pre-RIF CFSA
workforce with the racial composition of the separated employees and concluded that
"the African American termination rate was 277% the rate of non-African Americans"
and "444% the rate of Caucasians." Paige Munro, Ph.D. Resp. (Dr. Munro Resp.) at
3, Ex. 12.

23.    Dr. Munro offered no analysis of the specific employment practices
alleged by plaintiffs to have been unlawful—*i.e.*, the targeting of SSAs and SWAs for
elimination and the decision to abolish other positions through new teaming models
and elimination of redundancies. *See generally* Exs. 10, 12.

24.    Dr. Munro explained that she "would always choose" her statistical
model based on an assumption that all positions were equally at risk of abolishment
"unless there was uncontroverted evidence that certain positions were in fact the only

positions at risk," and that she was "less than fully confident" that Mr. Davidson's[2] description of CFSA's decision-making process was true. Dr. Munro Resp. at 6, 12, Ex. 12.

25.    Dr. Munro's skepticism was largely based on "timing"—she found Mr. Davidson's January 2014 declaration "somewhat incredible" because it contained details not set forth in earlier-executed declarations of other CFSA officials, and because he signed his declaration only one day before the District's expert, Stephen G. Bronars, Ph.D., issued his report. *Id.* at 8-9; *see* Dr. Munro Dep. at 170:8-14 ("I found it inappropriate to base an entire statistical analysis on a … justification that was signed … a day before his report and that was never before explained in that level of detail."); 178:11-13 ("They should have figured all this stuff out ahead of time and it should have been in their explanation in 2010."), Ex. 11.

26.    Dr. Munro explained that she had rejected a "category-based analysis"— which would have considered different risks of abolishment in different divisions— because it would have led to sample sizes that were "too small to be meaningful" or so homogenous that the results were "irrelevant and un-interpretable." Dr. Munro Resp. at 6, 14, 15, Ex. 12; Dr. Munro Dep. at 215:2-18, Ex. 11.

---

[2]    Raymond Davidson served as CFSA's Chief Administrative Officer during the relevant time period. Davidson Decl. ¶ 2, Ex. 7. In that role he oversaw various divisions of CFSA, including the Human Resources Department, and was involved in CFSA's design and implementation of the RIF. *Id.* ¶¶ 2-3.

Dated:  November 18, 2019.        Respectfully submitted,


KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Michael A. Tilghman II
MICHAEL A. TILGHMAN II [988441]
MICAH BLUMING [1618961]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 727-6247
(202) 741-8776 (fax)
michael.tilghman@dc.gov

*Counsel for Defendant District of Columbia*

7