## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONDA L. DAVIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 10-01564 (RC) |

## DEFENDANT'S OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs' cross-motion for summary judgment [170] and memorandum in support (Pls.' Mem.) [170-1] fail to make out a *prima facie* case in support of plaintiffs' disparate impact claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII), and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01, *et seq.* for two reasons. First, plaintiffs fail to connect each of the two employment practices they challenge—(1) the elimination of the Social Worker Assistant (SWA) and Social Service Assistant (SSA) positions at the Child and Family Services Agency (CFSA) and (2) the selection of other positions for elimination during a 2010 Reduction in Force (RIF)—to a disparate racial impact, relying instead on irrelevant arguments about their expert's statistical methodology and a large sample size. Second, plaintiffs' proffered expert opinion does not provide probative statistical evidence of a disparate impact because it fails to account for legal limitations placed

on CFSA's decision of which employees to separate in the RIF. Summary judgment cannot be granted in plaintiffs' favor—and should be granted for the District of Columbia (the District)—given plaintiffs' failure to meet their initial burden to establish a *prima facie* case.

The Court need not address plaintiffs' premature argument on the District's business necessity justification defense because the issue is only pertinent if the case proceeds to a second phase, which the Parties have not entered.[1] Thus, the Court should grant the District's motion for summary judgment and deny plaintiffs' cross-motion for summary judgment.

## ARGUMENT[2]

### I. Plaintiffs Have Not Demonstrated that Either of the Two Specific Employment Practices They Identify Had a Disparate Impact on African Americans.

Plaintiffs claim the Court should find as a matter of law that they have established a *prima facie* case of disparate impact discrimination. According to plaintiffs, there is no genuine issue of fact that the RIF resulted in a statistically significant race-based disparate impact for three reasons: (1) the statistical methodology used by their expert, Paige Munro, Ph.D., supports a strong inference of discrimination; (2) the statistical disparity is too great to have occurred by chance;

---

[1]     As explained below, the D.C. Circuit held that the case could proceed on remand only if plaintiffs first establish a *prima facie* case in support of their sole remaining disparate impact claim. Circuit Op. at 21-22.

[2]     The District set forth the case background and legal standard in its motion for summary judgment [169] filed on November 18, 2019. The District incorporates those sections by reference in this opposition.

and (3) Dr. Munro relies on a large sample size to support her analysis. Pls.' Mem. at 13-24. Dr. Munro, however, fails to connect the particular employment practices plaintiffs challenge to a disparate impact, which requires the Court to deny plaintiffs' motion.

Under Title VII, disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *see also Moore v. Summers*, 113 F. Supp. 2d 5, 19 (D.D.C. 2000). That is, "plaintiffs alleging disparate impact … are alleging the employer's practices have had a 'systemic adverse effect' on members of the [alleged protected] class." *Aliotta v. Bair*, 614 F.3d 556, 565 (D.C. Cir. 2010). "[P]laintiffs bear the burden of persuasion as to the existence of a race-related disparity caused by an employment practice …." *Moore*, 113 F. Supp. 2d at 19 (internal quotation marks omitted) (quoting *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984)). Only if the plaintiff meets this initial burden does the defendant then bear the burden of persuasion to show business necessity justified the practice. *Id.*

A plaintiff establishes a *prima facie* violation through a two-step process. 42 U.S.C. § 2000e-2(k)(1). First, the plaintiff "begin[s] by identifying the specific employment practice that is challenged." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); 42 U.S.C. § 2000e-2(k)(1)(A). Second, the plaintiff "must offer statistical evidence" sufficient to show that the challenged practices caused the

termination of employees "because of their membership in a protected group." *See id.* In other words, a *prima facie* case will fail unless the plaintiff can proffer "statistical evidence from which a reasonable jury could determine that the [identified practice] <u>caused</u> the statistical disparity in question." *Latson v. Sessions*, 239 F. Supp. 3d 163, 177 (D.D.C. 2017) (emphasis in the original).

### A. <u>Plaintiffs Have Not Pointed to Any Statistical Evidence Connecting Either of Their Identified Employment Practices to a Disparate Racial Impact.</u>

As the District argued in its motion for summary judgment, *see* Def.'s Mem. [169] at 14, plaintiffs have not proffered any probative statistical evidence to establish a causal connection between either of the two particular employment practices they identify and the race of employees separated as a result of those practices. "A plaintiff who fails to … produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).

