UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONDA L. DAVIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 10-01564 (RC) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant the District of Columbia submits the following response to Plaintiffs' Statement of Undisputed Material Facts.

1. The mission of the District of Columbia Child and Family Services Agency (CFSA) is to ensure the safety, permanence, and well-being of abused and neglected children and to strengthen troubled families in the District. FY 2011 CFSA Proposed Budget and Financial Plan, Pl. 00089 – Pl. 00104, attached as Def. Ex. A, at 1 (Pl. 00089).

**RESPONSE:** Undisputed.

2. Prior to the RIF, the Agency's organizational chart reflects that CFSA was organized into approximately twelve (12) offices or divisions: Office of the Director, Fiscal Operations, General Counsel, Agency Programs, Community Services, Office for Planning Policy and Program Support, Clinical Practice, Chief Administrative Office, Revenue Operations, Office of Chief of Staff, Public Information, and Accountability. Pl. Ex. 1.

**RESPONSE:** Disputed. CFSA was comprised of six divisions: (1) Agency Programs; (2) Community Services; (3) Policy and Planning; (4) Clinical Practice; (5) Agency Management; and (6) Agency Financial Operations. *See* CFSA FY2011 Proposed Budget at E21–E23, Def.'s MSJ Ex. 1 [169-1].

3. The Office of Agency Programs is responsible for many of CFSA's "frontline functions," including investigating reports of child abuse and neglect, temporarily removing children from unsafe settings, and providing direct case management for families at home, as well as for children and youth in out-of-home care. Def. Ex. A, 5 (Pl. 000093); Decl. of Debra Porchia-Usher, ECF No. 25-2, attached as Ex. B, ¶¶ 3, 5-7.

**RESPONSE:** Undisputed.

4. Prior to the RIF, the Office of Agency Programs consisted of five (5) sections: Child Protective Services, In-home and Reunification I, In-home and Reunification II, Out of Home and Permanency, and Office of Youth Empowerment. Pl. Ex. 1.

**RESPONSE:** It is undisputed that the Office of Agency Programs consisted of five sections prior to the RIF. Plaintiffs, however, incorrectly state the section names. The correct names were: (1) The Child Protective Services Administration; (2) The In-Home and Permanency Administration I; (3) The In-Home and Permanency Administration II; (4) The Out-of-Home & Permanency Administration; and (5) Office of Youth Empowerment. *See* CFSA FY2011 Proposed Budget at E21–E23, Def.'s MSJ Ex. 1 [169-1]; Pls.' Ex. 1.

5. The Child Protective Services Section was divided into three (3) separate sections: CPS Division I, CPS Division II, and CPS Division III, each of which included a Social Work Manager (SWM), a number of Supervisory Social Workers (SSW), a number of Social Workers or Social Work Assistants (SWA), and a number of Social Service Assistants (SSA). *Id.*

**RESPONSE:** Disputed in part. The Child Protective Services (CPS) Administration was divided into three divisions: (1) CPS Division I; (2) CPS Division II; and (3) CPS Division III. Pls.' Ex. 1. The document upon which plaintiffs rely does not evidence that each CPS Division included a number of Social Work Assistants (SWAs).

6. A number of the services provided through Agency Programs—including the 24-hour hotline, investigations into reports of abuse and neglect, and case management services—are mandated by law or the consent order entered in *LaShawn v. Bowser*, 89-1754 (TFH). Def. Ex. B, ¶ 10 n. 1; *see generally LaShawn v. Bowser*, 89-1754, ECF No. 864 [order approving Amended Implementation Plan].

**RESPONSE:** Undisputed.

7. CFSA is required to maintain a balanced budget. Decl. of Loren Ganoe, ECF No. 25-4, attached as Def. Ex. D, ¶ 5.

**RESPONSE:** Undisputed.

8. In Fiscal Year 2010 (October 1, 2009 – September 30, 2010), CFSA's local funds' budget was reduced by $25.3 million from the FY 2009 budget. *Id.*; *see also* FY 2010 Proposed Budget and Financial Plan, Vol. 3 "Agency Budget Chapters – Part II," at E-17 (Sept. 28, 2009) *available at* http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_3_agency_chapters_part_ii_web_0.pdf (FY 2010 Budget) (last visited November 11, 2015).

