# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONDA L. DAVIS, *et al.*, )<br><br>Plaintiffs, )<br><br><br>v. )<br><br>DISTRICT OF COLUMBIA, *et. al.*, )<br><br>Defendants. ) | Civil Action No. 10-1564 (RC) |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Aderson Francois (D.C. Bar No. 798544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave., NW, Suite 352
Washington, D.C. 20001

Phone: (202) 661-6721
Email: aderson.francois@georgetown.edu

Donald M. Temple, Esq.
1101 15th Street NW, Suite 203 Washington, D.C. 20005 Phone: (202) 628-1101
Email: dtemplelaw@gmail.com

January 27, 2020            Attorneys for the Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

GLOSSARY ....................................................................................................................iv

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...............................................................................................3

PROCEDURAL HISTORY .............................................................................................6

LEGAL STANDARDS.....................................................................................................8

ARGUMENT ...................................................................................................................9

   I.   THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
   COLUMBIA CIRCUIT HAS ALREADY DECIDED THE ISSUES DEFENDANTS
   RAISE IN THEIR MOTION FOR SUMMARY JUDGMENT..........................................9

   II.    EVEN IF THE COURT WERE TO ACCEPT DEFENDANTS' CONTENTION
   THAT THIS ISSUE HAS NOT YET BEEN DECIDED, DEFENDANTS HAVE FAILED
   TO DEMONSTRATE THAT THEY ARE ENTITLED TO SUMMARY JUDGMENT.10
     A.   The Process by Which Defendants Implemented the RIF is Incapable of Being
     Separated for Analysis. ................................................................................................10
       1.   Defendants Have Cited No Case Law That Supports Finding That This Process
       is Capable of Separation .............................................................................................11

   III.    PLAINTIFFS' STATISTICAL ANALYSIS OF THE RIF ESTABLISHES A
   *PRIMA FACIE* CASE OF DISCRIMINATION AGAINST AFRICAN AMERICAN
   EMPLOYEES. .................................................................................................................16
     A.   The Challenged Employment Practice, as the Court of Appeals Has Defined It,
     Requires Statistical Analysis That Considers the Rate at Which African American
     Employees Were Terminated Across the Agency as a Whole. .......................................17
     B.   Defendants' Analysis Finding It Did Not Cause a Discriminatory Impact Uses a
     Flawed Statistical Model and Relies on Self-Serving Assumptions Which the Court of
     Appeals Has Already Held Are Not Relevant at this Stage. ...........................................18
     C.   The Districts' Only Defense Against the Discriminatory Impact of the RIF
     Depends on Improper Consideration of Discretionary Factors That Do Not Undermine
     Plaintiffs' Statistical Showing........................................................................................21

CONCLUSION ................................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................8, 9

*Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248 (4th Cir. 2005)...........................21

*Bennett v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011)....................................................12

*Campbell v. Nat'l Railroad Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C. 2018)....................13

*Carpenter v. Boeing Co.,* 456 F.3d 1183 (10th Cir. 2006)................................................21, 22, 23

*Celotex Corp v. Catrett*, 477 U.S. 317 (1966)...........................................................8, 9

*Chin v. Port Auth. Of N.Y. & N.J.*, 685 F.3d 135 (2d Cir. 2012) .........................................14, 15

*Cook v. Billington*, 1992 WL 276936, at *4 (D.D.C. Aug. 14, 1992)..........................................14

*Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013) ....................................................11

*Davis v. District of Columbia*, 246 F. Supp. 3d (D.D.C. 2017) .............................................7

*Davis v. District of Columbia*, 925 F.3d 1240 (D.C. Cir. 2019). ...........................................passim

*Davis v. District of Columbia*, No. 10-1564 (D.D.C. Apr. 4, 2013) ..........................................16

*Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019).....................................................20

*Grant v. Metro Gov't of Nashville and Davidson County*, 646 Fed. Appx. 737, 740 (6th Cir. 2011)

.................................................................................................................12

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).........................................................20

*Holcomb v. Powell*, 433 F. 3d 889 (D.C. Cir. 2006) .....................................................8

*LaShawn A. v. Fenty*, 701 F. Supp. 2d 84 (D.D.C. 2010) ................................................21

*McClain v. Lufkin Industs., Inc.*, 519 F.3d 264 (5th Cir. 2008) ....................................15

*McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1 (D.D.C. 2004).................14, 15

*Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115 (D.D.C. 2011).....................................11

*Renati v. Wal-Mart Stores*, No. 19-02525, 2019 WL 5536206 (N.D.Ca. 2019) ........................ 15

*Schollenberger v. Planes Moving Storage,* 297 Fed. App'x 483 (6th Cir. 2008) ....................... 21

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ............................................................................ 7

*Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259 (N.D.Ca. 1992) ................................................ 15

*Tabor v. Hilti*, 577 Fed. Appx. 870 (10th Cir. 2014) .................................................................. 12

*Tabor v. Hilti, Inc*, 703 F.3d. 1206 (10th Cir. 2013) .................................................................. 18

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989) ........................................... 16, 25

*Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 (1988) ....................................... 9, 14, 16, 18

**Statutes**

Title VII, 42 U.S.C. §2000e-2(k)(1)(A)(i) ................................................................................... 7

**Rules**

D.C. Cir. R. 35(e) ..................................................................................................................... 10

Fed. R. Civ. P. 56(c) ................................................................................................................... 8

**Regulations**

6B DCMR § 2408.1 ................................................................................................................... 24

# GLOSSARY

**CFSA** Child and Family Services Agency

**RIF** Reduction in Force

**SSA** Social Service Assistant

**SWA** Social Work Associate

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| RONDA L. DAVIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 10-1564 (RC) |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff submits this memorandum in opposition to Defendants' motion for summary judgment.

