## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONDA L. DAVIS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action Nos.   1:10-cv-01564-RC** |
| | **1:10-cv-01718-RC** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS

Plaintiffs do not dispute items 1, 9, 10, 11, 12, 13, 16, 17, 19, 20, 21, 34, 38, 43, 44, 49, 50, 52, 54, 58, 59, 60, and 62 of Defendants' Statement of Undisputed Material Facts.

Plaintiffs do not dispute items 4, 5, 6, 7, and 8 only insofar as these items describe the various offices or divisions but are not used to distinguish the employees' capabilities within these offices or divisions.

As for the remaining items, Plaintiffs submit below that they raise the following legitimate questions of material facts:

*Defendants' Statement # 2*

> *CFSA operates the following six offices: (i) Agency Programs; (ii) Community Services; (iii) Policy and Planning; (iv) Clinical Practice; (v) Agency Management; and (vi) Financial Operations. Ex. A at 3 (Pl. 000090).*

Plaintiffs' Disputed Statement (#2)

Prior to the subject Reduction-in-Force ("RIF"), the Child and Family Services Agency ("CFSA" or "Agency") organizational chart reflects the Agency's organized into approximately twelve (12) offices or divisions: Office of the Director, Fiscal Operations, General Counsel, Agency Programs, Community Services, Office for Planning Policy and Program Support, Clinical Practice, Chief Administrative Office, Revenue Operations, Office of Chief of Staff, Public Information, and Accountability. Exhibit 1.

*Defendants' Statement # 3*

*The Office of Agency Programs investigates reports of child abuse and neglect, and provides direct case management for families at home, as well as for children and youth in need of home care. Agency programs work to ensure the safety and well-being of children and youth in care while moving them to permanence as quickly as possible via reunification, guardianship, or adoption. Ex. A at 6 (Pl. 000093).*

Plaintiffs' Disputed Statement (#3)

The Office of Agency Programs is responsible for many of CFSA's "frontline functions," including those above. Exhibit 7 at 1.

*Defendants' Statement # 14*

*During the process of developing the budget for FY 2011, the Office of the City Administrator directed that CFSA cut $3.2 million in personnel. Id.*

Plaintiffs' Disputed Statement (#14)

As noted with respect to items 15 and 18, it is disputed that the Agency was directed to cut personnel; rather, it was an Agency-wide cut, done at the discretion of those within the Agency.

*Defendants' Statement # 15*

*The Mayor submitted a proposed budget for FY 2011 to the Council for the District of Columbia in March/April 2010 that included fiscal cuts to CFSA's budget as well as a reduction of the agency's full-time equivalents (FTEs) positions. Id. ¶ 7.*

Plaintiffs' Disputed Statement (#15)

As a result of the Mayor's orders to reduce the budget, the Agency provided at least two proposed budgets to the Mayor's administration with cuts from the 2010 baseline. Exhibit 35 at 7, 10. In both proposals, the Agency cut the budget without firing any Full Time Equivalents (FTEs) (meaning, SSAs/SSWs). *Id*. However, the administration responded to both proposals by cutting 54 FTEs (the same 29 Social Service Representatives and 26 non-Social Service Representatives positions). *Id*. In other words, both instances show the Agency saved more money without firing a single person. This suggests the administration was provided with at least two options to save money without a RIF, but passed on both in favor of prioritizing other line-items in the budget.

The spreadsheet outlines a line-by-line comparison of "budget adjustment" and a "new CFSA amount," with yellow highlights where there are differences. Red text are cuts from the current budget and black are increases. Exhibit 35 at 7, 10. There are several major variations between

the two budgets. On page 7, item 17 shows a $3,200,000 savings by cutting 54 FTE (Full Time Equivalents) in the new CFSA amount. *Id.* at 7. The administration revised the budget amendment to protect certain programs while cutting others. For example, items 21 and 22 are cut by $2,500,000 and $915,000 in the budget adjustment column, but are brought back to $0 (no cut) in the new CFSA amount. *Id.* at 8. On the top of page 6 is the total budget of both versions.  *Id.* at 6. The budget adjustment cuts 4.8% from the 2010 budget without cutting a single FTE, while the new CFSA amount actually increases by 1.14% over the 2010 budget while cutting 54 FTEs. *Id.* It appears the administration debated the suggested cuts and decided that it would prefer to fire staff and prioritize other programs over saving money and keeping the staff intact. *Id.* at 7, 10.

*Defendants' Statement # 18*

> *The RIF necessary to balance CFSA's budget for FY 2011 had to be fully implemented before the beginning of FY 2011 when the new budget with its reduced FTEs and budget cuts went into effect. Id.*

Plaintiffs' Disputed Statement (#18)

In order to compensate for the loss of employees RIF'd, CFSA hired Nurse Care Managers "who will partner with social workers to ensure quality medical care for [families]" and will visit homes to look for health issues (the same tasks previously performed by SSAs/SSWs subject to the RIF). Exhibit 32 at 3. However, in an exhibit documenting variances in the first and second quarters for FY 10, the local deficit notes the twenty hired Nurse Care Management cost the Agency $699,826.41, while RIF'd employees cost the Agency $311,356.76. Exhibit 43 at 1. If the goal was to save the Agency money, hiring fewer Nurse Care Managers at a higher rate to perform the same tasks SSAs and SSWs performed does not accomplish this goal. Therefore, cutting SSAs and SSWs and replacing them with Nurse Care Managers did not meet the Agency's budgetary concerns.

That same exhibit reveals that CFSA administrators proposed an increase in its fiscal year 2011 operating budget by .7%, despite the RIF. Exhibit 2 at 5. In fact, proposed spending increased year-on-year on several line items, including: supplies and materials (2.4%), other services and charges (42.2%), and occupancy fixed costs (63.4%). Exhibit 2 at 5. In a study conducted after the RIF designed to measure the "Staying Effect" of the CFSA on staff, several staff members reported the CFSA had increased the earned income of newly-hired social workers to rates higher than their supervisors and other staff that had served within the Agency for years. Exhibit 33 at 3. In addition to increased operating costs, the CFSA also reported mass severance expenditures resulting from the RIF separations totaling $1,468,210.93. Exhibit 34 at 2. It is clear CFSA did not reduce costs but rather increased the deficit through implementing the RIF.

