# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RONDA L. DAVIS, *et al.*,              :
                                       :
    Plaintiffs,              :    Civil Action No.:    10-1564 (RC)
                                       :
    v.                       :    Re Document No.:    197
                                       :
DISTRICT OF COLUMBIA,                  :
                                       :
    Defendant.               :

## <u>MEMORANDUM OPINION</u>

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

The initial Complaint in this matter was filed over thirteen years ago, alleging that the District of Columbia made personnel cuts that discriminated against African American employees.  This action has already been through several rounds of summary judgment and an appeal, and the Court's most recent opinion concluded that Plaintiffs have established a prima facie case of racially discriminatory disparate impact.  Now, the District of Columbia brings another motion for summary judgment, claiming that the terminations were justified by business necessity and that no dispute of any material fact remains.  *See* Def.'s Mot. Summ. J. ("Mot. Summ. J."), ECF No. 197.  For the reasons stated below, the motion is GRANTED.

## II.  BACKGROUND

### A.  Factual Background

1.  The Child and Family Services Agency

The District of Columbia Child and Family Services Agency ("CFSA" or the "Agency") is charged with protecting the safety and well-being of abused and neglected children and with providing services to struggling families.  *See* Def.'s Statement of

Undisputed Material Facts ("Def.'s SOF") ¶ 1, ECF No. 197-1.  Although the parties dispute

the exact organizational structure of CFSA during the relevant time period, *compare id.* ¶ 2,

*with* Pls.' Statement of Disputed Material Facts ("Pls.' Disputed SOF") at 1, ECF No. 198-1, it

is undisputed that many of CFSA's "frontline functions"—including investigating reports of

child abuse and neglect, temporarily removing children from dangerous situations, and

providing direct case management—were led by the Office of Agency Programs,  *see* Def.'s

SOF ¶ 3; Pls.' Disputed SOF at 2.  Each of the Agency Programs divisions were led by a

Social Work Manager ("SWM") who oversaw a number of Supervisory Social Workers

("SSW").  *See* Pls.' Ex. 1 at 24–26, ECF No. 198-2.[1]  The SSWs supervised Social Workers

and Social Work Assistants ("SWA").[2]  *Id.*  In turn, the SWAs were supported by Social

Service Assistants ("SSA").  *Id.;* Pls.' Ex. 7 ¶ 8, ECF No. 198-8.

CFSA is required to maintain a balanced budget, and amid the Great Recession, CFSA

experienced significant budgetary pressure.  *See* Def.'s SOF ¶ 9.  In fiscal year ("FY") 2010

(October 1, 2009 to September 30, 2010), CFSA's budget decreased by $25.3 million from the

prior year.  *Id.*  These budget cuts included reductions in rates paid to congregate and family-

based foster care, reduced technology services, decreased contract funds with community

collaboratives, and personnel cuts.  *Id.* ¶ 10.

These cuts would continue.  In early 2010, CFSA began developing its FY 2011 budget.

*Id.* ¶ 11.  The budget process began with the D.C. Mayor's Office providing CFSA with the

number of funds available for FY 2011.  *Id.* ¶ 12.  CFSA submitted a proposed budget to the

---

[1] Plaintiffs have labeled their exhibits with numbers, while Defendant has used letters.

[2] Confusingly, the parties use the terms SSW and SWA interchangeably throughout
briefing.  As far as the Court can tell, this usage is an error, those two positions are distinct, and
CFSA terminated the SWAs, not the SSWs.  Def.'s Ex. D ¶¶ 7–8, ECF No. 197-7.

Mayor's office, which was reviewed and revised in consideration with all other D.C. agency budget submissions. *Id.* ¶ 13. On review, the Office of the City Administrator directed that CFSA cut $3.2 million in personnel costs. *Id.* ¶ 14. The Mayor's proposed FY 2011 budget included CFSA budget cuts and a reduction in the Agency's authorized FTEs. *Id.* ¶ 15. The final FY 2011 budget approved by the D.C. City Council reduced CFSA's budget by $12.1 million and cut FTEs from 892 down to 840. *Id.* ¶ 16.

The Agency was required to make the required budget cuts before October 1, 2010, the beginning of FY 2011. *See id.* ¶¶ 17–18. To balance the budget, CFSA made significant non-personnel cuts. *Id.* ¶ 19. CFSA reduced administrative costs, funds available for conferences and training, and reimbursements for foster care. *Id.* CFSA also reduced its contract with the Healthy Families/Thriving Communities Collaboratives and eliminated the contract with the Foster Parent Association*. Id.* And CFSA eliminated grants to the D.C. Children's Trust Fund and Adoptions Together Respite Care. *See id.* Nonetheless, CFSA still needed to cut employee positions.

### 2.  The *LaShawn* Court Order

During the relevant time period, CFSA was under a consent decree in a class action case that governed its provision of services. *See LaShawn v. Bowser*, No. 89-cv-1754 (D.D.C. Feb. 27, 2007), ECF No. 864 (order approving Amended Implementation Plan). The District states the *LaShawn* compliance plan "required CFSA to employ a specific staffing model for social workers and their supervisors" and because "CFSA needed to ensure continued compliance with the requirements of the *LaShawn* consent order, the Agency was necessarily limited in terms of its options for reducing the number of social worker, supervisor, and program manager positions." Mot. Summ. J. at 6. Plaintiffs instead characterize *LaShawn* as setting "non-

objective, non-concrete criteria" that did not constrain the Agency's personnel decisions.  *See* Pls. Opp'n Mot. Summ. J. ("Opp'n Mot. Summ. J") at 18, ECF No. 198.

### 3.  The Reduction in Force

To reduce personnel costs consistent with the FY 2011 budget, CFSA conducted a reduction-in-force ("RIF").  Def.'s SOF ¶ 18.  Because the RIF needed to be fully implemented before the beginning of FY 2011, CFSA chose an effective termination date of June 11, 2010 for employees subject to the RIF.  *Id.* ¶¶ 17–18.  CFSA eliminated a total of 115 positions in the RIF.  *Id.* ¶ 20.

On April 20, 2010, the Director of CFSA, Dr. Roque Gerald, requested approval for the RIF from the City Administrator, Neil Albert.  *Id.* ¶ 50.  In that request, Dr. Gerald stated that CFSA "must conduct a realignment to consolidate functions in accordance with the FY'2011 budget and internal re-engineering," and that "[t]he deficit resulting from the realignment will precipitate a Reduction-In-Force."  Def.'s Ex. G at 2, ECF No. 197-10. CFSA did not use a "single uniform criterion, test or requirement for determining which employees would be separated from the Agency in the RIF."  Def.'s SOF ¶ 24.  Instead, positions were cut based on "multiple individual decisions" by Dr. Gerald in "close consultation with the Chief of Staff, the Deputy Directors in charge of CFSA's various divisions, and other senior level managers in the Agency's executive team."  *Id.* ¶ 25; *see* Def.'s Ex. D ¶ 4, ECF No. 197-7.  On April 29, 2010, Dr. Gerald sent another memorandum requesting approval to eliminate 123 positions.  *See* Pls.' Ex. 2 at 10, ECF No. 198-3. Plaintiffs note that rather than specifying that the RIF targeted only particular positions, this memorandum provided an "agency wide" list of positions to be cut across CFSA offices.  *See* *id.* at 10–13; Pls.' Disputed SOF at 5–6.

In letters sent on May 6, 2010, Dr. Gerald informed each of 115 CFSA employees that their employment with CFSA would be terminated effective June 11, 2020.  *See* Pls.' Ex. 3 at 1, ECF No. 198-4.  Each letter stated that "[t]his action is in accordance with Chapter 24 of the District's Personnel Regulations and in no way reflects adversely on your performance of your official duties."  *See id.*  The elimination of the SSA and SWA positions accounted for the majority of the 115 employees terminated in the RIF.[3]   Def.'s SOF ¶ 30; Pls.' Disputed SOF at 8.  The SSAs and SWAs were overwhelmingly African American.[4]

The parties disagree about the nature of the RIF.  According to the District, which relies on a declaration from Raymond Davidson, CFSA's Chief Administrative Officer at the time, CFSA sought to implement the RIF personnel cuts by "realigning functions and implementing new service models within three specific divisions within the Agency: Agency Programs, the Office of Clinical Practice, and the Office of Community Services."  Def.'s SOF ¶ 27; *see also* Def.'s Ex. D ¶¶ 5–13.  Plaintiffs disagree and describe the RIF as "a neutral cost-cutting move," although without supporting evidence for this characterization.  Pls.' Disputed SOF at 6.  Either way, most employees impacted by the RIF were in Agency Programs.  Def.'s SOF ¶ 62.  CFSA decided it was necessary to implement a model in Agency Programs where Social Workers were "teamed" with a set of partners.  Def.'s SOF ¶ 28.  Plaintiffs dispute that this "team model" was actually more effective for the Agency's mission, that this model was a driving force for the RIF, or even that the model was anything

---

[3] The parties disagree as to whether a total of 70 or 73 employees were terminated when the SSA and SWA positions were eliminated.  *Compare* Def.'s SOF ¶ 30, *with* Pls.' Disputed SOF at 8.

[4] According to statistics that use a total number of 70 terminated employees, of the 57 SSAs, 56 (98%) were African American.  Pls.' Disputed SOF at 14.  Of the 13 SWAs, 11 (85%) were African American.  *Id*.

more than "new jargon to refer to the same work." Pls.' Disputed SOF at 7.

### 4. The Newly Created Family Support Worker Position

The parties have starkly different views on the Family Support Worker ("FSW")

position. According to the District, to advance the "team" model, CFSA eliminated the SSA

and SWA positions in the RIF and replaced them with the new FSW position. *See* Def.'s Ex.

H, ECF No. 197-11. Like the SWA position, but unlike the SSA position, the FSW position

required a bachelor's degree in a social service field. Def.'s SOF ¶¶ 29, 61; *see also* Pls.'

Disputed SOF at 12 (acknowledging the degree requirement). The District says that the FSW

position had "new major duties" such as "coordinating team meetings, clarifying team

member roles (including that of family members and third parties), maintaining all case-work

related documentation (including clinical notes), and preparation of reports for court." Def.'s

SOF ¶ 61. Similarly, Debra Porchia-Usher, CFSA's Deputy Director for Agency Programs,

stated that FSWs would be:

> able to perform casework activities that support investigative social workers to
> obtain the information necessary to complete investigations of abuse and neglect,
> including interviewing family members, children, and caretakers[;] assessing the
> safety of a home and the well-being of children[;] conducting home visits;
> documenting information into the case record; coordinating with other team
> members for meetings; and coordinating needed services for families and
> children.