In particular, the Supreme Court has rejected "bottom line" reasoning, which fails to consider the various factors that could have caused a racial imbalance. *Id.* at 657. "This disdain for 'bottom line' reasoning reflects the belief that holding employers liable for statistical imbalances *per se* is inconsistent with Title VII's plain language and statutory purpose." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276 (11th Cir. 2000).[3]

---

[3]    For example, in *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006), Hispanic farmers challenged the administration of federally funded loans, offering statistical evidence that compared the percentage of loans approved for white farmers with

Showing that an employment practice causes a disparate impact requires evidence of "the baseline racial composition that the impact is 'disparate' from; that is, what should the racial composition of the job force look like absent the offending employment practice." *Crum v. Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999). This is why the first step of the plaintiff's *prima facie* case is so important—"[f]or … statistical evidence to be reliable, it … must 'isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Tabor v. Hilti, Inc. (Tabor I)*, 703 F.3d 1206, 1223 (10th Cir. 2013) (quoting *Watson*, 487 U.S. at 994). Only by isolating the challenged employment practice can a statistician "control[] for key factors outside the challenged practice that could potentially cause or contribute to the disparity." *Id.* "The data need not include 'all measurable variables' but must be sufficient to prove discrimination by 'a preponderance of the evidence.'" *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *see also Koger v. Reno*, 98 F.3d 631, 637 (D.C. Cir. 1996) ("Courts [do] not … require acceptance of regressions from which clearly major variables have been omitted ….").

As the Circuit observed, plaintiffs have identified two particular employment practices that affected which positions were abolished: "[CFSA's] choices to (a) target

---

those approved for Hispanic farmers. *Id.* at 634. The Court affirmed the district court's rejection of this "bottom line" analysis, explaining that the "statistical analyses were analytically flawed because they did not incorporate key relevant variables," such as "whether fewer Hispanic farmers were U.S. citizens, whether Hispanic farmers had worse credit and whether Hispanic farmers had less experience." *Id.* at 635.

the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units." Circuit Op. at 14. But their statistical evidence does not separately address the statistical impact of either employment practice. Instead, it rests on unreliable bottom-line reasoning. *See* Pls.' Mem. at 15 (stating that plaintiffs' expert, Paige Munro, Ph.D., provides the statistical proof for plaintiffs' claims and that she relied on two variables—(1) race of the entire work force and (2) whether or not the employee was separated through the RIF—to discern whether there was a racial disparity).

To meet their burden at this stage, plaintiffs must point to reliable statistical evidence in the record tying the particular practices they challenge to a racially disparate result. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989) ("[A] plaintiff must demonstrate that it is the application of a *specific or particular employment practice* that has created the disparate impact under attack.") (emphasis added). To do this, they must separately analyze each employment practice and show how each had a disparate impact on their protected class. *See id.* (disparate impact plaintiff's burden requires "specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for" affected group). As the Supreme Court has explained, any other rule "would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* (quoting *Watson*, 487 U.S. at 992).

6

Plaintiffs' failure to proffer statistical evidence for each challenged employment practice is fatal to their case. *See Latson*, 239 F. Supp. 3d at 178 (concluding that because "the plaintiff has submitted purported statistical evidence that the Court cannot identify and review, much less rely upon[,] … the plaintiff has failed to establish a prima facie case of disparate impact, and thus her claim must fail"); *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 314 (D.D.C. 2015) (Contreras, J.) (failure "to introduce statistical evidence demonstrating causation" in support of a disparate impact claim rendered the plaintiff unable "to meet her summary judgment burden").

It is true that when Congress codified the "particular employment practice" requirement, it provided one exception to the general rule that each challenged practice be tied to a racially disparate result:   "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). The burden is on plaintiffs to demonstrate that CFSA's decision to eliminate two entire job categories is incapable of being separately analyzed from CFSA's other decisions regarding which positions to abolish. *Id.*; *see also Tabor v. Hilti, Inc. (Tabor II)*, 577 F. App'x 870, 877 (10th Cir. 2014) ("[I]t was [the plaintiff's] burden to demonstrate that the [employee development process] and the [promotional] interview process are not capable of separation for analysis."); *Davis v. Cintas Corp.*, 717 F.3d 476, 497 (6th Cir. 2013) (affirming summary judgment because plaintiff "did not explain why the

well-defined, discrete elements of the [hiring system] are 'not capable of separation for analysis'"); *Grant v. Metro. Gov't of Nashville & Davidson Cty.*, 446 F. App'x 737, 740-41 (6th Cir. 2011) ("A plaintiff may challenge the process as a whole only if he *first* demonstrates that its elements are incapable of separation."); *Bennett v. Nucor Corp.*, 656 F.3d 802, 817-18 (8th Cir. 2011) (rejecting plaintiff's argument that the elements of a promotion process were incapable of separation, where the company "used a variety of measures to evaluate candidates for promotion").