**RESPONSE:** Undisputed.

9. The FY 2010 budget reduced the total number of approved full-time employees (FTEs) from 940 in FY 2009 to 892 in FY 2010. FY 2010 Budget at E-17.

**RESPONSE:** Undisputed.

10. CFSA implemented various budgetary cuts to meet the new budget allocations, including personnel reductions in CFSA's information technology unit and public information office. Def. Ex. D, ¶ 5.

**RESPONSE:** Undisputed.

11. The D.C. Council passed a budget for FY 2011 that further reduced CFSA's local funds' budget by $12.1 million and reduced the number of approved FTEs from 892 to 840. *Id.* at ¶¶ 6-8.

**RESPONSE:** Undisputed.

12. CFSA was required to implement these budget and personnel cuts prior to October 1, 2010, when the FY 2011 went into effect. *Id.* at ¶ 9.

**RESPONSE:** Undisputed.

13. To achieve the reductions in personnel costs required by the FY 2011 Budget, CFSA implemented a reduction in force and realignment (RIF) with an effective termination date of June 11, 2010. *Id.*

**RESPONSE:** Undisputed.

14. CFSA eliminated a total of 123 positions in the RIF. Administrative Order No. CFSA2010-01, DC-001020 – DC-001028, attached at Def. Ex. F.

**RESPONSE:** Undisputed.

15. A total of 115 employees were separated from CFSA effective June 11, 2010. Def. Ex B, ¶ 15; CFSA Projected RIF June 2010, Pl. 000112 – Pl. 000117, attached as Def. Ex. G.

**RESPONSE:** Undisputed.

16. In a memorandum dated April 29, 2010, to City Administrator Neil Albert, CFSA Director Roque Gerald ("Gerald") requested "approval to conduct a Reduction-in-Force (RIF) to abolish one hundred and twenty-three (123) positions within the Child and Family Services Agency." Def. Ex. E, Attachment A, *Memorandum from Roque Gerald to Neil Albert*, P. 1.

**RESPONSE:** This is undisputed but immaterial. The Director had authority to authorize the RIF. *See D.C. Child & Family Servs. Agency v. District of Columbia Office of Emple. Appeals*, Case No. 2014 CA 001857 P(MPA), 2016 D.C. Super. LEXIS 20, at *6-7 (D.C. Super. Ct. Apr. 22, 2016).

17. As justification for the RIF, Gerald stated: "The Child and Family Services Agency must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering. The deficit resulting from the realignment will precipitate a reduction in force." *Id.*

**RESPONSE:** Undisputed.

18. Nothing in the April 29 memorandum indicated that the RIF targeted particular positions. The memorandum provided an "agency-wide" list of positions to be eliminated or consolidated purportedly due to FY'11 budget cuts, which supposedly affected virtually every office in the agency. *Id.* at 2.

**RESPONSE:** Disputed. The document upon which plaintiffs rely lists

positions proposed to be encompassed in a RIF and states before the term "agency wide" the following: "[i]n accordance with section 2409 of Chapter 24 of the regulations, the lesser competitive areas, listed below have been established for the Reduction-In-Force subject to this Administrative Order." Def.'s Ex. E, Attachment A [146-3] at DAVIS-001021.

19. Specifically, Gerald sought to abolish twenty-one (21) positions in the Office of the Deputy Director for Community Programs, nine (9) positions in the Office of the Deputy Director for Clinical Practices, two (2) positions in the Office of the Deputy Director for Revenue Operations, twelve (12) positions in the Office of the Deputy Director for Planning, Policy, and Program Support, seventy (70) positions in the Office of the Deputy Director for Agency Programs, one (1) position in the Office of General Counsel, one (1) position in the Fiscal Operations Administration, and two (2) positions in the Office of the Chief of Staff in CFSA. *Id.* at 4–8.