This case was remanded from the United States Court of Appeals for the District of Columbia Circuit to determine whether Plaintiffs' statistical evidence sufficiently establishes a *prima facie* case of racial discrimination, caused by the Defendant Agency's implementation of a Reduction in Force (RIF) in 2010. The Circuit Court reversed the grant of summary judgment to the Defendant, holding that the Plaintiffs had properly alleged a "specific employment practice," and that if they could show through probative evidence that this practice caused a disparate impact affecting the Agency's African American employees, their *prima facie* burden would be satisfied. Plaintiffs' evidence is mathematically sound and highly probative of a disparate impact resulting from the process by which Defendant conducted the RIF. As such, Plaintiffs have successfully shown a *prima facie* case of a disparate impact, and the burden is now on Defendants to justify this discrimination based on business necessity, after appropriate discovery.

1

Defendants' claim that they are entitled to summary judgment relies on arguments that directly contradict the binding holding of the Circuit Court. Firstly, they attempt to relitigate the question of the specific employment practice being challenged despite the Circuit Court's clear resolution of this issue, in order to undermine the probative value of the Plaintiffs' statistical analysis. Ignoring the fact that the Circuit Court explicitly rejected their attempt to analyze the implementation of the RIF as multiple separate employment practices, Defendants' now insist that Plaintiffs' evidence is inaccurate for using the agency-wide analysis of the RIF the Circuit Court endorsed. Their argument illogically dwells on the Plaintiffs' refusal to conceptualize the RIF implementation in the manner most favorable to Defendants, and criticizes Plaintiffs for not incorporating into their analysis the Agency's business justifications for implementing the RIF, a question for which there has been no discovery and which is not at issue at this stage. Their statistical analysis relies on this rejected premise as well, yet Defendants argue that this evidence is sufficient to absolve them, and that Plaintiffs were obligated to demonstrate the multiple practices they describe were incapable of separation for analysis. In fact, Plaintiffs were entitled to analyze the RIF implementation in the manner approved by the Circuit Court, but even if this were not the case, are able to show that the RIF was conducted through a holistic decisionmaking process which cannot be separately analyzed.

Secondly, Defendants' seek to undermine Plaintiffs' highly probative analysis by blaming the disparate impact caused by the RIF on their compliance with applicable regulations. Specifically, Defendants argue that a recent court order, requiring the agency to keep the caseloads of social workers below a certain level, created such burdening obligations on the agency that they were unable to implement the RIF in a non-discriminatory manner. This raises troubling questions about the state of the caseloads assigned to CFSA's social workers, but

regardless, is conclusively disputed by Defendant's own evidence of the changes it made to respond to this order. Additionally, Defendant claims it cannot be blamed for the disproportionate number of terminated African American employees due to municipal laws regulating the manner in which it chooses employees for termination, a claim that requires ignoring all of Defendants' earlier attempts to show that the analysis should revolve around the separate manner in which it decided to implement the RIF between distinct job categories. As Defendants have failed to cast doubt on the Plaintiffs' statistical showing, there are no grounds for granting them summary judgment.

## STATEMENT OF FACTS

In the opening brief for Plaintiffs' motion for summary judgment, Plaintiffs established the following undisputed facts:

- CFSA is an agency within the District of Columbia that is primarily responsible for investigating reports of known or suspected child abuse and neglect, and ensuring that children in the District have safe homes. About CFSA, DC.gov, http://cfsa.dc.gov/page/about-cfsa (last visited Jan. 22, 2020).

- On April 29, 2010, the CFSA Director Roque Gerald ("Gerald") requested approval to conduct a "Reduction-in-Force (RIF) to abolish one hundred and twenty-three (123) positions" within the Agency. (Def. Ex. E, Attach. 1, Mem. From Roque Gerald to Neil Albert, 1).[1] The basis for the RIF was to ensure the Agency operates within the constraints imposed by the FY' 2011 budget. Id.

[1] Parties have previously briefed a Motion for Summary Judgment by Defendants in 2015 (See Dkts. 146, Dkt 148, and Dkt. 154). Accompanying that briefing was a set of exhibits submitted to the record in support of the parties' respective briefs. In their opening brief, Defendants have submitted a set of exhibits numbered differently from the previously filed set of exhibits. For

- The memorandum did not indicate that the RIF was only targeting particular positions within the agency. In fact, the memorandum clearly stated that an "agency-wide" list of positions were to be eliminated or consolidated due to the budget cuts, affecting virtually every department in the agency. *Id*. at 2.

- Prior to the RIF challenged here, the Agency consisted of a total workforce of 832 employees. (Pl. Ex. 10).

- As part of the RIF to comply with the FY' 2011 budget,  the Agency abolished two support positions: the Social Work Assistant (SWA) and the Social Service Assistance (SSA) positions. *Davis v. District of Columbia*, 925 F.3d 1240, 1244 (D.C. Cir. 2019).

- As part of the RIF, 115 Agency employees were separated from the Agency. (Pl. Ex. 2). The employees were informed that their removal in no way "reflects adversely on [their] performance of [their] official duties." *Id*.

Although Plaintiffs do not propose to repeat facts already catalogued in the opening brief, given Defendants' argument in support of their motion for summary judgment, it bears emphasizing the following key facts. The Agency had described this RIF as a "realignment to consolidate functions" among the various departments of CFSA, and this shift to a team-based model required the wholesale elimination of the SWA and SSA positions. Among the 115 employees that were removed from the Agency as a result of the RIF, 13 held the SWA position and 57 held the SSA position. (Pl. Ex. 3 ¶13). Of the fifty-seven removed SSAs, fifty-six (98%) were African-Americans. *Id*. Of the thirteen SWAs, eleven were African-American (85%). *Id*. ¶16.

---

consistency purposes, the citations in the present Memorandum of Law in Opposition of Defendants' Motion for Summary Judgment refer back to the exhibits in the prior motion.