The cost of the RIF'd employees ($2.2 million) covered severance, annual leave, and compensatory time payout, while the savings ($1.9 million) covered salary savings assumption, leaving the cost of the RIF at $300,000. Exhibit 37 at 1. This cost could have been avoided if the Agency laid-off fewer, higher-salaried supervisors who were not dealing with the majority of the caseloads, like the SSAs/SSWs were. Defendants' expert

witness, Dr. Stephen Bronars, stated in his deposition he would "not be surprised" if there was a director at CFSA earning $170,000 a year but was not RIF'd (referring to Dr. Munro's supplemental report). Exhibit 38 at 33. Having a supervisor paid at such a high salary, while cutting frontline workers keeping the Agency afloat, was not necessary to balance the Agency's budget. Together, these reductions adequately addressed spending pressures, making the elimination of frontline workers a choice rather than a business necessity.

*Defendants' Statement # 22*

*The LaShawn consent order required CFSA to employ a specific staffing model for social workers and their supervisors. Declaration of Raymond Davidson (Davidson Decl.) ¶ 10, [169-7], attached as Exhibit D.*

Plaintiffs' Disputed Statement (#22)

The Implementation and Exit Plan, ordered by the United States District Court for the District of Columbia merely states that Family Support Workers are expected to conduct a second monthly visit at the home, school or elsewhere [Section 4.b], visits to children in out-of home care facilities (foster family homes, group homes, congregate care, independent living programs, etc.) [Section 5.b], and finally, visits to each child during the first four weeks of a new placement or a placement change [Section 6.b]. The Court's declarations cited by the Defendants fail to assert the reason for CFSA determination that the SSAs employed by CFSA prior to the Reduction in Force were not able to perform these duties.

Moreover, the Defendants have also failed to adequately articulate the rationale behind its assumption that a bachelor's degree is necessary to perform this function, particularly since a large majority of the work done by FSWs significantly overlaps with the job responsibilities of the SSAs. The SSA job description contained in the appendix of Ms. Usher's declaration, shows that the Social Service assistant major duties were to (1) conduct unaccompanied home visits, for reasons of safety, or to assist in locating the assessment site, (2) provide transportation for clients, (3) support social workers in implementing service plans by supervising/facilitating visits, making referrals, or scheduling service with providers, (4) supervises visits with children, and their family members, and (5) document information into the case record. Exhibit 7 at 6. Despite Defendants' position that SSAs were not qualified to conduct home visits, the job description shows that in performing the duties required by CFSA, SSAs already had significant contact with children and their families due to multiple visits at home and elsewhere, and were given a substantial amount of responsibility in conducting home visits, determining the safety, and well-being of the children and even making the appropriate referrals if necessary, as well as documenting the case for CFSA's records. There is no reason for CFSA to conclude that a bachelor's degree was required to perform a function that SSAs seem to already be skilled enough to perform. Furthermore, the responsibilities of FSWs listed by the Court do not conflict with the job responsibilities of SSA's listed in the appendix of Ms. Usher's declaration. *LaShawn v. Fenty*, No. 89 cv-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b. Accordingly, there is no evidence to support the Defendants' position that the Social Services Assistants could not perform the job responsibilities of a Family Support Worker adequately and consistent with the

mission of CFSA.

*Defendants' Statement # 23*

> *Given the LaShawn consent order, CFSA was necessarily limited in its options in terms of reducing the number of social workers, supervisors, and program managers because it needed to ensure continued compliance with that order. Id.*

Plaintiffs' Disputed Statement (#23)

As Plaintiffs stated in previous motions, both the *LaShawn* order and the retention status regulations depend on the Agency's prior exercise of discretion to have any concrete meaning at all, and did not limit the Agency's range of available options in implementing the RIF. *LaShawn A. v. Fenty*, 701 F. Supp. 2d 84 (D.D.C. 2010). The requirements of the *LaShawn* order were non-objective, non-concrete criteria that left the Agency completely unconstrained in its choices for complying.

As Defendants describe in its motion, the *LaShawn* compliance plan merely "required CFSA to retain enough case-carrying social workers—those who investigated abuse or neglect, provided in-home and in-foster-care services, and conducted home studies—to keep their caseloads below a specified number." Def.'s Mem. Supp. Renewed Mot. Summ. J., Dkt. 169, at 25. Unlike in *Carpenter* where the discretion of the employer was limited concretely by factors such as job, crew, position, and shop, in every instance of an overtime assignment decision, no single element of the outcome of the RIF implementation can be attributed exclusively or directly to the obligations imposed on the Agency by the *LaShawn* order. *Carpenter v. Boeing Co.*, 456 F.3d 1183 (10th Cir. 2006). The discretion of Defendants was not actually limited by the *LaShawn* compliance plan, as evidenced by the fact that Defendants acknowledged it could have made the necessary spending cuts by reducing just fifty-two (52) positions from its workforce; furthermore, by the Defendants' own count, they would have been free to choose those fifty-two (52) positions from 70% of its workforce. Def.'s Mem. Supp. Renewed Mot. Summ. J., Dkt. 169, at 23. Instead, Defendants eliminated more than twice the number of positions needed to comply with *LaShawn*.