*See* Def.'s Ex. C ¶ 12, ECF No. 197-6.

Plaintiffs contend that the SSA and FSW positions shared the same responsibilities,

and that the only difference between the positions was the bachelor's degree requirement.

Opp'n Mot. Summ. J. at 6–8. Plaintiffs present CFSA's job descriptions of the relevant

positions to illustrate the similarities. *See id.* at 7. SSA responsibilities included:

- "[P]roviding direct support to social work staff and the social work
  function." Def.'s Ex. C at 7.

- "Conduct[ing] non-clinical home visits accompanying a Social Worker or a Social Service Assistant, as needed, for reasons of safety . . . ."  *Id.*

- "Provid[ing] transportation assistance for clients . . . ."  *Id.*

- "Support[ing] social workers and supervisory social workers in implementing service plans by supervising/facilitating visits, making referrals or scheduling service with providers . . . ."  *Id.*

- "Participat[ing] in case and supervisory conferences as needed; bring[ing] problem issues to the attention of the worker and/or supervisor for discussion in these conferences."  *Id.*

- "Assist[ing] the social worker in completing specified paper searches to locate hard-to-find families by searching and clarifying data, checking files, and contacting other agencies."  *Id.* at 8.

The FSW job posting included several responsibilities, including:

- "Perform[ing] casework, group work, and community organization work under the supervision of a Licensed Independent Social Worker . . . ."  *Id.* at 13.

- "Accompan[ying] a Social Worker as needed, for reasons of safety or participat[ing] in home visits and/or investigations to determine the needs of clients . . . ."  *Id.*

- "Provid[ing] transportation assistance for clients . . . ."  *Id.*

- "Support[ing] social workers and supervisory social workers in implementing service plans by supervising/facilitating visits . . . ."  *Id.*

- "With guidance, develop[ing] plans for and provid[ing] appropriate assistance and services on a continuing basis to children and family members."  *Id.*

- "Assist[ing] the social worker in completing specified paper and record searches to locate hard-to-find families by engaging diligent search services or by searching and clarifying existing data, checking files and contacting other agencies as necessary."  *Id.* at 14.

The District acknowledges that "Plaintiffs are correct that the responsibilities of FSWs did have similarities to those of SSAs."  Def.'s Reply Supp. Mot. Summ. J. ("Reply") at 11–

12, ECF No. 200.  The District states that this similarity is "to be expected" as "CFSA was not reinventing the wheel," *id*. at 12, but rather combining the functions of the SSAs and SWAs while adding new major duties,[5] Mot. Summ. J. at 7.  The District differentiates the positions by noting that FSWs had broader responsibility to conduct home visits with social workers and to prepare pre-disposition reports and other court reports.  *See* Def.'s SOF ¶ 37.  FSWs also had a lead role in coordinating team meetings and directing the roles of all team members, whereas SSAs were not involved in team meetings.  *Id*. ¶ 40.

Still, Plaintiffs present evidence that at least some SSAs were performing responsibilities—specifically casework and assessments during home visits—that were later included in the FSW job description.  Plaintiff Darius Morris testified during a deposition that he made home visits and assessments, but that CFSA did not enter those visits and assessments into its database system.  *See* Pls.' Ex. 10 at 24–27, ECF No. 198-11.  In addition, in her response to an interrogatory, Plaintiff Stephanie Alston stated that despite her lack of a bachelor's degree, the Georgia Avenue Family Support Collaborative, a CFSA contractor, hired her as a Family Support Worker.  *See* Pls.' Ex. 14 at 3, ECF No. 198-15.  The District notes that it is unclear how this Family Support Worker position compared to CFSA's FSW

---

[5] As Defendant states, duties present in the FSW description but not absent from the SSA description included: "investigates reports of child abuse and neglect," "develops plans for and provides appropriate assistance and services on a continuing basis to children and family members," "[m]akes recommendations for planned use of agency resources and auxiliary services," "[c]larifies the roles and responsibilities of all team members as necessary," "[a]ssists Social Workers in the timely implementation of case plans," "[a]ssists in the preparation of pre-disposition reports," and "[i]nterviews children, families, neighbors, professional groups to obtain or provide information."  *See* Reply at 11–12; Pls.' Ex. 7 at 7–15.  Additionally, FSWs were also required to have "[s]kill in interviewing clients to gather and provide information" and the "[a]bility to communicate orally and in writing to provide assistance to clients, prepare reports and maintain contact with community resource groups and other outside groups and organizations."  Reply at 12.

position, as the record does not contain any description of that position's responsibilities. *See* Reply at 13–14.

Plaintiffs also present an email sent by CFSA employee Jenna Beebe on May 26, 2010. *See* Pls.' Ex. 15 at 1, ECF No. 198-16. Ms. Beebe said that "one of the other supervisory interviewers mentioned to me that they felt that the FSW would be used in the exact fashion SSA's were prior to the RIF." *Id.* Ms. Beebe added that in her understanding, "FSW's will have much higher requirements and acquired skills." *Id.* In response, Ms. Porchia-Usher stated that CFSA would need "to be conscious that all FSW[s] know[] the expectations" and that "performance evaluations [clearly] outline the current position expectations." *Id.*

Finally, the Court observes that the parties overwhelmingly focus on comparing the SSA and FSW positions, with much less discussion of the responsibilities of the SWA position. The District argues that FSW duties were broader than those assigned to SWAs to "account for the addition of the teaming model, by assigning a team coordination and clarification role to the FSWs, and newly required FSWs to take responsibility for record and report creation even where CFSA was subject to legal reporting requirements (as with clinical notes and judicial filings)." Mot. Summ. J. at 7–8 (citing Def.'s SOF ¶ 61). It is apparent that the SWA position had more duties and required higher qualifications than the SSA position. *See* Def.'s Ex. L at 1–3, ECF No. 197-15 (listing SWA job responsibilities). At the same time, while the SWA job duties are similar to the FSW position's duties, the District is correct to say that the FSW job description included responsibilities that the SWA description did not. The Plaintiffs do not seriously rebut this point. *See* Pls.' Disputed SOF at 20 (making a conclusory assertion that "there is no evidence that functions changed, and new duties were added.").

1. Agency Programs After the RIF

The parties' current briefing does not fully address the hiring process for the FSW

position.  The Court refers to its prior opinion, which recounted that:

> A job posting for the newly created FSW position stated that the position would be
> open as of May 5, 2010 and that CFSA planned to fill 35 vacancies.  On June 7,
> 2010, CFSA Director Gerald sent an email stating that "[t]he first of our new
> Family Support Workers (FSWs) came on board today" and that each of the 17
> new FSWs "are former CFSA employees we're re-hiring after the reduction in
> force last month."

*See Davis v. Dist. of Columbia*, 246 F. Supp. 3d 367, 374–75 (D.D.C. 2017) (internal citations

omitted), *aff'd in part, rev'd in part and remanded*, 925 F.3d 1240 (D.C. Cir. 2019).

Plaintiffs explain that 44 individuals terminated in the RIF applied for the FSW

position.  Pls.' Ex. 2 at 5, 8.  Of those eliminated employees, 30 had a bachelor's degree.  *Id.*

Plaintiffs say that not all terminated employees were given priority for new positions, citing

Mr. Morris's testimony that he was not hired as a FSW despite having an undergraduate

degree and 15 years of experience as an SSA.  Pls.' Ex. 10 at 16–18.  Plaintiffs also say that

CFSA considered relatively junior and inexperienced hires for the FSW position by citing a

email chain in which a CFSA employee discussed whether a recent college graduate should

apply for an SSA position, before another employee noted that the SSA position no longer

exists.  Pls.' Ex. 12 at 1–2, ECF No. 198-13.

Many of CFSA's remaining employees were displeased with the RIF.  Shortly after the

RIF was announced, in May 2010, a CFSA supervisor emailed that the social workers were

"really upset with the [SWAs] being RIF['d] since they are saying that they are already over

worked [sic]."  Pls.' Ex. 16 at 2, ECF No. 198-17.  Another email from May 2010, before the

FSWs were hired, stated that social workers were having difficulty transporting children due

to the termination of the SSAs who would normally handle that responsibility.  Pls.' Ex. 21 at

1–2, ECF No. 198-22.  In June 2010, a Data Assessment Specialist working for CFSA issued an Agency-wide data call for any problems stemming from the recent RIF.  Pls.' Ex. 18 at 1, ECF No. 198-19.  In a response, a social worker reported experiencing "a tremendous [e]ffect" on both her and other social workers, noting her lack of efficiency due to her completing client visits on her own and her inability to take required breaks.  Pls.' Ex. 19 at 1, ECF No. 198-20.  Another supervisor referred to staffing levels as "crazy" in June 2010, noting that she was trying to get more new positions approved.  Pls.' Ex. 20 at 1, ECF No. 198-21.  Also in June 2010, a program manager expressed that the staff took a "tremendous hit" from the RIF.  Pls.' Ex. 26 at 1, ECF No. 198-27.

Most notably, in a June 2010 all-staff email, Dr. Gerald announced "proactive" measures designed to reduce the investigations workload on the remaining staff.  Pls.' Ex. 24 at 2, ECF No. 198-25.  These measures primarily addressed the problem by shifting resources to detail 12 short-term staff for 45–60 days while CFSA recruited and hired an entirely new investigative unit at CPS.  *Id.* at 2.  Dr. Gerald explained that CPS was in a "surge" of new investigations while also "finding worse situations" adding to the workload of the staff.  *Id*. at 3.  Following this email, the CFSA union was concerned that the "RIF may be having an adverse impact on CFSA's ability to meet its caseload requirements without resort to emergency measures."  *Id.* at 1.  An August 2010 court report described social workers as "overwhelmed" and "striving to adjust to doing more tasks that were done by the RIF staff."  Pls.' Ex. 27 at 1, ECF No. 198-28.