Although plaintiffs carry the burden of showing the challenged practices must be analyzed together, *see* 42 U.S.C. § 2000e-2(k)(1)(B)(i), plaintiffs have not proffered evidence to show that the separation of the two challenged employment practices is not feasible. *See Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 326 (D.D.C. 2018) (finding plaintiffs "failed to meet their burden to show that [defendant employer's] selection procedures are 'not capable of separation for analysis'" where testimony from statistical experts did not establish absence of adequate data to conduct separate analyses of different employment practices).

Moreover, the evidence demonstrates that the employment practices plaintiffs challenge *are* capable of separate analysis. More than half of the separated employees held SWA and SSA positions, and those positions were abolished to make room for the new "teaming" model implemented in Agency Programs. Davidson Decl. ¶ 9, Def.'s MSJ Ex. 7 [169-7]; Porchia-Usher Decl. ¶¶ 11-15, Def.'s MSJ Ex. 8 [169-8].[4] The

---

[4]     CFSA was transitioning to the "teaming" model "as the major intervention methodology" approach in providing "the best services to children, youth and families." Porchia-Usher Decl. ¶ 11, Def.'s MSJ Ex. 8 [169-8]. "This meant that each

record already includes much of the data the employees would have needed to separately analyze the effect of this discrete decision. *See, e.g.*, Gerald Roque April 29, 2010 Memorandum, District Doc. Proc. at DAVIS-001020-DAVIS-001028, Def.'s MSJ Ex. 4 [169-4] (list of positions abolished in the RIF); Dexter Starks Decl., Def.'s MSJ Ex. 13 [169-13] (spreadsheet listing the name, position, and race of CFSA's active employees before the RIF). Dr. Munro herself indicated that the elimination of the SSA and SWA positions could be assessed in a separate statistical analysis. *See* Dr. Munro Resp. at 14, Def.'s MSJ Ex. 12 [169-12] (observing that "57 terminated SSAs would be an adequate analysis to conduct").

### B. Plaintiffs' Arguments About Dr. Munro's Statistical Methodology and Use of a Large Sample Size Are Irrelevant.

Rather than offering statistical evidence that separately analyzes the two employment practices the Circuit identified, plaintiffs focus on defending Dr. Munro's scientific methodology, arguing that her analysis "applies the standard chi-square methodology that is approved in the statistical field and by this court and other courts." *See* Pls.' Mem. at 14; *see also id.* at 15, 23, 24. Plaintiffs also claim that the analysis Dr. Munro proffered suffices because it bears three hallmarks "demonstrating strong statistical evidence," namely that "the statistical disparity is too great to have occurred by chance," that it "is based on a large sample size," and

---

child or family receiving services from CFSA would have an assigned team of workers available to manage each case and provide services." *Id.*

that it "meets the EEOC's 80% rule."[5] Pls.' Mem. at 16-17. But the scientific validity of Dr. Munro's methodology and her use of a large sample size is beside the point. The issue here is not whether her analysis had "a grounding in the methods and procedures of science," *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993), but whether it is probative of the question before this court: whether either of the two separate and distinct employment practices caused a disparate racial impact. *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009)) (the plaintiff's *prima facie* case requires the plaintiff "to identify the specific employment practice allegedly causing a disparate effect, *see* 42 U.S.C. § 2000e-2(k)(1)(B)(i), and to make 'a threshold showing of' a 'significant statistical disparity' caused by *that practice*[.]") (emphasis added).