**RESPONSE:** This is disputed to the extent plaintiffs miscount the number of positions included in Attachment A to former Director Roque Gerald's Memorandum.

20. In an administrative challenge to the RIF brought by plaintiff Ernest Hunter, the District of Columbia Office of Employee Appeals (OEA), an administrative adjudicative body with jurisdiction over RIF planning and implementation, held that "there is no [] evidence [] to show that the RIF was properly authorized." Pl. Ex. 15. OEA ordered the RIF invalid and CFSA to "reimburse [Hunter] all back-pay and benefits lost as a result of the RIF action." *Id.*

**RESPONSE:** This is undisputed but immaterial. The Director had authority to authorize the RIF. *See D.C. Child & Family Servs. Agency v. District of Columbia Office of Emple. Appeals*, Case No. 2014 CA 001857 P(MPA), 2016 D.C. Super. LEXIS 20, at *6-7 (D.C. Super. Ct. Apr. 22, 2016) (a proceeding in which Ernest Hunter participated as an intervenor).

21. The CFSA Deputy Director stated that, in implementing the RIF, the CFSA "reviewed its programs" and "determined which functions would have the

least negative impact" on the Agency. Def. Ex. B. ¶ 10.

**RESPONSE:** Undisputed.

22. Of the 115 employees who received RIF notices, 16 held SWA positions, 57 held SSA positions, and 105 held non-managerial positions. Def. Ex. B, ¶¶14, 15.

**RESPONSE:** This is disputed, in part, but immaterial. The citation plaintiffs reference does not support the assertion that 105 individuals held non-managerial positions.

23. Of the fifty-seven SSAs, fifty-six (98%) were African-American. Pl. Ex. 3, ¶ 13.

**RESPONSE:** This is disputed but immaterial. The citation plaintiffs reference does not support the assertion.

24. Of the thirteen SWAs, eleven were African-American and two identified as "other than black." *Id.* ¶ 16.

**RESPONSE:** This is disputed but immaterial. The citation plaintiffs reference does not support the assertion.

25. According to the 2010 Declaration of Stan Spaght, CFSA's Human Resources Manager for Compensation/Benefits, prior to the RIF, the Agency consisted of a total workforce of 832, including employees from the Office of Financial Operations Divisions. Pl. Ex. 10.

**RESPONSE:** Undisputed.

26. Subsequently, in 2013, Defendant submitted a separate Declaration from Dexter Starkes, CFSA Director of Human Resources, stating inexplicably that 30 employees in CFSA Office of Fiscal Operations Administration should not have been included in the head count of the Agency because at the time of the RIF they reported to the Office of the Chief Financial Officer and, as such were "not technically CFSA employees." Defs.' Ex. C, ¶ 7.

**RESPONSE:** This is disputed as to the use of the word "inexplicably." The document upon which plaintiffs rely does not support that assertion.

27. Plaintiff's expert, Dr. Munro, based her initial July 2012 report on data that Defendant provided in the Declaration of Stan Spaght, that prior to the RIF, CFSA had a total workforce of 832. Def. Ex. I.

**RESPONSE:** Undisputed.

28. According to EEOC Regulations Four-Fifths Rule, for purposes of Title VII disparate impact analysis, a statistically significant disparity is one in which the minority termination rate is greater than 125% of the majority termination rate. Plaintiffs' expert analysis showed that African-Americans were terminated in the RIF at a rate either 277% or 444% greater than that of non-African Americans. In other words, the RIF violated the 4/5ths rule for African American employees. *Id.*

**RESPONSE:** Disputed. The first sentence is not a statement of material fact but rather a legal conclusion. Further, Dr. Munro compared the racial composition of the pre-RIF CFSA workforce with the racial composition of the separated employees and concluded that "the African American termination rate was 277% the rate of non-African Americans" and "444% the rate of Caucasians." Paige Munro, Ph.D. Resp. at 3, Def.'s MSJ Ex. 12 [169-12]. Dr. Munro offered no analysis of the specific employment practices alleged by plaintiffs to have been unlawful—*i.e.*, the targeting of SSAs and SWAs for elimination and the decision to abolish other positions through new teaming models and elimination of redundancies. *See generally* Def.'s MSJ Exs. 10, 12 [169-10, 169-12].