The report by Plaintiffs' expert Dr. Paige Munro, dated July 8, 2012, found that of the 115 workers terminated in the RIF, 93% were African-American. (Pl. Ex. 10). Prior to the RIF, African-Americans comprised of 82.8% of the total workforce. *Id*. Using the data provided by the CFSA's Human Resources Manager for Compensation/Benefits, Dr. Munro found that the termination rate for African-Americans was 15.5%, whereas the termination rate for non-African-Americans was only 5.6%. *Id*.; *see Davis*, 925 F.3d at 1247. The EEOC guidance on disparate impact analysis finds a statistically significant disparity to be one in which the minority termination rate is greater than 125% of the majority termination rate.[2] In the present case, the effective termination rate for African Americans is 444% greater than the effective termination rate for Caucasians. *Davis*, 925 F.3d at 1247. This data is taken from the population of the entire Agency workforce prior to the implementation of the RIF, since Defendants have described this process as an "agency-wide" reduction in force. *Id*.

Defendants' expert report, which was written almost 2 years after Plaintiffs' report, found opposite statistical conclusions. Defendants' expert, Dr. Stephen Bronars began with the factual assumption that not all employees throughout the Agency faced the same risk of layoff due to the RIF, despite the clear language in the Agency Director's own memorandum, which stated that this RIF was an "agency-wide" action. (Def. Ex. J.; Def. Ex. E, Attach. 1, Mem. From Roque Gerald to Neil Albert, 1). What that means is that Dr. Bronars characterized the agency-wide RIF as 7 separate layoff decisions in 7 divisions. (Def. Ex. J, ¶21). He conducted a two-standard deviation analysis, and would only find evidence of discrimination if the difference between the actual outcomes of the RIF is so much greater than what is the expected outcomes of a random process, in order to be statistically significant. (Def. Ex. J, ¶19). As such, his analysis claimed

---

[2] Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11998 (Mar. 2, 1979).

that even in a randomized layoff process that could have occurred in those 7 separate termination

actions, 105.21 African American employees would have been terminated anyway. However, Dr.

Bronars' choice to view the RIF as 7 separate actions rather than a single agency-wide process is

not backed by any factual evidence in the record beyond the self-serving declaration of Raymond

Davidson, CFSA's Chief Administrative Officer at the time of the RIF, signed the day before

Defendants' expert report was published. (Def. Ex. K. at 6). Dr. Bronars also excluded from his

analysis the wholesale elimination of the SSA and SWA positions, or any job categories

occupied exclusively by African-American employees, because such cuts did not involve the

"excess termination" of African-American employees. *Davis*, 925 F.3d at 1246 (quoting Def.'s

Ex. J, Table 2A).

## **PROCEDURAL HISTORY**

This case was initially filed as a class action on behalf of forty-seven former Agency

employees who had lost their jobs through the RIF. Plaintiffs allege race and age discrimination

in how the RIF was conducted, as well as the imposition of a new higher education degree

requirement for a position created as part of the RIF, that performed essentially the same

function as certain job categories that were eliminated through the RIF (that did not have the

same degree requirement). *Davis*, 925 F.3d at 1244. A more detailed account of the procedural

history can be found in the Plaintiffs' motion for summary judgment, as well as the Circuit

Court's decision.

Given that the Defendants' main argument seems to rest entirely on asking this Court to

revisit a question that the Circuit Court has already ruled on, this much should be made clear:

When the United States Court of Appeals for the District of Columbia Circuit reversed the

district court's decision to grant summary judgment with respect to Plaintiffs' disparate impact

claim in regards to the RIF, the court found that Plaintiffs' have identified a "particular employment practice" susceptible to challenge for adverse racial impact under Title VII, 42 U.S.C. §2000e-2(k)(1)(A)(i). This directly rejected the district court's ruling - and Defendant's contention here - that Plaintiffs did not identify a "specific test, requirement, or practice" to establish a *prima facie* case for disparate impact based on the RIF. *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 395 (D.D.C. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Following the Circuit Court's remand on this disparate impact issue, both Plaintiffs and Defendants cross moved for summary judgment on November 18, 2019.

The district court had previously bifurcated discovery and pretrial motions, limiting the first stage to finding "statistical validity of group-based disparities" of the practices challenged on disparate impact grounds. *Davis*, 925 F.3d 1246. As such, the issue focused on at this stage of the litigation is whether or not Plaintiffs have established their *prima facie* burden of establishing an employment practice that led to this disparate impact. Evidence of any presumed operational justification or business necessity for the Agency's actions is irrelevant until the burden has shifted. As the Circuit Court made clear, it believed that the District Court erred in finding that Plaintiffs did not identify an employment practice – in fact the Circuit Court pointed out that the Plaintiffs' exact challenge is to "the process the Agency used to select positions for the chopping block." *Id*. at 1252, 1259. The court reaffirmed that such processes are indeed vulnerable to challenge under disparate impact doctrine. The Circuit Court did not express an opinion on the sufficiency of Plaintiffs' statistical evidence to make out their *prima facie* case, as the district court did not address this issue. However, the Circuit Court did frown upon Dr. Bronars' choice to exclude from analysis employee termination from job categories that are exclusively African-American, finding that "targeting" demographically disproportionate department for layoffs,

which would increase the likelihood of selecting an individual in a protected class, is the exact type of practice that disparate impact theory of discrimination exists to scrutinize. *Davis*, 925 F. 3d at 1256.

In their motion for summary judgment filed on November 18, 2019, Defendants again attempted to argue that Plaintiffs failed to allege an employment practice that is responsible for the disparate impact. However, this is the very issue that the Circuit Court has spoken conclusively on, holding that Plaintiffs have appropriately challenged the Agency's process of cutting and culling job categories for elimination as suspect. *Id.* at 1262.