*Defendants' Statement # 25*

> *The determination as to which agency positions would be included in the RIF was the result of multiple individual decisions made by the Director of CFSA working in close consultation with the Chief of Staff, the Deputy Directors in charge of CFSA's various divisions, and other senior level managers in the Agency's executive team. Id. ¶ 4.*

Plaintiffs' Disputed Statement (#25)

In a memorandum dated April 29, 2010, to City Administrator Neil Albert, CFSA Director Roque Gerald ("Gerald") requested "approval to conduct a Reduction-in-Force (RIF) to abolish one hundred and twenty-three (123) positions within the Child and

Family Services Agency." Exhibit 2 at 10. As justification for the RIF, Director Gerald stated: "The Child and Family Services Agency must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering. The deficit resulting from the realignment will precipitate a reduction in force." *Id.*

Nothing in Gerald's April 29, 2010 memorandum indicated that the RIF targeted particular positions. To the contrary, the memorandum provided an "agency-wide" list of positions to be eliminated or consolidated purportedly due to FY 11 budget cuts, which supposedly affected virtually every office in the Agency. *Id.* at 10–13. Specifically, Director Gerald sought to abolish twenty-one (21) positions in the Office of the Deputy Director for Community Programs, nine (9) positions in the Office of the Deputy Director for Clinical Practice, two (2) positions in the Office of the Deputy Director for Revenue Operations, twelve (12) positions in the Office of the Deputy Director for Planning, Policy, and Program Support, seventy (70) positions in the Office of the Deputy Director for Agency Programs, one (1) position in the Office of General Counsel, one (1) position in the Fiscal Operations Administration, and two (2) positions in the Office of the Chief of Staff in CFSA. *Id.* at 13–17.

*Defendants' Statement # 26*

*Employees holding positions within the Financial Operations Administration were not included in the RIF, because they reported to the Office of the Chief Financial Officer. Declaration of Dexter Starkes ¶ 7, [146-3] at 41–42, attached as Exhibit E.*

Plaintiffs' Disputed Statement (#26)

CFSA's organizational chart shows the Financial Operations Administration under the CFSA's Office of the Director. The April 29, 2010 memorandum from Director Gerald included one employee from the Office of Fiscal Operations Administration as being part of the RIF. CFSA also submitted a Declaration of Stan Spaght, CFSA's Human Resources Manager for Compensation/Benefits at the time of the RIF, counting the number of CFSA employees as 832, including the thirty (30) employees in the Financial Operations Administration. Exhibit 48 at 2. Subsequently, Defendants submitted a Declaration from Dexter Starkes, CFSA's Director of Human Resource. Exhibit 47 at 1. According to the Starkes Declaration, the thirty (30) employees in CFSA's Office of Fiscal Operations Administration (FOA) should not have been included in the headcount of the Agency because at the time of the RIF they reported to the Office of the Chief Financial Officer and, as such were "not technically CFSA employees." *Id.* at 2.

*Defendants' Statement # 27*

*CFSA achieved many of the required personnel cuts by realigning functions and implementing new service models within three specific divisions within the Agency: Agency Programs, the Office of Clinical Practice, and the Office of Community Services. Ex. D, Davidson Decl. ¶¶ 5–13.*

Plaintiffs' Disputed Statement (#27)

The personnel cuts were not driven by a targeted realignment of the Agency. To begin, CFSA did not conduct an authorized realignment. In an administrative challenge to the RIF brought by plaintiff Ernest Hunter, the District of Columbia Office of Employee Appeals (OEA), an administrative adjudicate body with jurisdiction over RIF planning and implementation, held that "there is no [ ] evidence [ ] to show that the RIF was properly authorized." Exhibit 49 at 8. OEA even went as far as to order the RIF invalid and CFSA to "reimburse [Hunter] all back-pay and benefits lost as a result of the RIF action." *Id*. at 11. The few planning documents CFSA produced regarding planning and implementation of the RIF, as well as the Declaration submitted by Agency executives in the early days of this suit, indicate the Agency undertook a neutral cost-cutting move rather than a targeted realignment. Exhibit 2.

*Defendants' Statement # 28*

> *Within Agency Programs, CFSA determined that it was necessary to implement a model in which Social Workers are "teamed" with a set of skilled partners to more effectively serve the needs of the Agency's children and family clients. Id. ¶ 6.*

Plaintiffs' Disputed Statement (#28)

> The question of whether a "teamed" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute. The fact that CFSA calls it a new "team model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to the same work. While CFSA has repeatedly claimed that the difference between the SSA and FSW positions is that FSWs are able to perform casework activities and make assessments during home visitations, the record contains a number of facts disputing that claim. To begin with, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work. Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that SSAs routinely made home visits and assessments. However, CFSA did not formally count and enter these visits and assessments in the FACES database. Exhibit 10 at 26–27. As further proof the Agency could have created a new position and effectively maintained the same workforce, following the RIF at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a CFSA contractor that provides services for emancipated youths in the District. Exhibit 14 at 3. In other words, CFSA contracted FSW functions to an outside vendor, which itself hired Alston to do the very work that Alston had been doing all along before the RIF that now CFSA claimed she needed a bachelor's degree to perform.  Lastly, CFSA's own supervisors conceded the similarities between the SSA and FSW positions, specifically stating that the job positions are substantially the same. Exhibit 15 at 1. In an email dated May 26, 2010, from Jenna Beebe to CFSA Program Administrator Jesse Winston and Theresa Cunningham, Beebe stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion SSA's were prior to the RIF'" based on the roles and responsibilities of the FSW position as defined by CFSA management. Exhibit 50 at 1.

*Defendants' Statement # 29*

    *In support of this new model, CFSA decided to eliminate entirely the positions of Social Services Assistant (SSA)—a social work support position—and Social Work Associate (SWA)—a bachelor-level social work position—in favor of a single new support position, titled Family Support Worker. Id. ¶¶ 7–8.*

Plaintiffs' Disputed Statement (#29)

    This item is merely a rephrasing of Defendants' legal argument rather than a statement of facts, much less an undisputed one. CFSA did eliminate the SSA and SWA positions and did come up with a new FSW label but, as noted above, there is no evidence that it represented a new model.

*Defendants' Statement # 30*

    *The agency-wide elimination of the SSA and SWA positions accounted for 70 of the 115 employees separated in the RIF. Id. ¶ 9.*

Plaintiffs' Disputed Statement (#30)

    The Declaration of Deputy Director Debra Porchia-Usher stated that of the 115 employees who received RIF notices, sixteen (16) held SWA positions, fifty-seven (57) held SSA positions for a total of seventy-three (73). Exhibit 7 at 4, ¶¶14, 15.

*Defendants' Statement # 31*

    *Within the Office of Clinical Practice (OCP), CFSA implemented a new model that would allow Social Workers to be paired with skilled Nurse Care managers to ensure quality medical care for the children, youth and families served by CFSA. Id. ¶ 10.*

Plaintiffs' Disputed Statement (#31)

    As with Defendants' statement regarding the SSAs, the question whether a "teamed" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute. The fact that CFSA calls it a new "team model" or a "new model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to the same work.