Several months later, CFSA held focus groups as part of a study about retention and employee relations.  Pls.' Ex. 25 at 1, ECF No. 198-26.  Some workers stated they were now "doing more with less support."  Pls.' Ex. 28 at 1, ECF No. 198-29.  Several social workers

were critical of the new teaming model and the RIF.  These social workers described a

"voluminous" approval process for requesting the assistance of a FSW as "burdensome and a

barrier to providing timely services to children and families."  Pls.' Ex. 25 at 3.  This process

apparently reduced access to FSWs.  *Id*.  Some workers reported "FSWs do not have enough

work to keep them occupied."  *Id*.  Several workers agreed that "Social Service Assistants

(SSAs) were much more helpful."  *Id*.

### 5.  Termination of Other Positions

Although the SSAs and SWAs in Agency Programs accounted for the majority of the

positions terminated in the RIF, dozens of other positions in other CFSA program areas were

also terminated.  In the Office of Clinical Programs, CFSA implemented a model that paired

Social Workers with skilled Nurse Care Managers who would supervise medical care for the

children, youth and families served by the agency.  Def.'s SOF ¶ 31.  CFSA eliminated or

reclassified 8 full-time positions, accounting for 7 of the 115 employees separated in the RIF, to

create the vacancies needed to hire 20 Nurse Care Managers and implement this new Nurse Care

Management model. [6]  *Id.*  ¶¶ 32, 47.  Plaintiffs say that Nurse Care Managers were mere

replacements that handled "the same tasks previously performed by SSAs/[SWAs] subject to the

RIF."  Opp'n Mot. Summ. J. at 16.  The record does not support this comparison.  CFSA hired

"skilled" Nurse Care Managers to "look after health issues" affecting those served by the agency.

Def.'s Ex. D ¶ 10; Pls.' Ex. 32. at 3, ECF No. 198-33.  By contrast, SSAs would sometimes

"[p]rovide transportation assistance for clients" to "city hospitals", *see* Pls.' Ex. 7 at 7, and serve

as "back up for medical and dental appointments for CFSA foster parents and social workers."

---

[6] These positions included Clinical Support Specialist, Health Services Program Liaison,
Supervisory Health Care Specialist, Supervisory Clinical Support Specialist, Residential
Specialist, and Office Automation Assistant.  Def.'s SOF ¶ 32.

*Id*. at 3.  Those duties are logistical support, and Plaintiffs do not have evidence that SSAs and SWAs had supervisory health care responsibilities or that these positions were interchangeable with Nurse Care Managers.

Within the Office of Community Services, CFSA devised a new model of overseeing performance of certain agency contractors.[7]  Def.'s SOF ¶¶ 42, 63.  CFSA sought to align its personnel "with the high level performance-based contract management required to manage multiple multimillion dollar contracts" and to "ensure high performance from a multifaceted array of congregate care contractors providing such services as diagnostic and emergency case, therapeutic and traditional group homes, and independent living programs." *Id*. ¶ 63 (quoting Def.'s Ex. D ¶ 12).  This reorganization eliminated or reclassified 19 positions, accounting for 19 of the 115 employees separated in the RIF, in the Congregate Care and Home Study Contract Monitoring Division.  *Id.* ¶ 42.

Beyond shifting to these new models, CFSA also selected the personnel to be terminated by reviewing its programs and determining which positions could be eliminated with the least negative impact on the Agency's ability to perform its statutory and court-ordered functions.  *Id.* ¶ 45.  Plaintiffs note that CFSA has explained that it "did not utilize a single uniform criteria, test or requirement for determining which employees would be separated from the Agency in the RIF."  Pls.' Ex. 2 ¶ 4.  CFSA eliminated 7 positions within the Administrative Review Division of the Office of Planning, Policy and Program Support based on a determination by the Office's Deputy Director that eliminating these positions would not detrimentally affect the division's

---

[7] Plaintiffs dispute that this was a new model or a more effective approach, but they give no evidence or reason to question this statement.  *See* Pls.' Disputed SOF at 14.

functions.[8]  Def.'s SOF ¶¶ 46–47.  CFSA then identified other non-direct or administrative

service positions for elimination, including Clerical Assistants, Human Resource Support,

Paralegals, Case Assessment Specialists, Payroll Specialists, and Contract Compliance.  *Id.* ¶ 48.

The reduction in these positions was based upon seniority within a particular competitive area

and level, as required by District personnel regulations.  *Id.*  The elimination of these positions

accounted for the remaining 12 employees terminated in the RIF.  *Id.* ¶ 49.

### B.  Procedural History

Plaintiffs filed their initial complaint on September 16, 2010.  *See* Compl., ECF No. 1.

The current operative complaint is Plaintiffs' Third Amended Complaint, filed on May 31, 2013.

*See* Third Am. Compl., ECF No. 66.  The Third Amended Complaint brings claims of age

discrimination pursuant to the District of Columbia Human Rights Act ("DCHRA") and race

discrimination pursuant to Title VII and the DCHRA.  *See id.* ¶¶ 78–105.  Following several

rounds of dispositive motions, Plaintiffs' sole remaining claim is a racially discriminatory

disparate impact claim caused by the manner in which the RIF was conducted.

In March 2017, this Court issued an opinion granting summary judgment to the District

on all issues.  *See Davis*, 246 F. Supp. 3d at 401.  When evaluating the disparate impact claim,

the Court determined that Plaintiffs failed to identify a specific employment practice that could

be challenged under Title VII.  *Id.* at 394.  The Court further found that "simply pointing to a

RIF generally is not sufficient" to support a disparate impact claim.  *Id.* at 395 (citing

*Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1269 n.5 (8th Cir. 1987)).  The Court also granted

---

[8] Plaintiffs say that regardless of whether CFSA believed there would be a detrimental effect, "the question of whether the elimination did in fact have a detrimental effect is a disputed question of fact insofar as Defendants have placed no evidence on the record to show one way or another the effect of the elimination of any position."  Pls.' Disputed SOF at 14.

summary judgment regarding the FSW position's bachelor's degree requirement, citing a lack of evidence regarding the qualified labor pool.  *Id.* at 397–99.

Plaintiffs appealed, and the D.C. Circuit panel "generally" affirmed the opinion but reversed and remanded "on one narrow question: whether the plaintiffs identified a 'particular employment practice' susceptible to challenge for its adverse racial impact under Title VII."  *See Davis v. Dist. of Columbia*, 925 F.3d 1240, 1243 (D.C. Cir. 2019) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  The Circuit panel explained that "[d]isparate impact analysis is 'no less applicable to subjective employment criteria than to objective or standardized tests.'"  *Id.* at 1249 (quoting *Watson v. Fort Worth Bank and Tr.*, 487 U.S. 977, 990 (1988)).  The panel observed that "[a]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination."  *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011)).  Consequently, because CFSA did not use uniform criteria to select positions for termination as part of the RIF, the panel noted that "the procedures for culling jobs fit *Watson's* description of 'an employer's undisciplined system of subjective decisionmaking' as to which 'it is difficult to see why Title VII's proscription against discriminatory actions should not apply.'"  *Id.* at 1250 (quoting *Watson*, 487 U.S. at 990–91).

The Circuit panel summarized the two remaining practices that would be at issue on remand, stating that "[t]here is no mystery in this case as to the layoff practices plaintiffs challenge: the Agency's choices to (a) target the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units."  *Id.* at 1249–50.  Thus, "[w]hat is at issue here is not a RIF in the abstract . . . but the means by which the Agency implemented it."  *Id.* at 1243.

The Circuit panel remanded to determine whether "plaintiffs clear the statistical hurdle" of making out a prima facie case of disparate impact regarding the identified employment practices. *Id.* at 1253. On remand, the parties filed motions for summary judgment on the issue, relying on their respective expert reports from Dr. Munro and Dr. Bronars. The Court denied both motions but determined that "Plaintiffs clear the statistical hurdle required to make out a prima facie case" of disparate impact. *Davis v. Dist. of Columbia*, 496 F. Supp. 3d 303, 317 (D.D.C. 2020). The Court held that "Dr. Munro's analysis shows that the processes by which CFSA implemented the RIF—the challenged employment practices identified by Plaintiffs and the D.C. Circuit—disproportionately impacted African Americans."[9] *Id*. at 318.

Because the Court had bifurcated discovery, the disparate impact decision allowed the litigation to proceed to discovery on whether the RIF was linked to legitimate business necessities. The District now moves for summary judgment, arguing that it has sufficiently shown that business necessity justified its RIF procedures. Plaintiffs oppose the motion.

### III. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is guided by "whether the evidence presents a sufficient

---

[9] Because of this prior finding, this opinion does not extensively discuss the racial demographics of the terminated personnel. The Court refers the reader to its prior opinion for a detailed discussion of the expert reports. *See Davis*, 496 F. Supp. 3d at 311–18.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. "[T]he non-movant 'may not rest upon mere allegation or denials . . .' but must [instead] present 'affirmative evidence.'" *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57). In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. But conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

To decide the present motion, the Court focuses on the "Agency's choices to (a) target the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units." *Davis*, 925 F.3d at 1250. In its motion, the District argues that both methods of implementing the RIF were justified by business necessity. Accordingly, the Court begins by reviewing Title VII and the business necessity framework. After determining the appropriate

test, the Court turns to the elimination of the SWA and SSA job categories in favor of the new

FSW category.  Because the District has presented substantial evidence that this restructuring

was consistent with business necessity, and Plaintiffs fail to show any alternative that would also

meet the District's goals, the District is entitled to summary judgment on this claim.  After, the

Court looks to the process by which the District identified other positions for elimination.  The

Court is satisfied that there is no material dispute regarding the District's explanation that this

procedure minimized impacts and complied with personnel regulations, and Plaintiffs fail to

offer any alternatives.  Therefore, the District's motion will be granted in full.

### A.  Title VII and Business Necessity

Title VII of the Civil Rights Act makes it unlawful for an employer "to fail or refuse to

hire or to discharge any individual . . . because of such individual's race."[10]  42 U.S.C. § 2000e-

2(a)(1).  A plaintiff may establish racial discrimination in violation of Title VII by proving

disparate impact: that an employer's actions came from a process that, "while apparently 'fair in

form,' was 'discriminatory in operation.'"  *Davis*, 925 F.3d at 1248 (quoting *Griggs v. Duke*

*Power Co.*, 401 U.S. 424, 431 (1971)).  Unlike a disparate treatment claim that requires proof of

a discriminatory motive, disparate impact claims require no such showing of intent.  *Id.*  Instead,

these claims are successful if they show an employer's "challenged practices have a

disproportionately adverse effect on the plaintiffs that cannot be justified as necessary to an

employer's business."  *Id.* at 1248–49.