Dr. Munro's reports and testimony do not separately address either of the challenged employment practices. In fact, she openly admitted that she had chosen not to separately analyze the new service models (including abolishment of "100%" of the SSA and SWA positions) because including them would have created sample sizes "too small to be meaningful or reliable statistically" or so homogenous that the results would be "irrelevant and un-interpretable." Dr. Munro Resp. at 12, 14, 15, Def.'s MSJ Ex. 12 [169-12]; Pls.' Opp'n to Def.'s First MSJ Ex. 13 at 44, 56, 60 [148-5]. It is

---

[5]     Plaintiffs also challenge the findings of the District's expert, Dr. Stephen Bronars, as relying on an improperly small sample size to determine whether the District's implementation of the RIF caused a racial disparate impact. Pls.' Mem. at 15-16. The District, however, does not rely on Dr. Bronars in support of its motion for summary judgment and need not propose a sample size to rebut plaintiffs' failure to establish their *prima facie* case.

possible, however, that Dr. Munro still could have obtained reliable results with advanced statistical modeling that allowed her to aggregate the too-small samples and use multiple regression to adjust for the different variables. *See Garcia*, 444 F.3d at 635 (noting that the Hispanic farmers could have incorporated the relevant variables with a "multiple regression" model—"a form of statistical analysis used increasingly in Title VII actions that measures the discrete influence independent variables have on a dependent variable").

And even if this was not possible—if incorporating the relevant variables would have led to inconclusive results—this cannot justify Dr. Munro's rejection of those variables from her study. Results from a statistical model based on a false premise lacks probative value regardless of whether the results from a properly structured model also would have lacked probative value. A plaintiff offers statistical analysis to demonstrate that the challenged employment practice "causes a disparate impact on the basis of race." 42 U.S.C. § 2000e-2(k)(1)(A)(i). That analysis therefore must "incorporate key relevant variables." *Garcia*, 444 F.3d at 635. Dr. Munro's desire to produce a statistically significant result therefore cannot justify her adoption of a statistical model that ignores the two separate and distinct employment practices that had a significant impact on which positions were abolished.

In fact, many of the cases on which plaintiffs rely actually support the District's position, confirming that a plaintiff can only satisfy her *prima facie* burden with statistical evidence showing that the *particular* employment practice had a disparate impact on a protected class. *See EEOC v. Joint Apprenticeship Comm. of the Joint*

*Indus. Bd. of the Electrical Indus.*, 164 F.3d 89 (2d Cir. 1998) (*prima facie* case established "by first pointing out the specific employment practice [plaintiff] is challenging and then demonstrating that the challenged employment practice caused a significant disparate impact on a protected group"); *Easterling v. State of Conn.*, 783 F. Supp. 2d 323, 332 (D. Conn. 2011) ("A plaintiff may not 'rely on bottom line numbers in an employer's workforce' to establish a prima facie case of disparate impact …. Instead, the plaintiff must produce statistical evidence showing that the identified employment practice 'causes a disparate impact.'"); *Progressive Officers Club, Inc. v. Metro. Dade Cnty.*, No. 86-1081-CIV-NESBITT, 1990 WL 270786, at *11-12 (S.D. Fla. Dec. 15, 1990) (*prima facie* case "requires 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group"); *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1146 (2d Cir. 1991) (plaintiffs alleging disparate impact from employment test must "establish a prima facie case of disparate impact by showing that use of the test causes the selection of applicants for promotion in a racial pattern that significantly differs from that of the pool of applicants"); *Johnson v. City of Memphis*, 355 F. Supp. 2d 911, 915 (W.D. Tenn. 2005) (to prove employment test had disparate impact, "the plaintiff must show that the tests in question select applicants for hire or promotion in a racial pattern"); *Arizona v. City of Cottonwood*, No. CV-11-1576-PHX-GMS, 2012 WL 2976162, at *5 (D. Ariz. Jul. 20, 2012) (Title VII plaintiff must show "that the [challenged] practice causes a disparate impact"). Indeed, if the statistical evidence

could rely on bottom-line analysis like that provided by Dr. Munro, there would be no reason for the first prong of the *prima facie* case: identifying the particular employment practice at issue. *See Watson*, 487 U.S. at 994; 42 U.S.C. § 2000e-2(k)(1)(A).

Tellingly, when boiling down their analysis, plaintiffs resort to arguing that "[t]he strength of [their] statistical evidence clearly shows that the racial disparity of the RIF is a result of discriminatory practices by the District rather than chance." Pls.' Mem. at 19; *see also id.* at 21. But that contravenes the Circuit's holding here, now law of the case, that "plaintiffs' claim is not that the RIF in the abstract was unlawful." Circuit Op. at 19. It is, moreover, precisely the "bottom line reasoning" the Supreme Court has forbidden. *Wards Cove*, 490 U.S. at 651. Plaintiffs have not pointed to any statistical analysis in the record connecting CFSA's choice to eliminate SWAs and SSAs, or the decision to leave it to managerial discretion to pick positions for elimination, to a disparate outcome. Mathematical soundness and large sample sizes are beside the point when starting from the wrong premises. Having failed to "produce statistical evidence demonstrating a causal connection" between the two challenged employment practices and race, plaintiffs "cannot make out a prima facie case of disparate impact." *See Inclusive Cmtys.*, 135 S. Ct. at 2523. As a result, plaintiffs fail to establish a *prima facie* case of discrimination.