29. Dr. Munro used three different statistical methods to calculate disparate impact: ANOVA, Chi-Squared, and the 80-percent Rule. All three tests consistently found that there exists a statistically significant disparate impact with respect to race. *Id.*

**RESPONSE:** Disputed. Dr. Munro offered no analysis of the specific employment practices alleged by plaintiffs to have been unlawful—*i.e.*, the targeting of SSAs and SWAs for elimination and the decision to abolish other positions through

new teaming models and elimination of redundancies. *See generally* Def.'s MSJ Exs. 10, 12[169-10, 169-12].

30. According to the SSA job description in the appendix of the declaration of Debra Porchia-Usher, the major duties fulfilled by SSAs were to: (1) conduct unaccompanied home visits, for reasons of safety, or to assist in locating the assessment site, (2) provide transportation for clients, (3) support social workers in implementing service plans by supervising/facilitating visits, making referrals, or scheduling service [*sic*] with providers, (4) supervises visits with children, and their family members, (5) documenting information into the case record. Def. Ex. B. This job description demonstrates that SSAs had significant contact with children and their families through multiple visits at home and elsewhere, and were given a substantial amount of responsibility in conducting home visits, determining the safety and well-being of the children and making referrals where necessary, and documenting the case for CFSA's records.

**RESPONSE:** Disputed. SSAs' duties were more limited than those intended for the Family Support Worker (FSW) position. CFSA intended to use FSW workers to have a more expanded role than SSAs in casework, including "interviewing family members, children, and caretakers, assessing the safety of a home and the well-being of children; … documenting information into the case record; [and] coordinating with other team members for meetings …." Porchia-Usher Decl. ¶ 12 and Exs. A, B, Def.'s MSJ Ex. 8 [169-8]. And, in December 2010, the court in *LaShawn* adopted an Implementation and Exit Plan that permitted FSWs to conduct certain visitations that count toward the CFSA's exit standard in *LaShawn*. *LaShawn v. Fenty*, Civil Action No. 89-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b. Prior to the creation of the FSW position, only Social Workers were permitted to conduct such visits. *See id.* at ECF No. 864, Amended Implementation Plan (Feb. 2007) §§ 4-6.

31. Plaintiff Darius Moore, one of the most experienced terminated SSAs,

testified in his deposition that SSAs routinely made home visits and assessments. However, CFSA did not formally count and enter these visits and assessments in the FACES database. Pl. Ex. 11, 21–6.

**RESPONSE:** This is immaterial and disputed to the extent plaintiffs assert that Mr. Morris was "one of the most experienced terminated SSAs" and "routinely made home visits and assessments." The document upon which plaintiffs rely does not support that assertion.

32. CFSA created a new position of Family Support Worker (FSW) and required a bachelor's degree for the position, even for re-hired employees terminated through the RIF. Def. Ex. B, ¶ 12.

**RESPONSE:** Undisputed.

33. The external job listing CFSA posted for the FSW position noted that the FSW would, inter alia, "perform[] casework group work and community organization work," "enter[] observational information into FACES as appropriate," and "assist[] Social Workers" in various tasks. Def. Ex. B.

**RESPONSE:** Undisputed.

34. The job responsibilities of the FSWs listed by the court do not conflict with the job responsibilities listed in the appendix of Ms. Usher's declaration. *LaShawn v. Fenty*, No. 89 cv-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b.

**RESPONSE:** This is disputed but immaterial. The Implementation and Exit Plan entered in *LaShawn* does not identify all job responsibilities of FSWs.