## LEGAL STANDARDS

Summary judgment is appropriate if the movant can demonstrate that there is "no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Holcomb v. Powell*, 433 F. 3d 889, 895 (D.C. Cir. 2006). An issue is considered genuine if "the evidence such that a reasonable jury could return a verdict for the nonmoving party." *Holcomb*, 433 F.3d at 895 (citing *Anderson*, 477 U.S. at 248). To meet its burden on a summary judgment motion, the movant must have fully established that the nonmoving party have "failed to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1966). In order to survive a motion for summary judgment after the movant met its Rule 56(c) burden, the non-moving party need only offer more than the "mere existence of a scintilla of evidence" in support of their motion. *Anderson*, 477 U.S. at 252. In addition, the non-moving party will need to provide "specific facts showing that there is a genuine issue for trial." *Id.* at 256. The moving party will only be entitled to summary judgment when, drawing all inference in favor of the non-moving party, a

reasonable jury could not return a verdict in favor of the non-moving party. *Celotex Corp*, 477

U.S. at 326-327; *Anderson*, 477 U.S. at 251.

## ARGUMENT

I. **THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT HAS ALREADY DECIDED THE ISSUES DEFENDANTS RAISE IN THEIR MOTION FOR SUMMARY JUDGMENT.**

To the extent that the District disputes whether Plaintiffs have established an employment

practice that can be challenged under the disparate impact theory of Title VII, the United States

Court of Appeals for the District of Columbia has already decided this issue. The Circuit Court

held that plaintiffs had "leveled their disparate impact challenge against the particular target of

the Agency's process for cutting and culling job categories" and explicitly reversed the District

Court's decision to the contrary. *Davis v. District of Columbia*, 925 F.3d 1240, 1254 (D.C. Cir.

2019). The Circuit Court went on to reject any question that there was more than one practice for

analysis. Specifically, the court cited to Defendant's own explanation of the process for culling

jobs, finding that it fit *Watson*'s description of "an employer's undisciplined system of subjective

decisionmaking." *Id*. at 1250 (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 990

(1988)). In fact, the court reasoned that this practice of "'targeting' demographically

disproportionate departments for layoffs . . . *is what plaintiffs here identify*, and is the kind of

practice the disparate impact theory of discrimination exists to scrutinize." *Id*. at 1250–51

(emphasis added). The court expressly addressed the dissent's argument regarding the

importance of framing the "specific employment practice," but it concluded that framing the

disparate-impact question as a challenge to the processes by which a RIF is implemented—as

Plaintiffs have here—"does not render irrelevant the agency-wide statistics." *Id*. at 1253. Notably,

the court said that "agency-wide statistics speak to the threshold issue the district court raised,"

that is, whether in implementing the RIF, "the identified mechanisms by which defendants did so had a statistically significant racial impact." *Id*.

Defendants now want to ignore the Circuit Court's ruling, claiming that there are two discrete practices for which plaintiffs must demonstrate a disparate impact. However, the D.C. Circuit already rejected this argument when it denied Defendants' petition for rehearing on August 14, 2019. Specifically, Defendants argued that the panel was incorrect in "identif[ying] two discrete standards used by the Agency to determine which positions to abolish" and "remand[ing] the case for the district court to determine whether the employees' statistical evidence—which does not separately analyze those standards—satisfied their *prima facie* burden." (Def.'s Pet. for Reh'g 2). Under the D.C. Circuit Rules, a response to a petition for en banc consideration is only filed where the court orders such response. D.C. Cir. R. 35(e). In this case, the court never ordered Plaintiffs to file a response to Defendants' petition. Instead, the D.C. Circuit rejected Defendants' request and thus its challenge to the ruling therein. Defendants cannot now raise this argument again in the District Court in an attempt to ignore the Circuit Court ruling.

**II.      EVEN IF THE COURT WERE TO ACCEPT DEFENDANTS' CONTENTION THAT THIS ISSUE HAS NOT YET BEEN DECIDED, DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THEY ARE ENTITLED TO SUMMARY JUDGMENT.**

**A. The Process by Which Defendants Implemented the RIF is Incapable of Being Separated for Analysis.**

Even if the decision of the Circuit Court had not already preempted this issue, Defendants have not established that they are entitled to summary judgment. The target of Plaintiffs disparate impact challenge here—as the Circuit Court recognized—is the process by which CFSA implemented the RIF and is incapable of separation for analysis. *See Davis*, 925 F.3d at

1254. To reiterate, the challenged layoff practices that the Circuit Court recognized was the Agency's decision a) to target the SWA and SSA job categories for elimination; and b) to allow managers to make "putatively individualized, discretionary and subjective choices" of which positions to eliminate from other units. *Id.* This Court has explained that Title VII "authorizes employees to demonstrate causation by showing the discriminatory effect of an overall hiring process, rather than the discriminatory effects of specific, isolated practices playing a role in a process, when the effects of those isolated practices cannot be analytically separated." *Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115 (D.D.C. 2011). Here the Defendants have not presented any evidence that the implementation of the RIF is capable of separation for analysis, and that the process is so full of subjectivity and inconsistency that it is incapable of separation for analysis.

> **1. Defendants Have Cited No Case Law That Supports Finding That This Process is Capable of Separation**

As an initial matter, with one exception, Defendants rely on non-controlling cases outside of this Circuit.  But more to the point, all of the cases Defendants cites in arguing that Plaintiffs have not established that the process of implementing the RIF is incapable of separation for analysis identify discrete steps or elements of an overall process that has separately recognizable effects. These cases are distinguishable from the issue here. In *Davis v. Cintas Corp.*, the Sixth Circuit held that by not challenging the individual effects of the "well-defined, discrete steps" of a hiring process, the plaintiff did not properly identify an employment practice that have created the disparate impact.  717 F.3d 476, 497 (6th Cir. 2013). In *Grant v. Metro Gov't of Nashville and Davidson County*, the Sixth Circuit similarly found that although plaintiffs had recognized distinct elements of the overall process, they made no effort to examine the individual effects of the isolated practices, and never attempted to establish that the process was incapable of

separation for analysis. 446 Fed. Appx. 737, 740 (6th Cir. 2011). The Tenth Circuit in *Tabor v. Hilti*, in reviewing the district court's decision for clear error, held that the lower court did not abuse its discretion when it found that an interview process was separate from a development and coaching process, and when the plaintiff did not argue that the processes were incapable of separation. 577 Fed. Appx. 870, 876 (10th Cir. 2014). In *Bennett v. Nucor Corp.*, the Eighth Circuit found that a promotion process was capable of separation when it included "objective criteria like experience, training, disciplinary history, and test scores, and subjective criteria such as interview performance and the opinion of the candidate's current supervisor." 656 F.3d 802, 817 (8th Cir. 2011).