*Defendants' Statement # 32*

    *To support the establishment of the Nurse Care Management model, CFSA eliminated or reclassified 8 full time positions to create vacancies to staff and implement the new model.*

*These positions included Clinical Support Specialists, Health Services Program Liaison, Supervisory Health Care Specialist, Supervisory Clinical Support Specialist, Residential Specialist, and Office Automation Assistant. Ex. D, Davidson Decl. ¶ 11.*

Plaintiffs' Disputed Statement (#32)

As with Defendants' statement regarding the SSAs, the question whether a "teamed" or "new" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute.

*Defendants' Statement # 33*

*The Family Support Worker (FSW) performs casework, group work, and community organization work, and assists Social Workers in assessing the needs and strengths of families and investigates reports of child abuse and neglect. Memorandum from Al Day to Ray C. Davidson (Day Mem.) at 2 (DC_Davis-00007461–7464), attached as Exhibit F.*

Plaintiffs' Disputed Statement (#33)

Plaintiffs agree that the above item reflects, in part, the job description for the FSW position. As stated with respect to item 32, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, in particularly as it compares with that of SSAs and SWAs.

*Defendants' Statement # 35*

*The FSW provides a wide range of complex support social services for complicated cases, including developing plans for family members, making recommendations for planned use of agency resources and auxiliary services, and discussing and documenting clinically related information into the case record. Id. at 2.*

Plaintiffs' Disputed Statement (#35)

Plaintiffs agree that the above item reflects, in part, the job description for the FSW position. As stated with respect to item 32 and 33, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, particularly as it compares with that of SSAs and SWAs. The Defendants are using this description to cast a comparison to the position description of SSA's, which handled the same array of complicated tasks.

CFSA Social Service Assistants (SSA) position was described as follows (similar to FSWs): Exhibit 7 at 2–3, 7–8, 13–14.

- "Performs casework, group work and community organization work under the supervision of a Supervisory Social Worker."

- "Provides a wide range of complex support social services for complicated cases."

- "Interviews children, families, neighbors and professional groups to obtain or provide information."

- "Participates in supervisory conferences, individually and with social workers, for the purpose of case planning, sharing information resources and developing specialized resources for clients."

## _Defendants' Statement # 36_

_The FSW ensures that all case work related documentation is documented, to include observations from parent-child and sibling visitations, foster parent-child interactions, medical and psychological information from a mental health professional or OCP representative. Id. at 3._

## Plaintiffs' Disputed Statement (#36)

Plaintiffs agree that the above item reflects, in part, the job description for the FSW position. As stated with respect to items 28, 32, 35 and 37, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, particularly as it compares with that of SSAs and SWAs.

Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that his responsibilities ranged "from home visits to medical appointments to crisis situations, to record management to inputting info into the FACES system." Exhibit 10 at 21.  Mr. Morris' responsibility was to support social workers as well as supervisors to meet the orders of the court as it related to stabilizing or supporting that family or child. Exhibit 10 at 23. However, CFSA did not formally count nor enter these visits and assessments in the FACES database. Exhibit 10 at 26–27. Mr. Morris was even informed by those still in the Agency, and even working in FSW positions, the FSWs "are doing nothing different from the SSAs" and in fact "probably doing less." Exhibit 10 at 35.

## _Defendants' Statement # 37_

_The FSW assists in the preparation of pre-disposition reports and other periodic court reports. Those responsibilities are significantly broader than the work of the SSA position. Id. at 3._

## Plaintiffs' Disputed Statement (#37)

Plaintiffs agree that the above item reflects, in part, the job description for the FSW position. As stated with respect to items 28, 32, 35 and 36, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, particularly as it

compares with that of SSAs and SWAs.

<u>*Defendants' Statement # 39*</u>

*With respect to home visits, the SSA assists in locating the site, arranging for transportation, facilitating the visits, making referrals or scheduling services with providers, and creating records for committed children based on their own, as opposed to the Social Worker's, observations. Id. at 2–3.*

<u>Plaintiffs' Disputed Statement (#39)</u>

Plaintiffs agree that the above item reflects, in part, the job description for the SSA position. As stated with respect to items 28, 32, 35 and 36, Plaintiffs do not concede that the above description is a full and accurate representation of the work of SSA.

<u>*Defendants' Statement # 40*</u>

*The FSW coordinates team meetings and supervisory conferences for case planning, develops specialized resources for clients, directs casework activities toward the goal of permanency, and clarifies the roles and responsibilities of all team members as necessary, whereas the SSA is not involved in team meetings. This responsibility requires the FSW to have a substantive knowledge of the roles of participants and their respective disciplines. Id. at 3.*

<u>Plaintiffs' Disputed Statement (#40)</u>

Plaintiffs agree that the above item reflects, in part, the job description for the FSW position. As stated with respect to items 28, 32, 35 and 36, Plaintiffs do not concede that the above description is a full and accurate representation of the work of FSW, particularly as it compares with that of SSAs and SWAs.

Mr. Morris testified that he was told an undergraduate degree was necessary but somehow his was not sufficient. Exhibit 10 at 16–18. Further, his fifteen (15) years of experience with the Agency and near completion of a master's degree was also insufficient. *Id.* here were people who had less education and institutional knowledge than Mr. Morris that were hired for the position. *Id.* at 38. Mr. Morris states there was no credible reason why he wasn't rehired, and believes the reason has to do with his age. The younger people being hired by the Agency were making less than Mr. Morris, and to elevate him to a higher grade would mean the Agency would be spending more money on employing him, rather than a younger, less experienced hire. *Id.* at 40–41. Cutting against the financial crisis, Mr. Morris states "there was and is no financial crisis," because of the fact the Agency would bring in FSW positions, pay them a higher amount of money due to their higher GS level, to perform the same job in which the SSAs were performing. *Id.* at 52–53.