---

[10] The parties, and prior opinions in this case, recognize that the District of Columbia
Human Rights Act tracks Title VII in all respects relevant to this case, meaning that Plaintiffs'
claims under District of Columbia law can be treated as coextensive with their federal claims.
*See Davis*, 925 F.3d at 1248.

Thus, to state a disparate impact claim, a plaintiff must identify specific employment practices that are responsible for statistical racial disparities.  *Id.* at 1249.  Such practices can include an employer's implementation of a RIF.  *See id.*  The plaintiff must show causation between the identified employment practices and the racially disparate outcomes.  *Id.* at 1251.  Once a plaintiff has made a prima facie case of discriminatory disparate impact, Title VII's burden-shifting framework kicks in, and the defendant has the burden to show that its practices were justified by "business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i); *see Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989); *Watson*, 487 U.S. at 994–98.

Indeed, "the 'touchstone' for disparate-impact liability is the lack of 'business necessity'" supporting the challenged practice.  *Ricci v. DeStefano*, 557 U.S 557, 578 (2009) (quoting *Griggs*, 401 U.S. at 431).  "An employer may defend against liability by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'"  *Id.* (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  Once the employer meets that burden, a plaintiff can still prove the claim "by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs."  *Id.* (quoting 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)).

The nature of the "business necessity" test is hazy, because neither Congress nor the Supreme Court has "provide[d] a precise definition of business necessity."  *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 241–42 (3d Cir. 2007).  Nor has the D.C. Circuit.  As a result, the Court must closely examine Supreme Court precedent and look to caselaw from other circuits.  A basic statement of business necessity is that a practice causing a disparate impact "must have a manifest relationship to the employment in question," or in other words, a requirement must be a "reasonable measure of job performance."  *Griggs*, 401 U.S. at 432, 436.  Put another way, the

standard looks to whether employers can "state and explain the valid interest served by their policies." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 541 (2015) (hereinafter "*Inclusive Communities*") (allowing housing authorities and developers to defend against disparate impact liability if they "state and explain the valid interest served by their policies" and explaining that "[t]his step of the analysis is analogous to the business necessity standard under Title VII").

Unsurprisingly, the parties arrive at different conclusions about the nature, and the rigors, of the business necessity standard. The District primarily relies on the Seventh Circuit's interpretation of the test, which affords employers considerable discretion. *See* Reply at 3–4. In particular, the Seventh Circuit views the Title VII business necessity standard as a "matter of reasonableness" in assessing whether an employer practice is valid. *See Bryant v. City of Chicago*, 200 F.3d 1092, 1099 (7th Cir. 2000). In a more recent decision applying that case law, a district court inquired into whether an employer's practice "reflects a reasonable and 'practical business choice.'" *Chicago Teachers Union, Local 1 v. Bd. of Educ. of the City of Chi.* ("*Chicago Teachers Union I*"), 419 F. Supp. 3d 1038, 1050 (N.D. Ill. 2020) (quoting *Inclusive Communities,* 576 U.S. at 533). Affirming the district court, the Seventh Circuit phrased the inquiry as whether an employer's proffered business justification is "legitimate." *Chicago Teachers Union v. Bd. of Educ. of the City of Chi.* ("*Chicago Teachers Union II*"), 14 F.4th 650, 656 (7th Cir. 2021).

Similarly, the First Circuit has looked to whether "defendants have presented legitimate business justifications for their actions." *Abril-Rivera v. Johnson*, 806 F.3d 599, 606–08 (1st Cir. 2015) (holding that employer proved legitimate business justification for closing a facility and laying off its employees because they were "no longer needed, given declining [business]

needs," and the employer "legitimate[ly]" had "concerns about the costs associated" with maintaining the facility).  The Sixth Circuit considers whether an employer demonstrated a "legitimate business justification" for the challenged employment practice.  *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 486 (6th Cir. 2008) (employer demonstrated "legitimate business justification" for a RIF in certain departments that had been particularly affected by declining business).  And the Eighth Circuit has held that showing that an employer made a "sound business decision" may be sufficient to establish business necessity.  *Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040–41 (8th Cir. 2018) (citation omitted) (affirming district court's finding that a bank's termination of all employees with certain criminal convictions was a "sound business decision" satisfying business necessity).

Plaintiffs, however, suggest a stricter business necessity standard: that a practice be "'essential' or 'necessary' to the success or to the 'safety and efficiency'" of an employer.  Opp'n Mot. Summ. J. at 24 (quoting *Lanning v. Se. Pa. Trans. Auth.*, 308 F.3d 286, 292 (3d Cir. 2002)).  But Plaintiffs' sole citation for that point comes in the fact-specific context of an aerobic capacity test for transit police officers.  *See Lanning*, 308 F.3d at 292.  And more to the point, the Third Circuit has been clear that "hiring policies need not be perfectly tailored to be consistent with business necessity" to satisfy Title VII.  *See, e.g.*, *El,* 479 F.3d at 242.

To support their argument that the business necessity test demands that a practice be vital to the success of an employer, Plaintiffs refer to the history of Title VII.  In 1989, the Supreme Court held that employers did not have the burden of persuasion for showing business necessity under Title VII.  *Wards Cove*, 490 U.S. at 659.  Congress responded by enacting the Civil Rights Act of 1991, which amended Title VII to clarify that employers did have such a burden.  *See, e.g., Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013) ("Disagreeing with the Court's

later narrowing of employer liability in *Wards Cove* . . . Congress codified a modified version of the [business necessity] defense into Title VII in 1991.").

Nonetheless, Plaintiffs misread this history by seizing on the language in *Wards Cove* that "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster." *Wards Cove,* 490 U.S. at 659.  While Congress reversed *Wards Cove* regarding which party had the burden of persuasion of showing business necessity, and made several other changes to Title VII, it did not address the exact requirements of the business necessity standard.[11]  *See* P.L. No. 102–166, 150 Stat. 1071.  Instead, the 1991 Civil Rights Act returned the law to a "preexisting 'state of confusion'" as to the business necessity standard.  *Chicago Teachers Union I*, 419 F. Supp. 3d at 1049 (citation omitted) (describing the 1991 Civil Rights Act's effect on Title VII and business necessity).  And as discussed above, many circuits continue to read the business necessity test in a way that affords considerable discretion to employers.

A perfect fit requirement—or something close to it—would not make sense given that once an employer has shown business necessity, a plaintiff may still succeed by demonstrating that there is an alternative employment practice that also meets the employer's needs.[12]  To say it again, "before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'"  *Inclusive Communities*, 576 U.S. at 533 (quoting *Ricci*, 577 U.S. at 578); *see also Smith*

---

[11] The 1991 statute also clarified that the standard by which a plaintiff shows an "alternative employment practice" shall follow the law as it was before *Wards Cove.  See* P.L. No. 102–166, 150 Stat. 1071.

[12] Plaintiffs do not suggest that Title VII requires a perfect fit, but do advance a stringent view of the business necessity test.

*v. City of Jackson,* 544 U.S. 228, 243 (2005) (noting that business necessity test "asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class"). Clearly, the law envisions enough room in "business necessity" that multiple practices might satisfy that test.

Now, transferring the business necessity framework to the RIF context is difficult. Most of the Supreme Court's Title VII decisions confront employment practices related to hiring and promotion, such as whether an aptitude test for applicants is actually related to job performance and necessary for identifying appropriate candidates. *See Griggs*, 401 U.S. at 431–32; *Ricci,* 557 U.S. at 587–88. However, when an employer decides whether to cut positions, what procedures to use when deciding what positions to cut, and what positions ultimately are cut, it could take any number of actions that could reasonably be described as a business necessity. Thus, the Court must identify a more specific framework for assessing a RIF in the Title VII context.

Plaintiffs ask the Court to use the following test: "(1) whether the RIF prioritized the skills and seniority of a defendant's employees; (2) whether the [RIF] is commensurate with a reduction in work; (3) whether the RIF streamlined the efficiency of the agency; and (4) whether the RIF adequately addressed budgetary matters." Opp'n Mot. Summ. J. at 25 (internal footnotes omitted). Plaintiffs have constructed this test with scattered cites to other cases, but with no citation to a case that is directly on point. That omission is likely because there are few cases, either in this Circuit or outside of it, that closely match this case. After an exhaustive search for cases with analogous facts and contested legal issues, the Court has identified just one that sufficiently resembles the present action.

This Court has already mentioned that case, *Chicago Teachers Union I*, where the district court confronted a similar claim that a government agency's layoff practices had a disparate

impact in violation of Title VII.[13]  After tracing much of the same case law that this opinion has

reviewed, the district court arrived at a business necessity test based on several overlapping

factors.  *Chicago Teachers Union I*, 419 F. Supp. 3d at 1050.  The Court finds that test to be

persuasive and well-grounded in Supreme Court precedent and adopts it here as well:

> to determine whether defendant's enrollment-based layoff practice is "job related
> and consistent with business necessity," this Court considers whether the practice
> bears a manifest relationship to the employment in question, whether it is
> necessary to safe and efficient job performance or essential to safe and efficient
> conduct of the employer's business, and whether it is consistent with genuine
> business needs.

*Id.*  The court in *Chicago Teachers Union I* also emphasized that it "focuses on whether there is

a reasonably tight fit between the challenged criterion and the actual demands of the job, such

that the criterion reflects a reasonable and practical business choice."  *Id.* (cleaned up).

Finally, although the parties do not address the point, the Court must note that this case

concerns not just a RIF but a government agency's RIF.  The First Circuit has observed, in the

context of a government RIF, that disparate-impact liability "must . . . be limited as applied to

government entities so as to avoid 'inject[ing] racial considerations into every [agency]

decision.'"  *Abril-Rivera*, 806 F.3d at 606 (quoting *Inclusive Communities*, 576 U.S. at 532).

Similarly, a prior decision in this district found that the business necessity test has different

contours in the context of a government RIF versus a private-sector RIF.[14]  *See Anderson*, 20 F.