C. **Alternatively, Dr. Munro's Analysis Is Unreliable Because of Qualitative, Non-Mathematical Assumptions That Fail to Consider Limitations on CFSA's Determination of Which Employees to Separate.**

In addition, "courts … [are not] obliged to assume that plaintiffs' statistical evidence is reliable." *Watson*, 487 U.S. at 996. Statistical conclusions based on flawed assumptions are simply not "probative of a prima facie case of disparate impact." *Wards Cove*, 490 U.S. at, 651. Thus, even if Dr. Munro's analysis was relevant to the *prima facie* showing plaintiffs must make, the Court should still find that it is not probative because Dr. Munro failed to consider two critically important limitations in CFSA's determination of which employees to separate.

First, the compliance plan mandated in *LaShawn A. v. Bowser*, Civil Action No. 89-1754 (*LaShawn*)[6] required CFSA to retain enough case-carrying social workers—those who investigated abuse or neglect, provided in-home and in-foster-care services, and conducted home studies—to keep their caseloads below a specified number. Def.'s MSJ Ex. 3 at 8-9, 18, 21-23 [169-3]. CFSA was still struggling to comply with these caseload limits when it conducted the RIF. *See LaShawn* Dkt. No. 1086 at 90-91 (June 2009 report showing that, in most categories, four to nine percent of case-carrying social workers carried more than the permissible number). CFSA

---

[6] The *LaShawn* plaintiffs originally sued former Mayor Marion Barry in his official capacity. Subsequent mayors, including Mayor Muriel Bowser, have been substituted as official capacity defendants while the case remains pending. The remedial order entered in the case addresses alleged deficiencies in the provision of child services by the Department of Human Services—the agency previously responsible for administering the District's child welfare system prior to the creation of CFSA. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 87-88 (D.D.C. 2010).

therefore could not abolish any of its case-carrying social worker positions, which, along with their supervisors, made up more than 30 percent of its workforce. Dist. Doc. Prod. at DAVIS-003923 – DAVIS-003966, Def.'s MSJ Ex. 4 [169-4]. Dr. Munro admitted that her analysis did not consider any of the Court-ordered *LaShawn* requirements—it assumed that all positions, including case-carrying social worker positions, were equally at risk of abolishment. Dr. Munro Dep. at 209:8-211:7, 218:14-15, Def.'s MSJ Ex. 11 [169-11]. This failure could easily have skewed her results and makes her conclusions insufficient to satisfy plaintiffs' *prima facie* burden as a matter of law. *See Carpenter v. Boeing*, 456 F.3d 1183, 1198 (10th Cir. 2006); *Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999) (the "plaintiffs must identify the correct population for analysis" which "in a reduction-in-force situation [only] consists of workers subject to termination"; in that context, "[t]he questions to be answered are thus what is the composition of the population subject to the reduction-in-force, what was the retention rate of the protected group compared to the retention rate of other employees, and how much of a differential in selection rates will be considered to constitute a disparate impact").

Second, Dr. Munro failed to consider the separated employees' retention standing relative to those who were retained. An employee occupying a position designated for abolishment is not automatically separated—rather, there is a strictly regulated process of lateral competition among employees in the same grade and classification series who perform similar duties. 6B DCMR §§ 2408-2421. Competing employees are separated in reverse order of retention standing, which is determined

15

by "tenure of appointment, length of creditable service, veterans preference, residency preference, and relative work performance." 6B DCMR § 2408.1. Thus, while CFSA chose which positions to abolish, it did not necessarily know which employees would lose their jobs. Plaintiffs' statistical analysis therefore needed to consider whether, among competing employees, there was a racial disparity between those with higher retention standing and those with lower retention standing. A higher concentration of African Americans among the less-senior employees could lead to a higher percentage of African Americans among the separated employees, without raising any inference of a disparate impact based on race. *See Carpenter*, 456 F.3d at 1198. Dr. Munro's overly simplistic statistical model did not consider this possibility.