35. Following the RIF, at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a CFSA contractor that provides services for emancipated youths in the District. Pl. Ex. 14. In other words, CFSA contracted FSW functions to an outside vendor, which itself hired Alston to do the very work that Alston had been doing prior to the RIF, but now that CFSA claimed she needed a Bachelor's Degree to perform.

**RESPONSE:** This is disputed and immaterial to the extent plaintiffs assert that "CFSA contracted FSW functions to an outside vendor, which itself hired Altson

to do the very work that Alston had been doing prior to the RIF, but now that CFSA claimed she needed a Bachelor's Degree to perform." The document upon which plaintiffs rely does not support that assertion.

36. CFSA's own supervisors have conceded similarities between the SSA and FSW positions. One instance was illustrated in an email dated May 26, 2010, between Jenna Beebe to CFSA Program Administrator Jesse Winston and Theresa Cunningham. Ms. Beebe stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion SSAs were prior to the RIF" based on the roles and responsibilities of the FSW position as defined by CFSA management. Pl. Ex. 6.

**RESPONSE:** Disputed. Plaintiffs incorrectly claim that plaintiffs' Exhibit 6 (attached to their opposition to the District's first motion for summary judgment) supports their view that "*supervisors* have conceded the similarities between the SSA and FSW positions …." Pls.' Mem. at 29 (emphasis added). In that exhibit, one CFSA employee stated that "one of the other supervisory interviewers mentioned to me that they felt that the FSW would be used in the exact fashion SSA's were prior to the RIF." Pls' Ex. 6. However, in the very next line, the CFSA employee states that "FSW's will have much *higher requirements* and acquired skills" and questioned whether the referenced "supervisor was not aware as to how the new position would be ut[i]lized …." *Id.* (emphasis added).

37. Chapter 24 of the District of Columbia Personnel Regulations describes the Reduction in Force Protocol, including the Agency Reemployment Priority Program, which define the way in which terminated employees should be evaluated for reemployment following a Reduction in Force. The regulations authorize agencies, including CFSA to establish and maintain a Reemployment Priority List through a specific protocol. Under the Program, employees are placed into (a) Group I, whose names remain on the list for two years and (b) Group II, whose names remain on the list for one year following termination. An employee's name shall be entered on the priority list for all positions for which they are qualified: (a) at his or her grade level at time of separation and (b) at any lower grade acceptable to the employee. An employee's name may also be deleted from the Reemployment Priority

List. When a qualified person on the priority list is available, a position shall not be filled by a new appointment, a transfer, or someone not on the priority list. Priority for selecting from the list is based on relative standing in competitive level and tenure. 6 DCMR B2427.

**RESPONSE:** Disputed. This is not a material statement of fact but instead a statement of law.

38. CFSA used the following formula, weighing six factors to determine the reemployment of former SSAs: worker experience (25%), flexibility/adaptation (10%), communication (10%), conflict resolution (10%), critical thinking (20%), and their most recent performance rating (25%). Def. Ex. E, ¶ 21. Individuals were then recommended for hire to an FSW position based on their composite score. Overall, anyone who scored 70% or higher was offered a position. *Id* at ¶ 22. Thus, there is no evidence in the record to show that CFSA followed the protocol for a Reemployment Priority Program nor is there anything in the record to show that a Reemployment Priority Program existed.

**RESPONSE:** This is disputed but immaterial. *See* Circuit Op. at 19 ("what plaintiffs challenge here[] is not the Agency's decision to reduce its workforce, but the process the Agency used to select positions for the chopping block.").

39. Plaintiff Darius Morris challenged both the RIF and his non-selection for the FSW position in his EEOC complaint. *See* Def. Ex. P at 1.

**RESPONSE:** Undisputed.

Dated: January 27, 2020.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Michael A. Tilghman II
MICHAEL A. TILGHMAN II [988441]
MICAH BLUMING [1618961]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 727-6247
(202) 741-8776 (fax)
michael.tilghman@dc.gov

*Counsel for Defendant District of Columbia*