In all of these cases, the courts identified discrete steps with objective criteria that has individual and identifiable effects on the employment practice. In some of these cases, the court struck down plaintiffs' challenges when they themselves had failed to argue that the processes were incapable of separation for analysis. *See Grant,* 646 Fed. Appx. at 740 (holding that plaintiffs never attempted to demonstrate that individual elements of the process are incapable of separation for analysis); *Tabor*, 577 Fed. Appx. at 878 (finding that plaintiff did not indicate to the district court that she was attempting to make the required showing of "analytical inseparability"). By contrast, it has been Plaintiffs position throughout the entire case that the Defendants' entire process is incapable of separation for analysis. Plaintiffs have not claimed - and this court has never found - that there were discrete, identifiable steps to CFSA's overall process that has distinguishable isolated effects.

The only case in the D.C. Circuit that Defendants identified in support of their argument is *Campbell*, where this court analyzed whether Amtrak's process for hiring and promoting was capable of separation. *Campbell v. Nat'l Railroad Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C.

2018). This court noted that plaintiffs themselves had acknowledged that Amtrak's selection process was comprised of five distinct steps and that Amtrak had maintained "job files" with detailed information and documents "spanning the various stages of the employment selection process for each individual." *Id*. at 325. Although plaintiffs argued that the files were unreliable because they were inconsistent and varied, the court concluded that plaintiffs had not established that the files contained insufficient information upon which to evaluate the separate stages. *Id*. at 326. Thus, the court determined that such documentation could allow for evaluation of the effect of each stage within the process. *Id*. Unlike in *Campbell*, Plaintiffs here have never conceded that Defendants' process consisted of distinct steps that are capable of separation for analysis. Even if—as Defendants suggest—the choices to target two job categories for elimination were separate from the managers' "putatively individualized, discretionary and subjective" decisions, these choices were a part of the overall "undisciplined system of subjective decisionmaking." As the Circuit Court emphasized, it is the processes the Defendants' used to select positions to eliminate that is being challenged here. *Davis*, 925 F.3d at 1259. This means that the decision to abolish the SSA and SWA job categories, as well as other "individualized, discretionary and subjective" choices made by individual managers are all subject to review here. Because this case remains at the *prima facie case*, any operational justification that Defendants' rely on must be excluded from the analysis. *Id* at 1261. When not taking into account the different reasons Defendants had for targeting SSA and SWA job categories for elimination, these two actions function as one inseparable and discretionary decisionmaking process, where the individual effects of each action cannot be identified or quantified in any meaningful way for statistical analysis.

What is relevant in the present case is that this Court has found decisionmaking processes incapable of separation for analysis where a process is pervaded with subjectivity and inconsistency. In *McReynolds*, plaintiffs brought a disparate impact claim supported, in part, by the fact that decision-makers had unfettered discretion that were not informed by job-related or objective criteria, and were not required to document the reasons for their decisions, thereby rendering them unreviewable. *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 6 (D.D.C. 2004). In fact, decisionmakers had absolute discretion on whom to interview and what questions to ask during the hiring process. *Id.* at 20. As such, the court concluded that plaintiffs had presented sufficient evidence to support their claim that the elements of defendant's decisionmaking process were not capable of separation for analysis. *Id.* at 29. *See also Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 988-89 (1988) (defining subjective decisionmaking as employment decisions that are "based on the exercise of personal judgment or the application of inherently subjective criteria"); *Cook v. Billington*, 1992 WL 276936, at *4 (D.D.C. Aug. 14, 1992) (finding that plaintiffs challenged specific employment practice in employer's "excessive use of subjective decision-making in the establishment and measurement of the criteria used to evaluate candidates for promotion"). Like in *McReynolds*, Defendants here did not rely on uniform criteria nor did they communicate such criteria to decisionmakers. In fact, the Agency relied on individual managers to make discretionary and subjective choices on whom to remove within their own units. *Davis*, 925 F.3d, 1254. There is no question that such individualized choices are indicative of a system of subjectivity and inconsistency.

Other circuits have taken a similar approach to the analysis of subjective decisionmaking processes, finding them incapable of separation for analysis. *See, e.g.*, *Chin v. Port Auth. Of N.Y. & N.J.*, 685 F.3d 135, 154-55 (2d Cir. 2012) (finding process incapable of separation where the

weight of commanding officers' recommendations were not consistently applied and played an indeterminate role in overall decisionmaking); *McClain v. Lufkin Industs., Inc.*, 519 F.3d 264, 278 (5th Cir. 2008) (recognizing plaintiffs challenged a practice of "subjective and discretionary application of the seniority provisions" when decisionmakers ignored objective criteria of employment practice); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 335 (N.D.Ca. 1992) (acknowledging that plaintiffs do not need to pinpoint particular aspects of an employment practice as unfavorable to a protected group if the entire process is pervaded by a lack of uniform criteria, criteria that are subjective as well as variable, discretionary placements and promotions, the failure to follow set procedures, and the absence of written policies or justifications for promotional decisions.) *cited in McReynolds*, 349 F. Supp. 2d at 29; *Renati v. Wal-Mart Stores*, No. 19-02525, 2019 WL 5536206, at *7 (N.D.Ca. 2019) (noting that elements of "subjective and ambiguous" decisionmaking processes are by definition difficult to define and variable and therefore incapable of separation).