*Defendants' Statement # 41*

> *Prior to the creation of the FSW position, only Social Workers were permitted to conduct home visits, see LaShawn v. Bowser, Civil Action No. 89-01754 (D.D.C.), [864] (Feb. 27, 2007) at 6; however, after the creation of the FSW position, FSWs were also permitted to conduct home visits that would count toward the agency's exit standard from the consent decree, see id. [1073] (Dec. 17, 2010) at 7–8.*

Plaintiffs' Disputed Statement (#41)

The Implementation and Exit Plan, ordered by the United States District Court for the District of Columbia merely states that Family Support Workers are expected to conduct a second monthly visit at the home, school or elsewhere [Section 4.b], to visit children in out-of-home care facilities (foster family homes, group homes, congregate care, independent living programs, etc.) [Section 5.b], and finally, visits to each child during the first four weeks of a new placement or a placement change [Section 6.b]. The Court's declarations cited by the Defendants fail to assert the reason for CFSA's determination that the SSAs employed by CFSA prior to the RIF were unable to perform these duties.

Moreover, the Defendants have also failed to adequately articulate the rationale behind its assumption that a bachelor's degree is necessary to perform this function, particularly since a large majority of the work done by FSWs significantly overlaps with the job responsibilities of the SSAs. The SSA job description contained in the appendix of Ms. Usher's declaration, shows that the Social Service assistant major duties were to (1) conduct unaccompanied home visits, for reasons of safety, or to assist in locating the assessment site, (2) provide transportation for clients, (3) support social workers in implementing service plans by supervising/facilitating visits, making referrals, or scheduling service with providers, (4) supervises visits with children, and their family members, and (5) document information into the case record. Exhibit 7 at 7–9. Despite Defendants' position that SSAs were not qualified to conduct home visits, the job description shows that in performing the duties required by CFSA, SSAs already had significant contact with children and their families due to multiple visits at home and elsewhere, and were given a substantial amount of responsibility in conducting home visits, determining the safety, and well-being of the children and even making the appropriate referrals if necessary, as well as documenting the case for CFSA's records. There is no reason for CFSA to conclude that a bachelor's degree was required to perform a function that SSAs were already knowledgeable and skilled enough to perform. Furthermore, the responsibilities of FSWs listed by the Court do not conflict with the job responsibilities of SSAs listed in the appendix of Ms. Usher's declaration. *LaShawn v. Fenty*, No. 89 cv-01754 (TFH), ECF No. 1073, Implementation and Exit Plan (Dec. 17, 2010) §§ 4.b., 5.b. & 6.b. Accordingly, there is no evidence to support the Defendants' position that the Social Services Assistants could not perform the job responsibilities of a Family Support Worker adequately and consistent with the mission of CFSA.

*Defendants' Statement # 42*

> *Within the Office of Community Services (OCS), CFSA implemented a new model to manage and oversee the performance of certain agency contractors. As a result, CFSA eliminated or reclassified 19 positions within the OCS's Congregate Care and Home Study Contract Monitoring Division. Ex. D, Davidson Decl. ¶ 12.*

Plaintiffs' Disputed Statement (#42)

> As with Defendants' statement regarding the SSAs, the question whether a "teamed" model or a "new" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute. The fact that CFSA calls it a new "team model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to the same work.

*Defendants' Statement # 45*
> *In addition to implementing these new services models, CFSA achieved the mandated personnel cuts by reviewing its programs and determining which positions could be eliminated with the least negative impact on the agency's ability to perform its statutory and court-ordered functions. Id. ¶ 14.*

Plaintiffs' Disputed Statement (#45)

> This item is merely a rephrasing of Defendants' legal argument rather than a statement of facts, much less an undisputed one. CFSA did eliminate the SSA and SWA positions and did come up with a new FSW label but, as noted above, there is no evidence that it represented a new model.

> Similar to 28 and 42, the question of whether a "teamed" model would more effectively serve the Agency's children and families, or that such a model was the driving force for the RIF is at the heart of the case and very much in dispute. The fact that CFSA calls it a new "team model" does not mean that it is an undisputed statement of fact as opposed to CFSA using new jargon to refer to the same work. While CFSA has repeatedly claimed that the difference between the SSA and FSW positions is that FSWs are able to perform casework activities and make assessments during home visitations, the record contains a number of facts disputing that claim. To begin, SSAs were already performing the work in the revised new post RIF job descriptions, but were not being credited for that work.

> Plaintiff Darius Morris, one of the most experienced terminated SSAs, testified in his deposition that SSAs routinely made home visits and assessments. However, CFSA did not formally count and enter these visits and assessments in the FACES database. Exhibit 10 at 26–27. As further proof the Agency could have created a new position and effectively maintained the same workforce, following the RIF at least one plaintiff, Stephanie Alston, was hired as a Family Support Worker by the Georgia Avenue Family Support Collaborative, a CFSA contractor that provides services for emancipated youths in the District. Exhibit 14 at 3. In other words, CFSA contracted FSW functions to an outside vendor, which itself hired

Alston to do the very work that Alston had been doing all along prior to the RIF but that now
CFSA claimed she needed a bachelor's degree to perform.  Lastly, CFSA's own supervisors
conceded the similarities between the SSA and FSW positions, specifically stating that the job
positions are substantially the same. Exhibit 15 at 1. In an email dated May 26, 2010, from
Jenna Beebe to CFSA Program Administrator Jesse Winston and Theresa Cunningham, Beebe
stated that a CFSA supervisor believed that "the FSW would be used in the exact fashion
SSA's were prior to the RIF" based on the roles and responsibilities of the FSW position as
defined by CFSA management. Exhibit 50 at 1.


## Defendants' Statement # 46

*CFSA eliminated one of two Administrative Review teams that had been maintained under
the Office of Planning, Policy and Program Support (OPPPS) based on a determination
by the Deputy Director for OPPPS that the elimination of these positions would not
detrimentally affect the division's functions. Id. ¶ 15.*

## Plaintiffs' Disputed Statement (#46)

While Defendants make the statement that CFSA believed that the elimination of any
position did not detrimentally affect any particular division's functions, the question
of whether the elimination did in fact have a detrimental effect is a disputed question of fact
insofar as Defendants have placed no evidence on the record to show one way or another the
effect of the elimination of any position.