Supp. 3d at 56.  And *Chicago Teachers Union I,* too, incorporated the nature of government

---

[13] *Chicago Teachers Union I* was appealed, but the court's business necessity analysis was not at issue in that appeal.  *See Chicago Teachers Union II*, 14 F.4th at 656 ("Nor do [the Plaintiffs] challenge the court's finding that the Board's decision to tie layoffs to declining enrollment in schools was legitimate, job-related, and consistent with business necessity.").  On the sole disputed issue, the district court's grant of summary judgment was affirmed.  *Id.* at 658.

[14] *Anderson* analyzed a RIF discrimination claim under the Americans with Disabilities Act and Rehabilitation Act, not Title VII.  But "[f]or purposes of disparate impact, the ADA and Title VII inquiry is similar" although not identical.  *Anderson*, 20 F. Supp. 3d at 57.

policy concerns and budget cuts into its analysis.  *See Chicago Teachers Union I*, 419 F. Supp. 3d at 1050–51 (considering parties' arguments over whether budget deficit caused the RIF, and concluding that the RIF was part of a policy to staff each Chicago public school "with the number of teachers and paraprofessionals reasonably necessary to serve the needs of the school's students").  This Court will do the same.

Finally, the Court reiterates that even after an employer has shown business necessity, that does not defeat the plaintiffs' claim.  Plaintiffs may still prove their claim by demonstrating that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975); *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(ii).  More specifically, "to satisfy this element, the plaintiff must demonstrate: (1) the availability of alternative procedures that serve the employer's legitimate interests and (2) produce substantially equally valid results, but with (3) less discriminatory outcomes."  *Johnson v. City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014) (internal quotation marks omitted).  Now that the Court has assessed and determined the appropriate statutory framework, the Court applies it to the present facts.

## B.  There Is No Material Dispute Regarding the Business Necessity of Eliminating SSAs and SWAs

### 1.  CFSA's Budget Cuts and the Creation of the FSW Position Both Justify Terminating SSAs and SWAs

In 2010, facing financial pressure from the Great Recession, the District cut CFSA's FY 2011 budget and number of FTEs.  *See* Def.'s SOF ¶ 16.  But this Court does not consider the business necessity of the RIF itself—it looks at the implementation of that RIF through the elimination of the SSA and SWA positions in favor of the new FSW position, as well as the

process for selecting other positions for termination.[15]  In this section, the Court first addresses CFSA's elimination of the SSA and SWA positions.  The District introduces several reasonable and legitimate justifications for eliminating SSAs and SWAs.  Plaintiffs say that the termination of SSAs and SWAs was not a business necessity because (1) CFSA could have responded to budget pressures without eliminating the SSAs and SWAs and (2) the FSW position was largely duplicative of the SSA and SWA position.  Opp'n Mot. Summ. J. at 33–44.  Plaintiffs also argue that the RIF disrupted CFSA activities and put workers under a heavy caseload.  *Id.* at 30–31.  The Court determines that none of these points create material issues of fact under the business necessity test.

To start, Plaintiffs contend that "Defendant[] could have met its budget reduction goals without eliminating [SSAs and SWAs].  The burden of proof is on the Defendant[] to show the Agency needed to target these positions to 'balance [the] budget."[16]  *Id.* at 16.  Plaintiffs add that "[w]ith respect to budget deficits, while terminating employees can be a means to cut costs, it should be a last-resort and only done to meet an essential, legitimate business need."  *Id.* at 32.  As discussed in the prior section, Plaintiffs are correct that the District has the burden of showing business necessity, but they overstate the rigors of the business necessity test.  Plaintiffs cite no authority for the proposition that terminations are only justifiable as a last resort, especially when CFSA was a government agency with other obligations to the public.  *See, e.g.*, *Inclusive Communities*, 576 U.S. at 533 (noting that agencies need to support public interest).  Instead, the

---

[15] The District argues that Plaintiffs still seek to challenge the RIF itself, and correctly observes that Plaintiffs have waffled on this issue throughout the litigation.  Mot. Summ. J. at 13, Reply at 7.  The Court relies on the D.C. Circuit's characterization of Plaintiffs' claims as challenging not the RIF but rather the way in which the District implemented it.  *See Davis*, 925 F.3d at 1249–50.

[16] Plaintiffs repeatedly refer to "Defendants," but the District is the sole remaining Defendant in this action.

Court considers whether those terminations were reasonably consistent with a legitimate business need.

The RIF has a close relationship to CFSA's FY 2011 budget cuts. And at the risk of belaboring the point, the RIF itself is not at issue. *See supra* note 15. Still, Plaintiffs repeatedly return to that topic. They note that CFSA administrators originally proposed a small increase in CFSA's budget. *See* Def.'s Ex. A. at 2, ECF No. 197-4. But the District eventually passed a budget reducing CFSA's FY 2011 budget by $12.1 million. Def.'s SOF ¶ 16. Plaintiffs argue that "[t]his suggests the administration was provided with at least two options to save money without a RIF but passed on both in favor of prioritizing other line-items in the budget." Opp'n Mot. Summ. J. at 17. That appears to be true. It is also irrelevant here, where the District conducting the RIF is not the issue and the Court focuses on examining the RIF's *implementation*.[17]

The Court therefore moves on to the District's justifications for terminating the SSA and SWA positions, and finds that the District has presented a business necessity beyond any material dispute. *See Davis*, 925 F.3d at 1253 ("The Agency's reasons for its actions evince a fact-intensive inquiry into business justification."). First, the quantity and nature of CFSA's casework had significantly changed in the years preceding the RIF. Def.'s SOF ¶ 53. A 47%

---

[17] Plaintiffs argue the RIF came with its own costs. Opp'n Mot. Summ. J. at 18. Because the RIF is not at issue, the Court addresses this point only for the sake of completeness. For fiscal year 2010, severance and leave for employees terminated in the RIF cost $2.2 million, more than the $1.9 million saved in salaries during this same time period. Opp'n Mot. Summ. J. at 18 (citing Pls.' Ex. 37 at 1, ECF No. 198-38). CFSA had to pay out one-time costs related to the RIF in the 2010 fiscal year, exceeding the savings during that period, but thereafter enjoyed the salary savings for the 2011 fiscal year and onward. Plaintiffs' reference to temporary severance does not indicate that the RIF was a net cost for the 2011 fiscal year. Plaintiffs also do not introduce any factual dispute over whether the elimination of SSAs in favor of FSWs provided cost savings.

decline in overall cases was accompanied by an increase of complex cases.  *See id* ¶ 56.  In the wake of these shifts, CFSA saw it as necessary to switch to a new model where "Social Workers are 'teamed' with a set of skilled partners to more effectively serve the needs of the Agency's children and family clients."  Def.'s Ex. D ¶ 6.  In other words, "the decision to eliminate the SSAs and create the new position of FSWs provided an overall cost savings for CFSA while also allowing CFSA to provide children and families with a team of professionals able to serve them and their needs."  Pls.' Ex. 7 at 4.

In this way, this case closely resembles *Anderson*.  There, the court found the U.S. Secretary of Education had established business necessity because his decision to centralize regional offices "was driven by a policy judgment on how to conduct the business of the federal government," and his belief that "dispersed [offices] suffered from program inefficiencies and redundancies and that streamlining [the offices] would reduce these problems while affording greater supervision."  *Anderson*, 20 F. Supp. 3d at 57.  The Court similarly agrees that, in this case, CFSA developed a reasonable policy judgment about how to better structure the Agency's workforce.

Plaintiffs heavily dispute the District's view of the termination of SSAs and SWAs. Plaintiffs disagree that the elimination of the SSAs and SWAs was associated with the switch to a team model, calling it "new jargon to refer to the same work."  Pls.' Disputed SOF at 7.  This portrayal runs counter to the record evidence that the District was adjusting its casework model. Dr. Gerald contemporaneously cited the teaming system as a justification for the change, Def.'s SOF ¶ 51, and the FSW position's responsibilities reflected a shift to a different organizational model, *see id.* 56–57.  Plaintiffs themselves introduce an exhibit that describes how CFSA conducted post-RIF focus groups to get feedback on the teaming model.  *See* Opp'n Mot. Summ.

J. at 14; Ex. 25 at 1–3.  Clearly, CFSA made a change.  Even so, Plaintiffs also dispute that this change of replacing SSAs and SWAs in favor of the FSW-supported team model was reasonably consistent with CFSA's genuine business needs.

Plaintiffs say that the initial stages of the RIF were chaotic and left staff overworked.  *See* Pls.' Ex. 16 at 2; Pls.' Ex. 17 at 1, ECF No. 198-18.  In June 2010, a month after the RIF was announced, CFSA issued an agency-wide data call for any problems resulting from the recent RIF.  Pls.' Ex. 18 at 1.  In other documents from June 2010, social workers reported a "tremendous [e]ffect" from the RIF, Pls.' Ex. 19 at 1, and a supervisor described the current level of staffing as "crazy," Pls.' Ex. 20 at 1.  Even by August, social workers remained "overwhelmed" and were "striving to adjust to doing more tasks that were done by the RIF staff."  Pls.' Ex. 27 at 1.  Plaintiffs therefore conclude that the District has not proven the elimination of the SSAs and SWAs was commensurate with a reduction in work.  *See* Opp'n Mot. Summ. J. at 30–31.

Plaintiffs would have a stronger argument if the District had attempted to justify the RIF solely through reference to declining workload.  But that is not the case.  *See, e.g.*, Reply at 16.  The District's business necessity argument must be viewed in relation to the budgetary need to reduce expenditures and FTEs.  In the context of budget cuts, it is unsurprising that the RIF would cause remaining employees to feel overworked.  Just because a reduction in work is one way to show business necessity for RIF practices, *see Shollenbarger*, 297 F. App'x at 486, that does not mean that an employer must always show it.[18]  The Court locates no support, in the

---

[18] Plaintiffs' citations to *Aliotta v. Bair*, 614 F.3d 556 (D.C. Cir. 2010) and *Teamsters Local Union No. 171 v. N.L.R.B.*, 863 F.2d 946 (D.C. Cir. 1988) are not applicable to this case. *See* Opp'n Mot. Summ. J. at 30–31.  Neither case arises in the Title VII context.  Moreover, *Aliotta* rejected an employment age discrimination claim because the Agency "submitted numerous communications between Agency officials and employees explaining its

caselaw or in logic, for Plaintiffs' apparent contention that the business necessity test requires an employer to show that its RIF practices were not followed by any adverse impacts on remaining operations or on remaining employee satisfaction.  Furthermore, regardless of the reports that CFSA employees were grappling with a high workload after the RIF, the record is uncontested that caseloads had fallen 47% in the 7 years preceding the RIF.  *See* Def.'s Ex. H; Def.'s SOF ¶ 53.