To have probative value, statistical analysis must "control for the constraints placed upon the decisionmaker's discretion." *Carpenter*, 456 F.3d at 1196 (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 266-67 (4th Cir. 2005)). "This is necessary '[e]specially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests.'" *Tabor I*, 703 F.3d at 1224 (quoting *Watson*, 487 U.S. at 994). In *Carpenter*, a class of female employees offered evidence that they were "highly statistically significantly less likely" than similarly situated male employees to receive overtime assignments. 456 F.3d at 1195. The Tenth Circuit found this insufficient to satisfy their *prima facie* burden, because their statistical model had not incorporated the collective bargaining agreement's non-discretionary eligibility requirements for overtime assignments, which required

that assignments first be offered to the employees who worked in that particular shop. *Id.* at 1198. This failure, the court explained, could "skew the results." *Id.* "If, for example, overtime assignments were concentrated in a handful of shops and almost no women worked in those shops," the discrepancy "could simply be a reflection of the gender distribution among those eligible for overtime." *Id.*

The same problem plagues Dr. Munro's analysis here. True, an employment practice may not always lend itself to statistical analysis, either because of the number of factors involved or the size of the affected group of employees. *See Inclusive Cmtys.*, 135 S. Ct. at 2523-24 ("It may … be difficult to establish causation" where "multiple factors … go into [the challenged] decision[]."); *Connecticut v. Teal*, 457 U.S. 440, 463 n.7 (1982) ("[T]he probative value of statistical evidence varies with sample size in disparate-impact cases."). Sometimes it is impossible to show a causal connection between a policy and disparate impact because the "law substantially limits [the defendant's] discretion[.]" *See Inclusive Cmtys.*, 135 S. Ct. at 2524. These circumstances, however, do not excuse a disparate-impact plaintiff from satisfying a *prima facie* burden. If statistically significant evidence of disparate impact cannot be obtained, summary judgment is properly entered for the defendant. *See Koger*, 98 F.3d at 639.

Dr. Munro's analysis here started from a false fundamental assumption: that "all jobs were equ[ally] at risk for termination." Dr. Munro Dep. at 218:14-15, Def.'s MSJ Ex. 11 [169-11]; *see also* Pls.' Mem. at 14 (relying on "statistical proof presented in Dr. Munro's reports"), 16 (stating "the statistical disparity here is best measured—

as [p]laintiffs did—using the proper sample size of 832, which reflects the number of employees at the agency prior to the RIF"). That assumption rendered Dr. Munro's analysis devoid of any probative value. Having failed to "produce statistical evidence demonstrating a causal connection" between the two challenged employment practices and race, plaintiffs "cannot make out a prima facie case of disparate impact." *See Inclusive Cmtys.*, 135 S. Ct. at 2523. As a result, plaintiffs fail to establish entitlement to summary judgment on a *prima facie* case of discrimination.

II.    **The District Need Not Assert Its Business Necessity for the RIF During Phase I of this Case Because Phase I Only Covers Plaintiffs' *Prima Facie* Case.**

Plaintiffs' request for summary judgment on the District's business necessity justification for implementing the RIF, Pls.' Mem. at 26-37, is premature because it contravenes the Court's Scheduling Order [59], where the Court bi-furcated this case into two phases. Phase I only addresses whether plaintiffs can establish a *prima facie* case in support of their race-based disparate impact claims. *See id.*; Circuit Op. at 21 ("As the district court chose to manage it, this case remains at the first step: plaintiffs' *prima facie* case.").

As the Circuit explained, the District's business necessity justification defense should be considered only after the Court makes a determination of whether the plaintiffs clear the statistical hurdle of connecting the challenged employment practices to a disparate impact and the Parties have had an opportunity for appropriate discovery regarding the District's business necessity justification defense. *Id.* at 22. Accordingly, because plaintiffs have failed to establish their *prima*

*facie* case, the Court should grant the District's motion for summary judgment and deny plaintiffs' cross-motion for summary judgment.[7]

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for summary judgment.

Dated:  January 27, 2020.                     Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Michael A. Tilghman II
MICHAEL A. TILGHMAN II [988441]
MICAH BLUMING [1618961]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 727-6247
(202) 741-8776 (fax)
michael.tilghman@dc.gov

*Counsel for Defendant District of Columbia*

---

[7]      If the Court finds that plaintiffs have established a *prima facie case*, it should also find that plaintiffs have waived discovery on the District's business necessity justification defense—given their improper decision to brief the issue in Phase I—and allow the District to separately move for summary judgment on its defense.