In this case the Defendants did not set out objective criteria when making decisions about which job categories to eliminate. CFSA further did not follow its own internal policies nor did it follow municipal regulations for carrying out a RIF. In fact, the District of Columbia Office of Employee Appeals (OEA) held that the RIF was invalid and found no evidence that the RIF was properly authorized. (Pl. Ex. 15). This deviation from stated policies is akin to the "discretionary application" of objective criteria that was disfavored in the Fifth Circuit. *McClain*, 519 F.3d at 278. Finally, there is no evidence that decision-makers were required to document or justify their decisions. Instead, much like the practice rejected in *Chin*, the weight of managers' evaluations of employees is indefinite and the criteria used is unclear, making these decisions inextricable and individually unreviewable. *Chin*, 685 F.3d at 155. Thus, the overall process by which

Defendants implemented the RIF is so subjective as to be incapable of separation for analysis. As the Circuit Court has already confirmed, the issue this court must now address is whether Plaintiffs have presented sufficient statistical evidence on the disparate impact of this overall process.

### III.     PLAINTIFFS' STATISTICAL ANALYSIS OF THE RIF ESTABLISHES A *PRIMA FACIE* CASE OF DISCRIMINATION AGAINST AFRICAN AMERICAN EMPLOYEES.

Plaintiffs' finding of a statistically significant disparate impact establishes a *prima facie* case of racial discrimination resulting from the process the Agency designed to implement the RIF. A plaintiff successfully establishes a *prima facie* showing of discrimination by disparate impact first by "identifying the specific employment practice that is challenged." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988). Next, the plaintiff must prove causation, by "[offering] statistical evidence of a kind and degree sufficient to show that the practice in question has caused [the adverse outcome] because of their membership in a protected group." *Id*. Once the plaintiff has alleged a *prima facie* case of discrimination, the burden shifts to the respondent to show that the disparate outcome was justified by considerations of business necessity, *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 658 (1989), – however, this element of the claim has been bifurcated from the one at issue in this proceeding. *See* Scheduling Order, *Davis v. District of Columbia*, No. 10-1564 (D.D.C. Apr. 4, 2013). At this stage, Plaintiffs have satisfied their burden by presenting probative statistical evidence of discrimination caused by the specific challenged employment practice. The competing analysis presented by Defendants uses a flawed statistical model and does not undermine the probative value of Plaintiffs' showing.

### A. The Challenged Employment Practice, as the Circuit Court Has Defined It, Requires Statistical Analysis That Considers the Rate at Which African American Employees Were Terminated Across the Agency as a Whole.

The first requirement of the Plaintiffs' prima facie burden has already been satisfied by the Circuit Court's earlier holding, identifying the employment practice susceptible to challenge as "the means by which the Agency implemented" the RIF, and specifically, "the process the Agency used to select positions for the chopping block." *Davis v. District of Columbia*, 925 F.3d 1240, 1243, 1252 (D.C. Cir. 2019).  Following from its identification of the challenged employment practice, the Circuit Court left for this Court only the question of whether Plaintiffs' statistical evidence is probative in showing the disproportionate adverse effect of that decisionmaking on CFSA's African-American employees. *Id.* at 1254. At this stage, Plaintiffs must simply present statistically valid evidence showing that "the practices of the Agency in selecting for elimination jobs and job categories" in executing the RIF disproportionately impacted African-American employees. *Id.* at 1243.

The Circuit Court noted that the "Agency described itself as conducting an 'agency-wide' reduction in force." *Id.*, at 1246 (quoting Def's Answer to Third Am. Compl. ¶ 3). Therefore, it was not only proper, but necessary for Dr. Munro's statistical analysis to measure the rate of termination of African American employees throughout the entire agency – showing the cumulative effect of the different employment decisions by which the RIF was implemented. The range of actions which must be reflected in the statistical inquiry is the entire re-organization scheme the Agency employed in order to bring CFSA within FY2011's reduced budget allotment, including each decision as to which job categories and specific positions to eliminate or reduce in size. *Davis*, 925 F. 3d at 1252. Despite the District's attempt to frame Plaintiffs' statistical analysis as inappropriately combining the effect of two separate employment actions,

("(a)[targeting] the SWA and SSA job categories for elimination; and (b)[allowing] managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units," (Def's Mem. Supp. Renewed Mot. Summ. J. 16 ) (quoting *Davis*, 925 F. 3d at 1250)), Dr. Munro's finding of a higher termination rate of African American employees agency-wide is highly probative. The aim underlying the RIF's implementation was to reduce the whole Agency's total operating cost, so the impact caused by "the specific processes the Agency used in order to cut positions to meet its budget shortfall" must be considered holistically and relative to each other. *Davis*, 925 F. 3d at 1252. Contrary to Defendants' assertion, the probative value of Dr. Munro's analysis is not undermined by her decision not to calculate racial impact distinctly within each position targeted for layoffs. Instead, her evidence strengthens Plaintiffs' *prima facie* showing, because it reflects the fact that the specific employment practice which the Court of Appeals approved for challenge includes the Agency's decisions concerning which overall job categories to target in addition to the individual employees selected for termination.

**B. Defendants' Analysis Finding It Did Not Cause a Discriminatory Impact Uses a Flawed Statistical Model and Relies on Self-Serving Assumptions Which the Circuit Court Has Already Held Are Not Relevant at this Stage.**

By distinguishing between each job category targeted for layoffs and calculating racial impact only within them, the District's statistical evidence misrepresents the scope of the challenged employment action and obscures any discriminatory effect of the categorizations themselves, therefore defeating the purpose of the inquiry. The District argues that the racial impact of the RIF's implementation must be calculated separately for each affected position, in order to "control for key factors outside the challenged practice that could potentially cause or contribute to the disparity." *Tabor v. Hilti, Inc*, 703 F.3d. 1206, 1223 (10th Cir. 2013) (quoting *Watson*, 487 U.S. at 994).