## Defendants' Statement # 47

*The elimination of these positions accounted for 7 of the 115 employees separated in the
RIF. See Stephen G. Bronars, A Statistical Analysis of the Reduction in Force at the D.C.
Child Family Services Agency, attached as Exhibit J, at Table 1. The elimination of
positions in the Office of Clinical Practice accounted for another 7 of the 115 employees
separated in the RIF. Id.*

## Plaintiffs' Disputed Statement (#47)

The Agency had described this RIF as a "realignment to consolidate functions" among the
various departments of CFSA, and this shift to a team-based model required the wholesale
elimination of the SWA and SSA positions. Among the 115 employees that were removed
from the Agency as a result of the RIF, thirteen (13) held the SWA position and fifty-seven
(57) held the SSA position. Exhibit 4 at 7–8. Of the fifty-seven (57) removed SSAs, fifty-six
(98%) were African Americans. *Id.* at 7. Of the thirteen (13) SWAs, eleven were African
American (85%). *Id.* at 7.

The report by Plaintiffs' expert Dr. Paige Munro, dated July 8, 2012, found that of the 115
workers terminated in the RIF, 93% were African-American. Exhibit 48 at 2. Prior to the
RIF, African Americans comprised 82.8% of the total workforce. *Id.* Using the data
provided by the CFSA's Human Resources Manager for Compensation/Benefits, Dr.

Munro found that the termination rate for African Americans was 15.5%, whereas the termination rate for non-African Americans was only 5.6%. Exhibit 45 at 3; *see Davis*, 925 F.3d at 1247. The EEOC guidance on disparate impact analysis finds a statistically significant disparity to be one in which the minority termination rate is greater than 125% of the majority termination rate. In the present case, the effective termination rate for African Americans is 444% greater than the effective termination rate for Caucasians. *Davis*, 925 F.3d at 1247. This data is taken from the population of the entire Agency workforce prior to the implementation of the RIF, since Defendants have described this process as an "agency-wide" reduction in force. Exhibit 2 at 3, ¶9.

Defendants' expert report, which was written almost 2 years after Plaintiffs' report, found opposite statistical conclusions. Exhibit 44 at 1–6. Defendants' expert, Dr. Stephen Bronars began with the factual assumption that not all employees throughout the Agency faced the same risk of layoff due to the RIF, despite the clear language in the Agency Director's own memorandum, which stated that this RIF was an "agency-wide" action. Exhibit 2 at 3, ¶9. What that means is that Dr. Bronars characterized the agency-wide RIF as 7 separate layoff decisions in 7 divisions. Exhibit 44 at 5 ¶21. He conducted a two-standard deviation analysis, and would only find evidence of discrimination if the difference between the actual outcomes of the RIF is so much greater than what is the expected outcomes of a random process, in order to be statistically significant. Exhibit 44 at 5, ¶19. As such, his analysis claimed that even in a randomized layoff process that could have occurred in those 7 separate termination actions, 105.21 African American employees would have been terminated anyway. However, Dr. Bronars' choice to view the RIF as 7 separate actions rather than a single agency-wide process is not backed by any factual evidence in the record beyond the self-serving declaration of Raymond Davidson, CFSA's Chief Administrative Officer at the time of the RIF, signed the day before Defendants' expert report was published. Exhibit 45 at 11. Dr. Bronars also excluded from his analysis the wholesale elimination of the SSA and SWA positions, or any job categories occupied exclusively by African-American employees, because such cuts did not involve the "excess termination" of African-American employees. *Davis*, 925 F. 3d at 1246 (*quoting* Exhibit 44 at 9).

*Defendants' Statement # 48*

*CFSA also identified various other non-direct or administrative service positions for elimination, including Clerical Assistants, Human Resource Support, Paralegal, Case Assessment Specialist, Payroll Specialist and Contract Compliance. Ex. D, Davidson Decl. ¶ 16. The reduction in these positions were based upon seniority within a particular competitive area and level, in accordance with District personnel regulations. Id. ¶ 17.*

Plaintiffs' Disputed Statement (#48)

Defendants implemented the RIF not based on seniority but rather an undisciplined, subjective decision-making process, exactly the type of impermissible employment practice prohibited under case law. CFSA's Deputy Director for Agency Programs testified that, in conducting the RIF, "CFSA reviewed its programs and determined which functions would have the least negative impact on the Agency's ability to perform its statutory and court-ordered functions."

Exhibit 7 at 3, ¶ 10 (emphasis added). However, Defendants offer no evidence that this assessment was validated by professionally acceptable methods. Instead, CFSA, through its Deputy Director for Administration, explained that it "did not utilize a single uniform criteria, test or requirement for determining which employees would be separated from the Agency in the RIF." Exhibit 2 at 2, ¶ 4. Presumably, CFSA offered this fact in an attempt to protect the RIF process from being assessed as an employment practice.

## Defendants' Statement # 51

*Director Gerald informed Mr. Albert that CFSA must conduct a realignment to consolidate functions in accordance with the FY 2011 budget and internal re-engineering and that removing these positions from the organizational structure would yield a cost savings and better align functional areas to support the agency's mission. Id. at 2.*

## Plaintiffs' Disputed Statement (#51)

As stated with respect to item 18, the restructuring of the organizational structure did not yield cost savings. Additionally, the cost of the RIF'd employees ($2.2 million) covered severance, annual leave and compensatory time payout, while the savings ($1.9 million) covered salary savings assumption, leaving the cost of the RIF at $300,000. Exhibit 37 at 1. This cost could have been avoided if the agency laid-off fewer, higher-salaried supervisors who were not dealing with the majority of the caseloads, such as the SSAs and SSWs. Defendants' expert witness, Dr. Stephen Bronars, stated in his deposition he would "not be surprised" if there was a director at CFSA earning $170,000 a year but was not RIF'd (referring to Dr. Munro's supplemental report). Exhibit 38 at 33. Having a supervisor paid at such a high salary, while cutting frontline workers keeping the agency afloat, was not necessary to balance the Agency's budget.