More compelling than Plaintiffs' reasoning about overall work levels is their argument that eliminating the SSAs and SWAs was inconsistent with the needs and functions of CFSA. For this point, Plaintiffs primarily rely on focus group results from late 2010 that questioned the efficacy of the FSW position and teaming model.  Pls.' Ex. 25 at 1–3.  Social workers felt that the process of requesting an FSW for their teams was "burdensome" and restricted access to FSWs, which hindered their ability to provide timely services to children and families.  *Id.* at 2. Several workers agreed that "FSWs do not have enough work to keep them occupied," all while concurring that "[SSAs] were much more helpful."  *Id.*  This evidence indicates that the switch to the teaming model may not have achieved the objectives that CFSA intended, at least in the six months following the RIF.

But the business necessity test looks to whether the District has presented "reasonable," *see Bryant*, 200 F.3d at 1098–99, "legitimate business justifications," *Abril-Rivera*, 806 F.3d at 606, rather than closely scrutinizing an employer's actual realization of those goals, *see Chicago*

---

nondiscriminatory reasons for the RIF." *Aliotta*, 614 F.3d at 564.  Accordingly, Plaintiffs argue that *Aliotta* applies because CFSA "failed to communicate to SSAs why their roles were . . . subject to the RIF." Opp'n Mot. Summ. J. at 31.  But the RIF announcement did exactly that. *See* Def.'s Ex. H.  Regarding *Teamsters*, that opinion scrutinized a purported reduction in work and determined that layoffs were motivated by anti-union animus rather than economic need, which is a separate legal and factual inquiry from the issues in this case.  *See Teamsters*, 863 F.2d at 956.

*Teachers Union I*, 419 F. Supp. 3d at 1051–52 (finding business necessity because it was "reasonable to devise a system for staffing individual schools with teachers and paraprofessionals based on how many students are enrolled in each school").  Those inquiries may be essentially identical in a typical Title VII disparate impact claim that challenges the use of a specific performance metric, but they are uncoupled in the setting of a one-time RIF decision.  *See, e.g.*, *Shollenbarger*, 297 F. App'x at 486 (looking only to whether an employer's reasons for targeting certain departments in a RIF were a "legitimate business justification", rather than considering the ultimate effects of that RIF on operations).  And in *Anderson*, the court looked at what government officials "believed" about how best to restructure an agency, regardless of whether they were "[r]ight or wrong," and was unpersuaded by the plaintiffs' argument that "later developments" demonstrated that the restructuring and personnel cuts were actually harmful to the agency.  *Anderson*, 20. F. Supp. 3d at 57.

Plaintiffs do not introduce evidence showing that, at the time of the RIF in May 2010, it was unreasonable for CFSA to believe that the switch to FSWs over SSA and SWAs would improve outcomes.  Conversely, the District *does* provide evidence that the FSW position was a reasonably targeted attempt at improving operations.  The FSW position had more sophisticated responsibilities than the SSA and SWA positions.  Def.'s Ex. F at 1–3, ECF No. 197-9; Def.'s SOF ¶ 61.  The FSWs were charged with coordinating and supervising social work teams, meaning that FSWs had to be capable of running meetings and holding a holistic view of how team members could contribute to the overall goals of a case.  See Def.'s SOF ¶ 40.  In addition to these planning and coordination duties, FSWs maintained "all case-work related documentation (including clinical notes)" and prepared "reports for court."  *Id*. ¶¶ 37, 61.  And different from SSAs, FSWs were permitted to conduct social work home visits that would count

towards satisfying the *LaShawn* consent decree.  *Id*. ¶ 41.  So, much as adjusting teacher staffing depending on the number of pupils was a "practical business choice," *Chicago Teachers Union I*, 419 F. Supp. 3d at 1051, it was also a practical choice for CFSA to respond to the combination of declining case numbers yet more complex cases by switching to a smaller and more highly trained set of staff.

Plaintiffs emphasize the similarities between the FSW position and the SSA and SWA positions.  Opp'n Mot. Summ. J. at 6–8.  But this continuity is unsurprising; the District acknowledges that the FSW position built on and combined the functions of the SSA and SWA positions.  *See* Pls.' Ex. 7 at 3–4; Reply at 11–12.  Plaintiffs recount the portions of the job descriptions that are similar while omitting the additional responsibilities that demonstrate the FSW position was a more complex role than the SSA or SWA positions.  *See* Reply at 12–13 (discussing duties present in the FSW description but not the SSA description); Pls.' Ex. 7 at 7–15.  Plaintiffs claim that "CFSA's own supervisors have conceded the similarities between the SSA and FSW positions."  Opp'n Mot. Summ. J. at 26.  Yet the email thread they cite actually shows a CFSA supervisor stating that to her knowledge FSWs "will have much higher requirements and acquired skills" than the SSAs, and then another supervisor agreeing that it is important to clarify the responsibilities of the FSW role.  *See* Pls.' Ex. 15 at 1. [19]

Plaintiffs also assert that SSA and SWA workers were already handling the responsibilities of the FSW position, and that CFSA could have created the position while maintaining the same work force.  Opp'n Mot. Summ. J. at 33.  They show that one SSA performed some responsibilities later given to FSWs, namely "home visits and assessments in

---

[19] The District argues this email is "inadmissible double hearsay."  *See* Reply at 13.  Regardless, the email *supports* the District's position on FSWs.

the same manner FSWs are prescribed to make." *See id.* at 34; Pls.' Ex. 10.  But there is no evidence that would reveal how widespread this practice was among SSAs.  And, if anything, the fact that some SSAs had to take on duties that fell outside their job description supports the idea that CFSA needed to retool the workforce in favor of the FSW position. *See, e.g.*, *Abril-Rivera*, 806 F.3d at 606–07 (finding a legitimate business justification to close a facility that was no longer closely aligned with the agency's goals).

Plaintiffs argue that SSAs must have been qualified for the FSW position because of an interrogatory response from former SSA Stephanie Alston.  However, Ms. Alston says only that she was later hired as a "Family Support Worker" for a different entity. Pls.' Ex. 14 at 3, ECF No. 198-15.  While this position shares a title with the FSWs at CFSA, there is no information on the responsibilities of the role or how it might compare with the FSWs. *Id.*  And regardless, Ms. Alston's career progression says little about the SSA workforce as a whole, nor would it displace CFSA's assessment of the educational background required to succeed in the FSW role at the Agency. *See Martin v. Omni Hotels Mgmt. Corp.*, 206 F. Supp. 3d 115, 123 (D.D.C. 2016) ("At the summary judgment stage, the Court must assess whether there is sufficient non-speculative evidence to support a verdict in favor of the non-movant.").  Lastly, Plaintiffs press on the FSW bachelor's degree requirement as "arbitrary," *see* Opp'n Mot. Summ. J. at 26–27, even though this Court has already rejected Plaintiffs' challenge to that bachelor's degree requirement and the D.C. Circuit affirmed that judgment, *see Davis*, 925 F.3d at 1254–55.  Nothing in the record indicates that requiring FSWs to have a bachelor's degree was arbitrary rather than an appropriate selection criterion for a more sophisticated role.  For example, the SWA position that was incorporated into the FSW role already required a bachelor's degree.  Def.'s SOF ¶ 29.

Plaintiffs raise several other scattered issues that do not respond to the arguments made by the District.  Plaintiffs say that the hiring of 20 "Nurse Care Managers" during the RIF supports their position.  Opp'n Mot. Summ. J. at 16.  It is difficult to see how.  Plaintiffs say that Nurse Care Managers were no more qualified, and more expensive, than the RIF'd employees and add that "[i]f the goal was to save the agency money, hiring fewer Nurse Care Managers at a higher rate to perform the same tasks SSAs and [SWAs] performed does not accomplish this goal."[20]  *Id.*  But the undisputed record evidence indicates that Nurse Care Managers were skilled workers with greater responsibilities than SSAs and SWAs, whose duties were limited to assisting with transportation and medical appointments.  Def.'s Ex. D ¶ 10; Pls.' Ex. 7 at 7–8.

Plaintiffs also argue that the record lacks "examples of SSA employees having deficient performances or poor evaluations."  Opp'n Mot. Summ. J. at 29.  The District has never attributed the termination of SSAs to poor job performance, instead focusing on the cost savings and the switch to a new teaming model supported by the more-skilled FSW position.  *See* Pls.' Ex. 7 at 4; *see also Utley v. MCI, Inc.*, Civil Action No. 05-0046, 2008 WL 836419, at *37 (N.D. Tex. Mar. 24, 2008) (rejecting disparate impact claim and noting that "[i]n the context of a[] RIF, good employees are sometimes terminated as a business necessity").

Plaintiffs misfire once more by suggesting that the elimination of the SSA and SWA positions should be scrutinized as pretextual.  Opp'n Mot. Summ. J. at 32.  Examining an employer's stated reasons for an employment policy for pretext is important in the context of a

---

[20] Plaintiffs support the claim that Nurse Care Managers were more expensive with a document that has no bates stamp, no date, and no other information that could contextualize the numbers contained in it.  *See* Pls.' Ex. 43, ECF No. 198-44.  Regardless, that document notes $699,826.41 in expenditures on "Nurse Care Management" and $311,356.76 on "RIF."  *Id.* Plaintiffs appear to be comparing the cost of severance payments related to the RIF with the cost of employing Nurse Care Managers, which would be a non-sequitur even if Nurse Care Managers were duplicative of SSAs.

Title VII disparate treatment claim but does not factor into a disparate impact claim.  *Abril-Rivera*, 806 F.3d at 608 n.9 ("Questions regarding 'intent or motive' come into play in a disparate treatment analysis, not a disparate impact analysis.").  The Court previously granted summary judgment for the District on Plaintiffs' disparate treatment claim, and the Circuit affirmed.  *See Davis,* 925 F.3d at 1254–55.  Plaintiffs cannot revive that claim by raising issues of pretext at this juncture.