18

Specifically, the District's expert, Dr. Bronars, points to the fact that not all jobs within the Agency were equally at risk for termination or downsizing as an intervening causal consideration that undermines the probative value of Plaintiffs' agency-wide finding of adverse racial impact. (Def's Mem. Supp. Renewed Mot. Summ. J. 15). The District argues that because the Agency targeted job categories for layoffs based on "financial concerns, the reorganization concerns, the realignment of goals, [and] different kinds of service models," there can be no probative inference of adverse racial impact from statistical analysis of the RIF's implementation that fails to distinguish between affected positions. *Id.* Dr. Bronars, on behalf of the District, not only calculated the racial proportions of terminated employees only within each affected job category relative to itself, he excluded from his analysis both the "wholesale elimination of the SSA and SWA positions" and "any layoffs from job categories occupied exclusively by African American employees," on the grounds that "there could be no 'excess' termination of African Americans from those categories." *Davis*, 925 F. 3d at 1246 (quoting Def.'s Ex. J, Table 2). Unsurprisingly, this analysis of the RIF's implementation found no statistically significant adverse racial impact.

The Circuit Court has explicitly condemned this analysis as relying on disputed assumptions that are not at issue in this stage of the proceedings, which is concerned only with establishing the "existence and statistical validity of group-based disparities caused by" the process of implementing the RIF. *Davis*, 925 F. 3d at 1245. It held that the District's analysis, premised on the influence of non-discriminatory causal factors on the racial makeup of the terminated employees, "presumed operational justification for (and therefore excluded from analysis) the Agency's selection of certain offices for downsizing and its wholesale elimination of the SSA and SWA jobs." *Id.* at 1253. It noted that the Agency even conceded that this

argument "'put the cart before the horse' by assuming the very facts that a successful statistical showing by plaintiffs would next require the Agency to show: that the reason the Agency targeted certain positions for elimination was justified by business necessity." *Id*. (quoting Oral Arg. 36:54-37:29). Whether these justifications are valid or not is a legal question properly addressed only "after appropriate discovery," not a matter of statistical validity or causal relationship of the disproportionate racial impact shown by Plaintiffs. *Davis*, 925 F. 3d at 1254.

Furthermore, Dr. Bronars, by excluding from his statistical calculation certain positions with no "excess" termination of African-American employees, defined relative to themselves, effectively excludes from analysis the factor which is the very essence of the claim: the disproportionate impact of the whole decision making process on African-American employees. A threshold assumption underlying any Title VII disparate impact claim is that the employee "need not demonstrate illicit motive" to raise an inference of discrimination, as the outcome of the challenged employment demonstrably "falls more harshly on one group than another and cannot be justified by business necessity." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971); *see, e.g.*, *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019). The District's analysis perverts this theory by intentionally excluding from their calculation any layoffs from positions that had 100% risk of termination (SSA and SWA positions) and those from positions wherein all the employees were African American. (Def.'s Ex. J, Table 2). The fact that including these terminations in their calculations would skew the analysis towards showing a more starkly disproportionate impact on African Americans is not a coincidence or statistical illusion; it is an example of the core purpose of the disparate impact theory of discrimination. By excluding these positions from its analysis, which it concedes constitute over half of the employees terminated by the RIF (Def's Mem. Supp. Renewed Mot. Summ. J. 17-18), the District asks the Court to

assume a lack of discrimination in defining the targeted categories themselves, and narrow the challenged employment practice in defiance of the Circuit Court's holding, which includes such categorical decisions as part and parcel of the challenged specific employment practice. *Davis*, 925 F. 3d at 1243. Instead of controlling for intervening variables *other than race* which might otherwise undermine inference of causality, Dr. Bronars' statistical model effectively controls for race itself, excluding the very factor the analysis is supposed to uncover. This analysis is explicitly at odds with the Court of Appeals' binding conception of the challenged employment practice in this case: "when an employer cuts back on its workforce by 'targeting' demographically disproportionate departments for layoffs"… "[this] is the kind of practice the disparate impact theory of discrimination exists to scrutinize." *Id.* at 1250 (quoting *Schollenberger v. Planes Moving Storage,* 297 Fed. App'x 483, 486 (6th Cir. 2008)).

### C. The Districts' Only Defense Against the Discriminatory Impact of the RIF Depends on Improper Consideration of Discretionary Factors That Do Not Undermine Plaintiffs' Statistical Showing.

Defendants fail to detract from the probative value of Plaintiffs' showing of discrimination by alleging their implementation of the RIF was constrained by their obligation to comply with the *LaShawn* court order and municipal retention status regulations. *LaShawn A. v. Fenty*, 701 F. Supp. 2d 84 (D.D.C. 2010). Neither of these constitute "constraints placed upon the decisionmaker's discretion" for which Plaintiffs' statistical analysis must control in order to fairly isolate the cause of the disparity. *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1196 (10th Cir. 2006)(citing *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 266-67 (4th Cir. 2005)). Both the *LaShawn* order and the retention status regulations depend on the Agency's prior exercise of discretion to have any concrete meaning at all, and did not limit the Agency's range of available options in implementing the RIF.

The District relies solely on *Carpenter v. Boeing Co.,* an out-of-circuit case, to argue that Plaintiffs' failure to consider their compliance obligations in the statistical analysis detracts from the probative value of its showing of causation, but the more accurate effect of this comparison is to illustrate the degree to which Defendants' discretion was not meaningfully limited, and especially not by any objective, mandatory criteria. *Carpenter*, 456 F.3d at 1183.

In *Carpenter*, a class of women brought suit against their employer alleging that its salary-setting practices and overtime assignments discriminated against women by disproportionately disadvantaging female employees. To show disparate impact, the plaintiffs provided statistical evidence that used a regression analysis showing that women were highly statistically less likely to receive overtime assignments and be paid overtime wages. *Id*. at 1195. The Tenth Circuit held that plaintiffs did not meet their *prima facie* case because their statistical evidence failed to factor in the employees' collective bargaining agreement, which required that employees' job and grade be considered when giving overtime assignments. *Id*. at 1196. The court reasoned that without taking into account the requirements of this mandatory, specifically bargained-for agreement, plaintiffs' analysis failed to use the proper population pool and variables, and their statistical analysis was thus not probative. *Id.* at 1204.