## Defendants' Statement # 53

*Director Gerald informed CFSA staff that the Agency's funding was dwindling and that its client population has dropped by 47 percent since 2003 and that reduction has caused CFSA to rethink how CFSA can be more efficient and effective while also controlling spending. Ex. H, Gerald May 6 E-mail.*

## Plaintiffs' Disputed Statement (#53)

The record cuts against the notion that CFSA's reduction in force was commensurate with the reduction in client work. First, unlike in *Aliota*, the agency failed to communicate to SSAs why their roles were the subject to the RIF. There is nothing to indicate that CFSA attempted to communicate with their employees regarding a decreased workload prior to the implementation of the RIF. Second, the remaining staff members were so burdened by the volume of work left after the RIF that in June 2010, all-staff email Dr. Gerald Roque sent out an all-staff email announcing "proactive" measures designed to reduce the investigations workload on the remaining staff. Exhibit 24 at 2. These emergency measures primarily relied on shifting resources to detail twelve (12) short-term staff (45–60 days) while the CFSA

recruited and hired an entirely new investigative unit at the CPS. Exhibit 24 at 2. Dr. Roque explained that CPS was in the midst of a "surge" of new investigations while also "finding worse situations," adding to the workload of the already reduced staff. *Id.* at 3.

On July 2, 2010, a Supervisory Social Worker emailed another member of CFSA describing how this supervisor was dealing with a team of social workers "with heavy case loads due to the recent RIF." Exhibit 40 at 2. In an all-staff email, CFSA noted "the client population [] dropped by 47 percent . . . since 2003" due to the agency working to keep children out of the system. Exhibit 32 at 2. However, in an email (sent on May 11, 2010, after the RIF) between a current CFSA employee and former employee, the current employee notes the "chaotic" situation at CFSA, and how there was "a number of removals and there were kids in almost all the supervisor cubes. Unless they hire these SSAs soon there is going to be more chaos." Exhibit 8 at 1. Employees were RIF'd with "full case-load[s]," needing to transfer prior clients to other employees.  This illustrates the RIF was not commensurate with the work. Even supervisors acknowledged the additional workload and hardship presented by the RIF on the CFSA. In an email dated June 2010, Supervisor Jane Young reported not having enough staff to complete the current workload, twice referring to the staffing level as "crazy." Exhibit 20 at 1. Had Defendants actually had "less of a need" for SSA/SWA positions, the Agency's daily operations would not be impacted to the extent that the SSAs absence could be characterized as "chaos." Exhibit 8 at 1.

*Defendants' Statement # 55*

    *CFSA explained to the union representing CFSA employees that the RIF was taken to enable more efficiency, increase workforce utilization and capacity while carrying out the agency's mission and meeting fiscal challenges. Id. at 2.*

Plaintiffs' Disputed Statement (#55)

    Plaintiffs agree that the above item was discussed with the union representative. Plaintiffs dispute that the RIF was taken to enable efficiency and increase utilization.

    The RIF was purported to maximize efficiency but instead, left the social workers without assistance and overwhelmed, reducing its ability to effectively serve CFSA clientele. According to a May 2010 email from Jane Young, a CFSA supervisor, the social workers were "really upset with the [SWAs] being RIF since they are saying they are already overworked." Exhibit 16 at 2. On May 10, 2011, Supervisor Tanya Torres emailed a member of the Quality Assurance team expressing concern that she was uncertain when and where she would be transferring two full-case loads previously managed by RIF'd employees. Exhibit 17 at 1. In June 2010 Wayne Enoch, a Data Assessment Specialist working for CFSA issued an agency-wide data call for any problems resulting from the recent RIF. Exhibit 18 at 1. In a response Ermine Lake-Queen reported having experienced "a tremendous [e]ffect" on both herself and other social workers, noting her lack of efficiency due to her completing client visits on her own, and her inability to take required breaks. Exhibit 19 at 1. On May 11, 2010, Bethlehem Zewde told Angela Peters, "I heard yesterday was chaotic at CFSA. They had a number of removals and there were kids in almost all the supervisor cubes. Unless they hire these SSAs soon, there is going to be more chaos." Exhibit 8 at 1. Even Supervisors acknowledged the

additional workload and hardship presented by the RIF on the CFSA. In an email correspondence in June 2010 Supervisor Jane Young reported not having enough staff to complete the current workload, twice referring to the staffing level as "crazy." Exhibit 20 at 1. Had Defendants actually had "less of a need" for SSA and SWA positions, the Agency's daily operations would not be impacted to the extent that the SSAs' absence could be characterized as "chaos."

As a result of the RIF, CFSA eliminated employees vital in conducting the day-to-day tasks of the Agency, burdening the remaining CFSA employees. Exhibit 21 at 1–2. Subsequently, CFSA employees often discussed the negative implications the RIF produced within the Agency. In May 2010, CFSA hosted a "Foster Parents Wellness Day," inviting foster parents to attend with their children [Id]. Due to the elimination of the SSA positions, childcare was unavailable at the event. [Id.] Thus, according to an email between Gavin J. Kirkpatrick and Jasmine Hayes, there were "potential health and safety problems . . . concerning for all who attended" the event and for the "quality of the [] training." Exhibit 22 at 1. CFSA continued to operate with a volume of work unrealistic for the number of employees left. Because CFSA eliminated all the SSA's responsible for transporting children, there were no available employees left to perform this responsibility. Exhibit 21 at 2. Social Workers were then given an additional task of picking up children. Exhibit 22 at 1.

On July 15, 2010, in response to a Letter of Admonition CFSA sent to a supervisory social worker, the worker indicated CFSA policies created barriers for the worker to fully comply with new policies, and that post-RIF work limit exceeded CFSA's "12-investigations at a time" compliance policy, noting the workers current workload of "managing up to 22 families" at a time was in violation of CFSA policy. Exhibit 23 at 1. Supervisors were also not meeting with the workers to address these clinical issues, leaving the workers to perform this work "without any assistance or supervision." Exhibit 23 at 2.