Plaintiffs also attempt to implicitly resuscitate their age discrimination claim through purported evidence that some individuals hired as FSWs were younger and less experienced than former SSAs.  *See* Opp'n Mot. Summ. J. at 27–28.  Again, this claim has already been resolved in favor of the District, and the Plaintiffs abandoned it on appeal.  *See Davis*, 925 F.3d at 1247 ("Plaintiffs  . . . limit their appeal to the district court's grant of summary judgment on the race discrimination class claims.").  Similarly, Plaintiffs fail to substantiate their argument that CFSA considered individuals with little to no experience as replacements for the SSAs.[21]

Finally, the Court notes that it does not find the District's references to the *LaShawn* order especially persuasive.  The District argues that "CFSA needed to ensure continued compliance with the requirements of the *LaShawn* consent order, the Agency was necessarily limited in terms of its options for reducing the number of social worker, supervisor, and program manager positions."  Mot. Summ. J. at 6.  To be sure, as noted above, the fact that FSWs would count toward *LaShawn* compliance certainly bolsters CFSA's creation of that role.  *Supra* at 31–32.  But the District does not show that complying with *LaShawn* required it to eliminate the

---

[21] Plaintiffs' evidence on this point is an email chain sent five months after the RIF, in which a CFSA employee discusses whether a recent college graduate should apply for an SSA position, before another employee notes that the SSA position no longer exists.  Pls.' Ex. 12 at 1–2.  It is hard to see what this exchange has to do with Plaintiffs' criticisms of the RIF or FSW position.

SSA and SWA positions.  Nevertheless, this point is not determinative, as the District has offered other persuasive reasons to explain its approach.

Looking at the entirety of the parties' arguments, the Court finds that no genuine dispute remains regarding the business necessity of eliminating the SSA and SWA positions.  The District has presented a factually supported narrative that CFSA executed an unavoidable RIF by terminating the outdated SSA and SWA positions in favor of the FSW position.  Not only did this decision indisputably help to achieve the District's budgetary needs, but CFSA also reasonably calculated that FSWs would meet changing casework conditions and improve outcomes for children and families by anchoring a new team model of providing services.[22]

The Court finds that Plaintiffs' only real rebuttal is that the RIF was unpopular among CFSA employees, who felt that they were being overworked and that the FSW position was ineffective.  That simply cannot overcome the multitude of other evidence showing that CFSA made reasonable choices to accomplish its business needs by grappling with the budget cuts imposed on it and, thus, restructured its workforce to best deal with the realities of handling complex caseloads with reduced workforce as efficiently as practical under the circumstances. *See Chicago Teachers Union I*, 419 F. Supp. 3d at 1050–51 (noting that government agency behaved reasonably in adjusting workforce size to address limited resources and the needs of the public).  In sum, the District has shown that the elimination of the SSA and SWA positions was reasonably calculated to achieve its legitimate goals of reducing the budget while modernizing the Agency's service model.  *See Abril-Rivera*, 806 F.3d at 606–07 (finding that plaintiffs did not

---

[22] The Court remains mindful that when evaluating business necessity, "[g]overnmental entities . . . must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes."  *Abril-Rivera*, 806 F.3d at 606 (quoting *Inclusive Communities,* 576 U.S. at 544).

sustain triable issue of business necessity when agency shut down an outdated facility to save money).

### 2.   Alternatives Without Disparate Impact

Because the District has shown a business necessity for terminating SSAs and SWAs, the burden shifts to Plaintiffs to demonstrate "(1) the availability of alternative procedures that serve the employer's legitimate interests and (2) produce substantially equally valid results, but with (3) less discriminatory outcomes." *Johnson*, 770 F.3d at 472 (internal quotation marks omitted); *see also Ricci*, 557 U.S. at 578.  Plaintiffs "may not rest on speculation" about these alternatives, *Johnson*, 770 F.3d at 472, and are obligated to "prove" that they are "equally effective," *Shollenbarger*, 297 F. App'x at 487.  That means Plaintiffs cannot offer "vague or fluctuating" alternatives.  *Allen v. City of Chicago*, 351 F.3d 306, 313 (7th Cir. 2003).  But that is all that Plaintiffs have done here.

Plaintiffs mostly attempt to offer alternatives through their argument that CFSA failed to manage the RIF in accordance with D.C. regulations; Plaintiffs say a satisfactory alternative would have been to follow those regulations.  *See* Opp'n Mot. Summ. J. at 40.  Accordingly, Plaintiffs attack the authorization of the RIF by asserting that "[f]rom all indications, prior, during, and after the RIF, CFSA ignored the bulk of the steps required by law to manage a RIF." *Id.* (citing D.C. Mun. Regs. tit. 6, § 2406.3 (2012)).  It is not clear what these "indications" are supposed to be.  Plaintiffs note that one of the terminated employees brought a petition to review the RIF before the District of Columbia's Office of Employee Appeals ("OEA") and OEA determined that the RIF was not properly authorized.  *See* Pls.' Disputed SOF at 7.  But as this Court has observed in a prior opinion in this case, the Superior Court for the District of Columbia overturned the OEA's decision.  *Davis*, 246 F. Supp. 3d at 391–92.  The Superior Court found

"that OEA's decision was clearly erroneous as a matter of law because the Director of CFSA had the authority to order the RIF without mayoral approval." *D.C. Child & Family Servs. Agency v. D.C. Office of Emp. Appeals,* No. 2014CA001857PMPA, 2016 WL 9307934, at *2 (D.C. Super. Ct. Apr. 15, 2016). In other words, CFSA sought approval from the City Administrator that it did not need, because Director Gerald's approval was sufficient.[23] *Id.* Aside from that question of authorizing authority, the OEA Board decision found that "the RIF was conducted in accordance with the applicable law and regulations."[24] *Id.*

Plaintiffs also argue that CFSA failed to comply with a regulation providing that an agency may "take appropriate action, prior to planning a reduction in force, to minimize the adverse impact on employees or the agency." Opp'n Mot. Summ. J. at 41 (quoting D.C. Mun. Regs. tit. 6, § 2403.2 (2010)). But this is a criticism without a solution. After all, asking whether CFSA's implementation of the RIF minimized the adverse impact on employees or the Agency is essentially the whole issue in this case. *See Davis*, 925 F.3d at 1243 ("What is at issue here is not a RIF in the abstract . . . but the means by which the Agency implemented it."). Plaintiffs' "broad suggestion[]" that CFSA should have minimized the RIF's adverse impact is just begging the question. *See Johnson*, 770 F.3d at 477.

_____

[23] Although OEA Board's decision was seemingly predicated on the idea that CFSA did not receive approval from the City Administrator, the District now presents an exhibit showing that the City Administrator did grant such approval. *See* Def.'s Ex. P, ECF No. 200-4. Regardless, that is irrelevant considering Director Gerald's authorization. *See* Pls.' Ex. 2 at 18 (Director Gerald's signature approving the RIF).

[24] Plaintiffs also imply in a parenthetical that the RIF was administratively deficient because there were changes following the approval of the RIF that were not "made by issuance of an amendment to the administrative order." *See* D.C. Mun. Regs. tit. 6, § 2406.3 (2012); Opp'n Mot. Summ. J. at 40. This argument is undeveloped, and Plaintiffs neither explain what these changes were nor why they believe an amendment was required.

In their most specific charge that CFSA violated D.C.'s regulations, Plaintiffs argue that CFSA should have placed the released employees into the FSW position because D.C. regulations provide that "agencies may, in order to minimize the adverse impact of a reduction in force, offer a released employee a vacant position for which he or she qualifies."  D.C. Mun. Regs. tit. 6, § 2405.2 (2012).  Indeed, 17 employees who were terminated in the RIF *were* rehired as FSWs.  *See supra* at 10.  For the SWA position, which required a bachelor's degree, six SWAs were rehired as FSWs, one SWA who applied was not rehired, and the remainder did not apply.  Def.'s Ex. D at 9–10, 20.  And as this opinion has already discussed, CFSA could not have rehired every terminated employee as a FSW because (1) CFSA had to cut the overall number of personnel and (2) there was a gap between the skills and responsibilities of the SSA and FSW positions.  *See supra* at 32–34.  Plaintiffs thus do not show that CFSA's management of the RIF was inconsistent with a regulation that does little more than permissively provide that an agency may rehire terminated and qualified employees.  Even putting aside the regulation— and taking Plaintiffs' position as a proposal that CFSA should have rehired every SSA and SWA—Plaintiffs completely fail to meet their burden of demonstrating this approach would have been a "viable alternative" in the context of CFSA's personnel cuts and organizational restructuring.  *See Chicago Teachers Union II*, 14 F.4th at 657.

Other than these unsuccessful attempts to identify alternatives based on the RIF's supposed inconsistency with District regulations, Plaintiffs offer no other proposed alternative. Plaintiffs flatly assert that CFSA "could have merely carried out the RIF in a manner that was cognizant of the potential for disparate impact and act to avoid such impact rather than impose a subjective, discriminatory employment process."  Opp'n Mot. Summ. J. at 41.  The word

"merely" does all the work in that sentence: Plaintiffs have not identified any specific and viable alternative to terminating the SSA and SWAs.

At most, Plaintiffs suggest the District could have considered "furloughs, job sharing, pay cuts, or benefit decreases." *Id.* at 36. These options "could have possibly addressed spending pressures and the need for improved efficiency without eliminating front-line workers." *Id.* Here, Plaintiffs' proposed alternatives resemble those that were rejected in *Chicago Teachers Union II*:

> As described above, CTU also claims that in addition to transferring employees to other open positions, the Board could have (1) conducted an adverse impact analysis before moving forward with layoffs; (2) relied on factors other than enrollment to select employees for layoff; and (3) relied on "other sources" of funding or revenue to avoid layoffs altogether. But for each proposed alternative, CTU falls far short of providing the sort of detail necessary to meet its burden of establishing an alternative to the Board's system: it fails to spell out what factors other than enrollment should have been used; fails to explain precisely how the Board could have accessed "other sources" of funding or how that funding would have allowed it to keep teaching positions open in schools with declining enrollments; and fails to identify how conducting an adverse impact study would obviate the need to base layoffs on declining enrollment. Thus, the district court correctly concluded that CTU did not carry its burden of establishing an equally valid, less discriminatory alternative the Board could have used in lieu of layoffs based on enrollment numbers.