The facts of *Carpenter* are unlike those in the present case and do not support an inference that something other than Defendants' discretionary decisionmaking process played a significant causal role in the statistical disparity. In *Carpenter*, the constraints placed on the decisionmakers were objective, concrete, and binding criteria that actually limited the decisionmakers' range of options separately from any exercise of their judgment. The collective bargaining agreement in *Carpenter* sets forth a number of easily-quantifiable criteria, including "whether women worked on the 'machine' or were in the 'crew,' 'position,' or 'shop' to which

the overtime was assigned," which the employer was required to consider in assigning overtime. The Tenth Circuit rejected plaintiffs' statistical data, on the grounds that  plaintiffs "acknowledge[d] that variables such as crew, position, and shop are relevant to qualification for overtime," but failed to include all such relevant variables in their analysis, thereby inaccurately attributing causation of the disparity to the employer. *Id.* at 1199.

Contrast these concrete criteria, which were binding at the outset of the challenged employment practice, with the constraints placed upon the Agency decisionmakers in the present case by compliance with the *LaShawn* order. The requirements of the *LaShawn* order were non-objective, non-concrete criteria that left the Agency completely unconstrained in its choices for complying. As Defendant describes in their motion, the *LaShawn* compliance plan merely "required CFSA to retain enough case-carrying social workers—those who investigated abuse or neglect, provided in-home and in-foster-care services, and conducted home studies—to keep their caseloads below a specified number." (Def.'s Mem. Supp. Renewed Mot. Summ. J. 5-6). Unlike in *Carpenter* where the discretion of the employer was limited concretely by factors such as job, crew, position, and shop, in every instance of an overtime assignment decision, no single element of the outcome of the RIF implementation can be attributed exclusively or directly to the obligations imposed on the agency by the *LaShawn* order. That the discretion of Defendant was not actually limited by the *LaShawn* compliance plan is evidenced by the fact that Defendant acknowledged it could have made the necessary spending cuts by reducing just 52 positions from their workforce; furthermore, by the Defendants' own count, they would have been free to choose those 52 positions from 70% of its workforce. (Def.'s Mem. Supp. Renewed Mot. Summ. J. 7, 23). Instead, Defendant eliminated more than twice the number of positions needed to comply with *LaShawn*.

Significantly, Defendant itself describes the discretion inherent in its process of complying with *LaShawn;* in service of "increas[ing] efficiency" while still adhering to "CFSA's mission," the Agency leadership embarked on a systemic and substantive restructuring of its major divisions. (Def.'s Mem. Supp. Renewed Mot. Summ. J. 7). By converting the Agency Programs division to using a "team model," Defendant was able to bring its costs under budget with room to spare, and comply with *LaShawn*'s caseload requirements in one fell swoop, by eliminating the SSA and SWA positions and the 70 employees who filled them. *Id*. However, the Clinical Practice division was similarly converted to a new service model, shedding 8 full time positions, and several dozen more employees beyond that were eliminated as a product of "multiple individual decisions by the agency leadership," apparently none of which can be justified on the basis of the constraints imposed by *LaShawn* compliance. *Davis*, 925 F. 3d at 1250 (quoting Def.'s Mem. Supp. Summ. J. 20).

Defendants' assertion that Plaintiffs' statistical analysis should have isolated the constraints imposed by municipal retention status regulations is even less convincing. These rules require the separation of employees filling eliminated positions in reverse order of retention standing, based on "tenure of appointment, length of creditable service, veterans preference, residency preference, and relative work performance." 6B DCMR § 2408.1. Therefore, as Defendants' concede, they could only possibly constrain decisionmakers following their decision to target particular positions for termination or downsizing. (Def.'s Mem. Supp. Renewed Mot. Summ. J. 24)("Thus, while CFSA chose which positions to abolish, it did not necessarily know which employees would lose their jobs."). Even granting that the unlikely assumption that there is no room for exercise of discretion in an inquiry based on "relative work performance," Defendant has repeatedly asserted the extent to which they did exercise discretion in their

choices of which job categories to eliminate. The District based both its statistical analysis and its criticism of Plaintiffs' statistical analysis on the premise that "not all positions were equally at risk of termination," a proposition that seems to necessitate the exercise of discretion in determining which positions were at risk and to what degree. (Def.'s Mem. Supp. Renewed Mot. Summ. J. 17-19). Only after this judgment is made would the retention status regulations become meaningful at all. A holistic assessment of the decisionmaking process by which Defendants implemented the RIF – the proper inquiry under the holding of the Court of Appeals – makes clear that the Agency decisionmakers were completely unconstrained in their approach for bringing the CFSA's operating costs within budget.

Furthermore, the statistical validity and probative value of Plaintiffs' prima facie showing of disparate impact is not undermined by not accounting for *LaShawn* compliance and the retention status regulations. Not only can these amorphous and highly flexible considerations not be meaningfully isolated from rest of the RIF implementation process, to attempt to do so would require granting Defendants' assertion that consideration of these factors left them virtually no choice in which employees to terminate, an assumption that could only be verified through more extensive discovery. These are not factors contributing to causation that Plaintiffs' statistical analysis should have isolated from the Districts' discretionary actions in order to avoid unacceptable "bottom line" reasoning; they are the subjective considerations that guided the District's choices for which positions to target for elimination or reduction. *Wards Cove*, 490 U.S. at 657. Plaintiffs have more than met their *prima facie* burden to demonstrate the statistically significant disparate impact of the RIF implementation to allow the claim to survive summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's renewed motion for summary judgment.


Dated: January 27, 2020

Respectfully submitted,

Aderson Francois (D.C. Bar No. 798544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave., NW, Suite 352
Washington, D.C. 20001
Phone: (202) 661-6721
Email: aderson.francois@georgetown.edu

Donald M. Temple, Esq.
1101 15th Street NW, Suite 203
Washington, D.C. 20005
Phone: (202) 628-1101
Email: dtemplelaw@gmail.com

Attorneys for Plaintiffs