The RIF precluded the critical participation of terminated employees in the Quality Service Review ("QSR") process, which adversely impacted CFSA's ability to comprehensively assess areas of quality improvement and better serve clientele in accordance with its mission. Exhibit 17 at 1. Certain units impacted by the RIF were selected to participate in the unit based QSR in the month of June 2010. During the process, social workers and supervisors meet with QSR reviewers to decide on next steps that can be completed within sixty (60) days for every single CFSA client. The next steps are included in a write-up describing the strengths and challenges for the child, caregiver, and system. Approximately six (6) to seven (7) weeks prior to the June 2010 review, QSR specialists began to request meetings with social workers in preparation for the review but were unable to gather a representative for every client as cases originally assigned to social workers terminated by the May RIF had not yet been assigned to someone else. *Id*.

*Defendants' Statement # 56*

*CFSA explained to the union representing CFSA employees that "[w]hile the number of cases being handled by the agency has decreased, the severity and complexity of incoming cases has increased dramatically," and that as a result, "the need and focus on adopting and implementing a new model became apparent." Id.*

Plaintiffs' Disputed Statement (#56)

Plaintiffs agree that this was stated to the union representative; however, Plaintiffs dispute that the number of cases handled by the Agency decreased, and that the SSAs and SSWs could not deal with the "increased complexity." As stated with respect to number 53, the record cuts against the notion that CFSA's reduction in force was commensurate with the reduction in client work. The SSAs were already dealing with complex cases that required home visits, reassignments, and more.

*Defendants' Statement # 57*

*CFSA introduced the FSW position to give Social Workers partners with more skills in managing cases and serving clients. Id.*

Plaintiffs' Disputed Statement (#57)

FSWs did not have "more skills in managing cases and serving clients" than SSAs and SSWs. Cutting further against the Defendants' notion of necessary skills and seniority needed for these new roles, an email exchange on October 22, 2010 between Andrea Reid (Project Management Specialist at CFSA) and Terri Powell (National Science Foundation) discussed hiring a "young woman who has an undergraduate degree in Sociology who is interest[ed] in working at CFSA in a 'social worker' type capacity." Exhibit 12 at 1–2. Although this young woman had no work experience, these administrators were trying to help her find a job as an SSA, noting that SSAs got RIF'd but "some got their jobs back because they had a bachelors." *Id.* However, workers with bachelor's degrees, and even close to master's degrees (like Mr. Morris) were not hired back, although they had more experience than new hires. In an email from Chanelle Reddrick (SWA hired in 2008, who was RIF'd in 2010, then rehired as an FSW), Ms. Reddrick discussed how she was highly recommended for one of the FSW positions within the Agency, but did not have a MSW (Master's in Social Work). Exhibit 13 at 1. Ms. Reddrick only had two years with the Agency before she was fired then rehired. Mr. Morris, who had more experience and years in the Agency than Ms. Reddrick, was not rehired.

In a May 10, 2010 email, Jay Murphy, a Planning Specialist in CFSA, wrote to an outside consultant, Heather Baker, recommending an employee that was recently RIF'd. Mr. Murphy stated there was an employee he "would recommend to just about anyone," that was an "M.Ed., which really overqualified him for the position he was RIF'd from last month." This fact further cuts against Defendants' notice that those RIF'd did not meet the bachelor's degree requirement, or needed a higher skill level "who could handle more difficult tasks that required judgment decisions," as the Defendants put it. Exhibit 46 at 1–2.

*Defendants' Statement # 61*

*The newly created FSW position combined the functions of the SSA and SWA positions, but retained the degree and knowledge requirements of the SWA position, and added new*

*major duties including coordinating team meetings, clarifying team member roles (including that of family members and third parties), maintaining all case-work related documentation (including clinical notes), and preparation of reports for court. See generally Ex. C, Porchia-Usher Decl. at 7–17, Exs. A and B (FSW and SSA position descriptions); Ex. L (SWA position description).*

<u>Plaintiffs' Disputed Statement (#61)</u>

This item is merely a rephrasing of Defendants' legal argument rather than a statement of facts, much less an undisputed one. CFSA did eliminate the SSA and SWA positions and did come up with a new FSW label but, as noted above, there is no evidence that functions changed, and new duties were added.

Additionally, there are reports from focus groups consisting of Social Workers, Supervisors, and Program Managers, describing how the RIF affected their units as workers took on additional duties and cases, and supervisors were carrying cases previously carried by a social worker, and how the new teaming model reduced the Agency's efficiency. Exhibit 25 at 1–3. On December 16, 2010, Office of Human Resources (OHR) and CFSA participated in a study about retention and employee relations in November 2010. Exhibit 25 at 1. Social workers described the new "voluminous" approval process required to make a referral or request the assistant of a FSW as "burdensome and a barrier to providing timely services to children and families." Exhibit 25 at 3. Consequently, social workers claimed to not have access to FSWs because of this arduous process. *Id.* The workers also report that "FSWs [are] not doing visits or transporting kids [and] [t]here also aren't that many of them," while "FSWs do not have enough work to keep them occupied," all while agreeing that "[SSAs] were much more helpful." *Id.*

*<u>Defendants' Statement # 63</u>*

*CFSA eliminated or reclassified 19 positions within OCS's Congregate Care and Home Study Contract Monitoring Division in order to align the qualifications and duties of these positions with the high level performance-based contract management required to manage multiple multimillion dollar contracts" and also to "ensure high performance from a multifaceted array of congregate care contractors providing such services as diagnostic and emergency case, therapeutic and traditional group homes, and independent living programs. Ex. D, Davidson Decl. ¶ 12.*

<u>Plaintiffs' Disputed Statement (#63)</u>

CFSA eliminated qualified congregate care managers who could have handled "high level performance-based contract management required to manage multiple multi-million-dollar contracts." As stated with respect to item 57, some RIF'd congregate care workers were overqualified for the position.  Exhibit 46 at 1–2.

Date: December 2, 2022.                    Respectfully Submitted,

/s/ Aderson B. Francois (D.C. Bar No. 798544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave., NW, Suite 352
Washington, D.C. 20001
Phone: (202) 661-6721
Email: aderson.francois@georgetown.edu

Donald M. Temple, Esq.
1310 L. Street, N.W. Suite 750
Washington, D.C. 20005
Phone: (202) 628-1101
Email: dtemplelaw@gmail.com

Attorneys for Plaintiffs