*Chicago Teachers Union II*, 14 F.4th at 657. Just as in that case, Plaintiffs fall far short of providing the detail necessary to explain why any of their proposed, less discriminatory alternatives—whether individually or together—would have been an equally valid or less discriminatory alternative to eliminating the SSA and SWA positions. All they can say is that they "possibly" would have addressed CFSA's budgetary and organizational issues. Opp'n Mot. Summ. J. at 36.

Ultimately, Plaintiffs are "obligated to prove equally effective alternatives and—although they offer alternatives to a RIF in general—they offer no alternative" to eliminating the SSAs and SSWs. *Shollenbarger*, 297 F. App'x at 487. And crucially, this failure to identify any

specific alternative practice or practices also means that Plaintiffs cannot even begin to present "evidence or statistics showing that these alternative practices would have reduced the disparate impact" of the RIF on African Americans.[25] *Williams*, 901 F.3d at 1041–42 (rejecting proposed alternative policy because plaintiffs' statistics did not support proposition that their alternative would reduce disparate impact). This stage of the inquiry requires Plaintiffs to do more than ponder courses of action: "without meaningful evidentiary support for their contention[s]," their argument fails. *Id.* at 1041. Because Plaintiffs have failed to adduce evidence sufficient to carry their burden of showing a viable alternative, the Court will grant summary judgment for the District on Plaintiffs' SSA and SWA disparate impact claims.

### C. CFSA Has Also Proven Business Necessity of the Process for Eliminating the Other Positions

As described by the D.C. Circuit, the other challenged employment practice is CFSA's decision to "allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units." *Davis*, 925 F.3d at 1250. The parties spend most of their briefing on the elimination of the SSA and SWA positions, and devote much less attention to the process by which CFSA identified the other positions to be included in the RIF. Still, a large part of the Court's analysis, such as Plaintiffs' lack of alternatives, also applies here. As explained below, the Court finds that the District has also adequately established business necessity for this decisionmaking process.

The District explains that: "[t]he determination as to which agency positions would be included in the RIF was the result of multiple individual decisions made by the Director of CFSA working in close consultation with . . . Deputy Directors in charge of CFSA's various divisions,

---

[25] Plaintiffs have failed to provide any statistical evidence for any of their alternatives, for that matter.

and other senior level managers in the Agency's executive team."  Def.'s SOF ¶ 25.  Outside of

the terminations in Agency Programs, which this Court has extensively reviewed, the District

says CFSA also adopted new models in the Office of Community Services and Office of Clinical

Practice.  *Id.* ¶¶ 42–43, 63.  CFSA shifted its management of the performance of agency

contractors, allowing CFSA to eliminate or reclassify 19 positions within the Office of

Community Services' Congregate Care and Home Study Contract Monitoring Division.  *Id.*  And

as explained above, CFSA began pairing Nurse Care Managers with Social Workers within the

Office of Clinical Programs, thereby eliminating 8 positions.  *Id.* ¶¶ 31–32, 47.  Along with the

SSAs and SWAs, these cuts accounted for almost 80% of the employees subject to the RIF.  *Id.*

¶¶ 47, 62.  As far as the Court can discern, Plaintiffs do not make any argument that these model-

shifting cuts outside of Agency Programs were improper.

 As for the personnel cuts that fell outside of these restructuring moves, the Director and

the managers below him identified these employees "by reviewing its programs and determining

which positions could be eliminated with the least negative impact on the Agency's ability to

perform its statutory and court-ordered functions, and by using seniority to cut positions in

specified areas and levels."  Mot. Summ. J. at 16 (citing Def.'s SOF ¶¶ 45–49).  Once a position

was identified for cuts, "the reduction in these positions were based upon seniority within a

particular competitive area and level, in accordance with District personnel regulations."  *Id.* at

9; *see* Def.'s SOF ¶ 48.  19 out of the 115 employees terminated in the RIF were chosen in this

fashion.  Def.'s SOF ¶¶ 47–49.

 The Court steps back to view the bigger picture.  These remaining discretionary cuts were

a small fraction of the overall RIF, and in this litigation, are clearly secondary to Plaintiffs'

claims regarding elimination of the SSAs and SWAs.  The Court has previously analyzed the

statistical evidence with reference to all positions terminated in the RIF, but noted that:

> At this stage, the agency-wide statistics offered by Dr. Munro speak to the process identified by the D.C. Circuit.  However, a more sophisticated and distinct analysis may be required at the next stage of the litigation, where the District will be permitted to present evidence of the business justifications for selecting the SWA and SSA positions for elimination, as well as other eliminated positions, and more fully explain how positions were selected in light of the agency's obligations under *LaShawn v. Bowser* and District retention policies.

*Davis*, 496 F. Supp. 3d at 315 n.12.

The Court has now reviewed the District's explanation for how positions were selected

for termination.  In light of how the RIF was conducted—where the SWA and SSA positions

were eliminated pursuant to a centralized restructuring decision, several other positions in other

Agency offices were also eliminated the same way, and where a smaller chunk of positions were

terminated based largely on decisionmaking by managers—the Court no longer believes

"agency-wide" statistics are the best way to assess the RIF.  That is especially true now that the

Court has granted judgment to the District on Plaintiffs' SSA and SWA claim: it would be more

appropriate for the experts, Dr. Munro and Dr. Bronars, to look at the statistics in a way that

focuses solely on the positions and employees that were terminated subject to the individualized

decisionmaking process.  Upon such re-examination, it is possible that Plaintiffs may no longer

be able to establish the prima facie case for this claim.  Regardless, the Court sees no need to

delve deep into the statistics, because the District has also presented a sufficient business

justification for its individualized decisionmaking process.

CFSA's focus on minimizing negative impact during a time of tight budget constraints,

while using seniority as a guardrail for the ultimate terminations, *see* Def.'s SOF ¶¶ 45–49, is

sensibly connected to the Agency's legitimate business needs.  It was also reasonable for CFSA

to allow input from individual managers in these personnel decisions, as they would have been

closest to their departments and thus would have held the best knowledge of how to minimize impact on the Agency's project of serving the public.  Further, because Dr. Gerald also played a role in these decisions, his judgment served as an equalizing check on the manager's determinations.  *See id.* ¶ 25.

The point is perhaps best illustrated by showing why Plaintiffs' caselaw is inapplicable in this context.  Plaintiffs heavily rely on *Delgado v. Ashcroft*, No. 99-cv-2311, 2003 WL 24051558 (D.D.C. May 29, 2003).  In *Delgado*, employees challenged the FBI's decision-making process for selecting special agents, and the court agreed that the process was overly subjective.  *Delgado*, 2003 WL 24051558, at *7.  As a result of inconsistency among employees about the standards to use when choosing special agents, the court found that the FBI had not established business necessity for its process.  *Id.* at *10–11.  But this is not a case about hiring, nor is it a case about choosing which individuals should be terminated.  As the District has explained, and Plaintiffs have not contested, CFSA looked at which *positions* could be eliminated, and then used the District's personnel rules and seniority requirements to determine which specific individuals holding those positions would be affected by the RIF.  *See* Def.'s SOF ¶¶ 45–49.  In that sense, this scheme was akin to the RIF in *Chicago Teachers Union I*, where a set number of positions were terminated while the particular employees losing their roles was partially determined by seniority rules.  *See Chicago Teachers Union I*, 419 F. Supp. 3d. at 1044, 1054.

Plaintiffs also repeatedly argue that CFSA "did not validate or attempt to validate the process by which they carried out the RIF," Opp'n Mot. Summ. J. at 38, but it is unclear to the Court how an employer is supposed to "validate" its approach to eliminating specific positions from its workforce during a RIF.  "'Validation' is the process of determining whether a selection device is sufficiently job-related to comply with the requirements of Title VII."  *Birmingham*

*Fire Fighters Ass'n 117 v. Jefferson Cnty.*, 290 F.3d 1250, 1252 n.1 (11th Cir. 2002).  "In simple terms, a selection practice is valid if it materially enhances the employer's ability to pick individuals who are more likely to perform better than those not picked."  *Lopez v. City of Lawrence*, 823 F.3d 102, 111 (1st Cir. 2016); *see also Watson*, 487 U.S. at 991 ("Standardized tests and criteria . . . can often be justified through formal 'validation studies,' which seek to determine whether discrete selection criteria predict actual on-the-job performance."). Accordingly, "validation" often applies to standardized tests, but can also describe an overall selection process for employment.  *See Delgado*, 2003 WL 24051558 at *1 ("The process of selecting special agents of the Federal Bureau of Investigation is a highly structured one that, up to a point, has been carefully validated by experts in industrial organizational psychology.").

But either way, Plaintiffs do not themselves explain, nor do they cite to case law or expert testimony explaining, how this concept could be applicable here or how CFSA could have "validated" a process about what positions were less critical and could be eliminated in the context of budget cuts across an agency.  The Court is therefore unconvinced by Plaintiffs' attempts to rebut the intuitive idea that an agency confronting personnel cuts should look to managers to recommend what roles should be cut while causing the least impact to their department's functions.  Thus, the Court finds that CFSA has established a business necessity for allowing managers to provide individualized input into the positions subject to the RIF.

Once more, the burden then shifts to the Plaintiffs, who do not introduce any alternative process that CFSA should have followed instead of this manager-input approach.  As discussed above, Plaintiffs' arguments about District regulations and Plaintiffs' assorted speculation about furloughs, job sharing, and benefit cuts are not concrete alternatives that could meet their burden here.  *See supra* at 37–41.  Nor do they address the question of how CFSA should have chosen

which personnel to terminate.  Therefore, while Plaintiffs must do more than provide "mere speculation," *Allen*, 351 F.3d at 315, they have not even offered that.[26]  The Court imagines that Plaintiffs would have perhaps preferred some type of purely objective criteria for eliminating personnel—but Plaintiffs do not say what that would be, how it would have served CFSA's business needs, or how it would have reduced the purported disparate impact.  Accordingly, the Court will grant summary judgment for the District on Plaintiffs' remaining claim.

## V.  CONCLUSION

For the foregoing reasons, the District's motion for summary judgment, ECF No. 197, is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 23, 2024                                        RUDOLPH CONTRERAS
                                                                 United States District Judge

---

[26] The Court notes again that ideally, a plaintiff would present an alternative that is supported with statistical evidence showing how it would address disparate impact while still meeting the employer's goals.  *Williams*, 901 F.3d at 1041.